UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 17-CV-21537-FAM

KARL M. BROBERG, Individually,
and As Administrator of the Estate of
SAMANTHA JOYCE BROBERG,

    Plaintiff,
vs.

CARNIVAL CORPORATION, d/b/a
CARNIVAL CRUISE LINES,

    Defendant.
_____/

## PLAINTIFF'S *DAUBERT* MOTION TO STRIKE CARNIVAL'S EXPERTS TRENDOWSKI AND PADRON

Plaintiff, KARL M. BROBERG, Individually, and as Administrator of the Estate of SAMANTHA JOYCE BROBERG, files this *Daubert* motion to strike certain of the opinions of CARNIVAL'S Expert, Elizabeth Trendowski, and to strike Oscar Padron for failure to provide an expert report pursuant to Fed.R.Civ.P. 26, and states in support thereof:

### Introduction

There is an old saying that everyone is entitled to their own opinion, but not their own facts. The standards established for expert opinion testimony by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) are significantly more exacting. The "findings" set forth in CARNIVAL's retained Dram Shop expert, Elizabeth Trendowski's report, by which she presumably means "opinions," are based upon only a partial view of the facts in this case and are completely unsupported by any articulated or accepted methodology.

We will first describe Ms. Trendowski's "expert report," and then compare and contrast it with the appropriately supported expert reports of Plaintiff's toxicology expert, Michael J. Whitekus, Ph.D., (Exhibit "A") and Dram Shop expert, John A. Cocklin. (Exhibit "B").

## The Evidence Concerning the Number of Drinks Which CARNIVAL Served to Samantha Broberg

Attached as Table 1 to Exhibit "A", and listed immediately below, is a chronological list of drinks served to Samantha Broberg prior to her falling overboard.

Table 1. Chronological List of Drinks Served to Broberg Prior to the Fall Incident

| Drinks Served | Date/Time | Location | Verified by:[d,e,f,g,h] |
|---|---|---|---|
| #1 Tito's vodka (double) | May 12 at 1:06 pm | Red Rum Frog Bar | S &S Statement, Receipt, Churman, Brady |
| #2 Tito's vodka (double) | May 12 at 4:33 pm | Promenade Bar | S &S Statement, Churman, Brady |
| #3 Tito's vodka (double) | May 12 at 5:33 pm | Promenade Bar | Receipt, S &S Statement, Churman, Brady |
| #4 Tito's vodka (double) | May 12 at 6:32 pm | Red Rum Frog Bar | Receipt, S &S Statement |
| #5 Tito's vodka (double) | May 12 at 7:58 pm | Promenade Bar | Receipt, S &S Statement |
| #6 Blue Liquor Special (Grey Goose & Curacao blue) | May 12 at dinner (~8:30 pm) | Dining Room | Churman, Brady |
| #7 Shot | May 12 at ~9:45 pm | Casino Room | Churman, Brady |
| #8 Tito's vodka (double); #9 Miller Lite (16 oz) | May 12 at 11:40 pm | Promenade Bar | Receipt, S &S Statement |
| #10 Tito's Vodka (double); #11 Corona (12 oz) | May 13 at 12:51 am | Promenade Bar | Receipt, S &S Statement |
| #12 Beer bought by man (12 oz) | May 13 at ~1:20 am | Promenade Bar | Tammy Ramirez |
| Time of Fall incident | May 13 at 1:57 am | Deck 10 | Report of Marine Accident, FLIR video |

Several things need to be noted about the Table. First, it is comprised of all of the evidence in the case, not just the drinks that were officially charged to Samantha Broberg's Sail and Sign account. Second, the Court will note that 7 of the drinks were *double shots* of Tito's Vodka, meaning that they were the equivalent of 14 individual drinks. In addition to those 14

2

individual drinks of Tito's Vodka, CARNIVAL served Samantha (as corroborated by her surviving dinner companions) a Blue Liquor Special, consisting of Grey Goose Vodka and Curacao Blue (liqueur) at dinner at approximately 8:30 p.m.  For unknown reasons, neither Ms. Broberg nor her companions, were charged for this drink on their Sail and Sign accounts.  In addition, also corroborated by her surviving travelling companions, the three women were each given a shot of alcohol in the casino after one of them hit a jackpot while playing the slots.  Finally, Tammy Ramirez, an independent witness, testified that she saw CARNIVAL serve Samantha Broberg a beer, purchased by a male passenger, at approximately 1:20 a.m.  Thus, there is record evidence that CARNIVAL served Samantha Broberg, who is 5'5" and weighed 120 pounds, a total of 19 drinks within a 12-hour period.  *Nineteen!*

Table 2 of the Defendant's expert toxicologist, Dr. Whitekus report, shown immediately below, tracks Samantha Broberg's blood alcohol content and stage of alcoholic influence in accordance with scientific and in industry standards.  It is important to note that the BAC% column reflects Mrs. Broberg's BAC <u>before</u> she was served the drink(s) in question.  See Exhibit "A" footnote n.  Thus, her BAC was 0.00 before the first drink, and 0.132 before the 8th serving (13th drink) at 11:40 p.m.

Dr. Whitekus has been approved to present expert testimony concerning BAC evidence. *See, e.g., Knecht v. Balanescu*, 2017 WL 4883198 at *12 (M.D. Pa. 2017).

Table 2. Broberg's BAC and Stage of Alcoholic Influence at Each Drink Served

| Drinks Served | Alcohol Consumed (g) | BAC% | Stage of Alcoholic Influence[l] |
|---|---|---|---|
| #1- Tito's vodka (double)[m] | 18.7 | 0.000[n] | Not applicable |
| #2- Tito's vodka (double) | 18.7 | 0.000[n] | Not applicable |
| #3- Tito's vodka (double) | 18.7 | 0.024[n] | Subclinical |
| #4- Tito's vodka (double) | 18.7 | 0.058[n] | Euphoria |
| #5 Tito's vodka (double) | 18.7 | 0.084[n] | Euphoria |
| #6 Blue Liquor Special[o] | 12.8 | 0.106[n] | Excitement |
| #7 Shot (1 oz) | 9.3 | 0.145[n] | Excitement |
| #8 Tito's vodka (double); #9 Miller Lite (16 oz) | 34.4 | 0.132[n] | Excitement |
| #10 Tito's Vodka (double); #11 Corona (12 oz) | 31.6 | 0.206[n] | Confusion |
| #12 Beer (12 oz) | 12.9 | 0.250[n] | Stupor |
| Time of Fall incident | Not applicable | 0.295[p] | Stupor |

**Elizabeth Trendowski's Report**

Page 1 of Elizabeth Trendowski's report, dated January 15, 2018, is a cover letter to defense counsel. (Exhibit "C" p. 1). Although Ms. Trendowski claims in her cover letter that "my analysis includes whether Carnival's responsible alcohol service training was applied as regard to Ms. Samantha Broberg on May 12, 2016 through May 13, 2016," her actual report does no such thing. Indeed, her findings are limited to the following which we quote verbatim:

1.  The *Liberty* Beverage staff on Carnival Cruise Lines participated in an in-house, responsible alcohol server program that met or exceeded industry standards.

2.  Carnival Cruise beverage training employed several different modules to teach and emphasize safe service of alcohol information to all beverage staff.

3.  Carnival Cruise Modules 4, 5, and 7 contain Carnival Cruise Lines' in-house safe alcohol service continuation policy of their responsible server training. This is an industry best practice and meets or exceeds industry standard of care.

    4.      There was no blood alcohol concentration from Ms. Broberg due to Ms. Broberg not being found.

(*Id.* at 7).[1]

As the Court can readily see, none of Ms. Trendowski's findings actually state whether CARNIVAL's responsible alcohol service training was properly applied to Samantha Broberg. The closest that Ms. Trendowski comes to rendering such an opinion is the last sentence on page 6 where she states that Assistant Chief Security Officer Sanjay Kumar "interviewed Marilyn Mazon, the bartender from the casino bar, and she stated that Ms. Broberg did not look intoxicated, so she was not cut off from alcohol." (*Id.* at 6). Notwithstanding the double hearsay (as opposed to double Tito's) contained within that statement, that statement is not an opinion that CARNIVAL complied with its responsible alcohol server program with respect to Samantha Broberg.

First and foremost, the double hearsay from bartender Marilyn Mazon is irrelevant since Ms. Mazon served Samantha Broberg at 11:40 p.m., and was obviously making her decision based on how Mrs. Broberg appeared to her *prior* to being served the double shot of Tito's Vodka and 16 oz. Miller Light (three drinks) which bartender Mazon served to Samantha Broberg at 11:40 p.m. Attached hereto are the actual bar receipts and the Sail & Sign Statement from the CARNIVAL *Liberty*. (Composite Exhibit "D"). The bar receipts demonstrate that, in addition to being served those three drinks at.11:40 p.m., CARNIVAL also served Samantha Broberg another double shot of Tito's and a 12 oz. Corona beer (3 more drinks) a little over an

---

[1] Pursuant to Rule 26(a)(2)(B)(i), the complete statement of all opinions and the basis and reasons for them must be contained in the expert's report. *Beauregard v. Cont'l Tire N. Am.,Inc.*, 2009 WL 1011121, at *3 (M.D. Fla. Apr. 15, 2009) (Whereas at the deposition Defendant may have elicited information, lacking in the Report, pertaining to the specific grounds underlying the expert's additional opinions, this does not excuse the omission from either that document or the original disclosure). Thus, Ms. Trendowski cannot supplement her opinions at trial.

hour later at 12:51 a.m. by a different bartender, Anali Sanchez Vasquez. There is no testimony from that bartender about Samantha Broberg's condition before she was served those three drinks, and Ms. Trendowski's report does not address that bartender and the service of those drinks to Mrs. Broberg whatsoever. Nor does Ms. Trendowski address CARNIVAL's service of a final beer to Mrs. Broberg. Thus, Mrs. Broberg had seven additional drinks after bartender Mazon allegedly declared her not to appear intoxicated.

Ironically, at 1:20 a.m. only 40 minutes before her fall overboard, Mrs. Broberg was photographed at the Promenade Bar by Tammy Ramirez, another *Liberty* passenger. This photograph tragically mirrors the photograph used by Carnival to demonstrate to bar personnel the effect of over-service of alcohol, (Exhibit "E" and "F") as depicted below:




Carnival Responsible Service of Alcohol Manual        (Photo 2 Ramirez Affidavit Exhibit "F")
    CCL 18943-323 of Exhibit "E"

Hence, Trendowski's reference to the 11:40 p.m. statement of bartender Mazon that "Ms. Broberg did not look intoxicated," is an isolated, out of context reference, made over two hours prior to Mrs. Broberg's fall overboard at 1:57 a.m. and demonstrates the lack of scientific methodology used by the defense expert to support her findings.

### I. *Daubert* Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial court must serve as a "gatekeeper" of expert testimony to ensure "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The Court identified five factors to consider when deciding this threshold issue: (1) whether the theory or technique used by the expert has been or can be tested; (2) whether the theory or technique has been published or subjected to peer review; (3) the known or potential rate of error of the technique used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted within the relevant scientific, technical, or otherwise specialized community. *Id.* at 593-94. These factors are not mandatory or exclusive, and case law provides additional factors to be considered, such as: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009).

The Eleventh Circuit has established a three-part test to determine admissibility of expert testimony under *Daubert*, each element of which must be met: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005)). "Even if a witness is qualified as

an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny." *Id.* at 1362.

The Eleventh Circuit refers to these requirements as the "qualifications", "reliability" and "helpfulness" prongs. *R & R Int'l v. Manzen, LLC,* No. 09-60545-CIV, 2010 WL 3605234, *6 (S.D. Fla. Sept. 12, 2010) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). In analyzing an expert's testimony, it is the court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). One of the express requirements of Rule 702, Federal Rules of Evidence, is that the expert's opinion be based on sufficient facts or data. "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In addition, the Court's role as "gatekeeper" requires that "the district court must 'ensure that speculative, unreliable expert testimony does not reach the jury.'" *R & R Int'l*, 2010 WL *7 (additional citations omitted).

The Plaintiff does not challenge Ms. Trendowski's qualifications, so far as they go. In other words, Ms. Trendowski is qualified to render an opinion that CARNIVAL's policies are acceptable. But that opinion is irrelevant. Thus, the Plaintiff challenges the reliability and helpfulness of her "findings."

### **Ms. Trendowski's "Findings" Are Not Reliable as She Has Not Employed The Same Level of Intellectual Rigor that Would Characterize the Practice of an Expert in the Relevant Field**

The party offering the expert testimony (here CARNIVAL) bears the burden to lay the proper foundation for the expert opinion to be admissible, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Furthermore, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. There must be a "scientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F.Supp.2d 1365, 1371 (S.D. Fla. 2005).

Because this is a case about CARNIVAL's over service of alcohol to Samantha Broberg, her blood alcohol concentration (BAC) at various points up to and culminating in her going overboard is crucial information. Ms. Trendowski, who has no training as a toxicologist, simply observes that "there was no blood alcohol concentration from Ms. Broberg due to Ms. Broberg not being found." (Exhibit "C" p. 7). Needless to say, this "finding" does not demonstrate a high degree of intellectual rigor. In fact, it demonstrates no intellectual rigor whatsoever.

For obvious reasons CARNIVAL has elected not to retain a toxicologist. CARNIVAL does not want to know Samantha Broberg's blood alcohol content, because that information can only hurt CARNIVAL. Instead, CARNIVAL has merely presented Ms. Trendowski as an expert to opine on whether CARNIVAL's *written* policies are sufficient, not whether they were actually followed in this case. As we will discuss in more detail in the "helpfulness" section, *infra*, that issue is irrelevant.

Looking to the *Daubert* factors as to whether an expert's testimony is admissible, there is a theory or technique by which blood alcohol content can be calculated, even without recovery of Mrs. Broberg's body. That theory and technique have been utilized by Plaintiff's retained toxicology expert, Michael J. Whitekus, Ph.D. (See Exhibit "A"). Ms. Trendowski does not, and, because she is not a toxicologist, cannot, employ the same acceptable methodology. Therefore, her testimony is inherently unreliable and misleading. Without a calculation of Mrs. Broberg's likely blood alcohol content, and the effect of that upon her behavior, Ms. Trendowski is relegated to little more than an advocate for what CARNIVAL's policies required CARNIVAL to do, not what CARNIVAL actually did. She is nothing more than a conduit for hearsay. It is well established that acting simply as a narrator of the facts does not convey opinions based an expert's knowledge and expertise, nor is such a narration traceable to a reliable methodology. *Luitpold Pharms., Inc. v. Ed Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662 at *3 (S.D. N.Y. 2015); *Matthews v. Hewlett-Packard Co.*, 2017 WL 6804075 at *4 (S.D. N.Y. 2017); *Estate of Puppolo v. Welch*, 2017 WL 4042342 at *16 (D. Vt. 2017) (holding that *Daubert* precludes opinions which are merely a conduit for the opinions or testimony of plaintiff and her counsel); *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685 at *2 (S.D. Ind. 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded."). As such, her testimony is not helpful.

Because Ms. Trendowski did not even consider the last seven drinks served by CARNIVAL to Samantha Broberg -- three at 11:40 p.m., three more at 12:51 a.m., and the seventh served to her at 1:20 a.m., which was paid for by a male passenger -- her opinion lacks any reliability whatsoever. It is proper for courts to exclude opinions based on incorrect facts because they are not helpful to the trier of fact. *See Boca Raton Cmty. Hosp., Inc. v. Tenet*

*Healthcare Corp.*, 582 F.3d 1227, 1232-34 (11th Cir. 2009); *Lewis v. New Prime, Inc.*, 2013 WL 6097568 at *3 (N.D. Ga. 2013) (excluding expert opinion based on average speed where pertinent inquiry was speed at time of the accident, not average speed). *See also, Companhia Energetica Portiguar v. Caterpillar, Inc.*, 2016 WL 7507848 at *12 (S.D. Fla. 2016).

### Ms. Trendowski's "Findings" Are Not Helpful to the Jury Because They Do Not Address the Only Salient Issue

In the final analysis, Ms. Trendowski's "findings" are nothing more than impermissible and irrelevant *ipse dixit*. *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The helpfulness, or relevancy, prong of the *Daubert* inquiry requires this Court to ensure that the expert's testimony "is relevant to the task at hand." *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). *See also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Here, the fact that CARNIVAL has, on paper, a proper (or even exemplary) training procedure for its bartenders is irrelevant. The Plaintiff is not suing CARNIVAL for having insufficient policies. Rather, the Plaintiff is suing CARNIVAL for violating the applicable standard of care by overserving Samantha Broberg alcohol.

In fact, the Plaintiff is suing CARNIVAL precisely because CARNIVAL did not follow its reasonable policies:

> 51. Carnival did not make any meaningful steps to follow or enforce its reasonable alcohol policy, since it would have resulted in less profit for Carnival.
>
> 52. Carnival violated its own service of alcohol policies for handling highly intoxicated individuals, when it did not monitor Decedent after her last drink and when she exited Promenade Bar in visibly and highly intoxicated state.

[DE 1, p. 9].

Thus, the first three "findings" contained on page 7 of Ms. Trendowski's report are irrelevant to any issue in dispute. That leaves only the fourth "finding," i.e., that "there is no blood alcohol concentration from Ms. Broberg due to Ms. Broberg not being found." As we noted above, that "finding" is nothing more than a statement of the obvious fact that no actual blood was taken from Mrs. Broberg due to her body not being found. But the statement is incredibly misleading, because there is a scientifically viable method for assessing Mrs. Broberg's likely blood alcohol content, given her height and weight, and the amount of alcohol she was served over a specific period of time. Thus, Ms. Trendowski's fourth "finding" is not helpful or relevant, and is in fact misleading, such that it should be precluded by Federal Rule of Evidence 403.

Stripped down to its essentials, Ms. Trendowski's opinion is nothing more than CARNIVAL's counsel would argue to the jury, i.e., that CARNIVAL did not stop serving Mrs. Broberg alcohol because she did not appear to *one* of CARNIVAL's bartenders to be sufficiently intoxicated. It is well settled that where an expert's proposed testimony does nothing more than parrot what the parties' counsel would argue to the jury, it fails to meet the *Daubert* standard. *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004). As the Eleventh Circuit noted in *Seamon v. Remington Arms Company, LLC*, 813 F.3d 983, 987 (11th Cir. 2016), "the basic standard of relevance . . . is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no fit." Simply put, "the trial Court's gatekeeping function requires more than simply taking the expert's word for it." *U.S. v. Masferrer*, 367 F.Supp.2d 1365, 1372 (S.D. Fla. 2005).

In the final analysis, Ms. Trendowski's opinion is merely conclusory. *See Finestone v. Florida Power & Light Co.*, 2006 WL 267330, at *11 (S.D. Fla. 2006) (excluding expert

testimony where report is "rife with conclusory statements that are supported by attached documentation."), *affirmed*, *Finestone v. Florida Power & Light Co.*, 272 Fed.Appx. 761 (11th Cir. 2008).

This is not the first time that Ms. Trendowski has been challenged. In *Bade v. Picone*, 2016 WL 81803 (Pa. Supp. Ct. 2016), the Superior Court of Pennsylvania, applying Pennsylvania Rule 702, which tracks Federal Rule of Evidence 702, and therefore *Daubert*, struck Ms. Trendoswki's opinion as to the source of a particular bottle of alcohol involved in a liquor liability action. The Court found that "the question of whether the bottle of Absolut came from La Dolce Casa is a straightforward question of fact for which expert testimony is unnecessary." *Id*. at *7. Likewise, here, assuming that CARNIVAL can introduce the double hearsay testimony of the penultimate bartender, whether or not that particular bartender thought Mrs. Broberg was intoxicated prior to serving her the three drinks she ordered at 11:40 p.m., is a question for the finder of fact, and CARNIVAL should not be allowed to buttress that double hearsay with an expert's adoption of it.

### Oscar Padron

CARNIVAL has listed Oscar Padron, C.P.A., presumably as a damages expert. However, CARNIVAL did not disclose any expert report for Mr. Padron, in violation of Fed.R.Civ.P. 26. Thus, Mr. Padron must be stricken as a sanction. Fed.R.Civ.P. 37. Moreover, Defendant never actually served an "Expert Disclosure" as required by Fed.R.Civ.P. 26(2)(a). Instead, defense counsel served an email with documents attached. A full copy of said email and attachments is attached hereto as Composite Exhibit "G."

Fed. R. Civ. P. 37(c)(1) provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Here, there has been no justification whatsoever given for the failure to provide the mandatory expert witness disclosure report for Oscar Padron. The trial in this matter is less than three months hence, and dispositive motions and *Daubert* motions have now been filed. Accordingly, Mr. Padron should be stricken as a witness.

The burden of establishing that a failure to disclose is substantially justified or harmless rests on the non-disclosing party, here CARNIVAL. *Mitchell v. Ford Motor Company*, 318 Fed.Appx. 821, 824 (11th Cir. 2009).

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)

Pursuant to Local Rule 7.1(a)(3), the undersigned counsel certifies that he has contacted Defendant's counsel, Cameron Eubanks, and Plaintiff and Defendant are unable to agree.

Respectfully submitted,

**ROBERT L. GARDANA, P.A.**
*Counsel for Plaintiff*
12350 SW 132 Court, Suite 204
Miami, FL 33186
Tel: (305) 358-0000
Fax: (305) 358-1680
Email: Robert@gardanalaw.com
      Staff@gardanalaw.com

By: */s/ Robert L. Gardana*
    Robert L. Gardana, Esq.
    Florida Bar No. 279668

**PHILIP D. PARRISH, P.A.**
*Co-counsel for Plaintiff*
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Telephone: (305) 670-5550
Facsimile: (305) 670-5552
Email: phil@parrishappeals.com
      betty@parrishappeals.com

By: */s/ Philip D. Parrish*
    Philip D. Parrish, Esq.
    Florida Bar No. 0541877

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 2, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, or pro se parties, identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    By:    */s/ **Philip D. Parrish***
           Philip D. Parrish (541877)

## ATTORNEY SERVICE LIST

**KARL M. BROBERG, et. al. vs. CARNIVAL**
**CASE NO: 17-CV-21537-FAM**

| | |
|---|---|
| Robert L. Gardana, Esq.<br>ROBERT L. GARDANA, P.A.<br>Attorney for Plaintiff<br>12350 SW 132 Court, Suite 204<br>Miami, FL 33186<br>Tel: (305) 358-0000<br>Fax: (305) 358-1680<br>Email: Robert@gardanalaw.com<br>       staff@gardanalaw.com | Philip D. Parrish, Esq.<br>PHILIP D. PARRISH, P.A.<br>Co-counsel for Plaintiff<br>7301 SW 57th Court, Suite 430<br>Miami, Florida 33143<br>Telephone: (305) 670-5550<br>Facsimile: (305) 670- 5552<br>Email: phil@parrishappeals.com<br>       betty@parrishappeals.com |

CURTIS J. MASE, ESQ
cmase@maselaw.com
kfehr@maselaw.com
SCOTT P. MEBANE, ESQ
smebane@maselaw.com
ctoth@maselaw.com
CAMERON EUBANKS, ESQ.
ceubanks@maselaw.com
rcoackley@maselaw.com
filing@maselaw.com
MASE TINELLI MEBANE & BRIGGS P.A.
*Attorneys for Defendant*
2601 South Bayshore Drive, Suite 800
Miami, Florida 33133
Telephone: (305) 377-3770
Facsimile: (305) 377-0080