UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.:  17-CV-21537-FAM

KARL M. BROBERG, Individually,
and As Administrator of the Estate of
SAMANTHA JOYCE BROBERG,

      Plaintiff,

vs.

CARNIVAL CORPORATION,
d/b/a CARNIVAL CRUISE
LINES,

      Defendant.

_____/

## PLAINTIFF'S DISCLOSURE OF EXPERT WITNESSES

Plaintiff, KARL M. BROBERG, Individually and as Administrator of the Estate of

SAMANTHA JOYCE BROBERG, through undersigned counsel, pursuant to Fed. R. Civ. P.

26(a) (2) and  (b), Scheduling Order Granting Motion to Continue and Order Continuing Trial

and Pretrial Deadlines, [DE 27] Order Revising Pretrial Deadlines [DE 32] and stipulation

between the parties to mutually exchange expert witness disclosures on January 17, 2018, serves

her expert witness disclosure, as follows:

## RETAINED EXPERTS

1.     Joellen Gill, M.S., CHFP, CLST        Human Factors Engineer
        Applied Cognitive Sciences          Safety and Risk Management Expert
        10501 S Lambs Lane
        Mica, WA 99023

Summary of Opinions/ Expected Testimony:

Joellen Gill is a Human Factors Engineering Consultant and the President of Applied Cognitive

Sciences. Ms. Gill has a B.S. in Human Factors Engineering, an M.S. in Environmental

Engineering and more than 35 years of experience in Human Factors Engineering, with an emphasis on safety and risk management. She has conducted theoretical work in the area of safety including warning design and effectiveness, as well as provided consulting services to private industry and businesses in the field of safety and risk management. She is board certified in Human Factors, a Certified Safety Professional, and a licensed Tribometrist (i.e. one that measures the slip resistance of walking surfaces). She is a graduate of the Colorado School of Mines with a Masters in Environmental Science and Engineering, and a B.S. in Human Factors Engineering. She has worked as a research associate, human factors engineering associate, and senior engineer on several hundred legal cases, for both the plaintiff and defense, nationwide.

Ms. Gill's professional experience includes:

*Senior Principal Engineer for EG&G (1990-1992):*   Responsible for the development and implementation of plant wide systems in accordance with Department of Energy Orders and Best Industry Practice.  This included programs for Root Cause Analysis (i.e. so as to determine the underlying causes of accidents and near misses so that corrective action could be implemented), Lessons Learned, Occurrence Reporting, and Document Control.

*Principal Engineer for Rockwell International (1983-1990):*   This position required a Department of Energy Q Clearance. Ms. Gill was responsible for the development of new weapons programs and served as the principal contact on technical matters with customers. Responsibilities included task analyses for unique processes in order to identify and mitigate safety and risk management issues.

*Human Factors Engineer for Martin Marietta Aerospace (1979-1983):*   This position required a Secret Security Clearance. She was responsible for the Human Factors Engineering on the MX Missile System, including safety and risk management issues. In this position she conducted analyses in all phases of the design, development, and manufacturing cycles of the MX Missile to ensure the Instrumentation and Flight Safety System was operable and maintainable by the 5th through 95th percentile Air Force technician. In addition, she developed detailed procedures for system operation and maintenance.

Ms. Gill's educational experience includes graduating *summa cum laude* from each university from which she graduated, and her professional affiliations include Member of Human Factors and Ergonomics Society, Member of American Society for Testing and Materials, Member of Illuminating Engineering Society of North America, Member of National Safety Council Member of System Safety Society. A copy of Ms. Gill's Curriculum Vitae is attached hereto and incorporated by reference.

Ms. Gill will testify that Carnival Cruise Line failed to implement and/or enforce a proper and effective safety and risk management program. Carnival Cruise Line was clearly aware of the hazards posed by overserving their guest, and the hazard associated with persons overboard, yet failed to develop and/or implement and also to periodically evaluate an effective safety program

2

so as to protect their passengers and employees alike. Such actions and/or inactions by Carnival Cruise Line were contrary to basic safety and risk management principles and one of the underlying causes of Ms. Broberg's fall and subsequent injuries.

Ms. Gill is being compensated at a rate of $350 per hour. Applied Cognitive Sciences was paid a $1,000.00 retainer by Plaintiff's counsel on October 23, 2017. Ms. Gill's fee schedule is attached hereto.

Attached is a copy of Joellen Gill's report, (Exhibit "A") Curriculum Vitae, (Exhibit "B") List of Cases (Exhibit "C") and Fee Schedule (Exhibit "D") are attached and incorporated herein by reference.

|   |   |   |
|---|---|---|
| 2. | John A. Cocklin | Police Practices, Dram Shop and |
|   | Robson Forensic, Inc. | Alcoholic Beverage Regulation Expert |
|   | 354 N. Prince Street, 1st floor |   |
|   | Lancaster, PA 17603 |   |

Summary of Opinions/ Expected Testimony:

John A. Cocklin is an expert in the field of law enforcement practice and procedures and the regulation of alcoholic beverages. He has three decades of law enforcement experience, twelve years of which were as a supervisor and the Chief Investigator of bars and nightclubs involving the sale, service and delivery of alcohol to visibly intoxicated patrons. A copy of Mr. Cocklin's Curriculum Vitae is attached hereto.

Mr. Cocklin's professional experience includes: *Associate at Robson Forensic, Inc. (2016-present) Private Expert Witness Counseling (2014- 2016) Chief Investigator, New Jersey Division of Alcoholic Beverage Control (2002- 2014) Chief of Detectives, New Jersey Division of Criminal justice (1999-2002) Deputy Chief of Detectives, New Jersey Division of Criminal Justice (1995-1999) Lieutenant of Detectives, New Jersey Division of Criminal Justice (1987-1995) Detective, New Jersey Division of Criminal Justice (1980-1987) Staff Auditor, United State Army Audit Agency (1979-1980) Uniformed Police Officer in Shiremanstown, Pennsylvania (1977-1979)*

Mr. Cocklin's educational experience includes graduating from Rider College in Lawrenceville, New Jersey with a Masters of Business Administration in 1984 and graduating with a Bachelor of Science in Accounting and Criminal Justice from the York College of Pennsylvania in 1978.

Mr. Cocklin will testify that the crew and staff of the *Carnival Liberty* created a dangerous condition when they served alcoholic beverages to Samantha Joyce Broberg, after she exhibited visible signs of intoxication in violation of the policies, procedures, guidelines, rules, and standard of care promulgated by Carnival Cruise Lines for the responsible service of alcohol and for identifying and caring for intoxicated passengers. This dangerous condition was a cause of Mrs. Broberg's death, as the crew and staff of the *Carnival Liberty* created a dangerous condition when they failed to recognize the intoxicated state of Mrs. Broberg, or if recognized, failed to follow the policies, procedures, guidelines, and standard of care promulgated by Carnival Cruise

Lines for identifying and caring for intoxicated passengers and terminating service of alcohol and sequestering the passenger in their cabin. This dangerous condition was a cause of Mrs. Broberg's death. Mr. Cocklin will further testify that the crew and staff of the *Carnival Liberty* created a dangerous condition by allowing an intoxicated Mrs. Broberg to leave the Promenade Bar without the assistance of a security officer, in violation of Carnival Cruise Lines' procedures for dealing with intoxicated passengers. The crew and staff of the *Carnival Liberty,* based upon their standard policies, procedures and training, should have known that the over service of alcoholic beverages to Mrs. Broberg while she was visibly intoxicated constituted a dangerous condition that was a cause of her death. A copy of Mr. Cocklin's signed expert report is attached hereto and incorporated herein by reference.

Mr. Cocklin is being compensated at a rate of $390 per hour. Mr. Cocklin's fee schedule is attached hereto. Mr. Cocklin's report, including his opinions and the basis therefore, are set forth in his report attached hereto and incorporated herein by reference. .  On the matter, to date, Robson Forensic has been paid for all Robson Forensic experts retained in the matter, the following payments: 8/18/2017-$2,750.00; 9/26/2017-$620.00; 9/26/2017-1,242.60; and 1/4/18-$ 4,227.90. (Invoice: Pending $11,158.00)

Attached is a copy of John A. Cocklin's report, (Exhibit "E") Curriculum Vitae, (Exhibit "F") List of Cases (Exhibit "G") and Fee Schedule (Exhibit "H") are attached and incorporated herein by reference.

 3. Michael J. Whitekus, PhD, DABT             Toxicologist and Drug Safety Expert
 Robson Forensic, Inc.
 354 N. Prince Street, 1st floor
 Lancaster, PA 17603

Summary of Opinions/ Expected Testimony:

Michael J. Whitekus is a board-certified toxicologist with over 23 years of post- bachelor in the fields of drug safety, blood alcohol concentration assessment, chemistry, inhalation toxicology and environmental contaminants. He is an expert in the field of Toxicology and Drug Safety.

Dr. Whitekus' professional experience includes: *Associate at Robson Forensic, Inc. (2014-Present) Drug Safety Team Leader, Toxicology at Pfizer Inc. (2008-2011) Laboratory Director, Toxicology at BioReliance Corporation (2005-2008) Assistant Researcher/Post-Doctoral Researcher at the University of California (2000- 2005) Assistant Scientist at the Parke-Davis Pharmaceutical Research Division (1995) Metabolism and Bioanalytical Coordinator at MPI (1993- 1994).*

Dr. Whitekus' educational experience includes graduating with a Masters of Science Degree from Eastern Michigan University and a Ph.D. Degree from the Institute of Chemical Toxicology. His professional affiliations include member of the American College of Toxicology and member of the Society of Toxicology. A copy of Dr. Whitekus' Curriculum Vitae is attached hereto and incorporated by reference.

4

Dr. Whitekus will testify that Samantha Broberg's BAC at the time she was served her first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth drink was 0.000%, 0.000%, 0.024%, 0.058%, 0.084%, 0.106%, 0.145%, 0.206%, and 0.250% (respectively) and that Mrs. Broberg's BAC at the time of the fall incident was 0.295%. Additionally, Dr. Whitekus will testify that the stage of alcoholic influence and representative clinical signs associated with Mrs. Broberg's BAC at the time she was served her third drink was subclinical with clinical signs of behavior nearly normal; at the time she was served her fourth and fifth drink her stage of alcoholic influence was euphoria with clinical signs of sociability, increased self-confidence and decreased inhibitions and judgment; at the time she was served her sixth, seventh, eighth and ninth drink her alcoholic stage of influence was excitement with clinical signs of emotional instability, and decreases in perception, memory and comprehension; at the time she was served her tenth and eleventh drink her alcoholic stage of influence was confusion with clinical signs of disorientation, mental confusion, vertigo, exaggerated emotional states, and staggering gate; at the time she was served her twelfth drink her alcoholic stage of influence was stupor with clinical signs approaching loss of motor function, and marked decrease in response to stimuli. The stage of alcoholic influence associated with Broberg's BAC at the time of the fall incident was stupor with clinical signs approaching loss of motor function, marked decrease in response to stimuli, disorientation, mental confusion, balance issues, along with decreased inhibitions and judgment.

Furthermore, Dr. Whitekus will testify that Mrs. Broberg was served alcohol while she was visibly intoxicated and that her intoxication due to the over service of alcoholic beverages by Carnival was the cause of her fall incident. A copy of Dr. Whitekus' signed expert report is attached hereto and incorporated herein by reference.

Dr. Whitekus is being compensated at a rate of $440 per hour. Dr. Whitekus' fee schedule is attached hereto. .  On the matter, to date, Robson Forensic has been paid for all Robson Forensic experts retained in the matter, the following payments: 8/18/2017-$2,750.00; 9/26/2017-$620.00; 9/26/2017-1,242.60; and 1/4/18-$ 4,227.90. (Invoice: Pending $11,158.00)

Attached is a copy of Michael J. Whitekus' report, (Exhibit "I") Curriculum Vitae, (Exhibit "J") List of Cases (Exhibit "K") and Fee Schedule (Exhibit "H") are attached and incorporated herein by reference.

    4.    Kyle P. McAvoy                Marine Safety Expert
            Robson Forensic, Inc.
            The Bourse Building, Suite 1000
            111 South Independence Mall East
            Philadelphia, PA 19106

Summary of Opinions/ Expected Testimony:

Kyle P. McAvoy is a Marine Safety Expert. He has more than 26 years of active duty service in the United States Coast Guard Marine Safety and Prevention programs, which included the inspection of ships, the investigation of ship and personnel casualties and the management

Transportation System using Coast Guard Captain of the Port authorities. He is an expert in the field of Marine Safety.

Mr. McAvoy's professional experience includes: *Associate of Robson Forensic, Inc. (2016-present) Office Chief, Office of Commercial Vessel Compliance Policy at the Coast Guard Headquarters (2012-2016) Traveling Marine Inspector, Advisor to Offshore National Center of Expertise at the Coast Guard Headquarters (2008-2012) Chief of the Prevention Department at the Coast Guard Sector Delaware Bay, Philadelphia (2004-2008) Chief of the Tank Vessel and Offshore Division, Salvage Engineering Response Team Leader at the Coast Guard Marine Safety Center (2000-2004) Ship Inspector/ Examiner, Ship plan reviewer, Accident Investigator, Trainer at the Coast Guard Marine Safety Office New Orleans (1996-1998) Staff Officer of the Coast Guard District Staff, New Orleans (1994-1996) Ship Inspector/Examiner, Accident Investigator, Suspension & Revocation Proceeding Presenter of the Coast Guard Marine Safety Office Baltimore (1990-1994).*

Mr. McAvoy's educational experience includes graduating with a Masters of Science in Engineering and Masters in Engineering from the University of Michigan in 2000. His professional affiliations include the Society of Naval Architects and Marine Engineers (SNAME).

Mr. McAvoy will testify that *Carnival Liberty's* placement of lounge chairs in the vicinity of the *Carnival Liberty* deck railing exposed Samantha Broberg to the hazard of falling overboard. The hazard created unreasonably dangerous conditions for Mrs. Broberg which was a cause of her death. Additionally, Mr. McAvoy will testify that Carnival Cruise Lines' routine procedure of either allowing, or purposely placing deck lounge chairs adjacent to the ships outboard open deck railing, deprived Mrs. Broberg of the protection she needed by industry and regulation which was a cause of her death, that Carnival knew, or should have known, that intoxicated passengers such as Mrs. Broberg are at risk of falling overboard at the incident location, that Carnival failed to adequately monitor the incident area because if Carnival had adequately monitored the incident area, Mrs. Broberg's death would have been prevented. Lastly, that Carnival's failure to adequately monitor the incident was a cause of Mrs. Broberg's death.

Robson Forensic is being compensated at a rate of $390 per hour for Mr. McAvoy.  On the matter, to date, Robson Forensic has been paid for all Robson Forensic experts retained in the matter, the following payments: 8/18/2017-$2,750.00; 9/26/2017-$620.00; 9/26/2017-1,242.60; and 1/4/18-$ 4,227.90. (Invoice: Pending $11,158.00)

Attached is a copy of Kyle P. McAvoy's report, (Exhibit "L") Curriculum Vitae, (Exhibit "M") List of Cases (Exhibit "N") and Fee Schedule (Exhibit "H") are attached and incorporated herein by reference.

     5.     Ross A. Klein, Ph.D.                Cruise Industry & Tourism Expert
           Memorial University of Newfoundland
           St. John's, NL A1C 5S7

Summary of Opinions/ Expected Testimony:

Ross A Klein is a Sociologist. He is a recognized international authority on the cruise industry and cruise tourism. He is board member of the Cruise Research Society.  A copy of Dr. Klein's Curriculum Vitae is attached hereto.

Dr. Klein is a cruise industry expert and possesses specialized knowledge concerning the foreseeability of persons falling overboard from cruise ships, the correlation between past incidents of personas falling from Carnival cruise ships, while intoxicated, and the relationship of this incident to past overboard incidents within the cruise industry, and specifically his expert opinions relating to passenger overboard incidents on Carnival Cruise Lines' cruise ships; the relationship between Carnival and Cruise Lines International Association in projecting a unified image that a cruise ship is a "safe environment."

Dr. Klein will testify that Carnival Cruise Lines has been aware of the problem of persons overboard from its ships; That Carnival Cruise Lines has failed in using available data to conduct a social epidemiological analysis of cases of persons overboard with the goal of targets and specific strategies for preventing incidents in the future; That guests are given an elevated sense of safety aboard Carnival Cruise Lines' cruises by its website, and by lack of publication of incidents of persons overboard through its website; That Carnival Cruise Lines, and the Cruise Lines International Association (and its predecessor the International Council of Cruise Lines) as a representative of Carnival Cruise Lines and other cruise lines, has consistently and systematically misrepresented the risk of going overboard from a cruise ship; That the disappearance of Mrs. Broberg was foreseeable given past incidents of persons overboard, that the system recording the official record relies on employees of the cruise line and consequently, there may be disincentives to accurately report a person overboard incident; That Carnival Cruise Lines should be more pro-active in preventing person overboard incidents; That Carnival Cruise Lines and CLIA have an obligation to disclose reliable, independently-verifiable data on person overboard incidents on its ships.

Dr. Klein is being compensated at a rate of $300 per hour. An initial retainer fee of $1,800.00 was paid to Dr. Klein on July 1, 2017.

A copy of Dr. Ross Klein's Report, (Exhibit "O") Curriculum Vitae, (Exhibit "P") List of Cases, (Exhibit "Q") and Fee Schedule (Exhibit "R") are attached.

| | | |
|---|---|---|
| 6. | Ryan C.W. Hall, M.D., DFAPA | Plaintiff's Psychiatrist |
| | Richard C.W. Hall, MD, PA | |
| | 2500 West Lake Mary Blvd, Ste 219 | |
| | Lake Mary, FL 32746 | |
| | Ph: (407) 322- 8199 | |

Summary of Opinions/ Expected Testimony:

Ryan C.W. Hall is a Psychiatrist. He is a diplomate of the American Board of Psychiatry and Neurology, the American Board of Forensic Medicine and the National Board of Physicians and

Surgeons for Psychiatry and Forensic Psychiatry. He is the assistant professor of Psychiatry at the University of Central Florida College of Medicine. He is an expert in the field of Psychiatry. A copy of Dr. Hall's Curriculum Vitae is attached hereto.

Dr. Hall's professional experience includes: *Psychiatrist for Richard C.W. Hall, MD, PA (2008-Present) Assistant Professor of Psychiatry at the University of Central Florida of Medicine (2009-2019) Affiliate Assistant Professor at the University of South Florida (2009-2016) Affiliate Associate Professor at the University of South Florida (2016-2019) Adjunct Faculty member at Barry University Dwayne O. Andreas School of Law (2010-2017).*

Dr. Hall's educational experience includes receiving him M.D. degree from the Georgetown University School of Medicine, and his professional affiliations include Diplomate for the American Board of Psychiatry and Neurology, a Certifies Forensic Physician, Diplomate of the American Board of Forensic Medicine, Fellow of the American College of Forensic Examiners Institute, and a Diplomate for the National Board of Physicians and Surgeons for Psychiatry and Forensic Psychiatry. A copy of Dr. Hall's Curriculum Vitae is attached hereto and incorporated by reference.

Dr. Hall performed an examination of Karl Broberg on September 4, 2017 to determine Mr. Broberg's mental condition, diagnosis, prognosis, and disability status as related to incidents involving his wife, Samantha Broberg's death of May 13, 2016. His expert opinion is based on examination findings, psychometric test results and a review of the Complaint and Karl Broberg's medical records from Dr. Cathal Grant's office.

Dr. Hall will testify that Mr. Broberg is suffering from a depression and potentially additional psychiatric conditions related to the loss of his wife, Samantha Joyce Broberg on May 13, 2016. (e.g. PTSD). The manner in which he learned of the loss seems to have exacerbated his suffering and potentially caused what could have been a normal grief process to turn into a major depression and possibly PTSD. During the interview, Mr. Broberg described having an increased level of anxiety, sense of helplessness and feelings of being overwhelmed, which he relates to his interactions with Carnival's support network and lack of information.

Further, Dr. Hall will testify that the lack of perceived or delayed organized response to a potential death more likely than not contributed to Mr. Broberg's emotional harm as Mr. Broberg reports being contacted by the media regarding his wife's disappearance/death before he was ever personally notified by Carnival. As noted in the medical and general professional literature regarding death notification, appropriate and timely dissemination of information regarding someone's death to the family is important to minimize emotional harm and damage. Proper notification helps to ensure that information is delivered in an appropriate manner, that support personnel are available to answer questions, and to reduce the risk of traumatization or re-traumatization. When the media is given information prior to the family and it is the media who contacts the family, their goal is to obtain information, not to provide it in the way least likely to harm the individual. Per the version of events relayed by Mr. Broberg, in the early stages of learning of his wife's disappearance/ death in the complaint reviewed, he was the one to contact Carnival first, communication was by phone with no mention of in-person support persons and

the media was aware of the details before him. It appears that Carnival Cruise Lines did not attempt to follow family notification guidelines widely used by multiple professionals and agencies. A copy of Dr. Hall's signed expert report is attached hereto and incorporated herein by reference.

Dr. Hall is being compensated at a rate of $400 per hour. An initial retainer fee of $2,000 was paid to Dr. Hall on August 24, 2017. There is currently an invoice pending of $2,816.00

Attached is a copy of Dr. Ryan C.W. Hall report, (Exhibit "S") Curriculum Vitae, (Exhibit "T") List of Cases (Exhibit "U") and Fee Schedule (Exhibit "V") are attached and incorporated herein by reference.

| | | |
|---|---|---|
| 7. | Bernard F. Pettingill Jr., PhD | Consulting Economist |
| | Sandbourne Lane #93 | |
| | Palm Beach Gardens, FL 33418 | |
| | Ph: (561) 622- 0330 | |

Summary of Opinions/ Expected Testimony:

Bernard F. Pettingill Jr., is a consulting forensic economist. He is a member of the American Economic Association, National Association of Forensic Economists and National Association of Business Economists. Dr. Pettingill is an expert in the expert in the field of Financial Analysis.

Dr. Pettingill's professional experience includes: *Forensic Economist (1996- Present) Professor of Economics, Florida Institute of Technology, Graduate Business School, Treasury Coast Graduate Center, Stuart, Florida (1988-1996) Professor of Economics, Rinker School of Business, Palm Beach Atlantic College (1987- 1988) Associate Professor, College of Business Administration, University of Southwestern Louisiana (1980-1987) Assistant Professor and Administrative Assistant, Department of Medicine, LSU Medical Center (1978- 1980) Assistant Professor, Department of Economics and Management, University of New Orleans (1977-1978) Research Associate in Department of Economics and Social Administration, University of Manchester (1975- 1977) Research Fellow at the Centre for Studies in Economics and Social Policy (1974- 1975).*

Dr. Pettingill's educational experience includes graduating with a Ph.D. in Economics from the Graduate Manchester University, and his professional affiliations include a member of the City of Palm Beach gardens Budget Committee, AAEFE, the American Economic Association, National Association of Forensic Economists, National Association of Business Economists, Health Economics Study Group, Great Britain, Gideons International, Rotary International, and Emergency Medical Service, Inc. A copy of Dr. Pettingill's Curriculum Vitae is attached hereto and incorporated by reference.

Dr. Pettingill's report includes a determination of the present value of future loss of support and household services for Samantha Broberg. Dr. Pettingill's expert opinion is based on Karl and Samantha Broberg's 2012-2016 W-2 Forms, the 2013-2015 Tax Returns, the Complaint for Damages and Demand for Jury Trial, Samantha Broberg's paystubs and the Defendant's Answer and Affirmative Defenses to the Plaintiff's Complaint.

Dr. Pettingill will testify that the total of Past Burial Expenses is $15,000. The total present day value for Loss of Support is $1,110,795 and the total Loss of Household Services is $695,285. The total Present Value of Economic Loss is $1,821,080, which is comprised of the present-day value of the economic loss to Spouse/Karl for Loss of Support is $882,234.00 and Loss of house hold Services is $542,956.00 for a Total $1,440,190; to Aaliyah for Loss of Support is $12,117.00 and Loss of Household Services is $8,314 for a Total of $20,431; to Savannah for Loss of Support is $49,078.00 and Loss of Household Services $33,075 for a Total $82,153.00; to Ryleigh for Loss of Support is $80,946.00 and Loss of Household Services $53,714 for a Total $134,659; to Kalee for Loss of Support is $86,421.00 and Loss of Household Services is $57,226.00 for a Total $143,647.

Bernard Pettingill is being compensated at a rate of $375 per hour. An initial retainer fee of $1,500 was paid to Dr. Pettingill on August 30, 2017 in accordance with the fee schedule attached hereto. There is a pending invoice of $1,337.50.

Attached is a copy of Bernard F. Pettingill Jr. report, (Exhibit "W") Curriculum Vitae, (Exhibit "X") List of Cases (Exhibit "Y") and Fee Schedule (Exhibit "Z") are attached and incorporated herein by reference.

## NON-RETAINED EXPERTS

The following individuals, who are not specially retained experts, may be called upon at trial to offer opinion testimony under Rules 702, 703 and/or 705, regarding liability issues and/or such medical topics as injury, diagnosis, symptoms, causation, prognosis, impairment, disability, and the necessity and reasonableness of past and future medical care, if any. Copies of the following physician's reports, and medical records have been provided to the Defendant during discovery in this action and the physician's opinions relating to Plaintiff's injuries, diagnosis, symptoms, causation, prognosis, impairment, disability, and the necessity and reasonableness of past and future medical care are adopted herein by reference.

| | | |
|---|---|---|
| 8. | Bob Rubin & Associates LLC<br>1010 Dawn Drive<br>Titusville, FL 32796 | Investigator |
| 9. | Cathal P. Grant, M.D., PA<br>1604 Hospital Pkwy, Ste 507<br>Bedford, TX 76022 | Plaintiff's Psychiatrist |
| 10. | Wasiq A. Zaidi, M.D.<br>Tri City Psychiatric Services | Decedent's Psychiatrist |

800 W Arbrook Blvd Ste 100
Arlington, TX 76015

11.      Patricia Allamon, M.D.                                      Decedent's Physician
         Doctor on Demand, Inc.
         275 Battery Street, Suite 650
         San Francisco, CA 94111

12.      Donald Ingle, M.D.                                          Decedent's Physician
         Family HealthCare Associates
         1926 SW Green Oaks Blvd
         Arlington, TX 76017-2735

I Hereby Certify that on the 17th of January 2018, the above and foregoing was served

via e-mail on all counsel on attached attorney service list.

ROBERT L. GARDANA, P.A.
Attorney for Plaintiff
12350 SW 132nd Court, Suite 204
Miami, Florida 33186
Telephone: 305-358-0000
Facsimile: 305-358-1680
E-Mail: Robert@gardanalaw.com


By: /s/ Robert L. Gardana
Robert L. Gardana, Esq.
Florida Bar No.: 279668

**ATTORNEY SERVICE LIST**

**KARL M. BROBERG, et. al. vs. CARNIVAL**
**CASE NO: 17-CV-21537-FAM**

Robert L. Gardana, Esq.
ROBERT L. GARDANA, P.A.
Attorney for Plaintiff
12350 SW 132 Court, Suite 204
Miami, FL 33186
Tel: (305) 358-0000
Fax: (305) 358-1680
Email: Robert@gardanalaw.com
        staff@gardanalaw.com

Christine Dimitriou, Esq.
Scott P. Mebane, Esq.
Mase Tinelli, PA
Attorneys for Defendant
2601 South Bayshore Drive, Suite 800
Miami, Florida 33133
Telephone: (305) 377-3770
Facsimile: (305) 377-0080
CDimitriou@masetinelli.com
ctoth@masetinelli.com
smebane@masetinelli.com

# Exhibit "A"



December 29, 2017

Robert L. Gardana, Esq.
Attorney at Law
12350 SW 123 Court
Suite 204
Miami, Florida  33186

**Re: Karl M. Broberg v. Carnival Corporation d/b/a Carnival Cruise Lines**

Dear Mr. Gardana:

I have reviewed the initial file material which your office provided concerning the fatality of Samantha Joyce Broberg while a passenger aboard a Carnival cruise; I was also afforded the opportunity to view surveillance footage of this fatal fall.  Ms. Broberg's fatal incident is similar to a number of other fatality incidents I have analyzed in the past 30 plus years.

I base my findings and opinions on:  my training, experience, and expertise in the fields of Human Factors Engineering and Safety, as well as the file material relative to this case that your office provided.  The purpose of this report is to provide an analysis of the facts of this fatal incident as well as a summary of my findings and opinions with respect to the underlying root cause(s) of Ms. Broberg's death, and to outline the bases for these opinions.  The specific material provided by your office includes the following:

- Defendant's Rule 26 Initial Disclosures;
- Defendant's Notice of Serving Responses to Plaintiff's Initial Interrogatories;
- Defendant's Responses to Plaintiff's Initial Request for Admissions;
- CG-2692 Report of Marine Accident, Injury or Death;
- Carnival Liberty's Position Report;
- Carnival Cruise Lines Carnival College Bar Service Program;
- Carnival Cruise Lines Carnival College Responsible Alcohol Service;
- Carnival Cruise Lines Carnival College Beverage Service Duties & Responsibilities;
- Carnival Cruise Lines Responsible Service of Alcohol;
- Shipboard Human Resources Responsible Service of Alcohol;
- Bartender Duties and Responsibilities;
- Carnival Cruise Lines Ship Security Manual;
- Plaintiff's Rule 26 Initial Disclosures;
- Plaintiff's Supplemental Rule 26 Initial Disclosures;
- Plaintiff's Second Supplemental Rule 26 Initial Disclosures;
- Plaintiff's Karl M. Broberg's, Individually, Notice of Serving Answers to Defendant Carnival's Initial Interrogatories;

_____

- Plaintiff's Karl M. Broberg's, as Administrator of the Estate of Samantha Joyce Broberg, Notice of Serving Answers to Defendant Carnival's Initial Interrogatories;
- Plaintiff's Karl M. Broberg's, Individually, Response to Defendant Carnival Corporation's First Request for Production;
- Plaintiff's Karl M. Broberg's, Individually, Supplemental Response to Defendant Carnival Corporation's First Request for Production;
- Letter from Robert L. Gardana, P.A. re CVSSA, deck rail height, and over-serving of alcohol;
- Depositions:
  S. Kumar Assistant Chief Security;
  V. Singh, Chief Security Officer;
  K. Broberg, Plaintiff;
  J. DeLaCruz, Vice President for Corporate Communications for Carnival Cruise Lines;
- Affidavit of Tammy Ramirez;
- Affidavit of Sarah Nelms Churman;
- Expert Report of Ross E. Klein, International Authority on the Cruise Industry;
- Expert Report of Michael J. Whitekus, Ph.D., Toxicologist;
- Expert Report of John A. Cocklin;
- Expert Report of Kyle McAvoy, Naval Architect/Marine Safety Expert.

Attached as an exhibit to this report is a copy of my CV that highlights my training, experience, and expertise as it pertains to safety and risk management.  Also attached is a listing of my sworn testimony for the past 5 years.  Please note that my fees for work on this matter are $350/hour plus expenses; sworn testimony fees are $400/hour, unless paid in advance, with a minimum charge of $1200.

I have a B.S. in Human Factors Engineering and an M.S. in Environmental Engineering; I have more than 35 years of experience in Human Factors with my emphasis being in safety and risk management.  I have done theoretical work in the area of safety including warning design and effectiveness, as well as provided consulting services to private industry and businesses in the field of safety and risk management.  Also, as noted in my CV, I am board certified in Human Factors, a Certified Safety Professional, and a licensed Tribometrist (i.e. one that measures the slip resistance of walking surfaces).

The study of Human Factors is the science that combines the traditional engineering disciplines, such as mechanical engineering, safety engineering, and accident reconstruction (i.e. the study of what caused any type of accident not merely automotive accident reconstruction), with the science of human behavior, such as human perception, learning and memory, cognition, decision making, response selection and execution, anthropometrics, and the like. Human Factors evolved in the early 1940's out of the science of accident reconstruction, due to the shortfall in traditional accident reconstructionists whose training was void of the science of human behavior.  Given the success that interdisciplinary teams of engineers/physicists and cognitive psychologists had in determining the underlying root causes of a wide array of accidents, the field of human factors was born.

Since that time Human Factors has evolved and expanded beyond the reactive approach of accident reconstruction to include a proactive approach. In short, the approach of Human Factors Engineering is to compliment the traditional engineering design process by including within that process consideration of the human component, including its foreseeable failure modes, within the system. By analyzing human behavior, it enables one to understand and predict the likely range of conduct, including failure modes, which may pose a foreseeable and predictable danger to the overall safety of the system.

Human factors first evolved in the early 1940s and have been a formally recognized discipline since the early 1950s. There are several associations, or organizations, specific to the field, namely: the International Ergonomics Association, the American Psychological Association, and the Human Factors and Ergonomics Society, of which I have been an active member since the mid 1970's when I first started studying Human Factors Engineering in undergraduate school.

Engineering is the profession that applies the basic sciences so as develop systems, products, and services for the benefit of all (i.e. humans, animals, plants, and so forth); traditional fields of engineering include mechanical, electrical, civil, and agricultural.

The study of engineering or an engineering degree is typically referred to as a "generalist" degree; that is, it is a study of the application of the general principles of science, which are unchanging, to design systems and products. One can focus in a given field of engineering (i.e. mechanical vs. electrical), but even so, engineers receive basic training that is universal across all disciplines of engineering (i.e. engineering sciences). As such, engineers are trained to design products of all types, including ones that have never existed before. In fact, the very purpose of the engineering profession is to solve problems by creating new products. There are not "product specific" degrees in engineering (i.e. such as an engineering degree in deck railing design); further, there are rarely courses offered in engineering that focus strictly on one product (i.e. for example, I have never heard of an engineering course on deck railing design). In short, the basic training of an engineer transcends any specific product or system; engineers are taught universally applicable principles and methodologies to apply to a wide range of industrial/agricultural/commercial/recreational equipment and products.

Similarly, safety is a generalist profession that evolved from the various traditional engineering disciplines; the safety profession has evolved to the point where one can specialize and pursue a degree in safety. However, just as in engineering, there are not "product specific" degrees in safety; in fact, there are rarely product specific courses in safety. The safety profession is rooted in fundamental tenets that are applied to specific settings; arguably the most fundamental of which is the Safety Hierarchy or the Fundamental Principle of Safety - a methodology that is universally applied throughout engineering and safety professions.

The Safety Hierarchy or Fundamental Principle of Safety was first promulgated by the National Safety Council (NSC) in the early 1920's. In short, it is a methodology that is used to mitigate foreseeable hazards; it consists of a three-level hierarchical process known as the Fundamental Principle of Safety. The first tier or the best alternative is "Safety by Design". That is, either eliminate the hazard or remove the user from the

3

vicinity of the hazard.  If and only if Safety by Design is not possible or feasible, then one would resort to the second-best alternative, "Guarding", or providing a barrier between the user and the potential hazard.  The final tier, known to be least effective and should be used only as a last resort, is "Persuasion Control", which means to employ techniques to persuade in such a manner as to minimize the risk of injury; common techniques include using warnings, training, checklists, manuals, or other types of human intervention so as minimize the risk.  It is emphasized that since Persuasion Control is the least effective level of the hierarchy, it is critically important that it be done consistent with state of the art methodologies and procedures.   In short, the Safety Hierarchy or Fundamental Principle of Safety is a fundamental tenet and methodology that is utilized in all fields of engineering, safety, and risk management.  It need not be "tested" each time it is applied, as it is the foundation from which the safety profession is built.

] When designing a product and/or evaluating the safety of a product, the engineering/safety profession utilizes a common methodology; while there are a variety of specific techniques or step by step procedures that are used, they all consist of 5 key components:

    a. Hazard Analysis: A systematic process or methodology that is used to identify foreseeable hazards.

    b. Plan Development/Alternative Designs: Developing a plan/alternate design to mitigate the identified hazard; such a plan/design must conform to the principles set forth in the Safety Hierarchy or Fundamental Principle of Safety.

    c. Plan Implementation: Implement the identified plan/design alternative.

    d. Plan Evaluation: In essence looping back to the hazard analysis component and repeating the process until an acceptable plan/design is achieved.

    e. Documentation: Creating and maintaining a historical record.

Here again, this basic design/evaluation technique is a basic and accepted methodology that is utilized in all fields of engineering, safety, and risk management; it need not be "tested" each time it is applied, as it is the foundation of these professions.

**Background**

On the day of Ms. Broberg's death, May 13, 2016, she and two friends were aboard the Carnival Liberty cruise ship which they boarded the day before in Galveston, Texas for a four-day cruise.  This cruise was a Mother's Day present to Ms. Broberg.  Between the hours of 1:00 PM on May 12, 2016 (i.e. shortly after boarding, and 1:57 AM on May 13, 2016 (i.e. the time she went overboard) Ms. Broberg was served 7 double Tito's vodka, 1 unknown shot, 1 Grey Goose and Curacao Blue and 3 beers.  According to witness statements as taken and testified to by Vikram Singh, as well as the affidavit of Ms. Ramirez, Ms. Broberg was visibly intoxicated at the time of her disappearance off the vessel.   Shortly before her fall overboard, Ms. Broberg and another passenger Mr. Cervantes left the Promenade Bar and went up to Deck 10 an exterior deck.  Here Ms. Broberg stepped up onto a lounge chair that was positioned adjacent to the deck railing, turned around, and hoisted herself up onto the deck railing.   Shortly after positioning herself on the railing Ms. Broberg appeared to lose her balance and fell backwards off the deck railing to the water 10 levels below.

**Risk Management**

In order to ensure the safety of their patrons, employees, and the like, a business such as Carnival Cruise Lines must employ some type of risk management program. To be effective at minimizing the potential harm to people and as discussed briefly above, any risk management program must be comprised of five basic components: Hazard Analysis, Plan Development, Plan Implementation, Plan Evaluation, and Documentation. Each of these steps and how they relate to Ms. Broberg's death are discussed below.

**Hazard Analysis**

A hazard analysis is a process whereby the various foreseeable tasks performed by the user (i.e. the manner in which the person interacts with the product or facility) are analyzed to identify potential hazards under the varying environmental conditions that exist where these tasks are accomplished. In the case of Ms. Broberg's death, the relevant tasks would be those associated with passengers being over-served alcohol, resulting in an under-appreciation of the hazards present on a cruise ship, and specifically putting themselves in a position to be at risk for a fall overboard. Thus, the hazards relevant to this case are two-fold:

1. Overconsumption of alcohol;
2. Exposure to fall overboard.

*Hazard of Over-Serving Alcohol*

Taking the overconsumption of alcohol first, it is apparent from my review of the various Carnival Cruise Line documents as identified above, my review of relevant witness statements, as well as my review of the expert report of Mr. Cocklin, that Carnival Cruise Line was well aware of the hazard of intoxicated passengers. In fact, in their Responsible Service of Alcohol Carnival Cruise Line states that the objective of this program is "showing our guests and team members that we care and respect them" and "ensuring the safety and security of our guests and team members." They go on to identify the reasons responsible service of alcohol is important:

- It is the LAW;
- Safety and Comfort of both our guest and team members;
- Prevent legal action against YOU and the company;
- Guest expectation
- To ensure our guests have a Fun and Memorable Vacation;
- Maintain Company image and reputation;
- Return business.

The point to be made is that it is clear Carnival Cruise Line recognizes the hazard posed to guests by overserving; it is interesting, however, that the concern is much more slanted toward protecting the cruise line rather than the passenger.

*Hazard of Persons Overboard*

The second hazard, exposure to fall overboard, is not clearly identified by Carnival Cruise Line. Notwithstanding, Mr. Klein in his expert report opines that Carnival Cruise Line has been aware of the problem of persons overboard from its ships. Mr. Klein goes on to state the following statistics relative to this hazard: Carnival Cruise Line had 63 passengers go overboard since 1995 through the first six months of 2017, comprising 20.6% of the known 306 persons overboard from cruise ships and passengers worldwide.

5

Carnival Cruise Line has the highest percentage of persons overboard of any of the eight Cruise Lines identified.  Eight people went overboard in just one year:  2009.  Here again, this is more than any other Cruse Line experienced in any one year; the next highest for any cruise line was five persons overboard in one year which occurred one time in 2012 on RCI.

The point to be made is that even though Carnival Cruise Line does not overtly state that they are aware of the hazard of persons overboard, they are clearly aware of the magnitude of this issue and therefore, consistent with the basic fundamental widely-accepted and long-standing principles of safety, should develop a plan to mitigate this extreme hazard.  That is, Mr. Klein reports that in 82.7% of the person overboard cases, there was no successful rescue.

Furthermore, it is important to point out that alcohol is a known factor in twice as many Carnival Cruise Line persons overboard than the industry average.  That is, not only are over-serving and exposure to a fall overboard both independent hazards, but they are not unrelated.

Finally, a hazard analysis is comprised of two key components; an a priori analysis (i.e. one that is performed before there is an accident or near miss) and a post hoc analysis (i.e. one that is performed after there is an accident or near miss).  It is not the intent of this report to delve into the details of a comprehensive hazard analysis.  As it pertains to this incident, the relevant issues for each type of analysis are:

*A Priori*

- The potential for guests to over-indulge in alcohol given the environment (i.e. on vacation, on a ship where they will not have to drive, the accessibility of alcohol without the need to even "pay" because of the sip and sail card, the free promotional drinks);

- The likelihood of an under-appreciation of the hazards on board the vessel when overserved alcohol;

- The incidence of alcohol related to persons overboard;

- The foreseeability of guests attempting to sit on a deck railing, especially when over-served and when the hazard (i.e. being 10 stories above the water) is not immediately obvious and when there is an access means readily available (i.e. the practice of placing/stacking/storing lounge chairs up against the railing.

*Post Hoc*

- If a post hoc analysis is to be effective in improving safety **it is absolutely mandatory that any and all incidents and/or near misses be thoroughly and properly investigated by trained and knowledgeable investigators**.  The investigations must be properly documented, including photographs and interviews of the victim and any/all potential witnesses.  Lastly, the incident

6

reports must be analyzed individually and then reviewed as a group to identify commonalities and potential patterns, by trained professionals to determine the root cause(s) of the incident(s). It is absolutely critical that the underlying root cause(s) be identified so that corrective action can be implemented; falsely attributing the failure mode ensures that needless incidents will be repeated over and over.

- In this case I have seen no evidence that Carnival Cruise Line ever disciplined or took any action after Ms. Broberg's death to ensure that bartenders and servers would not over-serve passengers.

- I have reviewed deposition testimony of the Carnival Cruise Line Chief Security Officer Mr. Singh in which he testified that he had seen people attempting to sit on the deck railing; he also testified he had seen individuals of all ages, including intoxicated individuals, step on the lounge chairs prior to Ms. Broberg's death. Yet I have seen no evidence that any steps were taken in response to these observations to further mitigate the hazard of persons overboard.

- Despite repeatedly being made aware of the hazard of persons overboard (i.e. as discussed above) prior to Ms. Broberg's death, I have seen no evidence that Carnival Cruise Line ever identified the underlying root cause(s) of these repeated persons overboard, most of which resulted in death. **The failure of Carnival Cruise Line to have even a modestly effective post hoc investigation/analysis program is a willful disregard for passenger safety.** In effect, the failure to have a meaningful and effective program is tantamount to making a conscious and willful decision to repeatedly expose passengers to a known hazard, knowing full well that some of them will lose their life.

## Plan Development

Once a specific hazard has been identified the second step is the development of a plan to mitigate the identified hazard. The goal of this step is to develop a plan or method for eliminating or at least minimizing the hazard. The chosen mitigation strategy should consider the level of risk. That is, risk can be defined as probability times consequence. The probability of persons being overserved is likely relatively high, as is the consequence of going overboard. As such the mitigation strategies chosen must be robust enough to control these hazards. When generating or creating a plan to control a known hazard (i.e. overserving that results in a fall overboard), the safety and human factors profession uses a three-level hierarchical process often referred to as the Safety Hierarchy.

### Carnival Cruise Line's Plan for Over-Serving Alcohol

First let us consider the hazard of guests being overserved alcohol. The first tier or the best alternative is "Safety by Design", that is, either eliminate the hazard or remove the user from the vicinity of the hazard. Clearly Safety by Design, the elimination of access to alcohol on board the ship, is not a feasible solution. If Safety by Design is not possible or feasible, the second-best alternative is "Guarding" or providing a barrier between the user and the potential hazard. Here again this is not a feasible mitigation strategy. One should **only** resort to a lesser effective level if and only if it is not possible to implement

7

the more effective level.  The final tier is "Persuasion Control", using warnings, training, or other types of human intervention to ensure user safety.   One should only resort to Persuasion Control as a "last resort" as it is known to be so limited in its effectiveness.  It is noted that in this instance, Carnival Cruise Line relied on the least effective level of the hierarchy, to protect its patrons from the hazards associated with over-serving alcohol.

That is, Carnival Cruise Line's plan was to have a program in place that educates employees as to the Responsible Service of Alcohol; this program includes information about liability on the part of the server as well as Carnival Cruise Line, guidelines for serving alcohol, and how to deal with "difficult situations".  This plan also includes a Traffic Light System for assessing the intoxication level of guests and responding appropriately.

In addition, in the Carnival Cruise Line Ship Security Manual Section 4.6.2 requires the following:

> *If a guest is considered under the influence of alcohol, the Bar Manager will instruct the bar personnel not to serve that person any more alcohol.  In the case of extreme intoxication, the Chief Security Officer will invite the person to follow him to their assigned cabin.  A brief period of surveillance is suggested (at least for the first hour).*

While I do not disagree that these elements are an important component to an overall safely plan aimed at preventing overserving guests, it is important to point out some obvious shortcomings which impact the overall effectiveness of such a program.

1. Tt is my understanding there are many bars on the ship.  As such there would not be consistent monitoring of the amount of alcohol consumed by any one guest as they move around the vessel.  In fact, in this case, Ms. Broberg consumed alcohol in many different locations (i.e. the Red Rum Frog Bar, the Promenade Bar, the Dining Room, and the Casino Room);
2. The bartenders and bar waiters on the Carnival Liberty are required as part of their duties to "Suggest and promote drinks that will proportionally, increase revenue."  This is inconsistent with the requirement to monitor and not over-serve guests.
3. The "make it a double" option, as well as free shots encourages excessive alcohol consumption;
4. Out of 27 Duties & Responsibilities for Bartenders and 24 Duties & Responsibilities for Bar waiters, only 1 addresses the duty to "advise bar management whenever a guest(s) appear to be intoxicated and need to be monitored for their best interests."
5. The practice of requiring bartenders and bar waiters to observe and assess guest behavior as it relates to alcohol consumption is not a reliable practice to ensure guests are not over-served.
6. The practice of waiting until guests appear intoxicated to report them to management is a reactive approach to safety.
7. It is my understanding the bartenders receive tips as part of their compensation.  This practice would lead to a conflict for bartenders between not over-serving and continuing to serve to increase his tips.

8

Perhaps a more effective plan should consider the monitoring of overall guest consumption of alcohol through the "sip and sail" card rather than expecting bartenders and bar waiters to observe and make judgment calls regarding guest behavior, judgment calls that are in direct conflict with their other responsibilities.

*Carnival Cruise Line's Plan for the Persons Overboard*

In this case, if the specific hazard that is to be mitigated is a fall overboard, then one must consider the various scenarios that can lead to exposure to this hazard. As discussed above, over-serving of alcohol is known to be a factor in persons overboard. But it is also important to consider the **prevention** (i.e. the proactive component of safety) of access to fall/jump overboard. Safety by Design is clearly not a feasible approach; people go on cruises with the expectation they will be on open-air decks and can look out at the ocean. CCL then has relied on the second level of the Safety Hierarchy: Guarding.

It is my understanding from the report of Mr. McAvoy, the Carnival Liberty, as well as all cruise ships, are required to have deck railings that are **at least** 42 inches above the deck surface. Clearly the reason for this requirement is for the protection of guests and even employees from a fall overboard. While I do not disagree this is a sound approach, it is important to recognize that, as discussed above, Carnival Cruise Line is aware of the fact that individuals of all ages, and even intoxicated individuals climb/stand on the lounge chairs that are placed up against the railing; Carnival Cruise Line has even seen individuals attempt to sit on the railing. This recognized behavior should have been a clear indication that Carnival Cruise Line's chosen plan of a minimum height deck railing to prevent persons overboard was rendered ineffective. That is, the presence of the lounge chairs adjacent/near the deck railing creates in essence a movable platform for easily accessing the deck railing. More effective mitigation strategies could include having higher rails (i.e. more effective Guarding), or possibly a treatment to the top of the railing that renders it uninviting for sitting.

In addition, the Chief Security Officer Mr. Singh testified regarding an ISPS Code requirement for a "security monitor" on the external decks from midnight to 4:00 AM; he testified that this monitoring was for all activities including the presence of an intoxicated passenger. Mr. Singh also testified that in their compliance of this requirement, there was only one security officer assigned to monitor decks 9, 10, 11, and 12.

In summary, Carnival Cruise Line's plan to mitigate the hazard of overserving consisted entirely of the third and least effective level, Persuasion Control. Carnival Cruise Line's plan to mitigate the hazard of persons overboard as a result of overserving and attempting to sit on the deck railing was simply to comply with the minimum deck railing height requirements, a plan that Carnival Cruise Line knew was ineffective prior to Ms. Broberg's death, and to "monitor" deck 10 intermittently between the hours of midnight and 4:00 AM.

**Plan Implementation**

Once the plan is developed, the next step in an effective safety program is to communicate the required plan to all relevant employees from the highest supervisory level all the way down to the employee performing the specific task or duty. Steps must be taken to ensure that the plan is properly implemented and enforced to ensure

compliance.  As discussed above Carnival Cruise Line's plan to mitigate the hazard of overserving guests is Persuasion Control; the burden is placed on bartenders and bar waiters to identify when guests are intoxicated and to intervene.  Because this is the third and least effective e level of hazard mitigation, it is critically important that this plan be properly executed to increase its potential effectiveness.  Imagine the chaos that would ensue on our roadways if traffic laws were not enforced.

In this case, it appears the initial components of the infrastructure to implement Carnival Cruise Line's plan are in place.  That is, I have reviewed several modules of training for bartenders and bar waiters regarding the identification of different levels of intoxication and the appropriate response.  However, in this case it is clear that Carnival Cruise Line's plan failed in this step of the safety process.  What is unclear to me after reviewing the materials I was provided is Carnival Cruise Line's enforcement of their plan to prevent overserving.

That is, Ms. Broberg was described by witnesses as being intoxicated and there are even photographs to support these observations.  Furthermore, the records of the number and type of drinks Ms. Broberg was served in the 12-plus hours preceding her death clearly resulted in a level of intoxication that was, according to the report of Dr. Whitekus, extremely high and dangerous to Ms. Broberg.  Yet, even at 1:20 AM, 37 minutes prior to her death, with an estimated BAC of 0.25% and clear signs of intoxication, Ms. Broberg was served alcohol.

Furthermore, I have seen no evidence to indicate that any of the bartenders or bar waiters were disciplined in any way for the overserving of Ms. Broberg in the hours leading up to her death.

It is glaringly obvious that Carnival Cruise Line failed in their implementation of the plan they developed to mitigate the hazard of over-serving their guests, a plan that was developed for the safety and security of the guests.

**Plan Evaluation**
The evaluation process is essential to ensure that the chosen plan has been properly implemented and is effectively controlling the identified hazard.  Given Carnival Cruise Line's failure to develop and/or implement an effective plan for ensuring the safety of their guests, there is no reason to believe that they have any type of meaningful ongoing evaluation of their safety and risk management program.  Carnival Cruise Line's failure to have taken any corrective action either upon the many persons overboard that Carnival Cruise Line has experienced, upon notification of the risky behaviors of guests in relation to standing on lounge chairs on the open deck and attempting to sit on the railing in advance of Ms. Broberg's death, or even in light of Ms. Broberg's death is further evidence that they have no systematic evaluation program.

This failure of Carnival Cruise Line to evaluate specific elements of their safety program periodically, and specifically when there is any kind of injury incident or even a near miss, is inconsistent with long-standing basic safety principles and compromises the effectiveness of such a program.  This compromise of effectiveness of Carnival Cruise Line's safety program is an underlying root cause of Ms. Broberg's death

**Documentation**

The final step in an effective risk management program is to document the safety process, including the plan, its implementation and evaluation.   Documentation is mandatory to provide the infrastructure for controlling risks and is a fundamental requirement to ensure the effectiveness of the overall management process.  To date I have not reviewed any evidence of documentation of any portion of Carnival Cruise Line's safety and risk management program other than the items identified above. Specifically, I have not reviewed any evidence of an evaluation program to ensure guests are not being over-served, any evidence of specific training of the bartenders and/or bar waiters as to the elements of Carnival Cruise Line's program, any evidence of consequences of failing to follow the requirements of Carnival Cruise Line's program; any evidence of discussion (i.e. safety meeting minutes, emails, and so forth) of the concern with persons overboard or the observed actions of stepping on lounge chairs and attempting to sit on the deck railing.

**Summary**

Based on my review of the material provided, Carnival Cruise Line failed to implement and/or enforce a proper and effective safety and risk management program. Carnival Cruise Line was clearly aware of the hazards posed by overserving their guest, and the hazard associated with persons overboard, yet failed to develop and/or implement and also to periodically evaluate an effective safety program so as to protect their passengers and employees alike. Such actions and/or inactions by Carnival Cruise Line were contrary to basic safety and risk management principles and one of the underlying causes of Ms. Broberg's fall and subsequent injuries.

It is emphasized that these factors were identified vis-à-vis my review of the preliminary information available to date.  A more in-depth analysis would likely identify other factors related to the risk management program of Carnival Cruise Line that contributed to Ms. Broberg's death.

Please let me know if you have any questions or if I can be of any further assistance in this matter.


Sincerely,

Joellen Gill, M.S., CHFP, CXLT, CSP
President

# Exhibit "B"

Joellen Gill
10501 S Lambs Lane
Mica, WA 99023
Phone: (509) 624-3714/Fax: (509) 795-5633
Email: Joellen@ACSciences.com

**LICENSES:**

Board of Certification in Professional Ergonomics
       Certified Human Factors Professional, 2006
       License Number:  1392

International Safety Academy
       Certified XL Tribometrist, 2005 - present
       License Number:  170

Project Management Institute
       Project Management Professional, 1993 – present
       Certification Number:  1384

Board of Certified Safety Professionals
       Certified Safety Professional, 2013
       Certification Number:   24124

**EDUCATION:**

Colorado School of Mines, 1994
       M.S. in Environmental Science and Engineering
       Area of Specialization: Environmental Engineering

University of Northern Colorado, 1988
       Masters in Business Administration

Wright State University, 1979
       B.S. in Human Factors Engineering

**PROFESSIONAL EXPERIENCE:**

*Human Factors Engineering Consultant for Applied Cognitive Sciences (1994-Present):*
I have worked as a research associate, human factors engineering associate, and senior engineer on several hundred legal cases, for both the plaintiff and defense, nationwide; I am currently serving as President of Applied Cognitive Sciences. The focus of my work has been in safety and risk management; my areas of expertise include, but are not limited to: facility design and fall-at-elevation accidents, industrial accidents, automotive accident reconstruction, workplace injuries, and consumer products. I have also worked on human factors engineering consulting projects for

**PROFESSIONAL EXPERIENCE:  (Continued)**

private industry, again with an emphasis in safety and risk management; projects have included work for:  Anchor Industries, City of Snohomish, and the American Fun Cart Association.

*Project Manager for EG&G (1992–1994):*  I was responsible for Environmental Restoration projects from conception and initial design through test and close-out.  This included overall responsibility for safety and risk management issues of the project, as well as maintaining scope, schedule and budget baselines, preparation of all required documentation, and overall leadership, management, and coordination of multi-functional disciplines in order to maximize program effectiveness and efficiency.

*Senior Principal Engineer for EG&G (1990-1992):*  I was responsible for the development and implementation of plant wide systems in accordance with Department of Energy Orders and Best Industry Practice.  This included programs for Root Cause Analysis (i.e. so as to determine the underlying causes of accidents and near misses so that corrective action could be implemented), Lessons Learned, Occurrence Reporting, and Document Control.

*Principal Engineer for Rockwell International (1983-1990):*  This position required a Department of Energy Q Clearance.  I was responsible for the development of new weapons programs and served as the principal contact on technical matters with customers.  Responsibilities included task analyses for unique processes in order to identify and mitigate safety and risk management issues.

*Human Factors Engineer for Martin Marietta Aerospace (1979-1983):*  This position required a Secret Security Clearance.  I was responsible for the Human Factors Engineering on the MX Missile System, including safety and risk management issues. In this position I conducted analyses in all phases of the design, development, and manufacturing cycles of the MX Missile to ensure the Instrumentation and Flight Safety System was operable and maintainable by the 5th through 95th percentile Air Force technician.  In addition, I developed detailed procedures for system operation and maintenance.


**HONORS AND AWARDS:**

Graduated *summa cum laude* at Colorado School of Mines, (GPA 3.9 out of 4.0), 1994

Graduated *summa cum laude* at University of Northern Colorado, (GPA 4.0 out of 4.0), 1988

Best Presentation Award at Martin Marietta Aerospace, 1980

Graduated *summa cum laude* at Wright State University, (GPA 3.9 out of 4.0), 1979

Outstanding Senior Engineer at Wright State University, 1979

W.S.U. Foundation Scholarships, 1977 and 1978

**PRESENTATIONS:**

Gill, J.  Short Course in Human Factors & Safety.  Invited Presentation by the Washington State Association for Justice, May 2015

Gill, J.  Forensic Applications of Human Behavior.  Invited Presentation by the Washington State Association for Justice, November 2013

Gill, J., Gill, R., and Colcombe, A.  Safety by Design:  Not Always.  Invited Presentation by the Idaho Trial Lawyers' Association, September 2013.

Gill, R. and Gill, J.  Safety by Design: Not Always.  Invited presentation by the 360 Advocacy Institute, February 2009

Gill, J. and Gill, R.  Human Factors in Litigation. Invited presentation by the Washington State Trial Lawyer's Association, October 2006.

**PROFESSIONAL ACTIVITIES:**

Member of Human Factors and Ergonomics Society
Member of American Society for Testing and Materials
Member of Illuminating Engineering Society of North America
Member of National Safety Council
Member of System Safety Society

**CONTRACTS:**

Evaluation of On-Product and On-Manual Warnings, CamX Crossbows, 2016

Testing and Evaluation of "Safe Steps Floor Treatment" on University of California Riverside campus, Principal Investigator, 2010.

Evaluation and Development of a Fire Shelter Warning System for Anchor Industries, Principal Investigator, 2006.

Safety Analysis of Electronic Billboards, City of Snohomish, Co-investigator, 2005

Evaluation of Warning Label Designs, American Fun Kart Association, Co-investigator, 2002.

# Exhibit "C"

**Applied Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

### Sworn Testimony for Joellen Gill, M.S., CHFP, CXLT, CSP
### As of October 20, 2017

**2017**
**Trials:**

1. Morrison v Stone; Teton County, Idaho
2. Smith v Bouwfonds Seasons GP, LLC; Snohomish County, Washington
3. Saltzberg v Chuckanut Capital, LLC; King County, Washington
4. Munro v Tiara Imperial HOA; Los Angeles County , California
5. Severson v The Beacon; Kootenai County, Idaho
6. Iverson v Munn; Benton County, Washington
7. Escamilla v County of San Bernardino, et al.; San Bernardino County, California
8. Slater, et al. v Northgate Mall; King County, Washington
9. Overbee v 3-M Company; Commonwealth of Kentucky
10. Wilson v Lincoln County Hospital District 13; Lincoln County, Washington
11. Foster v Lee; Ventura County, California
12. Sithisombath v Nguyen; Orange County, California

**Depositions/Arbitrations:**

1. Schmaljohn v Cho; King County, Washington
2. Moncada v Transdev d/b/a Veolia Transportation, Inc; Clark County, Nevada
3. Mulalley v City of Lewiston; Nezperce County, Idaho
4. Cochran v Seattle Housing Authority; King County, Washington
5. Guilford v Tacoma General Hospital; Pierce County, Washington
6. Carlisi v Aria Resort; Clark County, Nevada
7. Collins, et al v 3-M Company, et al.; Commonwealth of Kentucky
8. Slater, et al. v Northgate Mall; King County, Washington
9. Pilkington v Whitworth Water District; Spokane County, Washington
10. Martin v City of Los Angeles; Los Angeles County, California
11. Munro v Tiara Imperial Apartments; Los Angeles County, California
12. Trachsel v Lilly Lakes Estates;  District of Kodiak, Alaska
13. Caudill, et al. v American Optical Corp; Commonwealth of Kentucky
14. Seifert v City of Richland, et al.; Benton County, Washington
15. Burton v City of Davis; Yolo County, California
16. Simone v Jameson; Orange County, California
17. Hohenstein v Los Ninos, LLC, et al; Gallatin County, Montana

_____

18. Morris v Whitman County; Spokane County, Washington
19. Martinez v City of Tacoma; Pierce County, Washington
20. Simone v Jameson; Orange-Central County, California
21. Lovett v 61 Madison, Inc., et al; Cook County, Illinois
22. Manley v Sorrell; King County, Washington
23. Gardiner v Trader Joe's Company; King County, Washington
24. Garcia v Spokane County; Spokane County, Washington
25. Foster v Lee; Ventura County, California
26. Casteneda v Longhorn; Clark County, Nevada
27. Paeschke v General Motors; Eastern District; Washington
28. Roberto v CRST Lincoln Sales.; Riverside County, California
29. Overbee v 3-M Company; Commonwealth of Kentucky
30. Escamilla v County of San Bernardino, et al.; San Bernardino County, California
31. Johnson v Ford Company; Federal Court, Hunington, West Virginia
32. Ellis v Russell; Spokane County, Washington
33. Gish v Nth Degree, Inc.; Clark County, Nevada
34. Byrne v 48th Place Association, LLC; et al.; Jackson County, Missouri
35. Brown v Sam's Club West; US District Court, District of Nevada
36. Brice v Toyota, et al.; Santa Fe County, New Mexico
37. Swalko v City of Seattle; King County, Washington
38. Sithisombath v Nguyen; Orange County, California
39. Cudgma v Precision Motors, LLC, et al.; Stamford/Norwalk, Connecticut
40. Wilson v Lincoln County Hospital District 3; Lincoln County, Washington
41. Mabbutt v City of Seattle; King County, Washington
42. Ogelsby v LeMay-America's Car Museum; Pierce County, Washington
43. Broers v WSDOT; Grant County, Washington
44. Greenwood v City of Blaine; Whatcom County, Washington
45. Brewer v I-Guard International K-9 Services, LLC; Spokane County, Washington

**2016**
**Trials:**

1. Moctezuma v Big Lots; Los Angeles County, California
2. Alcala v City of Los Angeles; Los Angeles County, California
3. Weber v URM Stores, Inc.; Spokane County, Washington
4. Visuwan v Circus Circus Casinos Inc, et al.; Clark County, Nevada
5. Chenoweth v Mercer Island; King County, Washington
6. Glaser (Trees) v Sorenson; King County, Washington
7. Dawood v Mercedes Benz (Perpetuation); Western District, Washington
8. Jarvis v City of Phoenix; Maricopa County, Arizona
9. Vanlandingham v Sellen Construction; King County, Washington
10. Quintanilla v City of Seattle; King County, Washington

**Depositions/Arbitrations:**
1. Cheng v Tran, et al.; King County, Washington

2. Allensworth v Ganesha; Clark County, Nevada
3. King v MAC Pizza Co.; Chelan County, Washington
4. Alcala v City of Los Angeles; Los Angeles County, California
5. Harrington v Holland Residential, LLC; Snohomish County, Washington
6. Burnett v MT Department of Highways; Lewis and Clark County, Montana
7. Nelson v Masters; King County, Washington
8. Kwok v AAA NCNU Insurance Exchange; San Francisco, California
9. Vaughn v Northwest Eye Center; Spokane County, Washington
10. Bird v Martin Family Trust, et al.; Whatcom County, Washington
11. Stephens v Jack In The Box; Bannock County, Idaho
12. Woods v Auburn School District; King County, Washington
13. Morgan v Baker Hughes, et al.; US District Court, Wyoming
14. Hurst v Albo; King County, Washington
15. Rose v Herfy's Burgers; King County, Washington
16. Fulbright v Columbia County Transit; Columbia County, Washington
17. Pedersen v Crystal Mountain; King County, Washington
18. Boucher v BSNF; Cascade County, Montana
19. Kim v First Lutheran Church; Los Angeles County, California
20. Glassman v State of Washington (EWU); King County, WA
21. Radischat v Office Depot; King County, Washington (Arbitration)
22. Dimick v Hopkinson; Unita, Wyoming
23. Bongiorno v Allrock; Clark County, Nevada
24. Nunnallee v University of Idaho; Latah County, Idaho
25. Saltzberg v Chuckanut Capital, LLC; King County, Washington
26. Vanlandingham v Sellen Construction, Inc.; King County, Washington
27. Quintanilla v City of Seattle; King County, Washington
28. Glaser (Trees) v Sorenson; King County, Washington
29. Deitz v Providence Health Services-Washington; King County, Washington
30. Raines v Sunwest Enterprises, LLC, et al.; Yakima County, Washington
31. Kaptein v BMC West Corporation; US District Court, Idaho
32. Larson v Cactus Pete's; Twin Falls County, Idaho
33. Ross v Palace Station; Clark County, Nevada
34. Veluz-Abraham v County of Los Angeles; Los Angeles County, California
35. UP v UPRC, et al.; Morehouse Parish, Louisiana
36. Tolentino v Wenatchee Valley Hospital; Chelan County, Washington
37. Morrison v Stone; Teton County, Idaho
38. Roberts v Jackson Hole Mountain Resort; US District Court, Wyoming
39. Frey v Daffodil Bowl; Pierce County, Washington
40. Gagnier v Hilton Garden Hotel; Yakima County, Washington
41. Poteet v Washington Closure Hanford, LLC; Benton County, Washington
42. Smith v Bouwfonds Seasons GP, LLC; Snohomish County, Washington
43. Xu v City of Issaquah; King County, Washington
44. Arnold v City of Shelton; Mason County, Washington
45. Lima v State of Washington; King County, Washington

**2015**
**Trials:**

3

1. Gebru v Burstein; King County, Washington (State)
2. Gebru v Burstein (Rebuttal); King County, Washington
3. State of Idaho v Rietkerk; Twin Falls County, Idaho
4. Boyd v Isrankura; King County, Washington
5. Pamplin v Safway Services; Clark County, Washington
6. Guernsey v City of Salinas; Monterey County, California
7. Vannatter v Value Village; Spokane County, Washington
8. Broderick v State of California; Mariposa County, California
9. Holihan v Potlatch, et al.; Boise County, Idaho

**Depositions/Arbitrations:**
1. Vannatter v Value Village; Spokane County, Washington
2. Ledford v Value Village; Yakima County, Washington
3. Jarvis v City of Phoenix; Maricopa County, Arizona
4. Rhodes v Veolia Transportation, Inc.; Clark County, Nevada
5. Beck v Wilson; Spokane County, Washington
6. Schibel v STCU; Spokane County, Washington
7. King v Four Seasons Resort; Teton County, Wyoming
8. Williams v GE Medical Systems; King County, Washington
9. Brewer v City of Kent; King County, Washington
10. Arnett v Seaside Transportation; San Francisco, California
11. Byzewski v Part 212 Apartments; King County, Washington
12. Paulson v Life Care Services; King County, Washington
13. Montgomery v The Cosmopolitan; Clark County, Nevada
14. Hamiel v NET Systems; Kitsap County, Washington
15. Hopkins v Fred Meyer's; Spokane County, Washington
16. Selway v Walsh Construction; Great Falls, Montana
17. Grimes v NW Nitro; Yakima County, Washington
18. Poole v City of Auburn; King County, Washington
19. Moctezuma v Big Lots; Los Angeles County, California
20. Whyte v Whitebird, Inc; Grant County, Washington
21. Holihan v Potlatch, et al.; Boise County, Idaho
22. Drake v Costco; King County, Washington
23. Eirls v Hoopfest; Spokane County, Washington
24. Dingfield v Macy's; Spokane County, Washington
25. Mason v Emerald Downs; King County, Washington
26. Guernsey v City of Salinas; Monterey County, California
27. Holihan v Potlatch, et al. (Part II); Boise County, Idaho
28. Poole v City of Auburn (Part II); King County, Washington
29. Dirkson v Northtown Square, LLC.; Spokane County, Washington
30. Chenoweth v Mercer Island; King County, Washington
31. D'Arcy v Evergreen Hospital; King County, Washington
32. Gotcher v Intercity Contractors; King County, Washington
33. Kaur v All State; King County, Washington
34. Kendall v McDonald's; Jackson County, Missouri
35. Bigknife v Xanterra Parks & Resorts; District of Wyoming
36. Byers v Home Depot; Clark County, Nevada

37. Gray v Coast hotels, et al.; Clark County, Nevada
38. Baker v National Railroad; Western District of Washington, Seattle
39. Crawford v City of Kennewick; Benton County, Washington
40. Forbush v Sagecrest Multifamily POA; Ada County, Washington
41. Dawood v Mercedes Benz; Western District of Washington, Tacoma
42. Giovara v Fashion Mall; Clark County, Nevada
43. Fulton v Fred Meyer; King County, Washington

**2014**
**Trials:**
1. Brock v Jack in the Box, Inc.; King County, Washington (State)
2. Kerber v Golden Waite Properties, LLC; Pierce County, Washington
3. Jones v K-Mart; Natrona County, Wyoming

**Depositions/Arbitrations:**
1. Levi v Greyhound Bus Lines, Inc.; Seattle, Washington
2. Roundtree v Boise Baseball Park; Boise, Idaho
3. Gooler v Sun Dome; Yakima, Washington
4. Huebner v GNLV, Corp.; Clark County, Nevada
5. Morgan v City of Ketchum; Blaine County, Idaho
6. Steffen v Home Depot; Spokane County, Washington
7. Haney v SMG; King County, Washington
8. Israel v State of Washington; King County, Washington
9. Hansen v. Pettit Oil; King County, Washington
10. Jewell v Safeway, et al.; Spokane County, Washington
11. Jordon v Floral Expressions, et al.; Spokane County, Washington
12. Broderick v CAL Trans; Mariposa County, California
13. James v State of Washington; Seattle, Washington
14. McConnell v Burger and Grand; Spokane County, Washington
15. Lopez v Island of Angels Child Care Center; Benton County, Washington
16. Swingholm v Pilot Travel Ctrs.; Cheyenne, Wyoming
17. Pilutik v McDonald's; King County, Washington
18. Campbell v University of Washington; Seattle, Washington
19. Hutchins v Silverwood; Kootenai County, Idaho
20. Gebru v Burstein; King County, Washington
21. Buchanan v Brog; Lincoln County, Wyoming
22. Jones v K-Mart; Natrona County, Wyoming
23. Pamplin v Safway; Clark County, Washington
24. Ferraro v Mac & Jack's Brewery; Spokane County, Washington
25. McElyea v Zapata's, Inc.; Park County, Wyoming
26. Boyd v Isarankura; King County, Washington
27. Haynes v Orting School District; Pierce County, Washington
28. Graziano v Coast Hotels & Casinos; Clark County, Nevada
29. Boyd v Isarankura (Part II); King County, Washington
30. Morales v Restec Contractors, et al.; San Francisco County, California
31. Larsen v City of Seattle; King County, Washington

32. Gebru v Burstein; King County, Washington
33. Modroo v Mountain Hardware; Bonneville County, Idaho
34. Baker v Ada County; Canyon County, Idaho

**2013**
**Trials:**

1. MacLay v M/V Sahara, et al.; King County, Washington (Federal)
2. Hennefer v Blaine County School District #61; Blaine County, Idaho (State)
3. Felicia v Celebrity Cruises, Inc.; Miami-Dade County, Florida(Federal)
4. State of WA v Christopher Arnold; Spokane County,Washington (State)

**Depositions/Arbitrations:**

1. Reynolds v Seattle Transit; King County, Washington
2. Kill v City of Seattle; King County, Washington
3. Pupo-Fielding v Wal-Mart; Spokane County, Washington
4. Hennefer v Blaine County School District #61; Blaine County, Idaho
5. Creswell v Extendicare Homes, Inc.; Yakima, Washington
6. Powers v Kroger Co.; King County, Washington
7. Schiro v Emerald Downs; King County, Washington
8. Willard v City of Everett; Seattle, Washington
9. McCann v Haggen, Inc.; King County, Washington
10. Farnsworth v City of Yakima; Yakima, Washington
11. Thomas v Greyhound; Reno, Nevada
12. Seaman v LAVO Nightclub; Clark County, Nevada
13. Brock v Jack in the Box; King County, Washington
14. Labore v Kroger Company; Tacoma, Washington
15. Miller v Wind River Partners LLC; Teton, Wyoming
16. Buenrostro v Wal-Mart Stores Inc.; Las Vegas, Nevada
17. Moussa v Valley Health System, LLC; Clark County, Nevada
18. Cole v Ridley's Family Markets, Inc; Teton, Wyoming
19. Saunders v PNS Stores, Inc.; ADA County, Idaho

# Exhibit "D"



# Applied Cognitive Sciences, Inc.
# 2017 Fee Schedule

| | Rates Per Hour[1] | Sworn Testimony Per Hour[1,2] | Sworn Testimony Minimum Charge[1,3] |
|---|---|---|---|
| **Rick Gill, PhD, CHFP, CXLT**<br>Chief Scientist | $420 | $460 | $1350 |
| **Joellen Gill, MS, CHFP, CXLT, CSP**<br>President and Senior Engineer | $350 | $400 | $1200 |
| **Zachary Doerzaph, PhD**<br>Associate Engineer | $250 | $300 | $900 |
| **Scot Gill, MS**<br>Associate Scientist | $150 | $200 | $600 |
| **Levi Dixon, BS, CXLT, ASP**<br>Assistant Engineer | $150 | $200 | $600 |
| **Jerry Havens, BS, CXLT**<br>Assistant Engineer | $150 | $200 | $600 |

Notes:
1. All charges are portal to portal, plus expenses.  Expedited work (i.e. work required to be completed within 5 business days) is billed at time-and-a-half; during major holidays such requests will be billed at double time.
2. All rates are plus expenses, including preparation of any requested materials by opposing counsel.
3. Sworn Testimony Cancellation Policy: 50% of minimum fee for Sworn Testimony will be billed if cancelled within (1) week of scheduled date.
4. Terms:  Net 30 days.  Late charge of 1.5% per month will be added to any outstanding balance over 30 days.

If you wish to retain us, we do request a $1000.00 retainer and bill bi-monthly; checks should be made payable to Applied Cognitive Sciences, Inc.; Tax # 20-1883699.

Please let us know if you need any additional information or if we can be of any assistance. We look forward to working with you.

Effective Date:  January 1, 2017

_____

# Exhibit "E"

**INVESTIGATION OF THE
SAMANTHA JOYCE BROBERG
INCIDENT**

17SS0199

KARL M. BROBERG, Individually, and as Administrator of the Estate of
SAMANTHA JOYCE BROBERG, Deceased,
*Plaintiff*,

CARNIVAL CORPORATION,
d/b/a CARNIVAL CRUISE LINES,
*Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 17-CV-21537-FAM

AT LAW AND IN ADMIRALTY

By:

**John A. Cocklin**

October 2, 2017



## A.  INTRODUCTION

At approximately 1:57 a.m., May 13th, 2016 after an approximately thirteen hour time period of consuming alcoholic beverages, Samantha Joyce Broberg, a passenger on the cruise ship Carnival Liberty, fell overboard and was subsequently deemed lost at sea.  The Carnival Liberty was underway in the Gulf of Mexico, en route to Cozumel, Mexico on the first night of a four night cruise.

Robson Forensic was retained to determine if the crew and staff of the Carnival Liberty:

- Violated Carnival's standard of care for the sale, service and delivery of alcoholic beverages as well as passenger security measures for intoxicated passengers.
- If the service of alcoholic beverages to an intoxicated patron (Broberg) was a cause of Broberg's death.
- If the service of alcoholic beverages to an intoxicated patron, such as Broberg, would have caused the dangerous condition resulting in bodily harm and or death.

This evaluation was performed by, and report prepared by John A. Cocklin

## B.  AVAILABLE INFORMATION

1) United States Coast Guard response file number 5876655 for a man overboard from Carnival Liberty, REDACTED, and supplied pursuant to a Freedom of Information request.
2) United States Coast Guard Letter of Presumed Death, October 10, 2016
3) United States Federal Bureau of Investigation file number 45A-HO-7771467, REDACTED, and supplied pursuant to a Freedom of Information request.
4) Affidavit of Amy Brady, undated
5) Affidavit of Sarah Nelms Churman, undated
6) Affidavit of Tammy Ramirez, undated
7) Plaintiff's Supplemental Disclosure, dated September 1, 2017
8) Plaintiff's Second Supplemental Disclosure, dated September 15, 2017
9) Texas Driver's License for Samantha Joyce Broberg, No. 18080305
10) Carnival Sign and Sail statement for Sarah Churman
11) Carnival Sign and Sail statement for Amy Brady
12) Carnival Sign and Sail statement for Samantha Broberg
13) Six Sign and Sail alcoholic beverage receipts charged to Samantha Broberg's account.
14) Carnival Cruise Line bartender procedure number 18857
15) Carnival Cruise Line, Carnival College, Module 7, Beverage Service, Bar Service Program, CCL 18857
16) Carnival Cruise Line, Carnival College, Module 5, Duties and Responsibilities, Bar Service Program, CCL 18857
17) Carnival Cruise Line, Carnival College, Module 4, Responsible Alcohol Service, Bar Service Program, CCL 18857

18) Carnival Cruise Line, Carnival College, Responsible Service of Alcohol, slide show, Bar Service Program, CCL 18857, with instructor's notes
19) Carnival Cruise Line, Carnival College, F.S.S., Fun Sales System, Bar Service Program, CCL 18857
20) Carnival Cruise Line, Carnival College, Classic Cocktail Cross Promotion, Bar Service Program, CCL 18857
21) Carnival Cruise Lines Ship Security Manual, Chapter 4.4, Investigations, dated July 30, 2012, revision 3
22) Carnival Cruise Lines Ship Security Manual, Chapter 4.5, Reporting, dated July 30, 2012, revision 4
23) Carnival Cruise Lines Ship Security Manual, Chapter 4.6, Security Patrols, dated July 24, 2012, revision 10
24) Carnival Cruise Lines Ship Security Manual, Chapter 4.7, Vessel Security Procedures, dated November 28, 2012, revision 8
25) Carnival Cruise Lines Ship Security Manual, Chapter 4.10, Detention / Restraint of Guest / Crew, dated November 28, 2012, revision 0
26) Carnival Cruise Lines Ship Security Manual, Chapter 5.2, Crime Scene Check List for Cruise Lines Personnel Re: Homicides-Suicides-Accidental Deaths, dated October 1, 2003, revision 0
27) Carnival Cruise Lines Ship Security Manual, Chapter 5.3, Evidence Collection Checklist, dated December 8, 2008, revision 1
28) Carnival Cruise Lines Ship Security Manual, Chapter 5.16, Handling of Intoxicated or Aggressive Individuals, dated October 12, 2009, revision 2
29) Carnival Liberty, vessel position report, May 12, 2016 to May 14, 2016
30) Carnival Liberty FLIR video
31) Expert's Report of Dr. Michael Whitekus
32) Expert's Report of Mr. Kyle McAvoy

## C. INCIDENT DESCRIPTION

Sometime before Mother's Day 2016, Samantha Broberg, Sarah Nelms Churman and Amy Brady talked about having a "mom's getaway girls' weekend" and going on a Carnival Cruise.  They booked the Carnival Liberty leaving out of Galveston, Texas on May 12, 2016 and returning on May 16, 2016. This was Broberg's first cruise.

On May 12, 2016 shortly after noon, Broberg, Churman and Brady boarded the ship and went to their cabin number 1256[1] located on the ship's forward portside on the Rivera Deck One. [2]

Sometime around 1:00 p.m. Broberg, Churman and Brady went to the Red Frog Rum Bar (located on the Lido Deck 9[3]), and each of them had a cocktail special.  Broberg had a Tito's Vodka with a "make it a double" special and her Sign and Sail card was

---

[1] Affidavit of Amy Brady, page 2
[2] https://www.carnival.com/cruise-ships/carnival-liberty.aspx
[3] Ibid

charged at 1:06 p.m., $8.75 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[4]

At approximately 4:30 p.m., Broberg had another Tito's vodka with a "make it a double" special at the Promenade Bar (located on the Promenade Deck 5[5]) and her Sign and Sail Statement reflects a charge at 4:33 p.m., for $12.02.[6]

At approximately 5:30 p.m., Broberg had another Tito's vodka with a "make it a double" special at the Promenade Bar and her Sign and Sail card was charged at 5:33:28 p.m., $6.50 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[7]

At approximately 6:30 p.m., Broberg had another Tito's vodka with a "make it a double" special at the Red Frog Rum Bar and her Sign and Sail card was charged at 6:32:56 p.m., $6.50 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[8]

At approximately 8:00 p.m., Broberg had another Tito's vodka with a "make it a double" special at the Promenade Bar and her Sign and Sail card was charged at 7:58:25 p.m., $6.50 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[9]

At the 8:30 p.m. dinner seating, Broberg had a special drink containing Grey Goose vodka with Curacao (a blue liquor 15% to 40% ABV depending on brand).[10]

After dinner, Broberg, Churman and Brady went to the ship's casino (Czar's Palace Casino, Promenade Deck 5[11]).  While gambling, Churman won a slot jackpot and the casino manager offered them a shot of Tito's vodka.[12]

 At approximately 11:40 p.m., Broberg had another Tito's vodka with a "make it a double" special and a 16 ounce Miller Lite beer at the Promenade Bar and her Sign and Sail card was charged at 11:40:44 p.m., $5.95 for the Miller Lite beer, $6.50 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[13]

At approximately 12:51 a.m. on March 13, 2016, Broberg had another Tito's vodka with a "make it a double" special and a 12 ounce Corona beer at the Promenade Bar and her

---

[4] Carnival Liberty, Red Rum Bar, check # 096421847 5/12/2016 1:06:27 p.m.
[5] https://www.carnival.com/cruise-ships/carnival-liberty.aspx
[6] Carnival Liberty, Sail & Sign statement, Samantha Broberg, page 1.
[7] Carnival Liberty, Promenade Bar, check # 144424824 5/12/2016 5:33:28 p.m.
[8] Carnival Liberty, Red Frog Rum Bar, check # 096425852 5/12/2016 6:32:56 p.m.
[9] Carnival Liberty, Promenade Bar, check # 144427191 5/12/2016 7:58:25 p.m.
[10] Affidavit of Any Brady, page 3
[11] https://www.carnival.com/cruise-ships/carnival-liberty.aspx
[12] Affidavit of Amy Brady, page 2
[13] Carnival Liberty, Promenade Bar, check # 144430936 5/12/2016 11:40:44 p.m.

Sign and Sail card was charged at 12:51:54 a.m., $5.95 for the Corona beer, $6.50 for the Tito's vodka with and extra charge of $3.00 for the double amount of Tito's vodka.[14]

Sometime shortly after 1:15 a.m., another Carnival Liberty passenger, Tammy Ramirez, awoke in her cabin and determined that her husband, Armando Ramirez, had not come to bed.  She began a search of the ship and soon thereafter, found him at the Promenade Bar standing next to, and with his arm around, Broberg, who was sitting on a barstool.  Tammy Ramirez was very upset to find her husband with his arm around another lady and standing so close to her.  For that reason, Tammy Ramirez took four photographs using her cell phone of Broberg and Armando Ramirez.

After taking the photographs, Tammy Ramirez approached her husband and Broberg and spoke with them.  Tammy Ramirez recalled that Broberg was being referred to by others at the bar as "Sam" and Broberg stated that her name was "Sam."  As Tammy Ramirez was speaking with Broberg, she observed that Broberg was "very intoxicated and visibly drunk".



Tammy Ramirez made the following observations of Broberg as Broberg sat at the Promenade Bar:

1) Broberg was slouching forward with her elbows propped on the bar and her head leaning forward with her eyes partially closed at times and completely closed at other times.

2) When speaking with Tammy Ramirez, Broberg spoke very slowly and appeared drowsy.  Broberg's speech was so slurred that it was difficult to understand her and she appeared to be falling asleep

3) Broberg was unable to properly respond to questions asked by Tammy Ramirez and Broberg could not concentrate on what Tammy Ramirez and others were talking about and could barely speak.

4) Broberg had very glossy eyes and would not look at Tammy Ramirez as they talked.

---

[14] Carnival Liberty, Promenade Bar, check # 12843159* 5/13/2016 12:51:54 a.m. *check #'s last digit unreadable in copy.

As Tammy Ramirez was speaking to Broberg and her husband, Armando, she also observed that several other male passengers were standing around Broberg.  Tammy Ramirez observed that one of the male passengers bought Broberg a beer which the Carnival bartender served to Broberg without any reservation or concern for her visibly intoxicated state.  The service of this beer to Broberg occurred at approximately 1:20 a.m.

In the photographs Tammy Ramirez took her husband, Armando, was wearing a baseball cap, grey tank top and greyish plaid cargo shorts, with white sneakers and white socks.  Broberg was wearing a white strapless dress with white wedges and records one of the occasions that Tammy Ramirez observed Broberg nod off while sitting at the Promenade Bar.[15][16]

A male passenger, identified as Israel Cervantes, was seated with Broberg at the Promenade Bar[17]  Cervantes continued to stay with Broberg after the departure of Tammy and Armando Ramirez.  Mr. Cervantes reported to the Federal Bureau of Investigation that Broberg was aggressively "hitting" on him and Cervantes was reluctant to engage in sexual relations because Broberg was "drunk and he didn't want to be accused of taking advantage of her."  Cervantes suggested to Broberg that they both go up to the 10th deck (The Panorama Deck 10[18]) and get some fresh air.  Broberg agreed.  Once on the exterior tenth deck, Broberg stood up on a lounge chair that had previously been placed against the deck's exterior railing.  Broberg then lifted herself up on the top of the railing to sit on it. Almost immediately, Broberg fell over backwards off the ship.[19] The estimated time of Broberg's overboard fall was 1:57 a.m.[20]

## D.  BACKGROUND

Carnival Cruise Lines (CCL) provides internal training concerning the company's policies and procedures for its ships crew and staff.  The policies and procedures relevant to this incident are:

### Bar Service Program – Duties and Responsibilities

CCL lists twenty-three duties of a bar server.  The only reference to a bar server's responsibility for service to a guest that appears intoxicated is in the twelfth duty, which states:

> Advise Bar management or security when a guest(s) appear to be intoxicated and behaving in such a way that they need to be monitored for their wellbeing.[21]

---

[15] Affidavit of Tammy Ramirez, pages 1-3
[16] Federal Bureau of Investigation, File 45A-HO-7771467 [REDACTED], dated June 13, 2016, page 1
[17] The Federal Bureau of Investigation report refers to the "casino bar."   However the casino and the Promenade Bar are situated next to each other and are both located on the Promenade Deck 5.
[18] https://www.carnival.com/cruise-ships/carnival-liberty.aspx
[19] Federal Bureau of Investigation, File 45A-HO-7771467 [REDACTED], dated June 13, 2016, page 1
[20] Carnival Liberty FLIR video
[21] Carnival Cruise Line – Carnival College, Bar Service Program, section 5-5, page 131

The bar servers are supervised by either a bartender or a senior bartender. CCL lists twenty-five duties for a bartender and twenty- eight duties for a senior bartender.  The only reference to a bartender's or a senior bartender's responsibility for service to a guest that appears intoxicated states:

> Advise Bar Management whenever a guest(s) have been refused service due to excessive alcohol consumption.[22]

## Responsible Alcohol Service[23]

CCL provides staff training on the responsible service of alcohol.  The information presented in this course was compiled from the Serve Safe Alcohol Training Program. The Serve Safe program was designed by the National Restaurant Association Educational Foundation.[24]

### COUNTING DRINKS USING STANDARD MEASURES



| One Drink Equals | Or | Or | Or |
|---|---|---|---|
| 5 ounces of wine (Domestic wine 12% alcohol) | 12 ounces of beer (American lager 4-5% alcohol) | 1.5 ounces of 80 proof liquor | 1 ounce of 100 proof liquor |

- o The body can only process alcohol at the rate of one drink per hour.
- o Consuming more will result in a buildup of alcohol in the bloodstream, raising BAC (blood alcohol concentration).

---

[22] Ibid, pages 127-129
[23] Carnival Cruise Line, Carnival College, Responsible Service of Alcohol, slide show, Bar Service Program, CCL 18857, pages 20-46
[24] Carnival Cruise Line – Carnival College, Bar Service Program, Module 4, page 123

HOW TO PROVIDE RESPONSIBLE SERVICE

- o   Never serve a guest who is obviously intoxicated
- o   Offer a glass of water to guest who have had multiple drinks
- o   If in doubt, contact your Manager immediately
- o   Use the Traffic Light System

PHYSICAL AND BEHAVIORAL SIGNS OF INTOXICATION

1. Relaxed inhibitions - Inhibitions restrain or suppress a person's emotions, actions, or thoughts. Guests with relaxed inhibitions may:
     - o   Be overly friendly
     - o   Be unfriendly, depressed, or quiet
     - o   Use foul language
     - o   Become loud
     - o   Make rude comments

2. Impaired judgment - A guest's ability to make sensible decisions will be affected. Guests with impaired judgment may:

     - o   Complain about the strength of a drink after having consumed others of the same strength.
     - o   Begin drinking faster or switch to larger or stronger drinks.
     - o   Make irrational or argumentative statements.
     - o   Become careless with money. (i.e., buying drinks for strangers)

3. Slowed reaction time - A guest's reaction time and response will become slower.  Guests with slowed reaction time may:

     - o   Talk or move slowly
     - o   Become drowsy
     - o   Be unable to concentrate, lose their train of thought, or become forgetful
     - o   Become glassy-eyed, lose eye contact, or lose the ability to focus

4. Impaired motor coordination - Guest's motor skills will be affected.  Guests with impaired motor coordination may:

     - o   Stagger, stumble, fall down, or bump into objects
     - o   Be unable to pick up objects, or may drop them
     - o   Spill drinks or miss their mouths when drinking
     - o   Sway when sitting or standing.
     - o   Slur their speech
     - o   Have difficulty lighting a cigarette

HOW TO IDENTIFY INTOXICATION

Whenever serving alcohol to guest, you must look for the signs of Intoxication:

- o   Crude behavior
- o   Becoming loud and boisterous
- o   Annoying other guest
- o   Spilling drinks
- o   Become agitated or argumentative
- o   Falling asleep
- o   Clumsy uncoordinated movements such as swaying, stumbling or falling down
- o   Bumping into furniture or other guest
- o   Slurred speech
- o   Glassy Eyes, loss of focus/eye contact
- o   Unable to light a cigarette
- o   Rambling conversation or nonsensical statements
- o   Difficulty signing bar checks
- o   A guest who appears to be intoxicated needs to be pointed out to your BOM on duty, other bartenders and security even if they have not tried to order more drinks. An intoxicated guest can be a hazard to themselves and other guests,
- o   This also applies to guest who are dozing off or sleeping as this might indicate they need assistance or medical attention,

THE TRAFFIC LIGHT SYSTEM

The program identifies an easy to remember system to help determine if the guest should be served.  Serve Safe calls it the Traffic Light System. How do you assess the state of a guest?

- o   Utilize the points outlined in "How to Identify Intoxication"
- o   Pay close attention to the coordination skills of the guest

- o   Using these tools you should be able to identify if a guest falls into the green (go), yellow (caution) or red (stop) category of the Traffic Light System:

**GO -** No signs of visible intoxication are observed. It is acceptable to serve alcohol to guests

Status of Guest:
- o   Looks and acts Sober
- o   No visible signs of Intoxication

RSA Goals

- o Keep the guest in the Green Level
- o Allow the guest to have fun without progressing to the Yellow Level
- o Regular service should continue
- o Focus on upselling the guest to premium spirits and cocktails
- o Monitor the pace at which the guest is consuming alcoholic drinks
- o Offer water and other non-alcoholic beverages between the consumption of alcoholic drinks

**CAUTION -** The guest is not yet intoxicated but you are concerned.

Status of Guest:

- o Overly friendly with strangers and crew
- o Speaking loudly or acting in an annoying manner
- o Confrontational and aggressive towards other
- o Stumbling, swaying and slight loss of coordination

RSA Goals

- o Primarily, get the guest back to the Green Level
- o Secondly, try to ensure the guest does not get to the Red Level
- o Dramatically slow down the rate the guest is consuming Alcohol
- o Caution, Caution, Caution!
- o Offer the guest water, coffee or other non-alcoholic beverages
- o Closely monitor the guest's pace of consumption

**STOP -** The guest appears visibly intoxicated and should not be served any alcohol.

Status of Guest:

- o Falling asleep
- o Swaying and staggering
- o Slurred speech
- o Spilling drinks

RSA Goals

- o Stop the service of alcoholic beverages
- o Take action
- o Politely inform the guest that you are unable to serve them any more alcoholic beverages

- o  Provide the guest with a glass of water
- o  Inform the BOM on duty as well as security of the situation and guest folio number
- o  Keep a close eye on the guest and try to keep them in the location
- o  Coordinate with Security when they arrive on the scene
- o  Politely stop service and offer water

REFUSING ALCOHOL SERVICE

Steps to refusing alcohol service:

- o  You must take action
- o  Politely inform the guest that you are unable to serve them  anymore alcoholic beverages
- o  Provided the guest with a glass of water
- o  Call the BOM on duty and advise them of the situation
- o  Inform Security
- o  Keep an eye on the guest and their movement. You want to keep them in your location, particularly if it appears they are unable to look after themselves, until the BOM and Security arrive

## Carnival Cruise Lines Security Procedures

The Carnival Cruise Lines Security Manual details the ship's staff proper procedure for interaction with an intoxicated passenger.

### 4.6.2 Intoxicated or Aggressive Individual[25]

If a guest is considered under the influence of alcohol, the Bar Manager will instruct the bar personnel not to serve that person any more alcohol.  In a case of extreme intoxication, the Chief Security Officer will invite the person to follow him to their assigned cabin.  A brief period of surveillance is suggested (at least for the first hour).  The medical department will be informed if the condition of the guest warrants this action.

## Sanjay Kumar, Chief of Security

The security and alcohol service procedures are uniform throughout the Carnival Cruise Line's twenty-four ships. Training on these procedures are provided by Carnival Cruise Lines to both the security staff and the alcohol service staff. [26]  The Carnival Liberty has a normal complement of eleven security officers and one chief security officer.[27]   On

---

[25] Carnival Cruise Lines Ship Security Manual, Chapter 4.6, Security Patrols, dated July 24, 2012, revision 10, page 398
[26] Deposition of Sanjay Kumar, dated September 27, 2017, pages 19-20
[27] Ibid, page 22

the evening of May 12, 2016 into the early morning hours of May 13, 2016 the ship had five security officers on patrol.[28]

The first time Kumar became aware of Broberg was around Noon on May 13, 2016 after her cabin mates notified guest services that Broberg failed to return to her cabin from the previous evening.[29]

Mr. Kumar was asked if in his investigation did he make any determination that the bar staff tried to stop the service of alcohol to Broberg.  Kumar stated that the bar staff did not see anything dangerous, or alarming with Broberg's conduct. Kumar recalled that the bar staff did not cut her off because her conduct was not alarming enough.[30]

According to Kumar, all of the ship's supervisors, the bar managers, the housekeeping managers, and any senior staff are all are trained to identify intoxicated passengers. Kumar stated that if any saw this kind of situation involving a passenger they are required to report the passenger to security and the security officers will stop the sale or service of alcohol to that passenger.  In addition, once notified of an intoxicated passenger, security officers will attempt to contact their family members or cabin mates to assist in taking the intoxicated passenger back to their cabin.  The security officers will escort the intoxicated passenger to their cabin and monitor them for a period of time. If needed, the security officer will contact the ship's medical staff for assistance.[31]

## E. DANGEROUS CONDITIONS

1. The crew and staff of the Carnival Liberty created a dangerous condition when they served alcoholic beverages to Samantha Joyce Broberg, after Broberg exhibited signs of intoxication.

2. The crew and staff of the Carnival Liberty created a dangerous condition when they either failed to recognize the intoxicated state of Samantha Joyce Broberg, or if it was recognized, they failed to follow the standard of care for an intoxicated passenger as outlined in Carnival Cruise Lines procedures.

3. The crew and staff of the Carnival Liberty created a dangerous condition by allowing an intoxicated Samantha Joyce Broberg to leave the Promenade Bar without the assistance of a security officer, in violation of Carnival Cruise Lines' procedures for dealing with intoxicated passengers.

---

[28] Ibid, page 28.
[29] Ibid
[30] Ibid, page 80
[31] Ibid, pages 70 and 87

## F.  ANALYSIS

In a twelve and one half hour time period, Broberg consumed twelve alcoholic beverages – seven of which contained double shots.  The total number of standard drinks as defined in Carnival Cruise Lines Responsible Service of Alcohol (Serve Safe) presentation would equate to nineteen standard drinks.  Since seven of Broberg's drinks contained double shots of vodka, each drink was the equivalent of two standard drinks.  Since the body can only process the equivalent of one standard drink per hour, Broberg's level of intoxication rose as her consumption of alcohol was greater than her body could expel.

Had the bar staff at the Promenade Bar counted the drinks being served to Broberg between 11:40 p.m. and 1:40 a.m. they would have realized that they served Broberg the equivalent of seven standard alcoholic drinks in a two hour period.  During this time there is no evidence the bar staff identified Broberg as entering the caution and stop stages of alcohol service.  Either the staff failed to identify Broberg's visible signs of intoxication or they did recognize the signs and chose to ignore Carnival Cruise Lines' policies and procedures for the standard of care in the sale and service of alcoholic beverages.

As detailed in Dr. Whitekus' report, this level of consumption would have raised her blood/alcohol level to levels where it is more likely than not that she would have displayed visible signs of intoxication.  Based upon Broberg's Sign and Sail receipts, the bar staff continued to sell and serve her alcohol in violation of Carnival Cruise Lines companywide standard of care for the responsible service of alcohol.

The excessive alcohol consumption resulted in Broberg exhibiting visible signs of intoxication consistent with the signs detailed in the Carnival Cruise Lines companywide policy and training for responsible alcohol service.  These visible signs of intoxication were witnessed by another Carnival Liberty passenger, Tammy Ramirez.  The chart below compares the description of Broberg's visible signs of intoxication versus Carnival Cruise Lines policy and training on how to identify intoxication.

| RAMIREZ'S DESCRIPTION OF BROBERG | CARNIVAL CRUISE LINES HOW TO IDENTIFY INTOXICATION |
|---|---|
| Broberg was slouching forward with her elbows propped on the bar and her head leaning forward with her eyes partially closed at times and completely closed at other times. | Falling asleep<br><br>This also applies to guest who are dozing off or sleeping as this might indicate they need assistance or medical attention.<br>STOP – in traffic light rating system |
| Broberg spoke very slowly. Her speech was so slurred that it was difficult to understand her. | Slurred speech<br>STOP – in traffic light rating system |
| Broberg was unable to properly respond to questions of her. She could not concentrate on what others were talking about and could barely speak. | Rambling conversation or nonsensical statements |
| Broberg had very glossy eyes and would not look at people as they talked to her. | Glassy Eyes, loss of focus/eye contact |

The description of Broberg's actions is consistent with the levels of alcohol intoxication determined by Dr. Whitekus. During the time that Ramirez observed Broberg's intoxicated state, Broberg was served a beer by the ship's staff and purchased for her by another passenger. The bar staff either failed to recognize Broberg's signs of intoxication, or they chose to ignore them and continued to serve her alcohol. This was contrary to Carnival Cruise Lines' policies and procedures and the standard of care regarding the prohibition of alcohol service to intoxicated passengers. This created a dangerous condition that contributed to Samantha Joyce Broberg's death.

The ship's staff allowed Broberg to leave the bar without notifying security of her visibly intoxicated state. Because the staff failed to notify security of her intoxicated condition, Broberg and another passenger wandered to an exposed deck where her actions led to her death. This was contrary to Carnival Cruise Lines' policies and procedures and the standard of care regarding ship's security response to intoxicated passengers. This created a dangerous condition that contributed to Samantha Joyce Broberg's death.

## G.  FINDINGS

Within the bounds of reasonable professional certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The crew and staff of the Carnival Liberty created a dangerous condition when they served alcoholic beverages to Samantha Joyce Broberg, after Broberg exhibited visible signs of intoxication in violation of the standard of care promulgated by Carnival Cruise Lines for identifying and caring for intoxicated passengers.  This dangerous condition was a cause of Broberg's death.

2. The crew and staff of the Carnival Liberty created a dangerous condition when they either failed to recognize the intoxicated state of Samantha Joyce Broberg, or if it was recognized, they failed to follow the standard of care promulgated by Carnival Cruise Lines for identifying and caring for intoxicated passengers.  This dangerous condition was a cause of Broberg's death.

3. The crew and staff of the Carnival Liberty created a dangerous condition by allowing an intoxicated Samantha Joyce Broberg to leave the Promenade Bar without the assistance of a security officer, in violation of Carnival Cruise Lines' procedures for dealing with intoxicated passengers.  This dangerous condition was a cause of Broberg's death.

4. The crew and staff of the Carnival Liberty, based upon their standard policies, procedures and training, should have known that the over service of alcoholic beverages to Samantha Joyce Broberg while she was visibly intoxicated constituted a dangerous condition that was a cause of Broberg's death.


_____
John A. Cocklin

# Exhibit "F"

# **Robson Forensic** THE EXPERTS

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

## PROFESSIONAL EXPERIENCE

2016 to
Present

**Robson Forensic, Inc.**
*Associate*

**Law Enforcement Practice and Procedures:** Provide technical investigations, analysis, reports and testimony toward the resolution of civil, criminal, commercial and personal injury litigation involving law enforcement practices and procedures. Area of expertise includes the actions of law enforcement officers in the performance of their duties, and their responsibilities that include:

- Use of force
- Professional standards
- Code of ethics
- Criminal investigations
- Securing crime scenes
- Evidence procedures
- Police training
- Instructor conduct
- Proper training methods
- Firearms

**Dram Shop Litigation and the Regulation of Alcoholic Beverage Products:** Provide technical investigations, analysis, reports and testimony toward the resolution of civil, criminal, commercial, personal injury and Dram Shop litigation requiring investigation into alcoholic management policies, security and the sale, service and distribution of alcoholic beverages by the licensed beverage industry.

- Site inspections
- Deposition preparation and analysis of statements
- Analysis of business practices relating to compliance with the State's regulatory requirements
- Product substitution investigations
- Owner, management and staff practices and actions
- Service of alcohol to visibly intoxicated patrons
- Service of alcohol to persons under the legal age to purchase alcohol
- Signs of intoxication
- False identification
- Proper response by a retail establishment to intoxicated or under aged people

2014 to
2016

**Private Expert Witness Consulting**
Dram Shop Litigation and Alcoholic Beverage Industry Best Practices. Provide technical investigations, analysis, reports and testimony toward the resolution of civil, criminal, commercial and personal injury litigation.

# **Robson Forensic** THE EXPERTS

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

| | |
|---|---|
| 2002 to 2014 | **New Jersey Division of Alcoholic Beverage Control** |

*Chief Investigator*

Supervised investigative activities and the regulatory oversight of NJ's alcoholic beverage industry that involved more than 10,000 businesses. Supervised, reviewed and recommended administrative charges for violations of the New Jersey Alcoholic Beverage Control Act. Investigated or supervised over 17,000 investigations that involved alcoholic beverage establishments' staff, including the ownership and management, bar, service and wait staff, security personnel, entertainers and promoters involving, among others, violent and property crime, narcotics activity, gambling, sales of alcohol to persons under the legal age, service of alcohol to visibly intoxicated patrons and undisclosed ownership interests. Member of the Director's Executive Staff and was involved in the administrative rule making process applicable to the State's alcoholic beverage industry. Authored publications and material used by the industry, including the *State of New Jersey Alcoholic Beverage Control Handbook for Retail Licensees*. Established standard operating procedures, evidence, and case tracking systems for the Division's investigations.

**Dram Shop** - Created, designed, and implemented the New Jersey Division of Alcoholic Beverage Control's *Last Drink Initiative,* which collected information from more than 530 municipal, county and state law enforcement agencies in regard to the location of a person's last drink before they were arrested for driving while impaired. Data was used to identify patterns of customer over-service at retail alcohol establishments so as to identify establishments for undercover or overt investigations. Received Exceptional Service Award from the New Jersey Attorney General as a result.

**Alcoholic Beverage Substitution** - Designed and implemented the first statewide investigation of alcoholic beverage substitution by bars and restaurants in the United States. In the New Jersey Division of Alcoholic Beverage Control's *Operation Swill,* detectives and investigators covertly collected more than three hundred samples of premium alcoholic beverage products from on-premise consumption outlets. Through the cooperation and coordination of the International Federation of Spirits Producers, the samples were analyzed by the manufacturers to determine the product's authenticity and subsequently the violators were charged.

**Alcoholic Beverage Regulations** - Supervised all investigative activities for the regulatory oversight of NJ's alcoholic beverage industry involving more than 10,000 businesses. Supervised, reviewed, and recommended administrative charges for violations of the New Jersey Alcoholic Beverage Control Act. Member of the Director of Alcoholic Beverage Control's executive staff and participated in the review, modification, and enactment of administrative regulations concerning the alcoholic beverage industry. Reviewed and updated materials provided to the industry, including the *State of New Jersey Alcoholic Beverage Control Handbook for Retail Licensees*.

# Robson Forensic
**THE EXPERTS**

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

Co-created various law enforcement training courses for more than 4000 municipal police officers assigned to enforce Alcoholic Beverage Control Act violations. Conducted required background investigations that preceded the issuance of alcoholic beverage licenses. Co-created a block of instruction on alcoholic beverage control issues for police executives and presented it at New Police Chief Orientation programs.

| | |
|---|---|
| 1999 to 2002 | **New Jersey Division of Criminal Justice** |

*Chief of Detectives*

Supervised six Deputy Chief of Detectives who had overall supervisory responsibility for 400 Detectives and Investigators assigned to various criminal investigation units in the Division of Criminal Justice, the Office of the Insurance Fraud Prosecutor, and the Office of the State Medical Examiner. Reviewed on-going investigations and prosecutions. Established standard operating procedures, recruitment, hiring, training procedures, and professional standards for the Investigation staff.

**Use of Force by Law Enforcement** - Commanding member of a team consisting of Division of Criminal Justice, State Police Detectives, and Deputy Attorneys General that established the first Statewide Attorney General's [Police] Shooting Response Team. Established the working protocols for the investigation of police involved shootings for members of the State Police, Division of Criminal Justice, and County Prosecutor's Offices.

| | |
|---|---|
| 1995 to 1999 | **New Jersey Division of Criminal Justice** |

*Deputy Chief of Detectives*

Supervised investigative personnel assigned to the Division's Internal Affairs Unit, Statewide Shooting Response Team, Prosecutors and Police Bureau, Division of Criminal Justice Academy, Records and Identification Section, and Office of the Attorney General Legal Affairs. Part of a group of prosecutors and investigators that designed and implemented the Attorney General's Shooting Response Team. Created the first comprehensive policy and procedure for police involved shootings or other use of deadly force.

**Professional Standards Investigations** - Commanded the Division of Criminal Justice's Internal Affairs unit and the Prosecutor's Supervisory Bureau which involved the supervision and review of all criminal conduct, non-criminal professional conduct, use of force, and code of ethics violations involving the 3,800 investigative and prosecutorial personnel of the Division of Criminal Justice and New Jersey's county prosecutor's offices.

**Code of Ethics Violations** - Member of a team of Deputy Attorneys General, Assistant County Prosecutors and Detectives that created a uniform Code of Ethics for County Prosecutors and the Division of Criminal Justice. Taught Code of Ethics for the basic training course for Division of Criminal Justice and County Prosecutor's detectives from its inception through 2014. Co-authored the first set of comprehensive Division of Criminal Justice Standard Operating Procedures for the Division's 400 investigative personnel.

# **Robson Forensic**
THE EXPERTS

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

**Police Training, Instructor Conduct, and Appropriate Training Methods** – New Jersey Police Training Commission certified instructor for twenty-five years. Provided instruction in more than 50 basic police training courses that included: the New Jersey criminal justice system; law enforcement ethics; history of New Jersey law enforcement; alcoholic beverage laws; asset forfeiture law and procedure; and firearms training.  Additional certifications as a Firearms Instructor, Rangemaster, and Sub-gun Instructor.

Supervised all investigations of alleged instructor misconduct, inappropriate training methods, and non-conforming or non-approved training conducted at any New Jersey approved Law Enforcement Training Academy.

Original faculty member of "Top Gun" and "Drug Unit Supervisor Training - DUST," statewide narcotics investigations training courses.

1987 to 1995
**New Jersey Division of Criminal Justice**
*Lieutenant of Detectives*
Supervised Detectives and Criminal Information Analysts assigned to the Division's Operations Bureau, Civil Remedies and Forfeiture Bureau, and the Statewide Narcotics Task Force.

Assisted the Israeli National Police in the development of its national asset forfeiture unit during a three year law enforcement exchange program between the State of New Jersey and the Israeli National Police.

Assisted in the development of a proper forfeiture program within the Department of Law and Public Safety, and the implementation of the program in the State's County Prosecutor's Offices. Trained the executive staff of the State's 21 county prosecutor's offices on compliance with the Attorney General's forfeiture guidelines.

1980 to 1987
**New Jersey Division of Criminal Justice**
*Detective*
Conducted criminal investigations in the Organized Crime and Racketeering Bureau from 1985 to 1987; the Major Fraud Bureau from 1982 to 1985; the Program Integrity Section from 1981 to 1982; and the Medicaid Fraud Section from 1980 to 1981.

1979 to 1980
**United States Army Audit Agency (Northeast District)**
*Staff Auditor*
Conducted varying governmental audits for the United States Army that included the identification and elimination of fraud, waste, and abuse of government funds or property. Audits included both financial and operational reviews of the United States Army operations. Member of the audit team that reviewed the conversion of the National Guard facility at Camp Drum, New York, into a full-time active military facility housing the Army's 10th Mountain Division.  Received a commendation from the United States Army Criminal Investigation Command for uncovering a fraud scheme involving both civilian government employees and government contractors, at Fort Hamilton Officers Club, Brooklyn, New York.

# **Robson Forensic** THE EXPERTS

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

| 1977 to 1979 | **Shiremanstown, Pennsylvania** |
|---|---|

*Uniformed Police Officer*

Provided uniformed police patrol services to a small suburban community.   Responsibilities included responding to calls involving criminal and municipal offenses, medical and fire emergencies, motor vehicle accidents, traffic direction and enforcement.  Duties included the arrest and transportation of offenders, preliminary investigation of criminal activity and coordination with the District Attorney's Office, traffic accident investigation, basic medical and fire suppression, reports, and testimony in district and county court.

## PROFESSIONAL CREDENTIALS

Firearms Rangemaster, New Jersey Police Training Commission, October 1996
New Jersey Certified Public Manager, Rutgers, The State University of New Jersey, April 1991
Subgun Instructor New Jersey Police Training Commission, October 1991
Methods of Instruction, NJ Police Training Commission Certified Instructor, June 1989
Firearms Instructor, New Jersey Police Training Commission, March 1983
Pennsylvania Basic Police Officer Training Course, Pennsylvania Municipal Police Officers
    Training Commission, Harrisburg, Pennsylvania, September 1977

## EDUCATION

Masters of Business Administration, Rider College, Lawrenceville, New Jersey, 1984
Bachelor of Science, Dual Major: Accounting & Criminal Justice, York College of Pennsylvania,
    York, Pennsylvania, 1978

*Continuing Education*

The Basics of Pistol Shooting-Phase 1, National Rifle Association of America, April 2017
NRA Range Safety Officer Course, National Rifle Association of America, January 2017
Indiana Server Training Program, Alcohol and Tobacco Commission, November 2016
eTIPS on Premise 3/0, Health Communications, Inc., October 2016
Techniques of Alcohol Management (TAM), National Hospitality Institute through the NJ
    Licensed Beverage Association, November 2014
Internal Affairs, NJ Division of Criminal Justice, May 1996
Evaluating and Reporting on Internal Control Systems, United State Department of Agriculture,
    November 1989
Narcotics Commanders Course, United States Department of Justice, Drug Enforcement
    Administration, October 1988
Asset Forfeiture Training Program, US Bureau of Justice Assistance and the Police Executive
    Research Forum; June 1988
Automated Crime Analysis, University of Delaware, December 1986
Intelligence Investigative Techniques, International Association of Law Enforcement
    Intelligence Analysts, October 1986
Basic Analytical Training, Middle Atlantic–Great Lakes Organized Crime Law Enforcement
    Network, June 1986

# Robson Forensic
**THE EXPERTS**

JOHN A. COCKLIN
Police Practices & Dram Shop and Alcoholic Beverage Regulation

API Petroleum Measurement, University of Texas at Austin, May 1985
Specialized School on Investigative Techniques of Computer Related Crimes, FBI Academy, Quantico, VA, December 1983
Detection, Investigation and Prosecution of Financial Crimes, Division of Criminal Justice and the University of Delaware, March 1983
New Jersey Emergency Medical Technician, New Jersey Department of Health, January 1981

## PROFESSIONAL MEMBERSHIPS

International Association of Chiefs of Police, active member.  Member of the IACP's Police Investigative Operations Committee, (1999 to 2002)
New Jersey State Association of Chiefs of Police, active member (1999 to 2002); Retired member (2003 to present)

# Exhibit "G"

**John A. Cocklin, MBA, CPM**
History of Expert Testimony by Deposition or Trial

Date | Case Name & Description
---|---

02/03/2017 | Angel L. Cuevas, Sr. (Co-Administrator of the Estate of Angel L. Cuevas, Jr.) et al., vs.
Leslie Maldonado, et al.
Case No. CV 14 837253
*Court of Common Pleas, Cuyahoga County [OHIO]; Deposition*

05/17/2017 | Dolores McCriskin, Vincent Meo et al. v. John Muller, South Plainfield Elks et al.
Docket # L 002338 15
*Superior Court, Civil Division [NEW JERSEY]; Deposition*

08/02/2017 | Coleman Newell v. Tavern 3358, LLC d/b/a McGuigan's, Susan Murphy and Thomas
Cusack
Case No. 15-L-1082
*Circuit Court of Cook County [ILLINOIS]; Deposition*

08/03/2017 | Vielka M. Lippe and Christopher Lippe vs. Christopher Howard and the City of Oklahoma
City
Case No. CIV-15-331-D
*United States District Court [WESTERN DISTRICT OF OKLAHOMA]; Deposition*

09/14/2017 | Kelly A. Grady v. The Hertz Corporation
Case No. 151103380
*The Court of Common Pleas, Philadelphia County [PENNSYLVANIA]; Testimony*

10/19/2017 | Colman Newell v. Tavern 3358, LLC d/b/a McGuigans, et al.
Court No. 15 L 10872
*Circuit Court of Cook County, Law Division [ILLINOIS];* Testimony



# Exhibit "H"

# **Robson Forensic**
**THE EXPERTS**

August 18, 2017

Robert L. Gardana, Esq.
Robert L. Gardana, P.A.
12350 SW 132 Court
Suite 204
Miami, FL 33186
Phone:   (305) 358-0000
Email:   gardanalaw@gmail.com

**Re: Estate of Samantha Joyce Broberg, et al. v. Carnival Corporation d/b/a Carnival Cruise Lines**

Dear Attorney Gardana:

Thank you for contacting Robson Forensic regarding this matter.  I have attached the CVs of Kyle P. McAvoy, John A. Cocklin, Michael J. Whitekus, Ph.D., and Marjorie M. Cooke for your review.    Please note that our fees will not exceed $15,000 without prior written approval.

Mr. McAvoy has over 26 years of Coast Guard experience in the fields of Prevention and Marine Safety, which included the inspection of ships, the investigation of ship and personnel casualties, and, the management of the Marine Transportation System using Coast Guard Captain of the Port authorities.  That included verifying that foreign flagged cruise ships met the applicable U.S. Codes, Regulations, and the International Maritime Organization (IMO) Conventions.

Mr. Cocklin has three decades of law enforcement experience, twelve years of which were as a supervisor and the Chief Investigator of the New Jersey Division of Alcoholic Beverage Control.  John has participated in and supervised investigations of bars and nightclubs involving the sale, service and delivery of alcohol to visibly intoxicated patrons.  Mr. Cocklin has also participated in and supervised investigations regarding the actions of security personnel in bars and nightclubs and their handling of incidents involving intoxicated patrons.

Dr. Whitekus is a board certified toxicologist with expertise and experience in the fields of drug safety and blood alcohol concentration analysis. Dr. Whitekus is a graduate of the Borkenstein course on Alcohol and Highway Safety and applies his expertise in assessing the toxicology of drugs and alcohol in resolving disputes relating to adverse events similar to your case.

Ms. Cooke is an internationally recognized maritime safety expert with more than 40 years experience in the industry.  She is the former Director of the Office of Marine Safety for the National Transportation Board and has been responsible for all facets of marine accident investigations through Robson Forensic for nearly a decade.

**Fee Schedule:** The following applies to all work including preparation, file review, research, analysis, inspections, meetings/phone conferences, reports, depositions, travel and trial.

1. Services provided to you by Kyle P. McAvoy and John A. Cocklin will be invoiced to you at $390 per hour.  Services provided to you by Michael J. Whitekus, Ph.D. and Marjorie M. Cooke will be invoiced to you at $440 per hour.  When Mr. McAvoy is required to travel on behalf of your case, we will invoice you at full rate from Philadelphia, PA.  When Mr. Cocklin and Dr. Whitekus are required to travel on behalf of your case, we will invoice you at full rate from Lancaster, PA.  When Ms. Cooke is required to travel on behalf of your case, we will invoice you at full rate from Clinton, VA.

Robert L. Gardana, Esq.
Re: Estate of Samantha Joyce Broberg, et al. v. Carnival Corporation d/b/a Carnival Cruise Lines
August 18, 2017
Page 2

2. We employ a quality assurance program whereby our expert investigations and resulting conclusions are reviewed by another experienced Robson Forensic expert.  Reviewing experts will be invoiced at $440 per hour.

3. When advantageous to you, our client, we may call on supplemental Robson Forensic resources such as technical support, and research personnel.  These will be invoiced to you within the range of $220 to $390 per hour, depending on the person who provides the service.

4. When evidence is collected, it will be stored in our controlled, covered and secure facility. Evidence storage fees will be charged based upon the physical size of the evidence. Standard storage fees range from a $10/month minimum, to a maximum $200/month, based on a rate of $4 per cubic foot. Please call for vehicle and bulk item storage rates.

5. Upon the completion of Robson Forensic Inc.'s work on this case, you will receive an Evidence Authorization Form.  This form must be executed within thirty (30) business days indicating how evidence is to be handled.  If no response is received within thirty (30) business days, all evidence becomes the property of Robson Forensic Inc., and may be disposed of. You are responsible for evidence disposal fees.

6. Out-of-pocket expenses will be passed along with a 12% carrying charge.  This includes travel costs (mileage, airfare, airport service, accommodations, meals, auto rental etc.), photocopies, outside lab/testing, data collection/verification, demonstrative aids.

7. Invoices will be prepared for you intermittently on an in-progress basis and are due upon receipt.  After 30 days, balances will accrue 1.5% interest per month.  We reserve the right to discontinue work in the event of non-payment.  All rates are subject to change.

8. This agreement is strictly between you as our client and Robson Forensic, Inc.  You are therefore responsible for payment of our invoices.

**Engagement Fee**:  To secure the availability of our experts we require an advance of $2,750.00. This amount can be paid by either check or credit card and will be applied to your first invoice(s).  This payment is non-refundable, as it guarantees exclusive availability for your case.

If this letter correctly expresses your understanding, please sign where indicated and return to us with your advance payment of $2,750.00 via credit card(below) or check made payable to "Robson Forensic Inc." (TIN: 23-2776905). Alternatively, our receipt of just your prepayment signifies your agreement with the terms of this letter.  Once an agreement has been reached between you and Robson Forensic, you may identify Kyle P. McAvoy, John A. Cocklin, Michael J. Whitekus, Ph.D., and Marjorie M. Cooke as your experts.

**Please forward  engagement fees and payments to:**

> **Robson Forensic, Inc.**
> **PO Box 4847**
> **Lancaster, PA 17604-4847**

**Please forward all case materials to:**

| | |
|---|---|
| **Kyle P. McAvoy** | **John A. Cocklin, Michael J. Whitekus, Ph.D., and Marjorie M. Cooke** |
| **Robson Forensic, Inc.** | **Robson Forensic, Inc.** |
| **The Bourse Building, Suite 1000** | **354 N. Prince Street** |
| **111 South Independence Mall East** | **1st Floor** |
| **Philadelphia, PA 19106** | **Lancaster, PA 17603** |
| **215-922-1604** | **717-293-9050** |

Robert L. Gardana, Esq.
Re:  Estate of Samantha Joyce Broberg, et al. v. Carnival Corporation d/b/a Carnival Cruise Lines
August 18, 2017
Page 3

If you have any questions or comments, please don't hesitate to call. We appreciate the opportunity to do business with you.

Sincerely,

Rene I. Basulto, P.E., MSEM, CGC, CFEI
Area Manager

Robert L. Gardana, Esq.                    Date

Enclosures
RIB: db

(Mailing w/ Check copy attached)
To day -

| Credit Card Information *(optional)* | | |
|---|---|---|
| **Credit Card Type**   ☐ Visa ☐ MasterCard | **Expiration Date:** | |
| **Credit Card Account #:** | | **Security Code:** |
| **Name as it Appears on Credit Card:** | | |
| **Payment Amount: $ (US Dollars): 2,750.00** | | |
| **Cardholder Signature:** | | **Date:** |

# Exhibit "I"

Toxicologist's Report

on

The Samantha Joyce Broberg Incident

Estate of Samantha Joyce Broberg v. Carnival Corporation, et al.
RFI #17SS0199

Prepared by

**Michael J. Whitekus, Ph.D., DABT**

November 13, 2017



## Samantha Joyce Broberg Incident

**TOXICOLOGIST'S REPORT**                                                      **November 13, 2017**

### A.  INTRODUCTION

On the afternoon of 12 May 2016 Samantha Broberg boarded the Carnival Liberty cruise ship in Galveston, Texas with destination to Cozumel, Mexico.  Beginning that afternoon and continuing until the following morning, Broberg was served multiple alcoholic drinks by Carnival staff. A little before 2:00 am, Broberg made her way from the Promenade Bar on Deck 5 to Deck 10 where she approached a lounge chair and began climbing on the outside railing. She momentarily sat on the rail, then fell backwards into the water, and presumably drowned as her body was never recovered.

The purpose of my investigation was to:

1.  Determine Broberg's blood alcohol concentration (BAC) at the time she was served each drink prior to the fall incident.
2.  Determine Broberg's BAC at the time of the fall incident.
3.  Identify the stage of alcohol influence and the clinical signs associated with Broberg's BAC at the time she was served each alcoholic drink prior to the fall incident.
4.  Describe the clinical signs and symptoms associated with Broberg's BAC at the time of the fall incident.
5.  Determine if Broberg was visibly intoxicated while she was served alcohol prior to the fall incident.
6.  Determine if Broberg's intoxication due to Carnival Cruise's over service of alcoholic beverages to her was a cause of Broberg's fall incident.

### B.  MATERIALS AVAILABLE FOR REVIEW

1.  Complaint (24 pages)
2.  Defense's motion to dismiss (8 pages)
3.  Order denying motion to dismiss (9 pages)
4.  Defenses Answers and Affirmative Defenses (11 pages)
5.  Federal Bureau of Investigation, File 1, Section 1 (21 pages)
6.  Federal Bureau of Investigation, File 2, Section 1 (6 pages)
7.  Case Report (96 pages)
8.  Samantha Broberg Texas Driver License (1 page)
9.  Beverage Purchase Receipts (6 pages)
10. Amy Brady Affidavit (6 pages)
11. Sarah Churman Affidavit (6 pages)
12. Tammy Ramirez Affidavit (7 pages)
13. Amy Brady Sail and Sign statement (2 pages)
14. Sarah Churman Sail and Sign Statement (2 pages)
15. Samantha Broberg Sail and Sign Statement (2 pages)
16. Plaintiff's Supplemental Disclosure (1 & 15 Sept 2017, 15 pages)
17. A-Pass Web Reports for Carnival Liberty (83 pages)



THE EXPERTS
# Robson Forensic

[2]

18. US Department of Homeland Security, Report of Marine Accident, Injury or Death (2 pages)
19. Carnival Ship Security Manual (32 pages)
20. Carnival Cruise Lines Bartender Duties (3 pages)
21. Carnival Cruise Lines Beverage Service (66 pages)
22. Carnival Cruise Lines Duties and Responsibilities (9 pages)
23. Carnival Cruise Lines Responsible Alcohol Service (13 pages)
24. Carnival Cruise Lines Responsible Service of Alcohol Slide Show (43 pages)
25. Carnival Cruise Lines Classic Cocktail Cross Promotion (3 pages)
26. Carnival Cruise Lines Ship Security Manual (27 pages)
27. Carnival Liberty FLIR video footage

## C.  BACKGROUND AND DESCRIPTION OF THE INCIDENT[a]

On the afternoon of 12 May 2016 Samantha Broberg along with her two female traveling companions, Sarah Churman and Amy Brady, boarded the Carnival Liberty cruise ship in Galveston, Texas with destination to Cozumel, Mexico. Beginning that afternoon at approximately 1:00 pm and continuing until the following morning, 13 May 2016 at 1:20 am, Broberg was served multiple alcoholic drinks by Carnival staff in several cruise ship locations (see table 1). This included several Tito vodka doubles, a blue liquor special drink at dinner, a shot in the casino, and several beers (see table 1). The sail and sign statement, purchase receipts, and statements from Churman and Brady corroborate that Broberg purchased her first Tito's vodka double drink at 1:06 pm (Table 1) in the Red Rum Frog bar.  Subsequent to this drink, Broberg purchased four more Tito's vodka double drinks before dinner (see Table 1 for list of all subsequent drinks referred to in this narrative).  Sometime during dinner Broberg and her two girlfriends each consumed a blue liquor special drink (Grey Goose and Blue Curacao) which does not appear on the Sail and Sign statement for any of the women. Later after dinner Broberg, Churman, and Brady were in the casino playing the slot machines when Churman won about $220 on her machine. In celebration the casino manager offered all three ladies a shot on the house. Sometime before 11:30 pm Churman and Brady left the casino to attend a comedy show while Broberg ordered another Tito double and 16 oz Miller Lite beer from the Promenade Bar.  The comedy show was full so Churman and Brady returned to the casino bar and found Broberg. They asked Broberg if she wanted to leave and go back to their cabin but she indicated that she was not ready to go back yet so at 11:45 pm they left and returned to their cabin without Broberg. At 12:51 am Broberg again ordered a Tito double and a Corona.  At approximately 1:15 am Tammy Ramirez, another ship guest, woke up and realized that her husband Armando had not returned to their cabin so she went looking for him. She found him in the Promenade Bar standing next to a woman with his arm around her. Tammy Ramirez was upset to find her husband with his arm around another woman and she took several pictures of the incident. She then approached the lady and her husband and through conversation with the women determined that she was Broberg. As Tammy Ramirez spoke with Broberg she observed that Broberg was very intoxicated and visibly drunk, e.g., her speech was slow and slurred, she was leaning on the bar and her eyes were partially closed and at times totally closed, and she appeared very drowsy and could not concentrate. Ramirez further observed several other men standing around Broberg and while she was there one of them

---

[a] Account was taken from Complaint, Order Denying Motion to Dismiss, Defenses Answers and Affirmative Defenses, Beverage Purchase Receipts, Samantha Broberg Sail and Sign Statement, Amy Brady Sail and Sign Statement, Sarah ChurmanSail and Sign Statement, Amy Brady Affidavit, Sarah Churman Affidavit, Tammy Ramirez Affidavit, FLIR video, US Department of Homeland Security, Report of Marine Accident, Injury or Death.



THE EXPERTS
**Robson Forensic**

[3]

bought Broberg a beer and it was served to Broberg by the bartender without any reservation or consideration for her intoxicated condition.

Shortly before 2:00 am, Broberg made her way from the Promenade Bar on Deck 5 where she had consumed her last drink to Deck 10 where she approached a lounge chair and began climbing on the outside railing of the ship. She momentarily sat on the rail and then fell backwards into the water at 1:57 am, and presumably drowned as her body was never recovered.

The Carnival Liberty's FLIR system[b] recorded Broberg's fall overboard at 1:57 am but ship personnel did not become aware of it for several hours[c]. As a result, the Carnival Liberty did not initiate a search and rescue operation and the ship's captain did not report the fall to the United States Coast Guard until approximately fifteen hours after the incident and eight hours after Broberg's travel companions notified ship personnel that she was missing.

---

[b] FLIR=Forward Looking Infrared
[c] US Department of Homeland Security, Report of Marine Accident, Injury or Death; Carnival Liberty FLIR video footage



**Table 1. Chronological List of Drinks Served to Broberg Prior to the Fall Incident**

| Drinks Served | Date/Time | Location | Verified by:[d,e,f,g, h] |
|---|---|---|---|
| #1 Tito's vodka (double) | May 12 at 1:06 pm | Red Rum Frog Bar | S &S Statement, Receipt, Churman, Brady |
| #2 Tito's vodka (double) | May 12 at 4:33 pm | Promenade Bar | S &S Statement, Churman, Brady |
| #3 Tito's vodka (double) | May 12 at 5:33 pm | Promenade Bar | Receipt, S &S Statement, Churman, Brady |
| #4 Tito's vodka (double) | May 12 at 6:32 pm | Red Rum Frog Bar | Receipt, S &S Statement |
| #5 Tito's vodka (double) | May 12 at 7:58 pm | Promenade Bar | Receipt, S &S Statement |
| #6 Blue Liquor Special (Grey Goose& Curacao blue) | May 12 at dinner (~8:30 pm) | Dining Room | Churman, Brady |
| #7 Shot | May 12 at ~9:45 pm | Casino Room | Churman, Brady |
| #8 Tito's vodka (double); #9 Miller Lite (16 oz) | May 12 at 11:40 pm | Promenade Bar | Receipt, S &S Statement |
| #10 Tito's Vodka (double); #11 Corona (12 oz) | May 13 at 12:51 am | Promenade Bar | Receipt, S &S Statement |
| #12 Beer bought by man (12 oz) | May 13 at ~1:20 am | Promenade Bar | Tammy Ramirez |
| Time of Fall incident | May 13 at 1:57 am | Deck 10 | Report of Marine Accident, FLIR video |

**Alcohol Consumed by Broberg:**

Miller Lite % alcohol content (ABV)[1]: 4.2%
Corona alcohol content (ABV)[2]: 4.6%
Tito's Vodka (ABV)[3]: 40%
Grey Goose Vodka[4]: 40%
Curacao blue[5]: 30%

---

[d] S&S statement= Sail and Sign Statement
[e] Receipt= Beverage purchase receipts
[f] Churman= Sarah Churman Affidavit
[g] Brady= Amy Brady Affidavit
[h] US Department of Homeland Security, Report of Marine Accident, Injury or Death; Carnival Liberty FLIR video footage



**Samantha Broberg Personal Information[i,j,k]:**

Date of Birth: 01 Oct 1982
Age at time of incident: 33 years old
Height: 5'5"
Weight: 120 lb (according to husband and Churman)


**D.  ANALYSIS**

Broberg's BAC at the time of each drink served and at the time of the fall incident can be estimated based on scientifically valid standard methodology used by toxicologists[6]. This method relies on I) principles of alcohol pharmacokinetics, ii) Broberg's age, height and weight, iii) the time that she reportedly consumed each alcoholic beverage, and iv) the amount of alcohol in each drink.

Based on this information Broberg's BAC was calculated prior to each drink she was served and at the time of the fall incident (Table 2). Broberg's BAC at the time she was served her first and second drink was 0.000%; at the time Broberg was served her third drink her BAC was 0.024% (range= 0.000-0.060%); at the time Broberg was served her fourth drink her BAC was 0.058% (range= 0.020-0.102%); at the time Broberg was served her fifth drink her BAC was 0.084% (range= 0.036-0.139%); at the time Broberg was served her sixth drink her BAC was 0.106% (range= 0.054-0.165%); at the time Broberg was served her seventh drink her BAC was 0.145% (range= 0.086-0.212%); at the time Broberg was served her eighth and ninth drink her BAC was 0.132% (range= 0.058-0.216%); at the time Broberg was served her tenth and eleventh drink her BAC was 0.206% (range= 0.124-0.300%). At the time Broberg was served her twelfth drink her BAC was 0.250% (range= 0.165-0.348%). At the time Broberg fell from the 10th deck of the *Carnival Liberty* into the ocean her BAC was 0.295% (range= 0.206-0.397%).

Each of Broberg's BAC values throughout the evening can be staged, and representative clinical signs at each stage can be described per table 3. The stage of alcoholic influence and representative clinical signs associated with Broberg's BAC at the time she was served her third drink was subclinical with clinical signs of behavior nearly normal; at the time she was served her fourth and fifth drink her stage of alcoholic influence was euphoria with clinical signs of sociability, increased self-confidence and decreased inhibitions and judgment; at the time she was served her sixth, seventh, eighth and ninth drink it was excitement with clinical signs of emotional instability, and decreases in perception, memory and comprehension; at the time she was served her tenth and eleventh drink her alcoholic stage of influence was confusion with clinical signs of disorientation, mental confusion, vertigo, exaggerated emotional states, and staggering gate; at the time she was served her twelfth drink her alcoholic stage of influence was stupor with clinical signs approaching loss of motor function, and marked decrease in response to stimuli.

---

[i] Samantha Broberg Driver's License
[j] Samantha Broberg's husband claimed she went on a diet prior to the cruise and weighed 120 lb; Personal communication with Robert Gardana by email, 21 Aug 2017.
[k] Sarah Churman Affidavit, page 2



At the time Broberg fell from the 10th deck into the ocean, her stage of alcoholic influence was stupor with clinical signs approaching loss of motor function, marked decrease in response to stimuli, disorientation, mental confusion, balance issues, along with decreased inhibitions and judgment. Therefore, alcohol was a cause or contributing factor in Broberg's fall incident.

The vast majority of social drinkers are visibly intoxicated at a BAC of 0.150% or greater while the vast majority of all drinkers (including heavy drinkers) are visibly intoxicated at a BAC of 0.200% or greater. Therefore, based on either standard Broberg would have been more likely than not to have been visibly intoxicated prior to having been served her tenth and eleventh drink at 12:51 am with a BAC of 0.206% and prior having been served her twelfth drink at approximately 1:20 am with a BAC of 0.250%.

Tammy Ramirez indicated that Broberg was visibly intoxicated on the night of the fall incident and thus confirmed the toxicological analysis above.  Ramirez observed Broberg at approximately 1:20 am on the night of the fall incident and indicated that Broberg was visibly intoxicated at that time in that her speech was slow and slurred, she was leaning on the bar and her eyes were partially closed and at times totally closed, and she appeared very drowsy and could not concentrate.



[7]

**Table 2. Broberg's BAC and Stage of Alcoholic Influence at Each Drink Served**

| Drinks Served | Alcohol Consumed (g) | BAC% | Stage of Alcoholic Influence[l] |
|---|---|---|---|
| #1- Tito's vodka (double)[m] | 18.7 | 0.000[n] | Not applicable |
| #2- Tito's vodka (double) | 18.7 | 0.000[n] | Not applicable |
| #3- Tito's vodka (double) | 18.7 | 0.024[n] | Subclinical |
| #4- Tito's vodka (double) | 18.7 | 0.058[n] | Euphoria |
| #5 Tito's vodka (double) | 18.7 | 0.084[n] | Euphoria |
| #6 Blue Liquor Special[o] | 12.8 | 0.106[n] | Excitement |
| #7 Shot (1 oz) | 9.3 | 0.145[n] | Excitement |
| #8 Tito's vodka (double); #9 Miller Lite (16 oz) | 34.4 | 0.132[n] | Excitement |
| #10 Tito's Vodka (double); #11 Corona (12 oz) | 31.6 | 0.206[n] | Confusion |
| #12 Beer (12 oz) | 12.9 | 0.250[n] | Stupor |
| Time of Fall incident | Not applicable | 0.295[p] | Stupor |

---

[l] Descriptions taken from Table 3

[m] Tito's vodka alcohol amounts were based on a 1 oz serving of vodka for a single or 2 oz serving of vodka for a double.

[n] Broberg's BAC at the time the drink was ordered

[o] Blue Liquor Special is not listed in Carnival College Beverage Service Module 7. However, similar drinks containing vodka and Blue Curacao are the "Aquarius Martini" (2.5 oz vodka and 1 oz Blue Curacao) and Blue Moon (1.5-2.5 oz vodka  and 1-2 oz Blue Curacao), Violeta (3 oz vodka and 0.5 oz Blue Curacao). Based on these drinks a conservative estimate of 1.0 oz of vodka and 0.5 oz Blue Curacao was used to calculate the alcohol content of this drink.

[p] Broberg's BAC at the time of the fall incident



**Table 3. Stage of Alcoholic Influence and Clinical Signs Associated with BAC's** [6-12]

| Blood-Alcohol Concentration (percent) | Stage of Alcoholic Influence | Prominent Clinical Signs | Risk for Car Crash (age 21-24) |
|---|---|---|---|
| 0.01-0.05 | Subclinical | Behavior nearly normal by ordinary observation. Impairment detectable by special tests. | No date-4.3 |
| 0.03-0.12 | Euphoria | Mild euphoria, sociability, talkativeness. ↑ self-confidence; ↓ inhibitions, attention, judgment and control; loss of efficiency in critical performance tests, some sensory-motor impairment. | 2.4-33 |
| ≥0.08 | Euphoria | Driving under the influence for normal driver. | 10 |
| 0.09-0.25 | Excitement | Emotional instability; ↓ in perception; memory and comprehension; sensory-motor in-coordination; impaired balance; slurred speech; vomiting; drowsiness. | 14- >330 |
| 0.15 or 0.20 | Excitement (Visible Intoxication) | >50% of social drinkers are visibly intoxicated at 0.15 % and 84% of all drinkers (including heavy drinkers who develop tolerance) are visibly intoxicated at 0.20 %. | 78 or 330 |
| 0.18-0.30 | Confusion | Disorientation; mental confusion; vertigo; exaggerated emotional states (fear, rage, grief); ↑ pain threshold; staggering gait; ataxia; memory loss; apathy. | 185- >330 |
| 0.25-0.40 | Stupor | Approaching loss of motor function; Marked ↓ response to stimuli; inability to stand or walk; incontinence; impaired consciousness. | >330 |
| 0.35-0.50 | Coma | Complete unconsciousness; coma; depressed reflexes; ↓ temperature; circulation and respiration impairment. Possible death from respiratory or cardiac arrest. | >330 |



**E.  FINDINGS**

Within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. Broberg's BAC at the time she was served her first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth drink was 0.000%, 0.000%, 0.024%, 0.058%, 0.084%, 0.106%, 0.145%, 0.132%, 0.206%, and 0.250% (respectively).
2. Broberg's BAC at the time of the fall incident was 0.295%.
3. The stage of alcoholic influence and representative clinical signs associated with Broberg's BAC at the time she was served her third drink was subclinical with clinical signs of behavior nearly normal; at the time she was served her fourth and fifth drink her stage of alcoholic influence was euphoria with clinical signs of sociability, increased self-confidence and decreased inhibitions and judgment; at the time she was served her sixth, seventh, eighth and ninth drink her alcoholic stage of influence was excitement with clinical signs of emotional instability, and decreases in perception, memory and comprehension; at the time she was served her tenth and eleventh drink her alcoholic stage of influence was confusion with clinical signs of disorientation, mental confusion, vertigo, exaggerated emotional states, and staggering gate; at the time she was served her twelfth drink her alcoholic stage of influence was stupor with clinical signs approaching loss of motor function, and marked decrease in response to stimuli.
4. The stage of alcoholic influence associated with Broberg's BAC at the time of the fall incident was stupor with clinical signs approaching loss of motor function, marked decrease in response to stimuli, disorientation, mental confusion, balance issues, along with decreased inhibitions and judgment.
5. Broberg was served alcohol while she was visibly intoxicated.
6. Broberg's intoxication due to Carnival Cruise's over service of alcoholic beverages to her, caused her fall incident.

_Michael J. Whitekus_

**Michael J. Whitekus, Ph.D., DABT**



THE EXPERTS
**Robson Forensic**

[10]

**F.  REFERENCES**

1.  Miller Brewing Company. *Miller Lite*. 2017; Available from: https://www.millerlite.com/our-beer.

2.  Corona. *Corona Premier*.  [cited 2017; Available from: https://www.coronausa.com/our-cerveza.

3.  Tito's Vodka. *Tito's Hand Made Vodka*, . 2017; Available from: http://www.titosvodka.com/ask-tito/.

4.  The Wiskey Exchange. *Grey Goose*. Available from: https://www.thewhiskyexchange.com/p/5099/grey-goose-vodka.

5.  Alcoholcontents.com. *Liquor Alcohol Content*. Available from: http://www.alcoholcontents.com/liquor/.

6.  Brick, J., *Standardization of Alcohol Calculations in Research.* Alcohol Clin Exp Res, 2006. **30**(8): p. 1276-87.

7.  *National Highway Traffic and Safety Administration, Effects of Low Doses of Alcohol on Driving-related Skills: A Review of the Evidence*. 1998.

8.  Brick, J. and C.K. Erickson, *Intoxication is Not Always Visible: An Unrecognized Prevention Challenge.* Alcohol Clin Exp Res, 2009. **33**(9): p. 1489-507.

9.  Caplan, Y.H., B.A. Goldberger, *Garriott's Medicolegal Aspects of Alcohol*. 6th ed. 2015, Tucson, Arizona: Lawyers and Judges Publishing Company, Inc. .

10.  Moskowitz, H., Burns, M., Fiorentino, D., Smiley, A., and Zador, P., *Driver Characteristics and Impairment at Various BACs*, N.H.T.S. Administration, Editor. 2000.

11.  Moskowitz, H. and M. Burns, *Effects of rate of drinking on human performance.* J Stud Alcohol, 1976. **37**(5): p. 598-605.

12.  Moskowitz, H., M.M. Burns, and A.F. Williams, *Skills performance at low blood alcohol levels.* J Stud Alcohol, 1985. **46**(6): p. 482-5.



[11]

# Exhibit "J"

# **Robson Forensic** THE EXPERTS

MICHAEL J. WHITEKUS, PhD, DABT
Toxicologist/Drug Safety Expert

## SUMMARY

Board certified toxicologist with over 23 years of post-bachelor experience in the fields of drug safety, blood alcohol concentration assessment, chemistry, inhalation toxicology, and environmental contaminants.

## Drug Safety

Experienced in drug safety evaluation, drug development strategies, and data analysis. Evaluated drug safety on multiple types of drugs (CNS, cardiovascular, diabetes, anti-inflammatory, pain, cancer). Authored ~180 drug safety reports in ~30 drug programs and contributed to toxicology and pharmacology sections of investigational new drug and new drug applications (INDs/NDAs).

## Ethanol

Received advanced training in alcohol evaluation through the Robert F. Borkenstein course on Alcohol and Highway Safety: Testing, Research, and Litigation. Proficient in blood alcohol concentration calculations including number of drinks consumed, retrograde extrapolation and characterization of clinical signs of intoxication based on blood alcohol concentration.

## Inhalation Toxicology

Received advanced training in the field of inhalation toxicology studying the ability of diesel exhaust particles to enhance the allergic response. Presented work at national meetings, professionally published in peer reviewed journals and reviewed articles in nationally recognized toxicology journals.

## Environmental Contaminants

Received advanced training in metals, immunotoxicants, polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), diesel exhaust, and reproductive toxins, presented work at national meetings, professionally published in peer reviewed journals.

## PROFESSIONAL EXPERIENCE

2014 to present | **Robson Forensic, Inc.**
*Associate*

Provide technical investigations, analysis, reports, and testimony toward the resolution of commercial and personal injury litigation of toxicology and human health assessments involving drug safety, environmental and occupational exposures to agents such as metals, solvents, polychlorinated biphenyls (PCBs)/polyaromatic hydrocarbons (PAHs), environmental estrogens and endocrine disruptors, pesticides, blood alcohol and recreational drugs and substance abuse, food allergens, cosmetic products and related issues and failure analysis.

# **Robson Forensic** THE EXPERTS

MICHAEL J. WHITEKUS, PhD, DABT
Toxicologist/Drug Safety Expert

2008 to
2011
**Pfizer Inc.**, Groton, CT
*Drug Safety Team Lead, Toxicology*
- Worked on cross functional drug development teams in matrix environment and provide leadership critical for drug safety evaluation and de-risking strategies
- Designed drug safety programs and studies consistent with ICH/FDA guidelines and under GLP/GMP requirements
- Directed the initiation, execution and reporting of drug safety studies
- Provided scientific and operational oversight on ~80 drug safety studies which included interaction with drug safety team lead, protocol generation, oversight of ~2-10 project personnel, execution of project, interpretation of data, written discussion of safety findings and drug safety report generation
- Oversaw and participated in cross-departmental activities for CNS drug safety program
- Presented/interpreted results of drug safety studies to program teams with go/no go decision
- Participated in monthly training meetings on regulatory, toxicology, and drug safety issues
- Evaluated toxicokinetic reports
- Authored toxicology reports and contributed to pharmacology and toxicology sections of investigational new drug applications (INDs) and new drug applications (NDAs)
- Invited participant and reviewer of Pfizer's toxicology operational reorganization
- Participated on Lyrica project team. Toxicological Sciences 128(1), 42-56 (2012)
- Received 6 performance awards for scientific excellence, problem solving abilities and committee involvement

2005 to
2008
**BioReliance Corporation**, Rockville, MD
*Laboratory Director, Toxicology*
- Provided scientific and operational oversight on ~120 drug safety studies which included interaction with client, protocol generation, oversight of 2-15 project personnel, interpretation of study results, discussion of any findings, and generation of drug safety report
- Reviewed outsourced toxicokinetic reports
- Provided toxicology advice to clients
- Created two seminars (1 hour each) on carcinogenicity testing strategies at BioReliance and presented these at workshops around the country along with new scientific and regulatory developments
- Represented BioReliance during FDA site inspections and provided written responses
- Updated upper management via senior staff meetings on drug safety program progress
- Institutional Animal Care and Use Committee (IACUC) scientific representative
- Evaluated laboratories for compliance with internal SOPs and government regulations
- Responsible for overseeing work of report writers, study technicians, chemists, pathologists, and outside company contractors.  Oversaw work of 15 people

# **Robson Forensic** THE EXPERTS

MICHAEL J. WHITEKUS, PhD, DABT
Toxicologist/Drug Safety Expert

| | |
|---|---|
| 2000 to 2005 | **University of California Los Angeles**, Los Angeles, CA |

*Assistant Researcher/Post-Doctoral Researcher*
*Clinical Immunology and Allergy, UCLA School of Medicine*
Emphasis: Inhalation Toxicology, Diesel Exhaust Particles, Allergy, Markers of Oxidative Stress, and Immunotherapy

- Examined the role of oxidative stress as a potential marker of adverse health effects induced by diesel particulate matter
- Responsible for study design, procurement and breeding of mice, inhalation treatment, dissection, measurement of *in vitro* immunological endpoints, data analysis, data presentation and publication of results
- Journal Expert Peer Reviewer: Journals refereed included Clinical Immunology, Toxicological Sciences, Toxicology and Applied Pharmacology, Environmental Toxicology and Pharmacology
- Invited to be on Toxicological Sciences editorial board in 2005
- Oversaw breeding and genotyping of a knock-out mouse colony
- Promoted to assistant researcher after ~3 years due to quality of work
- Publication: J. Immunol. 168:2560-2567, 2002

1995 to 2000   **Wayne State University**, Detroit, MI
*Ph.D. Degree*, Institute of Chemical Toxicology

- Hypothesis: Mercury causes autoimmune disease by attenuating CD95-mediated apoptosis
- Mechanistically explored how mercury attenuates CD95-mediated apoptosis using numerous in vitro assays (western blot, fluorometric, colorimetric, and flow cytometry) on Jurkat and U-937 cell lines and human primary T cells
- Selected Publications: J. Immunol. 162:7162-7170, 1999; Toxicol Appl Pharmacol.190 (2):146-56, 2003

1995   **Parke-Davis Pharmaceutical Research Division**, Ann Arbor, MI
*Assistant Scientist, Genetic Toxicology Department*

- Evaluated the ability of drugs to cause DNA damage to cells
- Conducted *in vitro* micronucleus experiments and evaluated results microscopically
- Assisted in the maintenance of cell lines

1993 to 1994   **MPI,** Mattawan, MI
*Metabolism and Bioanalytical Coordinator*

- Developed HPLC methods and quantitated drug and metabolite levels in animal plasma samples from drug safety studies
- Supervised several BS chemists in HPLC lab

1991 to 1993   **Eastern Michigan University**, Ypsilanti, MI
*Master of Science Degree*

- Thesis: Isolated RNA and used RT-PCR to develop a unique in vitro PCR assay system to evaluate testicular toxins
- Evaluated HSP 27 and HSP 70 as potential markers of testicular toxicity

# **Robson Forensic**
### THE EXPERTS

### MICHAEL J. WHITEKUS, PhD, DABT
### Toxicologist/Drug Safety Expert

## **EDUCATION**

Ph.D., Molecular and Cellular Toxicology, Wayne State University, Institute of Chemical Toxicology, Detroit, MI, 2000

M.S., Chemistry (Emphasis in Toxicology) Eastern Michigan University, Ypsilanti, MI, 1993

B.S., Chemistry (Math minor), Eastern Michigan University, Ypsilanti, MI, 1991
    Michigan State Secondary Teacher Certification (Chemistry/Math) Grades 7-12

*Continuing Education*

Forensic Pharmacology, organized by the Center for Forensic Science Research & Education, June 2017

Certified as a Diplomate of the American Board of Toxicology, November 2016

Webinar Topic: Marijuana Legalization: Trends & Hot Topics, Occupational Health and Safety, February 2016

Marijuana Summit, Governor's Council on Alcoholism and Drug Abuse, Cherry Hill, NJ, October 2015

Completed *Advanced Comprehensive Toxicology* Course sponsored by the American College of Toxicology, University of Cincinnati, August 2015

Safety Evaluation of CNS Administered Therapeutics. Society of Toxicology Continuing Education Course; San Diego, CA, March 2015

Advances in Safety Assessment of Medical Devices. Society of Toxicology Continuing Education Course; San Diego, CA, March 2015

The Robert F. Borkenstein Course on Alcohol and Highway Safety; Testing, Research and Litigation. Indiana University: Center for Studies of Law in Action; Bloomington, IN, December 7-12, 2014

Current Strategies and Methods for Evaluating Drug-Induced Cardiovascular Toxicity. Society of Toxicology Continuing Education Course; Washington, DC, March 2011

The International Conference on Harmonisation Initiatives for Conducting Pharmaceutical Preclinical Safety Studies: New and Revised Guidelines and Challenges. Society of Toxicology Continuing Education Course; Salt Lake City, UT, March 2010

Principles and Applications of Toxicokinetics. Society of Toxicology Continuing Education Course; Baltimore, MD, March 2009

Practical Strategies for Evaluation of Immunosuppression in Pharmaceutical Development. Society of Toxicology Continuing Education Course; San Diego, CA, March 2006

Fundamentals of Risk Assessment and Applications of Recent Methodologies to Difficult Problems. Society of Toxicology Continuing Education Course; Salt Lake City, UT, March 2003

Evaluation of Immunomodulation in Safety Assessment. Society of Toxicology Continuing Education Course; Salt Lake City, UT, March 2003

A Practical Approach to Blood and Lymphoid Tissue (BLT) in Toxicology Assessments. Society of Toxicology Continuing Education Course; Nashville, TN March 2002

Pulmonary Immunotoxicology. Society of Toxicology Continuing Education Course; Philadelphia, PA, March 2000

In Vitro Methods for Evaluation Biokinetic Parameters for Risk Assessment. Society of Toxicology Continuing Education Course; New Orleans, LA, March 1999

# **Robson Forensic** THE EXPERTS

## MICHAEL J. WHITEKUS, PhD, DABT
## Toxicologist/Drug Safety Expert

### TRAINING

Completed Becton Dickinson's week long FACSCalibur training seminar, San Jose, CA, 1999
Completed two day interview training course, Farmington, MI, 2013
Participated in videotaped mock interview, Farmington, MI, 2013

### PROFESSIONAL MEMBERSHIPS

Member of the American College of Toxicology, 2016-present
Member of the Society of Toxicology, 1999-present

### AWARDS

- Nominated in 2011 for best drug development team at Pfizer
- Received Pfizer individual performance awards in 2010 and 2011 for work on drug safety programs
- Received Pfizer individual performance awards for involvement with SOT Pfizer committee
- Awarded NIH Post-Doctoral Training Grant: Dates: 9/1/00-8/31/02
- Received travel awards from the Society of Toxicology and Wayne State University to attend the 2000 Society of Toxicology meeting
- Recipient of the graduate student immunotoxicology specialty section award, 1999 Society of Toxicology meeting
- Recipient of the graduate student metals specialty section award, 1998 Society of Toxicology meeting
- Dean's list (undergraduate): '86, '87, & '89

### PUBLICATIONS

1. **Whitekus, M. J.,** R.P. Santini, A.J. Rosenspire, and M.J. McCabe, Jr., *Protection Against CD95-mediated Apoptosis by Inorganic Mercury in Jurkat T Cells*, J. Immunol. 162:7162-7170, 1999

2. **Whitekus, M. J.,** Ning Li, Min Zhang, Meiying Wang, Marcus A. Horwitz, Sally K. Nelson, Lawrence D. Horwitz, Nicholas Brechun, David Diaz-Sanchez, and Andre E. Nel, *Thiol Antioxidants inhibit the Adjuvant Effects of Aerosolized Diesel Exhaust Particles in a murine model for Ovalbumin Sensitization*, J. Immunol. 168:2560-2567, 2002

3. McCabe, M.J., **Michael J. Whitekus**, Joogyung Hyun, Kevin G. Eckles, Geniece McCollum, and Allen J. Rosenspire, *Inorganic Mercury Attenuates CD95-mediated Apoptosis By Interfering with Formation of the Death Inducing Signaling Complex*, Toxicol Appl Pharmacol.190(2):146-56, 2003

4. Finkelman, F. D., M. Yang, T. Orekhova, E. Clyne, J. Bernstein, **M. Whitekus**, D. Diaz-Sanchez and S. C. Morris. *Diesel exhaust particles suppress in vivo IFN-gamma production by inhibiting cytokine effects on NK and NKT cells*, J Immunol, 172:3808-3813, 2004

# Robson Forensic
**˙THE EXPERTS ▪**

MICHAEL J. WHITEKUS, PhD, DABT
Toxicologist/Drug Safety Expert

5. McCabe, Jr., M. J., Eckles, K. G., Langdon, M., Clarkson, T. W., **Whitekus, M. J.**, and Rosenspire, A. J. *Attenuation of CD95-Induced Apoptosis by Inorganic Mercury: Caspase-3 Is Not a Direct Target of low levels of $Hg^{2+}$*, Toxicol. Lett., 155(1): 161-70, 2005

6. Rivera, S.P., Hyun Ho Choi, Brett Chapman, **M. J. Whitekus**, Mineko Terao, Enrico Garattini, and Oliver Hankinson, *Identification of Aldehyde Oxidase 1 and Aldehyde Oxidase Homologue 1 as Dioxin-Inducible Genes.* Toxicology 207(3):401-9, 2005

## ABSTRACTS

1. **Whitekus, M. J.,** K.P. Singh, A.J. Rosenspire, and M.J. McCabe, Jr., *Inorganic Mercury Attenuates CD95-mediated Cell Death.* Mechanisms of Immunotoxicology 12th Annual Conference: Role of Apoptosis in Immunotoxicology, Morgantown, WV, 1997 (Poster Presentation)

2. **Whitekus, M. J.** and M.J. McCabe, Jr., *Inorganic Mercury Induces Tyrosine Phosphorylation and Attenuates CD95/Fas-mediated Cell Death.* The Toxicologist, Vol. 42, No. 1-S, Abstract #1760, pg 357. Society of Toxicology Annual Meeting, Seattle, WA, 1998 (Platform Presentation).

3. **Whitekus, M.J.,** I. Heimler, and M.J. McCabe, Jr., *Mercury Suppresses CD95/Fas-Mediated Apoptosis: A Search for the Mechanism.* The Toxicologist, Vol. 48, No. 1-S Abstract #721, pg 154.Society of Toxicology Annual Meeting, New Orleans, LA, 1999 (Poster Presentation)

4. **Whitekus, M.J.**, B.S. Chelladurai, A.J. Rosenspire and M.J. McCabe, Jr., *Dysregulation of CD95-mediated Apoptosis by Mercury.* The Toxicologist, Vol. 54, No. 1 Abstract #542.Society of Toxicology Annual Meeting, Philadelphia, PA, 2000 (Poster Presentation)

5. Fred D. Finkelman, Tatyana Orekhova, **Michael Whitekus** and David Diaz-Sanchez, *Selective inhibition of IFN-g secretion by Diesel Exhaust Particles.* The American Academy of Allergy, Asthma, and Immunology Annual Meeting, New York City, NY, 2002 (Poster Presentation)

6. **Whitekus, M.J.**, M. Zhang, N. Li, M. Horwitz, S.K. Nelson, N. Brechun, D. Diaz-Sanchez and A. Nel, *Thiol Antioxidants inhibit the Adjuvant Effects of Aerosolized Diesel Exhaust Particles in a murine model for Ovalbumin Sensitization.* The Toxicologist, Vol. 66, No. S-1 Abstract #373 page 77. Society of Toxicology Annual Meeting, Nashville, TN, 2002 (Poster Presentation)

7. **Whitekus, M.J.,** and D. Diaz-Sanchez, *Short-Term Exposure to Inhaled Diesel Exhaust Particles Enhances Asthma-Like Symptoms in the Low IgE Responder C57BL/6 Mouse.* The Toxicologist, Vol. 72, No S-1 Abstract #590 page 121. Society of Toxicology Annual Meeting, Salt Lake City, UT, 2003 (Platform Presentation)

8. **Whitekus, M.J.**,N Brechun, S K Nelson, O Hankinson, and D Diaz-Sanchez, *Short-Term Exposure To Inhaled Diesel Exhaust Particles Enhances Asthma-Like Symptoms And Increases Cyp1a1 mRNA Levels.* The Toxicologist, Vol. 48, No. 1-S, Abstract #1398. Society of Toxicology Annual Meeting, Baltimore, MD, 2004 (Poster Presentation)

9. **M J Whitekus,** S Ritz, D Diaz-Sanchez, Suloraphane, a Potent Phase 2 Inducer, Inhibits the Adjuvant Effect of Aerosolized Diesel Exhaust Particles in a Murine Model for Ovalbumin Sensitization. The Toxicologist, Vol. 84, No. S-1, Abstract #458 page 93. Society of Toxicology Annual Meeting, New Orleans, LA, 2005 (Poster Presentation)

# **Robson Forensic** THE EXPERTS

MICHAEL J. WHITEKUS, PhD, DABT
Toxicologist/Drug Safety Expert

## TEACHING EXPERIENCE

1991 to
1992
**Eastern Michigan University**, Ypsilanti, MI
*Graduate Teaching Assistant*
- Supervised undergraduate general chemistry, life science, and basic chemistry lab

1990
**Gabriel Richard High School**
*Student Teacher* for Michigan State Secondary Provisional Certification (Chemistry/Math) Grades 7-12
- Taught two high school chemistry classes and three high school math class

## VOLUNTEER SERVICE

1982 to
2004 &
2012
Positions:
- Jr and Sr high school, college and adult teacher at church
- Sr high school trip director (Poland, Jamaica, North Carolina, Alaska)
- Jr and Sr high school and college music leader (guitar)
- Jr and Sr high school bus driver (Class 3 CDL license)

1996 to
2000
- Graduate Student Representative, Wayne State University, Detroit, MI

2002 to
2004 &
2008
- Assisted in ballroom dance lessons, Beverly Hills, CA
- Helped organize a dance club and teach ballroom dance lessons to colleagues at Pfizer

2013 to
2014
- Personal trainer for several individuals at local fitness gym
- Bagged and distributed food with City Mission in Detroit, MI
- Assisted at fund raiser and organizational meetings for Grace Centers of Hope, Pontiac, MI
- Volunteered weekly as an usher or greeter at my local church

# Exhibit "K"

**Michael J. Whitekus, PhD, DABT**
History of Expert Testimony by Deposition or Trial

<u>Date</u>          <u>Case Name & Description</u>

03/23/16          JOSE APONTE and MARY APONTE v. RALPH CLAYTON & SONS and PR1MA
                  CORPORATION
                  Case No. L-2739-13
                  *SUPERIOR COURT OF NEW JERSEY LAW DIVISION: OCEAN COUNTY*
                  *NEW JERSEY; The Deposition was conducted electronically at Robson Forensic, Lancaster,*
                  *PA(expert witness and court recorder) and in NJ (lawyers).*

01/12/17          PREM CHANTANI, DEEPAK CHANTANI, and NEERUPA PREM CHANTANI v. DELAWARE
                  AUTHORITY FOR REGIONAL TRANSIT (DART), DELAWARE TRANSIT CORPORATION and
                  GEORGE ALLEN BRYANT.
                  Case No. N15C-07-086
                  SUPERIOR COURT OF THE STATE OF DELAWARE,  NEW CASTLE COUNTY, *Wilington, DE;*
                  *Trial.*



# Exhibit "L"

**NAVAL ARCHITECT/MARINE SAFETY EXPERT REPORT**

**REGARDING**

**SAMANTHA JOYCE BROBERG's fall overboard from the cruise ship CARNIVAL LIBERTY**

By:

**Kyle McAvoy**

January 8, 2018



**Naval Architect/Marine Safety Expert's Report**                    **January 8, 2018**

## 1.0    INTRODUCTION

In the early morning hours of May 13th, 2016, Samantha Joyce Broberg, who was a passenger on the cruise ship CARNIVAL LIBERTY, fell overboard.  At approximately 01:57[1] local time[2] on that morning she fell overboard while the CARNIVAL LIBERTY was approximately 170 nautical miles South East of Galveston, TX.

The purpose of my investigation was to determine whether or not the CARNIVAL LIBERTY created unreasonably dangerous conditions for Broberg that caused or contributed to her fall overboard; and whether the crew followed proper protocol for a man overboard (MOB) event.[3]

## 2.0    MATERIAL AVAILABLE FOR REVIEW

2.1   Complaint for Damages and Demand for Jury Trial.
2.2   Defendant's Motion to Dismiss.
2.3   Order Denying Motion to Dismiss.
2.4   Defendant's Answer and Affirmative Defenses.
2.5   Scheduling Order Setting Trial.
2.6   USCG Response to FOIA Request.
2.7   USCG Letter of Presumed Death.
2.8   FBI Response to FOIA Request.
2.9   Bartender and Bar Waiter Function/Duties documentation statements (CCL 18857 - 016 through 018).
2.10  Beverage Purchase Receipts (6 pages).
2.11  Carnival Cruise Lines (CCL) Module 7, Beverage Service, Carnival College Bar Service Program (CCL 18857 – 142 through 207).
2.12  Carnival Cruise Lines (CCL) Module 5, Duties & Responsibilities, Carnival College Bar Service Program (CCL 18857 – 124 through 132).
2.13  Carnival Cruise Lines (CCL) Module 4, Responsible Alcohol Service, Carnival College (CCL 18857 – 111 through 123).
2.14  Portvision Vessel Position Report for the CARNIVAL LIBERTY from 16:00 on May 12th, 2016 to 09:00 May 14th, 2016 (all times local).
2.15  CCL Responsible Service of Alcohol Presentation (CCL 18857 – 019 through 061).
2.16  Excerpts from CCL Ship Security Manual (CCL 18857 – 393 through 419).

---

[1] Per CARNIVAL LIBERTY FLIR video footage & the filed Report of Marine Accident, Injury or Death (From CG-2692).
[2] All times used in this report will be local times and in a 24 hour format unless otherwise indicated.  Additionally, within Coordinated Universal Time (UTC), the CARNIVAL LIBERTY was in a -6 hour time zone relative to Greenwich Mean Time (GMT) however Daylight Saving Time was in effect for the region at the time of the fall, thus the difference was  -5 hours.
[3] "Man Overboard" is the traditional nautical term for a person who has fallen overboard.



[2]

2.17 CCL Classic Cocktail Promotion discussion, Carnival College Bar Service Program (CCL 18857 – 283 through 285).

2.18 CCL F.S.S. (Fun Sales System), Carnival College Bar Service Program (CCL 18857 – 315 through 323).

2.19 Photo copy of Samantha Joyce Broberg's driver's license

2.20 Photographs labeled as #21 SCAN0000 through #27 SCAN00006 (including photos of Broberg at a bar, Broberg and friends in CCL fun shots, and photos from the on board investigation after Broberg was reported missing).

2.21 Photo of a SAR Grid pattern within the Gulf of Mexico.

2.22 Carnival Shipboard Human Resources, "Responsible Service of Alcohol" lesson outline (CCL 18857 – 329 through 340).

2.23 Numerous Screen Shots, numerically sequenced from #45 through #80, documenting CCL's on board message to fellow passengers, CCL's Corporate Communications statements, and the investigation on the open deck via various media sources.

2.24 Numerous copies of photographs sequentially, labeled within the directory as, #81 FBI – Photograph 001 through #138 FBI – Photograph 058, documenting the investigation in accordance with CCL's Ship Security Incident Report # LI 2016/090 and including many photographs of the investigation.  Note, some of the photos in this section are duplicates to photos listed elsewhere in this section.

2.25 vBulletin blog message on Cruise Critic Message Board Forum from 13 May 2016 regarding the search for Broberg.

2.26 News clip video from KTRK Reporter.

2.27 Broberg family photos (4) and photocopies of Broberg Marriage Certificate and Marriage License.

2.28 Carnival Sail & Sign Statement for Broberg, Churman, and Brady.

2.29 CCL 18943 – 1 (1), PORT FWD PT FLIR video.

2.30 CCL Missing Person Incident Report #LI2016-090 information (CCL 18943 - 2 through 3).

2.31 CCL Ship Security Incident Report #LI2016-090 information (CCL 18943 - 4 through 35).

2.32 USCG Form CG-2962, Report of Marine Accident, Injury or Death (CCL 18943 – 36 through 37).

2.33 A-PASS Web Reports for Carnival Liberty, Archive Details, credit card receipts, displays for financial booking history, Guest Management Portal information, for Broberg & other persons associated with the case, internal CCL records regarding missing persons report times, Locklink transfer lock events associated with the case, and Carnival Missing Person Report (CCL 18943 – 38 through 120).

2.34 Affidavit of Amy Brady.

2.35 Affidavit of Sarrah Nelms Churman.

2.36 Affidavit of Tammy Ramirez.

2.37 Deposition of Vikram Sing.

2.38 Deposition of Sunjay Kumar.



## 3.0   BACKGROUND

The CARNIVAL LIBERTY has the following principal dimensions:[4]

        Registry:        Panama
        Call Sign:      HPYE
        Length:        952.10 ft.
        Breath:        143.20 ft.
        Depth:        42.20 ft.
        Gross Tonnage:  110320
        Net Tonnage:    83378
        IMO Number:    9278181
        Build Year:      2005

## 4.0   DESCRIPTION OF THE INCIDENT

On or about, 01:57 on May 13th, 2016, while the CARNIVAL LIBERTY was underway in the Gulf of Mexico en route to Cozumel, Mexico,[5] on a course of 138°T and making approximately 19.7 knots[6], Samantha Joyce Broberg fell overboard.  At 01:57:52 the ship was in position 27° 32' 0.24" N Latitude and 092° 15' 14.98" W Longitude,[7] which is approximately 168 Nautical Miles and in a direction of 129°T[8] from the COLREGS Demarcation Line that separates the Galveston Bay Entrance Channel from the Outer Bar Channel near Galveston, TX in the Gulf of Mexico (see NOAA Chart 11324 - Galveston Bay Entrance, Galveston and Texas City Harbors).  Broberg was on the cruise with two friends, Amy Brady and Sarah Churman.[9]  At the time of her fall, as explained in Plaintiff Expert Reports by John Cocklin and Michael Whitekus, Broberg was intoxicated.

## 5.0   ANALYSIS

After an afternoon and evening of drinking numerous alcoholic drinks on the CARNIVAL LIBERTY, as explained in reports by Cocklin and Whitekus, Broberg was on the 10th deck of the CARNIVAL LIBERTY in the early morning hours of May 13th.   Per documentation collected in the investigation by both the FBI and Carnival, just prior to

---

[4] USCG Maritime Information Exchange, Port State Information Exchange
(https://cgmix.uscg.mil/PSIX/PSIXSearch.aspx).
[5] Carnival Cruise Lines (CCL) FLIR video, CCL filed form CG-2692, & CCL Incident Report #LI2016-090.
[6] Portvision Vessel Position Report.  Note:  The CCL Incident Report #LI2016-090 and the CG-2692 report a course of 139°T.
[7] Portvision Vessel Position Report.
[8] On the points of the compass, the Intercardinal Point, South East, is 135°. (Chapman Piloting Seamanship and Small Boat Handling, 55th Edition).
[9] Affidavits of Brady and Churman.





Figure 1 - CCL sketch; yellow arrow indicates area where Broberg fell overboard.

Broberg's fall, she was with a male passenger, Israel Cervantez,[10] on the port side of the vessel's 10th deck, on an outside deck area, just forward of the pool in that vicinity.

Figures 1, 2 & 3, indicate the approximate area where Broberg was before she fell. Figure 1 is a Carnival Cruise Line (CCL) sketch; figure 2 shows a port side view of the CARNIVAL LIBERTY taken from CCL's webpage on September 28th, 2017[11] (included for perspective only); and figure 3 is a "screen shot" image from a news broadcast that also shows the area from where Broberg fell.  Per the FBI investigation of Broberg's fall and presumed death,[12] various interviews with passengers that were either in contact with, or potentially in contact with Broberg within the last hours of her life, indicate that while Broberg was on the 10th deck and just prior her fall:

> Broberg stood up on the lounge chair, then lifted herself up on the top of the railing to sit.  Almost immediately, she fell over backwards and fell out of [        ]* sight.  [        ]*[13] walked over to the railing and looked, but could not see anything.[14]

---

[10] [Kumar Deposition: page 45]

[11] https://www.carnival.com/cruise-ships/carnival-liberty.aspx.

[12] USCG 04 OCT 2016 Letter of Presumed Death.

[13] * The bracketed sections within the quote indicate sections that were redacted from the FBI text.

[14] FBI documentation obtained via FOIA, 45A-HO-7771467 Serial 5 – 1 of 2 - .



[5]



Figure 2 - Port side view of CARNIVAL LIBERTY



Figure 3 - Screen shot of area from where Broberg fell.  Yellow caution tape marks off the area for the ship security staff investigation.

The CARNIVAL LIBERTY's FLIR video of Broberg's fall is consistent with that description.  The video reveals the thermal image of a person near the rail, then that same person rising up higher on the rail, becoming horizontally extended with part of her body over the outboard edge of the rail, and finally tumbling seaward head over heels off the rail.

**THE EXPERTS**
**Robson Forensic**                    [6]

Ships such as the CARNIVAL LIBERTY are required to have efficient bulwarks, or railings, that extend above the ships side and above the horizontal level of the open deck.  A foundational document for bulwark and railing heights to protect mariners at sea is the International Load Line Convention.  That convention has mandates not only for the minimum freeboard that a vessel must have, but also the heights of railings or bulwarks.  In addition to the Load Line Convention requirements, vessel Classification Societies also have requirements for rail heights.  Further, in order to help insure the safety and security of U.S. passengers on cruise ships, the U.S. Congress passed a law in 2010 entitled the, "Cruise Vessel Safety and Security Act" that codified in Title 46, United States Code, Chapter 35, several important safety and security features.  Within that law is a provision that cruise ships carrying U.S. citizens from U.S. ports shall have 42" high rails or bulwarks.  In a formally issued policy letter by the USCG in 2011, the USCG quite succinctly described the requirement relative to rail heights as follows[15]:

> (1) Ship Rails (46 U.S.C. 3507(a)(1)(A)). This special requirement is in conjunction with the normal passenger vessel guard rail requirements of 46 CFR 72.40, and pertains to deck-edge guard rails or bulwarks around all open air decks that are available for general passenger use, such as public decks, balconies of cabins, etc.  The height of these rails should not be less than 42 inches (1067 mm).  For the purposes of this requirement, plan review will not be required; instead a field unit shall spot check compliance at the first control verification examination (CVE) after 27 January 2012 and at any CVE thereafter when rails are modified.  Rail heights should be measured vertically from the top of the uppermost rail to the adjacent deck surface on the passenger side of the railing.  Lower heights are acceptable where the 42 inch height would interfere with other special arrangements (such as boarding areas around lifeboats, etc).  Non-deck edge guard rails, such as on stairways, are not subject to this special height requirement and need only meet the Loadline Convention requirements.

The purpose of railings or bulwarks is clear.  They are safety barriers to protect mariners and passengers from the potential hazard of falling into the sea.  On the CARNIVAL LIBERTY, however, at least on the voyage that Broberg was on, the effectiveness of that protection was compromised due the procedure of stacking or pushing deck lounge chairs up against the inboard side of the railing, a procedure verified by ship's crew.[16] In doing so, the lounge chairs became an easy and effective step in the vicinity of the railing that Broberg fell over.  The act of using a lounge chair as a step in the vicinity of the deck rail defeated the effectiveness of the rail's protection and defeated the rail's designed safety barrier.  Figures 4 and 5 illustrate the deck lounge chairs on the CARNIVAL LIBERTY in such positions.

---

[15] CG-543 Policy Letter 11-09 dated Jun 28 2011, "CRUISE VESSEL SECURITY AND SAFETY ACT (CVSSA) OF 2010 IMPLIMENTATION PROCEDURES
[16] [Kumar Deposition: page 67 & 69].





Figure 4 - Deck Lounge Chairs pushed against the rail.



Figure 5 - Deck Lounge Chairs pushed against the rail.

**CARNIVAL LIBERTY's stacking of the lounge chairs in the vicinity of the railing exposed Broberg to the hazard of falling overboard.  The combination of hazard and exposure created unreasonably dangerous conditions for Broberg which was a cause of her death**.

In the early morning hours of May 13th, 2016, if the deck lounge chairs had not been available and/or adjacent to the protective deck rail as an accessible step, the railing would have served as designed and provided an efficient barrier to prevent Broberg's fall, and ultimate death.  The procedure of either allowing, or purposely placing deck lounge chairs adjacent to the ships railing negates the full protective assurance of the



[8]

railing. In Broberg's case, since the deck lounge chairs were pushed up against the outer most rail of the ship, she was able to easily hoist herself up and attempt to sit on the rail. **CCL's routine procedure of either allowing, or purposely placing deck lounge chairs adjacent to the ships outboard open deck railing, deprived Broberg of the protection she needed by industry and regulation which was a cause of her death.**

It is confirmed that Broberg fell overboard from the CARNIVAL LIBERTY at 01:57 on May 13th, 2016. When Broberg's two friends and cabin mates, Brady and Churman, awoke at approximately 09:00 on May 13th (7+ hours after Broberg's fall), they recognized that Broberg had not returned to their cabin since they last saw her between 23:00 and 23:30 on the 12th.[17] While Brady and Churman attempted to look for Broberg after they awoke, they did not officially seek the assistance of the CARNIVAL LIBERTY ships crew until approximately noon on the 13th according to the ships investigation documents,[18] (10+ hours after Broberg's fall and 12+ hours since they had last seen Broberg). Upon notification by Brady and Churman of Broberg's disappearance, the ship's crew did take action and the following excerpt from the official CG-2692, filed with the USCG, indicates what the CARNIVAL LIBERTY staff did:

> "12:05 pm, Security initiated search for Ms. Broberg in public area. At 12:10 pm, Guest Services commenced paging for Ms. Broberg on PA system. Full ship search conducted. Result of the search yielded negative. At 4:45 pm, while reviewing the MOB Camera Bridge Officer observed Ms. Broberg falling overboard from deck 10 midship portside at 1:57 am (05/13/2016).
> Captain made verbal notification to USCG."

To add additional detail to this timeline, the Ship Security Incident Report #: LI2016/090 (Carnival Ship's Security Manual, Missing Person Report), indicates that the commencement of crew search efforts for Broberg occurred at "1:55 PM."

According to the CG-2692, at "4:45 pm" on May 13th, while reviewing the FLIR "MOB Camera" video, the "Bridge Officer" of the CARNIVAL LIBERTY observed Broberg's fall as documented on the video at "1:57 am." The CG-2692 goes on to state that the "Captain made verbal notification to the USCG," but does not specify the time that notification was made. Coast Guard records, however, indicate that at 16:48 (21:48 Z)[19], on May 13th, 2016, the US Coast Guard (USCG) received a call from the cruise ship CARNIVAL LIBERTY regarding a Person-In-the-Water (PIW) that was reported missing. Thus, the Captain of the CARNIVAL LIBERTY made verbal notification to the USCG at 16:48 on May 13th, 2016; nearly 15 hours after Broberg's actual fall and disappearance overboard. Prior to that time, and more specifically between approximately 12:00 and 16:45 on May 13th, 2016, the crew of the CARNIVAL LIBERTY

---

[17] Affidavits of Brady and Churman, &, CCL filed form CG-2692.

[18] CCL filed form CG-2692, & CCL Incident Report #LI2016-090.

[19] Within Coordinated Universal Time (UTC), the CARNIVAL LIBERTY was in a -6 hour time zone relative to Greenwich Mean Time (GMT) however Daylight Saving Time was in effect for the region at the time of the fall, thus the difference was -5 hours.



THE EXPERTS
**Robson Forensic**

were carrying out internal ship searches and paging attempts to try and locate Broberg. Thus, while the ship's crew initiated procedures to locate Broberg after she was reported missing, those efforts lasted approximately 4 hours and 45 minutes before notifying the Coast Guard of a potential man overboard event.

Chapter 4.6 of the Carnival Cruise Lines Ship Security Manual, is entitled "Security Patrols," and establishes procedures for security patrols, use of communication equipment and dealing with intoxicated or aggressive individuals. Section 4.6.3 of that chapter is entitled, "Missing Persons." Within that section, paragraph (1) mandates that, "the first attempt to locate a 'missing' guest should be two (2) public announcements, (at 5 minutes interval for 30 minutes), by the Guest Services Office." It then states that if that procedure is unsuccessful, the Chief Security Officer (CSO) should take additional steps that include interviewing the source or sources of the missing person complaint and completing a "Missing Person Report" that includes specific characteristics of the missing person. Paragraph (2) of that section discusses what the CSO should obtain to not only include in the report but to assist with the search. For example, photographs of the missing person should be obtained and distributed to crew members or persons involved in the search. Also, paragraph (2) states that the, "missing person's emotional state, <u>whether under the influence of alcohol</u>[20] or medication, and when and where the missing person was last seen should determined." Additionally, paragraph (2) states that, "The security staff should immediately commence a complete and thorough search of the ship, concentrating first on open decks." In this case, the Ship Security Incident Report #: LI2016/090, indicates that the "Commencement of Crew Search Efforts" began at "1:55 PM" which was nearly two hours after the initial report of Broberg's disappearance. Therefore, the ship's crew did not begin the search for Broberg until nearly 2 hours after the report of her as missing was filed, instead of at the end of the first phase of public announcements, which means that by delaying the start of the search by approximately 90 minutes, the ship's crew did not follow proper ships protocol for a potential man overboard event.

In paragraph (3) of Section 4.6.3, the Carnival Cruise Lines Ship Security Manual (still within Chapter 4.6) states:

> "3) Ship's Command is to be immediately notified if there is any indication that the missing person had threatened to commit suicide, has a history of mental illness, had been acting strangely, or is believed to pose a physical threat to themselves or anyone else on board ship. <u>Immediately begin to review their MOB Cameras for any discrepancies</u>."

While paragraph (4) of Section 4.6.3 authorizes less urgency, and does not mandate an immediate review of the ship's MOB (Man Overboard) Cameras for the search of the missing person if it is determined that, "there is no indication that the missing person may be a threat to themselves or others," it is notable that Carnival's procedures for missing persons distinguishes that from a case where an individual may pose a physical

---

[20] Underline emphasis added.

threat to themselves. In the former case, there is a need to "commence a complete and thorough search of the ship, concentrating first on the open decks," but only in the latter case is there an immediate directive to review the ship's MOB Cameras. It is irresponsible for CCL to differentiate these levels of urgency with regard to a review of the MOB Cameras, especially in this case, where Brady and Churman had not seen Broberg in 12+ hours upon the report of her missing.

By virtue of their own documentation, CCL acknowledges the risk present to an intoxicated passenger and acknowledges open deck areas, such as where Broberg went overboard, as a concentrated area in need of an immediate ships search.

**CCL knew, or should have known, that intoxicated passengers such as Broberg are at risk of falling overboard at the incident location.**

**CCL failed to adequately monitor the incident area. Had CCL adequately monitored the incident area, Broberg's death would have been prevented.**

**CCL's failure to adequately monitor the incident area was a cause of Broberg's death.**

## 6.0    FINDINGS

Within the bounds of reasonable technical and professional certainty, and subject to change if additional information becomes available, it is my opinion that:

**6.1    CARNIVAL LIBERTY's stacking of the lounge chairs in the vicinity of the railing exposed Broberg to the hazard of falling overboard. The combination of hazard and exposure created unreasonably dangerous conditions for Broberg which was a cause of her death.**

**6.2    CCL's routine procedure of either allowing, or purposely placing deck lounge chairs adjacent to the ships outboard open deck railing, deprived Broberg of the protection she needed by industry and regulation which was a cause of her death.**

**6.3    CCL knew, or should have known, that intoxicated passengers such as Broberg are at risk of falling overboard at the incident location.**

**6.4    CCL failed to adequately monitor the incident area. Had CCL adequately monitored the incident area, Broberg's death would have been prevented.**



**6.5    CCL's failure to adequately monitor the incident area was a cause of Broberg's death.**

Respectfully Submitted,



Kyle McAvoy
Marine Safety Expert

# Exhibit "M"

# Robson Forensic
**THE EXPERTS**

## KYLE P. McAVOY, CAPTAIN, USCG (Retired)
### Marine Safety Expert

More than twenty-six years of active duty service in the United States Coast Guard's Marine Safety and Prevention programs. His career spanned executive leadership, the generation of national and international inspection and environmental compliance policies and procedures for commercial ships (including international cargo vessels, energy industry (oil & gas) vessels, fishing vessels, passenger vessels, etc.), conducting ship inspections, conducting the investigation and analysis of ship casualties, ensuring the integrity of the Marine Transportation System via waterways management, and the development of policy germane to commercial mariner's Merchant Mariner Credentials (Licenses and Documents).

## PROFESSIONAL EXPERIENCE

2016 to present
**Robson Forensic, Inc.**
*Associate*
Conduct technical investigations and analysis, and provide reports and testimony as needed to resolve commercial and personal injury litigation in the maritime domain.

2012 to 2016
**Coast Guard Headquarters**
*Office Chief, Office of Commercial Vessel Compliance Policy*
Led the Coast Guard effort to analyze national and international maritime authorities and conventions, determine their intent, and then develop and implement national ship inspection and examination policies to ensure the safety, security, and environmental compliance of all commercial vessels. Areas of focus included (but were not limited to):

- **Appeals.** Maintained the final authority on behalf of the Commandant, regarding decisions on commercial ship inspection or examination issues under appeal. Developed and maintained policy determinations as a result of appeals challenging Merchant Mariner Credential (License) issuance decisions.

- **Articulated Tug-Barges (ATB).** Oversaw the study of ATB manning levels to determine how the evolution of the ATB design and its operational uses has modified traditional mariner responsibilities.

- **Ballast Water Management/Invasive Species.** Examined and affirmed alternate compliance methodologies while Coast Guard approval of Ballast Water Management Systems matures.

- **Emergent threats (e.g., Ebola).** Oversaw expedient national policy directives when needed. For example, to minimize the threat of Ebola entering the U.S. via maritime vectors, established new maritime reporting protocols to support World Health Organization (WHO) and Center for Disease Control (CDC) efforts.

- **Emission Control Area (ECA).** Worked with the **Environmental Protection Agency (EPA)** and developed new guidelines and technical objectives to enforce the mandates of **MARPOL** Annex VI to minimize sulfur content in engine exhaust gas.

# Robson Forensic
**THE EXPERTS**

KYLE P. McAVOY, CAPTAIN, USCG (Retired)
Marine Safety Expert

- **Fishing Vessels.** Established programs to meet the 2010 Congressional mandates for the examination of commercial fishing vessels.

- **Flag State Inspections/Port State Control Examinations.** Responsible for the ongoing development of Coast Guard inspection and examination policies to be executed under the regulatory authorities of the Coast Guard's **Officer-In-Charge, Marine Inspection (OCMI)** and the **Captain of the Port (COTP),** within all field commands.

- **Maritime Security Program (MSP).** Oversaw the implementation of consolidated national policy governing ships inspected under the MSP.

- **Merchant Mariner Credentials** (Licenses and Documents). Oversaw the development of strategies for compliance with the requirements of the **Standards of Training, Certification, and Watchkeeping (STCW)** and all domestic credential (license) developments.

- **Outer Continental Shelf (OCS).** Oversaw the continual evaluation, analysis, and development of compliance policy applicable to the complex OCS oil and gas industry.

- **Parasailing.** Oversaw the collaboration between the Coast Guard, water sports association members, and the American Society for Testing and Materials (**ASTM**), to develop voluntary standards for commercial parasailing operations.

- **Third Party Organization (TPO)** procedures. Oversaw the development of new TPO options and authorities within 46 CFR **Subchapter M,** to be leveraged under the new inspection program for the Towing Vessel fleet. Critically analyzed the existing use of TPO processes and delegated authorities under the Coast Guard's **Alternate Compliance Program (ACP),** to better determine how the Coast Guard could optimize and harmonize its authority and oversight procedures.

**2008 to 2012**     **Coast Guard Headquarters**
*Traveling Marine Inspector, Advisor to Offshore National Center of Expertise*
On behalf of the Coast Guard Assistant Commandant for Prevention Policy, led USCG inspections and investigations on challenging and unique cases beyond field unit capability. Areas of focus included (but were not limited to):

- **Outer Continental Shelf (OCS).** Established and managed the Coast Guard's OCS – National Center of Expertise. Advised Coast Guard and industry experts on newly developing and complex inspection issues and policies.

- **USCG/NTSB Marine Board of Investigation (MBI).** Led the investigation and chaired the board proceedings, to determine the cause of the sinking of the fishing vessel *Lady Mary*, a scallop fishing vessel that claimed the lives of 6 crewmen.

# Robson Forensic
### THE EXPERTS

KYLE P. McAVOY, CAPTAIN, USCG (Retired)
Marine Safety Expert

| | |
|---|---|
| 2004 to 2008 | **Coast Guard Sector Delaware Bay, Philadelphia**<br>*Chief of the Prevention Department* |

Led 150 plus member department to ensure the integrity of safety and security inspections, casualty investigations, and waterways management decisions related to commercial shipping and the Maritime Transportation System in the PA, NJ, & DE Tri-State region. Verified compliance with regulatory standards and imposed operational restrictions or controls to maximize safety and security and to minimize pollution threats. Areas of focus included (but were not limited to):

- **Casualty Investigations.** Responsible for the execution of ship and personnel casualty investigations. Examples included the investigation into what caused the 265,000 gallon crude oil spill from the Cypriot Tanker ***Athos I*** in November of 2004.

- **Flag State Inspections/Port State Control Examinations.** Responsible for the regional execution of commercial vessel and facility inspections and examinations. Examples included the oversight of new tanker construction to non-traditional US standards, the determination and enforcement of Maritime Security Levels on ships and facilities, the identification and prosecution of criminal pollution cases, and the detention of ships with identified safety or security risks within port (or their expulsion from port).

- **Waterways Management.** Responsible for managing the integrity of the Marine Transportation System, including that all Aids to Navigation (AToN's) were in place and adequately administered, and that all Notice to Mariners and Marine Safety Zones were published and enforced (including ice season restrictions, Marine Event Permits, Marine Safety or Security Zones, Dredging Operations, etc).

| | |
|---|---|
| 2000 to 2004 | **Coast Guard Marine Safety Center**<br>*Chief of the Tank Vessel and Offshore Division, Salvage Engineering Response Team Leader* |

Led division that reviewed and approved plans and drawings for new ship construction and engineering design modifications for commercial tank vessels and OCS industry vessels. Ensured designs/plans were in accordance with international & national standards and regulatory oversight programs. Oversaw the salvage expertise provided to Coast Guard units responding to major shipping accidents. Areas of focus included (but were not limited to):

- **Outer Continental Shelf (OCS)**. Examined and approved the first prototype use of polyester mooring systems to determine their feasibility for Floating Production Units.

- **Oil Pollution Act of 1990 (OPA 90).** Verified structural arrangements and worst case oil outflow calculations for compliance with OPA 90.

- **Structural Fire Protection**. Analyzed Structural Fire Protection tradeoffs between steel, aluminum, and composites within escape routes for offshore rigs/units.

# **Robson Forensic** THE EXPERTS

KYLE P. McAVOY, CAPTAIN, USCG (Retired)
Marine Safety Expert

**1996 to**    **Coast Guard Marine Safety Office New Orleans**
**1998**    *Ship Inspector/Examiner, Ship plan reviewer, Accident Investigator, Trainer*
Carried out Flag State Inspections and Port State Control Examinations on commercial ships to assess a vessel's fitness for its intended route and service, and to verify compliance with regulatory standards; imposed operational restrictions or controls as necessary to maximize safety and security, and to minimize pollution threats. For international detentions, filed appropriate reports via **International Maritime Organization (IMO)** protocol. Assessments included evaluation of hull integrity (strength/watertight integrity), machinery/engineering systems, lifesaving systems, fire protection systems, navigation systems, stability characteristics, etc. Trained new Coast Guard inspectors and Examiners on all processes. Reviewed and inspected technical modification proposals for regional US commercial ships in accordance with applicable standards. Reviews included detailed assessment of fire protection systems, lifesaving systems, egress capabilities, stability analysis, etc. Conducted ship and personnel casualty investigations to determine cause and evaluate the need for regulatory improvements, as well as potential responsible party liability.

**1994 to**    **Coast Guard District Staff, New Orleans**
**1996**    *Staff Officer*
Managed Coast Guard ship inspection and maritime casualty investigation activities throughout the Gulf of Mexico region. Reviewed and analyzed Coast Guard positions on appeals, civil penalties, and pending vessel compliance policy. Oversaw Coast Guard Personnel safety training initiatives. Oversaw the implementation of the newly developed Coast Guard **Streamlined Inspection Program (SIP)** which utilized auditing and oversight methodologies over ship owner self-inspections. Studied emergency egress and lifesaving capabilities in combination with Search and Rescue capacities applicable to rescue efforts from high capacity passenger vessels on the Mississippi River.

**1990 to**    **Coast Guard Marine Safety Office Baltimore**
**1994**    *Ship Inspector/Examiner, Accident Investigator, Suspension & Revocation Proceeding Presenter*
Carried out Flag State Inspections and Port State Control Examinations on commercial ships to assess the vessel's fitness for its intended route and service, and to verify compliance with regulatory standards and impose operational restrictions or controls as necessary to maximize safety and security and to minimize pollution threats. For international detentions, filed appropriate reports via IMO protocol. Assessments included evaluation of hull integrity (strength/watertight integrity), machinery/engineering systems, lifesaving systems, fire protection systems, navigation systems, stability characteristics, etc. Conducted ship and personnel casualty investigations to determine cause and evaluate the need for regulatory improvements, as well as potential responsible party liability. Presented government/Coast Guard evidence in formal Suspension and Revocation Proceedings before an Administrative Law Judge to prove charges levied against commercial mariners.

# **Robson Forensic** THE EXPERTS

KYLE P. McAVOY, CAPTAIN, USCG (Retired)
Marine Safety Expert

## **PROFESSIONAL CREDENTIALS/USCG CREDENTIALS**

ASME/AWS Code Welding Requirements Trained, 1996
Engineer-In-Training (PE Precursor), Virginia, 2001
FEMA National Incident Management System/Response Plan Certification, 2005
Incident Command System (ICS) 300-400 Certification, 1996-1997
ISO 9001 Quality Management Systems Auditor/Lead Auditor Certification, 2008
NFPA 472-92, Hazardous Material Awareness & Operations Qualified (HAZWOPER), 2000
NFPA Shipyard Competent Person Trained, 1991, 1993
U.L. Advanced Boating Accident Investigation Trained, 1995
USCG Inspection and Examination Qualifications for the following vessel types:
   Deep Draft (Hull), Deep Draft Dry-dock, Tank Ships, Foreign Freight ships, Foreign Tank
   ships, Barges (Tank and Deck), & Small Passenger Vessels (Subchapter T & Subchapter
   K), 1992-1994
USCG Marine Casualty Investigator Qualified, 1993
USCG Marine Safety & Environmental Protection Professional designation, 2001
USCG Merchant Mariner Credential Suspension & Revocation Officer Qualified, 1993

## **EDUCATION**

Master of Science in Engineering - Naval Architecture and Marine Engineering, University of
   Michigan, 2000
Master of Engineering - Manufacturing Engineering, University of Michigan, 2000
Bachelor of Science – Mathematics (Physics Minor), State University of New York College at
   Fredonia

## **PROFESSIONAL MEMBERSHIPS**

Society of Naval Architects and Marine Engineers (SNAME)

## **PUBLICATIONS/PRESENTATIONS**

"Regulatory Update & Workforce Planning for the Liquefied Gas Industry," Panel Member,
   USCG Liquefied Gas Senior Executive Forum, Houston, Texas, December 2015
"A Marine Forensic Analysis of Fishing Vessel *Lady Mary,*" presented at the SNAME
   Maritime Convention, Houston, Texas, October 2014
"MSC's Salvage Engineering Response Team, A Valuable Resource Tool for Marine Safety
   Field Units" published in the USCG's Proceedings of the Marine Safety Council, Summer
   2004 edition
"Regulatory Complexities, The Gulf of Mexico Oil and Gas Industry," published in the
   USCG's Proceedings of the Marine Safety Council, Summer 2004 edition

# Robson Forensic
## THE EXPERTS

### KYLE P. McAVOY, CAPTAIN, USCG (Retired)
### Marine Safety Expert

**OTHER**

Collegiate Assistant Swim Coach, 1987
High School Varsity Swim Coach, 1988-1989
NY State Department of Recreation Chief Lifeguard, 1987-1989
Avid swim enthusiast, pool and open water competition, 1981-present
Recreational Boater, 1975-present

# Exhibit "N"

**Kyle P. McAvoy, Captain, USCG (Retired)**
History of Expert Testimony by Deposition or Trial


<u>Date</u>                        <u>Case Name & Description</u>

Jan. 21, 2016            USCG/NTSB Major Marine Board of Investigation regarding the sinking of the SS
                        EL FARO, with loss of life, on October 1, 2106
                        *Washington, DC*
                        Deposed on behalf of the USCG


Feb. 22, 2016            USCG/NTSB Major Marine Board of Investigation regarding the sinking of the SS
                        EL FARO, with loss of life, on October 1, 2106
                        *Jacksonville, FL*
                        Testified on behalf of the USCG



# Exhibit "O"

# EXPERT REPORT OF
## ROSS A. KLEIN

1.     My name is Ross A. Klein. I am a recognized international authority on the cruise industry and cruise tourism. I have testified four times before the U.S. Congress (twice in general oversight hearings before the Senate Committee on Commerce, Science, and Transportation), frequently give lectures and conference presentations (approximately 100 in Europe, Australasia, Central America, the Caribbean, and North America), and am actively involved in research producing four books, six monographs commissioned by nongovernmental organizations, twenty-five academic articles and seventeen book chapters specifically about the cruise industry and cruise tourism – most of this published work is peer reviewed. My expertise was the basis for being asked to contribute 40 entries on cruise industry related topics to the 2008-published *Encyclopedia of Tourism and Recreation in Marine Environments* (Oxfordshire, UK: CAB International). My international stature means I am frequently contacted by media – more than 200 interviews on radio (many programs nationally/internationally syndicated), over 200 interviews for print media (again, many nationally and internationally syndicated), and over 70 television interviews (a significant number being national news programs in the US, Canada, United Kingdom, Australia, New Zealand, Germany, Croatia, and small island states in the Caribbean). My full academic CV is attached.

2.     I have been retained by counsel for the Plaintiff to serve as an expert witness as it relates to foreseeability of persons overboard on cruise ships, within the cruise industry, and specifically to offer expert opinion relating to passenger overboard incidents on Carnival Cruise Lines' (CCL) cruise ships, and the relationship between CCL and Cruise Lines International Association (CLIA) in projecting a unified image that a cruise ship is a safe environment.

3.     My opinion is based on:

- Almost 20 years of research and academic writing on the cruise ship industry, including crime and person overboard incidents on cruise ships. Data is drawn from diverse sources, including: media reports (e.g., mass media and trade media) from the 1950s to present; participation at industry trade shows such as Seatrade Cruise Shipping Convention; discussions with crew members onboard cruise ships, and from more than 330 days of participant observation on cruise ships; files provided in discovery in civil law suits; data presented by CLIA and its member lines to the U.S. House of Representatives and U.S. Senate (2005, 2006, 2007, 2012, 2013); crime reports secured from the Federal Bureau of Investigation (FBI) through Freedom of Information Requests (2007-08, 2011); and academic and nonacademic studies and reports.

1

- Persons overboard data. I began displaying on my website, Cruise Junkie dot Com, "A Comprehensive List of Persons Overboard from Cruise Ships" in 2005 when it became apparent there was no comprehensive set of data. The need was identified in the lead-up to Congressional hearings in 2005; I began displaying online the dataset I had already developed. The data is continuously updated as incidents occur. I discuss the issue of persons overboard from cruise ships in my fourth book; in several of my academic book chapters and journal articles; in public lectures and in academic papers at international conferences and symposia; and was part of my testimony before the U.S. Senate in 2012 and 2013.

- Information and insights gained through my role as an expert witness in cases involving CCL and several other CLIA-members lines (i.e., Royal Caribbean International (RCI), Norwegian Cruise Lines (NCL), Disney Cruise Line).

- Survey of the CCL website with regard to its presentation of data on persons overboard, and representations on the website relating to the risk on CCL ships of going overboard.

- The following material produced specifically for this case:

  o Complaint for Damages and Demand for Jury Trial (25 April 2017)
  o Defendant's Motion to Dismiss (May 18, 2017)
  o Order Denying Motion to Dismiss (July 17. 2017)
  o Defendant's Answer and Affirmative Defense (August 7, 2017)
  o Carnival Beverage Service Module
  o Carnival College Duties of Bar Service Module
  o Carnival College Responsible Alcohol Service Module
  o Carnival SMS Security Manual – Chapters 4.4, 4.5, 4.6, 4.7, 4.10, 5.2, 5.3, 5.16
  o Casino-Drink Promotions
  o Affidavit of Sarah Churman, October 2, 2017
  o Affidavit of Tammy Ramirez, October 12, 2017
  o Deposition of Sanjay Kumar, September 24, 2017
  o Deposition of Vikram Singh, October 29, 2017

- My academic training in sociology (particularly research methods and data analysis) and in social work, and my involvement in training of students for a wide range of practice settings in social work.

4.     I received a B.S. with a triple major (Sociology, Social Work, and Secondary Education) in 1972 from Arizona State University, a Masters in Social Work (MSW) in 1974 from University of Maryland, and a M.A. and Ph.D. in Sociology in 1979 and 1982 (completed all requirements August 1981, official graduation May 1982) respectively from Syracuse

University. My training in both Social Work and Sociology strongly emphasized research methods, research design, and data analysis (both quantitative and qualitative).

5.    I am currently Associate Dean for Graduate Studies and Research in the School of Social Work at Memorial University of Newfoundland, St. John's, NL Canada. Before this position, my teaching responsibilities in the School of Social Work for the previous thirteen years focused almost exclusively on teaching research methods and data analysis (including statistics) to Masters and Doctoral students, and on supervision of doctoral dissertations. My teaching prior to 2002 was balanced between research methods and social work practice. I previously held faculty appointments at Iowa State University, Skidmore College, and Smith College.

6 . Since 1998, my primary area of research and publication has been the international cruise industry and cruise tourism. Specific to cruise tourism and the cruise industry, I have published the following books and monographs:

2009    *Getting a Grip on Cruise Ship Pollution*, Washington, DC: Friends of the Earth.

2009    *Cruising without a Bruising: Cruise Tourism and the Maritimes*, Halifax, NS: Canadian Centre for Policy Alternatives.

2008    *Paradise Lost at Sea: Rethinking Cruise Vacations*, Halifax: Fernwood Publishing.

2005    *Cruise Ship Squeeze: The New Pirates of the Seven Seas*, Gabriola Island, BC: New Society Publishers.

2005    *Playing Off the Ports: BC and the Cruise Tourism Industry*, Vancouver, BC: Canadian Centre for Policy Alternatives.

2003    *The Cruise Industry and Environmental History and Practice: Is A Memorandum of Understanding Effective for Protecting the Environment,"* San Francisco: Bluewater Network and Seattle: Ocean Advocates.

2003    *Charting A Course:  The Cruise Industry, the Government of Canada, and Purposeful Development,* Ottawa: Canadian Centre for Policy Alternatives.

2003    *Cruising - Out of Control: The Environment, Workers, and Atlantic Canada's Ports*, Halifax: Canadian Centre for Policy Alternatives.

3

2002   *Cruise Ship Blues: The Underside of the Cruise Ship Industry*, Gabriola Island, BC: New Society Publishers.

2001   *Death by Chocolate: What You Must Know Before Taking a Cruise*, St. John's: Breakwater Books.

I have also published since 2006 the following book chapters and journal articles related to the cruise industry and cruise tourism:

2018   "Dreams and realities: The cruise industry," *Tourists and Tourism* (ed. S. Gmelch and A. Kaul), Chicago, IL: Waveland Press (forthcoming)

2017   "Adrift at sea: The state of research on cruise tourism and the international cruise industry," *Journal of Tourism in Marine Environments* 12 2/3. In press

2016   "Representation without taxation: The power and politics of the cruise industry," *Cruise Ship Tourism, 2nd Edition* (R.K. Dowling & C. Weeden, ed.), Wallingford, UK: CABI. pp. 57-71

2016   "Passengers and risk: Health, wellbeing, and liability," *Cruise Ship Tourism, 2nd Edition* (R.K. Dowling & C. Weeden, ed.), Wallingford, UK: CABI (R. Klein, M. Lueck & J. Poulston) pp. 106-123

2016   "Troubled seas: The politics of activism related to the cruise industry," *Journal of Tourism in Marine Environments* 11:3/4 (R. Klein & K. Sitter). pp. 147-160.

2015   "Safety, Security, Health and Social Responsibility," in *Cruise Business Development - Safety, Design and Human Capital* (ed. A. Papathanassis), Berlin: Springer Verlag. pp 3 – 15

2015   "Crime at Sea: A Comparison of Crime on Carnival Cruise Lines, 2007 – 2011," in *Cruise Business Development - Safety, Design and Human Capital* (ed. A. Papathanassis), Berlin: Springer Verlag. pp. 17 - 28

2015   "Introductory Note: 'Long-Tail' or 'Fairy-Tale'? The case for scientific publishing on cruise," Special Issue on Cruise Research, *Journal of Tourism in Marine Environments* 10:3/4, pp. 141-148 (A. Papathanassis and R. Klein)

2014   "Old Ships in New Bottles: Where Do Cruise Ships Go When They Get Old?" *Cruise Tourism& Innovation: Improving Passengers' Experiences* (ed. A. Pappathanassis, M.H. Breitner, A. de Groot), Berlin: Verlag. pp. 185-198

2014    "The Cruise Industry's Business Model: Implications for Ports," *Harboring Tourism: Cruise Ships in Historic Port Communities* (ed. E. Avrami), New York: World Monuments Fund, pp. 46-51

2014    "Tensions Between Cruise Tourism and Land-based Tourism: The Case of Key West and Dubrovnik," *Harboring Tourism: Cruise Ships in Historic Port Communities* (ed. E. Avrami), New York: World Monuments Fund, pp. 88-93

2013    "Envisioning Environmental Policy as Social Policy: The Case of the International Cruise Industry," *Environmental Policy as Social Policy – Social Policy as Environmental Policy: Toward Sustainability Policy,* (ed. I. Wallimann), New York: Springer, pp. 181-196.

2013    "Opportunities for Market Development of Nautical Tourism in Europe," *Nautical Tourism* (ed. T. Lukovic), London: CABI, pp. 201-224. (R. Klein, K. Božic, R. Dowling, P. Gibson, Z. Gržetic, A. Haahti, S. Horak, T. Lukovic, A. Papathanassis and S. Pekkala)

2012    "Sexual Crimes on Cruise Ships: A Historical Perspective on Security Issues for Passengers and Crew," Tourism and Society:  A Socio-Economic Perspective (ed. A. Pappathanassis), Heidelberg: Springer Verlag, pp. 141-151.

2012    "In the Aftermath of the Costa Concordia Disaster," *Risk & Regulation* 24 (Winter), pp. 4-5.

2012    "Different Streams in Cruise Tourism Research," Special Issue on Cruise Tourism, *Tourism*, 60:1, pp. 7-13. (Introduction to the special issue which I edited)

2012    "Treacherous Waters: The Latest Bad Publicity for the Global Cruise Industry is Just the Tip of the Iceberg," *Foreign Policy*, April 6, 2012 (http://www.foreignpolicy.com/articles/2012/04/05/treacherous_waters); Reprinted as "Stop Rearranging the Deck Chairs: Cruise Industry Needs Big Changes," *Seattle Times*, April 10, 2012 (http://seattletimes.nwsource.com/html/travel/2017948779_webcruiseships11.html); Reprinted as "Industry Cruising for a Bruising," *The Press*, April 12, 2012 (http://www.stuff.co.nz/the-press/opinion/perspective/6728212/Industry-cruising-for-a-bruising)

2011    "Responsible Cruise Tourism: Issues of Cruise Tourism and Sustainability," Special Issue on Cruise Tourism:  Emerging Issues and Implications for a Maturing Industry, *Journal of Hospitality and Tourism Management*, 18, 103-112.

2011    "Sex at Sea: Sexual Crimes on Cruise Ships," *Journal of Tourism in Marine Environments*, 7:2, 67-80. (Ross A. Klein and Jill Poulston)

2010    "The Cost of Cruising," *Vancouver Observer*, April 13, 2010 (http://www.vancouverobserver.com/2010/04/13/cost-cruising) (Reprinted in *Island Tides*, 22:8 (April 29 – May 12) pp. 2, 11; Reprinted in The Tyee, May 21, (http://thetyee.ca/Opinion/2010/05/21/CostOfCruising/).

2010    "Greening the Cruise Industry," *Journal of Ocean Technology*, 5:1 (March), pp. 7 – 15.

2010    "The Cruise Sector and Its Environmental Impact," *Tourism and the Implications of Climate Change: Issues and Actions,* (ed. C. Schott), Bingley, UK: Emerald, pp. 113-130.

2010    "Cruises and Bruises: Safety, Security and Social Issues on Polar Cruises," *Cruise Tourism in Polar Regions: Promoting Environmental and Social Sustainability* (ed. M. Luck, P.T. Maher, and E. Steward), London: Earthscan Ltd., pp. 57-74.

2009    "Environmental Impacts of Cruise Tourism," *Prows Edge Cruise Magazine and Guide to Cruising*, July 2009. (http://www.prowsedge.com/views-ross-klein.html)

2009    "An Intellectual Balancing Act," *Sociology on the Rock* (Issue 3), Winter. (http://www.mun.ca/soc/newsletter/issue3/index.html)

2008    Multiple Entries (40). *Encyclopedia of Tourism and Recreation in Marine Environments*, Oxfordshire, UK: CAB International.

2007    "Protecting Paradise: Minimizing the Downside of Cruise Tourism," *Proceedings of the 5th International Coastal and Marine Tourism Congress: Balancing Marine Tourism, Development and Sustainability* (ed. M. Luck et al), Auckland: New Zealand Tourism Research Institute, pp. 242-257.

2007    "The Politics of Environmental Activism: A Case Study of the Cruise Industry and the Environmental Movement," *Sociological Research Online*, 12:2 (March). (http://www.socresonline.org.uk/12/2/klein.html)

6

2006    "Troubled Seas: Social Activism and the Cruise Industry," *Cruise Ship Tourism: Issues, Impacts, Cases* (ed. Ross K. Dowling), Oxfordshire, England: CABI Publishing, pp. 377-388.

2006    "Turning Water Into Money: The Economics of the Cruise Industry," *Cruise Ship Tourism: Issues, Impacts, Cases* (ed. Ross K. Dowling), Oxfordshire, England: CABI Publishing, pp. 261-269.

2006    "The Industry's Darkside," *World Regions and Places: A Reader* (6th ed), (ed.) Jeffrey S. Smith, Boston: Pearson Custom Publishing. (Reprint of 2003 article in *Conscious Choice*)

2006    "Attack of the Oversized Playpen," *Briarpatch Magazine* 35:7 (November), pp. 14 – 17.


In addition, I have appeared as a witness four times before the U.S. Congress:

July 2013    U.S. Senate, Committee on Commerce, Science, and Transportation, Hearings on "Cruise Industry Oversight: Recent Incidents Show Need for Stronger Focus on Consumer Protection"

March 2012    U.S. Senate, Committee on Commerce, Science, and Transportation, Hearings on "Oversight of the Cruise Ship Industry: Are Current Regulations Sufficient to Protect Passengers and the Environment?"

June 2008    U.S. Senate, Committee on Commerce, Science, and Transportation, Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety and Security, Hearings on "Cruise Ship Safety: Examining Potential Steps for Keeping Americans Safe at Sea"

March 2007    U.S. House of Representatives, Subcommittee on Coast Guard and Maritime Transportation, Committee on Transportation and Infrastructure, Hearings on "Crimes Against Americans on Cruise Ships"

I founded in 2002, and continue to maintain, the website Cruise Junkie dot Com. In 2005 I established the International Centre for Cruise Research. In addition, I am on the Board of Directors of the International Cruise Research Society, Associate Editor of the Journal of Tourism in Marine Environments (I handle all cruise-related articles), served as Guest Editor for a special issue of *Tourism* (an academic journal published by the Croatia Tourism Institute) focused on cruise tourism (2012), and twice served as co-guest editor for a special double issue of the *Journal of Tourism in Marine Environments* (2014 & 2015). These three special issues,

7

including more than 30 academic articles, are notably the only academic journal volumes published with a focus on research of cruise tourism and the cruise industry. A fourth special issue is being developed for publication in 2018.

7.      I have served as an expert witness in 19 cases. In the past five years (since 2012) I have provided an expert report in the following cases (except CLIA vs City and Borough of Juneau). I have been deposed twice as designated by "**(d)**":

January 2017   CLIA vs City and Borough of Juneau, United States District Court – Alaska District (Hoffman & Blasco), Case #1:16:cv-00008-HRH

March 2016    Mudd vs Carnival Cruise Lines, United States District Court – Southern District (Brais & Brais), Case # 15-cv-22872-UNGARO

August 2015   Horne vs Carnival Cruise Lines, United States District Court – Southern District (Gerson & Schwartz), Case # 12-CV-21031 **(d)**

August 2014   Drane vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) Case # 1:13-24345-CIV-Graham

February 2014 Sneitzer vs Royal Caribbean Cruises Limited, United States District Court – Southern District (Gerson & Schwartz), Case # 12-24560-CIV-Altonga/Simonton

January 2014  Blackmon vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) Case # 1:13-cv-20837-JAL

August 2012   Gregory (Jane Doe) vs. Norwegian Cruise Line Limited, United States District Court - Miami (Brais & Brais) Case #11-22230-CV-Cooke/Turnoff **(d)**

8.      My opinion is based on my experience and expertise as a researcher and scholar in sociology, social work and tourism studies; my research of the cruise ship industry; my analysis of persons overboard data for Carnival Cruise Lines specifically, and CLIA-member cruise lines more generally; and all documents and materials itemized above in paragraph 3. I opine:

   A.  That Carnival Cruise Lines has been aware of the problem of persons overboard from its ships;

   B.  That Carnival Cruise Lines has failed in using available data to conduct a social epidemiological analysis of cases of persons overboard with the goal of targeted and specific strategies for preventing incidents in future;

C.  That guests are given an elevated sense of safety aboard Carnival Cruise Lines' cruises by its website, and by lack of publication of incidents of persons overboard through its website;

D.  That Carnival Cruise Lines, and the Cruise Lines International Association (and its predecessor the International Council of Cruise Lines) as a representative of Carnival Cruise Lines and other cruise lines, has consistently and systematically misrepresented the risk of going overboard from a cruise ship;

E.  That the disappearance of Ms. Broberg was foreseeable given past incidents of persons overboard;

F.  That the system recording the official record relies on employees of the cruise line and consequently there may be disincentives to accurately report a person overboard incident;

G.  That Carnival Cruise Lines should be more pro-active in preventing person overboard incidents;

H.  That Carnival Cruise Lines and CLIA have an obligation to disclose reliable, independently-verifiable data on person overboard incidents on its ships.

9.   *That Carnival Cruise Lines has been aware of the problem of the problem of persons overboard from its ships.*

It is my expert opinion that the cruise industry as a whole, and Carnival Cruise Lines (CCL) in particular, has an ongoing awareness of the problem of persons overboard from CCL ships. The issue was put under a microscope in hearings before the U.S. House of Representatives in 2005 (by that point, 13 persons went missing from CCL ships; 49 from all passenger ships in the previous ten years). On December 13, 2005, joint hearings were convened by two subcommittees of the House of Representatives Committee on Government Reform: the Subcommittee on National Security, Emerging Threats and International Relations chaired by Christopher Shays and the Subcommittee on Criminal Justice, Drug Policy and Human Resources chaired by Mark Souder. One purpose of the hearings was to determine jurisdictional conflicts that occur when U.S. citizens traveling on a foreign-flagged vessel are involved in a criminal incident, including sexual assaults, physical assaults, robbery, and missing persons. In addition to the disappearance of George Smith, the Committee acknowledged the disappearance of Hue Pham and Hue Tran from the *Carnival Destiny* in May 2005 and of James Scavone, a twenty-two year old man who disappeared from the *Carnival Destiny* July 5, 1999 between San Juan and Miami. Just three days before the hearings opened another passenger, fifty-nine year old

Canadian Jill Begora, disappeared from Royal Caribbean's *Jewel of the Seas* on its way to Nassau in the Bahamas.

The hearing received testimony from government officials, including the Department of Defence, the Coast Guard and the Federal Bureau of Investigation, and from cruise industry representatives from the International Council of Cruise Lines, Royal Caribbean Cruises Limited and Carnival Corporation. It also received written testimony from family members of passengers who had disappeared. The cruise industry used the hearings, and surrounding media attention, to promote the safety and security of a cruise ship. This contrasts starkly with the briefing memo provided to members of the subcommittee conducting the hearings:

> "Certain issues about cruise line travel should be highlighted to passengers. American passengers should be aware that even though they board a ship in a U.S. port it does not necessarily mean they are fully protected by the United States justice system. Most ships are registered outside the United States and travel in territorial waters where U.S. laws might not apply. Additionally, the cruise industry does not report crime data consistently. The governing law, the International Maritime Law, is not as well developed as U.S. law. And finally, reporting a crime on board a cruise ship does not mean anything will be done or that a crime will be investigated. Passengers should be made aware of these issues."[1] (see page 12)

The hearings followed a cluster of cases where a passenger disappeared from a cruise ship. The problem was raised in June 2005 in a *Business Journal of Jacksonville* article by Mary Moewe.[2] She had found that since 2000 at least twelve cruise ship passengers had gone overboard or disappeared in eleven incidents involving cruise ships that frequent U.S. ports. Two of the passengers were rescued, two were confirmed dead and the eight remaining passengers are still missing. The eight that remained missing were a mystery.

Unbeknownst to Moewe, the numbers were actually much higher. Because none of the cruise lines kept track of persons going overboard and no federal agency had responsibility for monitoring these events, she was left to rely on information that was readily available. The most comprehensive list of persons going overboard from cruise ships at the time was online at Cruise Junkie dot Com (see <www.cruisejunkie.com/Overboard.html>). The site reports forty-seven incidents during the same time period covered by Moewe's article; in nine cases the person was rescued alive. Some cases were clearly suicide, some were accidents and many remained

---

[1] Palarino, R. Nicholas and Pat Dequattro. 2005. *Hearing Memorandum: International Maritime Security, Subcommittee on National Security, Emerging Threats and International Relations.* U.S. House of Representatives. December 8

[2] See Moewe, M.C. 2005. Disappearances Leave Mystery. *Business Journal of Jacksonville* June 3.

mysterious. Alcohol was a factor in a fair number of suicides and accidents; large gambling losses were a factor in at least three cases and an argument with a spouse or travelling companion preceded four incidents (three men, one woman – in two of these cases the passenger was rescued alive). There was a single case where one passenger was observed throwing another overboard. In September 2001 Myrtha Vogt, a sixty-nine year old woman from New Mexico, was pushed overboard, as her husband watched, by a fellow passenger who was a former mental patient.

Some of the unexplained disappearances include: Cris Allen Swartzbaugh, a thirty-nine year old man who disappeared between Tahiti and Raiatea in the South Pacific the first night of a cruise aboard the *Paul Gauguin* in April 2000; Manuelita Pierce, a thirty-nine year old woman who disappeared without a trace at the end of her weeklong Caribbean cruise aboard Royal Caribbean's *Enchantment of the Seas* in October 2000; Randall Gary, a fifty year old psychotherapist who in May 2003 disappeared from Holland America Line's *Veendam* somewhere between Vancouver and Alaska; Merrian Carver, a forty year old woman who in May 2004 disappeared from an Alaska cruise aboard Celebrity Cruises' *Mercury*; Annette Mizener, a thirty-seven year old woman who disappeared from a nine day Mexican Riviera cruise aboard *Carnival Pride* in December 2004 – in her case the surveillance camera viewing the deck area from where she appeared to have disappeared following a struggle was covered by a map of the ship; and in May 2005 Hue Pham (age seventy-one) and his wife of forty-nine years, Hue Tran (age sixty-seven), disappeared in the Caribbean between the islands of Barbados and Aruba from *Carnival Destiny*. There were common patterns in these cases: search for the missing passenger was either not undertaken or was inordinately delayed, there appeared to be an absence of investigation, and in some cases law enforcement authorities were not initially notified.

In sum, CCL had 63 passengers go overboard since 1995, comprising 20.6% of the known 306 persons overboard from cruise ships and passenger ferries worldwide. As seen in Table 1, CCL saw a spike of incidents in 2004 through 2009 when 30 persons disappeared overboard; eight people went overboard in just one year: 2009.

10.    *That Carnival Cruise Lines has failed in using available data to conduct a social epidemiological analysis of cases of persons overboard with the goal of targeted and specific strategies for preventing these incidents in future*

Cruise lines appear to gather considerable data, but they don't appear to take full advantage by analyzing the data they have. I cannot assert that CCL has not undertaken forensic or epidemiological analysis of data on person overboard incidents and other crimes aboard its ships (even though this impression is supported by what is said by Mr. Paraniello's deposition in *Horne v CCL*, pages 88-89; 125; and also supported by Ms. Vasquez's deposition in *Horne v CCL* in which she states there are no patterns or trends in crime incidents so an analysis of data is unnecessary, page 108), but I can say that by all appearances available data has not resulted in practices or arrangements that mitigate against predictable risks or that ameliorate known risks.

11

**Table 1: Number of Persons Reported Overboard by Cruise Line, 1995 - 2017**

| | Carnival | Celebrity | Costa | HAL | MSC | NCL | Princess | RCI | Other+ | Ferry^ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| '95-99 | 3 | 2 | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 10 |
| 2000 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 3 | 2 | 0 | 9 |
| 2001 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 5 |
| 2002 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 4 |
| 2003 | 3 | 0 | 0 | 2 | 0 | 1 | 1 | 0 | 2 | 0 | 9 |
| 2004 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 0 | 12 |
| 2005 | 5 | 0 | 0 | 1 | 0 | 1 | 1 | 3 | 4 | 0 | 15 |
| 2006 | 5 | 1 | 1 | 1 | 1 | 2 | 0 | 4 | 4 | 3 | 22 |
| 2007 | 7 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 5 | 4 | 20 |
| 2008 | 2 | 1 | 1 | 0 | 0 | 2 | 0 | 0 | 3 | 1 | 10 |
| 2009 | 8 | 1 | 2 | 1 | 0 | 1 | 2 | 2 | 5 | 3 | 25 |
| 2010 | 3 | 2 | 1 | 1 | 1 | 2 | 1 | 3 | 6 | 1 | 21 |
| 2011 | 3 | 4 | 2 | 2 | 0 | 2 | 2 | 2 | 4 | 3 | 24 |
| 2012 | 4 | 0 | 2 | 2 | 0 | 0 | 0 | 5 | 7 | 3 | 23 |
| 2013 | 2 | 0 | 0 | 0 | 2 | 0 | 3 | 3 | 2 | 6 | 18 |
| 2014 | 2 | 1 | 3 | 2 | 1 | 0 | 3 | 4 | 6 | 1 | 23 |
| 2015 | 4 | 1 | 1 | 1 | 2 | 3 | 1 | 3 | 8 | 3 | 27 |
| 2016 | 2 | 0 | 1 | 0 | 1 | 2 | 2 | 3 | 2 | 3 | 16 |
| 2017* | 3 | 0 | 1 | 0 | 3 | 1 | 2 | 1 | 2 | 0 | 13 |
| Total | 63 | 14 | 16 | 14 | 11 | 20 | 23 | 44 | 70 | 31 | 306 |
| % of total | 20.6 | 4.6 | 5.2 | 4.6 | 3.6 | 6.5 | 7.5 | 14.4 | 22.9 | 10.1 | 100% |

*First six months

+ "Other" includes: AIDA, American Cruise Line, Birka, Cunard, Discovery, Disney, Expedition, Fred Olsen, Hurtigruten, Island, Japan, Ocean Village, P&O, P&O Australia, Pullmantur, , RSSC, Saga, Scandlines, Seabourn, SeaEscape, Silja, Silversea, Star, Success, Sun Cruz, Thomson, Windstar and The World of Residensea

^ "Ferry" includes: Condor, Erko, Baystate, BC Ferries, Washington State Ferries, Marine Atlantic, Spirit of Tasmania, Grimaldi, Irish Ferries, P&O Ferries, Talink, and Viking.

It must first be acknowledged that the data publicly available is severely limited to that which is reported in the public media. Cruise lines are not required to report persons overboard incidents to the media or to law enforcement, except under the Cruise Vessel Security and Safety Act of 2010 when the incident is judged to be a crime; a large proportion of persons overboard are not labeled as a crime so there is no mandatory reporting. When information is provided, it tends to be sparse and more often than not says the person overboard jumped or fell. It is an exception when more information than that is available.

Regardless, we can make some statements based available data, not just about CCL but about cruise ships generally. As seen in Table 2, the average age of persons overboard from a CCL ship is eight years older (both males and females) than persons overboard from other mass market cruise lines such as Norwegian Cruise Line (NCL) and Royal Caribbean International (RCI). They are younger than persons overboard from Princess, Holland America Line, and Celebrity Cruises. Other patterns visible in Table 2 include that males are three times more likely than females to go overboard from a CCL ship, there are few crew members relative to passengers who go overboard from CCL ships (lowest proportion of crew members compared to all cruise lines), and that no female crew members have gone missing from a CCL ship.

Table 3 presents additional data, in this case focusing on factors associated with disappearances. As can be seen, 17.3% of those overboard are fortunate to be rescued alive – CCL is consistent with the industry average with 19% of those overboard rescued; NCL more than doubles the industry average having rescued 40% of those who have gone overboard from their ships. Also an interesting contrast is whether the person was known to be intoxicated. In 12.7% of cases of persons overboard from CCL ships, it is known that alcohol was a factor – this rate is twice the average for the cruise industry. Based on my knowledge of incidents on cruise ships, I assert the degree to which alcohol is a factor is much higher in all cases – both CCL and other cruise lines, but that cannot be determined by the information available. All we can say for now, based on available data, is that **a person going overboard from a CCL ship is twice as likely as the industry average to have had alcohol play a role.** Analysis of data not publicly available would give a much better understanding of the dynamics at play. As seen in Table 3, just focusing on the limited publicly available data gives an interesting picture of persons overboard and comparison of these incidents across different cruise lines.

A robust analysis of investigations and reports of persons overboard could be insightful and instructive. Insights can inform security initiatives and could direct security to undertake activities known to have a high likelihood of reducing the risk. There is something of a paradox here. Mining existing data for patterns and trends increases the foreseeability of certain events in certain locations or within certain parameters, however there is a disincentive because foreseeability itself demands proper methods be implemented to ameliorate the "known" risk.

13

**Table 2: Demographic Characteristics of Persons Reported Overboard by Cruise Line, 1995 – 2017\***

| | Carnival | Celebrity | Costa | HAL | MSC | NCL | Princess | RCI | Other+ | Ferry^ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Age - Male | 40.5 | 47.0 | 37.4 | 52.9 | 33.3 | 34.44 | 39.22 | 31.8 | 43.8 | 36.9 | 40.0 |
| Average Age - Female | 41.6 | 44.33 | 36.7 | 57.8 | 50.3 | 29.67 | 51.60 | 35.8 | 54.9 | 31.7 | 44.5 |
| Average Age - All | 40.8 | 46.11 | 37.0 | 54.3 | 39.0 | 32.0 | 43.6 | 32.8 | 47.1 | 36.1 | 41.32 |
| | | | | | | | | | | | |
| % Male | 77.4 | 69.2 | 50.0 | 71.4 | 60.0 | 57.9 | 68.2 | 80.0 | 73.1 | 83.9 | 72.8 |
| % Female | 22.6 | 30.8 | 50.0 | 28.6 | 40.0 | 42.1 | 31.8 | 20.0 | 26.9 | 16.1 | 27.2 |
| | | | | | | | | | | | |
| % Pax | 85.5 | 50.0 | 62.5 | 78.6 | 63.6 | 70.0 | 68.2 | 71.4 | 80.0 | 93.1 | 76.7 |
| % Crew | 14.5 | 50.0 | 37.5 | 21.4 | 36.4 | 30.0 | 31.8 | 28.6 | 20.0 | 6.9 | 23.3 |
| | | | | | | | | | | | |
| % Pax Male | 75.0 | 57.1 | 40.0 | 72.7 | 57.1 | 53.8 | 60.0 | 72.3 | 72.2 | 81.5 | 69.8 |
| % Pax Female | 25.0 | 42.9 | 60.0 | 27.3 | 42.9 | 46.2 | 40.0 | 27.7 | 27.8 | 18.5 | 30.2 |
| | | | | | | | | | | | |
| % Crew Male | 100 | 83.3 | 66.7 | 66.7 | 66.7 | 66.7 | 100 | 100 | 76.9 | 100 | 84.4 |
| % Crew Female | 0 | 16.7 | 33.3 | 33.3 | 33.3 | 33.3 | 0 | 0 | 23.1 | 0 | 15.6 |

\*First six months
+ "Other" includes: AIDA, American Cruise Line, Birka, Cunard, Discovery, Disney, Expedition, Fred Olsen, Hurtigruten, Island, Japan, Ocean Village, P&O, P&O Australia, Pullmantur, , RSSC, Saga, Scandlines, Seabourn, SeaEscape, Silja, Silversea, Star, Success, Sun Cruz, Thomson, Windstar and The World of Residensea
^ "Ferry" includes: Condor, Erko, Baystate, BC Ferries, Washington State Ferries, Marine Atlantic, Spirit of Tasmania, Grimaldi, Irish Ferries, P&O Ferries, Talink, and Viking.

14

Table 3: Disposition of Persons Reported Overboard by Cruise Line, 1995 – 2017*

| | Carnival | Celebrity | Costa | HAL | MSC | NCL | Princess | RCI | Other+ | Ferry^ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| # Cases Gender Known | 62 | 13 | 16 | 14 | 10 | 19 | 22 | 40 | 67 | 31 | 294 |
| # Males | 48 | 9 | 8 | 10 | 6 | 11 | 15 | 32 | 49 | 26 | 214 |
| # Females | 14 | 4 | 8 | 4 | 4 | 8 | 7 | 8 | 18 | 5 | 80 |
| % Females | 22.6 | 30.8 | 50.0 | 28.6 | 40.0 | 42.1 | 31.8 | 20.0 | 26.9 | 16.1 | 27.2 |
| | | | | | | | | | | | |
| # Rescued | 12 | 2 | 1 | 0 | 1 | 8 | 6 | 7 | 10 | 6 | 53 |
| % Rescued | 19.0 | 14.3 | 6.3 | 0 | 9.1 | 40.0 | 26.1 | 15.9 | 14.3 | 19.4 | 17.3 |
| | | | | | | | | | | | |
| # Alcohol | 8 | 0 | 1 | 0 | 1 | 1 | 0 | 2 | 5 | 1 | 19 |
| % Alcohol | 12.7 | - | 6.3 | - | 9.1 | 5.0 | - | 4.5 | 7.1 | 0.0 | 6.2 |
| | | | | | | | | | | | |
| # Suicide | 9 | 1 | 1 | 1 | 0 | 3 | 5 | 2 | 6 | 3 | 31` |
| % Suicide | 14.3 | 7.1 | 6.3 | 7.1 | 0 | 15.0 | 21.7 | 4.5 | 8.6 | 9.7 | 10.1 |
| | | | | | | | | | | | |
| # Fall | 9 | 0 | 1 | 1 | 2 | 2 | 1 | 3 | 4 | 4 | 27 |
| % Fall | 14.3 | 0 | 6.3 | 7.1 | 18.2 | 10.0 | 4.3 | 6.8 | 5.7 | 12.9 | 8.8 |
| | | | | | | | | | | | |
| # Fight | 8 | 2 | 1 | 0 | 1 | 0 | 1 | 4 | 2 | 0 | 19` |
| % Fight | 12.7 | 14.3 | 6.3 | 0 | 9.1 | 0 | 4.3 | 9.1 | 2.9 | 0 | 15.6 |

NOTE: Categories included in this table are not mutually exclusive.;  *First six months;
+ "Other" includes: AIDA, American Cruise Line, Birka, Cunard, Discovery, Disney, Expedition, Fred Olsen, Hurtigruten, Island, Japan, Ocean Village, P&O, P&O Australia, Pullmantur, , RSSC, Saga, Scandlines, Seabourn, SeaEscape, Silja, Silversea, Star, Success, Sun Cruz, Thomson, Windstar and The World of Residensea;
^ "Ferry" includes: Condor, Erko, Baystate, BC Ferries, Washington State Ferries, Marine Atlantic, Spirit of Tasmania, Grimaldi, Irish Ferries, P&O Ferries, Talink, and Viking.

11. *That guests are given an elevated sense of safety aboard Carnival Cruise Lines' cruises by its website, and by lack of publication of incidents of persons overboard through its website.*

The cruise industry's propensity for minimizing the appearance of risk to going missing overboard has already been mentioned above. It is helpful to get a sense of what CCL says on its website about safety on its cruise ships.

At the time the Ms. Broberg took her cruise, the website stated under "Safety and Security" (http://www.carnival.com/legal/safety-security.aspx):

> As required by US law, you may view statistics related to the allegation of crimes aboard all cruise lines on the US Coast Guard website. Note that the statistics include all allegations, even those from cases where investigations later found the allegation to be untrue.

There is another link on the same webpage labeled "Carnival Corporation & plc Voluntary Report of Alleged Crimes." It goes to a webpage at Corporate Governance (http://phx.corporate-ir.net/phoenix.zhtml?c=140690&p=irol-voluntaryreport).

> In the spirit of transparency -- **and to remove all doubt about the low level of crime on cruise ships** compared with comparable land-based venues -- Carnival Corporation & plc's North American-based Brands have voluntarily agreed to post on this Web site allegations of crime and missing persons in the CVSSA crime reporting categories. [bolded emphasis added]

> It is important to note that these are allegations, the majority never substantiated as actual crimes. By any measure, **travel by sea aboard commercial cruise lines is exceptionally safe.** The rate of crime on cruise ships is substantially lower than corresponding rates on land, according to independent research experts. [bolded emphasis added]

This emphasis by bolding underlines the cruise line's claim of safety.

Interestingly, neither of these statements are accessible today (September 2017) at this webpage at Carnival Cruise Lines' website. Today this page of the website states, "The safety and security of our guests is our top priority." From here one can go to Safety and Security FAQs (help.carnival.com/app/answers/category/~/shipboard-health-and-safety/~/safety-and-security/c/499).

16

Under "Cruise Ship Safety Features," one is again reassured that "Carnival provides a safe and enjoyable vacation experience to nearly 4 million passengers a year and we can assure you that the safety of our guests and crew is our number one priority." And under Cruise Vessel Security and Safety Act of 2010 (CVSSA) it states, "There is nothing more important to us than the safety of our guests. Comprehensive, fleet-wide security practices have been in place for many years, which include the reporting of alleged crimes to the FBI."

That a passenger is safe is cumulatively reinforced. That nowhere is there any mention of persons going overboard is easily interpreted that going overboard (even falling) is something that is not a risk on a cruise ship.

The passenger who looks further by following the link from CCL's website to the website of the U.S. Department of Transportation (www.transportation.gov/mission/safety/cruise-line-incident-reports) finds twenty-seven separate pages to download and from those pages will see that CCL has reported since 1 January 2010 six persons overboard (Q1, 2013; Q2, 2016; Q3, 2016; Q1, 2017; Q2, 2017). In each quarter there was one person, except quarter 1 of 2017 when there were 2 incidents.

In comparison, during the same time period there were reports in the media of 23 persons going overboard from CCL ships. The numbers until 2016 drastically misrepresent the actual degree to which people go overboard from CCL ships. It is interesting that starting with the case involving Ms. Broberg, the number of incidents reported to the U.S. Government and indicated on the U.S. Department of Transportation website are now the same for CCL as the number of incidents reported in the media. Prior to Ms. Broberg's disappearance there were 17 persons overboard from CCL ships, but the cruise line reported to the FBI only one incident, as reflected in the data presented on the Department of Transportation website.

12.  *That Carnival Cruise Lines, and the Cruise Lines International Association (and its predecessor the International Council of Cruise Lines) as a representative of Carnival Cruise Lines and other cruise lines, has consistently and systematically misrepresented the risk of going overboard from a cruise ship.*

I have already shown how CCL has misrepresented, or made invisible, the risk of going overboard from a cruise ship. The Cruise Line International Association (CLIA) further contributes to the perception that not just CCL cruises are safe, but that all cruises are safe. This was certainly the underlying theme of CLIA's testimony in each of the four Congressional hearings where I testified.

CCL and CLIA have a close relationship.  As such, it is difficult to separate what is said by CCL regarding the incidence of persons overboard from the company's ships from what is said by

CLIA (and its predecessor, the ICCL). Both CCL and CLIA have consistently minimized the incidence and problem of person overboard incidents on cruise ships; to my knowledge, CCL has at no time publicly differentiated itself from the public position of CLIA.

Like the CCL website, CLIA's website assures a passenger s/he will be safe on a cruise. Under the "Security at Sea" tab (https://cruising.org/cruise-vacationer/industry-facts/security-at-sea) it is stated:

> Cruise ships are one of the safest vacation options in the world, with rates of serious crimes that are exceedingly lower than those on land. Data from the FBI supports this fact, and due to multiple layers of security, allegations of major crimes on cruise ships are extremely rare.

If one clicks the "Data" hyperlink the page that loads says: "The page, file or directory you are looking for cannot be found."

Under the "Safety at Sea" tab (cruising.org/cruise-vacationer/industry-facts/safety-at-sea), the reader is told:

> For Cruise Lines International Association (CLIA) and its Cruise Line Members, the safety of guests and crew is the highest priority and is fundamental to their operations. Even with an increase in cruise capacity, cruise lines have maintained an exceptional safety record – making cruising one of the safest ways to travel. **In fact, cruise travel is safer than virtually every other form of travel.** [bolded emphasis added]

The assurance again is a cruise is virtually safe. That declaration of absolute safety and security, without implicit or explicit boundaries, is difficult to imagine given what both CCL and CLIA know the risks aboard their ships.

13.    *That the disappearance of Ms. Broberg was foreseeable given past incidents of persons overboard.*

While no disappearance can be predicted, several factors suggest the incident might have been preventable.

As already stated, we know that alcohol was a known factor in one-eighth of all persons overboard from CCL ships; the percentage is undoubtedly much higher. For example, research of crime on cruise ships finds that alcohol is a factor in more than two-thirds of the cases involving sexual contact, almost two-thirds of the cases involving assault with serious bodily injury, and more than one-third of incidents involving simple assault. The research found differences by cruise line. Alcohol was present in a considerably larger proportion of incidents on CCL ships

18

than on RCI. Alcohol is present on CCL vs RCI twice as often for simple assault and assault with serious bodily injury, and almost three times more frequently for sexual contact.[1] The research did not include incidents of persons overboard largely because of the dearth of available, reliable data. Regardless, the fact that Ms. Broberg was intoxicated was the first element of foreseeability in what ultimately happened. CCL was well aware that there is greater risk of crime (under which "missing U.S. Nationals" is a category) for those who are intoxicated.

A cursory review of person overboard incidents reveals a large proportion occur in the late-night/early-morning hours. Based on the data we have for CCL, there is a greater risk of going overboard between 11PM and 3AM than any other four hour time period in the day. Ms. Broberg's disappearance was in the middle of that time frame. The intelligence provided by data suggests a need for greater vigilance on the part of the cruise line during this period of time.

The data also indicates that 14.3% of persons overboard from CCL cruise ships are a fall (not a jump, but specifically referring to what would appear to be an accidental fall). This risk is not likely to be disputed. However, its acknowledgement suggests steps that may be taken to prevent falls, especially a fall late at night by someone who is intoxicated. This is a sort of trifecta of risk and foreseeability.

With analysis of additional data, it is possible that intelligence from past incidents can lead to effective strategies or initiatives to reduce the risk of persons going overboard from CCL ships.

14.    *That the system recording the official record relies on employees of the cruise line and consequently there may be disincentives to accurately report a person overboard incident.*

A cruise ship is a unique environment when compared to land, especially when crime, security, and law enforcement are considered. Unlike on land where there are protocols for prevention of crime and intervention when crime occurs, it was disclosed in *Horne v CCL* that *Liberty's* sister ship, *Sensation,* that the Ship Security Plan required by ISPS code:

> … does not contain provisions related to protecting passengers or crew from personal crimes, such as sexual assaults or robberies, and it does not contain provisions related to investigating these types of incidents.[2]

Also unlike on land where crimes and incidents are investigated by an independent, objective, and professionally-trained police force, on a cruise ship "security" is comprised of persons

---

[1] See Klein, R.A. and J. Poulston. 2011. Sex at Sea: Sexual Crimes Aboard Cruise Ships. *Journal of Tourism in Marine Environments* 7:1, 67-80.
[2] Paragraph #6, affidavit of Michael Paraniello, Director, Security Services, CCL (dated 27 August, 2015)

employed by the cruise line, generally with considerably less professional qualifications than police officers on land, and who report to the ship Master and to the corporate office. Most notably they have limited training in crime scene investigation and in handling something like a person overboard incident. Perhaps more serious is that these security personnel ultimately gather available evidence when a person disappears (something they may not be trained for) and they will determine whether the disappearance is considered a crime. If it is determined to be a crime, then under the CVSSA it must be reported to the FBI; however if it is not considered a crime then no such report is necessary. This is likely to explain why no persons overboard cases on CCL are recorded in the government data set for 2010 through 2012 and 2014 through 2015. They were not labeled as crimes under the CVSSA.

15.   *That Carnival Cruise Lines should be more pro-active in preventing person overboard incidents.*

With the long history of persons overboard from CCL ships, it is a wonder why the cruise line is not more proactive in addressing the problem. The most obvious and simplest method is to communicate to passengers about onboard risks and strategies for maintaining personal safety. This information could be contained in pre-cruise material and/or included in the passenger cabin along with information about what to do if one is victim of a crime.

It isn't just having material in print. Passengers need to somehow have impressed upon them the need to take the same precautions as they would in any city or any vacation setting. It isn't a matter of stating that a cruise ship is more unsafe than being on land, but avoiding statements that lead a passenger to believe they are significantly safer (i.e., virtually safe) onboard a cruise ship than on land.

Another proactive measure relates to security: the number of security deployed at different times of day; the qualifications of the security personnel provided; and whether security is more than minimally trained to deal with a crime scene. The judgment of number is something that needs to be ship-specific rather than a corporate-wide system of allocation, and there needs to be a proactive approach to assign security personnel consistent with foreseeable risks.

One example of being pro-active would be for CCL educate passengers about responsible consumption of alcohol, especially in light of increased risks aboard a cruise ship (e.g., crime, falling overboard, etc) associated with alcohol. This is quite different than "Responsible Serving of Alcohol," which could be debated *ad nauseum*. Sanjay Kumar was asked in his deposition whether there is an mention in the safety briefing about the reasonable consumption of alcohol. He said there was not (see page 120:10, Deposition of Sanjay Kumar, September 24, 2017).

A focus on Responsible Consumption of Alcohol shifts responsibility to the passenger, however the cruise line must take the first step in the initiative. It needs to help the passenger understand the risks aboard a cruise ship and, in light of these risks, help the passenger understand the importance of consuming alcohol responsibly or in moderation. The result may be reduced income for the cruise as a result of lower sales at the bar, but the PR value of emphasizing responsible consumption, and the reduced incidents of persons "falling overboard" would seem to be well worth it.

16.    *That Carnival Cruise Lines and CLIA have an obligation to disclose reliable, independently-verifiable data on person overboard incidents on its ships.*

In this age of transparency and demands for greater corporate responsibility, it only makes sense that CCL, CLIA, and all cruise lines honestly report crime data (including all incidents of a person overboard), not just crime categories defined in the CVSSA, but all incidents. Passengers have a right to make a fully informed decision. It is not fair to have a Government website present data indicating that no one goes overboard from a CCL cruise ship when in fact there were 20 cases not reported for the years covered.

An important part of this opinion is that all data be independently verifiable. This means labels of crimes will be standardized and verifiable, and that the details of every incident will be put into a dataset available to researchers for analysis. It also means that accounts of incidents such as persons overboard include relevant demographic and situational data (including alcohol consumption) so a dataset can be developed, cases can be compared, and patterns discerned.

17.    In exchange for my services as an expert, I am compensated at a rate of $300 per hour. I received a retainer for 6 hours, $1800, to prepare this report. My fee to appear at a deposition is $1500 for up to five hours; each additional hour (or part thereof) will be billed at $300 per hour.

18. I reserve the right to supplement my opinion as additional depositions and/or data become available.

**Ross A Klein**
Digitally signed by Ross A Klein
DN: cn=Ross A Klein, o=Memorial
University, ou=School of Social Work,
email=rklein@mun.ca, c=CA
Date: 2017.11.12 14:22:55 -03'30'

Date                                    Ross A. Klein, PhD

# Exhibit "P"

Updated April 14, 2017

## CURRICULUM VITAE

### Ross A. Klein

---

### PERSONAL SUMMARY:

| | |
|---|---|
| Office Address: | School of Social Work |
| | Memorial University of Newfoundland |
| | St. John's, NL A1C 5S7 |
| Home Address: | 6 Cormack Street |
| | St. John's, NL A1E 4C9 |
| Telephone: | 709-747-2177 (home) |
| | 709-864-8147 (office) |
| Electronic Contacts: | rklein@mun.ca |
| | ross@cruisejunkie.com |
| | http://www.cruisejunkie.com |
| | http://www.cruiseresearch.org |

### POST-SECONDARY EDUCATION

| Degree | University | Year | Specialization |
|---|---|---|---|
| Ph.D. | Syracuse University | 1981 | Sociology |
| M.A. | Syracuse University | 1979 | Sociology |
| M.S.W. | University of Maryland | 1974 | Social work |
| B.S. | Arizona State University | 1972 | Sociology, Social work |

### ACADEMIC APPOINTMENTS

2015 to present  Associate Dean, Graduate Programs and Research, School of Social Work, Memorial University of Newfoundland, St. John's NL

2016 (July 18 – November 17) Acting Dean, School of Social Work, Memorial University of Newfoundland, St. John's NL

1988 to present  Professor, School of Social Work, Memorial University of Newfoundland, St. John's NL (Tenure granted 1990; Promotion to Professor 2005)

2009 – present  Associate, Marine Studies Research Unit, Memorial University of Newfoundland, St. John's, NL

2010 to 2013  Professor, Tourism Program, Memorial University (Grenfell Campus), Corner Brook, NL

Ross A. Klein, PhD                                                                                      2

| | |
|---|---|
| 2010 to 2013 | Associate, International Centre for Responsible Tourism, Leeds Metropolitan University, Leeds, England |
| 1992 – 1993 | Associate Chair in Child Protection, School of Social Work, Memorial University of Newfoundland |
| 1990 – 1993 | Visiting Associate Professor, School of Social Work, Smith College, Northampton, MA |
| 1986 – 1988 | Assistant Professor, Department of Sociology, Anthropology, and Social Work, Skidmore College, Saratoga Springs, NY |
| 1986 – 1988 | Mentor, Empire State College, State University of New York, Saratoga Springs, NY |
| 1981 – 1986 | Assistant Professor, Department of Sociology, Anthropology, & Social Work, Iowa State University |
| 1977 – 1978 | Field Instructor, Wurzweiler School of Social Work, Yeshiva University, New York City, NY |

## PROFESSIONAL EXPERIENCE

### Non-Academic Employment

| | |
|---|---|
| 1992 | Acting Executive Director, Family Life Bureau, St. John's, NF (January – May) |
| 1974 – 1978 | Regional Director, B'nai Brith Youth Organization, Skokie, IL; Syracuse, NY |
| 1973 – 1974 | Staff Development Specialist, Social Security Administration, Baltimore, MD |

### Expert Witness (d=deposed)

| | |
|---|---|
| January 2017 | CLIA vs City and Borough of Juneau, United States District Court – Alaska District (Hoffman & Blasco), Case #1:16:cv-00008-HRH |
| March 2016 | Jane Doe vs Carnival Cruise Lines, United States District Court – Southern District (Brais & Brais), Case # 15-cv-22872-UNGARO |
| August 2015 | Horne vs Carnival Cruise Lines, United States District Court – Southern District (Gerson & Schwartz), Case # 12-CV-21031 **(d)** |
| August 2014 | Drane vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) Case # 1:13-24345-CIV-Graham |
| February 2014 | Sneitzer vs Royal Caribbean Cruises Limited, United States District Court – Southern District (Gerson & Schwartz), Case # 12-24560-CIV-Altonga/Simonton |
| January 2014 | Blackmon vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) Case # 1:13-cv-20837-JAL |

| | |
|---|---|
| October 2012 | Lapin (Sara Doe) vs. Royal Caribbean Cruises Limited, (The Eriksen Law Firm) |
| August 2012 | Gregory (Jane Doe) vs. Norwegian Cruise Line Limited, United States District Court - Miami (Brais & Brais) Case #11-22230-CV-Cooke/Turnoff **(d)** |
| April 2011 | Hesse vs. Royal Caribbean Cruises Limited, (Hickey Law Firm) |
| August 2009 | Boney vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) Case #08-22299-CIV-Seitz/O'Sullivan **(d)** |
| May 2009 | Howell vs Carnival Corporation, United States District Court – Southern District (Lipcon, Margulies & Alsina P.A.) #08-23140-CIV-Lenard/Garber |
| Sept 2008 | Bartholomew vs Royal Caribbean Cruises Limited, United States District Court – Southern District (Walker and O'Neill, PA) Case #07-22766 CIV-Jordan/Torres **(d)** |
| August 2007 | Sheila Bruce (S.B.) vs Royal Caribbean Cruises Limited (The Eriksen Law Firm) **(d)** |
| July 2007 | Minogue (O.M.) vs Magical Cruise Company d/b/a/ Disney Cruise Line, Middle District Court – Orlando (The Eriksen Law Firm) Case#6:06 CV 351 ORL-28 KRS |
| Sept 2006 | Pinto et al vs Princess Cruise Lines, United States District Court – Southern District (Crewmembers and Maritime Advocacy Center) Case #05-23087-CIV-Altonaga/Turnoff |
| Feb 2006 | Sanford et al vs Carnival Corporation, 11th Judicial Circuit, Miami-Dade, FL (Hill and Ponton, P.A.) 22-16832 CA 22, 02-16855 CA22 to 02-16860 CA22 **(d)** |
| Nov 2002 | Hui Hoopakele Aina vs Hawai'i Departments of Transportation and Land and Natural Resources (Earthjustice) |

**Congressional Testimony**

| | |
|---|---|
| July 2013 | US Senate, Committee on Commerce, Science, and Transportation, Hearings on "Cruise Industry Oversight: Recent Incidents Show Need for Stronger Focus on Consumer Protection" |
| March 2012 | US Senate, Committee on Commerce, Science, and Transportation, Hearings on "Oversight of the Cruise Ship Industry: Are Current Regulations Sufficient to Protect Passengers and the Environment?" |
| June 2008 | US Senate, Committee on Commerce, Science, and Transportation, Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety and Security, Hearings on "Cruise Ship Safety: Examining Potential Steps for Keeping Americans Safe at Sea" |

Case 1:17-cv-21537-FAM   Document 53-1   Entered on FLSD Docket 04/02/2018   Page 137 of 449

March 2007     US House of Representatives, Subcommittee on Coast Guard and Maritime
               Transportation, Committee on Transportation and Infrastructure, Hearings on
               "Crimes Against Americans on Cruise Ships"

**Other Expert Testimony**

Nov 2005       Hawai'i County Council, invited testimony re: environmental and economic
               issues

March 2003     San Francisco City and County Board of Supervisors, testimony re:
               environmental issues on behalf of San Franciscans for a Clean Environment

Jan 2003       San Francisco City and County Board of Supervisors, testimony re:
               environmental issues on behalf of Bluewater Network

**Recent Research Grants and Contract Research**

2016 – 2017    Collaborative Applied Research in Economics (CARE)
               Project Title: Economic Impact of Cruise Tourism in Atlantic Canada (co-
               applicants: B. Kayahan, R. Klein, R. Moir, B. VanBlarcom), amount: $30,000

2015 – 2016    Collaborative Applied Research in Economics (CARE)
               Project Title: Economic Impact of Cruise Tourism in Atlantic Canada (co-
               applicants: B. Kayahan, R. Klein, R. Moir, B. VanBlarcom), amount: $27,000


**PUBLICATIONS AND PROFESSIONAL CONTRIBUTIONS**

**Books, Monographs, and Published Reports**

2009     *Getting a Grip on Cruise Ship Pollution*, Washington, DC: Friends of the Earth.

2009     *Cruising without a Bruising: Cruise Tourism and the Maritimes*, Halifax, NS:
         Canadian Centre for Policy Alternatives.

2008     *Paradise Lost at Sea: Rethinking Cruise Vacations*, Halifax: Fernwood
         Publishing.

2005     *Cruise Ship Squeeze: The New Pirates of the Seven Seas*, Gabriola Island, BC:
         New Society Publishers.

2005     *Playing Off the Ports: BC and the Cruise Tourism Industry*, Vancouver, BC:
         Canadian Centre for Policy Alternatives.

2003     *The Cruise Industry and Environmental History and Practice: Is A Memorandum
         of Understanding Effective for Protecting the Environment,"* San Francisco:
         Bluewater Network and Seattle: Ocean Advocates.

2003    *Charting A Course:  The Cruise Industry, the Government of Canada, and Purposeful Development,* Ottawa: Canadian Centre for Policy Alternatives.

2003    *Cruising - Out of Control: The Environment, Workers, and Atlantic Canada's Ports*, Halifax: Canadian Centre for Policy Alternatives.

2002    *Cruise Ship Blues: The Underside of the Cruise Ship Industry*, Gabriola Island, BC: New Society Publishers.

2001    *Death by Chocolate: What You Must Know Before Taking a Cruise*, St. John's: Breakwater Books.

**Select Chapters in Books** (*=refereed, I=invited)

2017 I    "Representation without taxation: The power and politics of the cruise industry," *Cruise Ship Tourism, 2nd Edition* (R.K. Dowling & C. Weeden, ed.), Wallingford, UK: CABI, pp. 57-71

2017 I    "Passengers and Risk: Health, Wellbeing, and Liability," *Cruise Ship Tourism, 2nd Edition* (R.K. Dowling & C. Weeden, ed.), Wallingford, UK: CABI (R. Klein, M. Lueck & J. Poulston), pp. 106-123

2015*    "Safety, Security, Health and Social Responsibility," in *Cruise Business Development - Safety, Design and Human Capital* (ed. A. Papathanassis), Berlin: Springer Verlag, pp 3 – 15

2015*    "Crime at Sea: A Comparison of Crime on Carnival Cruise Lines, 2007 – 2011," in *Cruise Business Development - Safety, Design and Human Capital* (ed. A. Papathanassis), Berlin: Springer Verlag, pp. 17 - 28

2014*    "Old Ships in New Bottles: Where Do Cruise Ships Go When They Get Old?" *Cruise Tourism& Innovation: Improving Passengers' Experiences* (ed. A. Pappathanassis, M.H. Breitner, A. de Groot), Berlin: Verlag. pp. 185-198

2014 I    "The Cruise Industry's Business Model: Implications for Ports," *Harboring Tourism: Cruise Ships in Historic Port Communities* (ed. E. Avrami), New York: World Monuments Fund, pp. 46-51

2014 I    "Tensions Between Cruise Tourism and Land-based Tourism: The Case of Key West and Dubrovnik," *Harboring Tourism: Cruise Ships in Historic Port Communities* (ed. E. Avrami), New York: World Monuments Fund, pp. 88-93

2013*I    "Envisioning Environmental Policy as Social Policy: The Case of the International Cruise Industry," *Environmental Policy as Social Policy – Social Policy as Environmental Policy: Toward Sustainability Policy,* (ed. I. Wallimann), New York: Springer, pp. 181-196.

2013 I    "Opportunities for Market Development of Nautical Tourism in Europe," *Nautical Tourism* (ed. T. Lukovic), London: CABI, pp. 201-224. (R. Klein, K. Božic, R. Dowling,  P. Gibson,  Z. Gržetic,  A. Haahti,  S. Horak, T. Lukovic, A. Papathanassis

and S. Pekkala)

2012*      "Sexual Crimes on Cruise Ships: A Historical Perspective on Security Issues for
           Passengers and Crew," Tourism and Society:  A Socio-Economic Perspective (ed. A.
           Pappathanassis), Heidelberg: Springer Verlag, pp. 141-151.

2010*      "The Cruise Sector and Its Environmental Impact," *Tourism and the Implications of
           Climate Change: Issues and Actions,* (ed. C. Schott), Bingley, UK: Emerald, pp. 113-
           130.

2010*I     "Cruises and Bruises: Safety, Security and Social Issues on Polar Cruises," *Cruise
           Tourism in Polar Regions: Promoting Environmental and Social Sustainability* (ed. M.
           Luck, P.T. Maher, and E. Steward), London: Earthscan Ltd., pp. 57-74.

2008       Multiple Entries (40). *Encyclopedia of Tourism and Recreation in Marine
           Environments*, Oxfordshire, UK: CAB International.

2007*      "Protecting Paradise: Minimizing the Downside of Cruise Tourism," *Proceedings of the
           5th International Coastal and Marine Tourism Congress: Balancing Marine Tourism,
           Development and Sustainability* (ed. M. Luck et al), Auckland: New Zealand Tourism
           Research Institute, pp. 242-257.

2006 I     "Troubled Seas: Social Activism and the Cruise Industry," *Cruise Ship Tourism: Issues,
           Impacts, Cases* (ed. Ross K. Dowling), Oxfordshire, England: CABI Publishing, pp.
           377-388.

2006 I     "Turning Water Into Money: The Economics of the Cruise Industry," *Cruise Ship
           Tourism: Issues, Impacts, Cases* (ed. Ross K. Dowling), Oxfordshire, England: CABI
           Publishing, pp. 261-269.

2006       "The Industry's Darkside," *World Regions and Places: A Reader* (6th ed), (ed.) Jeffrey
           S. Smith, Boston: Pearson Custom Publishing. (Reprint of 2003 article in *Conscious
           Choice*)

**Select Articles** (*= refereed, I=invited)

2016 *     "Troubled seas: The politics of activism related to the cruise industry," *Journal of
           Tourism in Marine Environments* 11:2/3 (R. Klein & K. Sitter), pp. 147-160.

2015 **I**   "Introductory Note: 'Long-Tail' or 'Fairy-Tale'? The case for scientific publishing on
           cruise," Special Issue on Cruise Research, *Journal of Tourism in Marine Environments*
           10:3/4, pp. 141-148 (A. Papathanassis and R. Klein)

2012 I     "In the Aftermath of the Costa Concordia Disaster," *Risk & Regulation* 24 (Winter), pp.
           4-5.

2012       "Different Streams in Cruise Tourism Research," Special Issue on Cruise Tourism,
           *Tourism*, 60:1, pp. 7-13. (Introduction to the special issue which I edited)

2012 I     "Treacherous Waters: The Latest Bad Publicity for the Global Cruise Industry is Just
           the Tip of the Iceberg," *Foreign Policy*, April 6, 2012

(http://www.foreignpolicy.com/articles/2012/04/05/treacherous_waters); Reprinted as "Stop Rearranging the Deck Chairs: Cruise Industry Needs Big Changes," *Seattle Times*, April 10, 2012 (http://seattletimes.nwsource.com/html/travel/2017948779_webcruiseships11.html); Reprinted as "Industry Cruising for a Bruising," *The Press*, April 12, 2012 (http://www.stuff.co.nz/the-press/opinion/perspective/6728212/Industry-cruising-for-a-bruising)

2011*    "Responsible Cruise Tourism: Issues of Cruise Tourism and Sustainability," Special Issue on Cruise Tourism:  Emerging Issues and Implications for a Maturing Industry, *Journal of Hospitality and Tourism Management*, 18, 103-112.

2011*    "Sex at Sea: Sexual Crimes on Cruise Ships," *Journal of Tourism in Marine Environments*, 7:2, 67-80. (Ross A. Klein and Jill Poulston)

2010 I    "The Cost of Cruising," *Vancouver Observer*, April 13, 2010 (http://www.vancouverobserver.com/2010/04/13/cost-cruising) (Reprinted in *Island Tides*, 22:8 (April 29 – May 12) pp. 2, 11; Reprinted in The Tyee, May 21, (http://thetyee.ca/Opinion/2010/05/21/CostOfCruising/).

2010 I    "Greening the Cruise Industry," *Journal of Ocean Technology*, 5:1 (March), pp. 7 – 15.

2009 I    "Environmental Impacts of Cruise Tourism," *Prows Edge Cruise Magazine and Guide to Cruising*, July 2009. (http://www.prowsedge.com/views-ross-klein.html)

2007*    "The Politics of Environmental Activism: A Case Study of the Cruise Industry and the Environmental Movement," *Sociological Research Online*, 12:2 (March). (http://www.socresonline.org.uk/12/2/klein.html)

2006 I    "Attack of the Oversized Playpen," *Briarpatch Magazine* 35:7 (November), pp. 14 – 17.

2003*    "Sweatships: The Cruise Industry and the Socialist Agenda" *Socialist Studies Bulletin*, 70 (Spring-Summer), pp. 5 – 18.

2003 I    "Cruise Ships Blues: A Cruise Junkie Exposes the Industry's Darkside," *The New Times*, July.

2003 I    "Major Cruise Lines Charged, Fined for Pollution – But Not in Canada," *CCPA Monitor*, (June), 28 – 29.

2003 I    "Cruise Ship Blues: The Darkside of Sailing the Deep," *Whole Life Times*, 25:3 (March), 22 – 25.

2003 I    "Cruise Ships: The Industry's Dark Side," *Conscious Choice: Journal of Ecology and Natural Living*, 16:2 (February), 24 – 25, 29.

2003 I    "High Seas, Low Pay," *Motionsickness: The Other Side of Travel*, Issue #4, 20 – 25. 2003  (Reprint of article in Our Times Magazine, December 2001/January.

2002 I    "Cruise Ship Blues: A Cruise Junkie Explores the Environmental and Social Costs of Industrial Tourism," *Shared Vision*, 171 (November), 16-19.

2002*   "Left In Its Wake: The Cruise Industry Prefers a Voluntary Approach to Environmental Responsibility but Performance has been Poor Where Tough Regulatory Controls are not in Place," *Alternatives Journal*, 28:4 (Fall), 23-27.

2001   "High Seas, Low Pay: Working on Cruise Ships," *Our Times: Canada's Independent Labour Magazine*, December/January, 29-34.

2001 I   "Cruising Attitude," *Doctor's Review*, 19:10 (October), 103-106, 209.

2001   "Jumping Ship: A Cruise Junkie Explains Why Doctors Should Think Twice Before Booking the Week at Sea," *Doctor's Review*, 19:4 (April), 78-81, 197. 2001 (R. Klein and K. Halley)

**Recent Presentations at Professional Meetings and Academic Conferences**
(Unless indicated, the paper presentation was refereed. I=invited, K=keynote)

2016   Panelist, Ensuring Safe and Secure Maritime Activity, Governing Across the Waves: Global Insights for Transboundary Waterways Management in Sensitive and Congested Maritime Spaces, Brunswick, ME, 26-27 September

2015   "The Politics of Activism Related to the Cruise Industry," International Congress on Coastal and Marine Tourism, Kona, November 2015

2014   "The Cruise Ship Invasion: Is Cruise Tourism a Viable Mode of Travel for Polar Tourism," International Polar Tourism Research Network, Christchurch, August 2014

2014 K   "Health and Safety, Environment, and Security, International Cruise Conference 5 (Cruise Research Society), Bremerhaven, Germany, January 2014

2014   "Crime at Sea: A Comparison of Crime on Cruise Ships, 2007 vs 2011," International Cruise Conference 5 (Cruise Research Society), Bremerhaven, Germany, January 2014

2013 K   "Cruising without a Bruising: The Ups and Downs of Cruise Tourism," Fjord 2.0 Konferansen 2013 (Fjord Norway & NCE Tourism Fjord Norway), Balestrand, Norway, September 2013

2013   "Breaking Loose from the Ivory Tower: The Challenges for Academic Researchers with an Activist Agenda," International Critical Tourism Society Conference, Sarajevo, Bosnia, June.

2013 I   "Tensions between Cruise Tourism and Land-based Tourism: The Case of Dubrovnik and Key West," International Symposium on Cruise Ships in Historic Port Communities, Charleston, SC, February.

2013 I   "The Cruise Industry's Business Model: Implications for Ports," International Symposium on Cruise Ships in Historic Port Communities, Charleston, SC, February.

2012   "Old Ships in New Bottles: Where Do Cruise Ships Go When They Get Old?" 4th International Cruise Conference, Leeuwarden, Holland, May.

2011       "Leaving Ethics at The Door: Environmentalism, Sustainability and Transnationalism,"
           Annual Conference of the Canadian Association for Social Work Education,
           Fredericton, June.

2011       "Sexual Crimes on Cruise Ships: A Historical Perspective on Security Issues for
           Passengers and Crew," 3rd International Cruise Conference, Dubrovnik, May.

2010 K     "Is Cruising Responsible Tourism," Responsible Cruising Conference, International
           Centre for Responsible Tourism, Leeds Metropolitan University, March, Keynote
           Address.

2009       "Keeping the Cruise Tourism Responsible: The Challenge for Ports to Maintain High
           Self Esteem," Third International Conference on Responsible Tourism in Destinations
           (Academic Conference), Belmopan, Belize, October.

2007       "Protecting Paradise: Minimizing the Downside of Cruise Tourism," 5th Coastal and
           Marine Tourism Congress, Auckland.

2006       "Paradise Lost at Sea: Cruise Ship Workers as Commodity," Serving the New
           Economy: Critical Perspectives on Hospitality and Tourism Work – A Centre for
           Research on Work and Society Workshop, York University, Toronto.

2004       "The Politics of Environmental Activism: A Case Study of the Cruise Industry and the
           Environmental Movement," British Sociological Association, York.

2003       "Sweatships: The Cruise Industry and the Socialist Agenda," Keynote Address at
           Annual Program Meeting of Society for Socialist Studies, Halifax.

2002       "Sweatshops at Sea: Unglamourous Work in a Glamourous Environment," Canadian
           Sociology and Anthropology Association / Society for Socialist Studies, Toronto.


**Professional Workshops and Academic Lectures, 1988 - present**
(All are invited unless otherwise indicated. K=keynote)

2016       "Charting a Course to 2020: Becoming a Mature Cruise Destination and Source Market,"
           New Zealand Tourism Research Institute, Auckland (August)

2016       Keynote Address, Save Our Spit AGM, Gold Coast, Australia (August)

2015       "Cruises and Bruises: Keeping Safe at Sea," NAPE Women's Conference, Corner Brook,
           NL (September)

2015       "Cruise Tourism and Climate Change," Innovator's Think Tank, Centre for Responsible
           Travel and Punta Cana Fundacion Ecologica, Punta Cana, Dominican Republic (July)

2014       "A Cruise Ship Terminal: The Facts, Myths and Opportunities," A Business Breakfast
           Sponsored by Save Our Spit Alliance (SOSA) (September)

2014       "A Gold Coast Cruise Ship Terminal: Reality vs Spin," Sponsored by Save Our Spit
           Alliance (SOSA) and Gold Coast and Hinterland Environment Council (Gecko),
           (September)

2014    "Crui$ing for Dollar$: Development of International Cruise Tourism – Implications for New Zealand, New Zealand Tourism Research Institute, AUT University, Auckland (August)

2014    "Contemporary Issues in Tourism: Cruise Tourism and the Cruise Industry," AUT University, Auckland (August)

2014    "Planning and Development: Planning for Cruise Ships & Port Readiness," AUT University, Auckland (August)

2013    "Scholarship and Critical Action," International Critical Tourism Society Conference, Sarajevo, Bosnia, (June) (with Lynn Minneart)

2013 K  "Charting a Course: The Future of Cruise Tourism in Key West," Invited Keynote Lecture, Last Stand, Key West, Florida (February)

2012    "Cruising Cash Cows: Perceptions and Misperceptions," Forum Advocating Cultural and Eco-Tourism, Fremantle, Australia (August)

2012    "Cruising Cash Cows: Perceptions and Misperceptions," South West Development Corporation and Bunbury Chamber of Commerce," Bunbury, Australia (August)

2012    "Cruising Cash Cows: Perceptions and Misperceptions," University of Otago, Dunedin, NZ (August)

2012    "Cruising Cash Cows: Perceptions and Misperceptions," AUT University, Auckland, NZ (August)

2012    "The Business of Cruise Tourism," AUT University, Auckland, NZ (August)

2012    "Accommodation Management: The Role of the Purser's Office," AUT University, Auckland, NZ (August)

2012    "Consumer Satisfaction," University of Newcastle, Newcastle, Australia (August)

2012    "Sex at Sea: Sexual Crimes on Cruise Ships," University of Newcastle, Newcastle, Australia (August)

2012    "Examination of Witnesses," University of Newcastle, Newcastle, Australia (August)

2012    "Cruise Lines and Repeating "Titanic" Mistakes," World's Largest Metaphor Sinks Iceberg: A Roundtable Commemorating the Titanic, Maritime Studies Research Unit and the Department of History, Memorial University of Newfoundland, St. John's, NL (April)

2012    "Sex at Sea: Sexual Crimes on Cruise Ships," NAPE Women's Conference, St. John's, NL (February)

2012    "Sex at Sea: Sexual Crimes on Cruise Ships," Department of Women's Studies Speakers' Series, Memorial University, St. John's, NL (February)

2011    "Protecting Paradise: Minimizing the Downside of Cruise Tourism," Hochschule Bremerhaven, Bremerhaven, Germany (October)

2011    "Cruises Bruises:  Social Issues Related to Cruise Tourism," Hochschule Bremerhaven, Bremerhaven, Germany (October)

2011    "Externalities of Growth of Cruise Tourism," Stenden University, Leeuwarden, Holland (October)

2011    "Critical Approaches to Cruise Research," Hochschule Bremerhaven, Bremerhaven, Germany (October)

2011    "Cruise Industry: Management Challenges Ahead," Institute for Tourism, Zagreb, Croatia (May)

2011    "Workshop on Cruise Tourism," Institute for Tourism, Zagreb, Croatia (May)

2010    "Cruise Tourism is a Business: Issues for Charleston and South Carolina," Cruise Industry Community Forum, Coastal Conservation League, Charleston, SC (March)

2010    "How Responsible is Cruise Tourism," Seminar with Industry Leaders sponsored by Association of British Travel Agents (ABTA), London, England (March 2010)

2010    "How Responsible is Cruise Tourism," International Centre for Responsible Tourism, London, England (March)

2009    "Global Impacts Of Cruise Tourism & Sustainability," Third International Conference on Responsible Tourism in Destinations, Belmopan, Belize (October)

2009    "Sweatships: Historical and Contemporary Reflections on the Crews of Passenger and Cruise Vessels," Marine Studies Research Forum, Memorial University of Newfoundland (September)

2009    "Keeping Cruise Tourism Responsible" Coastal Tourism/Development Panel, International Centre for Responsible Tourism – Belize, San Ignacio, Belize (May)

2009    "Building Cruise Ship Tourism in Newfoundland and Labrador: Issues and Challenges," The Leslie Harris Centre of Regional Policy and Development, St. John's (April)

2009    "Building Cruise Ship Tourism: Issues and Challenges," Council of Haida Nation, Skidegate (January)

2009    "Making Cruise Ship Tourism Sustainable," Gaaysiigang – An Ocean Forum for Haida Gwaii, Skidegate (January)

2008    "Paradise Lost at Sea," Mount Saint Vincent University Tourism Program, Halifax (November)

2008        "Cruising without a Bruising," Sir Wilfred Grenfell College Tourism Program, Corner Brook, NL. (October)

2007        "Troubled Seas: Social Activism and the Cruise Industry," University of Northern British Columbia, Department of Recreation and Tourism, Prince George (February)

2007        "Troubled Seas: Social Activism and the Cruise Industry," University of Victoria Department of Sociology, Victoria (February)

2007        "Rethinking the Benefits of Cruise Tourism," Vancouver Island Public Interest Research Group and James Bay Neighbourhood Environment Association, Victoria (February)

2006        "Turning Water Into Money: The Economics of Cruise Tourism," New Zealand Tourism Research Institute, Auckland (August)

2006 K      Environmental and Economic Issues and the Cruise Industry, Ships vs. Spit Business Breakfast, Save Our Spit, Gold Coast, Australia (August)

2006        "Looking After Children in Government Care: Assessing and Improving Outcomes in Child Welfare," Institute for Child Protection Studies, Australian Catholic University, Canberra (August)

2006 K      Cruise Ship Tourism Forum, University of Prince Edward Island (co-sponsored by Institute on Island Studies and Dean of Arts), Charlottetown (July)

2005        "Troubled Seas: The Cruise Industry and Social Activism," Kea'au Community Center (co-sponsored by Sierra Club and KAHEA: The Hawaiian Environmental Alliance), Hilo (November)

2005        "Protecting Paradise: Hawai'i and NCL America," University of Hawai'i (co-sponsored by University of Hawai'i and KAHEA: The Hawaiian Environmental Alliance), Honolulu (November)

2005        "Environmental Regulation of the Cruise Industry: Legal Issues and Challenges," University of Hawai'i Richardson School of Law (Environmental Law Program), Honolulu (November)

2005        "Turning Water Into Money: The Economics of the Cruise Industry," Mount Saint Vincent University (Department of Business and Tourism), Halifax, NS (October)

2005        "The Art of Greenwashing: The Cruise Industry and the Environment," Brock University (Department of Recreation and Leisure Studies), St. Catharines, ON (May)

2004        "Renewable Energy: Save Money, Save the World," Caribbean Media Exchange on Sustainable Tourism VI – Exploring Tourism: Widening the Boundaries of Caribbean Sustainability (Panel Participant), Saint Lucia (June)

2004        "Weighing Anchor: Maximizing Benefits, Minimizing Risks of the Cruise Ship Industry in Atlantic Canada," Maritime Museum of the Atlantic (sponsored by

Canadian Centre for Policy Alternatives, Ecology Action Centre, and Maritime Museum of the Atlantic), Halifax (June)

2004    "Charting A Course:  An International Congress for Coral Reef Protection from Ship-based Tourism" (Panel Participant), White Water to Blue Water Partnership Conference (sponsored by UN, US State Department, CARICOM, Government of Canada, et al), Miami (March)

2004    "Cruising Out of Control," Nancy Foster Environmental Centre -- NOAA (sponsored by Last Stand and Livable Oldtown), Key West, FL (January)

2003    "Corporate Responsibility of The Cruise Sector – An Environmental, Economic And Labour Analysis," Caribbean Media Exchange on Sustainable Tourism V -- Tourism and The Media: The Next Generation, Bridgetown, Barbados, (Panel Participant) (December)

2003    "Charting A Course:  The Cruise Industry, Government of Canada, and Purposeful Development," Maritime Studies Research Unit, St. John's, NL, (October)

2003    "Cruise Out of Control," Maui Community College, Kahului, Maui (co-sponsored by KAHEA, Maui Today, Sierra Club Maui, and University of Hawaii Sea Grant), (October)

2003    "Cruise Out of Control," Kealakehe High School Cafeteria, Kailua-Kona (co-sponsored by KAHEA and University of Hawaii Sea Grant), (October)

2003    "Cruise Out of Control," Komohana Ag Complex, Hilo (co-sponsored by KAHEA, Sierra Club Moku Loa), (October)

2003    "Cruise Out of Control," McCoy Pavilion, Honolulu (co-sponsored by KAHEA, Sierra Club O`ahu, Environmental Defense Fund Hawaii), (October)

2003    "Charting a Course: The Cruise Industry, The Government of Canada, and Coastal British Columbia,: University of Northern British Columbia, Prince George (co-sponsored by Economics, Geography, Resource Recreation and Tourism, International Studies, and Social Work), (September)

2003    "By Land, By Sea, or Both?" Caribbean Hotel Industry Conference (Caribbean Hotel Association Annual Meeting), Punta Cana, Dominican Republic. (Panel Participant) (June)

2003    "The Caribbean Cruise Sector: Friend or Foe?" Caribbean Media Exchange on Sustainable Tourism IV: Maximizing the Economic Impact of Tourism, Montego Bay, Jamaica. (May)

2003    "Cruise Ship Blues: The Underside of the Cruise Industry," The Commonwealth Club (co-sponsored by Bluewater Network), San Francisco, CA.   (January)

2003    "Sweatships: The Cruise Industry, Its Workers, the Environment, and the Developing World," University of Toronto, School of Social Work, Toronto, ON.  (January)

2003      "The Cruise Industry and the Environment," Department of the Environment, City and County of San Francisco, San Francisco, CA.  (January)

2002-03   "Is the Cruise Industry Environmentally Sustainable?:  Industry Practices, International Regulation, and the Developing World".
- University of Saskatchewan, Department of Sociology, Saskatoon, SK (October)
- Dalhousie University, Department of International Development Studies and Lester Pearson International, Halifax, NS (October)
- University of Alaska, Environmental Studies Program, Anchorage, AK (October)
- Memorial University of Newfoundland, Department of Sociology (November); School of Social Work (November)
- University of Victoria, Co-sponsored: School of Social Work and Vancouver Island Public Interest Research Group, Victoria, BC (November)
- Monterey Institute for International Studies, Co-Sponsored: Ocean Conservancy, Save Our Shores, Friends of the Sea Otter, Monterey, CA (January)
- Juneau City Council Chambers, Downtown Neighborhood Association, Juneau, AK (January)

2002      "Cruisin' without a Bruisin': Avoiding Problems of a Cruise Vacation," Memorial University of Newfoundland, St. John's, NL.

2002      "Images versus Realities of the Cruise Industry: Ethical, Moral and Professional Issues for Social Work," University of South Florida (Tampa, FL) and University of Manitoba, Winnipeg, MB.

2001      "How Green Is Green?: The Cruise Industry and the Environment," Marine Institute, St. John's, NL.

2000      "Death by Chocolate: An Inside Look at the Cruise Industry," Maxwell School of Public Policy, Syracuse University, Syracuse, NY.


**PROFESSIONAL SERVICE**

**Editorial Positions**

2015 – 2016      Co-Guest editor, Special Issue on Cruise Tourism, *Journal of Tourism in Marine Environments*, vol. 11, nos. 2 & 3.

2014 – 2015      Co-Guest editor, Special Issue on Cruise Tourism, *Journal of Tourism in Marine Environments*, vol. 10, nos. 3 & 4.

2011-2012        Guest Editor, Special Issue on Cruise Tourism, *Tourism* (published by the Croatia Tourism Institute), vol 60, no.1

2005-2008        Editorial Advisory Board, *Encyclopedia of Tourism and Recreation in Marine Environments*, Oxfordshire, UK: CABI Publishing

2003-            Associate Editor, Journal of Tourism in Marine Environments

**Editorial Reviews for Journals and Research Councils, 2013 - present**

Referee for *Tourist Studies*
Referee for Croatian Science Foundation
Referee for Canada Social Sciences and Humanities Research Council (SSHRC), Research
      Grants and Grants in Aid of Publication.
Referee for *International Journal of Hospitality Management*
Referee for *Journal of Sustainable Tourism*
Referee for *Sustainability*
Referee for *Canadian Social Work Review*
Referee for *Marine Pollution Bulletin*
Referee for *Tourism and Planning*
Referee for *Current Issues in Tourism*

# Exhibit "Q"

Testimony of Ross A. Klein, PhD
Before the
Senate Committee on Commerce, Science, and Transportation

Hearings on "Oversight of the Cruise Industry"

Thursday, March 1, 2012
Russell Senate Office Building
Room #253

Ross A. Klein, PhD, is an international authority on the cruise ship industry. He has published four books, six monographs/reports for nongovernmental organizations, and more than two dozen articles and book chapters. He is a professor at Memorial University of Newfoundland in St. John's, Newfoundland, Canada and is online at www.cruisejunkie.com. His CV can be found at www.cruisejunkie.com/vita.pdf  He can by contacted at ross@cruisejunkie.com or rklein@mun.ca

## TABLE OF CONTENTS

**Oral Testimony**                                                          2

**Written Testimony**                                                       4

**I.      Safety and Security Issues**                                      4
          Onboard Crime                                                     5
          Persons Overboard                                                 7
          Abandoning a Ship in an Emergency                                 8
                  Crew Training                                             9
                  Muster Drills                                             9
                  Functionality of Life-Saving Equipment                   10
          Shipboard Black Boxes                                            11
          Crime Reporting                                                  11
          Death on the High Seas Act (DOHSA)                               12

**II.     Environmental Issues**                                           12
          North American Emission Control Area                             13
          Regulation of Grey Water                                         14
          Regulation of Sewage                                             15
          Sewage Treatment                                                 15
                  Marine Sanitation Devices (MSD)                          15
                  Advanced Wastewater Treatment Systems (AWTS)             16
                  Sewage Sludge                                            17
          Incinerators                                                     17
          Solid Waste                                                      18
          Oily Bilge                                                       19
          Patchwork of Regulations and the Clean Cruise Ship Act          20

**III. Medical Care and Illness**                                          22
          Malpractice and Liability                                        23
          Norovirus and Other Illness Outbreaks                            25
          Potable Water                                                    26

**IV. Labour Issues**                                                      27
          U.S. Congressional Interest                                      28
          U.S. Courts and Labor                                            29
          Arbitration Clauses                                              30
          Crew Member Work Conditions                                      31

**Appendix A: Events at Sea**                                              33

**Appendix B: Analysis of Crime Reports Received
          by the FBI from Cruise Ships, 2007 – 2008**                      51

## *ORAL TESTIMONY*

*It is an honor to be asked to share my knowledge and insights with the U.S. Senate Committee on Commerce, Science, and Transportation. In my brief oral remarks I will identify some of the key points in my written submission.*

*First, I will discuss safety and security issues relating to cruise ships. There are a number of issues:*

*One issue is onboard crime – between October 1, 2007 and September 2008, the cruise industry reported 421 incidents of crime to the FBI. These include 115 simple assaults, 16 assaults with serious bodily injury, 101 thefts, and 154 sex related incidents. The data was accessed through a request under the Freedom of Information Act. Unfortunately, given the wording of the Cruise Vessel Security and Safety Act of 2010, comparable data is not available for subsequent years, so it is impossible to judge whether things are getting better or worse. An analysis of these crimes is in Appendix B.*

*A second issue is whether cruise ships, as the industry often claims, is the safest mode of commercial transportation. Appendix A presents various events at sea: ships that have sunk, 1980 – 2012 (n=16); ships that have run aground, 1973 - 2011 (99); ships that have experienced fires, 1990 – 2011 (n=79); ships that have had collisions, 1990 – 2011 (n=73); and ships that have gone adrift or have had other issues that could be seen to pose a safety risk, 2000 – 2011 (n=100). These events speak for themselves.*

*A third set of issues come directly from the Costa Concordia disaster: the challenge of abandoning a ship within the thirty minute period after an abandon ship call, as dictated by the Convention on Safety of Life at Sea (a large cruise ship in 1974 when the regulation was establish accommodated less than 3,000 passengers and crew, one-third the number on the largest ships today; the ability to comply with the requirement that lifeboats can be deployed on a ship listing up to 20 degrees (reports I have seen are that the Costa Concordia was listing 20 degrees and that lifeboats on one side could not be used); and changes in the manner in which muster drills are run today as compared to earlier times – there is still question whether industry commitments are adequate. Other issues worthy of comment are the fact that the Costa Concordia did not have a functioning black box when it experienced its tragic accident and thus much objective data is lacking; that crew training for dealing with crime scenes is inadequate and that onboard security (as cruise ship employees) is not in a position to objectively investigate crimes onboard cruise ships; and that passengers on cruise ships are treated differently by the Death on the High Seas Act than passengers on aircraft – an anomaly that appears unwarranted. In my written testimony I discuss several changes that need to be considered to the Cruise Vessel Security and Safety Act, including the need for public reporting of all alleged crimes on cruise ships.*

*The second area I discuss in my written testimony is environmental concerns. I compliment the U.S. Congress for its endorsement of the North American Emission Control Area and I applaud the U.S. Environmental Protection Agency for its plan to extend regulations pertaining to*

2

*discharge of grey water in U.S. waters. However, I express concern that the U.S. is an anomaly in the world by allowing discharge of treated sewage within three miles of the coast; untreated sewage between three and twelve miles. I also address shortcomings of Advanced Wastewater Treatment Systems (AWTS) and of marine sanitation devices (MSDs), both of which discharge "treated sewage" so can discharge in areas where discharge of grey water is prohibited; the problem posed by permitting sewage sludge dumping at sea (is this also considered treated sewage); the lack of adequate regulation of onboard incinerators; and problems associated with dumping at sea of solid waste (including incinerator ash). Finally, I discuss the patchwork of widely varying environmental regulations across coastal states in the U.S. and I advocate for reconsideration of the previously-introduced Clean Cruise Ship Act in order to bring consistency across jurisdictions in the U.S.*

*The third area I discuss in my written testimony is qualifications of medical care staff and the medical care provided on cruise ships, and illness on cruise ships. There are four issues. One relates to the qualifications of onboard medical staff, something that was supposed to be addressed by the Cruise Vessel Security and Safety Act, however the provisions are inadequate and leave less protection to passengers and to victims of sexual assault than I believe was the intent of the legislation's authors. A second issue is medical malpractice and liability – that a cruise ship is not ultimately responsible or liable for improper medical care provided by its medical personnel; a loophole in U.S. law that should be addressed. The third issue is norovirus and how the industry can more effectively deal with the problem – with greater transparency, and without creating incentives that indirectly encourage spread of the illness. Finally, I discuss a case where potable water on as many as 50 cruise ships was potentially contaminated, leaving many U.S. passengers at risk. Unfortunately, information about the situation was sealed in 2006 by the High Court in the UK, making it near-impossible to gain full and complete knowledge about the problem; it is still difficult to secure reliable information.*

*I wish I could go into greater detail in these oral comments. I invite questions to allow me to expand further on any of these issues.*

3

## WRITTEN TESTIMONY

It is an honor to be asked to share my knowledge and insights with the U.S. Senate Committee on Commerce, Science, and Transportation. My testimony focuses on the parameters I was given when I was invited to testify:

- safety and security issues relating to cruise ships (i.e., onboard crime; persons overboard; abandoning ship in an emergency, including muster drills and crew training; shipboard black boxes; crime reporting; and the Death on the High Seas Act (DOHSA)).

- environmental issues related to cruise ships (i.e, the North American Emission Control Area; regulation of grey water, sewage, sewage sludge, and limitations of marine sanitation devices (MSDs) and advanced wastewater treatments systems (AWTS); incinerator air emissions; solid waste; oily bilge; and the patchwork of regulations around the U.S. and the not-enacted Clean Cruise Ship Act).

- medical care and illness on cruise ships (i.e., medical malpractice and liability, norovirus and other illness outbreaks, and issues relating to potable water).

- Labor issues (i.e., the absence of labor laws governing hours of work and remuneration, and the use of arbitration clauses to truncate worker rights to use U.S. courts to address injuries and onboard injustice).


## I. SAFETY AND SECURITY ISSUES

The *Costa Concordia* disaster has refocused attention on cruise ship safety and security. Following this tragic event, the cruise industry predictably repeated its mantra that cruise ships are the safest mode of commercial transportation. They often cite a 1996 Coast Guard "comprehensive safety study that concluded the cruise industry is the safest form of commercial transportation."[1] The study was based on Bureau of Transportation statistics and compared accidents involving occupants of cruise ships with those involving motor vehicles (including occupants, pedestrians, and pedacyclists), and U.S. air carriers; it compared fatalities (natural deaths and those caused by injury), injuries requiring more than first aid, and "accidents /incidents" (left undefined). The study apparently did not consider sexual assaults. Since the study period (1990 – 1994), the number of cruise ships and cruise passengers has more than tripled and the industry has undergone considerable change.

Rather than accept the industry's claim at face value, it is important to consider the history of accidents and occurrences on cruise ships. Appendix A provides a list of known incidents where cruise ships have sunk; run aground; experienced onboard fires; collided with other ships, quays, or objects; and other significant problems such as loss of power and going adrift, severe lists, encounters with storms, etc. The Appendix does not include the many cases where ships operate

---

[1] See CLIA website, "Safety Standards, April 2006." <www2.cruising.org/industry/safety.cfm>, Accessed April 11, 2011.

4

with engines that are not functioning or have "mechanical issues" such that ports are missed and itineraries changed. The reader can judge, after reviewing Appendix A, whether cruise ships are truly as safe a mode of transportation as the cruise industry claims.

*Onboard Crime*

There have previously been hearings on onboard crime, particularly sexual assaults and disappearances. I will not rehash what has already been presented to these esteemed committees, however I call your attention to my previous testimony before the Senate Subcommittee on Surface Transportation and Transportation and Merchant Marine Infrastructure, Safety, and Security on June 19, 2008. I have also attached Appendix B, which presents analysis of reported crimes to the FBI from October 1, 2007 to September 30, 2008. The data speaks for itself: 115 simple assaults, 16 assaults with serious bodily injury, 101 thefts, and 154 sex related incidents.

Perhaps the most distressing findings is the number of onboard sexual assaults – more than 17 percent against children under the age of 18 – a rate that on Carnival Cruise Lines in 2007-08 is 50 percent higher than the rate for sexual assault in Canada (using the same definition for sexual assault for ships as on land). Royal Caribbean International in the period 2003 – 2005 had a rate comparable to Carnival Cruise Lines, but reduced the onboard rate by about half between 2003 – 2005 and 2007 – 2008. They are to be complemented.[2]

When one thinks about what can be done it is still timely to refer to two reports completed by consultants for Royal Caribbean in 1999. They had been charged with making recommendations for preventing sexual harassment and assault. The problem was obvious. As one report stated, "… improper activity occurs frequently aboard cruise ships, but goes unreported and/or unpunished."[3] The other report acknowledged: "crew members generally understand that if they commit an offence and are caught they are most likely going to lose their job and be returned home, but not spend time in jail."[4] (Greenwood, 1999: 4).

The reports make a range of recommendations, including:

- increased video surveillance of high risk areas (including the disco bar and dance area, main service corridors on crew decks and key intersections on passenger decks, and youth activity areas);
- cameras already in place be monitored periodically, at least on a random basis, and be recorded at all times;
- an increase in the number of security staff by two per ship;
- increased training and education of staff and crew members;
- responses to sexual harassment and assault be standardized across brands and ships;
- training for medical personnel include an interview protocol for sexual assault incidents;

---

[2] Klein, Ross A. and Jill Poulston. 2011. "Sex at Sea: Sexual Crimes Aboard Cruise Ships," *Tourism in Marine Environments*, 7:2, pp. 67–80.
[3] Krohn, Kay. 1999. Unpublished consultant's report examining current efforts of Royal Caribbean Cruises Ltd. In the area of preventing sexual harassment and assault. May 26.
[4] Greenwood, Don. 1999. "Reducing Sexual Assaults on Cruise Ships: Risk Assessment and Recommendations." Unpublished consultant's report. June 7.

- that a staff member be identified and assigned responsibility to serve as an advocate for the target of sexual harassment or assault;
- that a shore side hotline be established to receive telephone reports of wrongdoing and that investigations be consistent and evenly handled.
- better educating passengers and better signage onboard demarcating areas that are "off limits" to passengers.

These recommendations are great, but many had not been implemented before passage of the *Cruise Vessel Security and Safety Act of 2010*, and many have still not been fully implemented.

In addition to sexual assaults, Appendix B shows there is a fair number of assaults and thefts. Admittedly, many assaults are between traveling companions and can be considered a case of domestic violence; but not all. Take the case of San Diego grocer Scott Boney who in September 2007 went on Carnival Cruise Lines' *Elation* to celebrate his fiftieth birthday with his wife and a number of friends. On the first night of the cruise, he was pushed down a flight of stairs by a twenty-one year old fellow passenger. When he was found he was nonresponsive. Seven months later he still couldn't speak or write, couldn't stand on his own, was fed through a stomach tube, and didn't appear to recognize many family members and friends who visit or help care for him.[5]

I mention the Boney case because two relevant issues are highlighted. One is the question of whether there is adequate security personnel on cruise ships. This is a theme that has repeatedly been raised as concerns incidents of sexual assault.

Of particular note in those cases is not just the number of security staff, but the training of those personnel. Several cases indicate security personnel may not be adequately trained to deal with crimes and with crime scenes. A model course on "Crime Prevention, Detection, Evidence Preservation and Reporting," developed by the U.S. Coast Guard, FBI, and Maritime Administration in July 2011, and recently implemented, devotes a total of 3.5 hours to actions to preserve crime scenes and crime scene reporting and documentation, considerably less than the 40 hour course advocated by International Cruise Victims Association. The course is taught online; not in-person. This might be sufficient as a refresher for already-trained individuals, but not for those who appear to serve those roles on cruise ships. As related by Laurie Dishman after her 2007 testimony before the House of Representatives:

> I didn't know who to call, because my rapist was supposedly "security". I told [my friend] what had happened, and we decided to call the Purser's desk, which prompted two officers to come to our cabin. Instead of securing the cabin, they sat on the bed, where the rape occurred. Eventually, I was permitted to go to the ship's doctor, but he told [my friend] and I to go back to our cabin and collect the sheets & clothing from the incident and to place then in plastic bags, which they had provided.[6]

---

[5] See Boney v Carnival Corporation, Case No. 08-22299-CIV , U.S> District Court, Southern district of Florida, Miami Civil Division; Darce, Keith. 2008. "Rehabilitation Slow, Uncertain for Grocer Hurt in Cruise Ship Fall," San Diego Union Tribune, April 9.

[6] Dishman, Laurie. 2007. "Laurie Dishman." International Cruise Victims Association. <www.internationalcruisevictims.org/LatestMemberStories/Laurie_Dishman.html>

The other issue is the responsible serving of alcohol. The bar tab of Mr. Boney and one of his friends shows the purchase of 24 drinks (at a cost of more than $250) and several bottles of wine between ten people over dinner from the time they boarded the ship to 11:00 PM. Depositions taken in the court case indicate Mr. Boney was intoxicated. There are other cases where intoxication has been a factor in grave events. Take the case of Lyndsay O'Brien, an Irish 15-year-old who on January 2, 2006, fell overboard from the *Costa Magic* after being served a lethal amount of alcohol. Also consider page 10 of Appendix B, which shows alcohol is involved in at least 62.5 percent of onboard assaults with serious bodily injury, 35 percent of simple assaults, and 36 percent of sexual assaults. While this data suggests greater concern with responsible serving of alcohol and curtailing alcohol misuse, some cruise lines now offer "all you can drink" packages at flat rates for the duration of a cruise. Bar sales is one of the top sources of onboard revenue for cruise ships.

There is a third issue with regard to shipboard security. Unlike police in a community setting, who are objective and are a disinterested party in their investigation, shipboard security personnel are compromised by the fact that they must investigate crimes onboard a ship where their own employer may be complicit in, or party to the crime. Can these security personnel truly act in a disinterested, objective manner that places the interests of the victim above those of the organization from which they receive their paycheck and continued employment? It is difficult to imagine that onboard security can reasonably be viewed as parallel to the quality and objectivity of a land-based, community police force. This is a disservice to crime victims on a cruise ship.

*Persons Overboard*

The issue of persons overboard has already been discussed at previous Congressional hearings in December 13, 2005, March 7, 2006, March 27, 2007, September 19, 2007, and June 19, 2008. While the cruise industry tends to view these incidents as comprising accidents and suicides, this is not supported by the 177 incidents recorded since 2000.[7] Admittedly, many incidents are intentional suicides – the 15 year old child who leaves a note after fighting with his parents, the 82 year old man who goes missing in the North Atlantic, and cases where a spouse jumps overboard after an argument – and some are accidents, such as the 23-year-old man who fell overboard while urinating over the side as the ship steamed away from San Juan (he swam to shore), or a 19-year-old man who climbed over a railing and threatened to kill himself after an argument with his girlfriend; when his girlfriend pleaded with him to climb to safety he complied but slipped and fell overboard.  However, there are at least two known murders (and a third where a body was thrown overboard to hide a murder), a number of cases where a severely intoxicated person bent over a railing to vomit, and many incidents that are mysterious.

It is the mysterious incidents that raise the most concern. These are people who have given no sign of being suicidal, are happy and enjoying the cruise (often with family members along), and then go missing. Congressional hearings have already heard about some of these cases: Merrian Carver, Annette Mizener, and Hue Pham and Hue Tram, to name a few. In these cases, video surveillance footage was not made available – in the case of Annette Mizener the camera had been covered with a map or newspaper. Interestingly, video surveillance footage is readily available when it confirms the incident is a suicide or accident, but is not available in these

---

[7] See www.cruisejunkie.com/Overboard.html

incidents that remain a mystery. The situation suggests there is need for better video coverage of deck areas and that video feeds be monitored in real time, at least on a random basis and at times when these incidents most frequently occur.

Another issue is the cost borne by U.S. taxpayers when the U.S. Coast Guard is enlisted to search for a missing passenger. This expense is not trivial. In just one case – that of Michelle Vilborg who went missing 70 miles southwest of Pensacola, Florida on June 15, 2009 – the total cost incurred during the search was estimated by the Coast Guard to be $813,807.[8] This is on a not-cost-recovery basis. It would seem that the cruise corporation (Carnival Corporation in this case) could be held liable for a portion these costs. In 2009 the corporation earned  $1.790 billion in net income. Despite the U.S. corporate tax rate of 35 percent, Carnival Corporation's corporate tax paid in the U.S. in 2009, as a Panamanian-register corporation, was 0.9 percent.

One additional issue is proper detection of persons overboard. The Cruise Vessel Security and Safety Act requires that ''the vessel shall integrate technology that can be used for capturing images of passengers or detecting passengers who have fallen overboard, to the extent that such technology is available.''[9] The degree to which the cruise industry has complied with this requirement is entirely unclear. There may be additional camera surveillance (but no indication that this is the case), however there has not been adoption of any of the active measures recommended by the International Cruise Victims Association in discussions with the industry prior to the legislation being passed. There are many systems available, many manufactured and marketed in the U.S., but none of these appear to be under consideration for adoption, no doubt because of the cost involved.[10] In addition, the U.S. Coast Guard posted a Federal Register Request for Input from the Industry, and received a number of proposals, but there is no indication that these have been acted upon.[11]

*Abandoning Ship in an Emergency*

The *Costa Concordia* disaster brought to the forefront concerns about the ability for a ship to be abandoned within the requisite 30 minutes from an abandon ship call, as required by the Convention of Safety of Life at Sea (SOLAS). While the cruise industry might argue that larger ships cannot meet the 30-minute requirement and the period of time should be extended, this gets at the crux of the matter.  A catastrophic event, such as seen with the *Estonia*, which in 1994 sunk in 30 minutes with loss of 852 lives, does not allow for a luxury of time. On some large ships today it could conceivably take a passenger, especially one with mobility issues, 30 minutes to get to a lifeboat station.

There are two issues at play. First, how large can a ship become before it is no longer feasible for the number of people onboard to be offloaded within a reasonable timeframe. When the SOLAS requirement was promulgated a large ship accommodated 2,000 passengers and crew. The *Costa*

---

[8] The figure is in a response to a FOIA request, #09-4707: Linda Griesman Christopherson; Requesting the Coast Guard cost that was incurred in the search for Michelle Vilborg, letter dated October 15, 2009.
[9] See §3507(a)(1)(D)
[10] For a description of systems available see "Man-Overboard Devices," *Motor Boating*, April 11, 2011. <www.motorboating.com/electronics/man-overboard-devices>
[11] It appears proposals were received from Seafaring Security Systems and Radio Zealand DMP Americas, along with supporting documentation, as posted on the U.S. Coast Guard website.

*Concordia* had more than twice that number, and the largest ships afloat today have more than four times that number – more than 6,200 passengers and 2,500 crew members. There need to be drills and tests to determine whether current systems for abandoning ship can meet the SOLAS requirement; they should be required by the U.S., given that otherwise compliance with SOLAS is left with the country where the ship is registered, most commonly Panama or the Bahamas.

Second, related to the issue of increasing size is ship design. There needs to be consideration for width of passageways, width of stairwells, and the ease with which passengers can make their way from cabins and entertainment areas to their muster stations. That which is practical when people are calm and orderly is quite different, as can be seen in video from the *Costa Concordia*, than what is possible in the frenzy of an emergency.

A related issue also follows from SOLAS requirements. They dictate that lifeboats can be deployed when a ship is listing by 20 degrees or less. This did not appear to be the case with the *Costa Concordia*. If this requirement cannot be met, then consideration needs to be given to alternative methods of evacuation and that there be sufficient life-saving equipment on both sides of the ship for the full complement of passengers and crew. While the Captain of the *Costa Concordia* has shouldered responsibility for the cause of the accident, it has not been sufficiently acknowledged that he likely saved 100s or 1000s of lives by maneuvering the ship to run aground close to shore, making evacuation by helicopter practical.

Three other issues are brought to the forefront by the *Costa Concordia*: crew training, muster drills, and functionality of life-saving equipment.

**Crew training**. There is no basis on which to say that crew was not adequately trained on the *Costa Concordia*. However, what can be said is that the multiple languages used on board led to increased confusion and messages were not always clearly available to all passengers. This suggests the U.S. Coast Guard pay particular attention to the ability for all crew to speak and understand English on cruise operating out of U.S. ports of call.

While there are conflicting reports, it also appears that crew members (some at least – there were many others who were notably heroic in their efforts) forgot their training and their responsibility by failing to keep passengers calm and by not providing sufficient assistance with getting to muster stations and getting off the ship.  It isn't just a matter of some senior officers not remaining onboard until all passengers and crew were safely evacuated, but also that there are some reports of crew members trading priority on lifeboats for money, and others leaving the ship before they had completed all of their responsibilities. This underlines the need for additional training and additional drills for how to respond when an emergency occurs.

**Muster drills**. Cruise ships have appeared to become complacent about lifeboat drills. When I was cruising in the 1960s, 1970s, and early 1990s there was always a lifeboat drill at the muster station (lifeboat) before a ship left port. A senior officer (usually the captain) would inspect whether each passenger properly wore their life vest (pulling straps tighter and fixing those that had been worn improperly), attendance was taken by roll call, and clear instructions were given about what to do in an emergency. Often the lifeboat would be lowered and a demonstration given on how the boat would be boarded and in what order. In the case of the *Costa Concordia*,

9

the muster drill was planned the afternoon after the cruise began, which isn't inconsistent with SOLAS requirements, but in hindsight not a good decision.

By the mid-to-late 1990s, roll calls were taken less frequently and the inspections became less vigilant. Undoubtedly, with 3,000 or more passengers, officers could no longer complete inspections in a reasonable period of time, and there may have been a reaction to increasing complaints from passengers who didn't see the need for the drills. By the late-1990s I began to see virtual lifeboat drills. Passengers would muster in a lounge or a bar and be instructed on procedures to follow in an emergency. They were instructed how to put on a life vest, but there were no longer inspections to ensure they wore them correctly. And there were no longer demonstrations on how a lifeboat was lowered or boarded, or instruction on the order of boarding (children and women first, assist those with mobility issues, and able-bodied men last).

The Cruise Lines International Association (CLIA) and some cruise lines have now announced there will be mandatory life boat drills before a ship leaves port. However, it is still unclear whether these will be virtual drills or real drills, whether passengers will be inspected as to whether they properly wear a life vest, and whether there will be demonstration of life-saving equipment. It appears, based on a cruise director's blog, that attendance will not be taken.

> …once guests are gathered at the muster stations then the staff will walk around with clickers to count the number of guests at the muster stations … These numbers are then given to each muster station supervisor who will then tell the bridge … the cruise director will let guests know this is happening, it will be very obvious and should take approximately five minutes to accomplish as the line has multiple staff assigned to this new task.[12]

The "old-fashioned" lifeboat drills normally took 30 minutes or more.

While I applaud CLIA's requirement for a mandatory muster drill, I have to ask what will happen to those members who do not comply. The Association has had mandatory environmental standards since 1999, however no cruise line has knowingly been sanctioned for violations, numbering in the hundreds and leading to more than $50 million in fines in the U.S.

**Functionality of Life-Saving Equipment**. Reports from the *Costa Concordia* indicate some lifeboats did not easily deploy given corrosion and rust. I wasn't there, so I can't say what was the case. However, these reports, if accurate, underline the importance for U.S. Coast Guard inspections to include a determination that each and every lifeboat on a cruise ship freely lowers.

I also understand from news reports following the accident that some cruise ships no longer place life vests in passenger cabins, but leave them on the deck where passengers muster to their lifeboat. The wisdom of this practice might be worth reconsidering in the aftermath of the *Costa Concordia* accident. What if passengers can't get to their muster station? Will there be a sufficient supply on each side of the ship to outfit all passengers in the case that one side of the ship isn't accessible? These questions need to be seriously considered.

---

[12] Young, Susan. 2012. "Carnival Cruise Lines Adjusts Muster Drill," Travel Agent Central, February 16. < www.travelagentcentral.com/ocean-cruises/carnival-cruise-lines-adjusts-muster-drill-33701>

*Shipboard Black Boxes*

Like airplanes, modern cruise ships have black boxes that record critical information about the ship and conversations on the bridge. Following the *Costa Concordia* accident the captain reported the black box on the ship had been broken for more than two weeks; that he had notified the company and it had yet to be repaired or placed.[13] Without a black box there is limited objective data about the accident. Just as an airplane is likely not allowed to knowingly operate without an operating black box, the same should be legislated for cruise ships.

*Crime Reporting*

The data in Appendix B was received from the FBI in response to a Freedom of Information request. A similar request was made in 2011 for data after October 2008. The material returned in response was totally unhelpful. All useful information was redacted. As well, the FBI says they are not required to keep track of or report crimes committed on cruise ships unless they have opened a file of investigation and subsequently closed the file. That means that allegations of crime are no longer available for analysis (including crimes where the FBI has judged a sexual assault to be a "he said, she said" situation, and thefts of less than $10,000 given that these are not treated as worthy of prosecution). One obvious problem is that it is impossible to measure whether cruise ships are doing better or worse than the 2007-08 baseline. Another problem is that it is impossible to compare onboard crime rates with crimes on land. On land crime rates are based on the number of allegations; these can't reliably be compared to only the number of incidents opened for investigation and subsequently closed. While this absence of data may serve the interest of the cruise lines, which prefer incidence of crime to remain hidden, it is not in the interest of the public or in the spirit of the Cruise Vessel Security and Safety Act of 2010.

Unfortunately, the Cruise Vessel Security and Safety Act of 2010 (CVSSA) was amended from what was proposed to what was passed. Here is the text of the Act as introduced:

> (4) AVAILABILITY OF INCIDENT DATA VIA INTERNET-
> `(A) WEBSITE- The Secretary shall maintain, on an Internet site of the department in which the Coast Guard is operating, a numerical accounting of the missing persons and alleged crimes recorded in each report filed under paragraph (1)(A). The data shall be updated no less frequently than quarterly, aggregated by cruise line, and each cruise line shall be identified by name.
> `(B) ACCESS TO WEBSITE- Each cruise line taking on or discharging passengers in the United States shall include a link on its Internet website to the website maintained by the Secretary under subparagraph (A)

The Act as passed reads:

---

[13] Kenna, Armorel. 2012. 'Concordia Captain Says Black Box Wasn't Working, Repubblica Says, January 22. < http://www.bloomberg.com/news/2012-01-22/concordia-captain-says-black-box-wasn-t-working-repubblica-says.html> and Hoskins, Paul and Himanshu Ojha. 2012. "How the Cruise Ship Industry Sails Under the Radar," Reuters, January 24. < www.reuters.com/article/2012/01/24/uk-italy-ship-regulation-idUSLNE80N02M20120124>

(4) AVAILABILITY OF INCIDENT DATA VIA INTERNET-
'(A) WEBSITE- The Secretary shall maintain a statistical compilation of all incidents described in paragraph (3)(A)(i) on an Internet site that provides a numerical accounting of the missing persons and alleged crimes recorded in each report filed under paragraph (3)(A)(i) that are no longer under investigation by the Federal Bureau of Investigation. The data shall be updated no less frequently than quarterly, aggregated by cruise line, each cruise line shall be identified by name, and each crime shall be identified as to whether it was committed by a passenger or a crew member.
'(B) ACCESS TO WEBSITE- Each cruise line taking on or discharging passengers in the United States shall include a link on its Internet website to the website maintained by the Secretary under subparagraph (A).

The change was made in Committee before it was reported back to the full Congress and my understanding is that the sponsors of the bill missed this. As you can see, there is a huge difference between reporting alleged crimes versus reporting crimes no longer under investigation. I encourage the Committee to change the language back to the original so the public has accessible accurate information about crime onboard cruise ships, and so researchers have access to reliable data that can be used to accurately measure the industry's progress in dealing with crime.

*Death on the High Seas Act (DOHSA)*

Cruise ship passengers are treated differently than airline passengers under the *Death on the High Seas Act* (DOHSA) The Act, originally passed in 1920, presently does not allow non-pecuniary and punitive damages to families of someone who has died while at sea. These limits were deemed to be unfair in the context of aviation cases and were removed, but they were not changed for passenger ships. House Resolution 2989, introduced by Representative Doggett July 11, 2007, intended to correct this inconsistency, but it was not approved. Two bills were introduced in the 111th Congress, HR 5803 (Conyers and 26 co-sponsors) and S 3600 and S 3755 (Rockefeller/Schumer), but they also didn't go beyond Committee. Given the obvious unfairness that American citizens on cruise ships are treated different on a cruise ship than when traveling by airplane, I hope amendments to DOHSA are revisited.


## II. Environmental Issues

Environmental issues and the cruise industry were brought to the forefront in the late 1990s after Royal Caribbean International was fined more than $30 million for illegal discharges into U.S. and Alaska state waters of oil, hazardous chemicals, and for making false statements to the U.S. Coast Guard. The incidents date back to the early 1990s.[14] The U.S. General Accounting Office subsequently reported in 2000 that between 1993 and 1998 the federal government confirmed 87

---

[14] See Klein, Ross A. 2002 *Cruise Ships Blues: The Underside of the Cruse Industry*, Gabriola Island, BC: New Society, pp. 88–89.

illegal discharges from cruise ships (81 involving oil, 6 involving garbage or plastic). Seventeen "other alleged incidents" were referred to the countries where the cruise ships were registered.[15]

It wasn't only Royal Caribbean. Holland America Line was fined $2 million in 1998 for pumping oily bilge into Alaska's Inside Passage, in addition to other violations,[16] Then in April 2002, Carnival Corporation entered a plea agreement, pleading guilty to numerous pollution incidents from 1996 through 2001 – discharging oily waste into the sea from their bilges by improperly using pollution prevention equipment and of falsifying the Oil Record Book on six ships to conceal its practices. Part of the plea agreement, in addition to an $18 million fine, was that the company was required to have environmental officers on all its ships; it was also required to file compliance reports with the court, which was later found to not comply with.

A few months later, in July 2002, Norwegian Cruise Line signed an agreement with the U.S. Department of Justice pleading guilty to having discharged oily bilge water for several years and to having falsified discharge logs. The company was fined $1 million and ordered to pay $500,000 toward environmental service projects in South Florida. Federal prosecutors considered the sentence lenient. There have been other fines since, but it is overkill to list them here.[17]

*North American Emission Control Area*

Governments have recently taken action to curtail air pollution from ships.  The European Community issued Directive 2005/33/EC requiring all ships while in European ports to use fuel with sulfur content of 0.1 percent or less effective January 1, 2010. Six months later, provisions in Annex VI of the International Convention for the Prevention of Pollution from Ships (MARPOL) regarding Sulfur Dioxide Emissions Control Areas (Baltic Sea, North Sea, and English Channel) placed a limit of 1.0 percent sulfur content; the limit reduces to 0.1 percent in 2015. Following developments in Europe, the U.S. and Canada partnered to establish the North America Emission Control Area (extending 200 miles from the coast), which was ratified by the International Maritime Organization on March 26, 2010.[18] It limits sulfur content in fuel to 1.0 percent effective August 1, 2012 and 0.1 percent by 2015.[19]

The cruise industry argued against the emission control areas (ECA) in Europe. It also voiced concern about increased fuel costs associated with the North American ECA and asked that consideration be given to "…alternative means, such as scrubbers, that ships could use to meet emissions goals, and to take a piecemeal, rather than blanket approach. 'The ECA area should be

---

[15] See U.S. General Accounting Office. 2000. *Marine Pollution: Progress Made to Reduce Marine Pollution by Cruise Ships, But Important Issues Remain*, February. (Doc #GAO/RCED-00-48)

[16] See Klein, Ross A. 2009. *Getting a Grip on Cruise Ship Pollution*, Washington, DC: Friends of the Earth. See also Klein, Ross A. 2005. *Cruise Ship Squeeze: The New Pirates of the Seven Seas*, Gabriola Island, BC: New Society.

[17] See Klein, Ross A. 2008. Paradise Lost at Sea: Rethinking Cruise Vacations, Halifax, NS: Fernwood. Also see Pollution and Environmental Violations and Fines, 1992 – 2010 <www.cruisejunkie.com/evirofines.html>

[18] Lagan, Christopher. 2010. "IMO adopts 200-mile North American Emissions Control Area," Coast Guard Compass, March 26.

[19] See Klein, Ross A. 2011. "Responsible Cruise Tourism: Issues of Cruise Tourism and Sustainability," *Journal of Hospitality and Tourism Management*, 18, pp 107–116. See also Klein, Ross A. 2010. "The Cruise Sector and Its Environmental Impact," *Tourism and the Implications of Climate Change: Issues and Actions Bridging Tourism Theory and Practice Volume 3* (ed. Christian Schott), London:Emerald Group Publishing, pp. 113–130.

tuned to prioritize those areas where urgency exists and the greatest health and environmental benefits can be achieved.'"[20] Ironically, while saying they support the health and environmental goals behind the creation of the ECA, cruise industry associations questioned the research on which the regime is based and warned it could hurt the Canadian and North American cruise sector insofar as ships relocating elsewhere.

The North American Emission Control Area is an important step in dealing with air emissions from cruise ships. The U.S. needs to stand its ground under pressure from the cruise industry to delay implementation or to "water down" the measure. With air emissions from fuel dealt with, it is possible to now shift to other sources of pollution from cruise ships.

*Regulation of Grey Water*

Except for the Great Lakes, Maine, and Alaska, gray water was until 2009 largely unregulated. However, effective February 6, 2009, pursuant to a Clean Water Act (CWA) National Pollutant Discharge Elimination System (NPDES) Vessels General Permit issued by U.S. EPA (VGP), cruise ships must meet treatment standards for gray water as well as 25 other types of incidental vessel discharges – from ballast water to deck runoff. Operational limits in the permit prohibit the discharge of untreated gray water within one nautical mile (nm) of shore. Gray water discharges are only allowed within one nm if they meet specific effluent limits and can not be discharged in waters of marine sanctuaries, units of the National Park System, units of the National Wildlife Refuge System, National Wilderness areas, and national wild and scenic rivers system components. Discharges of untreated gray water are allowed between one nm and three nm of shore if the vessel is traveling at a speed of six knots or more. The EPA is proposing for 2013 extending the present grey water treatment standards (the same standards that currently exist in Alaska) for large ships out to three nautical miles. The extension is to be complemented and encouraged.

The VGP is a positive step. However, there is room for improvement because the VGP only regulates gray water out to three nautical miles. As indicated by the U.S. EPA, untreated gray water falls woefully short of National Recommended Water Quality Standards and the Title XIV Standard for Continuous Discharge in Alaska Waters, in particular for fecal coliform, chlorine, biological oxygen demand, suspended solids, ammonia, copper, nickel, zinc, and tretrachloroethylene.[21] This suggests the need for upgrading and regular testing of systems treating gray water, and for further extending the area in which gray water discharges are prohibited. As well, it is necessary to perform system inspection and monitoring more frequently than required in the NPDES VGP, which only requires annual inspection and evaluation by the U.S. Coast Guard or the ship's classification society.

---

[20] Steuk, Wendy. 2010. "Clean-fuel Rules May prompt Cruise Line to Bypass Canada, *Globe and Mail*, July 9. Page A4.
[21] See United States Environmental Protection Agency. 2008. *Cruise Ship Discharge Assessment Report*, Washington, DC: EPA. (Report #EPA842-R-07-005)

*Regulation of Sewage*

A cruise ship produces more than eight gallons of sewage per day per person. The cumulative amount per day for a ship such as Royal Caribbean's *Explorer of the Seas* (4,190 passengers and 1,360 crew) is more than 40,000 gallons; almost 300,000 gallons on a one-week cruise. These wastes contain harmful bacteria, pathogens, disease, viruses, intestinal parasites and harmful nutrients. If not adequately treated they can cause bacterial and viral contamination of fisheries and shellfish beds. In addition, nutrients in sewage, such as nitrogen and phosphorous, promote algal growth. Algae consume oxygen in the water that can be detrimental or lethal to fish and other aquatic life.[22]

Sewage from cruise ships is a critical problem, compounded by the fact that it is excluded from the Clean Water Act's (CWA) National Pollutant Discharge Elimination System (NPDES) permitting requirements and ignored beyond three nautical miles from shore. The Clean Water Act's provision for sewage discharges from vessels sets treatment standards that are inadequate, and now outdated, and does not require permits or reporting. Further, the discharge of untreated sewage from vessels in coastal waters beyond three miles is not regulated.

It is worth note that the U.S. is one of the few coastal nations in the developed world that has not signed Annex IV of the International Convention for the Prevention of Pollution from Ships (MARPOL). While its neighbors ban the discharge of treated sewage within four nautical miles of shore, and untreated sewage within twelve nautical miles of shore, the U.S. permits sewage treated with a Type II Marine Sanitation Device to be discharged between zero and three miles of shore, and untreated sewage to be discharged anywhere beyond three nautical miles. This anomaly in national regulations around the world has led a number of jurisdictions to request the EPA for "no discharge areas" within three miles of shore (such as Maine, New Hampshire, Michigan, Rhode Island and California), has led to state legislation (as in the case of California and Alaska), and has made necessary Memoranda of Understanding in other jurisdictions (such as Washington).

*Sewage Treatment*

**<u>Marine Sanitation Devices</u>**. Sewage from a cruise ship traditionally has been treated by a Type II marine sanitation device (MSD). Under Section 312 of the U.S. Clean Water Act, commercial and recreational vessels (including cruise ships) with installed toilets are required to have a MSD. Type II MSDs are the most common type of wastewater treatment systems on cruise ships and consist of flow-through devices that break up and chemically or biologically disinfect waste before discharge. Within three nautical miles of shore vessels must treat sewage with an approved Type II MSD prior to discharge. Beyond three nautical miles, discharge of raw sewage is allowed. The U.S. Environmental Protection Agency's (EPA) regulations governing MSDs have not been updated since they were instituted in 1976.

---

[22] See United States Environmental Protection Agency. 2008. *Cruise Ship Discharge Assessment Report*, Washington, DC: EPA. (Report #EPA842-R-07-005)

Type II MSDs are supposed to produce effluent containing no more than 200 fecal coliform for 100 milliliters and no more 150 milligrams per liter of suspended solids.[23] Whether MSDs achieve that standard was called into question in 2000 when the state of Alaska found that 79 of 80 samples from cruise ships were out of compliance with the standard. According to the Juneau port commander for the Coast Guard, the results were so extreme that it might be necessary to consider possible design flaws and capacity issues with the Coast Guard-approved treatment systems.[24] A 2008 report from the U.S. EPA suggests problems identified in 2000 with MSDs continue today.

**Advanced Wastewater Treatment Systems (AWTS)**. The cruise industry in recent years has adopted the use of AWTS (an advanced form of Type II Marine Sanitation Device) on many ships – most often ships visiting Alaska's Inside Passage where such systems are required for continuous discharge in state waters. A ship with an AWTS avoids the need to travel outside Alaska state waters to discharge treated sewage. Installation of AWTS for ships visiting other waters with less stringent or no regulations has been at a much slower pace. For example, Carnival Corporation (which includes Carnival Cruise Lines, Holland America Lines, and Princess Cruises) had AWTS installed on slightly less than one half of its fleet at the end of 2008. But Carnival Cruise Lines, which sends only one ship to Alaska per season, has installed an AWTS on only one of its twenty-three ships. The corporation's spokesperson says they try to make sure AWTS are included on ships that go to Alaska and to other sensitive areas.

AWTS are a vast improvement over MSDs — yielding what the industry refers to as drinking-water quality effluent. However this terminology must be treated with skepticism. Such water cannot be recycled for onboard human consumption nor can it be used in the laundry because sheets and towels apparently turn gray. Both the EPA and Alaska have found that even the best systems still had difficulty with a number of constituents. A key problem is the AWTS do not adequately address nutrient loading, which means they pose similar problems as MSDs with regard to nitrogen and phosphorous. In addition, tests in Alaska have shown levels of copper, nickel, zinc, and ammonia that are higher than the state's water quality standards. The EPA has also found that AWTS exceed permitted concentrations of chlorine and tetrachlorethylene. As a result, 12 of 20 (60%) ships permitted to discharge in Alaska waters violated discharge limits in 2008, logging 45 violations involving 7 pollutants. These include ammonia, biological oxygen demand, chlorine, copper, fecal coliform, pH, and zinc. The year 2009 was even worse, with 13 of 18 (72%) ships permitted to discharge in Alaskan waters violating Alaska discharge limits during the season, racking up 66 violations involving 9 pollutants. Comparable data is not available for 2010 or 2011; the state lowered its limits for waste from AWTS under pressure from the industry, so there is no way to reliably measure improvement by publicly available data. It is noteworthy that nearly 30 percent of ships discharging in Alaska in 2008 and 2009 were able to meet the water quality standards.[25]

---

[23] 33 C.F.R. § 159.3 (2008); 40 C.F.R. § 140.3(d) (2008).
[24] See McAllister, Bill. 2000. "A Big Violation on Wastewater: Some Ship Readings 100,000 Times Allowed Amount," The Juneau Empire, August 27 <www.juneauempire.com/stories/082700/Loc_wastewater.html>
[25] See Klein, Ross A. 2009. *Getting a Grip on Cruise Ship Pollution*, Washington, DC: Friends of the Earth.

**Sewage Sludge**. Most Type II MSDs and AWTS filter solids from sewage as part of treatment. This yields on average 4,000 gallons of sewage sludge per day;[26] cumulatively, it adds up quickly. It is estimated that 4.2 million gallons of sewage sludge are produced every year by ships as they pass through Washington State waters on their way to Alaska[27] – this is small compared to what cruise ships generate outside Washington state waters. In some cases (about one in sixteen ships with an AWTS), sewage sludge is dewatered and then incinerated. In other cases sludge is dumped at sea. Most jurisdictions permit sludge to be dumped within three miles of shore; in California a ship must be beyond three miles from shore and in Washington beyond twelve miles. In either case, these sludges have a high oxygen demand and are detrimental to sea life. Sewage sludge poses the same problem as sewage, but in a more concentrated form.

A report issued in August 2003 by the California Environmental Protection Agency and the California State Water Resources Control Board said "it found 'particularly troubling' the discharging of sludge twelve miles out to sea."[28] This concern is in stark contrast to regulations elsewhere that define sewage sludge as treated sewage and permit its discharge within three miles of the U.S. shoreline. The need for minimum regulations applicable to the entire U.S. coastline is obvious.

One option is to require sewage sludge to be dewatered and incinerated onboard, however incineration creates an air quality problem and the ash must be disposed of somewhere. Dumping the ash overboard raises new problems. Another option is to require sewage sludge to be held onboard and offloaded for treatment in port. Washington State has in recent years explored the commercial use and value of sewage sludge as a fertilizer, but no clear plans have yet been made.[29] Clearly, a workable solution to the huge volume of sludge being dumped into the waters of the U.S. – 28,000 gallons per week on an average-sized cruise ship – must be identified and implemented.

*Incinerators*

Cruise ships incinerate and burn a variety of wastes, including hazardous wastes, oil, oily sludge, sewage sludge, medical and bio-hazardous waste, outdated pharmaceuticals, and other solid wastes such as plastics, paper, metal, glass, and food.[30] A cruise ship may burn 1 to 2.5 tons per day of oily sludge in these incinerators and boilers.[31] The emissions from onboard incineration and its ash can include furans and dioxins, both found to be carcinogenic, as well as nitrogen

---

[26] National Marine Sanctuaries. 2008. Olympic Coast Marine Sanctuary: Condition Report 2008, Washington, DC: NOAA. p. 43

[27] King County Wastewater Treatment Division. 2007. Cruise Ship Wastewater Management Report. Seattle: Department of Natural Resources and Parks

[28] Weiss, Ken. 2003. "Cruise Line Pollution Prompts Legislation," *Los Angeles Times*, August 18. Also see: *Report to the Legislature: Regulation of Large Passenger Vessels in California*, Cruise Environmental Task Force, August 2003 <www.swrcb.ca.gov/publications_forms/publications/legislative/docs/2003/cruiseshiplegrpt.pdf>

[29] See Port of Seattle. 2008. *Cruise Vessel Biomass Management Study, Phase 1A (Draft): Data Compilation and Initial Assessment*, Port of Seattle, Nov. 18.

[30] California Cruise Ship Environmental Task Force. 2003. *Report to the Legislature: Regulation of Large Passenger Vessels in California*, August, p. 54

[31] California Cruise Ship Environmental Task Force. 2003. *Report to the Legislature: Regulation of Large Passenger Vessels in California*, August, p. 56

oxide, sulfur oxide, carbon monoxide, carbon dioxide, particulate matter, hydrogen chloride, toxic and heavy metals such as lead, cadmium and mercury, and hydrocarbons.[32]

In contrast to incinerator use on land, which is likely to be strictly monitored and regulated, incinerators at sea operate with few limits. MARPOL Annex VI bans incineration of certain particularly harmful substances, including contaminated packaging materials and polychlorinated biphenyls (PCBs). There are no national standards limiting emissions from ship incineration.

The State of California has established that air emissions from incineration, generated between 27 and 102 miles off the coast, could negatively impact the air quality of the state.[33] The state initially introduced legislation in 2003 to prohibit ships from using onboard waste incinerators while within 20 miles of the coast, but subsequently passed legislation applicable only to waters over which the state had jurisdiction. The final California law prohibits incinerator use when a ship is within three miles of the coast.

Clear parameters are needed for operational requirements for onboard incinerators, much like on land. In addition, it is wise to do as California has done and ban the use of incinerators within a specific distance from the coast. Any such law must take into account the potential for onshore winds and ocean currents to move incinerator pollutants on-shore.

*Solid Waste*

A cruise ship produces a large volume of non-hazardous solid waste. This includes huge volumes of plastic, paper, wood, cardboard, food waste, cans, glass, and the variety of other wastes disposed of by passengers. It was estimated in the 1990s that each passenger accounted for 3.5 kilograms of solid waste per day. With better attention to waste reduction this volume in recent years has been cut nearly in half. But the amount is still significant, more than eight tons in a week from a moderate sized cruise ship. Twenty-four percent of the solid waste produced by vessels worldwide comes from cruise ships.[34] Glass and aluminum are increasingly held onboard and landed ashore for recycling, but only when the itinerary includes a port with reception facilities.

Food and other waste not easily incinerated is ground or macerated and discharged into the sea. These "… food waste can contribute to increases in biological oxygen demand, chemical oxygen demand, and total organic carbon, diminish water and sediment quality, adversely effect marine biota, increase turbidity, and elevate nutrient levels."[35] They may be detrimental to fish digestion and health and cause nutrient pollution.[36] An additional problem with discharging food waste at sea is the inadvertent discharge of plastics. Under MARPOL, 38 throwing plastic into the ocean

---

[32] Bluewater Network's EPA petition on cruise ship incineration, April 2000.

[33] California Cruise Ship Environmental Task Force. 2003. Report to the Legislature: Regulation of Large Passenger Vessels in California, August, p. 66

[34] Copeland, Claudia. 2008. Cruise Ship Pollution: Background, Laws and Regulations, and Key Issues. Washington, DC: Congressional Research Service (Report #RL32450)

[35] United States Environmental Protection Agency. 2008. Cruise Ship Discharge Assessment Report, Washington, DC: Environmental Protection Agency (Report #EPA842-R-07-005), p. 5-11

[36] See John Polglaze. 2003. "Can We Always Ignore Ship-Generated Food Waste," Marine Pollution Bulletin 46:1, pp. 33-78

is strictly prohibited everywhere. Plastic poses an immediate risk to sea life that might ingest or get caught in it. It poses a longer-term risk as it degrades over time, breaking down into smaller and smaller pieces, but retaining its original molecular composition. The result is a great amount of fine plastic sand that resembles food to many creatures. Unfortunately, the plastic cannot be digested, so sea birds or fish can eventually starve to death with a stomach full of plastic.[37]

Solid waste and some plastics are incinerated on board, with the incinerator ash being dumped into the ocean. Incinerator ash and the resulting air emissions can contain furans and dioxins, both found to be carcinogenic, as well as heavy metal and other toxic residues. For this reason Annex V of MARPOL recommends, but does not require, that ash from incineration of certain plastics not be discharged into the sea.[38] At the very least, incinerator ash should be tested before each overboard discharge. This would include analysis and accounting of the contaminants typically found in cruise ship incinerator ash to determine whether it should be categorized as solid waste or hazardous waste.

Under MARPOL 44 and U.S. law,[39] no garbage can be discharged within three miles of shore. Between three and twelve miles garbage can be discharged if ground-up and capable of passing through a one-inch screen. If not ground-up and capable of passing through a screen, most food waste and other garbage can be discharged at sea when a ship is more than twelve miles from shore.

Although cruise ships have reduced their volume of solid waste, the total amount is still significant. Royal Caribbean's stated commitment in 2003 to not dump any trash overboard is admirable and should set a standard for all cruise ships operating from U.S. ports and in U.S. waters. If it is achievable by Royal Caribbean, then there is no reason why it is not practical for all cruise lines. This should be incorporated in legislation in order to ensure cruise ships can be held accountable for any unnecessary dumping of solid waste in the waters of the U.S.

*Oily Bilge*

A typical large cruise ship will generate an average of eight metric tons of oily bilge water for each twenty-four hours of operation;[40] according to Royal Caribbean's 1998 Environmental Report its ships produce an average 25,000 gallons of oily bilge water on a one week voyage. This water collects in the bottom of a vessel's hull from condensation, water lubricated shaft seals, propulsion system cooling and other engine room sources. It contains fuel, oil, wastewater from engines and other machinery, and may also include solid wastes such as rags, metal shavings, paint, glass, and cleaning agents.

---

[37] Reid, David. 2007. "Earth's Eighth Continent." The Tyee Nov. 21.
<thetyee.ca/News/2007/11/21/PacificGarbagePatch/>
[38] See MARPOL Annex V, Appendix B, Section 5.4.6.2, referenced in United States Environmental Protection Agency. 2008. Cruise Ship Discharge Assessment Report, Washington, DC: Environmental Protection Agency (Report #EPA842-R-07-005), p. 5-12
[39] See 33 C.F.R. parts 151.63, 151.65, 151.67, 151.69, 151.71, 151.73,
[40] National Research Council. 1995. Clean Ships, Clean Ports, Clean Oceans: Controlling Garbage and Plastic Wastes at Sea. Washington, DC: National Academy Press.

The risks posed to fish and marine organisms by oil and other elements in bilge water are great. In even minute concentrations oil can kill fish or have numerous sub-lethal effects such as changes in heart and respiratory rates, enlarged livers, reduced growth, fin erosion, and various biochemical and cellular changes.[41]  Research also finds that by-products from the biological breakdown of petroleum products can harm fish and wildlife and pose threats to human health if these fish and wildlife are ingested.

Oily bilge water in U.S. waters is regulated by the Clean Water Act. The Act prohibits the discharge of oil or hazardous substances, in such quantities as may be harmful within 200 miles of the coast. In addition, Coast Guard regulations specifically prohibit discharges within 12 nautical miles of shore unless it has been passed through a fifteen parts per million (ppm) oily water separator and does not cause a visible sheen.[42] The NPDES VGP reinforces the 15 ppm standard and it requires large vessels (over 400 gross tons) to discharge oily bilge beyond 1 nautical mile from shore if the vessel is underway and the discharge is technologically feasible and safe. Beyond 12 nautical miles, oil or oily mixtures can be discharged while a vessel is proceeding en route so long as the undiluted oil content is less than 100 ppm. The oil extracted by the separator can be reused, incinerated, and/or offloaded in port. Vessels are required to document the disposal of oil, oily bilge water or oily residues in an Oil Record Book.[43]

To address the deleterious effect of oil to marine life, even in minute quantities, the discharge of oily bilge water should be prohibited in sensitive areas and in coastal zones out to 12 nautical miles. Additionally, consistent minimum water quality standards for oily bilge should be set across all waters under U.S. control either at the Coast Guard's current level of 15ppm or as low as 5 ppm. The reduction to 5 ppm is achievable.[44]

*Patchwork of Regulations and the Clean Cruise Ship Act*

There is a patchwork of different regulations in the U.S. Cruise ships are permitted to legally discharge waste in one place but not another. On the west coast for example, enforceable regulations have had a positive effect in Alaska, Washington, and California, but leave open for greater environmental harm in neighboring jurisdictions such as Oregon and British Columbia. In fact, British Columbia is a good illustration of the problem with a patchwork approach. In some circles it is referred to as the toilet bowl of the Alaska cruise industry. This is because a ship may not discharge wastes in certain areas in Washington State (such as sewage sludge, untreated gray water, and sewage treated with a MSD) and it is restricted in the waste permitted for discharge in Alaska, but it can discharge those same wastes in Canada. The reason is weaker Canadian regulations (except for sewage) and Canada's failure to enforce the regulations it has.

---

[41] Copeland, Claudia. 2008. Cruise Ship Pollution: Background, Laws and Regulations, and Key Issues. Washington, DC: Congressional Research Service (Report #RL32450), November 17, p. CRS-5
[42] See 33 C.F.R. §151.10.
[43] Copeland, Claudia. 2008. Cruise Ship Pollution: Background, Laws and Regulations, and Key Issues. Washington, DC: Congressional Research Service (Report #RL32450), November 17, p. CRS-14
[44] An example of current technology that demonstrates the achievability of 5 ppm is a system manufactured by North Carolina-based EnSolve Biosystems. The company's PetroLiminator oily water separator "is a green technology that consistently achieves effluent levels of less than 5 parts per million (PPM)." See "EnSolve Biosystems Launches Operating Cost Guarantee Program For Bilge Water Treatment Program ," EnSolve Biosystems Inc. News, Volume 1, Issue 1, October 2008.

The same scenario operates on the east coast where gray water cannot be discharged in the waters of Maine, but can be discharged in the waters of Canada, and until the extension of the NPDES comes into effect every other coastal state.

Inconsistent regulations permit the cruise industry to argue that it meets or exceeds all environmental regulations while at the same time showing relatively different regard for environmental protection from one place to the next. These differences are even seen in the fuel ships use. It was reported in 2007 that when Holland America Line's *Zaandam* operated on the west coast of North America (British Columbia and Alaska) it used fuel with a sulfur content of about 1.8 percent; while operating during the winter months in the Caribbean the sulfur content was as much as 3 percent.[45] The North American Emission Control Area addresses this problem directly.

These variations raise to the forefront the need for comprehensive, minimum national regulations that maintain uniformly high standards for protection of the marine environment. One approach was the *Clean Cruise Ship Act of 2008* (CCSA) sponsored by Durbin in the Senate (S 2881) and Farr with 20 cosponsors in the House of Representatives (HR 6434). This was the third session of Congress in which this legislation was introduced. In the 109th Congress Farr had 47 cosponsors; Durbin had 5 cosponsors, and in the 108th Congress there were 42 cosponsors in the House and 9 cosponsors in the Senate. Key provisions of the CCSA include:

- Prohibits the discharge of sewage, graywater, and bilge water out to 12 miles and in nodischarge zones such as marine protected areas;

- Prohibits the discharge of sewage sludge, incinerator ash, and hazardous waste within 200 miles of the U.S. coastline. Sludge, incinerator ash, and hazardous waste must be offloaded at an appropriate land-based facility;

- Requires EPA to establish effluent standards for sewage, graywater, and bilge water discharges from 12 to 200 miles. These effluent limits must be consistent with best available technology. The ship must be traveling at not less than 6 knots;

- Establishes a monitoring, sampling, reporting and inspection program with unannounced annual inspections and samples;

- Establishes an observer program for monitoring discharges (one observer per ship), similar to the "Ocean Ranger" program in Alaska;

- Establishes the Cruise Vessel Pollution Control Fund to carry out the programs in the Act. The fund is comprised of reasonable and appropriate fees collected from cruise vessels for each paying passenger. This, too, is modeled after how Alaska pays for its monitoring and enforcement program.

---

[45] Montgomery, Christina. 2007. "Setting Out to Sea in an Eco-Friendly Ship." *The Province*, May 31.

### III.  Medical Care and Illness

International maritime law surprisingly does not require a cruise ship to provide medical services.  The only legal requirement is under the Standards of Training, Certification and Watchkeeping for Seafarers (SCTW) Convention, which requires certain crew members to have various levels of first aid and medical training. Regardless, all modern cruise ships maintain an infirmary. Those dispensing medical care are concessionaires for whose actions the cruise line assumes no liability. Their precise qualifications can vary widely. Some small cruise ships may have a nurse but no doctor. Some large ships have two physicians as well as two or more nurses.

In 1996, the International Council of Cruise Lines (ICCL) adopted industry guidelines for medical facilities and personnel on cruise ships. The guidelines were a response to pressure from the American Medical Association (AMA) which had that year called on the U.S. Congress for the development of medical standards for cruise ships. Based on a number of cases of disease, including a recent outbreak of gastroenteritis on Carnival Cruise Line's *Jubilee* in which 150 passengers became ill and one person died, the AMA also called for greater awareness of the limited medical services available aboard ships.  The AMA position was supported by a survey administered by two Florida doctors to eleven cruise lines.

> [T]he doctors found that 27 percent of doctors and nurses did not have advanced training in treating victims of heart attacks, the leading killer on ships, and 54 percent of doctors and 72 percent of nurses lacked advanced training for dealing with trauma. Fewer than half of shipboard doctors – 45 percent – had board certification, an important credential that is granted after three to seven years of residency and a written examination in a specialty or its equivalent ... As for equipment, the survey found that 63 percent of ships did not have equipment for blood tests for diagnosing heart attacks, and 45 percent did not have mechanical ventilators or external pacemakers.  "What we found was that the quality of maritime medical care was less than adequate, from the medical facilities to nurse and physician credentials..."[46]

The American Medical Association has continued to lobby for government regulation of health care on cruise ships, but with no success.

Some have suggested that Section 3507 (d) (3) of the *Cruise Vessel Security and Safety Act of 2010* addresses this matter. The section states that in the case of a sexual assault the owner of a vessel to which the section applies shall make available on the vessel at all times medical staff who have undergone a credentialing process to verify that he or she—

> (A) possesses a current physician's or registered nurse's license and—
>> (i) has at least 3 years of post-graduate or postregistration clinical practice in general and emergency medicine; or
>> (ii) holds board certification in emergency medicine, family practice medicine, or internal medicine;

---

[46] Frantz, Douglas.  1999. "Getting Sick on the High Seas: A Question of Accountability," *New York Times*, October 31.

(B) is able to provide assistance in the event of an alleged sexual assault, has received training in conducting forensic sexual assault examination, and is able to promptly perform such an examination upon request and provide proper medical treatment of a victim, including administration of anti-retroviral medications and other medications that may prevent the transmission of human immunodeficiency virus and other sexually transmitted diseases; and

(C) meets guidelines established by the American College of Emergency Physicians relating to the treatment and care of victims of sexual assault.

While this section requires a doctor or nurse to be onboard for the treatment of a victim of sexual assault, it does not dictate where the person has received their training, license, and board certification, so there can still be wide variation in the nature and quality of care (the original proposals made by the International Cruise Victims Association were that these personnel be board certified in the U.S.). In addition, the American College of Emergency Physicians' guidelines are general enough that they provide little assurance, especially given that they are not easily transferable to the setting of a cruise ship.[47] It is relatively easy to comply with this section of the Act, however there is less protection to victims than is apparent at first blush.

*Malpractice and Liability*

No doubt there are cases of malpractice on cruise ships. Most Americans and Canadians assume they have the same rights and the same protections as they would on land when something happens. But that is not the case. Even though a physician wears the uniform of a senior-ranked officer, is introduced to passengers onboard as the ship's physician (implying he, like the Captain, is an employee of the cruise line), and like other senior officers may host a dinner table for invited guests, the cruise lines without exception say the physician is a private concessionaire and as such the cruise line accepts no liability for mistakes made. It is a hard concept to get one's head around given that the service is offered by the cruise ship and the cruise ship collects the fees, but one that was supported by the Florida Supreme Court in February 2007 and by the U.S. Supreme Court in October 2007.

The case began ten years before in March 1997. Fourteen-year-old Elizabeth Carlisle was on a Caribbean cruise on *Carnival Destiny* with her family. On the second night out of Miami she developed severe abdominal pain. She consulted the ship's physician, Dr. Mauro Neri – he had finished medical school in his native Italy in 1981, had held nine medical jobs in Italy, Africa, and England in the fifteen years before joining Carnival Cruise Lines and was earning $1,057 a month from the cruise line. Dr. Neri advised that Elizabeth was suffering from the flu and sent her on her way. But her pain became worse. On the third visit to the infirmary, after Elizabeth's parents specifically asked whether the problem could be appendicitis, Dr. Neri conducted his first physical exam. He responded that he was sure the problem was not the girl's appendix.

When the pain continued to grow worse Elizabeth's parents called their family physician in Michigan and he advised they return home. The family took the advice and shortly after arriving home Elizabeth underwent emergency surgery to remove her ruptured appendix. The infection

---

[47] See American College of Emergency Physicians. 2012. Policy Compendium, 2012 Edition. Dallas, TX: ACEP. Pages 124-125. <www.acep.org>

had rendered the fourteen-year-old sterile and caused lifelong medical problems. Elizabeth sued Carnival Cruise Lines in Florida state court, a case she lost on Carnival's motion for summary judgment. The cruise line claimed it was not responsible for the medical negligence of the doctor on board and pointed to the fine print in the passenger cruise contract to support its position.

The family appealed the Circuit Court's decision to Florida's Third District Court of Appeal where the parents argued the cruise line was vicariously liable for the doctor's negligence. Judge Joseph Nesbitt agreed and reversed the lower court's decision. The judge held that the cruise line had control over the doctor's medical services for agency law purposes; the doctor was to provide medical services to passengers and crew in accordance with the cruise line's guidelines. And as it was foreseeable that some passengers at sea would develop medical problems (and that the only realistic alternative for such a passenger was treatment by the ship's doctor) the cruise line had an element of control over the doctor-patient relationship. As such, the cruise line's duty to exercise reasonable care under the circumstances extended to the actions of a ship's doctor placed on board by the cruise line. The doctor was an agent of the cruise line whose negligence was imputed to the cruise line. This invalidated the cruise ticket's purported limitation of the cruise line's liability for the negligence of its agents.

Judge Nesbitt's decision was groundbreaking. It was likely the very first case where a cruise line was held responsible for the care provided by a ship's physician. Not surprisingly, Carnival appealed the case to the Florida Supreme Court. While the court almost agreed with the lower court's assertion that times had changed and that a doctor's negligence at sea also shows negligence by the cruise line, it ultimately found in favor of Carnival. Justice Peggy Quince wrote in her opinion,

> We find merit in the plaintiff's argument and the reasoning of the district court. However, because this is a maritime case, this Court and the Florida district courts of appeal must adhere to the federal principles of harmony and uniformity when applying federal maritime law.[48]

The case was appealed to the U.S. Supreme Court and the court refused to hear it. The Florida Supreme Court's decision was the final word. If the Carlisle family wanted to pursue the case they would have to sue the physician directly. But this is difficult in their case, and in most involving medical malpractice on cruise ships, given that they'd first have to locate the physician in his or her present home, something with which cruise lines historically have not provided assistance. Malpractice cases involving treatment in international waters must be filed in the courts of the physician's country of origin, which is both difficult and expensive.[49]

The bottom line is that cruise line escape liability for the medical errors committed (on a daily basis) of its employed staff and it's independent contractor staff/ doctors. The decisions are all based on a relatively old 5th Circuit Court case, Barbetta.[50] The court in Barbetta said that the cruise line is not in the business of providing medical care and that the passenger has alternatives. Neither is correct. The cruise lines are in the business of providing medical care

---

[48] Supreme Court of Florida. 2007. *Carnival Corporation vs. Darce Carlisle*, Case No. SC 04-393, February 15.
[49] Chen, Stephanie. 2007. "Trouble at Sea: Free-Agent Doctors," *Wall Street Journal*, October 24.
[50] See *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1998)

because (1) they attract passengers by representing that they have medical staff onboard, and (2) by having onboard medical care they avoid the obligation of diverting the course of the vessel every time there is a medical situation onboard. The passenger has no alternative for medical care when the vessel is at sea and the passenger gets sick or injured.  Even when the ship is at or near port, the port is usually in a developing world country with developing world medical care. Cruise lines know that an overwhelming majority of their business is from Americans who expect and deserve first world medical care.

It is worth noting here that emergency medical evacuations from cruise ships are not uncommon. Here again we have the U.S. taxpayer often footing the bill for these endeavors, supporting a cruise industry that doesn't fall under many U.S. laws and regulations and that does not pay corporate income tax to the U.S. Government.

*Norovirus and Other Illness Outbreaks*

The complexion of illnesses found on cruise ships has shifted over the past two decades. In the 1980s and 1990s outbreaks were commonly caused by food borne bacteria such as shigella, salmonella and E coli, but these gave way to norovirus as it increased in incidence in 2001. Also in 2001 the Food Standards Agency in the United Kingdom announced that it would give health officials the statutory right to enter and inspect cruise ships (similar to the Vessel Sanitation Program in the United States). It was reacting to a report from the Consumers' Association which indicated an increase of food poisoning cases among cruise ship passengers. The Consumers' Association had received complaints about fourteen ships in 2000 and 2001, with illnesses ranging from salmonella poisoning to the potentially fatal Legionnaires' disease.[51]

With better food processing and refrigeration, and more careful testing and treatment of drinking water loaded from shore, incidents caused by bacteria have reduced significantly. In fact, from 2002 through 2011 there are only four known outbreaks caused by salmonella and seven caused by E coli. There were four reports of Legionnaires' disease during the same 9 year period.[52] During the same time there were 378 outbreaks involving norovirus, plus another nine in 2012.

As bacteria-caused illness has decreased, the incidence of illness caused by norovirus increased significantly. Between 1999 and 2001, there were four or five illness outbreaks per year on cruise ships recorded by the U.S. Centers for Disease Control (CDC) that were attributed to norovirus (to be considered an outbreak, three percent of passengers or two percent of crew members must report illness). In 2002, the CDC's reported numbers jumped to twenty-nine illness outbreaks (most of which were caused by norovirus); in total there were forty-four cases of gastrointestinal illness reported on cruise ships in 2002. The CDC's rate of outbreaks increased from 0.65 per 1000 cruises in 2001 to 6.45 per 1000 cruises in 2002 – a ten-fold increase.[53] The number of outbreaks has fluctuated since 2002 with a high of fifty-four in 2006 and a low of twenty-three in 2011. The number of passengers reporting ill has ranged from a low of 1,970 in a year to 7,215. Thus far in 2012, 1,725 passengers and crew have reported illness.

---

[51] Gadher, Dipesh. 2001. "Cruise Liners Face Tougher Hygiene Tests," *Sunday Times*, May 6.
[52] See www.cruisejunkie.com/outbreaks2012.html, and other years listed.
[5353] Cramer, Elaine H., David X. Gu, and Randy E. Durbin. 2003. "Diarreal Disease on Cruise Ships, 1990-2000," *American Journal of Preventive Medicine* 24, 3 (April).

While the industry, since 2002, has characterized norovirus as something passengers bring onboard with them, this is not entirely accurate.[54] Rather than debate this point there are two points to be made here.

First, a cruise ship is a perfect incubator for the spread of norovirus and once it takes hold it is difficult to eradicate. A common practice is that crew members reporting ill are taken off work (often two days) while they are symptomatic, however this is contraindicated given that the virus continues to be shed (and thus a person is potentially contagious) for up to two weeks. Because crew members are often not paid when they are off work, there is an obvious disincentive to report when they are ill, increasing the likelihood that the virus will be transmitted to others (NB: the virus follows a fecal-oral route and is most commonly transmitted by poor personal hygiene: people not washing their hands after using the toilet). This needs to be confronted in a more vigilant manner.

Second, most passengers learn that if they report being ill they will be quarantined to their cabin until they are asymptomatic – reportedly a very unpleasant experience. As a result, there are many cases where ill passengers do not report their illness in order to avoid being quarantined. In other words, there is a disincentive to behaving in ways that minimize the spread of the disease. These disincentives need to be removed. As well, the cruise lines can do a better job of educating passengers about the nature of norovirus and steps to be taken to avoid contracting the illness, and its spread if one becomes ill. Rather than engaging in media campaigns that attempt to state how common the illness is and that it isn't a cruise ship virus, the industry can do a better job of accepting the illness as a problem they must deal with and confront norovirus as a problem that manifests itself on cruise ships (as is the case in many institutional settings).

*Potable water*

While I don't wish to raise alarm, it is necessary to raise one other health concern because it gives some insight into how problems may be dealt with by the cruise industry. This is concern based on a case about which there is incomplete information (it has been sealed by the British courts), about which those involved are not permitted to comment for fear of fine or incarceration and about which the lack of transparency suggests there is a real basis for fear. Information available in October 2005 at <www.logacomplaint.com> provided a body of information about toxicity in potable water aboard certain cruise ships. But that material disappeared, as has all information about the case that followed (the case, Hempel A/S v B Bradford [2006] EWHC 2528, is cited at the website of the attorney for the industry, but otherwise no information may be found anywhere).

Gleaning from what was on the website, and from recent appeals filed with the High Court of Justice in the UK and European Court of Human Rights, we can extrapolate that a paint coating used in potable water tanks on a series of cruise ships built in Pappenburg, Germany (at least four ships owned by two major companies serving North America and Europe, but perhaps as many as 50) was found to be defective. It could purportedly break down and potentially release toxins

---

[54] For a fuller discussion of the causes of norovirus and how the industry has characterized the illness and its response see Klein, Ross A. 2008. *Paradise Lost at Sea: Rethinking Cruise Vacations*, Halifax, NS: Fernwood.

26

(acrylonitrile, a known carcinogen) into the water system of these vessels. The problem was apparently discovered and repairs undertaken. Drinking water on these ships could not be certified as safe until repairs were completed.

Rather than take the ships out of service for proper repair, the work was done while ships were in service with passengers and crew onboard. The work required sanding the interior surface of water tanks and then applying a new, safe coating. If done properly, repairs would also address contamination that had already occurred and was now part of the water delivery system. Regardless, while the problem coating was being "solved", the repair may have itself produced another set of problems. There is no certainty that fine dust produced from sanding potable water tanks did not make its way into other areas of the ship, including air ventilation and food preparation areas. On one ship the fine dust clogged vent pipes that allowed air to escape as water tanks were filled, creating a serious and dangerous situation when one of the tanks was put back into use.

The lack of transparency about the case, and the way in which the information has been sealed from public knowledge, gives good reason for a passenger on any cruise ship to be cautious. The purportedly defective paint coating was manufactured by a large-scale provider (Hempel A/S) to shipyards building cruise ships and it is hard to know, without adequate testing for chemical contamination, on which ships there is reason for concern. This isn't a matter of opinion or conjecture – there are apparently affidavits admitting to the problem of toxicity, but these too are sealed. The cruise lines involved suggest there was never any danger to passengers and crew, and that the problem has been fully ameliorated. However, given the effective silencing of Mr. Bradford and the information he had, it is difficult to be confident in those assurances.[55]

## IV. Labor Issues

Workers on foreign flag vessels generally work without union protection and their pay is determined by the employer. They may even have to accept arbitrary cuts in pay in order to keep their jobs. In the view of Paul Chapman, a Baptist minister who founded the Centre for Seafarer's Rights in New York in 1981, the typical cruise ship is a sweatshop at sea. "A ship owner can go any place in the world, pick up anybody he wants, on almost any terms. If the owner wants to maximize profit at the expense of people, it's a piece of cake."[56] Though the requirement to pay minimum wage was extended to ships registered in the United States in 1961, Congress left intact the exemption for foreign ships. This exemption was further defined in a 1963 Supreme Court decision that held that U.S. labour laws, including the right to organize, do not apply to foreign vessels engaged in American commerce, even if the owners of these ships are from the United States. This is the context in which the modern cruise ship industry developed and took hold. Foreign labour, whose first language is not English, may be a factor in cruise ship safety and security, especially in an emergency situation.

---

[55] See Foggo, Daniel. 2011. "Gag Hid Cancer Threat to Cruise Ship Passengers," *Sunday Times*, November 13. Page 4
[56] Reynolds, Christopher and Dan Weikel. 2000 "For Cruise Ship Workers, Voyages Are No Vacations," *Los Angeles Times*, May 30.

*U.S. Congressional Interest*

Working conditions on cruise ships emerged as a momentary concern in late 1980s and early 1990s. William Clay, Chairman of the House Labor-Management Subcommittee of the Education and Labor Committee of the House of Representatives introduced legislation to extend the National Labor Relations Act (NLRA) and the Fair Labor Standards Act (FLSA) to vessels foreign-flagged cruise ships operating primarily in the United States.[57] At hearings in October 1989, the Committee was told of exploitation of sailors, who had no redress for grievances about their working conditions. Reverend James Lingren, the Director of the New England Seaman's Mission, specifically described conditions in the cruise ship industry:

> We have discovered that on several of the largest cruise ship lines calling in U.S. ports a typical seafarer works 100 hours each week with no days off during his one year of employment. Many of them work without benefit of anything resembling a true contract of employment. They often earn less than 75 cents an hour … I personally saw the contract of ... [a] seafarer who signed for $192 a month to work for seven days a week for one year. He was to be paid overtime for any hours over eight hours a day, and while he was required to work 12 hours a day, the company refused to pay the overtime. This meant he was effectively making 53 cents an hour. When he complained he was relieved of his duties and sent home."[58]

The subcommittee approved the bill in the summer of 1990 though it never went any further. It was reintroduced in the next Congress on February 27, 1991 and again died in committee.

On March 30, 1993 Clay introduced H.R. 1517, another version of the same legislation. Hearings were again held; they yielded no new information. However, for the first time the cruise industry, through its main lobbyist, the International Council of Cruise Lines (ICCL), threatened that if the House of Representatives passed the legislation the cruise industry would be forced to relocate to non-U.S. ports. In testimony before the Subcommittee on Labor Standards on May 13, 1993 the president of the ICCL, John Estes, stated:

> Some have told you that we will not relocate. I am here to tell you that this industry will relocate if the Bill is passed. It won't happen all at once, but it will happen."[59]

He pointed out the ease with which cruise ships can be moved from one homeport to another and that:

> … in order to keep international costs competitive we do in fact on occasion move from country to country. International shipping will always seek a hospitable economic and political climate from which to operate...It would be an unfortunate

---

[57] See House of Representatives, 1994 *Coverage of Certain Federal Labour Laws to Foreign Documented Vessels* (House Report #103-818), Washington, DC: GPO, 1994, page 1

[58] House of Representatives, 1994 *Coverage of Certain Federal Labour Laws to Foreign Documented Vessels* (House Report #103-818), Washington, DC: GPO, 1994, page 3

[59] Estes, John. 1993. *Testimony Before the Subcommittee on Labor Standards, Occupational Health, and Safety of the Committee on Education and Labor of the House of Representatives*, May 13. Washington, DC: GPO. (Document # Y4 ED8/1 103-9)

28

failure of United States policy not to recognize that homeports are unimportant to passengers.[60]

The legislation this time made its way to the floor of the House of Representatives, but it failed to be heard by the full House and died with the end of the Congress.

Pro-industry legislation introduced in 1995 by Representative Don Young had much greater success. He attached a tort reform measure to the Coast Guard Reauthorization bill passed on May 9, 1995. The amendment, referred to by Young as a 'noncontroversial manager's amendment;' was for the most part written by the International Council of Cruise Lines.[61] It passed the House by a vote of 406 to 12. Only afterwards did people read the final print.

For one thing, the amendment limited the rights of foreign seafarers to sue in US courts for grievances against foreign cruise lines. This went against the stream of court cases taken up by the U.S. Government several years earlier. In 1991, the U.S. Equal Employment Opportunity Commission (EEOC) won two cases against foreign flag cruise vessels. In one, the court enjoined a foreign cruise line from discriminating on the basis of sex against any actual or potential job applicant. In the other, Norwegian Cruise Line (NCL) was charged with sex discrimination by an assistant cruise director who alleged she lost her job after becoming pregnant, and with discrimination by race and national origin by a bar manager who says he was forced to resign. NCL disregarded two subpoenas claiming the EEOC lacked jurisdiction. It won in the US District Court in Miami but the decision was reversed by the U.S. Court of Appeals in Atlanta, which affirmed the EEOC's jurisdiction. This was a dangerous precedent for the cruise industry and Young's amendment gave them an out. Another provisions in the amendment was designed to protect ship owners from unlimited liability in suits brought by passengers or crew members who were harmed by medical malpractice at a shore side facility.

The final version of the legislation followed intense lobbying by opponents to the amendments and by the cruise industry. In the end, a cruise line sued by one of its workers in regard to treatment at a U.S. health facility or doctor's office can invoke an award cap allowed medical practitioners under the laws of the state in which the care is provided. The provision limiting seafarer's use of U.S. courts was replaced with a provision that seafarer employment contracts can block the worker from seeking legal remedies in U.S. courts.[62] This provision has crept into seafarer employment contracts and has thus far been ruled enforceable by U.S. courts.

*US Courts and Labor*

There is a long history of court cases where cruise ship workers have successfully sought relief in cases of, among other things, breach of contract, injury and death. Claims have often been under the Merchant Marine Act of 1920 (Jones Act) or the federal Seaman's Wage Act. But

---

[60] Estes, John. 1993. *Testimony Before the Subcommittee on Labor Standards, Occupational Health, and Safety of the Committee on Education and Labor of the House of Representatives*, May 13. Washington, DC: GPO. (Document # Y4 ED8/1 103-9)
[61] Glass, Joel. 1996. "Compromise on US Cruise Tort," *Lloyd's List*, October 1. Page 1.
[62] Glass, Joel. 1996. "Compromise on US Cruise Tort," *Lloyd's List*, October 1. Page 1.

access to the U.S. courts appears to be waning for seafarers on foreign-flagged cruise ships that operate out of U.S. ports.

A Federal court decision issued in October 2003, and upheld on appeal in January 2005, ruled that the families of Filipino cruise ship workers injured and killed during a 2003 boiler explosion aboard NCL's *Norway* had to resolve claims in the Philippines per their employment contract. The decision meant that death claims for the eight crew members killed in the accident were limited to $50,000. The U.S. National Transportation Safety Board subsequently ruled that the accident, which also severely injured about 20 crew members, was the result of "… deficient boiler operation, maintenance, and inspection practices of Norwegian Cruise Line, which allowed material deterioration and fatigue cracking to weaken the boiler."[63]

The court's ruling had more far reaching consequences. It upheld the enforceability of employment contracts that require disputes to be resolved through arbitration and only in particular places – for Filipino workers the place is Manila. It also lent support to Carnival Cruise Lines' desire to have a new clause inserted in its new crew member contracts requiring all claims against the employer to be arbitrated internationally in London, Manila, Panama City, or Monaco, whichever is closer to the crew member's home.

*Arbitration Clauses*

Arbitration clauses are now commonplace in cruise ship worker contracts. These clauses have dire consequences for crew members. The fact is that foreign seaman have no rights to sue in U.S. Courts. Because a cruise line can have foreign law apply thereby circumventing the Jones Act, it has a disincentive to hire American workers. The arbitration clauses, and the opinions enforcing them, are therefore job killers for Americans, and they circumvent long standing U.S. Law – the Merchant Marine Act of 1920.

For those who are not familiar with the Jones Act, it provides to the worker the right to sue for pain and suffering damages for job related injuries. The general maritime law that was inherited from the English also provides for the obligation to pay the seaman maintenance (expenses of daily living) and cure (prompt and adequate medical care) until the seaman reaches maximum medical improvement.  Historically, the seaman was viewed as a ward of the court because typically s/he is in a place where s/he does not know anyone and s/he has little resources.  Thus the law says that if the shipowner/employer does not pay maintenance and cure properly, punitive damages can be awarded.   The shipowner/ employer escapes these obligations with the arbitration clauses that apply foreign law.

This was seen in a case brought by a Filipino worker with Holland America Line, filed in U.S. federal court in Seattle, Washington on April 27, 2007 (Case #C07-0645) and which sought class action status. The suit claimed the company illegally forced crew members to pay back the cost of airfare to and from the ships and fired them if they failed to do so. The worker was a bartender who had signed a standard twelve-month contract with the cruise line, working a mandatory 77 hour workweek. He received a monthly guaranteed salary of $442 per month (inclusive of

---

[63] NTSB. 2007. *Marine Accident Brief: Boiler Rupture on Bahamian Cruise Ship S.S. Norway, Port of Miami*, May 25, 2003. NTSB Report Number MAB 07/03, November.

overtime, vacation and allowances) and was required to repay $212 per month for "deployment costs" – leaving a net income of $230 per month. Deployment costs include round trip air far to/from the ship, uniforms, medical exams, visas, recruiting costs, and union dues.

The U.S. court refused to hear the case given terms of the employment contract between the crew member and the cruise line; it referred the case to the Philippines for arbitration. The arbitration board ruled in favor of the individual claimant, but there was no basis on which it could certify a class action claim. The cruise line benefits because the penalties assessed by an arbitration board are small by comparison to those historically garnered through the U.S. courts, and it avoids a payout to other workers in the same situation.

*Crew Member Work Conditions*

There are many work conditions I could discuss, but there are only three worthy of mention here. The first relates to the normal contract from cruise ship employees. The typical workweek is a mandatory 77 hours – 11 hours a day, seven days a week. The length of a contract generally varies by work role (officers typically work four months; laborers work six to twelve months, depending on whether they work on a European contract or a Filipino, Central American, or Asian contract), and salary also varies by the worker's national origin within the same job category. Whether this is fair is a matter of vantage point; it is a matter of fact. With these hours, worker fatigue may also be an issue in emergency situations.

A second issue is the common use of recruiting agents. Though International Labor Organization (ILO) regulations prohibit agents from collecting fees from the worker – they are supposed to be paid by the employer – workers are often required to pay to secure a position. These can range as high as $4,000. According to the International Transport Workers Federation, Filipinos normally pay $1,500 to join a ship.[64] A 1997 story in the *Wall Street Journal* cites a Croatian worker who paid $600 to an agent to confirm his employment. In addition, he started work with a $1,400 debt to Carnival Cruise Lines, which had advanced the cost of his transportation to the ship.[65] In February 2000, an article in the *Miami New Times* described a cook on Carnival Cruise Line's Paradise who had given a Bombay agency $2,000, which included airfare. That sum, much of which he borrowed from relatives, is almost one-third of the $7,000 he will make during his ten-month contract.[66] And in 2001 it was reported that an agent in Rumania was charging $500 to interview for a position with Norwegian Cruise Line; if the person is hired s/he paid an additional $1,000 to secure the position.[67]

The final issue is unpaid overtime. This matter was successively resolved with each of the major cruise lines through class action suits between 2002 and 2006. However the problem re-emerged recently with NCL America, a U.S. registered carrier. The company agreed to pay $526,602 in back wages to 2,059 employees in Hawaii after a federal labor investigation found that the

---

[64] ITF. 2000. "The Dark Side of the Cruise Industry," Seafarers' Bulletin, no. 14. Page 17.

[65] Prager, Joshua Harris. 1997. "For Cruise Workers, Life Is No 'Love Boat'" Wall Street Journal, July 3. Page B1.

[66] Nielsen, Kirk. "The Perfect Scam: For the Workers Life Is No Carnival, Believe It or Not," Miami New Times, February 3-9, 2000

[67] Klein, Ross A. 2002. *Cruise Ship Blues: The Underside of the Cruise Industry*, Gabriola Island, BC: New Society. Page 128.

company had violated minimum wage, overtime (many employees were working 60 hours a week), and record-keeping provisions for employees on *Pride of America* between July 2009 and November 2011. The investigation also found that because NCL Amereica took large meal and lodging credits, some employees were paid less than the federal minimum wage of $7.25 per hour, and that the cruise line failed to record and pay the housekeeping staff for cleaning the cabins between cruises. Following the investigation, the cruise line agreed to bring its pay practices into compliance with the law.[68]

## V. In Closing

Thanks again for the opportunity to share my observations and insights generated from my 16 years as an academic whose research has focused on the cruise industry. I welcome your questions.

---

[68] Gale, Kevin. 2012. "Norwegian Cruise Lines Settles Overtime Investigation," South Florida Business Journal, February 16.

32

**APPENDIX A: EVENTS AT SEA***

A.1 - Cruise Ships that Have Sunk, 1980 - 2012 –                         Page 34

A.2 - Cruise Ships Running Aground, but not Sinking, 1973 – 2012   Pages 34 - 38

A.3 - Fires Onboard Cruise Ships, 1990 – 2011                            Pages 38 - 41

A.4 - Collisions Involving Cruise Ships, 1990 – 2011                     Pages 41 - 45

A.5 - Other Significant Events Involving Cruise Ships, 2000 – 2011   Pages 45 - 50

_____

* Source: Cruise Junkie dot Com
        http://www.cruisejunkie.com/Sunk.html
        http://www.cruisejunkie.com/Aground
        http://www.cruisejunkie.com/fires.html
        http://www.cruisejunkie.com/collides.html
        http://www.cruisejunkie.com/Disabling.html

## A.1 - Cruise Ships That Have Sunk, 1980 - 2012

| Year | Ship (Cruise Line) | Incident |
|---|---|---|
| 2012 | Costa Concordia (Costa Cruises) | Hit submerged rock off Giglio, Italy, partially sunk after taking on water and severely listing. **~4,200 evacuated; 32 deaths** |
| 2007 | Explorer (GAP Adventures) | Ship abandoned near the South Shetland Islands after it hit an unidentified object (likely ice).  Environmental impact. **154 evacuated; no deaths** |
| 2007 | Sea Diamond (Louis Cruises) | Ship abandoned after hitting a reef a half mile from shore in Santorini. **1524 evacuated; 2 deaths** |
| 2004 | Wilderness Adventurer (Glacier Bay Cruise Line) | Ship evacuated after striking ice and taking on water in Tracy Arm, AK. **All evacuated safely.** |
| 2003 | Safari Spirit (American Safari Cruises) | Ship hit some rocks about 80 miles in SE Alaska. Sank in 30 feet of water. **All evacuated safely to lifeboats.** |
| 1999 | Sun Vista (Sun Cruises) | Engine room fire – Sinks of Malaysia. **1,090 evacuated safely** |
| 1998 | Fantome (Windjammer Cruises) | Sinks trying to outrun Hurricane Mitch. **30 crew deaths** |
| 1995 | Club Royale | Gambling ship sinks off Florida coast trying to outrun Hurricane Erin. **8 crew rescued; 3 crew deaths** |
| 1994 | Estonia (Estline) | The passenger cruise ferry sunk in a storm in the Baltic Sea. Sunk in 30 minutes. **~852 deaths** |
| 1992 | Royal Pacific (Greek cruise ship) | Collided with a fishing trawler in the Straits of Malacca with **500 rescued; more than 30 deaths** |
| 1991 | Oceanos (Greek cruise ship) | Sunk in a storm off South Africa. **All 571 people onboard were saved** |
| 1988 | Jupiter (Greek cruise ship) | Sank  within 40 minutes after a collision with a car carrier outside Piraeus. **581 safely rescued; 4 deaths.** |
| 1986 | Admiral Nakhimov (Russian cruise ship) | Sank in seven minutes after colliding with a large bulk carrier. **811 safely rescued; 423 deaths** |
| 1986 | Mikhail Lermontov (Baltic Shipping Company) | Ran aground on rocks off New Zealand and sank within 3 hours. **More than 1,000 rescued safely; 1 death** |
| 1984 | Sundancer (Sundancer Cruises) | The ship declared a total loss after hitting a rock north of Vancouver. Investigators found that crew were disorganized and evacuation was largely coordinated by passengers. **All evacuated safely.** |
| 1980 | Prinsendam (Holland America Line) | An engine room fire forced evacuation to lifeboats while 140 miles from Alaska. **All evacuated safely.** |

## A.2 Ships Running Aground (but not sinking), 1972 - 2011

| Year | Ship (Cruise Line) | Incident |
|---|---|---|
| 2012 | Poesia (MSC Cruises) | Ran aground near Freeport, Bahamas. Waited for tide to get high. |
| 2011 | Polar Star (Polar Star Cruises) | Sustained a minor breach of its outer hull by grounding on a rock near Antarctica's Detaille Island. **Cruise terminated** |
| 2010 | Clipper Adventurer (Clipper Cruises) | Ship evacuated after it ran aground 55 nautical miles from Coppermine, Nunavut. **Cruise terminated** |
| 2009 | Zenith (Pullmantur Cruises) | Ship went aground on the approach to Copenhagen having cruised too close to a wind farm of twenty-four turbines in the Oresund Strait. |

| 2009 | Ocean Nova (Quark Expeditions) | Ran aground about one mile from the San Martin base (Antarctica), pushed by "extremely high winds" into craggy rocks. 64 passengers and 41 crew members aboard. **Cruise terminated.** |
|------|--------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 2009 | Richard With (Hurtigruten) | Ran aground at the port of Trondheim on the west coast of Norway. Suffered propeller damage and took on board water through a leak in a seal. 53 passengers on board evacuated. **Cruise terminated** |
| 2008 | Ushuaia (Fathom expeditions) | Ran aground on a rock close to Wilhelmina Bay in Antarctica causing a hull breach, and possibly fuel leak. All 130 aboard safely evacuated. **Cruise terminated** |
| 2008 | QEII (Cunard Line) | Ran aground at the Brambles sandbank near Calshot, Southampton, with three tugs attached to her stern. Five tugs were sent out to assist her getting off the sandbank. |
| 2008 | Antarctic Dream (Antarctic Shipping) | Ran aground off Svalbard, just east of the island of Spitsbergen, with 130 passengers on board. Freed after six hours. |
| 2008 | Queen Victoria (Cunard Line) | Ran aground while leaving port. Freed in about an hour. |
| 2008 | Spirit of Glacier Bay (Cruise West) | Grounded in Tarr Inlet near Glacier Bay. Refloated the next day and towed to port. Crack in hull. |
| 2008 | EasyCruise Line (EasyCruise) | Ran aground inside the port of the Aegean island of Syros with 353 passengers and 105 crew on board. Freed by tug. |
| 2008 | Spirit of Alaska (Cruise West) | Touched bottom in Tracy Arm, AK. It did not take on water and did not have interior damage but is having a problem with its propulsion system Towed to Juneau for inspection and repairs; passengers disembarked. **Cruise terminated** |
| 2008 | Mona Lisa | Ran aground on a sandbank about 10 miles from the Latvia coast. Attempts to free itself were unsuccessful; almost 1000 passengers needed to be evacuated . **Cruise terminated** |
| 2008 | Sky Wonder (Pullmantur) | Ran aground in port of Kusadasi (Turkey). All 1,029 passengers evacuated. **Cruise terminated** |
| 2007 | Spirit of Nantucket (Cruise West) | Ran the vessel aground in Virginia Beach **to prevent it from sinking**.  It began taking on water while passing through the Intercoastal Waterway after striking something that left a 2 inch by 12 inch gash in the hull near the end of the ship.  None of the 61 passengers or five crew members were as injured. **Cruise terminated** |
| 2007 | Spirit of Columbia (Cruise West) | Ran aground in Prince William Sound. Refloated when tide came up. |
| 2007 | Royal Express 4 (SunCruz) | Ran aground as it was returning to shore.  Several passengers injured. |
| 2007 | Millenium (Celebrity Cruises) | Drifted onto submerged rocks while at Villefranche, France, damaging propulsion system. **Cruise terminated next day** |
| 2007 | Disko II (Albatros Travel) | Ran aground off Greenland and more than 50 people evacuated. **Cruise terminated** |
| 2007 | Empress of the North (Majestic America Line) | Ran aground off Alaska coast and began taking on water. 281 of 320 aboard evacuated.  **Cruise terminated** |
| 2007 | Regal Princess (Princess Cruises) | Sustained damage after touching bottom. Out of service for three weeks for repairs. |
| 2007 | Nordkapp (Hurtigruten) | Touched ground near Deception Island in the Antarctic. The ship sustained an 82 foot long gash to its outer hull – environmental damage. All evacuated. **Cruise terminated** |
| 2007 | Sky Wonder (Pullmantur) | Ran aground in Rio de la Plata. Freed at high tide. |
| 2006 | Lyubov Orlova (Quark Expeditions) | Ran aground in Whalers' Bay while visiting Deception Island in the South Shetland Islands with 150 passengers onboard. Towed free after eight hours. |
| 2006 | Statendam (Holland America Line) | Touched bottom in Port of Melbourne with 1,700 persons onboard. Found to be travelling too fast. Minor damage. |
| 2006 | Grand Princess (Princess Cruises) | Ran aground while heading out of Livorno harbor. Freed after 30 minutes. |
| 2006 | Norwegian Crown (NCL) | Ran aground in Bermuda. Freed after 10 hours. |

| 2006 | Columbus (Hapag-Lloyd) | Scraped bottom during her visit to Sault Sainte Marie, sustaining no damage. |
|------|------------------------|------------------------------------------------------------------------------|
| 2006 | Celebration (Carnival Cruise Lines) | A propeller struck bottom while approaching the dock at Nassau spilling an estimated 200 liters of lubricating oil and affecting the operation of the engine. |
| 2006 | Yorktown Clipper (Clipper Cruises) | Ran aground at Matia Island in Washington state.  Company fined $1000 for placing passengers at risk because company officials did not report a dent the ship sustained on its bottom. |
| 2006 | Regal Princess (Princess Cruises) | Became stuck on a sandbar in the Amazon.  Freed after 1.5 hours, "by using its bow thrusters, emptying the pools and probably grey water and some ballast." |
| 2006 | Empress of the North (American West Steamboat) | Ran aground on the Columbia River with 250 people onboard. Refloated two days later. **Cruise terminated** |
| 2006 | Queen Mary 2 (Cunard Line) | Touch a submerged object, damaging propulsion system. Departure delayed 41 hours. |
| 2005 | Pacific Sky (P&O Princess) | Suffered engine problems and drifted onto a reef. Ship freed one day later by tugs. |
| 2005 | Hanseatic (Hapag-Lloyd) | Ran aground near the island of Luroy off the Norwegian, causing a 5 meter hole in the ships hull. **Cruise terminated** |
| 2004 | Sapphire Princess (Princess Cruises) | Lost power and out of control for about 5 minutes, which caused it touching the coral reef at Moorea. Damage to thrusters. |
| 2004 | Clipper Odyssey (Clipper Cruises) | Ran hard aground on rocks in the Aleutian Islands, forcing 153 passengers and crew to transfer to other ships and spilling an undetermined amount of fuel from a ruptured tank.  **Cruise terminated** |
| 2004 | Mona Lisa (Holiday Kreuzfahrten) | Got stuck in the mud close to St. Mark's Square in Venice, Italy with 1000 passengers onboard. Freed. |
| 2004 | Astor (Transocean Cruises) | Grounded in the shipping channel after leaving Townsville port. Detained for two hours. |
| 2004 | Empress of the North (American West Steamboat) | Hit the gate at Ice Harbor Dam and became stuck in the navigational lock.  200 passengers bussed back to Portland. **Cruise terminated** |
| 2003 | Empress of the North (American West Steamboat) | Went aground on the Oregon side of the Columbia River.  Two crew and one passenger suffered minor injuries. |
| 2003 | Mona Lisa (Holiday Kreuzfahrten) | 670 passengers were evacuated after the ship ran on to rocks near Sptisbergen.  Both propellers and the hull damaged. **Cruise terminated** |
| 2003 | Summit (Celebrity Cruises) | Hull damaged when the ship hit a rock leaving Hubbard Glacier. The result was a 10-foot-long hole in the ballast tank midway along the hull, and a 140-foot-long crease. |
| 2003 | Spirit of Columbia (Cruise West) | Hit bottom and possibly bent port shaft and propeller in Prince William Sound. |
| 2003 | Vistamar (Plantours & Partners | Collided with underwater rocks near the port of Ibiza.  Towed by tugs to Ibiza and all passengers and crew evacuated. **Cruise terminated** |
| 2003 | Safari Spirit (American Safari Cruises) | Hit rocks in SE Alaska. All evacuated to lifeboats. **Cruise terminated** |
| 2002 | Olympic Voyager (Royal Olympic Cruises) | Grounded and experienced minor damage. Passengers evacuated. **Cruise terminated** |
| 2002 | Clipper Adventurer (Clipper Cruises) | Ran aground in the vicinity of Deception Island. Freed by a Chilean icebreaker. |
| 2002 | Holiday (Carnival Cruise Lines) | Lodged on a sandy bottom of the Caribbean Sea, a quarter mile off the coast of Playa del Carmen. Passengers evacuated. Freed three days later. **Cruise terminated** |
| 2002 | Clipper Odyssey (Clipper Cruises) | Went aground on St. Matthew Island in the Bering Sea in favorable conditions with 184 persons onboard. |
| 2002 | Clipper Adventurer (Clipper Cruises) | Ran aground on a sand-bank in the Essequibo River (Guyana's major waterway). Stuck for more than a day. |
| 2002 | Black Prince (Fred Olsen Cruises) | Ran aground on a sand bank while leaving Casilda, Cuba. Passengers evacuated. **Cruise terminated** |

36

| 2001 | Costa Tropicale (Costa Cruises) | Grounded at Venice, towed free by tugboats. |
|------|------|------|
| 2001 | Costa Tropicale (Costa Cruises) | Grounded at Mykonos, towed free by Costa Atlantica |
| 2001 | Wilderness Explorer | Grounded in Alaska |
| 2001 | Regal Princess (Princess Cruises) | Grounded in Cairns. Freed and continues. |
| 2001 | Mistral (Festival Cruises) | Grounded off Nevis. Stuck for a day. |
| 2000 | World Discoverer | Hit rock or reef and holed – Forced to beach.  100 passengers rescued - Solomon Islands. **Cruise terminated** |
| 2000 | Carousel Sun (Sun Cruises) | Ran over rocks causing propeller damage and oil leak (50 ton spill) – Abandon ship at Calica. **Cruise terminated** |
| 1999 | Norwegian Sky (NCL) | Grounded in St. Lawrence Seaway. Out of service for eight weeks. **Cruise terminated** |
| 1999 | Radisson Diamond (Radisson Seven Seas Cruises) | Grounded near Stockholm – Refloated |
| 1999 | Spirit of '98 | Grounded in mouth of Tracy Arm (SE of Juneau) – Holed.  Evacuated. **Cruise terminated** |
| 1999 | Wilderness Explorer (Glacier Bay Cruise Line) | Grounded west of Juneau – Refloated |
| 1998 | Monarch of the Seas (RCCL) | Strikes charted reef at St. Maarten – holed.  27,000 sq feet of coral reef damaged.  Out for four months. **Cruise terminated** |
| 1997 | Leeward (NCL) | Collides with Great Mayan Reef near Cancun – damages 460 sq yard swath of coral |
| 1997 | Noordam (Holland America Line) | Soft grounding off Mexican coast – Propeller damage.  Passengers sent home.  **Cruise terminated** |
| 1997 | Hanseatic (Hapag Lloyd) | Grounded in Norwegian Arctic - Evacuated, refloated, continues. |
| 1997 | Albatross (Phoenix Horizon) | Holed while leaving Isles of Scilly – Out for 2 weeks.  **Cruise terminated** |
| 1996 | Hanseatic (Hapag Lloyd) | Grounded in Northwest passage – refloated after being evacuated. |
| 1996 | Gripsholm (Cunard Line) | Grounded 2 miles from Swedish port. **Cruise terminated** |
| 1996 | Royal Viking Sun (Cunard Line) | Collision with reef in Red Sea – Holed.  Out for 2 months. **Cruise terminated** |
| 1996 | Tropicale (Carnival Cruise Lines) | Grounded while leaving Tampa – Freed.  Harbor pilot complains that ship failed to respond to 3 different orders to turn. |
| 1995 | Sovereign of the Seas (RCCL) | Grounded in mud bank in San Juan Harbour – Freed after 80 minutes; Towed to port, leaves 24 hours late. |
| 1995 | America Queen (Delta Steamboat) | Grounded in Ohio River for 1 day – Refloated |
| 1995 | Star Princess (P&O Cruises) | Grounded in Alaska – 40' long, 8" wide gash + 100' gash, modest pollution.  Evacuated by tender.  **Cruise terminated** |
| 1995 | Royal Majesty (Majesty Cruise Line) | Grounded off Nantucket - 17 mi off course. |
| 1995 | Renaissance Six (Renaissance Cruises) | Grounded, eastern Aegean – Evacuated. **Cruise terminated** |
| 1994 | Royal Odyssey (Royal Cruises) | Grounded leaving Rome. **Cruise terminated** |
| 1994 | Starward (NCL) | Grounded in St. John, VI – oil spill of 100 gallons. |

| 1994 | Nieuw Amsterdam (Holland America Line) | Grounded in SE Alaska – 200 ft crease in hull, damaged propeller, puncture in ballast tank, 260 gallon spill.  Refloated in 30 minutes. **Cruise terminated** |
|------|------|------|
| 1994 | Sally Albatross (Silja Line) | Grounded in Gulf of Finland – Half-sunk. **Cruise terminated** |
| 1993 | Yorktown Clipper (Clipper Cruises) | Grounded in Glacier Bay -- Spills 28,000 gallons of fuel 45 west of Juneau Evacuated. **Cruise terminated** |
| 1993 | Ocean Princess (Pacquet Cruises) | Grounded near Belem – Life boat evacuation Declared a total loss. **Cruise terminated** |
| 1992 | Nantucket Clipper (Clipper Cruises) | Aground off Maine - 4 minor injuries.  Refloated 3 hours later – Damage to hull and diesel tank |
| 1992 | QEII (Cunard Line) | Grounded off Cape Cod – 74 foot gash.  **Cruise terminated** |
| 1992 | Mermoz (Pacquet Cruises) | Grounded off Scandinavia. **Cruise terminated** |
| 1992 | Tropic Star (Starlite Cruises) | Ran aground in Freeport. |
| 1991 | Seaward (NCL) | Runs aground near Miami after plastic bag caught in an air intake and engine shut down. |
| 1990 | Regent Star (Regency Cruises) | Fire and grounded while approaching Philadelphia – Evacuated.  **Cruise terminated** |
| 1990 | Bermuda Star (Bahamas Cruise Line) | Grounded off Nova Scotia – evacuated.   Freed after 13 hours. **Cruise terminated** |
| 1986 | Dolphin (Dolphin Cruises) | Grounded in Bahamas |
| 1985 | Amerikanis (Fantasy Cruise Line) | Grounded off Mexico – 5 days to free. **Cruise terminated** |
| 1985 | Bermuda Star (Bahamas Cruise Line) | Grounded off Key West |
| 1984 | Yankee Clipper (Clipper Cruises) | Grounded after tearing from anchorage at St. Martin. |
| 1984 | Rhapsody | Grounded off Cayman Islands – Evacuated after 4 days; freed after 12 days**. Cruise terminated** |
| 1982 | Alaskan Majestic Explorer (Exploration Cruises) | Grounded – Evacuated  1 dead; 2 injured.  Captain charged with negligence. **Cruise terminated** |
| 1978 | Kungsholm | Aground for 5 days at Martinique |
| 1973 | Mardi Gras (Carnival Cruise Lines) | Maiden Voyage – runs aground leaving Miami Harbour.  Stuck for 24 hours. |

## A.3 - Fires Onboard Cruise Ships, 1990 - 2011

| Year | Ship (Cruise Line) | Incident |
|------|------|------|
| 2011 | Amsterdam (Holland America Line) | Fire in hydraulic unit in incinerator room. Put out in 35 minutes. |
| 2011 | Ocean Princess (Princess Cruises) | Fire in one of the generators, contained without serious damage. |
| 2011 | Queen Mary 2 (Cunard Line) | Fire in gas turbine rendering it useless. Passengers told to get their children and stay in cabins. |
| 2011 | Nordlys (Hurtigruten) | Fire in engine room. 100 passengers and crew evacuated by lifeboat; 162 evacuated when towed to port. **2 deaths. Cruise terminated** |
| 2011 | Ocean Star Pacific (Ocean Star Cruises) | Generator fire knocked out power to the ship, forcing the evacuation of nearly 800 passengers and crew off Mexico's coast. **Cruise terminated** |
| 2011 | Thomson Dream (Thomson Cruises) | A starboard engine fire early in the cruise that departed Barbados. No impact on itinerary and no reported injuries. |

| 2010 | Musica<br>(MSC Cruises) | Fire in engine room knocked out air conditioning and the water supply. **Cruise terminated** |
|---|---|---|
| 2010 | Carnival Splendor<br>(Carnival Cruise Lines) | Engine room fire disabled the ship's electrical system (3,299 guests, 1,167 crew). Towed to San Diego. **Cruise terminated** |
| 2010 | Infinity<br>(Celebrity Cruises) | Electrical fire caused loss of power for several hours while in Alaska. |
| 2010 | Deutschland<br>(Peter Deilmann Cruises) | Fire in engine room while docked. Passengers evacuated. **Cruise terminated** |
| 2009 | Zenith<br>(Pullmantur Cruises) | All passengers were evacuated when the ship had a major fire while docked at Stockholm. Sailed one day late. |
| 2009 | Crown Princess<br>(Princess Cruises) | Fire in passenger cabin. Contained. |
| 2009 | Royal Princess<br>(Princess Cruises) | Fire in engine room. Passengers called to muster stations **Cruise terminated** |
| 2009 | Sea Cloud<br>(Sea Cloud Cruises) | Fire extinguished by fire brigade before returning to port. |
| 2009 | Golden Princess<br>(Princess Cruises) | Fire in main engine room.  Contained within 1.5 hours. |
| 2009 | Costa Romantica<br>(Costa Cruises) | Fire in the generator room causes brief blackout. 1,429 passengers and 590 crew members evacuated. **Cruise terminated** |
| 2009 | Ecstasy<br>(Carnival Cruise Lines) | Fire in passenger cabin at 2:30 AM – several cabins damaged. |
| 2008 | Zuiderdam<br>(Holland America Line) | Small electrical fire reported overnight – No injuries or known damage. |
| 2008 | Eurodam<br>(Holland America Line) | Passengers awakened at 4AM by fire alarm. Fire in engine room. |
| 2008 | Norwegian Dream<br>(NCL) | At about 2:45 a.m. an electrical fire broke out on deck three in an electrical locker of the ship. |
| 2008 | Azamara Quest<br>(Azamara Cruises) | While docked in Chios (Greece) there was a fire in the ship laundry room. The fire was contained quickly and it did not affect the schedule. |
| 2008 | Fantasy<br>(Carnival Cruise Lines) | Fire (or smoke) caused by welder. Embarkation suspended; passengers onboard moved to Lido Deck. Contained. |
| 2008 | Zuiderdam<br>(Holland America Line) | Onboard fire while docked at Dubrovnik. Firefighters called from city. Under control within 45 minutes. |
| 2008 | Queen of the West<br>(Majestic America Line) | Fire broke out in the engine room while the ship was near Maryhill, WA. Passengers evacuated. **Cruise terminated** |
| 2008 | Star Princess<br>(Princess Cruises) | Fire in incinerator room. Contained. |
| 2007 | Norwegian Spirit<br>(NCL) | Fire in engine room. Contained. |
| 2007 | Jewel of the Seas<br>(Royal Caribbean International) | Fire in laundry room at 2:30AM. Contained. |
| 2007 | Pacific Star<br>(P&O Australia) | Small fire in an electrical panel; mustering of crew to prepare for a possible emergency. Contained. |
| 2007 | Enchantment of the Seas<br>(Royal Caribbean International) | Fire in closet of unoccupied cabin. Contained in less than an hour. |
| 2007 | Mariner of the Seas<br>(Royal Caribbean International) | Incinerator fire. Contained. |
| 2007 | Norwegian Star<br>(NCL) | Escorted into the Prince Rupert harbor by the a Canadian Coast Guard vessel following a small fire in the engine room. |
| 2007 | Disney Magic<br>(Disney Cruise Line) | Fireworks mishap caused fire by Palo's restaurant. Contained. |

| 2006 | Seabourn Spirit (Seabourn Cruises) | Small fire in Verandah Café. Contained. |
|---|---|---|
| 2006 | Radiance of the Sea (Royal Caribbean International) | Fire at 2AM in Windjammer Café. Contained in less than an hour. |
| 2006 | Oosterdam (Holland America Line) | Engine room fire disables one of the Azipod propulsion systems. Contained. |
| 2006 | Jewel of the Sea (Royal Caribbean International) | Fire in trash can. Contained. Seven staterooms evacuated and passengers moved. |
| 2006 | Statendam (Holland America Line) | At 5:30AM fire alarm went off. Fire in stack of incinerator contained. |
| 2006 | Calypso (Louis Cruises) | Disabling fire off UK coast. 462 passengers and 246 crew were at muster stations, but evacuation was not necessary. Towed to port. **Cruise terminated** |
| 2006 | Seabourn Pride (Seabourn Cruises) | Serious fire in engine room. Contained |
| 2006 | Star Princess (Princess Cruises) | Fire in passenger accommodations. About 150 cabins damaged. **1 death; cruise terminated** |
| 2005 | Costa Classica (Costa Cruises) | Escorted back to Athens after a fire broke out in mooring area, aft side. **Cruise terminated** |
| 2005 | Carnival Legend (Carnival Cruise Lines) | Heavy smoke from engine room. Passengers mustered to lifeboats. All clear given an hour later. |
| 2005 | Infinity (Celebrity Cruises) | Fire in stateroom 7067 that gutted the room. |
| 2005 | Seven Seas Navigator (Radisson Seven Sea Cruises) | Electrical fire in generator room at 1AM caused temporary blackout and propulsion problems. **Next cruise canceled** |
| 2004 | Carnival Destiny (Carnival Cruise Lines) | Fire in trash incinerator while at St. Thomas. Embarkation delayed 45 minutes. |
| 2004 | Sun Cruz V (Sun Cruz) | Engine room fire extinguished. Towed back to port with 160 passengers onboard. |
| 2004 | Majesty of the Sea (Royal Caribbean International) | Passengers directed to muster stations when a galley fire broke out at 5 AM in the Windjammer Cafe. Contained in less than an hour. |
| 2003 | Explorer of the Sea (Royal Caribbean International) | A minor fire at the aft end of Deck 13 extinguished within 15 minutes, causing damage to the inline skating facility and the top of the waterslide on Deck 12. |
| 2002 | Statendam (Holland America Line) | Five tugs boats tow ship back to Vancouver after a small fire knocked out four generators and two main propulsion motors. **Cruise terminated** |
| 2002 | Disney Magic (Disney Cruise Line) | Smoke stack fire; extinguished within an hour. Passengers were awakened at 5:00 AM and told to go to their assembly stations with their life jackets. |
| 2001 | Arkona | Runs into dock after engine room fire causes loss of power. **Cruise terminated** |
| 2001 | Nordic Prince (Royal Caribbean International) | Engine room fire, loss of power. Passengers flown home from Bermuda. **Cruise terminated** |
| 2000 | Nieuw Amsterdam (Holland America Line) | Fire in crew quarters while in Glacier Bay – Delayed 12 hours until given clearance by US Coast Guard. |
| 2000 | Celebration (Carnival Cruise Lines) | Fire in generator -- Adrift for 6 hours until power restored. No toilets or air conditioning. |
| 1999 | Tropicale (Carnival Cruise Lines) | Engine fire – Disabled. Arrives in port 2 days late. **Next 6 cruises canceled** |
| 1999 | Sun Cruz | Engine room fire before it left port – Evacuated. **Cruise canceled** |
| 1999 | Norway (NCL) | Fire in turbocharger room while in Barcelona mid-cruise. **Cruise terminated** |

| 1999 | Sun Vista (Sun Cruises) | Fire in engine room – Sinks off Malaysia. |
|------|-------------------------|--------------------------------------------|
| 1999 | Enchantment of the Sea (Royal Caribbean International) | Engine fire/failure 60 miles from St. Thomas. **Cruise terminated** |
| 1998 | Ecstasy (Carnival Cruise Lines) | Fire in laundry room while leaving Miami – 54 injured and 4 hospitalized. **Cruise terminated** |
| 1997 | Romantica (New Paradise Cruises) | Fire 10 mi off Cypress (total loss)  – Evacuated. **Cruise terminated** |
| 1997 | Vistafjord (Cunard Line) | Fire while in Straits of Magellan - disabled for two days. |
| 1997 | Vistafjord (Cunard Line) | Fire in ship's laundry room. **1 death; cruise terminated.** |
| 1997 | Fair Princess (P&O Cruises) | Fire in casino  - passengers called to muster stations - fire contained. |
| 1996 | Universe Explorer (Commodore Cruises) | Laundry room fire, 67 crew and 6 passengers injured. **5 deaths; cruise terminated** |
| 1996 | Golden Princess (Princess Cruises) | Fire in engine room – Towed to Victoria. **Cruise terminated** |
| 1996 | Sagafjord (Cunard Line) | Fire – Stranded off coast of Manila (listing) – Towed to dock. **Cruise terminated** |
| 1995 | Regent Star (Regency Cruises) | Engine room fire while in Prince William Sound– Disabled.  Passengers transferred to Rotterdam. **Cruise terminated** |
| 1995 | Celebration (Carnival Cruise Lines) | Engine room fire when 370 miles south of Miami – Adrift for more than 2 days.  No a/c or hot food or elevators.  Passengers transferred to Ecstasy. **Cruise terminated** |
| 1994 | Regal Empress (International Shipping) | Fire when 30 min from NYC – Evacuated. |
| 1994 | Pallas Athena (Epirotiki) | Fire while berthed in Piraeus – Total loss. |
| 1992 | Star Majestic | Fire – Evacuated |
| 1991 | Pegasus (Epirotiki) | Fire while berthed in Venice – Total loss |
| 1991 | Eurosun (Europe Cruise Line) | Fire off Canary Islands |
| 1991 | Sovereign of the Seas (RCCL) | Fire in lounge while in port at San Juan – Evacuated.  Cruise resumed. |
| 1990 | Crystal Harmony (Crystal Cruises) | Temporarily disabled from fire in auxiliary engine room – Drifted for 16 hours. Evacuated at port. **Cruise terminated** |
| 1990 | Regent Star (Regency Cruises) | Fire – put under control. Possible arson. |
| 1990 | Scandinavian Star (International Shipping) | Fire while in North Sea – Evacuated. **159 deaths; cruise terminated** |
| 1990 | Fairstar (Sitmar Cruises) | Engine room fire – Not disabled. **1 death** |

## A.4 - Collisions Involving Cruise Ships

| Year | Ship (Cruise Line) | Incident |
|------|--------------------|----------|
| 2011 | Veendam (Holland America Line) | A container derrick tore off a 50 foot section of railing on deck 12 and cracked a window in the Crows Nest while leaving Buenos Aires. |
| 2011 | Avalon Tranquility (Avalon Waterways) | Danube cruise abandoned after vessel struck by a cargo ship. **Cruise terminated** |

| 2011 | Oriana (P&O Cruises) | Ship dented after bashing into quay at Kristiansand, Norway. Ship's stern stoved in. |
|---|---|---|
| 2011 | Emerald Princess (Princess Cruises) | Sustained considerable damage to several lifeboats when a fuel loading barge collided with the side of the ship while in the port of St Petersburg, Russia. |
| 2011 | Westerdam (Holland America Line) | Collision between the ship and ice in the vicinity of Yakutat Bay, Alaska. Sustained damage approximately 15 feet below the water line. |
| 2011 | Opera (MSC Cruises) | Collided twice with the pier as it was leaving Buenos Aires, damaging several cabins. Detained in port for 10 hours. |
| 2010 | Costa Classica (Costa Cruises) | Collided with a cargo ship near the deep water channel of the Yangtze River. News images show a scrape or gash stretching about 20 meters along the starboard side of Deck 5 midships. Passengers disembarked. **Cruise terminated** |
| 2010 | Sergei Kirov (Russian ship) | The cruise ship, carrying hundreds of U.S. and German tourists, collided with a barge on the Volga River. **Cruise terminated** |
| 2010 | Black Watch (Fred Olsen Cruises) | The ship's port bow collided with an iceberg off Greenland resulting in a significant impact. Superficial damage. |
| 2010 | Caribbean Princess (Princess Cruises) | The ship hit the gangway structure and was delayed several hours in departure. |
| 2010 | Columbus (Hapag-Lloyd_ | Ship bumped a cargo vessel and hit a steel bar while docking at the Iloilo International Port in Loboc, La Paz (Philippines). The front part of the cruise ship was damaged. Departure delayed for repairs. |
| 2010 | Costa Europa (Costa Cruises) | Crashed into a pier in the Egyptian resort town of Sharm el-Sheikh. **3 deaths; cruise terminated** |
| 2010 | Ecstasy (Carnival Cruise Lines) | While docking at Galveston, hit the elevated gangway used to embark & disembark guests. Little damage to the ship, but several window panels fell out of gangway. The $1.8 million structure was out of commission for 30 days or more for repairs. |
| 2009 | Carnival Splendor (Carnival Cruise Lines) | Collided with the pier at Puerto Vallarta causing damage to the stern. Departure delayed 20 hours for repairs. |
| 2009 | Saga Ruby (Saga Holidays) | Hit a concrete bollard while berthing in New York, and had to have emergency repairs to a hole in the bow before setting off back to the UK. One day delayed departure. |
| 2009 | Carnival Legend (Carnival Cruise Lines) & Enchantment of the Seas (Royal Caribbean International) | Two ships collided in Mexican port in an incident that left both vessels with minor damage. |
| 2009 | Antarctic Dream | While coming alongside the quay in Longyearbyen the ship collided with a smaller passenger vessel. Damage repaired. |
| 2009 | Avalon Tranquility (Avalon Waterways) | Collided with the tall ship Schoenbrunn while it was maneuvering in Linz on the Danube River. Damage to the Schoenbrunn was extensive; damage to the riverboat was minimal. |
| 2009 | Golden Princess (Princess Cruises) | A 31-foot-long fishing vessel "erratically" crossed within about 30 feet of the front of the cruise ship as it entered Los Angeles harbor. Near miss. |
| 2008 | Costa Concordia (Costa Cruises) | Ship hit the dock in Palermo harbor. The bow was damaged. Repairs were undertaken after the ship was firmly docked. |
| 2008 | Imagination (Carnival Cruise Lines) | A minor crash that left a huge dent and needing some paint touch up on the front side of the ship. |
| 2008 | Boudicca (Fred Olsen Cruises) | Sustained minor damage to bow whilst in Barbados. The damage caused a 7ft dent which needed to be repaired. Held in port for a day. |
| 2008 | Seven Seas Voyager (Regent Seven Seas Cruises) | Hit the quay in Rhodes with her stern, no injuries but minor damage done to the ship. |
| 2008 | Spirit of Adventure (Saga Holidays) | In Kepez, Turkey the ship hit the quay after tug failed and gashed hull.  It was repaired and continued cruise. |
| 2008 | Crystal (Louis Cruises) | Collided with a ferry at Piraeus port. There were 955 passengers on board the cruise ship. Only material damage was caused to both vessels. |

| 2008 | Zenith (Pullmantur) and Aegean Pearl (Louis Cruises) | Ships collided in Greece's main port of Piraeus causing damage but no injuries. *Aegean Pearl's* cruise canceled. |
|---|---|---|
| 2008 | Costa Classica (Costa Cruises) and Poesia (MSC Cruises) | Collided in the Adriatic Sea near the Croatian tourist town of Dubrovnik, but no one was injured. |
| 2008 | Norwegian Spirit (NCL) | While docking in NYC the ship rammed into Pier 90 at 50th St. and 12th Ave. The city Buildings Department said the accident damaged beams supporting upper-level parking lots. |
| 2008 | Queen Victoria (Cunard Line) | Hit the quay of the Valletta Waterfront, denting the stern of the ship. Malta Maritime Authority officially attributed the incident to a mechanical failure in the ship. Detained for repairs. |
| 2008 | Aquamarine (Louis Cruises) | Scraped against a pier as it was leaving Iraklion (Crete) causing damage to the hull. |
| 2007 | QEII (Cunard Line) | A cross-channel ferry had to slam on the brakes when the cruise liner failed to give way at sea off the Dover coast and sailed into the passenger ferry's path. |
| 2007 | Fram (Hurtigruten) | Had engine failure and was without power for about two hours while near Brown Bluff on the northern tip of the Antarctic Peninsula. Drifted into a towering wall of ice; bent the railing and a lifeboat was completely crushed. |
| 2007 | Norwegian Dream (NCL) | Collided with a barge being pulled by a tug in Uruguay's main port, sending several cars and containers off the barge and shutting the port down. The ship received damages above the water line, which did not appear serious. Detained for repairs. |
| 2007 | Lirica (MSC Cruises) | Damaged in Civitavecchia when it scraped the pier. An area between the bow and portside bulwarks was damaged. |
| 2007 | Thomson Celebration (Thomson Cruises) and Ocean Majesty (Page and Moy) | Collided in the Greanger fjord (Norway ) as the two were berthing. The damage was reported as slight with some lifeboats and davits taking the brunt of the slow collision. *Ocean Majesty's* **cruise terminated.** |
| 2007 | Spirit of Yorktown (Cruise West) | Collided with a Seattle-based fishing vesssel, leaving the seiner "dead in the water" with a disabled steering mechanism.  The cruise ship appeared undamaged. |
| 2007 | Serenade (Louis Cruises) | Slightly damaged when it grazed the pier while docking at the Greek island of Tinos, leaving a small hole on the left side of the ship's bow above the water line. Repaired. |
| 2007 | Kristina Regina (Kristina Cruises) | Collided with a timber loaded deck barge in dense fog south of Gedser. Only slight damage and continued to Helsinki . |
| 2007 | Fantasy (Carnival Cruise Lines) | A barge struck the ship on the Mississippi River near New Orleans, leaving a 30 foot gash (about 5 feet above the waterline) in its hull. **Cruise canceled** |
| 2006 | Enchantment of the Seas (Royal Caribbean International) | Ship  dragged its anchor 300 metres before it ran into a moored barge off Pageant Beach Georgetown , Cayman Islands .  Other than two dents in the port side and a long 100-foot scrape, there was no damage to the ship. |
| 2006 | Pride of America (NCL America) | Struck a 2,800 pound navigational buoy as it left Honolulu and dragged the buoy chain all the way to Maui .  Remained in Maui an extra day for inspections and repairs of the propeller, to which the chain became attached. |
| 2006 | Freedom of the Seas (Royal Caribbean International) | Collided with a refueling ship as it was leaving Montego Bay.  Damage was not significant. |
| 2006 | River Empress (Uniworld) | Hit a bridge on the Danube near Melk at 6 AM.  All passengers (111) were evacuated. **Cruise terminated** |
| 2005 | Norwegian Spirit (NCL) | Collided with the pier as it docked at Juneau , breaking out windows in 3 or 4 rooms and making a large dent in the side. |
| 2005 | Norwegian Majesty (NCL) | As the ship moored at St. George's, Bermuda, it knocked into three yachts moored in Powder Hall anchorage and almost sucked one yacht under. The ship's propeller appears to have been damaged. |

| 2005 | Grandeur of the Seas (Royal Caribbean International) | Struck the pier in Costa Maya, Mexico while docking causing a puncture 42 feet long and 5 feet wide at its widest point. The puncture was in the first deck, approximately five feet above the waterline. Delayed two days for repairs. |
|------|------|------|
| 2005 | River Duchess (Uniworld) | Crashed into a dockside restaurant in Amsterdam on Sunday.  Police said the ship — owned by US firm Uniworld — went off course due to technical reasons. |
| 2004 | Enchantment of the Seas (Royal Caribbean International) | While docked at Key West, struck by a barge leaving an 8 foot hole in the vessel's hull. Repaired. |
| 2004 | Holiday (Carnival Cruise Line) | Lost engine power and collided with some pilings along the Mobile River before dawn. |
| 2004 | Van Gogh (Travelscope) | Collided with an oil tanker in foggy conditions off the southern coast of Spain. **Cruise terminated** |
| 2004 | Viking Europe (Viking River Cruises) | The ship (135 passengers; 39 crew) hit a bridge in Vienna , injuring 19 passengers. |
| 2004 | Diamond Princess (Princess Cruises) | Ship pushed into pier at Victoria, BC, while docking.  Damage minor, except for bent propeller blade tips, which caused altered itineraries and missed ports. |
| 2004 | American Glory (American Cruise Lines) | Destroyed a 40 foot section of the Downtown Marina dock in Beaufort, SC (and damaged two yachts) when a strong current and tide combination forced the stern into the pier.  One of the cruise ship's doors was damaged and two windows shattered. |
| 2004 | Stena Nautica (Stena Line) | Collided with a cargo ship (the Jamaican registered Joanna) en route from Denmark to Varberg in Sweden. 91 passengers and 37 crew were evacuated to another ship.  The collision caused an 11-metre hole in the ship's hull. **Cruise terminated** |
| 2003 | Royal Princess (Princess Cruises) | Collided with the pier when it was docking, causing an 8 foot rent in the bow of the vessel and delaying its departure until repairs were completed. |
| 2003 | Opera (Silja Line) | Collided with a Yermak icebreaker stationed at the exit of a St. Petersburg port.  The ship's lifeboats were damaged but the ship remained capable of traveling. |
| 2003 | Sundream (Sun Cruises) | Collided with the pier.  It required repairs at Tenerife and returned early to Southampton for further repairs. |
| 2003 | Opera (Silja Line) | Collided with several ships and a crane at St. Petersberg. Damage not sufficient to delay itinerary. |
| 2003 | Melody (MSC Cruises) | Ran into the pier at Kusadasi harbor.  Ship had to wait several days for repairs to be completed. |
| 2003 | Star Flyer (Star Clippers) | Sustained minimal damage and a small section of the wharf collapsed at Port Klang, Malaysia after it collided with the wharf. |
| 2001 | Asuka | Collision with cargo ship off coast of Kobe. |
| 2001 | Royal Princess (Princess Cruises) | Broke loose from mooring at Port Said; drifted into the path of a cargo ship. |
| 2000 | Island Breeze (Premier) | Collision w/ tugboat – damaged  propeller; Tug sinks.  **2 cruises cancelled** |
| 2000 | Carnival Destiny (Carnival Cruise Lines) | Propulsion problems – Adrift for 27 hours. |
| 1999 | Norwegian Dream (NCL) | Collision with cargo ship in English Channel – Out for 2 months. |
| 1998 | Rhapsody of the Seas (Royal Caribbean International) | Hits pier in Curacao causing a 7 meter hole above water line --Repaired and continues. |
| 1997 | Island Princess (Princess Cruises) | Collision with unmarked obstruction at Civitavecchia – **2 cruises cancelled**. |
| 1996 | Statendam (Holland America Line) | Near miss with barge carrying 80,000 liters of propane and pallets of dynamite in the Discovery Passage, British Columbia. Collision averted by barge's action. |
| 1993 | Noordam (Holland America Line) | Collision with freighter in the Gulf of Mexico. |
| 1992 | Europa (Hapag-Lloyd) | Collision with freighter 180 miles off Hong Kong. |

| 1991 | Regent Sea<br>(Regency Cruises)<br>Island Princess<br>(Princess Cruises) | 2 ships collide in strong winds at Skagway – Regent Sea had its steel hull plating on the stern ripped; Island Princess had a 50' gash 30 ft above water line and 11 cabins were exposed. |
|------|--------------------------------------|-----------------------------------------------------------------------------|
| 1990 | Azure Seas | Struck while moored by container ship in LA harbor. |

## A.5 Other Significant Events Involving Cruise Ships, 2000 - 2012

| Year | Ship (Cruise Line) | Incident |
|------|--------------------|----------|
| 2012 | Independence<br>(America Cruise Line) | The starboard engine drive shaft broke on leaving Savanah. Returned to port where the problem was determined. Left port with blessing of the CG. On one engine cruised to Brunswick, GA  where the CG withdrew its approval to continue with the passengers. **Cruise terminated** |
| 2011 | Disney Magic<br>(Disney Cruise Line) | Loss of power and adrift at sea for more than 90 minutes. |
| 2011 | Balmoral<br>(Fed Olsen Cruises) | Ship detained by Maritime and Coastguard Agency after finding fault with life boats and inconsistent record keeping of crew hours of rest. |
| 2011 | Opera<br>(MSC Cruises) | Detained in Southampton following an inspection by Maritime and Coastguard Agency. The MCA said: "The ship was not fully compliant with international maritime safety regulations." |
| 2011 | Opera<br>(MSC Cruises) | Suffered a failure to an electric panel, causing an initial low power and afterwards a total loss while the ship was near Wisby in Baltic Sea. It was adrift for more than 9 hours. |
| 2011 | Radiance of the Seas<br>(Royal Caribbean International) | The ship is currently operating under USCG Captain of The Port Order (COTP) due to one of two main propulsion azipods being inoperative for maneuver and requires a tractor tug tethered escort every arrival & departure from Tampa Bay to insure safe transit should the one remaining azipod propulsion fail. |
| 2010 | Clelia II<br>(Travel Dynamics International) | A large wave slammed into the ship with 88 passengers and 77 crew members aboard, but the ship's crew overcame minor damage and is heading safely back to its scheduled port (Ushuaia). The ship declared an emergency yesterday, reporting it had suffered engine damage amid heavy seas and 90 kph winds when it was northeast of the South Shetland Islands and about 845km from Ushuaia. The International Association of Antarctica Tour Operators issued statement saying the wave that hit the Clelia II caused a broken bridge window and some electrical malfunctions that temporarily knocked out some communications and affected engine performance. |
| 2010 | Costa Atlantica<br>(Costa Cruises) | The ship experienced steering problems minutes after leaving Bermuda. The Bermuda Maritime Operations received a distress call. The duty officer said: "The ship departed Dockyard at 1:10pm. She reported problems with her steering. The pilot immediately stopped the ship and ordered two tugs to come out to assist. The tugs came alongside and took her to an area with more sea room and then the engineers were able to fix the problem." |
| 2010 | Celebrity Century<br>(Celebrity Cruises) | Passengers were offloaded in Villefranche after the ship's rudders were damaged. **Cruise terminated** |
| 2010 | Queen Mary 2<br>(Cunard Line) | The ship was approaching Barcelona when one of 12 capacitors in a harmonic filter failed, accompanied by a loud explosion. The explosion resulted in extensive damage to the surrounding electric panels and caused the vessel to black out. The ship was adrift for an hour. |
| 2010 | Atlantic Star<br>(Pullmantur) | An electrical problem meant no air conditioning and problems with toilets. **Cruise terminated** |
| 2010 | Clelia II<br>(Travel Dynamics International) | The ship lost all power, apparently the result of human error. |
| 2010 | Pacific Dream<br>(Pullmantur Cruises) | Experienced engine failure. **Cruise terminated** |

| 2010 | Fascination (Carnival Cruise Lines) | Lost power for several hours and was adrift at sea. Carnival says the ship had a "technical malfunction." |
|---|---|---|
| 2010 | Vistamar (Plantours & artner) | The UK Maritime and Coastguard Agency detained the ship at Belfast Docks after numerous faults were identified on board including broken or missing fire doors and failure to maintain the vessel in line with International Safety Management (ISM) code. The coastguard had said that 10 of the ship's 100 fire doors were faulty. It also said that one of the lifeboat engines would not start. **Cruise canceled** |
| 2010 | Prince Albert II (Sliverseas Cruises) | The ship was impounded for several hours in Portsmouth amid safety fears. One concern was that it was overloaded. The other concern was that senior officers had not had enough rest. The report also says the ship's lifeboats were 'not ready for use,' there were three unsafe emergency routes in case of fire, and there was an air bubble in the ship's magnetic compass. |
| 2010 | Minerva (Swan Hellenic) | The ship broke down in the Mediterranean and was taken for emergency dry dock in Syros in Greece for engine repair. No a/c or lighting. **Cruise terminated** |
| 2010 | Pacific Dawn (P&O Australia) | A pilot averted a possible disaster by bringing the out-of-control ship to a stop just 700m away from the six-lane Gateway Bridge over the Brisbane River. Two tugboats got the ship under control, bringing her to a complete standstill 70m shy of the bridge. |
| 2010 | Caribbean Princess (Princess Cruises) | A steering malfunction caused the ship to list 5 to 9 degrees as it approached port. |
| 2010 | Explorer of the Seas (Royal Caribbean International) | Human error caused a severe list (10 to 12 degrees) that put passenger windows on Deck 3 under water. The list lasted 2 – 3 minutes. |
| 2010 | Louis Majesty (Louis Cruises) | 26-foot waves crashed into the ship off France, smashing glass windshields and killing two passengers. Another fourteen people suffered light injuries. **2 deaths** |
| 2009 | Norwegian Dawn (NCL | The ship temporarily lost all power off the coast of Puerto Rico. Power was restored much later in the day. |
| 2009 | Silja Europa (Silja Line) | With almost 1,700 people onboard, the ship was towed to the Finnish port city of Turku due to problems with its rudder system. |
| 2009 | Brilliance of the Seas (Royal Caribbean International) | The ship's departure was delayed because of needed repairs after a storm broke out a number of windows on Decks 3 and 4. |
| 2009 | Oceanic (Peace Boat) | The ship (with 848 passengers) was detained after US Coast Guard inspectors found a small hole in the ship's hull during a routine safety inspection. About a gallon of water per hour was coming into the ship. An additional 16 safety violations were cited. |
| 2009 | Maasdam (Holland America Line) | The ship severely listed, causing damage onboard, when the captain took evasive action to avoid running aground on a sandbar in the St. Lawrence Seaway. |
| 2009 | Seven Seas Voyager (Regent Seven Seas Cruises) | One of the pods was caught in a fishing net. Attempts to release the pod failed. The ship is on its way to Dubai where it will be dry docked to fix the pod. Cruise delayed; itinerary adjusted. |
| 2009 | Costa Europa (Costa Cruises) | The ship underwent repairs in the Kenyan port of Mombasa, before sailing towards Reunion Island, but passengers said the vessel's speed remained "erratic," while others noticed black smoke coming from the engines. Itinerary changed. |
| 2009 | Aurora (P&O Cruises) | Broke down 4 hours after leaving Sydney. The Port Shaft Thrust Bearing had gone. Sailed at reduced speed to Auckland for repairs (taking 4 days instead of two). Itinerary changed. |
| 2009 | Explorer of the Seas (Royal Caribbean International) | A propeller on one of the ship's engines struck an unidentified object and was bent while leaving Samana. Cruise continued. Repaired on the next cruise when the ship was in St. Thomas. |
| 2008 | Grand Princess (Princess Cruises) | The ship diverted to safe harbour, anchoring outside English Harbour (Antigua). It had to be diverted to that part of the island because it was having problems with its bow thruster. |
| 2008 | Lyuba Orlova (Quark Expeditions) | The ship was detained by Argentinian officials due to mechanical problems. Four cruises were canceled. |

46

| 2008 | Queen Victoria (Cunard Line) | The ship suffered a severe list of about 7 degrees causing damage onboard, and later in the cruise had a full power failure that lasted for some time. |
|------|------|------|
| 2008 | Sea Princess (Princess Cruises) | The ship encountered 'technical difficulties' as it attempted to dock at Port Zante, which resulted in passengers being ferried to the nearby marina by the ship's life crafts. Initial reports were there had been a fire onboard that caused engine damage to the vessel and hindered its berthing. |
| 2008 | Fantasy (Carnival Cruise Lines) | There was a minor technical glitch a few hours after the ship left New Orleans, leaving the ship adrift. The problem was fixed and the ship resumed sailing. |
| 2008 | Discovery (Voyages of Discovery) | The ship was detained by Polish and later by UK authorities for safety deficiencies. The ship was cited for seven deficiencies. |
| 2007 | Enchantment of the Seas (Royal Caribbean International) | The ship had a power failure in the early morning and was assisted by a tug into Fort Lauderdale at the cruise's end. |
| 2007 | Norwegian Star (NCL) | A severe list causing damage onboard attributed to human error. |
| 2007 | Island Princess (Princess Cruises) | Engines failed off the coast of France, plunging the ship into darkness.  Passengers were ferried to shore by the ship's tenders. **Cruise terminated** |
| 2007 | Black Prince (Fred Olsen Cruises) | Propeller damaged. **Cruise terminated** |
| 2007 | QEII (Cunard Line) | The ship was delayed in port for 24 hours, mid-cruise, because of mechanical problems. |
| 2007 | Ryndam (Holland America Line) | Power failure and propulsion failure. Power restored. The Coast Guard required the ship to have 2 tugboats to assist entering San Diego harbor and docking. |
| 2007 | Brilliance of the Seas (Royal Caribbean International) | A complete power loss, leaving the ship adrift for 2.5 hours. |
| 2006 | Ryndam (Holland America Line) | The ship reported engine problems about an hour after sailing and stalled in the channel between the port and the Skyway Bridge.  Power was subsequently restored, but the Coast Guard said the ship would remain moored overnight while they investigated the problem with the engines. |
| 2006 | Thomson Destiny (Thomson Cruises) | The ship's toilets did not work for three days and there was no hot water for 24 hours.  A series of blockages in the plumbing system were blamed for the problem; experts were dispatched to deal with the problem. |
| 2006 | Crown Princess (Princess Cruises) | Severely rolled (15 degrees) to one side shortly after leaving Port Canaveral (at 3:25 PM ). ~240 passengers were treated for various injuries; 94 were transferred to local hospitals ashore for evaluation and treatment. The roll was attributed to a problem with the auto-pilot. |
| 2006 | Costa Allegra (Costa Crociere) | The ship twice lost all power for 30 minutes or so (shortly after leaving Shanghai and again on its return). |
| 2006 | Seabourn Pride (Seabourn Cruises) | Sailed through very heavy seas on way to Bergen . There was a substantial amount of water damage on board – forward suites had broken windows and flooding; other rooms also had water damage (including electrical systems). |
| 2006 | Vistamar (Plantours & Partners) | Ship impounded in London because of serious safety deficiencies, including inoperable lifeboats. |
| 2006 | Rhapsody of the Seas (Royal Caribbean International) | The ship listed 10 degrees due to a malfunction with the stabilizing mechanism. Considerable damage onboard. |
| 2006 | Zuiderdam (Holland America Line) | The ship lost all power and was adrift for about an hour (midnight to 1 AM) while between St. Thomas and Tortola. |
| 2006 | Sensation (Carnival Cruise Lines) | Coast Guard inspectors detained the ship at Port Canaveral until the captain and crew could fix violations related to the ship's fire-control systems. |
| 2006 | Carnival Liberty (Carnival Cruise Lines) | There was a complete power failure that lasted approximately 1 hours (10 - 11PM) and it was another hour or so before everything appeared "back to normal". |

| 2006 | Pacific Sky (P&O Australia) | Five hours after leaving Singapore the ship experienced engine problems, came to a shuddering halt, and sat anchored in the Malacca Strait for 30 hours while crew tried to fix the problem.  The cruise finally resumed on one engine. |
|------|------|------|
| 2006 | Grand Princess (Princess Cruises) | Two hours after leaving Galveston, a medical emergency required return to port.  The ship made a sharp turn while traveling at 21 knots, causing 18.5 degree list, which resulted in considerable damage onboard. Twenty-seven passengers and ten crew suffered injuries |
| 2006 | Norwegian Spirit (NCL) | Several windows were smashed and 11 cabins flooded when the ship encountered a storm. |
| 2005 | Funchal (Classic International Cruises) | The ship was stuck in Safaga (Egypt) for a week, mid-cruise, while repairs undertaken to the port main engine. Many passengers canceled the remainder of the cruise. |
| 2005 | Sun Princess (Sun Princess) | A power outage while docked at St. Thomas, USVI, left passengers mostly in the dark for more than 2 hours.  Backup generators provided limited power.  Power was restored and the ship left port two hours late. |
| 2005 | Norwegian Jewel (NCL) | The ship lost power as a result of problems with the port-side azipod while leaving St. Petersburg .  The ship was assisted by Finnish tugs to reach the next port. |
| 2005 | Carnival Legend (Carnival Cruise Lines) | Heading for NYC a, "computer glitch" caused a hard left turn, that resulted in a 14 degree list causing injuries and damage. |
| 2005 | Carnival Destiny (Carnival Cruise Lines) | The ship lost power and propulsion at 7AM – it was dead in the water for 8 hours and without electricity and air conditioning for about two hours. |
| 2005 | Thomson Celebration (Thomson Cruises) | 600 passengers flown home after the plumbing in 250 cabins failed. **Cruise terminated** |
| 2005 | Norwegian Dawn (NCL) | The ship was struck by a 70 foot wave enroute from the Bahamas to New York .  The wave knocked out windows in two passenger cabins and on the navigation bridge and damaged the ships hull. Diverted to Charleston for repairs. 300 passengers chose to fly home. |
| 2005 | Pacific Sky (P&O Australia) | Problem with the shipboard's gearbox ends cruise. **Cruise terminated** |
| 2005 | Grand Voyager (Iberojet Cruises) | A huge wave breached a bridge window, resulting in damage to electrical control systems, a temporary loss of propulsion, and loss of all communications.  A distress call was issued.  Twenty passengers reported minor injuries (including eight with broken bones). |
| 2005 | Explorer (Semester at Sea) | Lost power in three of its four engines when a 50-foot wave broke bridge windows and damaged controls while 650 miles south of Alaska's Aleutian Islands..  Crew members were able to start a second engine and the ship "limped" to Honolulu for needed repairs. |
| 2005 | QEII (Cunard Line) | The ship lost power in the early hours of New Year's Day. Without power there is no propulsion, ventilation, lighting or water. The ship drifted for about an hour before power was restored. |
| 2004 | Pacific Sky (P&O Australia) | Cruise aborted because of problems with the starboard engine. Departure had been delayed for more than a day because of a faulty boiler and a damaged gerarbox. **Cruise terminated** |
| 2004 | Rotterdam (Holland America Line) | Ambulances greeted the ship in Halifax after passengers and crew endured monster waves generated by hurricane Karl in the North Atlantic . About a dozen passengers were taken to hospital with suspected fractures and severe bruising.  90 people (including 5 crew) reported minor injury. Ship lost power and for 3.5 hours was tossed around in high waves and in total darkness. |
| 2004 | Carnival Destiny (Carnival Cruise Lines) | The ship lost power and was adrift for several hours while cruising to St. Thomas from Dominica. |
| 2004 | Caronia (P&O Cruises) | The ship "suffered a total power failure following a leak from a swimming pool that took out the main electric board.  Drifted for approximately 2 hours before partial power restored. |
| 2004 | Norwegian Crown (NCL) | Fuel fumes filled 50 cabins as a result of a hole in a ventilation duct in the air conditioning system, and there were reportedly power outages. |

| 2004 | Black Prince (Fred Olsen Cruises) | Enroute to her first journey after engine repairs, the ship broke down just off Southampton docks and lost all power. |
|------|-----------------------------------|----------------------------------------------------------------------------------------------------------------------|
| 2004 | Diamond Princess (Princess Cruises) | The ship suffered several short power failures on one cruise and "technical difficulties" on the next cruise. |
| 2003 | Brilliance of the Seas (Royal Caribbean International) | While cruising between Corfu and Civitivecchia, the ship was hit by a storm – twice listing hard to the port side approximately 13.6 degrees.  After daybreak the ship had a power blackout that lasted several hours. |
| 2003 | Norway (NCL) | A boiler explosion killed 8 crew members and injured dozens of others. All future cruises canceled. **8 deaths** |
| 2003 | Pacific Sky (P&O Australia) | The ship had to turn back to Auckland on an 11 day cruise to Fiji.  The ship took on 17 tonnes of water after it sprang a leak through cracked and corroded plating on the side of the 19-year-old ship. |
| 2003 | Ryndam (Holland America Line) | The ship listed to the port side around 6:30 PM, causing injuries and considerable damage onboard. The incident was explained as the result of a mechanical failure from going from manual to automatic pilot |
| 2003 | Carnival Conquest (Carnival Cruise Lines) | The USCG investigated a sharp roll that sent passengers running for life vests, and glass crashing to decks. Seven passengers reported to a newspaper in New Orleans that they saw the lights of another vessel silhouetted in thick fog less than 200 yards from the ship. |
| 2003 | Radiance of the Seas (Royal Caribbean International | Ship struck by strong winds as it crossed a squall line and briefly went into a seven degree list.  No injuries. |
| 2003 | Marco Polo (Orient Lines) | After being pushed by wind on to shallow waters while in the South Shetland Islands, the hull of the ship was found to have three cracks (4, 3, and 1.7 meters long by 2 centimeters wide).  Eight millimeter thick plates were welded over the cracks at Ushuaia and the cruise continued. |
| 2003 | Wind Spirit (Windstar Cruises) | The ship experienced engine problems and generator problems that left it adrift for a night and part of a day.  The ship made it back to Torotola and underwent necessary repairs. |
| 2002 | Olivia (Ukraine-registered) | With 650 passengers onboard, the ship was detained for a full day by the New Zealand Marine Safety Authority.  Safety inspectors found problems with an emergency pump and with equipment that separates oil from water in the ship's bilges. |
| 2002 | Brilliance of the Seas (Royal Caribbean International) | A propulsion problem required shutdown of the complete propulsion system at sea while technicians worked to repair it. |
| 2002 | Radiance of the Seas (Royal Caribbean International) | USCG reports the ship experienced a three-minute power outage disabling the ship's steering and propulsion capability while in Frederick Sound (preparing to transit the Gatineau Channel en route to Juneau ). |
| 2002 | Ryndam (Holland America Line) | A generator stopped running while the ship was in the Lynn Canal (Alaska) causing it to lose power – it lost all propulsion and was adrift for about 20 minutes (at 1:30 AM). The water was too deep for the ship to drop anchor. |
| 2002 | QEII (Cunard Line) | A large sea water leak was discovered in the aft engine room, caused by the perforation (from corrosion) of a sea water inlet pipe.  The leak was stopped after several efforts (over 36 hours), but not before several hundred tones of sea water had to be pumped overboard so that workers could get at the leaking pipe in the engine room (which was submerged by water from the leak). |
| 2002 | Oriana (P&O Cruises) | While crossing the North Pacific an auxiliary engine failed, causing the other three engines to stop.  Ship drifted for two hours and proceeded at reduced speed after it restored. |
| 2001 | Caledonia Star | Damaged by rogue wave – escorted to port by Argentinean Navy. |
| 2001 | Bremen (Hapag-Lloyd) | Hit by rogue wave – wheelhouse windows break and water enters bridge; detour to Montevideo for immediate repairs. |
| 2001 | Radiance of the Seas (Royal Caribbean International) | Hit heavy seas – balcony cabins, Seaview and Windjammer cafes flooded |

| 2001 | Norway (NCL) | Ship detained in port because of safety violations – 106 leaks in fire sprinkler system. |
|------|-------------|------------------------------------------------------------------------------------------|
| 2001 | Norwegian Sky (NCL) | Autopilot malfunction causes roll –70+ injured, 16 hospitalized. |
| 2000 | Ocean Explorer | Engine failure; world cruise ended. **Cruise terminated** |
| 2000 | Sundream (Sun Cruises) | Failing generators; no a/c and limited power for 2 days. |
| 2000 | Gradeur of the Seas (Royal Caribbean International) | Loss of electrical power.  Towed to port – delayed 12 hours. |
| 2000 | Aurora (P&O Cruises) | Hit by 40 foot wave – smashed windows in 6 cabins; 20 cabins flooded.  6 injured. |
| 2000 | Oriana (P&O Cruises) | 18 hours into maiden voyage - problem with over heated propeller shaft. **Cruise terminated.** |

**APPENDIX B**

**ANALYSIS OF CRIME REPORTS RECEIVED BY THE FBI FROM CRUISE SHIPS**

**OCTOBER 1, 2007 – SEPTEMBER 30, 2008**

**CONTENTS:**
**Table 1:  Crime by Cruise Ship, October 1, 2007 – September 30, 2008 (Page 1 – 4)**
**Table 2:  Crime by Cruise Line, October 1, 2007 – September 30, 2008 (Page 5)**
**Table 3:  Crimes Involving Minors, Alcohol, or Domestic Violence by Cruise Ship (Page 6 – 9)**
**Table 4:  Crimes Involving Minors, Alcohol, or Domestic Violence by Cruise Line (Page 10)**
**Table 5: Crimes Involving Crew Members (Page11)**

**PREPARED BY:**
**Ross A. Klein, PhD**
**Professor of Social Work**
**Memorial University**
**St. John's, NL A1C 5S7**
**CANADA**

© Ross A. Klein, PhD – ross@cruisejunkie.com

**Table 1:  Crime by Cruise Ship, October 1, 2007 – September 30, 2008**
(based on reports to the FBI)[1]

| Cruise Line/Ship | Simple Assault[2] | Assault w/SBI[3] | Theft[4] | Theft >10K[5] | Sexual contact[6] | Sexual assault[7] | Sexual harass[8] | Death[9] | Overboard[10] | Drugs[11] | Other[12] | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Azamara** | | | | | | | | | | | | |
| Journey | | | 1 | | | 1 | | | | | | 2 |
| Quest | | | 1 | | | | | | | | | 1 |
| TOTAL | | | 2 | | | 1 | | | | | | 3 |
| | | | | | | | | | | | | |
| **Carnival** | | | | | | | | | | | 1 | 1 |
| Celebration | | | 1 | | | 1 | 1 | | | | | 3 |
| Conquest | 1 | 1 | 4 | 1 | 4 | 2 | 1 | 1 | | | | 15 |
| Destiny | | | 4 | | 1 | 1 | | | | | | 6 |
| Ecstasy | 1 | | 3 | | 1 | 4 | | | | | | 9 |
| Elation | 2 | | 1 | | 3 | 1 | 1 | | | | | 8 |
| Fantasy | | 1 | 3 | | 1 | 1 | | | 1 | | | 7 |
| Fascination | | | 4 | | 2 | 4 | | | | | | 10 |
| Freedom | | | 6 | | 2 | 1 | | 1 | | | 1 | 11 |
| Glory | 1 | 1 | 4 | | 3 | 1 | | 1 | 1 | | | 12 |
| Holiday | | | 1 | | 1 | 1 | | | | | | 3 |
| Imagination | | 1 | 6 | | 3 | 4 | | | | | | 14 |
| Inspiration | 1 | | 3 | | 2 | | | 1 | | | | 7 |
| Legend | | | 1 | | | 1 | 1 | | | | 1 | 4 |
| Liberty | | | 3 | | | | 1 | 1 | | | 1 | 6 |
| Miracle | | | 4 | | | | | | | | | 4 |
| Paradise | 1 | 1 | 4 | 1 | 6 | 3 | | | | | | 16 |
| Pride | 1 | | 3 | | 2 | 2 | | | | | | 8 |
| Sensation | | | 3 | | 4 | 4 | | | | | | 11 |
| Spirit | | | 1 | | 2 | 2 | | | | | | 5 |
| Triumph | 1 | | 7 | | 2 | | | | | | 1 | 11 |
| Valor | | | 5 | | 7 | 4 | | | | | 1 | 17 |
| Victory | | | 2 | 1 | 2 | 3 | | | 1 | | | 9 |
| TOTAL | 9 | 5 | 73 | 3 | 48 | 40 | 5 | 5 | 3 | | 6 | 197 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

© Ross A. Klein, PhD – ross@cruisejunkie.com

| Cruise Line/Ship | Simple Assault | Assault w/SBI | Theft | Theft >10K | Sexual contact | Sexual assault | Sexual harass | Death | Overboard | Drugs | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Celebrity** | | | | | | | | | | | | |
| Century | 2 | | | 1 | 2 | | | | | | | 5 |
| Constellation | 1 | | 1 | | | | | | | | 1 | 3 |
| Galaxy | | | 1 | 1 | 1 | | | | | | | 3 |
| Infinity | 1 | | | | 2 | | | | | | | 3 |
| Mercury | 1 | | | 1 | 1 | | | | | | | 3 |
| Millennium | | 1 | | | | | | | | | | 1 |
| Summit | | | | | 1 | | | | | | | 1 |
| **TOTAL** | 5 | 1 | 2 | 3 | 7 | | | | | | 1 | 19 |
| | | | | | | | | | | | | |
| **Costa** | | | | | | | | | | | | |
| Fortuna | | | | | | 1 | | | | | | 1 |
| Mediterranea | | | | | | | | | 1 | | | 1 |
| **TOTAL** | | | | | | | | | | | | 2 |
| | | | | | | | | | | | | |
| **Crystal** | | | | | | | | | | | | |
| Serenity | | | | | 1 | | | | | | | 1 |
| | | | | | | | | | | | | |
| **Discovery** | | | | | | | | | | | | |
| Sun | | | | | | | | | 1 | | | 1 |
| | | | | | | | | | | | | |
| **Disney**[13] | | | | | | | | | | | | |
| Wonder | | | 1 | | | | 1 | | | | | 2 |
| | | | | | | | | | | | | |
| **Holland America**[14] | | | | | | | | | | | | |
| Amsterdam | | | 1 | | | | | | | | | 1 |
| Maasdam | 1 | | | 1 | | | | | | | | 2 |
| Oosterdam | | | | | | 1 | | | | | | 1 |
| Ryndam | | | | 1 | | | | | | | | 1 |
| Statendam | | | 1 | | | 1 | | | | | | 2 |
| Volendam | | | | | | 2 | | | | | | 2 |
| Westerdam | | | 2 | 1 | | | | | | | | 3 |
| Zuiderdam | | | | | | 4 | | | | | | 4 |
| **TOTAL** | 1 | | 4 | 3 | | 8 | | | | | | 16 |

| Cruise Line/Ship | Simple Assault | Assault w/SBI | Theft | Theft >10K | Sexual contact | Sexual assault | Sexual harass | Death | Overboard | Drugs | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NCL[15]** | | | | | | | | | | | | |
| Dawn | | | | | | 2 | | | | | | 2 |
| Majesty | 1 | | | | 1 | | | | | | | 2 |
| Star | | 1 | | | | | | | | | | 1 |
| **TOTAL** | 1 | 1 | | | 1 | 2 | | | | | | 5 |
| | | | | | | | | | | | | |
| **NCLA** | | | | | | | | | | | | |
| Pride of America | | | | | | 1 | | | | | | 1 |
| | | | | | | | | | | | | |
| **Princess[16]** | | | | | | | | | | | | |
| Caribbean | 2 | | | | 2 | 1 | 1 | 1 | | | | 7 |
| Coral | | 1 | | | | | | | | | | 1 |
| Dawn | | | | | | 1 | | | | | | 1 |
| **TOTAL** | 2 | 1 | | | 2 | 2 | 1 | 1 | | | | 9 |
| | | | | | | | | | | | | |
| **RCI** | | | | | | | | | | | | |
| Adventure | 4 | | 1 | | 3 | | | | | | 1 | 9 |
| Brilliance | 1 | | | 1 | | | | | | | | 2 |
| Empress | | | | | | | | | | | 1 | 1 |
| Enchantment | 5 | | | | 2 | | | 2 | | | 1 | 10 |
| Explorer | 4 | 2 | | | | 2 | | | | | | 8 |
| Freedom | 18 | 1 | 2 | | 2 | 3 | | 1 | | | | 27 |
| Grandeur | 4 | | | | 2 | | | | | | | 6 |
| Jewel | | | | | | | | | | | 1 | 1 |
| Liberty | 7 | | | | 2 | 2 | | | | 1 | | 12 |
| Majesty | 6 | 1 | | 2 | | 1 | | | | | 2 | 12 |
| Mariner | 8 | 1 | | | 2 | 1 | | | | | | 12 |
| Monarch | 14 | 3 | 1 | | | 2 | | | | 2 | 1 | 23 |
| Navigator | 1 | | | | | 1 | | | | | | 2 |
| Radiance | 2 | | | | | 2 | | | | | | 4 |
| Rhapsody | | | | | | | | | | | 1 | 1 |
| Serenade | 1 | | 1 | | | 1 | | | | | | 3 |
| Sovereign | 13 | | 1 | | 3 | 1 | | | | | | 18 |
| Splendor | 1 | | | | | | | | | | | 1 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vision | 6 | | 1 | | 3 | 1 | | | | | | 11 |
| Voyager | 1 | | | | | | | | | | | 1 |
| **TOTAL** | 96 | 8 | 7 | 3 | 19 | 17 | | 3 | | 3 | 8 | 164 |

| Cruise Line/Ship | Simple Assault | Assault w/SBI | Theft | Theft >10K | Sexual contact | Sexual assault | Sexual harass | Death | Overboard | Drugs | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Seabourn** | | | | | | | | | | | | |
| Legend | | | | | 1 | | | | | | | 1 |
| | | | | | | | | | | | | |
| **SeaEscape** | | | | | | | | | | | | |
| Island Adventure | | | | | | | | | 1 | | | 1 |
| | | | | | | | | | | | | |
| **Windstar** | | | | | | | | | | | | |
| Windstar | 1 | | | | | | | | 1 | | | 2 |
| | | | | | | | | | | | | |
| **GRAND TOTAL** | 115 | 16 | 89 | 12 | 75 | 75 | 4 | 9 | 7 | 3 | 15 | 421 |

**NOTES:**

[1] Data was secured through a Freedom of Information request by Ken Carver/International Cruise Victims Association

[2] Simple assault refers to incidents where there is an altercation or fight; one or both parties may experience minor injuries requiring medical attention.

[3] Assault with Serious Bodily Injury refers to incidents were there is an altercation or fight; one or both parties require medical attention for serious cuts, abrasions, concussion, or broken bones.

[4] Theft refers to incidents where items of value have been stolen or are missing from a cabin, a safe, luggage while in the care of the cruise line, or items lost onboard.

[5] Theft greater than $10,000 refers to incidents where the value of a theft exceeds $10,000.

[6] Sexual contact refers to incidents of unwanted sexually touching, unwanted kisses, and incidents where a minor has been propositioned or otherwise approached by an adult.

[7] Sexual assault refers to incidents of unwanted sexual contact with genetalia, unwanted attempts to have sexual relations, and forcible rape.

[8] Sexual harassment refers to incidents of verbal sexual abuse and/or where an employee is asked to trace sexual favors for advancement in or continuing in their job.

[9] Death refers to incidents where there is a natural death or suicide.

[10] Overboard refers to incidents where a passenger or crew member has gone missing. Three ships had media reports of passengers/crew overboard, but these were not reported to the FBI: Celebrity Constellation (non-US crew) – February 18, Carnival Victory – April 22, 2008, Norwegian Dawn – May 11, 2008.

[11] Drugs refers to incidents where drugs have been found on the person or in the cabin of a passenger or crew member.

[12] Other refers to incidents otherwise unclassified, including passengers missing the ship, security breaches, fire, etc

[13] Disney Cruises Line has one ship with no crime reports received

[14] Holland America Line has five ships with no crime reports received

[15] NCL has seven ships with no crime reports received

[16] Princess has 13 ships with no crime reports received

© Ross A. Klein, PhD – ross@cruisejunkie.com

## Table 2:  Crime by Cruise Line, October 1, 2007 – September 30, 2008
(based on reports to the FBI)[1]

| Cruise Line/Ship | Simple Assault[2] | Assault w/SBI[3] | Theft[4] | Theft >10K[5] | Sexual contact[6] | Sexual assault[7] | Sexual harass[8] | Death[9] | Overboard[10] | Drugs[11] | Other[12] | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Azamara | | | 2 | | | 1 | | | | | | 3 |
| Carnival | 9 | 5 | 73 | 3 | 48 | 40 | 5 | 5 | 3 | | 6 | 197 |
| Celebrity | 5 | 1 | 2 | 3 | 7 | | | | | | 1 | 19 |
| Costa | | | | | | 1 | | | 1 | | | 2 |
| Crystal | | | | | 1 | | | | | | | 1 |
| Discovery | | | | | | | | | 1 | | | 1 |
| Disney[13] | | | 1 | | | | 1 | | | | | 2 |
| Holland America[14] | 1 | | 4 | 3 | | 8 | | | | | | 16 |
| NCL[15] | 1 | 1 | | | 1 | 2 | | | | | | 5 |
| NCLA | | | | | | 1 | | | | | | 1 |
| Princess[16] | 2 | 1 | | | 2 | 2 | 1 | 1 | | | | 9 |
| RCI | 96 | 8 | 7 | 3 | 19 | 17 | | 3 | | 3 | 8 | 164 |
| Seaborn | | | | | | 1 | | | | | | 1 |
| SeaEscape | | | | | | | | | 1 | | | 1 |
| Windstar | 1 | | | | | | | | 1 | | | 2 |
| GRAND TOTAL | 115 | 16 | 89 | 12 | 78 | 73 | 7 | 9 | 7 | 3 | 15 | 424 |

NOTES:
[1] Data was secured through a Freedom of Information request by Ken Carver/International Cruise Victims Association
[2] Simple assault refers to incidents where there is an altercation or fight; one or both parties may experience minor injuries requiring medical attention.
[3] Assault with Serious Bodily Injury refers to incidents were there is an altercation or fight; one or both parties require medical attention for serious cuts, abrasions, concussion, or broken bones.
[4] Theft refers to incidents where items of value have been stolen or are missing from a cabin, a safe, luggage while in the care of the cruise line, or items lost onboard.
[5] Theft greater than $10,000 refers to incidents where the value of a theft exceeds $10,000.
[6] Sexual contact refers to incidents of unwanted sexually touching, unwanted kisses, and incidents where a minor has been propositioned or otherwise approached by an adult.
[7] Sexual assault refers to incidents of unwanted sexual contact with genitalia, unwanted attempts to have sexual relations, and forcible rape.
[8] Sexual harassment refers to incidents of verbal sexual abuse and/or where an employee is asked to trade sexual favors for advancement in or continuing in their job.
[9] Death refers to incidents where there is a natural death or suicide.
[10] Overboard refers to incidents where a passenger or crew member has gone missing. Three ships had media reports of passengers/crew overboard, but these were not reported to the FBI: Celebrity Constellation (non-US crew) – February 18, Carnival Victory – April 22, 2008, Norwegian Dawn – May 11, 2008.
[11] Drugs refers to incidents where drugs have been found on the person or in the cabin of a passenger or crew member.
[12] Other refers to incidents otherwise unclassified, including passengers missing the ship, security breaches, fire, etc
[13] Disney Cruises Line has one ship with no crime reports received
[14] Holland America Line has five ships with no crime reports received
[15] NCL has seven ships with no crime reports received
[16] Princess has 13 ships with no crime reports received

© Ross A. Klein, PhD – ross@cruisejunkie.com

5

**Table 3:  Crimes Involving Minors, Alcohol, or Domestic Violence by Cruise Ship**
(based on reports to the FBI)[1]

| Cruise Line | MINORS[2] | | | ALCOHOL INVOLVED[3] | | | DOMESTIC VIOLENCE[10] |
|---|---|---|---|---|---|---|---|
| | SEXUAL CONTACT[4] | SEXUAL ASSAULT[5] | SEXUAL HARRASSMENT[6] | ASSAULT W/ SBI[7] | SEXUAL CONTACT/ ASSAULT[8] | SIMPLE ASSAULT[9] | |
| **Azamara** | | | | | | | |
| Journey | | | | | | | |
| Quest | | | | | | | |
| **TOTAL** | | | | | | | |
| | | | | | | | |
| **Carnival** | | | | | | | |
| Celebration | | | 1 | | 1 | | |
| Conquest | 1 | 1 | 1 | 1 | 2 | 1 | 1 |
| Destiny | | | | | | | |
| Ecstasy | | 1 | | | 2 | | |
| Elation | | | | | 4 | 2 | |
| Fantasy | | | | 1 | 2 | | |
| Fascination | | | | | 4 | | |
| Freedom | | | | | 2 | | |
| Glory | | | | 1 | 3 | 1 | |
| Holiday | | | | | | | |
| Imagination | | | | 1 | 5 | | |
| Inspiration | 1 | | | | | | |
| Legend | | | | | | | |
| Liberty | | | | | | | |
| Miracle | | | | | | | |
| Paradise | | | | 1 | 3 | 1 | |
| Pride | 2 | | | | 1 | | |
| Sensation | | | | | 5 | | |
| Spirit | 1 | | | | 2 | | |
| Triumph | | | | | 2 | 1 | |
| Valor | 1 | | | | 4 | | |
| Victory | | 1 | | | 3 | | |
| **TOTAL** | 6 | 3 | 2 | 5 | 47 | 6 | 1 |
| | | | | | | | |
| | | | | | | | |

© Ross A. Klein, PhD – ross@cruisejunkie.com

6

| Cruise Line | MINORS | | | ALCOHOL INVOLVED | | | DOMESTIC VIOLENCE |
|---|---|---|---|---|---|---|---|
| | SEXUAL CONTACT | SEXUAL ASSAULT | SEXUAL HARRASSMENT | ASSAULT W/ SBI | SEXUAL CONTACT/ ASSAULT | SIMPLE ASSAULT | |
| **Celebrity** | | | | | | | |
| Century | | | | | | 1 | |
| Constellation | | | | | | | |
| Galaxy | | | | | | | |
| Infinity | | | | | | | |
| Mercury | | | | | | | |
| Millennium | | | | 1 | | | |
| Summit | | | | | | | |
| **TOTAL** | | | | 1 | | 1 | |
| | | | | | | | |
| **Costa** | | | | | | | |
| Fortuna | | | 1 | | | | |
| Mediterranea | | | | | | | |
| | | | | | | | |
| **Crystal** | | | | | | | |
| Serenity | 1 | | | | | | |
| | | | | | | | |
| **Disney[11]** | | 1 | | | | | |
| | | | | | | | |
| **Holland America[12]** | | | | | | | |
| Amsterdam | | | | | | | |
| Maasdam | | | | | | | |
| Oosterdam | | | | | | | |
| Ryndam | | | | | | | |
| Statendam | | | | | | | |
| Volendam | | | | | | | |
| Westerdam | | | | | | | |
| Zuiderdam | | | | | | | |
| **TOTAL** | | | | | | | |
| | | | | | | | |

| Cruise Line | MINORS | | | ALCOHOL INVOLVED | | | DOMESTIC VIOLENCE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | SEXUAL CONTACT | SEXUAL ASSAULT | SEXUAL HARRASSMENT | ASSAULT W/ SBI | SEXUAL CONTACT/ ASSAULT | SIMPLE ASSAULT | |
| **NCL[13]** | | | | | | | |
| Dawn | | 1 | | | | | |
| Majesty | 1 | | | | | 1 | |
| Star | | | | | | | |
| **TOTAL** | 1 | 1 | | | | 1 | |
| | | | | | | | |
| **NCLA** | | | | | | | |
| Pride of America | | | | | | | |
| | | | | | | | |
| **Princess[14]** | | | | | | | |
| Caribbean | 2 | | | | | 1 | |
| Coral | | | | | | | |
| Dawn | | | | | | | |
| **TOTAL** | 2 | | | | | 1 | |
| | | | | | | | |
| **RCI** | | | | | | | |
| Adventure | 1 | | | | | 1 | 1 |
| Brilliance | | | | | | | 1 |
| Empress | | | | | | | |
| Enchantment | 1 | | | | | 2 | 3 |
| Explorer | | 2 | | 1 | | | |
| Freedom | | | | 1 | 1 | 4 | 4 |
| Grandeur | 1 | | | | 1 | 2 | 1 |
| Jewel | | | | | | | |
| Liberty | | | | | | 3 | 2 |
| Majesty | | | | | 1 | 3 | 5 |
| Mariner | | | | 1 | | | 5 |
| Monarch | | 2 | | 1 | 2 | 6 | 4 |
| Navigator | | 1 | | | | | |
| Radiance | | | | | 1 | 1 | |
| Rhapsody | | | | | | | |
| Serenade | | 1 | | | | | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sovereign | 1 | | | | 1 | 4 | 8 |
| Splendor | | | | | | 1 | |
| Vision | | | | | | 3 | 1 |
| Voyager | | | | | | | |
| **TOTAL** | 4 | 6 | | 4 | 7 | 30 | 36 |
| | | | | | | | |

| | MINORS | | | ALCOHOL INVOLVED | | | **DOMESTIC VIOLENCE** |
|---|---|---|---|---|---|---|---|
| **Cruise Line** | SEXUAL CONTACT | SEXUAL ASSAULT | SEXUAL HARRASSMENT | ASSAULT W/ SBI | SEXUAL CONTACT/ ASSAULT | SIMPLE ASSAULT | |
| | | | | | | | |
| **Seabourn** | | | | | | | |
| Legend | | | | | | | |
| | | | | | | | |
| **SeaEscape** | | | | | | | |
| | | | | | | | |
| **Windstar** | | | | | | | |
| Windstar | | | | | | 1 | |
| | | | | | | | |
| **GRAND TOTALS** | 14 | 11 | 3 | 10 | 54 | 40 | 37 |

NOTES:

[1] Data was secured through a Freedom of Information request by Ken Carver/International Cruise Victims Association

[2] Minor refers to passengers aged 17 or younger.

[3] Alcohol involved are incidents where the crime reports the victim of perpetrated was intoxicated.

[4] Sexual contact refers to incidents of unwanted sexually touching, unwanted kisses, and incidents where a minor has been propositioned or otherwise approached by an adult.

[5] Sexual assault refers to incidents of unwanted sexual contact with genitalia, unwanted attempts to have sexual relations, and forcible rape.

[6] Sexual harassment refers to incidents of verbal sexual abuse and/or where an employee is asked to trace sexual favors for advancement in or continuing in their job.

[7] Assault with Serious Bodily Injury refers to incidents were there is an altercation or fight; one or both parties require medical attention for serious cuts, abrasions, concussion, or broken bones.

[8] Sexual contact/assault refers to any incident of a sexual nature (i.e., it combines the categories of sexual contact and sexual assault)

[9] Simple assault refers to incidents where there is an altercation or fight; one or both parties may experience minor injuries requiring medical attention.

[10] Domestic violence refers to incidents of spousal abuse or the physical abuse of a child.

[11] Disney Cruises Line has one ship with no crime reports received.

[12] Holland America Line has five ships with no crime reports received.

[13] NCL has seven ships with no crime reports received.

[14] Princess has 13 ships with no crime reports received.

© Ross A. Klein, PhD – ross@cruisejunkie.com

**Table 4:  Crimes Involving Minors, Alcohol, or Domestic Violence by Cruise Line**
(based on reports to the FBI)[1]

| Cruise Line | MINORS[2] | | | ALCOHOL INVOLVED[3] | | | DOMESTIC VIOLENCE[10] |
|---|---|---|---|---|---|---|---|
| | SEXUAL CONTACT[4] | SEXUAL ASSAULT[5] | SEXUAL HARRASSMENT[6] | ASSAULT W/ SBI[7] | SEXUAL CONTACT/ ASSAULT[8] | SIMPLE ASSAULT[9] | |
| Azamara | | | | | | | |
| Carnival | 6 | 3 | 2 | 5 | 47 | 6 | 1 |
| Celebrity | | | | 1 | | 1 | |
| Costa | | | 1 | | | | |
| Crystal | 1 | | | | | | |
| Discovery | | | | | | | |
| Disney | | 1 | | | | | |
| Holland America | | | | | | | |
| NCL | 1 | 1 | | | | 1 | |
| NCLA | | | | | | | |
| Princess | 2 | | | | | 1 | |
| RCI | 4 | 6 | | 4 | 7 | 30 | 36 |
| Seabourn | | | | | | | |
| SeaEscape | | | | | | | |
| Windstar | | | | | | 1 | |
| TOTALS | 14 | 11 | 3 | 10 | 54 | 40 | 37 |
| As % of TOTAL for CRIME | 18.7% | 14.7% | 50.0% | 62.5% | 36.0% | 34.8% | 32.2%[2] |

NOTES:
[1] Data was secured through a Freedom of Information request by Ken Carver/International Cruise Victims Association
[2] Minor refers to passengers aged 17 or younger.
[3] Alcohol involved are incidents where the crime reports the victim of perpetrated was intoxicated.
[4] Sexual contact refers to incidents of unwanted sexually touching, unwanted kisses, and incidents where a minor has been propositioned or otherwise approached by an adult.
[5] Sexual assault refers to incidents of unwanted sexual contact with genitalia, unwanted attempts to have sexual relations, and forcible rape.
[6] Sexual harassment refers to incidents of verbal sexual abuse and/or where an employee is asked to trace sexual favors for advancement in or continuing in their job.
[7] Assault with Serious Bodily Injury refers to incidents were there is an altercation or fight; one or both parties require medical attention for serious cuts, abrasions, concussion, or broken bones.
[8] Sexual contact/assault refers to any incident of a sexual nature (i.e., it combines the categories of sexual contact and sexual assault)
[9] Simple assault refers to incidents where there is an altercation or fight; one or both parties may experience minor injuries requiring medical attention.
[10] Domestic violence refers to incidents of spousal abuse or the physical abuse of a child.
[11] Disney Cruises Line has one ship with no crime reports received.     [12] Holland America Line has five ships with no crime reports received.
[13] NCL has seven ships with no crime reports received.     [14] Princess has 13 ships with no crime reports received.

© Ross A. Klein, PhD – ross@cruisejunkie.com

## Table 5: Crimes Involving Crew Members
(based on reports to the FBI)[1]

| | Crew on Crew (F victim : M victim) | Crew on Pax (F victim : M victim) | Pax on Crew (F victim : M victim) | Total |
|---|---|---|---|---|
| Simple Assault | 6 (1:5) | 1 (1:0) | 4 (1:3) | 11 (3:8) |
| Assault w/ SBI | 3 (0:3) | - | 1 (0:1) | 4 (0:4) |
| Subtotal | 9 (1:8) | 1 (1:0) | 5 (1:4) | 15 (3:12) |
| % of all onboard assaults | 6.9% | 0.7% | 3.8% | 11.4% |
| | | | | |
| Sexual Harass | 4 (4:0) | - | - | 4 (4:0) |
| Sexual Contact | 13 (10:3) | 12 (11:1) | 7 (2:5) | 32 (23:9) |
| Sexual Assault | 11 (11:0) | 20 (20:0) | 2 (0:2) | 33 (31:2) |
| Other | - | 1 (1:0) | - | 1 (1:0) |
| Subtotal | 28 (25:3) | 33 (32:1) | 9 (3:6) | 70 (60:10) |
| % of sex-related incidents | 17.9% | 21.1% | 5.8% | 44.9% |
| | | | | |
| Theft[1] | 20 (8:12) | - | - | 20 |
| Theft of ship property[2] | 3 | - | - | 3 |
| Theft >10K[3] | 5 | - | - | 5 |
| Subtotal | 28 | - | - | 28 |
| % of all onboard thefts | 27.7% | - | - | 27.7% |
| | | | | |
| Overboard | - | - | - | 4 |
| % of all persons overboard | - | - | - | 57.2% |
| | | | | |
| Grand Total | 65 | 34 | 14 | 117 |

**NOTES:**

[1] Data was secured through a Freedom of Information request by Ken Carver/International Cruise Victims Association

[2] Total value of theft of crew is $49,600 (average $2,480 per theft)

[3] Total value of theft of ship property is $8,200 (2 incidents) plus one incident of stealing mail (value unknown)

[4] Total value of theft >10K is $120,000 (average $24,000 per theft) – all were thefts against the cruise ship.

© Ross A. Klein, PhD – ross@cruisejunkie.com

Testimony of Ross A. Klein, PhD
Before the
Senate Committee on Commerce, Science, and Transportation

Hearings on "Cruise Industry Oversight: Recent Incidents Show Need for
Stronger Focus on Consumer Protection"

Thursday, July 24, 2013
Russell Senate Office Building
Room #253

Ross A. Klein, PhD, is an international authority on the cruise ship industry. He has published four books, six monographs/reports for nongovernmental organizations, and more than 30 articles and book chapters. He is a professor at Memorial University of Newfoundland in St. John's, Newfoundland, Canada and is online at www.cruisejunkie.com. His CV can be found at www.cruisejunkie.com/vita.pdf  He can be contacted at ross@cruisejunkie.com or rklein@mun.ca

## TABLE OF CONTENTS

**Oral testimony**                                                                3

**Written Testimony**                                                             5

I. Safety and Security of Cruise Ships                                            5
    The Nature of the Problem                                 6
    Lessons to be Learned from These Events                   9
        The Relative Absence of Reliable Data        10
        Frequency and Types of Events                10
        Discernable Insights from Data               11
        Learning from Success, Not Just Accidents    14
        Regulation and Oversight of the Cruise Industry   15

II. Safety and Security of Cruise Passengers                                      17
    Scope of the Problem                                       17
    The Cruise Vessel Security and Safety Act of 2010          18
        From Hearings to Legislation                 21
        Persons Overboard                            21
        Sexual Assaults                              22
            Prevention                       23
            Intervention                     25
            Investigation                    28
            Prosecution                      30
        Other Crimes                                 30

III. Consumer Rights and Cruise Ship Liability                                    31
    CLIA Bill of Rights                                        31
        The Right to Disembark a Docked Ship         32
        The Right to a Full Refund                   33
        The Right to Medical Care                    33
        The Right to Timely Information              34
        The Right to Trained Crew                    35
        The Right to an Emergency Power Source        35
        The Right to Transportation                  36
        The Right to Lodging                         37
        The Right to a Toll-Free Number              37
        The Right to Have Published                  38
        CLIA Passenger Bill of Rights and the Cruise Contract   37
    What the CLIA Passenger Bill of Rights Does Not Include    39
        Passenger Rights                             39
        Cruise Line Rights                           42
        Issues of Liability                          44

1

Illness Outbreaks                 44

Independent Contractors    46

Medical Care              46

Shore excursions        47

Sexual Assaults         48

Limit of Liability       49

IV. In Closing             50

V. Summary of Recommendations    50

Appendix 1: Summary of Cruise Ship Incidents,
        January 2009-June 2013    53

Appendix 2: Ships with Two or More Mechanical Incidents,
        January 2009 – June 2013    54

Appendix 3:    Summary of Persons Overboard,
        January 1995 – June 2013    64

Appendix 4: Drug Busts, January 2009 – June 2013    65

Appendix 5: Sex at Sea: Sexual Crimes Aboard Cruise Ships    66

### ORAL TESTIMONY

*It is an honor to be asked to share my knowledge and insights with the U.S. Senate Committee on Commerce, Science, and Transportation. In my brief oral remarks I will identify some of the key points in my written submission.*

*The cruise industry has received considerable attention in the media in recent years. In 2013 alone the media reports for cruise ships: 3 running aground; 5 fires; 2 collisions; 19 mechanical problems including power loss, propulsion problems, and generator problems; 10 canceled port calls and/or changes in itinerary; 16 cruises with delayed embarkation and/or disembarkation; 2 cruises where passengers were bumped; and 8 ships that have failed U.S. health inspections.*

*In response to the negative publicity from these events, and Senator Schumer's call for greater consumer protection, the Cruise Lines International Association (CLIA) in late-May issued its Passenger Bill of Rights –an obvious public relations initiative. Sadly, a systematic evaluation reveals that while many of the promises on their face are reassuring to cruise passengers, a deeper look indicates the Passenger Bill of Rights is filled with empty promises. Take for example Right #5 - The right to a ship crew that is properly trained in emergency and evacuation procedures. There is a huge chasm between being properly trained and those same crewmembers demonstrating through behavior competence in executing emergency and evacuation procedures. Take for example the U.S. Coast Guard's investigation of the fire and power loss of Carnival Splendor in 2010. It indicates human error in a fire alarm being reset, leading to a 15-minute delay in activation of an automatic fire-suppression system; the crew's lack of familiarity with the engine room, which hampered their ability to locate and fight the fire; and the captain ventilating the compartment where the fire began before it was fully extinguished, allowing the flames to flare again. I doubt the crewmembers were not properly trained, but what assurance does CLIA's Passenger Bill of Rights provide that training will be reflected in action. And what recourse does a passenger have when this or any Right is not realized?*

*Also take for example Right #1 - The right to disembark a docked ship if essential provisions cannot adequately be provided onboard. What cruise passenger would not be reassured by this, but how is this Right fulfilled when a ship is dead in the water for 3 or 4 days and being towed to port? And once the ship returns to port, who decides how quickly disembarkation will begin? Does a passenger have any right to contest a decision to keep them onboard?*

*Coming up with a list of "mom-and-apple-pie" rights is easy. But as they say, the devil is in the details.*

*Perhaps more troubling are contradictions between CLIA's Passenger Bill of Rights and the typical cruise passenger contract. There is no indication which takes precedence, especially given the restrictiveness of the passenger cruise contract with regard to rights held by a cruise passenger (particularly in comparison to the rights of the cruise line) and the extreme limitations on the cruise line's liability for almost anything that happens on a cruise ship. My written*

3

*testimony systematically analyses CLIA's Bill of Rights and typical passenger cruise contracts. This analysis points to the need for better consumer protection of cruise passengers, much like the protections available to passengers on other modes of commercial transportation, including air carriers.*

*My written testimony also provides systematic analysis of the Cruise Vessel Security and Safety Act of 2010. I look at the implications of differences between the Act as initially introduced and the final Act passed. I also look at issues that are not adequately addressed by the current Act. One major issue is the reporting of statistics of crime on cruise ships. The original intent was that the Act would make available all reported crimes on cruise ships. In practice, there are many crimes that are either not being reported to the FBI or which the FBI chooses not to make available to the American public. Take as just one example the fact that for one 15-month period the FBI reports a single case of sexual assault on Norwegian Cruise Line; however records disclosed in discovery indicate the number was actually 23.*

*Access to reliable data is important for passengers who have a right to know the relative risk, including between one cruise line and another and ideally between one cruise ship and another. Through a Freedom of Information request by International Cruise Victims Association I was given 12-months of data to analyze. The analysis was illuminating. It revealed where sexual assaults occur, the identity of perpetrators and victims, and the conditions surrounding an attack (including the presence of alcohol and the high rate of victimization of children).  Availability of such data is important for passengers, and access to data is essential for a proper social epidemiological analysis of the problem.*

*I will stop my oral testimony here. I invite all interested to read my written testimony for a deeper understanding of my insights and resulting concerns. I welcome the Committee's questions.*

4

## WRITTEN TESTIMONY

It is an extreme honor to be asked to share my knowledge and insights with the U.S. Senate Committee on Commerce, Science, and Transportation. My testimony focuses on the parameters I was given when I was invited to testify:

- safety and security issues relating to cruise ships (e.g., fires, collisions, and other accidents);

- safety and security of cruise ship passengers, including discussion of the Cruise Vessel Security and Safety act of 2010;

- consumer rights and issues relating to cruise ship liability, including discussion of CLIA's Passenger Bill of Rights.

## I. SAFETY AND SECURITY OF CRUISE SHIPS

As the luxury liner finally made it to shore … [passengers] expressed disgust at the way they had been treated … Conditions inside the cabins were said to have been "beyond horrific" due to the lack of air conditioning and running water. Lavatories overflowed and they were fed on little but spam sandwiches. They were forced to sleep on deck in sweltering temperatures of up to 35C (95F) and said that the stench in the corridors and cabins was so bad it would remain with them "for a long time"… "Sheer luck has disguised the incompetence from start to finish. Some people are blissfully unaware of how lucky they are."

The alarm was first raised at around 1.30pm on Monday when an electrical fault caused a fire in the engine room and power was lost … All passengers were told to go to their muster stations, at which point many said they feared they would have to abandon ship … It then took three hours to conduct a roll call amid chaotic scenes and growing panic. As black smoke billowed from one of the chimneys, it became immediately clear that a fire had broken out on board.

American Gordon Bradwell, 72, from Georgia, who used to work in the travel industry, was on the cruise ship with his wife Eleanor when the engine caught fire. "It was very tense," he said. "We are just happy to have got through it. We were very hot and the sewage was very poor. Right now we're delighted to be off the ship. We are living off adrenalin right now. We have been eating dried sandwiches for three days so we are looking forward to eating a proper meal. After the fire broke out there was nothing to propel the ship along. Things deteriorated rather quickly. There was no running water so we had go back to living a primitive existence. The cabin temperature reached 110F so we had to sleep on the deck."[1]

---

[1] Ward, V. 2012. "Costa Allegra: Passengers Tell of 'Hell' On-board. *The Telegraph* (March 1).

One might think this describes the ordeal on *Carnival Triumph* in February 2013, but it is about an almost identical incident occurring a year earlier in February 2012. The *Costa Allegra* experienced an engine fire, causing a loss of all power and setting it adrift for three days in the Indian Ocean. It was finally towed to Port Victoria on the island of Mahe in the Seychelles where passengers disembarked. The ship was decommissioned and scrapped after the incident.

## A. The Nature of the Problem

The cruise industry would like us to believe incidents such as the one described above, and the eerily similar incident involving *Carnival Triumph* which had an engine fire knocking out all power and setting the ship adrift for five days[2] – finally arriving in Mobile under tow – are uncommon. The question isn't whether they are uncommon, but how common they are. Take for example the following engine fires, all involving members of the Cruise Lines International Association:[3]

- June 2009 – *Royal Princess* had an engine room fire while leaving Port Said, Egypt. The ship returned to the port the next day and after evaluation of damage the cruise was terminated.
- November 2010 – *Carnival Splendor* has engine room fire setting it adrift; the ship was finally towed to San Diego (150 miles north) even though it was 55 miles west of Punta San Jacinto, Mexico. It was a five day ordeal for passengers. Initially there was no electricity and toilets did not work, but toilets were restored by the end of the first day although there was no air conditioning and no hot food service. The ship's engine that failed had had five alarms between July 21, 2010 and November 5, 2010, most recently repaired on November 5, 2010; the fire occurred on November 8, 2010.[4]
- September 2011 – Hurtigruten's *Nordlys* suffered an engine room fire, killing two crew members and injuring 16. The ship was evacuated by lifeboat and the cruise was terminated. The *Washington Post* reported salvage teams pumped water from the cruise liner in danger of capsizing, reducing the tilt 21.7 degrees in the morning to 16 degrees in the evening.
- October 2011 – Cunard Line's Queen Mary 2 suffered an engine fire causing a loss of power while in a major storm (two other ships chose to turn back from the storm, but the *Queen Mary* decided to battle through). Staff members were given a 90 minute warning in order to prepare to deploy the lifeboats. Guests had their children dropped off and their animals picked up from the kennels. Power was restored, but people were understandably shaken up. Three weeks later the ship twice went dead in the water on a transAtalantic cruise. And again in February 2012 the ship had a total power failure and was dead in the water.

---

[2] See Brown, R., K. Severson, and B. Meier. 2013. "Cruise Line's Woes are Far From Over as Ship Makes Port," *New York Times*, (February 15).
[3] All of these events are reported at Events at Sea (www.cruisejunkie.com/events.html)
[4] See United States Coast Guard. 2013. *Report of Investigation into the Fire Onboard the Carnival Splendor which Occurred in the Pacific Ocean Off the Coast of Mexico on November 8, 2010, which Resulted in Complete Loss of Power*, MISLE Incident Investigation Activity Number: 3897765 (July 15).

- March 2012 – *Azamara Quest* had an engine room fire, injuring five crew members (one critically), setting the ship adrift between Manila and Borneo. The ship was able to restore power and some propulsion after 24 hours and limped to Sandakan, Malaysia, arriving three days after the fire. The cruise was terminated and passengers flown home.
- April 2012 – *Adventure of the Seas* had an engine room fire causing section 6 of the ship to be temporarily evacuated. The ship was adrift for 1-2 hours and then continued on one engine.
- November 2012 – *Adventure of the Seas* had an engine room fire while crossing the Atlantic causing a brief loss of power and electricity.
- February 2013 – *Carnival Triumph* suffers an engine room fire, setting it adrift for five days without power, air conditioning, or toilets. Initial plans were to tow the ship to the closest port, Progresso, Mexico, however a decision was subsequently made to tow the ship to Mobile. NOTE: The ship was reported to have technical problems with its propulsion system affecting its cruising speed and causing a six hour delay in its return to port two weeks before;
- June 2013 – Pullmantur's *Zenith* had a disabling engine fire and had to be towed to port (Venice, Italy)

There are also ships running aground (19 since 2009) with some incidents leading to termination of the cruise. Some examples include:

- January 2009 – Hurtigruten's *Richard With* ran aground at the port of Trondheim on the west coast of Norway suffering propeller damage and taking on water through a leak in a seal. All 153 passengers were evacuated by the local emergency services from land.
- February 2009 – Quark Expeditions' *Ocean Nova* ran aground off Antarctica. Passengers were evacuated to other ships. Unofficial sources report the ship's engines were turned off for maintenance when the ship was blown aground.
- August 2010 – *Clipper Adventurer* ran aground in Canada's Northwest Passage. Passengers wer transported to Coppermine, Nunavut to be transported home.
- October 2010 – Celebrity Cruises' *Century* damaged its rudder at Villefranche-sur-Mer. Cruise terminated.
- March 2013 – Hurtigruten's Kong Harald was forced to wait for the tide to come in and lift the ship off the underground rock at the entrance to Trollfjord where it was grounded and the hull breached. Once the incoming tide freed the ship it carried on to Svolvaer, where all 258 passengers onboard disembarked and were flown home today.
- March 2013 – Coastal and Maritime Voyages' *Marco Polo* ran aground just outside Sortland in Vesterålen causing a leak in a ballast tank.
- March 2013 – Lindblad Expeditions' *National Geographic Sea Lion* hit a rock in the Las Perlas Islands, about 70 nautical miles from Panama City. The ship sustained damage to its hull and one propeller during the incident, but after clearance from the U.S. Coast Guard returned to Panama City on its own power. The cruise was terminated.

It isn't just engine fires and ships running aground. There are other problems worth note:

7

- March 2009 – P&O Cruises' *Aurora* experienced propulsion problems four hours after leaving Sydney. It limped to Auckland where passengers remained onboard for five days while repairs were completed. The world cruise itinerary was changed.
- April 2009 – Passengers were told upon embarkation on *Seven Seas Voyager* that most port calls between Dubai and Rome were canceled because of propulsion problems; the next two cruises canceled.
- November 2009 – *Norwegian Dawn* lost power for hours (and no air conditioning). Power was restored and the ship sailed to San Juan from where passengers were flown home. This and the next cruise were canceled.
- February 2010 – *Costa Europa* collided with pier in Sharm-el-Sheikh, ripping a hole in the side of the ship and flooding crew cabins. Three crewmembers were killed; four passengers were injured. The 18-day cruise from Dubai to Savona was terminated and passengers flown home.
- February 2010 – P&O Australia's *Pacific Dawn* was delayed in port for 18 hours because of propulsion and maintenance problems; its itinerary is changed. Two months later the ship lost power and propulsion and narrowly missed collision with a bridge in Brisbane.
- May 2010 – P&O Cruises' *Artemis* notified passengers upon boarding that engine problems require one port to be dropped from the itinerary. But once underway on the 20 day cruise, originally with ten scheduled port calls, passengers were issued a revised itinerary with four ports calls, only three of which were on the original itinerary.
- June 2010 – Celebrity Cruises' *Infinity* was delayed five or six hours because of engine problems causing a port call to be canceled. Five days later an electrical fire caused a power loss for several hours.
- February 2011 – P&O Australia's *Pacific Sun* delayed 24 hours in its arrival at Newcastle because of engine problems; several port calls canceled. Propulsion problems in November 2010 caused a 10-hour delayed arrival in Melbourne, engine problems cause a cruise to be canceled in April 2010, mechanical problems caused two ports calls to be canceled, and in November 2009 a cruise was canceled to permit repair of the propulsion system.
- March 2011 – MSC's *Opera* twice collided with pier at Buenos Aires damaging several cabins and delaying departure for 10 hours while repairs completed. September 2011 – Toilets in front and mid-ship cabins were inoperable for a day on *Carnival Imagination*. Passengers were told to use public washrooms in the aft section.
- May 2011 – MSC's *Opera* had failure of an electric panel causing power loss for 8.5 hours. The ship was towed to port and the cruise canceled.
- November 2011 – *Carnival Splendor* collided with pier in Puerto Vallarta, requiring it to stay an extra day to complete repairs; the next port call was canceled.
- January 2012 – *Costa Concordia* hits a rock off the Italian coast and capsizes killing 32 people.
- February 2012 – *Enchantment of the Seas* left Baltimore 24 hours late after unsuccessful attempts to repair an engine. The ship started the cruise on one engine, sailing at half speed, and the itinerary changed. Two weeks later the cruise had propulsion problems that left it in Port Canaveral for 27 hours for repairs, again requiring a change to the itinerary.
- March 2012 – Silversea Cruises' *Silver Shadow* collided with container ship in Viet Nam holing the cargo ship; only minor damage to the cruise ship. Passengers were frightened.

- October 2012 – Celebrity Cruises' *Summit* had a tender run aground with 93 passengers and 2 crew members. The tender suffered major damage and passengers were rescued by a fishing boat and whale-watching boat.
- November 2012 – *Saga Ruby* had engine problems that required the current cruise to be canceled.
- March 2013 – A malfunction of the backup emergency power diesel generator caused power outages and plumbing issues on *Carnival Dream* and led to a cruise being terminated in Saint Maarten and passengers flown home.
- March 2013 – Steering problems required *Carnival Elation* to have a tugboat escort to port.
- March 2013 – *Carnival Legend* was disabled and stuck in Costa Maya for a day. It finally got underway at reduced speed and dropped a port call to arrive on time at its port of disembarkation. The itinerary of the subsequent cruise was changed because of propulsion problems.
- March 2013 – *Seven Seas Voyager* suffered propulsion problems causing ports to be skipped.
- April 2013 – *Crown Princess* began a cruise with 410 cabins having toilets that would not flush. Until they were fixed, passengers needed to go to public bathrooms (even during the middle of the night).

The list can go on. Appendix 2 lists cruise ships having two or more incidents between January 2009 and June 2013. It shows 353 incidents involving mechanical problems and accidents, approximately 80 incidents per year.

The obvious question is how such events can be so common. A February 2013 in *Newsweek* gives the perspective of Jim Hall, head of the National Transportation Safety Board during the Clinton administration:

> [He] says the industry is watched over by "paper tigers" like the International Maritime Organization and suffers from "bad actors" ... "The maritime industry is the oldest transportation industry around. We're talking centuries. It's a culture that has never been broken as the aviation industry was, and you see evidence of that culture in the [Costa Concordia] accident," says Hall.
>
> Ships may seem and feel American but are mostly "flagged" in countries like the Bahamas or Panama in order to operate outside of what he says are reasonable safety standards. "It is, and has been, an outlaw industry," says Hall. "People who book cruises should be aware of that."[5]

## B. Lessons to be Learned from These Events

My point is not to muckrake, listing all that goes wrong with cruise ships. My analysis instead provides insights. By knowing the problems, we can identify potential solutions. The available data raises several issues.

[5] Conant, E. 2013. "Carnival from Hell: The Warning Signs Before the Triumph Disaster," *Newsweek* (February 22).

## 1. The Relative Absence of Reliable Data

"No one is systematically collecting data of collisions, fires, evacuations, groundings, sinkings," says Jim Walker, a maritime lawyer, to the *New York Times*. The article goes on to say:

> The reason for the lack of data is that cruise lines, while based in the United States, typically incorporate and register their ships overseas. Industry experts say the only place cruise lines are obligated to report anything is to the state under whose laws the ship operates."[6]

As the article points out, there remains no comprehensive public database of events at sea like fires, power failures, and evacuations except the data available at my website, Cruise Junkie dot Com.

While I take this acknowledgement as a compliment, it identifies a major gap in available information. My data is based on reports available in the public media and, on occasion, reports from passengers and/or crewmembers. There are many incidents occurring that never reach the public domain. Consequently, there is no way for passengers to know the track record of an individual cruise line or the ships comprising the line.

The data I have benefits greatly from the efforts of Senator Rockefeller who made public a list of casualty investigations by the U.S. Coast Guard for 2008 – 2012 and the Sun-Sentinel, which posted online U.S. Coast Guard data received through a Freedom of Information request. While the two datasets have considerable overlap, there are incidents on one list not appearing on the other, and incidents in my dataset that appear on neither.

Making data available is more important than simply making passengers aware. It allows a sort of social epidemiology of cruise ship incidents from which patterns can be discerned and potential solutions formulated. Rather than seeing each major incident as unique and unrelated to anything before it, a comprehensive data set permits early identification of trends or common problems. Unlike the airline industry, which is governed by the FAA, there is no similar authority when it comes to the cruise industry.

**Recommendation #1:** *There is need for systematic reporting of all cruise ship incidents to an independent, central authority charged with responsibility for data analysis and policy and operational recommendations.*

## 2. Frequency and Types of Events

There is a range of incidents occurring on cruise ships. Between January 2009 and June 2013 there were more than 350 incidents involving mechanical problems or accidents (see Appendix 1). The most frequent incidents were:

---

[6] Rosenbloom, S. 2013. "How normal are cruise mishaps," *New York Times* (May 8, 2013).

- propulsion and engine problems (average 19.59 per year) – 7 in which cruise ships were known to go adrift;
- fires (average 13.56 per year) – 6 known to require evacuation and 4 with loss of power;
- material failure and lifeboat failure (average 13.33 per year); and
- collisions (average 11.56 per year).

These four categories account for 261 incidents – all combined yielding an average 58 incidents per year. As seen in Appendix 1, less frequent incidents include loss of power (n=21), running aground (n=19), maneuverability and steering problems (n=15), experiencing a severe list (n=11), and technical (n=8) and electrical (n=8) problems. It needs to be remembered that these accounts rely on public reports, so the list is largely incomplete and underrepresents the actual frequency. For example, as relates to fires, a ship officer recently wrote to me saying:

> Every ship, almost weekly, has some type of fire incident.  This could be something as simple as a cigarette butt in a trash can or a fire in the silo of the incinerator, or a grease fire, toaster fire, electrical cord fire in the galley.  These are never reported because they are put out quickly, within minutes.  However, there are fires happening on ships every single week. (Private correspondence)

In part related to these incidents, and in part related to weather-related factors (not including tropical storms and hurricanes), there were 104 cruises (average 23 per year) with media-reported canceled port calls, 69 cruises with media-reported itinerary changes, 25 cruises with media-reported canceled cruises, and 73 cruises with media-reported delays in embarkation/debarkation. In sum, there are 271 incidents resulting in a cruise itinerary provided passengers when he or she booked the cruise being  different than the itinerary delivered. The number is undoubtedly considerably higher given that there is no centralized collection of data on the degree to which cruise ships approximate their published itinerary, and my data does not include cruise itinerary changes caused by hurricanes or tropical storms.

**Recommendation #2:** *Similar to data maintained on airlines documenting "on time" performance, there should be a mechanism whereby cruise ships and cruise lines have reported their adherence to itineraries and on time performance.*

3. Discernable Insights from Data

Based on cursory analysis of the limited data available – approximately 1,500 incidents in four-and-a-half years (an average 333 per year) – there are two insights that stand out. First is that Carnival Cruise Lines is disproportionately represented. Appendix 2 shows ships with two or more mechanical incidents from January 2009 through June 2013. Not only does Carnival Cruise Lines have a higher proportion of its fleet included on the list (19 of 23 (82.6%) versus 10 of 16 (62.5%) for Princess Cruises, 10 of 21 (47.6%) for Royal Caribbean International, and 4 of 11 (36.3%) for Celebrity Cruises), but it has a higher average rate of incidents per ship listed (3.89 for Carnival Cruise Lines versus 3.40 for Princess Cruises, 3.25 for Celebrity Cruises, and 3.20 for Royal Caribbean International). An obvious question is why the rate of incidents for Carnival Cruise Lines would be 20% higher than for Royal Caribbean International; 30% higher than for Holland America Line and P&O Cruises, both of which are also owned by Carnival Corporation.

One factor may be the number and training of staff, but this is based on conjecture. An inside source in Royal Caribbean Cruises Limited wrote to me after the *Carnival Triumph* fire saying:

> I've worked at RCCL for many years. Over the last 10 years they have been steadily decreasing the number of marine employees. These are the employees that navigate and maintain the engines and the main employees dealing with life saving. If there is a fire - it's the marine team suiting up and fighting the fires. If the ship is listing or sinking - it's the marine team dealing with technical systems such as water tight doors, moving tank contents from one area to another, making contact with rescue services, lowering life boats, etc.
>
> The reason for the decrease in marine manning?  It's purely driven by concern for profit. You can get rid of two marine employees who do not generate any income (they just play a major role in saving lives if something goes wrong) and replace them with a hotel employee such as a marketing and revenue manager or a maître 'd for income-generating specialty restaurants, or bar supervisors. Many times employees are cut in the marine department or doubled up in cabins so the company can revamp the crew cabins into sellable cruise guest cabins.
>
> Approximately 5 years ago RCCL got rid of the safety officer position and combined the job with the chief officer position. There is now talk about changing the marine contracts for 3 stripe officers from 10 weeks/10 weeks off to 4 months on/2 months off so they match the hotel officer positions. The degree of technical knowledge needed, and the tremendous life saving responsibility marine officers have, is in no way equal to the demands placed on hotel officers to sell another drink. When the ship is sinking - do you want a marine officer that knows the technical systems or do you want a hotel officer selling you another beer as you are stepping into a lifeboat? (Personal correspondence)

While these comments are specific to one corporation, it raises to the forefront the degree to which this pattern is common to other cruise lines. Anecdotal accounts indicate changes of the same nature are taking place within Carnival Cruise Lines. This leads to a question requiring empirical research using reliable data. The problem is that such data is not available, largely because systematic independent oversight of the cruise industry is lacking. It is in stark contrast to the airline industry where oversight and reporting is the norm.

**Recommendation #3:** *There is need for greater oversight and monitoring of the cruise industry in order to monitor changing trends and to determine whether these changes are related to changes in safety and/or casualties.*

A second insight from the data is a preliminary conclusion also based in part on anecdotal information. It appears there is a pattern of incidents involving ships built on the Destiny platform (Destiny-class and Dream-class ships): my understanding is that *Carnival Destiny, Carnival Triumph, Carnival Splendor, Carnival Glory, Carnival Breeze, Carnival Dream, Carnival Liberty*, and *Carnival Magic* have all reported electrical and/or propulsion issues,

12

power losses, and some electrical fires over the last three years or so (not all of these have been reported in the media and are thus not included in my dataset); *Costa Concordia, Costa Magica, Costa Serena* and *Costa Pacifica* have also reported similar problems during this timespan – all of these ships are Destiny platform design ships.

The relevant difference between Destiny platform and the Spirit/Vista 1/Vista 2/Signature classes is simple. Destiny platform ships have only been built at Fincantieri shipyards in Italy from a design by Fincantieri. Spirit & Vista 1 class ships originated in Kvaener Masa shipyards and were then adapted/enlarged by Fincantieri. The original blueprints had more than enough redundancy to allow for growth and design tweaks. There is limited redundancy built into the Destiny platform ships, which may be why they suffer from systemic failures.

This is illustrated in the report of the *Carnival Splendor* fire, leading to the ship losing all power and going dead in the water. The report observes that "vessel engineers were unable to restart the unaffected main generators due to extensive damage to cables in the aft engine room."[7] It goes on to state, there is "susceptibility of the Carnival Splendor and all Dream class vessels to a complete loss of power resulting from damage to a single area of electrical system components in either the forward or aft engine room." Presumably, with appropriate redundancy the main generators would have been functional.

The report also observes design flaws that cut across Dream class (and presumably Destiny platform vessels). These include air cooler drainage problems, noted as far back as October 2009 and documented problems with the CO2 system. That these problems were identified as early as 2009, and may have been factors in the catastrophic nature of both the *Carnival Splendor* and *Carnival Triumph* fires lends convincing support for increased independent oversight of the cruise industry.

Carnival Cruise Lines appears to address the shortcoming of redundancy through its announcement April 17, 2013, of a $300 million program to enhance operating reliability, an initiative spurred by the *Carnival Triumph* fire in February 2013. As stated in the company's press release, the initiative will add an additional emergency generator on each vessel and install a second permanent back-up power system. There will also be increased fire prevention, detection and suppression systems. As well, there will be modifications to decrease the likelihood of losing propulsion or primary power.

> The modifications will include a reconfiguration of certain engine-related electrical components. On ships where these enhancements will be made, the design of specialized components will require longer lead times for completion.[8]

---

[7] United States Coast Guard. 2013. *Report of Investigation into the Fire Onboard the Carnival Splendor which Occurred in the Pacific Ocean Off the Coast of Mexico on November 8, 2010, which Resulted in Complete Loss of Power*, MISLE Incident Investigation Activity Number: 3897765 (July 15).
[8] See "Carnival Cruise Lines announces fleetwide $300 million program to enhance operating reliability and guest comfort." April 17, 2013. Online at: http://carnival-news.com/2013/04/17/carnival-cruise-lines-announces-fleetwide-300-million-program-to-enhance-operating-reliability-and-guest-comfort/

While the company deserves recognition of the steps being taken, an obvious question is how many of these enhancements involve adding components that were not originally included in the ship's design, but are normally included in the design of ships operated by other cruise lines and/or built and designed by other ship yards. An independent audit is the only reliable means for determining the situation.

More serious is that the company did not appear to maximize learning from the *Carnival Splendor* fire in 2010. First, a report about the incident was not issued until three years later, perhaps because responsibility rested with Panamanian authorities; this even though Carnival Cruise Lines had employed a number of experts to provide them with analysis of causes of the fire. However, a preliminary U.S. Coast Guard investigation revealed several holes in the ship's fire fighting methodology, not to mention significant errors in its firefighting operations manual.

> According to a marine advisory issue by the Coast Guard, the Splendor's firefighting instruction manual was riddled with problems, including references to "pulling" valves that actually needed to be turned to operate, incorrect descriptions of system locations, inaccurate graphics and schematics and confusing instructions such as: 'Once the fire has been extinguished, make sure that the temperature has decreased before investigate the area same time is needed to wait hours.'[9]

**Recommendation #4:** *Ships operating from U.S. ports should be obligatorily subject to accident investigations by the National Transportation Safety Board as a condition of using U.S. ports, and should be subject to the same fines and other administrative actions the NTSB is empowered to take with other modes of commercial transportation.*

4. Learning from Success, Not Just Accidents

So far I have looked at what might be learned from accidents and things that go wrong on cruise ships. There is another way to look at the data; concentrate on those cruise ships and cruise lines that appear to be under-represented when it comes to incidents. For example, among the mass market cruise lines Norwegian Cruise Line and MSC Cruises appear to have much lower incidence of fires, groundings, engine failures and accidents than others in this class. It would be interesting to know what those cruise lines are doing differently than Carnival Cruise Lines and Royal Caribbean International. The problem is that cruise lines under Cruise Lines International Association (CLIA) tend to not effectively differentiate themselves with regard to such things, and the consuming public lacks reliable data on which to compare cruise lines. As an authority on the cruise industry I am often asked what cruise line or cruise ship is the safest. I can give an anecdotal response, but without adequate data it is difficult to give a fully informed response.

There are similar contrasts among cruise lines in the premium and ultra-luxury segments, however they aren't as stark as among the mass market cruise lines. It appears that Oceania Cruises has a better record than Celebrity Cruises and both have a better record than Holland America Line; all have a better record than Princess Cruises. Similarly, Seabourn Cruises appears to have fewer incidents than Silverseas Cruises and both less than Regent Seven Seas

---

[9] Wolfe, K.A. 2013. "Horrific Carnival cruise gets D.C.'s attention," *Politico* (February 27).

Cruises. Seadream Yacht Club has a lower incidence rate than any of the ships in the ultra-luxury category.

Again, it appears that some companies are doing a far-better job than others. Research on what they are doing, whether in staffing and training or in ship design and maintenance, is worth attention. This would naturally be something undertaken by an industry-based body, but this is unlikely to happen given the dominance in CLIA of under-achievers. As well, such research must be done by a wholly-independent researcher.

**Recommendation #5:** *There needs to be funded research, ideally provided by the cruise industry to a wholly independent body, to learn from those cruise lines that appear to be effective in reducing incidents and accidents.*

5. Regulation and Oversight of the Cruise Industry

Unlike the airline industry, the cruise industry is largely self-regulated. As foreign-registered vessels operated by foreign-located corporations, cruise ships are not subject to many regulations and laws in the U.S. However, cruise ships operating from U.S. ports are subject to regular safety inspections by the U.S. Coast Guard and they voluntarily participate in the Vessel Sanitation Program of the Centers for Disease Control (CDC) and report illness outbreaks affected 3% or more of passengers and/or 2% or more of crew members on ships operating from a U.S. port (ships operating from foreign ports, but sailing with a majority or U.S. passengers do not have to file illness reports with the CDC). While reports of CDC activities are available online, reports of U.S. Coast Guard inspections are not.

I received from a San Francisco-based NBC-affiliate a set of inspections (Annual Control Verification Exam) done by the U.S. Coast Guard in San Francisco from 2002 to 2012; they had been acquired through a Freedom of Information request. These reports spanning 82 pages were illuminating. It was interesting to see the types of deficiencies identified by inspectors (e.g., fuel leaks, water leaks from fire pumps, many lifeboat problems, missing or faulty equipment, faulty fire extinguishers, improper record keeping of required information, exposed live electric wires, faulty doors, mixing of segregated garbage streams (including hazardous waste), fire risks, security deficiencies, and more) and the length of time permitted for correction of some of the deficiencies. Given these are annual inspections, it is difficult to know how long deficiencies were overlooked or ignored. Of greater concern is that these inspections are not entirely unannounced, so officers and crew often prepare for them and the most obvious problems are corrected in advance.

In extreme cases, a matter identified in the Annual Control Verification Exam was referred to the vessel's Classification Society (e.g., Lloyd's Register, Bureau Veritas, Registro Italiano Navale, Det Norske Veritas), which certifies the ship's safety and seaworthiness. While these societies appear to be independent, they earn their income from cruise lines and may be conflicted when taking action that can cost the cruise line money or cause a ship to be taken out of service. For example, there is a fair number of cases where ships have been judged to have insufficient lifeboat space for the number of passengers. In some, the Classification Society has instructed the cruise line to book fewer passengers on the ship until the lifeboat(s) has/have been repaired.

15

In others, the Classification Society has permitted the cruise ship to accommodate passengers on inflatable rafts rather than lifeboats. It is unclear whether this is a reasonable solution if there were need for emergency evacuation, especially if like the *Costa Concordia* half of the lifeboats cannot be deployed.

There is also need for the U.S. Coast Guard to oversee and review the work of classification societies. For example, the report of the *Carnival Splendor* fire indicates:

> The firefighting manual available to officers onboard the Carnival Splendor referred to a CO2 system but not the one that was installed onboard the vessel. Related system photographs, images, schematics and diagrams were also found to be inaccurate.

> A review of CO2 system documents revealed a RINA approved test memoranda dated October 20, 2006, which established the following procedure for testing the CO2 system: 1) select the zone or line, 2) observe the shutdowns of ventilation systems, machinery and other warning alarms and then 3) move to the gas-release procedure, which included cylinder selection for the particular zone and verification of pressurization of the manifold, etc. Another document that appears to be part of a RINA approval letter dated December 28, 2008, describes the operational procedure in exact reverse order.

> In this instance, ship's crew opened the cylinder valves first. As a result, the pressure differential across the zone valve prevented opening of the ball valve.

This reminds me of publicly-reported findings in 2001 and 2004 respectively , both involving a ship approved by their Classification Society. The first involves Holland America Line's *Zaandam.* In May 2001 a crew member noticed a sprinkler head missing from a passenger cabin and upon investigation found that a branch of the sprinkler system did not connect to the main water supply. The problem was corrected.[10]

In the second, the British Marine and Coastguard Agency ordered Cunard Line's Queen Mary 2 in June 2004 to fit extra sprinklers in the ship's 1,300 passenger cabins. A BBC investigation revealed material used in the ships' bathroom units did not meet international fire safety regulations. A short-term remedy was fitting all cabins with an extra smoke detector, but the ship must also add extra sprinklers in bathrooms. The ship is estimated to contain 140,000 pounds (63,503 kilograms) of the material causing concern.[11]

**Recommendation #6**: *Ships should have thorough and exhaustive safety inspections by the U.S. Coast Guard without advance warning. Full reports (including all details) of cruise ship inspections by the U.S. Coast Guard should be available online.*

---

[10] Seatrade Insider. 2001. "Another Ship Sprinkler Problem," Seatrade Insider (June 5).
[11] BBC News. 2004. "Urgent Safety Work Starts on QM2," BBC News (June 26).

The importance of an unannounced, surprise inspection is demonstrated by a recent health inspection of Silversea Cruise's *Silver Shadow*. The ship had never had an inspection score of 99 in May 2012 and 95 in September 2012, however following complaints to the CDC from crewmembers a surprise inspection was done June 17, 2013, and the ship received a failing score of 84. Crewmembers had alleged that they were forced to store raw meat, salami, fish, cakes, and every kind of culinary preparations in their cabins and remote hallways to avoid inspections by the U.S. Public Health (USPH), and that some spoilable food items were kept out of the refrigerator in cabins and hallways but were served the following day to the cruise passengers.  Other complaints included the alleged use of out-of-date ingredients which were served to the guests. Again, the importance of inspections being done unannounced and without advance notice can not be stressed enough.

## II. SAFETY AND SECURITY OF CRUISE PASSENGERS

Previous committee hearings have dealt with safety and security of cruise passengers.[12] I won't duplicate that information here, except to summarize some important points.

### A. Scope of the Problem

It is worth noting that the only comprehensive dataset for crime on cruise ships is based on data provided by the FBI in response to a Freedom of Information request by the International Cruise Victims Association. Between October 1, 2007 and September 30, 2008, the data reveals there were 115 simple assaults, 16 assaults with serious bodily injury, 89 thefts less then $10,000, 12 thefts more than $10,000, 154 sex related incidents, 7 people overboard, and 3 drug arrests. A comprehensive analysis of the data on sexual assaults on cruise ships is reported in "Sex at Sea: Sexual Crimes Aboard Cruise Ships," published in 2011 in the *Journal of Tourism in Marine Environments* (see Appendix 4).

Two areas are worth further mention here because the data is not reported elsewhere. First, is persons overboard. Since 1995, there have been 201 reports of persons gone overboard from passenger ships.[13] As shown in Appendix 3, 73.8% were male, 26.2% female. On average, males are a shade younger than females (38.85% vs 42.11%). The majority go overboard from cruise ships: 91.4% from a cruise ship, 8.6% from a ferry. While data is limited, we know that the person overboard was rescued alive in 16.7% of cases, 11% cases were a confirmed suicide, and all indications are that 3.3% of cases involve murder. Alcohol was a factor in at least 6.2% of cases, a fight with a significant other in 7.1% of cases, 2.4% followed a significant loss in the casino, and 9.5% were witnessed and confirmed to be a fall. These numbers will be discussed further later.

---

[12] Testimony before the Senate Committee on Commerce, Science and Transportation, Hearings on "Oversight of the Cruise Industry," March 1, 2012; Testimony before the Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety, and Security, Senate Committee on Commerce, Science and Transportation, June 19, 2008; Testimony before Subcommittee on Coast Guard and Maritime Transportation, Committee on Transportation and Infrastructure, Hearings on "Crimes Against Americans on Cruise Ships, March 27, 2007.

[13] See www.cruisejunkie.com/Overboard.html

The second area worth mention is drug arrests. Between January 2009 and June 2013 there were 53 media reports of drug arrests on cruise ships involving 87 people. Based on cases where data is available, we know that males are more likely to be arrested than females (83.33% vs 16.66%); the average age is the same for both genders. The largest number of individual incidents occur in Bermuda (n=27) where cruise ships are routinely searched by government officials using drug-sniffing dogs; the U.S. had 8 incidents involving the arrest of 27 individuals, in all cases the person was apprehended by Customs and Border Protection agents.  Ships with the largest number arrests are *Norwegian Dawn* (9) and *Explorer of the Seas* (6) (see Appendix 4). Most frequently, drug arrests are for small amounts of marijuana, from several grams to less than an ounce.

### B. The Cruise Vessel Security and Safety Act of 2010 (CVSSA)

The Cruise Vessel Security and Safety Act was introduced in 2008 following Congressional hearings in 2005, 2006, 2007, and 2008. The hearings in 2005 were convened in December by two subcommittees of the House of Representatives Committee on Government Reform: the Subcommittee on National Security, Emerging Threats and International Relations chaired by Christopher Shays and the Subcommittee on Criminal Justice, Drug Policy and Human Resources chaired by Mark Souder. The hearings had a twofold purpose. First, given the recent attack of the *Seabourn Spirit* by pirates off the coast of Somalia, they sought to determine the decision-making procedures and processes that were in place to determine the extent to which the U.S. Government responds to a ship being attacked by terrorists or pirates. The second purpose of the hearings was to determine jurisdictional conflicts that occur when U.S. citizens traveling on a foreign-flagged vessel are involved in a criminal incident. These incidents included sexual assaults, physical assaults, robbery, and missing persons. The hearings concluded with an assurance they would reconvene in March in order to hear directly from victims.

Hearings were reconvened in March 2006. The committee heard from six victims of crime on cruise ships: three victims of a sexual assault, two families with three persons overboard (one mysterious, one alcohol-related fall), and one incident involving a theft of $6,700. The committee also heard from International Cruise Victims Association (ICV), which presented 10 recommendations, many of which would be incorporated in the CVSSA; and from an expert hired by the cruise industry who claimed the rate of sexual assault on cruise ships was half the rate on land. The committee appeared to be sceptical about the reliability of crime statistics and acknowledged the absence of reliable data on persons overboard from cruise ships. Subsequent to the hearing Representative Shays introduced on June 28, 2006 HR 5707, *Cruise Line Accurate Safety Statistics Act*. The bill was straightforward. It required cruise ships that call at a port in the United States to report all crimes occurring on the ship in which a U.S. citizen is involved. It also required this information to be made available to the public on the Internet. The cruise industry didn't embrace the legislation and with the current session of Congress near-complete the legislation died in committee.

18

In March 2007 hearings were held by the Subcommittee on Coast Guard and Maritime Transportation of the House of Representatives Committee on Transportation and Infrastructure. Two things appear to have solidified support for the hearings. First, the *Los Angeles Times* published an article on January 20, 2007, which based on internal documents from Royal Caribbean said sex-related onboard incidents was a larger problem than the cruise industry suggested in March 2006. The documents revealed 273 reported incidents within a period of thirty-two months, including 99 cases of sexual harassment, 81 of sexual assault, 52 of inappropriate touching, 28 of sexual battery and 13 cases that fit into other categories.[14] When the company-specific numbers were subjected to the same statistical analysis as done with industry-wide data in James Fox's 2006 testimony before Congress, the rate of sexual assault was not half the average rate for rape in the U.S., but 50 percent greater than the U.S. rate.[15]

The second factor that pushed for a new round of hearings was that Representative Doris Matsui from California had a constituent, Laurie Dishman, appeal for help following non-prosecution of a rape by a security officer on a Royal Caribbean International's *Vision of the Seas*. Matsui was not only concerned about the way Laurie had been treated and her case handled, but also with discrepancies in crime statistics.

These hearings opened with the FBI and Coast Guard announcing that an agreement had just been reached with the cruise industry whereby cruise line members of the Cruise Line International Association (CLIA) agreed to report to the FBI (either a field office in the U.S. or the FBI Legal Attaché at an embassy or consulate closest to the vessel's location at the time of the incident) all crimes against Americans on their ships. To many the timing of the announcement was suspicious. As well, the agreement appeared to be a rehash of the "zero tolerance" policy announced by the International Council of Cruise Lines in 1999 and it was redundant to reporting requirements already in place. The key difference was the agreement provided a standardized form for reporting crimes that the FBI could use to establish a data set from which reports could be drawn for Congress and other government authorities. The data would not to be available to the public. The hearings also heard from ICV, Laurie Dishman, a sociologist who reported on analysis of the crime statistics presented in the *Los Angeles Times*, an attorney who represents cruise victims, and representatives of the cruise industry. At the end of the hearings the subcommittee chair, Elijah Cummings, called on CLIA and ICV to get together and to attempt to find some common ground and solutions. He said he'd prefer a solution that did not require legislation, but also said that legislation was always an option. He gave the two sides six months and said the hearings would reconvene in September.

With no solution from collaboration between ICV and CLIA, hearings were reconvened in September 2007. The day before the Congressional subcommittee reconvened September 19, 2007, Representatives Matsui and Shays with twenty-three co-sponsors introduced a House Resolution to call attention to the growing level of crime on cruise ships and the lack of federal regulations overseeing the cruise industry. The purpose of the reconvened hearings was to

---

[14] Yoshino, K. 2007. "Cruise Industry's Dark Waters: What Happens at Sea Stays There as Crimes on Lineres Go Unresolved," *Los Angeles Times* (January 20).

[15] Klein, R. A. 2007. "Crime Against Americans on Cruise Ships," Testimony Before the Committee on Transportation and Infrastructure, United States House of Representatives, Subcommittee on Coast Guard and Maritime Transportation, March 27.

receive an update on the status of discussions between ICV and CLIA and to examine whether the security practices and procedures aboard cruise ships are adequate to ensure the safety of all passengers. As before, it received testimony from the FBI and Coast Guard, which discussed the implementation of the reporting framework announced at the previous hearings; from ICV and several of its members (parents of a 21-year-old who fell overboard while throwing up over a railing, two sexual assault victims, a surviving family member whose father died in a cruise ship fire); and from the cruise industry. Not surprisingly the cruise industry painted a picture that said everything was under control, that it is working diligently to improve situations raised as sources of concern by its critics, and that cruises continue to be safe.[16] The claim of safety was based in large part on the FBI receiving from cruise ships only forty-one reports of sexual assault and twenty-eight cases of sexual contact between April 1 and August 23, 2007. Together, these numbers give an annualized rate for sexual abuse on CLIA member cruise lines of 172 incidents; a rate of 56.9 per 100,000 passengers – several fold higher than the rate claimed in the 2006 hearings. The industry also used the hearings to announce formation of its survivors' working group, a group that ostensibly attempted to supplant ICV.

Less than a week after the hearings, the House Committee on Homeland Security approved by voice vote inclusion of language in the Coast Guard Authorization Act requiring cruise lines to notify the Department of Homeland Security Secretary of security-related incidents involving U.S. persons when it advises its next port of call of its arrival. Incidents required to be reported under the legislation include any act that results in death, serious bodily injury, sexual assault, a missing person, or that poses a significant threat to the cruise ship, any cruise ship passenger, any port facility, or any person in or near the port. Unlike Representative Shays' Cruise Line Accurate Safety Statistics Act, the reports would not be made public.

At the same time there was a move involving Senator John Kerry and Representatives Matsui, Shays, and Maloney to write legislation that would require cruise lines to immediately notify the FBI about crimes, suicides, and disappearances. The legislation would also provide protocols for collecting evidence. The legislation in many ways is like the agreement announced in March 2007 between CLIA and the FBI would be mandatory. A key requirement of any legislation or regulation, if it is to be useful to the public, is public disclosure. Passengers should know the history of problems and incidents on a cruise ship, much the same as they can view reports of sanitation inspections conducted on cruise ships by the Centers for Disease Control.

The Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety, and Security of the Senate Committee on Commerce, Science and Transportation held hearings in June 2008. The hearings heard from ICV; CLIA; the Rape, Abuse, Incest and Neglect Network (RAINN); and a sociologist reporting on analysis of sexual assault data and on persons overboard. The information presented was similar to previous hearings in the House of Representatives, however RAINN discussed the need and methods for providing support to victims of sexual assault on cruise ships. The CVSSA was introduced shortly after the hearings.

---

[16] Dale, T. 2007. "Cruise Ship Security Practices and Procedures," Testimony Before the Committee on Transportation and Infrastructure, United States House of Representatives, Subcommittee on Coast Guard and Maritime Transportation, September 19.

## 1. From Hearings to Legislation

A key advocate for legislation was the International Cruise Victims Association, formed when its founders (Ken Carver whose 40 year old daughter mysteriously went missing in 2004 from *Mercury,* a Celebrity ship; Bree Smith whose 26 year old brother mysteriously went missing in on his honeymoon in 2005 from *Brilliance of the Seas,* a Royal Caribbean ship; Son Michael Pham whose parents aged 67 and 71 mysteriously went missing in 2005 from *Carnival Destiny*; the parents of 23 year old Amy Bradley who mysteriously went missing in 1998 from *Rhapsody of the Seas*, a Royal Caribbean ship; and the parents of 22 year old James Scavone who mysteriously went missing in 1999 from *Carnival Destiny*) met at the 2005 hearings. The sponsor of the CVSSA in 2008 in the U.S. House of Representatives was Doris Matsui (HR 6408); in the U.S. Senate John Kerry (S 3204). The legislation was reintroduced in 2009 as HR 3360 and S 588 and subsequently passed, becoming Public Law 111-207.

The initial version of the CVSSA reflected concerns raised in hearings and contained solutions to identified problems. However, a number of provisions of the Act when it was first introduced in 2008 and in March 2009 were changed when introduced in the Senate in June 2009, presumably partially in response to lobbying by the cruise industry or others. These changes and other elements of the legislation will guide this discussion.

## 2. Persons Overboard

The number of people going overboard from cruise ships is significant: between 20 and 25 a year since 2009. It is known that in 9.5% of cases the person fell overboard, however if we trust cruise industry claims – they often say a passenger has fallen or jumped even if the assertion cannot be independently corroborated – then the percentage is much higher. With that in mind, it is curious that the original version of the CVSSA stated, "The vessel shall be equipped with ship rails that are located not less than 4½ feet above the deck" (§3507 (a)(1)(A)). However the legislation passed set the height one foot lower at 42 inches. In retrospect, it would appear the original provision of 54 inches (4½ feet) may be more reasonable as an impediment to passengers falling overboard.

A second change is seen in §3507(a)(1)(D). The original proposed legislation stated, "The vessel shall integrate technology that can be used for detecting passengers who have fallen overboard, to the extent that such technology is available." Such technology is available, but there are cost implications.

The revised legislation states, "The vessel shall integrate technology that can be used for capturing images of passengers or detecting passengers who have fallen overboard, to the extent that such technology is available." While close-circuit television (CCTV) technology (used to capture images of persons going overboard) may be effective if it were monitored in real-time, it is of little use when tapes are reviewed only after it is known a person has disappeared. In addition, there are issues with whether CCTV cameras cover all relevant areas where a person may go overboard, and whether images are readily made available when requested. In a recent case in which I was retained as an expert witness we found that the CCTV images were recorded using old technology (not in a format easily viewed) and when converted the images were of

21

limited probative value. Again, it would appear that the original legislation proposed in 2007 was more effective in identifying when a person goes overboard and in causing a response that is more likely to lead to a live rescue. Many of the 16.7% of cases where a person is rescued alive is when their disappearance is observed and reported to officers who immediately execute rescue procedures.

Data also indicates there is sufficient number of cases of persons going overboard when they are intoxicated. In two known cases the person was bending over the railing while throwing-up over the side of the ship. This is further reason for raising railing height, but also reinforces the need for stringent rules for the responsible service of alcohol; not just training, but practice.

One other concern is the way the FBI interprets the CVSSA. International Cruise Victims Association reports they have been told by the FBI that a person overboard is not necessarily a crime and thus will not be investigated and not included in the FBI's official statistics. It is difficult to understand how a determination can be made about whether a case of a person overboard is not a crime without a proper investigation. Even if CCTV videotapes show a person falling overboard, an investigation may be warranted to determine the conditions surrounding the incident, for example whether intoxication is an issue and whether the cruise ship was responsible in serving alcohol. Current wording of the CVSSA does not classify a person overboard as a crime.

**Recommendation #7:** Original provisions of the CVSSA regarding railing height and technology to detect passengers who have fallen overboard be reconsidered.

3. Sexual Assaults

Contrary to cruise industry claims, sexual assaults are an ongoing problem on cruise ships. Just in the past couple of months there have been media reports of a 12-year-old girl groped on *Celebrity Century* by a 30-year-old male passenger, and an 11-year-old girl molested by a crew member on *Disney Dream*. In neither case was the perpetrator arrested or prosecuted; in the latter, the crewmember was offloaded by the cruise line in the Bahamas and flown home to India at the cruise line's expense. Data from the FBI for October 2007 through September 2008 reveals that at least 18% of sexual assault victims are younger than age 18. The data was secured through a freedom of information request.

Unfortunately, reliable data is hard to come by. No comprehensive FBI data has been available since 2008. The only other data available for analysis was provided in the discovery phase of lawsuits, yielding incident reports from 1998 through 2002 for one cruise line; 1998 through 2005 for another. In a recent lawsuit involving the sexual assault of a minor a cruise line was ordered by the judge to disclose to the plaintiff's attorney all reported cases of sexual assault for the previous five years. The cruise line settled the case out of court in order to avoid complying with the court order.

There is much to be learned from incident reports of sexual assault. We know that the most frequent perpetrator among crewmembers (between 50% and 77% of sexual assaults on passengers are perpetrated by a crew member) is a room steward (34.8%) followed by dining

22

room waiter (25%) and bar worker (13.2%). We also know that the most frequent location for the assault is a passenger cabin (36.4%) and that alcohol is a factor in 36% of incidents involving minors. Having detailed data permits identification of risk and of potential solutions or means for ameliorating the problem. However, changes to the CVSSA between the first versions to the version passed make this data much more difficult to access and thus more difficult for proper prevention and intervention. The following discussion will be organized around prevention, intervention, investigation, and prosecution.

*Prevention*

The best way to deal with sexual assault is to have methods of primary prevention. One of the most effective methods is for passengers to know the risk. That is why the initial version of the CVSSA not only required all sexual assaults to be reported to the FBI but that "The Secretary shall maintain, on an Internet site of the department in which the Coast Guard is operating, a numerical accounting of the missing persons and alleged crimes…" (§3507(c)(4)(A)). But the section was changed in the final version to read, "The Secretary shall maintain a statistical compilation of all incidents described in paragraph (3)(A)(i) on an Internet site that provides a numerical accounting of the missing persons and alleged crimes recorded in each report filed under paragraph (3)(A)(i) that are no longer under investigation by the Federal Bureau of Investigation" (§3507(e)(4)(A)0.

The result is that the FBI only publicly discloses those cases where they have opened a case and they have subsequently closed the case. Those incidents judged to be he said-she said, or where sufficient evidence is not available, do not have an investigation so appear to be not reported. Unlike crimes on land that are included in Uniform Crime Statistics and that reflect all complaints of a crime, crimes on cruise ships are only publicly recorded when the FBI has decided first that an investigation is warranted and second when the investigation is closed. The result is that the number of publicly reported sexual assaults on cruise ships is grossly under-reported. The one-year data for 2007-08 reported 154 sex-related incidents. In stark contrast, the FBI dataset on the U.S. Coast Guard website (which is difficult to find) reports 11 incidents in 2012 (data for 2010 and 2011 was not accessible). More illuminating is a recent case I was involved with. The FBI indicated that the cruise line (NCL) had one case of sexual assault in 15 months, but records disclosed in discovery indicated the cruise line had received (and we assume reported to the FBI in compliance with the CVSSA) 23 complaints. The change in the language of the Act effectively makes invisible the true scale of the problem of sexual assault and undermines passenger awareness of the need to protect themselves and their children.

**Recommendation #8:** *The CVSSA should require reported cases of sexual assault committed on a cruise ship be displayed online and broken down by cruise line and cruise ship. In addition, the raw data of cases should be made available upon request for statistical/sociological analysis in order to permit a social epidemiology of the problem.*

A provision that was not changed, but that may need to be revisited relates to crew access to passenger cabins. §3507(f)(1) states that a cruise ship shall "establish and implement procedures and restrictions concerning – (A) which crewmembers have access to passenger staterooms; and (B) the periods during which they have access; and (2) ensure that the procedures and restrictions

are fully and properly implemented and periodically reviewed." While this provision is clear in its intent, it may not be specific enough in its statement. I am not sure if it effectively addresses certain incidents of sexual assault. Take for example the teenage daughter left in her parent's cabin who is walked in upon and sexually assaulted by a crew member gaining access with a room key; or the adult woman who returns to her room in the middle of the afternoon and when she walks out of the shower finds a crew member in her room and is raped; or a woman who wakes in the middle of the night and finds a crew member standing over her and is assaulted. These cases are not anomalies, but even if they were they demonstrate why there is clear need for strict restrictions on crewmember access to passenger cabins. As it stands, restrictions on access to passenger cabins by room stewards, maintenance people, minibar stockers, and others are unclear. This may be addressed in legislation that more clearly identifies parameters for when crew members have access to passenger cabins (e.g., between 9:00 AM and 11:59 AM, and between 6:00 PM and 9:00 PM). At the very least, passengers should be told what hours of the day a crewmember may have access to their cabin.

**Recommendation #9:** *The CVSSA should require passengers to be advised of the hours during which crewmembers may access their cabin without specific permission from the passenger.*

Another strategy for prevention, as well as useful for investigation, is CCTV cameras. There are two issues. One is that cruise ships often have real cameras and dummy cameras around the ship. Consequently, a crewmember may take a passenger to an area with no camera or a dummy camera and then assault them. This was the case when an 8-yearo-ld girl was molested on a cruise ship: a cleaner led her down a hallway with the promise he would help her find her way back to her family's cabin. He knew where there were active cameras and where there were dummy cameras.

A second related issue is where live cameras are located. In a recent case in which I served as an expert witness I raised concern about where cameras were and were not located, pointing out that cameras were not directed toward areas that I believed were high risk. The cruise line's attorney countered that the CVSSA only requires that "The owner of a vessel … shall maintain a video surveillance system to assist in documenting crimes on the vessel and in providing evidence for the prosecution of such crimes" (§3507(b)(1). In this case the area not being covered was the entrance to public washrooms even though one data set indicates that 4.4% (n=14) of sexual assaults occur in public washrooms. While it shouldn't be necessary for an act to clearly specify where CCTV surveillance should take place, the current language of the Act is so vague that it can be effectively used to counter and/or undermine victim claims when an assault occurs. As has already been mentioned, the videotapes that were provided by the cruise line in this case were of such poor quality that they had no probative value.

**Recommendation #10:** *The CVSSA more clearly and specifically state requirements for CCTV surveillance and the quality and format of tape recordings.*

A final method of prevention is making passengers aware of the risk of crime on cruise ships. I have already discussed the quality of information reported on the website maintained by the U.S. Coast Guard, however the website is difficult to find and for most passengers does not alert them to the risk. Perhaps a better way to alert passengers of onboard risk is through the "Security

24

Guide" required under §3507(c)(1)(A) of the Act. Presently the Act requires the guide to be available for each passenger, but doesn't specify how availability is achieved. The Act requires the guide to "provide a description of medical and security personnel designated on board to prevent and respond to criminal and medical situations with 24 hour contact instructions" and to describe the jurisdictional authority applicable and the law enforcement process available with respect to reporting a crime. However there is no requirement for the guide to include a clear statement of what crimes occur on cruise ships, nor for it to educate passengers in methods and/or strategies for reducing vulnerability to crime. The guide could be an effective method for forewarning passengers of known dangers.

Ironically, passengers are often advised in port lectures of things they can do to reduce the likelihood of becoming a victim to crime ashore, but there is no parallel information for how to reduce the likelihood of crime onboard the ship. It is reasonable to expect a cruise ship to alert parents to the need to supervise their children and to be aware of the risk of child sexual assault onboard, to advise adult passengers of the risk of sexual assault and the most common places and scenarios where these occur – this may include advice to keep track of one's drink to be sure it is not drugged or otherwise tampered with. The data on sexual assaults provides considerable insight into where and when sexual assaults occur; information that passengers would benefit from knowing.

**Recommendation #11:** *The CVSSA explicitly require the "Security Guide" be placed in plain sight in every passenger cabin and that the content of the guide include information about the types of crimes on cruise ships, where they commonly occur, and steps a passenger can take to decrease the likelihood of becoming a victim of crime.*

*Intervention*

Despite best efforts, it is likely some sexual assaults will occur on cruise ships. The issue then is how victims will be treated. Again, there was a critical change from early drafts of the CVSSA and the Act that subsequently passed into law. §3507(e)(3) stated,

> … make available on the vessel at all times an individual licensed to practice as a medical doctor in the United States to promptly perform such an examination upon request and to provide proper medical treatment of a victim, including antiretroviral medications and other medications that may prevent the transmission of human immunodeficiency virus and other sexually transmitted diseases.

This was replaced with §3507(d)(3) that reads:

> (3) make available on the vessel at all times medical staff who have undergone a credentialing process to verify that he or she— (A) possesses a current physician's or registered nurse's license and— (i) has at least 3 years of post-graduate or postregistration clinical practice in general and emergency medicine; or (ii) holds board certification in emergency medicine, family practice medicine, or internal medicine; … and (C) meets guidelines established by the American College of

25

Emergency Physicians relating to the treatment and care of victims of sexual assault.

The most significant change is the required qualifications of the person providing medical care to a sexual assault victim. The original draft clearly required a physician who is licensed to practice in the United States; the change permits either a doctor or a nurse and makes no reference to where that person was trained or where they are licensed. This change is significant.

There are several reasons why this change may be of concern. First, some may believe a physician would be better able to deal with a medical issue. But more importantly is where that doctor was trained and is licensed. There has traditionally been a wide variation in medical care on cruise ships. Some cruise lines have chosen only physicians trained and licensed in the U.S., Canada, or U.K.; others have drawn physicians from a variety of countries because they are able to pay significantly less. This is not to impugn the competence of all foreign-trained physicians, but there may be issues around language (competence in English, which is important given the nuances and emotions at play in a sexual assault), issues around culture and different views about women and sexuality, and differences in knowledge of clinical guidelines common in the U.S. Perhaps more important is that when there is malpractice a physician in the U.S., Canada, or the U.K. may be easy to find, but a physician from a developing country or a non-English speaking country may be exceedingly difficult for a patient to track down.

The reference in the CVSSA to guidelines established by the American College of Emergency Physicians may be seen as a way of dealing with some of these concerns. However a review of the Policy Compendium (2013 Edition) of the American College of Emergency Physicians (ACEP) brings other issues to the forefront. The Compendium reads:

> The sexually assaulted patient, who may be an adult or child of either sex, presents special medical, psychological, and legal needs. ACEP believes that all patients who report a sexual assault are entitled to prompt access to emergency medical care and competent collection of evidence that will assist in the investigation and prosecution of the incident. ACEP has therefore developed the following guidelines:
> - With the cooperative efforts of local governments, law enforcement agencies, hospitals, courts, and other relevant organizations, each county, state or other geographic area should establish a community plan to deal with the sexually assaulted patient. The plan should ensure that capable, trained personnel and appropriate equipment are available for treating sexual assault patients.
> - Each community plan should address the medical, psychological, safety, and legal needs of the sexually assaulted patient. The plan should provide for counseling, and should specifically address pregnancy and testing for and treatment of sexually transmissible diseases, including HIV.
> - Each hospital should provide for access to appropriate medical, technical, and psychological support for the patient. A community may elect to establish, under the supervision of a physician, an alternative medical site, which specializes in the care of the sexually assaulted patient and provides

medical and psychological support capabilities when no other injuries are evident.

- A victim of sexual assault should be offered prophylaxis for pregnancy and for sexually transmitted diseases, subject to informed consent and consistent with current treatment guidelines. Physicians and allied health practitioners who find this practice morally objectionable or who practice at hospitals that prohibit prophylaxis or contraception should offer to refer victims of sexual assault to another provider who can provide these services in a timely fashion.

- Specially trained, nonphysician medical personnel should be allowed to perform evidentiary examinations in jurisdictions in which evidence collected in such a manner is admissible in criminal cases.

- Physicians and trained medical staff who collect evidence, perform in good faith, and follow protocols should be immune from civil or criminal penalties related to evidence collection, documentation of findings, and recording of the patient's subjective complaints.

- For the special diagnostic and therapeutic needs of the pediatric patient, a community plan should provide for primary referral centers with expertise and ancillary social services that support a multidisciplinary approach.

- As part of its ongoing quality management activities, the hospital should establish patient care criteria for the management of the sexually assaulted patient and monitor staff performance.

- ED staff should have ongoing training and education in the management of the sexually assaulted patient.

- ACEP supports appropriate measures to prevent sexual assault in the community.

First, and perhaps most important, is the guidelines place the emergency care physician as the primary care provider to a victim of sexual assault. Nonphyscian medical personnel may be allowed to perform evidentiary examinations, however the guidelines do not contemplate a nurse being responsible for the care received by a sexual assault victim. The CVSSA contradicts this by permitting it.

Second, the guidelines set expectations on the community, including ongoing quality management activities, however these do not appear to be part of what a cruise ship does, especially with physicians typically working a four-month (or less) contract. The infirmary on a cruise ship is not comparable to a land-based hospital and it is difficult for it to comply with the guidelines.

One guideline that is of particular note is that the ACEP expects the physician to support appropriate measures to prevent sexual assault in the community. As has already been discussed, there is much more a cruise ship can do to prevent sexual assault and to, in turn, comply with this guideline. One has to wonder whether an under-contract physician who is considered an independent contractor is in a position to effectively advocate on such a matter.

27

Finally, the guidelines are explicit that the psychological and safety needs of a sexual assault victim be addressed. It also has very specific expectations for how the pediatric patient will be treated, including referral centers and ancillary social services. These "best practices" are not available on a cruise ship. There are no psychological services available onboard, and cruise ships do not typically take responsibility for referring the sexual assault victim (especially a child) to appropriate therapeutic and support services. As well, a victim of sexual assault will often see their perpetrator wandering freely on the cruise ship, which seriously questions the commitment to the victim's need for feeling safe. In both cases discussed above, of the 11-year-old and 12-year-old girls recently sexually assaulted, the perpetrator was not apprehended in a timely manner (in one case the perpetrator was not apprehended at all).

While the intent of the CVSSA in referencing the ACEP guideline is laudable, it is an empty gesture when the guidelines do not fit with the setting. More appropriate would be language that addresses: 1) the qualifications of the physician charged with treating sexual assault victims; 2) the appropriate role played by nonphysician medical personnel; and 3) the provision of psychological and therapeutic services both onboard and appropriate referrals for when the victim returns home from the ship. These latter requirements may be met through a partnership with land-based organizations such as RAINN or with land-based service providers. Interestingly, based on the landscape of onboard sexual assaults I advocated in my 2002 book, *Cruise Ship Blues: The Underside of the Cruise Industry*, that cruise ships invest in having a counselor onboard a ship, both for passengers and crew. I write:

> The counselor would be someone competent in dealing with cases of sexual assault, who could serve as an ombudsperson in matters arising between passengers and staff or between shipboard employees. If a counselor is to be effective and seen as someone to turn to, it is essential that he or she be independent of the ship's hierarchical structure – a status similar to the ship's physician who on medical matters essentially answers to no one onboard, not even the captain. Counselors would need to be independent, and independently available. The simple fact is that abuses are known to occur on ships, but the information is kept within the shipboard community. The only way that information gets out is by having an outsider brought in (p. 161).

I know this was read by cruise industry executives and their lawyers, but it had no apparent effect.

**Recommendation #12:** *The CVSSA should require onboard physicians to be board certified in emergency medicine, family practice medicine, or internal medicine in the U.S., U.K., Canada, Australia, France, or Germany. Further, there should be clear statements about how cruise ships will treat the psychological and safety needs of sexual assault victims, especially victims who are minors.*

*Investigation*

Proper investigation of cruise ship crimes and preservation of evidence is critical, especially in a case of sexual assault. In addition, there needs to be proper procedures for ensuring chain of

evidence requirements. Though beyond my expertise, I have to wonder whether evidence collected and secured by a shipboard safety officer will stand up in a shore side court of law. I suspect a critical issue will also be whether the safety officer is available to testify in a criminal prosecution or a civil case, especially if the case is against his/her employer.

This raises a critical issue with regard to the independence and impartiality of onboard security officers. On land when there is a sexual assault the victim can talk to their local law enforcement office, which is totally independent of the perpetrator, and they receive medical care and support services from professionals who are also independent of the perpetrator. On a cruise ship, a victim's case is investigated by an employee of the cruise line, a relationship that becomes particularly thorny when the perpetrator is also a cruise line employee – the most recent comprehensive data of sexual assaults on cruise ships indicates that the majority are perpetrated by a cruise ship employee; and then their medical care is provided by another employee of the cruise line. This situation does not engender the same level of trust a victim is likely to have when dealing with the same issue on land.

**Recommendation #13:** *Cruise ships should be required to have a private, independent law enforcement agent for purposes of crime investigation. These would be similar to the wholly-independent Ocean Rangers placed on cruise ships by the State of Alaska to monitor discharge of waste streams while the ship is in Alaska state waters.*

Notwithstanding the above, §3508(a) of the CVSSA states that the Secretary "shall develop training standards and curricula to allow for the certification of passenger vessel security personnel, crewmembers, and law enforcement officials on the appropriate methods for prevention, detection, evidence preservation, and reporting of criminal activities in the international maritime environment." The intent of this provision is clear, however the execution appears to be problematic. Compliance is ostensibly effected by *Model Course CVSSA 11-01: Crime Prevention, Detection, Evidence Preservation and Reporting*. This is an on-line course that takes eight hours (one day) to complete. Aside from there being no direct contact between an instructor and a student, there is a total of three hours devoted to "Crime Scene Actions," which includes techniques used by law enforcement, action required to preserve different crime scenes, and access control. There is extremely limited content on collection and preservation of evidence. The stated measure of competence for this three-hour module is that "requirements related to reporting and recording of serious crimes are correctly identified and demonstrated." It is unclear from the manual how students are tested (although it appears that the most likely method is multiple choice and other closed-choice exams) and whether the student can learn in three hours the skills and knowledge commonly possessed by crime scene investigators on shore. While the course may be useful for training support personnel to a professionally trained investigator, it appears inadequate preparation if the concern is with gathering evidence that will withstand the requirements of land-based law enforcement and a court of law.

**Recommendation #14:** *In the absence of a professionally qualified crime scene investigator, a cruise ship should be required to have onboard a staff person with more than adequate training in all facets of crime scene preservation, collection of evidence, and methods to ensure proper chain of evidence.*

29

*Prosecution*

The final area to consider regarding sexual assault is prosecution of the perpetrator. I have already addressed the need for evidence to facilitate prosecution. Another critical issue is to detain the offender. This may be more easily done when the perpetrator is a crewmember, however when a passenger perpetrates a sexual assault he or she should also be detained for law enforcement personnel at the next U.S. port. It is unfortunate when a crewmember is flown to his home country from a foreign port rather than having to face prosecution, especially when the crime is irrefutably caught on videotape, as was the case of the 11-year-old girl molested on *Disney Dream* in May 2013. It is equally sad that a 30-year-old man who groped a 12 year old girl can wander freely on the ship while the girl and her family are reminded of the ordeal every time they see him.

**Recommendation #15:**  *Cruise ship personnel should take more seriously their responsibility to detain perpetrators of sexual assault until the ship arrives at its next U.S. port. Further, Congress should contemplate whether there needs to be a legislated requirement to ensure perpetrators are isolated from the general public onboard the ship and held for delivery to land-based law enforcement personnel.*

## 4. Other Crimes

There are two crimes for which the FBI collected data in 2007-08, but that are not required to be reported under the CVSSA. One is a theft of less than $10,000 – there were 89 in the one year period 2007-08. The other is simple assault – there were 115 in the same one year period. It doesn't seem right that these crimes are not recorded and that victim rights are apparently truncated.

As regard theft, there is the obvious fact that crew members know that a theft of less than $10,000 will not only not be prosecuted, but will not be recorded. This seems like an open door for a permissible level of crime. Why $10,000 rather than $9,800? The amount appears arbitrary. However, more importantly, by not collecting data there is no ability for analysis to discern patterns or trends that might inform interdiction or prevention. As well, there is no way to know whether the problem is increasing or decreasing, and whether the problem on cruise ships is greater or lesser than on land.

Judge Thomas A. Dickerson of the New York State 9th Judicial District makes the same point, but more eloquently:

> [The Act does not] … require the reporting of thefts which are between $1,000 and $9,999 in value. These problems may be resolved as follows. First, requiring owners to report thefts less than $10,000 would allow local law enforcement to investigate and deter future crimes. Second, mandating owners to include the recorded thefts of property valued between $1,000 and $9,999 on the USCG website would allow prospective cruise passengers to better appreciate the risks associated with cruises. An even more effective method would be to breakdown the

30

USCG online reporting by individual cruise ships, rather than by cruise lines, as is currently required.[17]

There are similar concerns with regard to simple assault. What if the assault is a case of domestic violence (a fair proportion of which do fall within this category) – why would this not be reported and considered for prosecution, especially if the victim decides to press charges. Also, what is the fine line between a simple assault and an assault with serious bodily injury? Are cruise ship personnel expert in making this determination? I think not. But most importantly is the fact that having this data is useful both to determine changes over time as well as to compare the situation between different cruise ships and between cruise ships and incidence on land. It would seem it is in the interest of the cruise industry to have this data collected, unless they are concerned that the rate onboard their ships is higher than the rate onshore.

**Recommendation #16:** *The CVSSA should require reporting to the FBI of all onboard crime, including thefts less than $10,000 and simple assaults.*

## III. CONSUMER RIGHTS AND CRUISE SHIP LIABILITY

The issue of consumer rights was directly addressed by CLIA's recent announcement of its Passenger Bill of Bights. This will be discussed first. I will then shift to the broader issue of liability as it applies to cruise ships and cruise lines.

### A. CLIA Passenger Bill of Rights

The CLIA Bill of Rights is as interesting for what it includes as for what it does not include. It was announced May 22, 2013 just five days before a fire on *Grandeur of the Sea;* probably motivated in large part by a series of problems before and following the media-focused fire on the *Carnival Triumph* and by Senator Schumer's stated intent to develop a passenger bill of rights. In the month before the *Carnival Triumph* fire, five ships experienced propulsion problems causing delay and/or requiring itinerary changes: *Carnival Splendor*, *Carnival Destiny*, *Carnival Legend*, *Carnival Triumph*, and P&O Cruises' *Aurora* (all ships operated by Carnival Corporation). In the several months following the *Carnival Triumph* fire there were the following:

- *Seaborn Odyssey* had a power failure and was towed to port in New Zealand;
- Cunard Line's *Queen Elizabeth* had a collision with a tug boat packed with pleasure seekers in New Zealand;
- Hurtigruten's *Kong Herald* ran aground and the cruise was canceled;
- Coastal and Maritime Voyage's *Marco Polo* was holed and canceled its cruise;
- *Carnival Dream* had generator problems and ended a cruise early, flying passengers home from Saint Maarten;

---

[17] Dickerson, T.A. and S. L. Sgroi. 2012. "Recent Developments in Maritime Law," Presented at the Joint Judicial Seminar Program for the Appellate Divisions for the First and Second Judicial Departments," April 25. Available at: <www.nycourts.gov/courts/9jd/TacCert_pdfs/Dickerson_Docs/recent_dev_maritimelaw.pdf>

- *Carnival Legend* had propulsion problems and was stuck for a day in Costa Maya; the ship altered the itinerary on this cruise and the next because of continuing problems;
- *Carnival Elation* had steering problems and required assistance of a tug to navigate to New Orleans;
- P&O's *Ventura* had propulsion problems transatlantic and changed its itinerary;
- Regent Seven Seas' *Voyager* had propulsion problems causing significant delays;
- *Carnival Sunshine* canceled two cruises because of longer-than-anticipated time in dry dock; when the ship finally left dry dock passengers complained that work was still being done and some ship services are unavailable;
- *Celebrity Millennium* had propulsion problems that caused itinerary changes, at one point being dead in the water for three hours in the South China Sea;
- *Carnival Ecstasy* experienced a power failure;
- *Coral Princess* experienced a fire;

And then comes the Passenger Bill of Rights – no doubt a public relations initiative to counter the wave of bad publicity (notably, all but three of the problems occurred on ships operated by Carnival Corporation). In announcing the Bill of Rights CLIA stated that they detail CLIA members' "commitment to the safety, comfort and care of guests." CLIA also stated the Bill of Rights "codifies many longstanding practices of CLIA members and goes beyond these to further inform cruise guests of the industry's commitment to their comfort and care." The obvious question then is what is new about the Bill of Rights. I will address this and then consider what isn't contained in the Bill of Rights.

1. The right to disembark a docked ship if essential provisions such as food, water, restroom facilities and access to medical care cannot adequately be provided onboard, subject only to the Master's concern for passenger safety and security and customs and immigration requirements of the port.

This Right makes perfect sense if a ship is alongside a pier, however it does not consider the issue of passengers who are stranded on ships without electrical power, propulsion, toilets, air conditioning and adequate food for three to five days. What are the rights of those passengers? Getting off a ship when it is docked is an easy Right to guarantee. However there are still questions. As Senator Schumer observes in his May 21, 2013 letter to CLIA, who determines that essential provisions cannot be adequately provided? If someone on the ship or the cruise line is the decision maker, how can passengers appeal that decision? But there is also the issue of disembarking in a port that requires clearance by customs and immigration officials. A cruise ship can prevent disembarkation if local port authorities do not cooperate. What are the rights of passengers then?

The issue of landing and needing clearance from immigration officials was raised as a potential concern when *Carnival Triumph* had its fire and the company decided to tow the ship to a U.S. port rather than to a closer Mexican port. The explanation given was that many passengers didn't have passports, so disembarking in Mexico and repatriating to the U.S. could be problematic. Does the location of a ship truncate one's rights? On surface the Right sounds reasonable, but in the concrete situation with a range of conditions it isn't as straightforward.

32

2. The right to a full refund for a trip that is canceled due to mechanical failures, or a partial refund for voyages that are terminated early due to those failures.

Again, the Right is straightforward and sounds reasonable. If a product paid for is not delivered there will be a refund. But the Right does not indicate whether the refund is in cash and how long it will take for the refund to be processed – the passenger paid for their cruise 60 – 90 days in advance of the cruise so shouldn't they be entitled to the income generated by the cruise line for the period of time it held the money on deposit? As well, how is a partial refund calculated and what mechanism is in place for a passenger to challenge the entitlement offered by the cruise line.

But there is a larger issue. What is a passenger's Right when they fly to a distant port and learn upon arrival that their ship will not depart? Will the cruise line reimburse their travel costs to the port on top of refunding the cruise fare? This is not clear from the Passenger Bill of Rights. The Passenger Bill of Rights is also not clear about a passenger's rights if a cruise line leaves port with a cruise ship that it is known will not be able to fulfill the published itinerary, as was the case on a couple of cruises listed in Appendix 2.

A related issue is how the Passenger Bill of Rights applies to a missed port and/or changed itinerary. There is a significant number of these as noted in Appendix 2 (see for example *Aurora* (March 2009), *Seven Seas Voyager* (April 2009), *Pacific Dawn* (February 2010), *Artemis* (May 2010), *Infinity* (June 2010), *Pacific Sun* (February 2011), *Enchantment of the Seas* (February 2012), *Carnival Legend* (March 2013), *Seven Seas Voyager* (March 2013), *Crown Princess* (April 2013)). Do passengers have the right to be refunded port fees, taxes, and port related services for which they have already paid when a port call skipped, and is this payment in cash rather than the typical practice of an onboard credit? Are they entitled to an additional payment for failure to deliver the published itinerary, especially when the change is due to a mechanical problem or failure? And should passengers have a right to be reimbursed for costs associated with an independently arranged shore excursion in a port call that is skipped or canceled? Finally, how are these refunds computed and by what means does a passenger have a right to dispute that computation? As the saying goes, the devil is in the details.

While the Passenger Bill of Rights appears to address canceled cruises, albeit without sufficient clarity, it does not address the much more common occurrence of port calls that are canceled. What rights do passengers have in these cases?

3. The right to have available on board ships operating beyond rivers or coastal waters full-time, professional emergency medical attention, as needed until shore side medical care becomes available.

Having on board professional emergency medical attention has been a long-standing practice on cruise ships – in fact it is required by International Labor Organization Convention 164, entitled "Health Protection and Medical Care for Seafarers," requiring that ships ":engaged in international voyages of more than three days' duration shall carry a medical doctor as a member of crew responsible for providing medical care." However the qualifications of medical personnel has varied widely. In most cases a physician and/or a nurse provide medical services.

33

Some cruise lines have a policy of only using medical professionals trained and board certified in the U.S., Canada, or U.K. Other cruise lines, in part because the fee paid is less, draw medical professionals from a range of countries. In all cases, medical professionals are considered independent contractors – they are paid a fee by the cruise line and receive a commission based on charges for medical services and prescriptions/supplies. Though the physician wears a senior officer's uniform and is considered a member of the crew, she or he is not a cruise line employee and the cruise line claims no liability for his or her medical practice.

While the Right states a standard practice, and reiterates a requirement of the CVSSA, it does not indicate a substantial fee is charged for emergency medical attention. The Passenger Bill of Rights should have greater transparency, clearly indicating that medical services on board a ship are fee-for-service. In addition, passengers have the Right to know the limitations on medical services on board a ship. One issue is the scope of practice of the individual physician. An equally, if not more important issue, is the limited nature of a ship's infirmary. There may be limited diagnostic facility (e.g., no x-rays or complex blood tests) and there is no surgical theatre. As an experienced emergency physician on board a cruise ship told me, "my greatest fear is an ectopic pregnancy that needs emergency surgery – there is very little I can do in the middle of the ocean."

What this suggests is that the Passenger Bill of Rights should include useful information about the limits of medical care on a cruise ship so a passenger can make an informed decision and not go onboard expecting services that will not be available. In the absence of such information, the obvious question is whether a cruise ship, by the Passenger Bill of Rights, is accepting liability for cases where emergency medical attention may be inadequate or otherwise lacking in an emergency medical situation. What recourse is available to a passenger in such a case?

4. The right to timely information updates as to any adjustments in the itinerary of the ship in the event of a mechanical failure or emergency, as well as timely updates of the status of efforts to address mechanical failures.

On surface this right sounds ideal – what else could a passenger expect? However the term "timely" is subjective. I have been on cruises where timely was measured in hours (sometimes many hours) whereas I as a passenger measure timely in quarter hours. It would be helpful to a passenger in understanding the Right to know what is meant by timely. Aside from that, how will these information updates be provided – via public announcements on board or by written notifications? And what recourse does a passenger have if information updates are not timely? Are they entitled to compensation or some other consideration? In many ways the Right can easily become an empty promise.

Another term requiring definition is "mechanical failure or emergency." This presumably includes a situation where a ship is dead in the water or has an extended power loss. But does it also apply to a ship that has a propulsion problem causing it to sail at reduced speeds, or a medical emergency that delays a ship and causes a change in itinerary. It would seem that what the industry should be stating is that a passenger has a Right "to timely information updates as to any adjustments in the itinerary of the ship" – full stop.

34

The Right leaves unstated what compensation, if any, is available to passengers when a port call is dropped or an itinerary is changed. Will they be refunded all port fees, taxes and other port use expenses associated with that port? This was addressed above. In any case, the Passenger Bill of Rights should be explicit about the parameters for what their rights are and what their rights are not.

5. The right to a ship crew that is properly trained in emergency and evacuation procedures.

This is certainly a fair expectation on the part of passengers. However, there is a huge chasm between being properly trained in emergency and evacuation procedures – there may not be basis to argue that crewmembers aren't trained – and those same crewmembers demonstrating through behavior competence in executing emergency and evacuation procedures.

Unfortunately, there is a track record of crewmembers not demonstrating this competence, not only in emergency situations but in periodic inspections by the U.S. Coast Guard and in annual U.S. Coast Guard Control Verification exams. The report of the *Carnival Splendor* fire is a good example of the point I am making. Officers were likely properly trained, however the reports says that one reason for the catastrophic nature of the fire was human error – when the fire alarm first went off on the ship's bridge, a crew member reset it, leading to a 15-minute delay in the activation of an automatic fire-suppression system. The report also faults the crew's "lack of familiarity with the engine room," which hampered their ability to locate and fight the fire, and the captain's decision to "ventilate" the compartment where the fire began before it was fully extinguished, allowing the flames to flare again.[18]

Two questions derive from these points. First, what will the cruise industry require to ensure that all crewmembers are properly trained – will current regimes of training be augmented or bolstered? How will proper training in emergency and evacuation procedures be verified? Second, what recourse does a passenger have when crewmembers do not demonstrate competence in emergency and evacuation procedures? Will the cruise line waive damage limits contained in the Passenger Contract and/or permit a passenger to file a lawsuit (including for emotional distress, mental suffering/anguish or psychological injury, presently excluded from the cruise line's liability) for demonstrated failure of competence in emergency and evacuation procedures? These should be explicitly laid out in the Passenger Bill of Rights.

6. The right to an emergency power source in the case of a main generator failure.

Like other items in the Passenger Bill of Rights, the obvious question is what is included under "main generator failure" and what is excluded? We can point to *Carnival Splendor*, which had six diesel engines – a fire in one engine caused extensive damage to cables in the aft engine room that meant vessel engineers were unable to restart the unaffected main generator.[19] How can CLIA guarantee that a similar or more catastrophic event wouldn't happen on another ship? In the case of the *Carnival Splendor* it wasn't that the main generator failed, but that the cables

---

[18] Dolan, J. 2013. Crew Error Cited in Carnival Ship Fire that Led to Nightmare Tow," *Los Angeles Times* (July 16).
[19] U.S. Coast Guard. 2013. Report of Investigation into the Fire Onboard the *Carnival Splendor which Occurred in the Pacific Ocean off the Coast of Mexico on November 8, 2010, which Resulted in Complete Loss of Power.* MISLE Incident Investigation Activity Number 3897765.

carrying power from the generator had been destroyed. Also on the *Carnival Splendor* the emergency generator apparently continued to work, but only provided power to emergency services. Does this technically comply with the right stipulated?

In the case of *Carnival Dream* in March 2013, news reports indicate the main power generator had not failed, but the backup emergency diesel generator had failed, thus causing the cruise to be terminated when the ship was in Saint Maarten. This illustrates the confusion in the language in the Right – what is it actually telling a passenger and whether what is being promised can actually be delivered? And if the Right is not fulfilled, what recourse does a passenger have?

This issue is made even more confusing when considering the number of cruise ships that have lost power and gone adrift – some for short periods of time; others for longer periods of time. How does this Right apply to a passenger in this situation? Does this Right apply to all power outages or only power outages of a certain duration and/or only power outages caused by failure of the main generator? Assuming a passenger has a Right to an emergency power source, what happens if it isn't provided; what recourse or compensation is available to them? There are many questions raised by this Right, which on surface is intended to reinforce a sense of security, but upon reflection is potentially an empty promise.

7. The right to transportation to the ship's scheduled port of disembarkation or the passenger's home city in the event a cruise is terminated early due to mechanical failures.

This Right is already a common practice of the cruise industry, however the Passenger Bill of Rights doesn't address two situations. First, what Right does a passenger have when a cruise ends early and passengers are returned to the port of embarkation – does the cruise line assume responsibility for the additional travel costs (and change fees on airline tickets) associated with getting from the port of disembarkation, does the cruise line assume responsibility for lodging and food expenses incurred by the passenger in getting home, and does the cruise line provide compensation for a passenger who arrives home later than scheduled thereby losing salary from missed work and having expenses for childcare etcetera? The Right to transportation doesn't appear to extend to these issues. Related to this is whether a passenger is accommodated in the same class of service on airlines and the same class of hotel that they normally choose. How long will a passenger wait for reimbursement of these costs and what mechanism is in place if there is a dispute between a cruise line and the passenger about the amount due to the passenger? Does the cruise line waive the Passenger Contract so the passenger can pursue a case in a court of law of their choosing (for example, if they live outside the U.S. or in a location remote from the court specified in the Passenger Contract's forum selection clause)?

Second, the Passenger Bill of Rights does not address the Right a passenger has when a ship arrives late in a port of disembarkation and the passenger has arranged his/her own transportation. Does a passenger in this case have the Right to have the cruise line assume responsibility for all additional travel costs (in the class of service originally booked) as well as lodging and food expenses incurred in getting home, and does the cruise line provide compensation for a passenger who arrives home later than scheduled thereby losing salary from missed work and having expenses for childcare etcetera? This is an area of rights that is not addressed at all in the Passenger Bill of Rights.

36

8. The right to lodging if disembarkation and an overnight stay in an unscheduled port are required when a cruise is terminated early due to mechanical failures.

Does this Right only apply to a cruise terminated due to a mechanical failure, or to any cruise terminated early? CLIA's choice of more restrictive language suggests there are many situations when a cruise may be terminated in an unscheduled port of call and lodging would not be provided. How does this Right interface with the Passenger Bill of Rights' #1?

This Right also says nothing about the quality of the lodging provided. Does a cot in a high school gymnasium qualify as "lodging"? Does lodging include a private bathroom? Based on past events, it is possible to imagine a range of scenarios. What Right to lodging, precisely, does a passenger have and will the cruise line assume all costs associated with that lodging? What recourse does a passenger have when the lodging provided is unacceptable.

9. The right to have included on each cruise line's website a toll-free phone line that can be used for questions or information concerning any aspect of shipboard operations.

Cruise lines already have toll-free numbers accessible from telephones in the U.S. Will access to these numbers extend to all ports of call on the cruise line's itinerary and to all countries from which passengers are drawn? More importantly, what will be done to ensure that the information provided by an operator at a toll-free number has accurate and correct information? Take for example the following correspondence I received from the parent of a passenger on *Carnival Legend* March 14, 2013:

> The ship is disabled and stuck in Costa Maya on March 13, 2013. I spoke with Carnival last night about how this might effect the itinerary because my daughter is on the ship. They told me they did not know anything about an alteration in the cruise schedule and would only tell me the ship was moving. I called the ship to try to speak with my daughter today and while I did not reach her, the ship officer confirmed to me that they were in Costa Maya and not Belize yesterday. Her boyfriend called Carnival this morning as well and they denied the ship was in Costa Maya and called it a rumor. I can understand a mechanical issue that needs to be addressed although this seems to be a big problem with this company. I cannot tolerate flat out lying and misinformation that they are providing about the Legend.

What changes or initiatives are being undertaken by CLIA and its member lines in order to avoid a similar situation? What recourse does a passenger and/or his/her family have when misinformation is provided or information is withheld?

10. The right to have this *Cruise Line Passenger Bill of Rights* published on each line's website.

This seems like the easiest Right to realize, however a quick survey of CLIA-member cruise line websites on July 15, 2013, found that the Passenger Bill of Rights was apparently not published on 13 of the 26 member lines' website. CLIA's May 22, 2013, Press Release (Cruise Industry Adopts Passenger Bill of Rights) states that publishing the Passenger Bill of Rights on a cruise line's website is a condition of membership in CLIA. Are these 13 members no longer members

37

of CLIA? What right or recourse does a passenger have if they have purchased a ticket from one of these lines in the past eight weeks – does the Passenger Bill of Rights apply to them?

CLIA Passenger Bill of Rights and the Cruise Contract

There is one additional issue with the Passenger Bill of Rights. CLIA promised that the Passenger Bill of Rights would be added to Cruise Passenger Contracts. This is laudable, but this is not apparent from Passenger Contracts displayed on cruise line websites, but more importantly there is no mention of how conflicts and contradictions between the Passenger Bill of Rights and the Cruise Passenger Contract are resolved. Which has precedence? According to the standard passenger contract the cruise line has the right to alter a cruise itinerary for any reason and the passenger has no recourse. As Carnival Cruise Lines states in its hard-to-find "Cruise Cancellation and Itinerary Change Policy" states:

> In the event an itinerary change becomes necessary while the ship is at sea or when notice prior to sailing is not feasible, Carnival and/or the Master will attempt to substitute an alternative port. Carnival and/or the Master may, in their discretion and for any purpose, deviate in any direction or for any purpose from the direct or usual course, and omit or change any or all ports of calls, arrival or departure times, with or without notice, for any reason whatsoever, all such deviations being considered as forming part of and included in the proposed voyage. Carnival shall have no liability for any refund or other damages in such circumstances. [20]

In terms of itinerary changes before a ship leaves port, the policy states:

> Due to the nature of a cruise vacation, itinerary changes sometimes become necessary for safety, weather or other reasons beyond the control of Carnival. If the itinerary change is for reasons beyond Carnival's exclusive control, including but not limited to safety, security, weather, strikes, tides, hostilities, civil unrest, port closings, emergency debarkations of guests or crew, late air, sea, car or motor coach departures or arrivals, mechanical breakdowns or problems not known to Carnival, itinerary changes consistent with U.S. State Department travel warnings / advisories or other applicable US or foreign governmental advisories, guests will not be provided any compensation. Guests electing to cancel will be subject to the standard cancellation terms.

And in terms of passenger costs resulting from cruise cancellations or itinerary changes the policy states:

> Carnival shall not be liable to guests for any charges, fees or expenses paid or owed to third parties by guests (such as air travel booked by a guest directly with an airline) in connection with a cancelled cruise or an itinerary change for any reason.

Carnival Cruise Lines' Passenger Contract is even more restrictive:

---

[20] See http://www.carnival.com/about-carnival/legal-notice/port-cancellation-policy.aspx

(e) If the performance of the proposed voyage is hindered or prevented (or in the opinion of Carnival or the Master is likely to be hindered or prevented) by war, hostilities, blockage, ice, labor conflicts, strikes on board or ashore, restraint of Princes, Rulers or People, seizure under legal process, **breakdown of the Vessel**, congestion, docking difficulties or any other cause whatsoever or if Carnival or the Master considers that for any reason whatsoever, proceeding to, attempting to enter, or entering or remaining at the port of Guest's destination may expose the Vessel to risk or loss or damage or be likely to delay her, **the Guest and his baggage may be landed at the port of embarkation or at any port or place at which the Vessel may call, at which time the responsibility of Carnival shall cease and this contract shall be deemed to have been fully performed, or if the Guest has not embarked, Carnival may cancel the proposed voyage without liability to refund passage money or fares paid in advance.** (emphasis added)

These statements appear at variance with a number of items in the Passenger Bill of Rights. It appears disingenuous to promote a Passenger Bill of Rights without also clarifying how conflicts between those rights and the cruise passenger contract are to be resolved.

A common theme across all elements in the Passenger Bill of Rights is how a passenger deals with a Right that has not been fulfilled or has been directly violated. Are these rights ultimately governed by the cruise passenger contract that sets clear terms about when and how complaints and legal action must filed, and where law suits must be filed? Forum selection clauses effectively truncate a passengers rights under the Passenger Bill of Rights given the requirement that legal action can only be taken in a court located in the state where the cruise line's corporate headquarters is located (most frequently Florida). The cruise passenger contract also includes a "class action waiver," prohibiting a passenger from taking any legal action as a member of a class or as a participant in a class action. For many passengers these are impediments to taking any action and they often resign to accepting whatever the cruise line offers, if anything.

## B. What the CLIA Passenger Bill of Rights Does Not Include

1. Passenger Rights

There are a number of things obviously missing from the CLIA Passenger Bill of Rights. Some of these have already been mentioned:

- There is no mention of the recourse a passenger has if one of the Rights is not fulfilled or realized.
- There is no indication of how a partial refund will be computed and whether that refund is provided in cash or, as common in the industry, as a discount on a future cruise or an onboard credit.
- There is no mention of whether the cruise line is responsible for ancillary costs when a cruise is cancelled, including change fees for airline tickets and for the costs of the tickets themselves, the cost of lodging required in travel to the passenger's home city, and

support for food and incidentals associated with delays in getting from the ship to the passenger's home city.

- There is no mention of what rights a passenger has when a port of call is canceled. Some cruise lines refund "port fees and taxes," however these are given as an onboard credit rather than as a cash refund. As well, there is no transparency with regard to the amount refunded. Some cruise lines average the cost of port fees and taxes so a refund for one port is the same as the other even though actual fees can vary widely from one port to another. Also, it isn't transparent whether costs other than port taxes and fees that are not paid by the cruise line because of the canceled port call are also refunded to the passenger. There is considerable need for greater clarity and transparency around passenger rights when a port call is canceled.
- There is no mention of what rights a passenger has when a cruise itinerary is changed, such as a cruise sailing the Eastern Caribbean instead of the Western Caribbean because of propulsion problems, or a cruise going to Canada instead of the Caribbean because of weather. The Passenger Cruise Contract is clear that the cruise line has no obligation or responsibility to provide compensation in these situations. This absence of rights should be clearly articulated in the Passenger Bill of Rights.
- There is no mention of the rights a passenger has when embarkation is delayed. Does a passenger have a Right to meal vouchers or compensation for meals purchased (as is common in airline travel)? Also, after how many hours of waiting in a cruise terminal is the cruise line obligated to provide either lodging or a comfortable setting to wait? A comprehensive Passenger Bill of Rights would address these situations given the frequency of delayed embarkations.
- There is no mention of a passenger's rights when a cruise arrives late in its port of disembarkation, causing the passenger to miss transportation arrangements for their trip to their home city.

In addition there are some rights that should be directly addressed.

The Passenger Bill of Rights should clearly articulate the rights of a passenger who is "bumped" from a cruise because of overbooking or other issues. The most recent cases involve *Carnival Sunshine*, which bumped passengers on its June 7, 2013, cruise because a number of cabins were needed for contractors completing work that was not completed while the ship was in dry dock. Similarly, passengers in 78 cabins on *Grandeur of the Seas* were bumped from the July 12, 2013 (and perhaps the July 19th), sailing because cabins were needed for workers who were still making repairs following the fire earlier in the year. Some of these bumped passengers had their cruise canceled because the ship had been out of service for repairs, and here they were bumped from their replacement cruise.[21]

---

[21] It is worth mention that Royal Caribbean Cruises Limited, in anticipation of these hearings and concern that the facts might paint an unkind picture, sent an email to all employees asking them to write their Senator with the following text: Dear Senator, As one of your constituents and an employee of _____, one of the major cruise lines serving North America, I am contacting you today out of concern regarding the July 24 Senate Commerce Committee hearing regarding the cruise industry. As an individual who is intimately familiar with cruising, it is apparent to me that there has been a great deal of misinformation and distortion regarding the industry in recent months.  As one of your constituents, I am concerned that the industry will be unfairly portrayed at this hearing. As someone that works in the cruise line industry, I know firsthand that cruising is extremely safe and well regulated at the national level, by the U.S. Coast Guard, and by international authorities.  Additionally, the cruise

Similarly, the Passenger Bill of Rights should discuss a passenger's rights when they are expelled from a cruise ship, often for questionable reasons and the result is loss of cruise fare and their having responsibility for transportation from the port where they are left. Between January 2009 and June 30, 2013, there are eight cases list on my website where a passenger has been evicted or expelled (these are only ones reported in the media). These passengers have no right to appeal or recourse. The cruise line Cruise Passenger Contract gives them this unilateral, uncontestable Right to evict or expel, without liability.

The Passenger Bill of Rights does not address a passenger's rights when they miss the ship because of flight delays or because of weather conditions (such as Hurricane Sandy in the fall of 2013 when passengers lost their cruise fare because they couldn't get to the ship). The cruise lines generally take the position that this type of situation is not their problem. A passenger without trip insurance is responsible for lost cruise fares and/or additional travel costs to join the ship at a later point. Further, it there are reports that some benefits under trip insurance policies offered by the cruise line are more restrictive in the benefits they provide than insurance policies offered independent of the cruise line.

The Passenger Bill of Rights does not address a passenger's rights to have safety concerns taken seriously. Though not the first time I have received this sort of information, on June 21, 2013, I received the following from a cruise passenger:

> We have just disembarked after a 7-day Alaskan cruise aboard Celebrity Solstice. We frequented the quasar dance club each night. On night two I noticed at 2300 (11pm), when the club only allows 18 and over, a crew member used a small rope to tie the handles of one of the two exits closed to prevent access. Not must looped but tied in a fashion that untying would be impossible is a smoke filled environment or panic. This room is required to have two emergency exits and this exit was clearly marked " emergency exit". This happened three nights in a row. I brought my concerns to the attention of guest services requesting to speak to the ships Safety Officer. I was told that another passenger had requested to speak with him also but he stated that he was "too busy with paperwork to speak to anyone". The guest services person apologized and drafted an email to him explaining my concerns and that I am a 28 year firefighter. That night in quasar the doors were once again tied closed. As of this writing no staff or crew has contacted me. I would encourage that all passengers be aware of their surroundings. It appears Celebrity is not concerned with safety and if this blatant example of reckless disregard for its passengers and crew in a public space is allowed to exist, then I am wondering what other safety issues exist that we did not see.

---

industry directly benefits businesses in all 50 states, generating over 355,000 jobs and over $42 billion in economic impact. It provides $17.4 billion in wages to American workers each year.  I would greatly appreciate your support to ensure that the cruise industry receives a fair and balanced hearing.  Thank you for your time and attention to this matter and your service to our nation. Sincerely,  Your Name

It would seem this passenger's expectations were realistic, but they were ignored. Did he have any rights? And what rights were available for this disregard of concern for fire safety?

Finally, the Passenger Bill of Rights does not address the Right to be free of sexual assault by crewmembers or cruise ship employees, or the Right to be free of other types of crime. This type of assurance seems only natural given the rate of sexual assault on cruise ships, but it is obviously one that would be difficult to fulfill (although no less difficult than some of the other rights included in the Passenger Bill of Rights). In this line of thought, the Passenger Bill of Rights should also contain a Right to contact the FBI directly from the ship when a victim of a crime. This Right is accorded by the CVSSA, so it should be provided, however most victims will be unaware of what is available to them without it explicitly being stated in something like a Passenger Bill of Rights. Alternatively, a cruise ship may be required to provide a crime victim with an information sheet outlining the rights and the options available to them, including the telephone numbers for relevant law enforcement agencies, and agencies that provide direct services or referral to services that are likely to be needed by the victim.

In sum, it appears the Passenger Bill of Rights is a public relations initiative that on its face accords more rights and protection to a passenger than is realistically the case. One problem is the many empty or nonspecific promises contained in the Passenger Bill of Rights, but a larger problem is there is no clear recourse for a passenger who believes the rights promised have not been provided. This is all based essentially based on a matter of trust, however as was observed by the Organization for Economic Co-operation and Development (OECD) in 2003, trust (or voluntary approaches) does not substantively change the status quo of the way things are done. Focusing specifically on environmental policy, the OECD notes few cases where voluntary approaches have improved the environment beyond a business as usual baseline.[22]

**Recommendation #17:** *Given the imprecise nature of the CLIA Passenger Bill of Rights, there is an obvious need for a legislated solution. Passenger rights can only be achieved by legislation that puts into place clear and specific measures for consumer protection, similar to those available to passengers of other modes of commercial transportation.*

This recommendation for greater consumer protection may help level the field between the rights of cruise passengers in the U.K. versus in the U.S. Unlike the U.S., there have been a number of successful lawsuits in the U.K. for "cruises from hell," with problems ranging from illness outbreaks, lapses in service, and ships having facilities that are not in proper repair or that remain under construction following time in dry dock.

## 2. Cruise Line Rights

While the typical Passenger Cruise Contract accords few rights to the cruise passenger, it gives many rights to the cruise line. Unfortunately, the cruise passenger contract is rarely given to the passenger when they make their booking and put down a deposit. Further, they are not usually given a copy of the passenger contract before making full payment for their cruise 60 – 90 days

---

[22] Organization for Economic Co-operation and Development. 2003. *Voluntary Approaches to Environmental Policy: Effectiveness, Efficiency, and Usage in Policy Mixes*, Paris:OECD.

before the cruise. Most frequently a copy of the cruise passenger contract is provided in small print on the back of the tickets sent to a passenger to be used for boarding. By accepting the ticket the passenger acknowledges receipt of applicable brochures and agrees to abide by the terms and conditions of the cruise line's brochures and web site, including but not limited to the information contained in the "Frequently Asked Questions" and "Embarkation Information" sections.[23] At this point the passenger's rights have already been compromised – he or she cannot cancel the cruise without losing all monies paid. A cruise line would likely say that the passenger could have downloaded the passenger contract from the company's website, however a more proactive approach by the cruise line would make sense. When I buy an airline ticket I receive the passenger contract when I print or receive the ticket and I have 24 hours to cancel that ticket without loss of funds. It only seems reasonable that a cruise passenger should receive a copy of the cruise passenger contract before his or her Right to a refund passes.

As regards rights, there is an asymmetric power relationship between a passenger and a cruise ship. As already seen, the cruise line holds all of the power when it comes to itinerary changes and canceled cruises, and when it comes to crime. The cruise line similarly has full control over how to resolve customer service issues – not just evictions and expulsions, but lapses in providing the services and care a passenger is led to believe will be provided by advertising and promotional materials. The cruise contract either truncates a passenger's rights in most situations, or reinforces the cruise line's Right at the detriment of the passenger.

Some of the cruise line's rights appear unreasonable. For example, Carnival Cruise Line's contract states:

> Carnival reserves the right to increase published fares and air fare supplements without prior notice. However, fully paid or deposited guests will be protected, except for fares listed, quoted, advertised or booked in error, fuel supplements, government taxes, other surcharges and changes to deposit, payment and cancellation terms/conditions, which are subject to change without notice. In the event that a cruise fare listed, quoted or advertised through any website, Carnival sales person, travel agent or any other source is booked but is incorrect due to an electronic error, typographical error, human error or any other error causing the fare to be listed, quoted or advertised for an amount not intended by Carnival, Carnival reserves the right to correct the erroneous fare by requesting the Guest to pay the correct fare intended, or by canceling the cruise in exchange for a full refund, but in no event shall Carnival be obligated to honor any such booking resulting from the error or otherwise be liable in such circumstances.

Thus, a passenger can book a cruise only to be told later that they owe additional funds for a fuel supplement, surcharge, or government taxes. As well, if the company makes an error in booking a cruise at a fare it didn't mean to, the passenger has no right to receive the fare advertised and under which the cruise ticket was issued. This is another stark contrast with the airline industry.

The passenger contract also gives the cruise line the right to cancel the cruise contract at its discretion (and without the passengers consent) – the passenger has no reciprocal right. The

---

[23] See section 2(d) of Carnival Cruise Lines' passenger contract.

cruise line also has no obligation to provide a passenger the cabin reserved when a reservation was made. As Carnival Cruise Lines' contract states, "Carnival reserves the right to move Guests to a comparable stateroom for any reason, including but not limited to, instances in which a stateroom is booked with fewer than the maximum number of Guests the stateroom can accommodate." Again, the passenger has no recourse.

Finally, the cruise line retains an exclusive right to use photographs and videotapes of a passenger onboard a ship with no limitation (including in advertising and publicity) and without the passenger's consent. Imagine taking a cruise and some time later seeing an advertisement or video with your image in a photograph or videotape (including when doing something silly or foolish). To some of us, this would be construed as a violation of privacy. Rightfully, consent should be required for use of anyone's image in a public forum.

## 3. Issues of Liability

In addition to issue of the cruise line's rights is the extreme limits placed on the company's liability. For claims not involving personal injury, illness, or death a passenger must give notice of claim within 30 days of disembarkation from the vessel. Claims involving personal injury, illness or death must be filed with the company within 6 months of the injury, event, illness or death and a lawsuit must be filed within a year. In all cases that legal action is taken, it must be filed in the U.S. District Court or state court where the cruise line's headquarters is located (referred to as a forum selection clause). As already mentioned, this severely limits the option available to many passengers.

### Baggage and Personal Effects

Even when legal action may be initiated, there are other limits. Many passenger cruise contracts limit the liability of the cruise line for lost or damaged luggage and personal effects. For example, Carnival Cruise Lines' passenger contract states "…that the aggregate value of Guest's property does not exceed $50 USD per guest or bag with a maximum value of $100 USD per stateroom regardless of the number of occupants or bags." Consequently, a family of four whose luggage is lost by the cruise line is due only $100 – this doesn't even cover the cost of the luggage, much less the contents. A passenger can increase these limits by declaring a higher value and paying 5% of the declared value to the cruise line. In contrast, the passenger contract for an air carrier limits liability to approximately $1,500 per passenger.[24] A family of four on a cruise would have to pay $280 to the cruise line for the same level of coverage provided automatically by an air carrier.

### Illness Outbreaks

Cruise lines operating out of U.S. ports and serving U.S. ports have successfully avoided liability for illness outbreaks. This has not consistently been the case in the U.K. where there are stronger consumer protection laws. Part of the cruise industry's defense is their mantra that "passengers bring the illness with them," thereby coloring itself as an unwilling victim. As Rose Abello, vice president of Public Relations of Holland America Line stated, "The ship is not sick. There are

---

[24] Coverage under the Warsaw Convention is approximately US$1,663; under the Montreal Convention US$20 per kg for loss of or damage or delay to checked baggage, and US$400 for unchecked package.

sick people getting on the ship."[25] This mantra was first used in late-2002 when there was a wave of very visible norovirus outbreaks on cruise ships, and it proved effective. Interestingly, The International Council of Cruise Lines (ICCL) laid out its strategy at the 2003 World Cruise Tourism Summit on March 3, 2003. An almost-inspirational video was shown about the situation in which the industry found itself and the way that it successfully responded on the public relations front.

At the start of the video, the industry was depicted as receiving an inordinate amount of attention for a series of norovirus  outbreaks on cruise ships. Illness on cruise ships had been the topic of stories on mainstream television: Inside Edition, CNN, NBC, and many others. The industry had even become the brunt of jokes on late night television — Jay Leno and David Letterman among others. Evening news with increasing frequency showed people who had become sick on board ships.

The video described the industry's media strategy had three elements: provide talking points to cruise executives and others in a position to present the industry's position, arrange as many media interviews as possible, and flood the media with positive information about the cruise industry. It proactively distributed pictures and video footage showing ships being disinfected, and engaged in positive messaging. Carnival Cruise Lines' president, Bob Dickinson, framed the problem as part of a national epidemic and said there was no cause-and-effect with regard to norovirus on cruise ships. Colin Veitch, NCL's CEO, pointed to the incidence of norovirus in the general population to minimize the problem as unique to cruise ships. The industry also enlisted the help of third parties in its campaign, most significantly the Centers for Disease Control. It helped promote the idea that people get sick on airplanes too, but they don't experience symptoms until they get home so they don't associate it with air travel.

ICCL's video concluded with "Smooth Seas Ahead." The industry successfully fought off the negative media attention and reframed the issue. Its message was two pronged: cruises are a great vacation at a good price, and why worry about norovirus — it is as common as the common cold. You can't argue with that. The media became desensitized to the issue and most of the 79 outbreaks affecting 6,630 people in 2003 and 2004 went unnoticed. The problem continues: in 2012 the were were 34 known outbreaks affecting 5,542 passengers.

When an outbreak does happen ill passengers often are quarantined in their cabin for days; whether they receive any compensation is wholly at the cruise line's discretion. However, cruise lines are not as innocent or defenseless as they would like to appear. In 2005 and again in 2008 I argued in my books, in response to claims by the industry that the low incidence among prove that norovirus is largely a passenger problem, that there are systemic disadvantages for crewmembers to report when they are ill. This position appears to be supported by recent CDC health inspections that have identified cases where crewmembers have continued to report to work despite being ill, including in positions of food handling and food service.

The problem for passengers is that cruise lines have effectively escaped liability for illness among passengers. To my knowledge there have been no successful lawsuits in the U.S. for these

---

[25] LaMendola B. and T. Steighorst. 2002. "Cruise Lines Blame Passengers for 3rd Viral Outbreak on Ship," *Sun – Sentinel* (November 12).

outbreaks even though similar lawsuits have been successful under consumer protection laws in the U.K.

*Independent Contractors*

A cruise ship is populated with many independent contractors whose behavior and practice the cruise line assumes no liability. Most visibly these include medical services (physician(s) and nurse(s)), but spa and personal care services (including health and beauty staff), photographers and video diary staff, retail shop personnel, casino workers, art auctioneers, and all other concessionaires. Even though many of these people wear clothing with the cruise line's logo, and in the case of medical personnel officer uniforms, they are not considered cruise line employees. Unbeknownst to most passengers, the cruise ship has no liability for services provided and billed to the passenger's onboard account. The status of these groups as independent service providers over whom the cruise line has no authority, control, or responsibility (even though tacitly endorsed by the cruise line) needs to be more clearly visible to passengers. At the very least, there should be signage or formal notification to passengers of this fact.

*Medical Care*

Medical services are a bit different. In an emergency situation, the passenger has no choice but to accept the service of medical personal who the cruise line has judged to be appropriate for medical care on its ship. But the cruise ship has no liability for their practice. It is a hard concept to get one's head around given the service is offered by the cruise line and the cruise ship collects the fees. But the nature of this arrangement was supported by the Florida Supreme Court in February 2007 and by the U.S. Supreme Court in October 2007.

The case began ten years before in March 1997. Fourteen-year-old Elizabeth Carlisle was on a Caribbean cruise on *Carnival Destiny* with her family. On the second night out of Miami she developed severe abdominal pain. She consulted the ship's physician, Dr. Mauro Neri, who had finished medical school in his native Italy in 1981 and had held nine medical jobs in Italy, Africa and England in the fifteen years before joining Carnival Cruise Lines. His salary was $1,057 a month. Dr. Neri advised that Elizabeth was suffering from the flu and sent her on her way. But her pain became worse. On the third visit to the infirmary, after Elizabeth's parents specifically asked whether the problem could be appendicitis, Dr. Neri conducted his first physical exam. He responded that he was sure the problem was not the girl's appendix.

When the pain continued to grow worse Elizabeth's parents called their family physician in Michigan, who advised they return home. The family took the advice, and shortly after arriving home Elizabeth underwent emergency surgery to remove her ruptured appendix. The infection had rendered the fourteen year old sterile and caused lifelong medical problems. Elizabeth sued Carnival Cruise Lines in Florida state court, a case she lost on Carnival's motion for summary judgement. The cruise line claimed it was not responsible for the medical negligence of the doctor on board and pointed to the fine print in the passenger cruise contract to support its position.

The family appealed the Circuit Court's decision to Florida's Third District Court of Appeal, where the parents argued the cruise line was vicariously liable for the doctor's negligence. Judge Joseph Nesbitt agreed and reversed the lower court's decision. The judge held that the cruise line

46

had control over the doctor's medical services for agency law purposes; the doctor was to provide medical services to passengers and crew in accordance with the cruise line's guidelines. And as it was foreseeable that some passengers at sea would develop medical problems (and that the only realistic alternative for such a passenger was treatment by the ship's doctor) the cruise line had an element of control over the doctor–patient relationship. As such, the cruise line's duty to exercise reasonable care under the circumstances extended to the actions of a ship's doctor placed onboard by the cruise line. The doctor was an agent of the cruise line and his negligence was imputed to the cruise line. This invalidated the cruise ticket's purported limitation of the cruise line's liability for the negligence of its agents.

Judge Nesbitt's decision was groundbreaking. It was likely the very first case where a cruise line was held responsible for the care provided by a ship's physician. Not surprisingly, Carnival appealed the case to the Florida Supreme Court. While the court almost agreed with the lower court's assertion that times had changed and that a doctor's negligence at sea also shows negligence by the cruise line, it ultimately found in favour of Carnival. Justice Peggy Quince wrote in her opinion:

> We find merit in the plaintiff 's argument and the reasoning of the district court. However, because this is a maritime case, this Court and the Florida district courts of appeal must adhere to the federal principles of harmony and uniformity when applying federal maritime law.[26]

The case was appealed to the U.S. Supreme Court and the court refused to hear it. The Florida Supreme Court's decision was the final word. If the Carlisle family wanted to pursue the case they would have to sue the physician directly. But this would be difficult in their case, and in most involving medical malpractice on cruise ships, given that they'd first have to locate the physician in his present home. Cruise lines historically have not provided assistance with locating former staff members. In addition, malpractice cases involving treatment in international waters must be filed in the courts of the physician's country of origin, which is both difficult and expensive.[27]

*Shore Excursions*

Shore excursions are a major source of income for a cruise ship – the cruise ship retains 50 – 70% or more of what a passenger pays for the tour. These tours are sold onboard at a Shore Excursion Desk by staff members wearing the cruise line's uniform. But when something goes wrong on a shore excursion, the cruise line is quick to remind the passenger that they are not liable; shore excursions are provided by independent contractors. Appendix 1 indicates 14 known deaths on shore excursions (these are only incidents that have been reported in the media; there are many more than this) and five robberies ashore (some at knife or gun point) on shore excursions affecting dozens of passengers – these again are only those that have been reported in the media so they underrepresent the true number.

---

[26] Supreme Court of Florida. 2007. *Carnival Corporation vs. Darce Carlisle, Case No. SC 04-393*, February 15.

[27] Chen, S. 2007. "Trouble at Sea: Free-Agent Doctors," *Wall Street Journal* (October 24).

If there is an injury or death on a shore excursion, the cruise passenger's options are limited in U.S. courts. Their options in a court in the country where the shore excursion was offered may also offer few options. The problem is that shore excursions are largely unregulated, except by the cruise line itself, and some can be quite dangerous.

While the cruise line has no liability for shore excursions, they tend to dissuade passengers from taking tours that are independently available. They may talk about safety concerns for a tour that is not approved, and will often warn passengers that the advantage of the ship-sponsored tour is that if they are delayed the ship will wait for them. In contrast, the ship will not wait for a passenger delayed on an independent tour. While more and more passengers are choosing to make private arrangements for land-based tours, those who make advance plans may find they are out money when a ship alters its itinerary or cancels a port call.

*Sexual Assaults*

The issue of liability for sexual assaults reached public attention in the mid-1990s. A tort reform measure attached to the Coast Guard Reauthorization bill had passed on May 9, 1995. The amendment, for the most part written by the ICCL, was introduced by Representative Don Young. He referred to it as a "noncontroversial manager's amendment."[28] It passed the House by a vote of 406 to 12. Only afterwards did people read the final print.

One provision, directed at mounting claims from injuries and sexual assaults, limited liability to passengers and crew for "infliction of emotional distress, mental suffering or psychological injury" unless negligence or an intentional act can be proven. The American Trial Lawyers Association characterized the amendments as "dangerous legislation" that "jeopardized the safety of women on cruise ships." Opposition also came from the Women's Defense Fund, the National Organization for Women's Legal Defense Fund, the Maritime Committee of the AFL-CIO, and rape treatment centers.[29]

The amendment languished for more than a year waiting to go to a House–Senate conference where lawmakers would resolve the House and Senate versions of the Coast Guard Reauthorization Bill. Lobbying by the industry continued, including a delegation of cruise line executives led by Micky Arison in March 1996. He and Celebrity Cruise's president Richard Sasso met with Senator Larry Pressler and separately with other members of the Senate Committee on Commerce, Science, and Transportation. Pressler chaired the committee and would serve on the conference committee charged with reconciling the House and Senate versions.[30] By October 1, 1996, a compromise had been negotiated. Ernest Hollings, from the Senate's Commerce, Science, and Transportation Committee, observed before the Conference Committee that no one knew if the cruise ship people had enough votes to push the amendments through, but the cruise industry figured they were 50% there and didn't have much to lose.[31] When the Conference Committee convened, Senator Hollings threatened to kill the entire

---

[28] Glass, J. 1996. "Compromise on US Cruise Tort," *Lloyd's List* (October 1), p. 1.
[29] Fox, L. and B. R. Fox. 1995. "Anchored in the Docks, *Washington Post* (October 8), p. E4.
[30] Rowe, S. 1996. "There Oughta Be a Law," *Miami New Times* (March 21).
[31] Ibid.

reauthorization bill if ICCL's amendments remained. In the end he capitulated after amended language was adopted for the two provisions.

In the final version, ship owners were prohibited from limiting their liability in cases involving sexual harassment, sexual misbehavior, assault, or rape in cases where the victim is physically injured.[32] Current passenger cruise contracts read, as does Carnival Cruise Line's, the cruise line shall not be liable to the passenger for damages for emotional distress, mental suffering/anguish or psychological injury of any kind under any circumstances, except when such damages were caused by the negligence of Carnival and resulted from the same passenger sustaining actual physical injury, or having been at risk of actual physical injury, or when such damages are held to be intentionally inflicted by the cruise line. Consequently, unless a cruise line can be found negligent, a victim of a sexual assault, whether be a crew member or a fellow passenger, has no claim for emotional distress, mental suffering/anguish or psychological injury. This position appears insensitive, especially to those (including children) victimized by a cruise ship employee.

*Limit of Liability*
In addition to the issues already discussed, there is one other limitation on a cruise line's liability that is worth mention; specifically that the cruise line is not liable for the intentional or negligent acts of any persons not employed by the cruise line (including independent contractors and other passengers) nor for any intentional or negligent acts of cruise ship employees committed while off duty or outside the course and scope of their employment. This last exclusion is a huge loophole given the cruise line has no responsibility when a crewmember commits a sexual assault when off duty. As well, they are not responsible when the sexual assault is not part of the scope of their employment – by its very nature, an assault would be outside the scope on one's employment. While there are a large number of lawsuits filed against cruise lines for sexual assaults, the vast majority of these are settled out of court, presumably because the cruise line wishes to avoid negative publicity. However, in how many of these cases can the cruise line effectively use the disclaimer in the passenger cruise contract?

**Recommendation #18**: *Given the many limits on cruise line liability, there should be a requirement that cruise lines provide passengers, in advance of when penalties accrue for cancelation, a clear statement in plain, clear English (and French or Spanish as required) of all limits on liability and laying out all rights that can be freely exercised, without limitation, by the passenger.*

**Recommendation #19:** *That consumer protection legislation be promulgated that extends to cruise passenger common rights and opportunities for complaint or other action similar to those available to consumers of other services, especially transportation services such as train, airlines, and other commercial carriers.*

---

[32] Glass, J. 1996. "Compromise on US Cruise Tort," *Lloyd's List* (October 1), p. 1.

**IV. IN CLOSING**

Thank you again for the opportunity to share my observations and insights generated from my 17 years as an academic whose research has focused on the cruise industry. I welcome your questions.

**V. SUMMARY OF RECOMMENDATIONS**

**Recommendation #1:** *There is need for systematic reporting of all cruise ship incidents to an independent, central authority charged with responsibility for data analysis and policy and operational recommendations.*

**Recommendation #2:** *Similar to data maintained on airlines documenting "on time" performance, there should be a mechanism whereby cruise ships and cruise lines have reported their adherence to itineraries and on time performance.*

**Recommendation #3:** *There is need for greater oversight and monitoring of the cruise industry in order to monitor changing trends and to determine whether these changes are related to changes in safety and/or casualties.*

**Recommendation #4:** *Ships operating from U.S. ports should be obligatorily subject to accident investigations by the National Transportation Safety Board as a condition of using U.S. ports, and should be subject to fines and other administrative actions the NTSB is empowered to take with other modes of commercial transportation.*

**Recommendation #5:** *There needs to be funded research, ideally provided by the cruise industry to a wholly independent body, to learn from those cruise lines that appear to be effective in reducing incidents and accidents.*

**Recommendation #6**: *Ships should have thorough and exhaustive safety inspections by the U.S. Coast Guard without advance warning. Full reports (including all details) of cruise ship inspections by the U.S. Coast Guard should be available online.*

**Recommendation #7:** Original provisions of the CVSSA regarding railing height and technology to detect passengers who have fallen overboard be reconsidered.

**Recommendation #8:** *The CVSSA should require reported cases of sexual assault committed on a cruise ship be displayed online and broken down by cruise line and cruise ship. In addition, the raw data of cases should be made available upon request for statistical/sociological analysis in order to permit a social epidemiology of the problem.*

**Recommendation #9:** *The CVSSA should require passengers to be advised of the hours during which crewmembers may access their cabin without specific permission from the passenger.*

50

**Recommendation #10:** *The CVSSA more clearly and specifically state requirements for CCTV surveillance and the quality and format of tape recordings.*

**Recommendation #11:** *The CVSSA explicitly require the "Security Guide" be placed in plain sight in every passenger cabin and that the content of the guide include information about the types of crimes on cruise ships, where they commonly occur, and steps a passenger can take to decrease the likelihood of becoming a victim of crime.*

**Recommendation #12:** *The CVSSA should require onboard physicians to be board certified in emergency medicine, family practice medicine, or internal medicine in the U.S., U.K., Canada, Australia, France, or Germany. Further, there should be clear statements about how cruise ships will treat the psychological and safety needs of sexual assault victims, especially victims who are minors.*

**Recommendation #13:** *Cruise ships should be required to have a private, independent law enforcement agent for purposes of crime investigation. These would be similar to the wholly-independent Ocean Rangers placed on cruise ships by the State of Alaska to monitor discharge of waste streams while the ship is in Alaska state waters.*

**Recommendation #14:** *In the absence of a professionally qualified crime scene investigator, a cruise ship should be required to have onboard a staff person with more than adequate training in all facets of crime scene preservation, collection of evidence, and methods to ensure proper chain of evidence.*

**Recommendation #15:** *Cruise ship personnel should take more seriously their responsibility to detain perpetrators of sexual assault until the ship arrives at its next U.S. port. Further, Congress should contemplate whether there needs to be a legislated requirement to ensure perpetrators are isolated from the general public onboard the ship and held for delivery to land-based law enforcement personnel.*

**Recommendation #16:** *The CVSSA should require reporting to the FBI of all onboard crime, including thefts less than $10,000 and simple assaults.*

**Recommendation #17:** *Given the imprecise nature of the CLIA Passenger Bill of Rights, there is an obvious need for a legislated solution. Passenger rights can only be achieved by legislation that puts into place clear and specific measures for consumer protection.*

**Recommendation #18**: *Given the many limits on cruise line liability, there should be a requirement that cruise lines provide passengers, in advance of when penalties accrue for cancelation, a clear statement in plain, clear English (and French or Spanish as required) of all limits on liability and laying out all rights that can be freely exercised, without limitation, by the passenger.*

**Recommendation #19:** *That consumer protection legislation be promulgated that extends to cruise passenger common rights and opportunities for complaint or other*

51

*action similar to those available to consumers of other services, especially transportation services such as train, airlines, and other commercial carriers.*

**Appendix 1: Summary of Cruise Ship Incidents, January 2009 – June 2013[1]**

**Cancelations, Itinerary Changes, Missed Port Calls (N=271)\***

| | |
|---|---|
| Cruise with Media-Reported Canceled Port Calls | 104 |
| Cruise with Media-Reported Itinerary Changes | 69 |
| Cruise with Media-Reported Canceled Cruises | 25 |
| Cruise with Media-Reported Delayed Embarkation and/or debarkation: | 73 |

\* Does not include changes caused by a hurricane or tropical storm

**Mechanical Problems (N=353)**

| | |
|---|---|
| Aground | 19 |
| Collision | 37 |
| Collision with Pier | 15 |
| Damage in Storm | 5 |
| Detained for Safety | 5 |
| Electrical Problems | 8 |
| Engine Problems | 26 |
| Fire (6 evacuation; 4 power loss) | 61 |
| Generator Problems | 5 |
| Lifeboat Failure | 7 |
| Maneuverability/Steering Problems | 15 |
| Material Failure | 53 |
| Power Loss (7 adrift, 1 towed) | 21 |
| Propulsion Problems (7 adrift) | 62 |
| Severe List | 11 |
| Technical Problems | 8 |

**Deaths on Shore (N=37)**

| | |
|---|---|
| Dive/Scuba (1 on Shore Excursion) | 4 |
| Jet Ski | 1 |
| Parasailing (3 on Shore Excursion) | 3 |
| Snorkeling (3 on Shore  Excursion) | 8 |
| Swimming (7 on Shore Excursion) | 13 |
| Other | 8 |

**Miscellaneous (N=269)**

| | |
|---|---|
| Accidents Ashore (8 on Shore Excursion) | 10 |
| Bomb Threats: | 14 |
| Child Pornography Seized | 8 |
| Illness Outbreaks | 189 |
| Injuries on Shorex (n=52) | 5 |
| Passengers expelled/evicted | 11 |
| Robberies Ashore (5 on Shore Excursion) | 13 |
| Onboard Falls (3 deaths) | 9 |
| Thefts > $10K | 10 |

[1]Data based on media and other reports as recorded at Cruise Junkie dot Com

**Appendix 2: Ships with Two or More Mechanical Incidents, January 2009 – June 2013**

**A.     CARNIVAL CORPORATION** (7 companies, 45 ships, 145 incidents)

**Carnival Cruise Lines** (19 ships, 74 incidents)
Carnival Destiny (n=6)

| | |
|---|---|
| 11/18/2009 | Primary motor unit 1 tripped due to malfunction |
| 1/26/2010 | Propulsion problems; itinerary changed, cruises canceled |
| 10/22/2010 | Propulsion problems; primary motor two faulty |
| 9/10/2011 | Lifeboat damaged – removed for repair |
| 1/7/2012 | Material failure |
| 1/24/2013 | Problem with stern thrusters; itinerary changed |

Carnival Dream (n=3)

| | |
|---|---|
| 7/6/2011 | Propulsion problems; change from Western Caribbean to Eastern Caribbean itinerary |
| 10/7/2012 | Fire |
| 3/14/2013 | Malfunction of backup emergency diesel generator, power outages and plumbing issues; cruise canceled in St. Maarten |

Ecstasy (n=5)

| | |
|---|---|
| 1/19/2009 | Propulsion problems; operating on half power |
| 2/13/2009 | Fire |
| 1/28/2010 | Collision with gangway |
| 4/22/2010 | Severe list to avoid buoy; damage and 60 injuries |
| 4/18/2013 | Power failure; some onboard attribute it to a fire |

Elation (n=3)

| | |
|---|---|
| 10/20/2009 | Propulsion problems as a result of failure with electronic control system |
| 1/13/2011 | Technical problem with propulsion system; port call skipped |
| 3/14/2013 | Steering problems; tugboat escort required |

Fantasy (n=4)

| | |
|---|---|
| 1/29/2009 | Equipment failure in steering system |
| 1/5/2010 | Lifeboat failure/material failure |
| 7/27/2011 | Collision with *Imagination*; minor damage |
| 10/17/2011 | Vessel maneuverability problem; arrives in port late |

Fascination (n=3)

| | |
|---|---|
| 7/1/2010 | Loss of power for several hours, adrift; late arrival |
| 2/27/2011 | Material failure |
| 1/19/2013 | Late return from dry dock; 7 hour delay |

Carnival Freedom (n=3)

| | |
|---|---|
| 2/6/2010 | Fire in crew cabin |
| 6/27/2011 | Blackout due to generator failure; fuel oil filters cleaned, fuel oil purifiers started and chemical treatment added to the both service tanks. |
| 8/21/2011 | Material failure |

Carnival Glory (n=3)

5/15/2011        Vessel maneuverability
11/14/2012       Material failure
12/2/2012        Propulsion problems

Holiday (transferred to Iberocruises in 2010) (n=4)
1/20/2009        Material failure
2/6/2009         Technical problem causing reduced speeds; dropped port call on this and next cruise

3/9/2009         Material failure
4/11/2009        Material failure

Imagination (n=3)
7/13/2010        Fire in the elevator machinery room leaving two passenger elevators and one crew
                 elevator inoperable
7/27/2011        Collision with Fantasy
9/28/2011        Toilets in front and midship inoperable for day

Carnival Legend (n=10)
3/21/2009        Smoke and fire system on Deck B-A-1 in fault and not operating properly
6/21/2009        Unpalatable water in cabins
9/30/2009        Collision with *Enchantment of the Seas*; minor damage
2/7/2010         Maneuverability problems given malfunctioning azipod
2/14/2010        Mechanical problems cause seven-hour delay leaving Tampa, itinerary changed; vessel
                 pitched when leaving Roatan, maybe caused by touching channel wall
7/11/2010        Loss of propulsion on port azipod while entering port; faulty circuit breaker tripped
1/17/2012        Material failure
1/29/2012        Technical problem with starboard azipod causes late arrival (5 hours) and delayed
                 embarkation (2 hours)
3/14/2013        Disabled and stuck in Costa Maya; a day later underway with reduced speed and changed
                 itinerary
3/16/2013        Propulsion problems; changed itinerary

Carnival Liberty (n=4)
4/26/2010        Problems with palatable water in cabin
11/5/2010        Two diesel generators shutdown because of malfunction
1/15/2012        Technical problem, severe list
11/25/2012       Loss of electrical power

Carnival Miracle (n=3)
1/10/2010        Lifeboat material failure
1/28/2010        Collision with pier at Port Zante (St. Kitts); stay overnight for repairs and arrive late for
                 disembarkation
1/18/2011        Lifeboat material failure

Carnival Paradise (n=2)
8/31/2012        Material failure
10/1/2012        Partial loss of propulsion; power loss

Carnival Pride (n=2)
5/16/2009        Fire in battery room
3/31/2011        Blown from mooring at Port Canaveral; delayed departure

<u>Sensation</u> (n=2)

| | |
|---|---|
| 2/9/2012 | Burst pipe floods 10 – 20 cabins; departure delayed 4 – 5 hours |
| 5/22/2012 | Fire |

<u>Carnival Splendor</u> (n=7)

| | |
|---|---|
| 11/8/2009 | Delay in Long Beach (7 hours) to repair fire door |
| 11/25/2009 | Collision with *Radiance of the Seas* in Puerto Vallarta |
| 12.17/2009 | Collision with pier in Puerto Vallarta, stayed until 3:30PM next day for repairs; next port call canceled |
| 2/18/2010 | Sharp turn (radar missed some small yachts in path) causes flooding onboard |
| 11/8/2010 | Fire lasting several hours knocks out all power, ship towed back to San Diego; this and next 8 – 10 cruise canceled |
| 1/6/2013 | Itinerary changed to permit two days in Puerto Valllarta for repair of damage to propulsion system |
| 1/13/2013 | Cruise delayed one day given repair of propulsion system; itinerary changed |

<u>Carnival Triumph</u> (n=4)

| | |
|---|---|
| 3/14/2010 | Vessel maneuverability |
| 11/18/2010 | Oil leak from shaft seal of forward bow thruster; disabled until repairs made |
| 1/27/2013 | Technical problem with propulsion system affecting cruising speed; 6 hour delay in return to port |
| 2/10/2013 | Disabling fire, adrift for days with no power/electricity, towed to port; cruise canceled |

<u>Carnival Victory</u> (n=2)

| | |
|---|---|
| 1/17/2010 | Failure of UPS battery charger |
| 1/20/2013 | Propulsion problem; leaves port almost 24 hours late, itinerary change |

**Costa Cruises** (1 ship, 2 incidents)

<u>Costa Europa</u> (n=2)

| | |
|---|---|
| 3/5/2009 | Propulsion problems lead to passenger revolt; ports missed |
| 2/26/2010 | Collision with pier in Sharm-el-Sheikh killing three crew and injuring four passengers; cruise canceled |

**Cunard Line** (1 ship, 6 incidents)

<u>Queen Mary 2</u> (n=6)

| | |
|---|---|
| 7/22/2009 | Broke from mooring lines; damage to stern, four hour delayed departure |
| 9/23/2010 | Loss of electric and all power for an hour after explosion in electric panel |
| 10/5/2011 | Fire causes power loss in major storm, damage onboard; arrive in NYC 2 hours late |
| 10/17/2011 | Went "dead in the water" twice during transatlantic cruise |
| 2/4/2012 | Total power failure, "dead in the water" |
| 10/23/2012 | Material failure |

**Holland America Line** (7 ships, 21 incidents)

<u>Maasdam</u> (n=4)

| | |
|---|---|
| 3/17/2009 | Fire in crew galley |
| 5/22/2009 | Severe list caused by pilot error |
| 8/8/2012 | Sewage and refuse from ship washes up on shore at Nahant, MA |

56

| 6/13/2013 | Port forward propulsion system malfunctioning; 2.5 hour delayed departure and sailing at reduced speed |

**Prinsendam** (n=2)

| 9/11/2010 | Major damage from storm – 50 windows blown out (with flooding) and dent in prow of ship |
| 12/17/2010 | Lifeboat failure |

**Ryndam** (n=2)

| 11/18/2012 | Material failure |
| 6/8/2013 | Fire – 40 minute wait for all clear after initial alarm |

**Statendam** (n=2)

| 12/21/2009 | Engine problems, changed itinerary |
| 9/22/2012 | Fuel pump explosion causes two hour power outage |

**Westerdam** (n=2)

| 5/11/2011 | Collision with ice; damage 15 feet below water line |
| 10/28/2011 | Fire |

**Zaandam** (n=6)

| 1/13/2009 | Alternator of #5 generator exploded causing switchboard to ground out; emergency generator started 43 second later |
| 7/13/2010 | Fire |
| 7/28/2010 | Loss of electrical power |
| 8/11/2010 | Material failure |
| 6/7/2011 | Material failure |
| 10/19/2012 | Mechanical problems and/or flooding onboard |

**Zuiderdam**  (n=3)

| 7/8/2010 | Material failure |
| 2/9/2012 | Fire in engine room |
| 9/25/2012 | Material failure |

**P&O Cruises** (4 ships, 12 incidents)

**Artemis** (n=2)

| 4/7/2010 | Engine problems, skipped St. Barts |
| 5/8/2010 | Engine problems, itinerary changed from 10 ports to 4 ports (Pax advised when boarding that there were engine problems and 1 port would be skipped) |

**Aurora** (n=4)

| 3/3/2009 | Propulsion problems – Broke down 4 hours after leaving Sydney. Stuck in Auckland (with passengers aboard) for five days for repairs. Itinerary changed |
| 9/18/2009 | Mechanical problems and loss of bow thruster; changed itinerary |
| 9/30/2011 | Electrical problems delay for three hours departure from Portland, ME |
| 2/8/2013 | Fault with port propeller shaft. Delayed in Auckland, dropped two port calls |

**Oriana** (n=4)

| 8/5/2010 | Delayed four hours in Dubrovnik; computers crash causing loss of steering system |
| 8/7/2010 | Fire on tender |
| 11/30/2010 | Engine breakdowns; missed port call |

6/2/2011          Collision with pier

Ventura (n=2)
10/18/2012        60 mm crack on full width of deck 14; passengers advised to not use balconies
3/17/2013         Propulsion problems cause missed ports and itinerary changes

**P&O Australia** (3 ships, 10 incidents)
Pacific Dawn (n=3)
1/8/2009          Engine problems; arrival in Sydney 10 hours late
2/15/2010         Propulsion and maintenance problems cause 18 hour delayed departure; itinerary changed
4/10/2010         Loss of power and propulsion; near miss collision with bridge

Pacific Pearl (n=2)
2/2/2011          Three-meter-across chandelier falls three storeys into café area in atrium
2/3/2011          Lack of running water and working toilets

Pacific Sun (Left fleet in 2012) (n=5)
11/10/2009        Cruise canceled to permit repair of propulsion system
3/13/2010         Mechanical problems cause canceled port calls at Suva and Denarau
4/21/2010         Engine problems; cruise canceled
11/2/2010         Propulsion problem; 10 hour delayed arrival at Melbourne
2/28/2011         Engine problems, 24 hour delayed arrival at Newcastle; several ports canceled

**Princess Cruises** (10 ships, 34 incidents)
Caribbean Princess (n=9)
10/16/2009        Severe list, storm damage
4/5/2010          Severe list, steering malfunction
5/9/2010          Collision with gangway; departure delayed several hours
8/8/2010          Material failure
2/4/2012          Engine problems - delays
2/25/2012         Material failure
3/12/2012         Engine problems – next two cruises canceled
6/8/21012         Technical fault; remain in port overnight, itinerary changed
12/15/2012        Loss of electrical power

Coral Princess (n=3)
3/19/2009         Propulsion problems; missed port
8/19/2011         Turbine oil system failure; switch to diesel electric power
5/2/2013          Fire

Crown Princess (n=3)
6/20/2009         Fire in passenger cabin
7/17/2012         Electrical fire in passenger cabin
4/13/2013         Toilets in 410 cabins not operational

Dawn Princess (n=3)
6/15/2010         Propulsion breakdown, adrift for 2.25 hours; restored and sailing at reduced speed
7/16/2010         Engine problems; missed port call
10/27/2011        Mechanical problem; missed port call

Emerald Princess (n=2)

| 7/26/2010 | Electrical failure leads to propulsion problems; no A/C; repaired in 6 hours |
| 5/17/2011 | Collision with fuel barge damages several lifeboats |

Golden Princess (n=3)

| 1/22/2009 | Near-collision with fishing vessel |
| 3/22/2009 | Fire in engine room |
| 3/28/2012 | Vessel maneuverability |

Royal Princess (n=2)

| 6/18/2009 | Fire in engine room as leaving Port Said, passengers called to muster stations; cruise and next cruise canceled |
| 4/9/2010 | Break in fire hose fitting causes extensive damage to restaurants; water leaked all the way down to crew decks |

Sapphire Princess (n=4)

| 7/12/2010 | Severe list to avoid collision with whale |
| 2/4/2011 | Loss of electrical power |
| 2/26/2011 | Material failure |
| 9/7/2011 | 2 pleasure boats swamped and float dock damaged by ship's wake when maneuvering in Ketchikan Harbour |

Star Princess (n=3)

| 3/21/2011 | Material failure |
| 7/1/2012 | Material failure |
| 8/2/2012 | Material failure |

Sun Princess (n=2)

| 7/25/2012 | Material failure |
| 8/27/2012 | Transformer blown leading to loss of power adrift for 3.5 hours |

## B.     ROYAL CARIBBEAN CRUISES LIMITED

**Celebrity Cruises** (4 ships, 13 incidents)

Century (n=4)

| 10/15/2010 | Rudder damaged, stranded in Villefranche-sur-Mer; cruise canceled |
| 10/22/2011 | Vessel maneuverability problems |
| 3/25/2012 | Engine problems, late departure and late arrival |
| 10/28/2012 | Fire |

Infinity (n=3)

| 6/22/2010 | Material failure |
| 6/26/2010 | 5-6 hour delayed departure because of engine problems, canceled port call; five days later an electrical fire causes power loss for several hours |
| 8/23/2012 | Material failure |

Millennium (n=2)

| 3/9/2009 | Cruise canceled to allow repair of problem with bearing on propeller shaft |

59

| 4/9/2013 | Electrical problem adversely affects propulsion, dead in water for 3 hours; port call at Hanoi canceled |

Summit (n=4)
| 1/10/2009 | Electrical problem causes cruise to be shortened by one day and itinerary changed |
| 2/27/2010 | Material failure |
| 4/9/2011 | Loss of electrical power |
| 10/5/2012 | Tender runs aground with 93 passengers and 2 crew, sustains major damage |

**Pullmantur** (1 ship, 2 incidents)
Zenith (n=2)
| 8/18/2009 | Fire while docked in Stockholm, evacuated; departed one day late, itinerary changes |
| 6/25/2013 | Fire in engine room disables ship; towed to port |

**Royal Caribbean International** (10 ships, 32 incidents)
Allure of the Seas (n=2)
| 1/29/2012: | Fire in incinerator area |
| 4/12/2012: | Fire in engine room, section 6 of ship evacuated; drift 1-2 hours and then operated on 1 engine |

Brilliance of the Seas (n=2)
| 10/13/2009 | Windows broken out in storm and 35 passenger cabins flooded, delayed departure from Barcelona |
| 12/12/2010 | Severe list while entering Alexandria, Egypt; 30 passengers injured |

Enchantment of the Seas (n=5)
| 7/21/2009 | Material failure |
| 3/23/2010 | Load sharing problem shuts down engine 4 |
| 7/27/2011 | Steering gear pump failure on pump #4 |
| 2/20/2012 | Propulsion problems – one propeller broken; delayed departure by 24 hours, changed itinerary, sailing at half speed |
| 3/10/2012 | Propulsion problems; spent 27 hours in Port Canaveral to accommodate repairs, itinerary changed |

Explorer of the Seas (n=7)
| 2/5/2009 | Propeller damaged causes change in itinerary on this cruise and next |
| 4/14/2009 | Changes in itinerary for several upcoming cruises; too late to cancel, no explanation |
| 9/30/2009 | Collision with *Carnival Legend*; minor damage |
| 1/13/2010 | Delayed departure because delayed arrival from drydock |
| 3/14/2010 | Severe list due to human error; injuries and considerable damage |
| 9/14/2012 | Collision with *Norwegian Star* when mooring line breaks; minimal damage |
| 10/29/2012 | Sailed into Hurricane Sandy |

Grandeur of the Seas (n=3)
| 2/26/2009 | Loss of two engines; material failure |
| 7/30/2009 | Loss of power due to malfunctioning power inverter; loss of electrical power |
| 5/27/2013 | Fire; cruise canceled |

Jewel of the Seas (n=3)
| 8/3/2010 | One hydraulic motor not working forcing reduced speeds; itinerary changes |

60

| 12/7/2010 | Collision with 500 meter long 2 foot wide flexible plastic pipe, becoming wrapped around front of ship |
| 9/6/2012 | 4.5 hour delay leaving Cape Liberty; no reason given |

Legend of the Seas (n=2)

| 2/9/2009 | Pulled into Key West for unscheduled stop because of faulty azipod and leaking oil (needed boom around ship); repaired by day's end |
| 1/30/2012 | Fire in bar (Café Promenade) |

Majesty of the Sea (n=4)

| 8/13/2010 | Lifeboat malfunction when lowered; damaged and release of oil |
| 9/30/2011 | Vessel maneuverability |
| 11/2/2011 | Material failure |
| 11/7/2011 | Material failure |

Oasis of the Seas (n=2)

| 5/7/2010 | Emergency generator damaged; given three months to repair |
| 11/16/2012 | Vessel maneuverability |

Radiance of the Seas (n=2)

| 11/25/2009 | Collision with *Carnival Splendor* in Puerto Vallarta; minor damage |
| 1/27/2011 | Ship is operating under USCG COTP due to one of two main propulsion azipods not working; repairs anticipated in fall 2011 |

## C.   PRESTIGE CRUISE HOLDINGS (3 companies, 5 ships, 14 incidents)

**Norwegian Cruise Line** (2 ships, 4 incidents)

Norwegian Dawn (n=2)

| 11/27/2009 | Loss of power for hours (no A/C), ship disembarks in San Juan instead of Miami; this and next cruise canceled |
| 8/27/2010 | Leaves Bermuda 11 hours early because engine problems cause slower speeds; want to arrive in NYC on time |

Norwegian Star (n=2)

| 4/28/2012 | Collision while docking |
| 9/14/2012 | Collision with *Explorer of the Seas* when mooring line breaks; minimal damage |

**Oceania Cruise** (1 ship, 3 incidents)

Regatta (n=3)

| 6/20/2011 | Material failure |
| 7/24/2011 | Material failure |
| 10/19/2012 | Electrical outage; delayed return to port (NYC) by several hours |

**Regent Seven Seas Cruises** (2 ships, 7 incidents)

Seven Seas Navigator (n=2)

| 10/25/2011 | Material failure; one day delayed departure from Charleston, itinerary change |
| 11/9/2011 | Material failure |

Seven Seas Voyager (n=5)

| 3/22/2009 | Propulsion problems (fishing net caught in azipod), reduced speed; many ports canceled |

| 4/1/2009 | Passengers told upon embarkation that most port calls canceled from Dubai to Rome because of propulsion problems; following two cruises canceled |
| 12/14/2009 | One azipod fails so sailing at reduced speed; port call canceled |
| 10/4/2010 | Podded propulsion system fails; passengers flown home from Athens, 2 cruises canceled |
| 3/17/2013 | Propulsion problem; skipped ports and itinerary changes |

## D.   INDEPENDENT CRUISE LINES

**Avalon Waterways** (1 ship, 3 incidents)
Avalon Tranquility (n=3)

| 7/23/2009 | Collision with the tall ship Schoenbrunn, a 1912-built paddlesteamer |
| 9/5/2011 | Collision with cargo ship – holed, cruise ended |
| 12/13/2011 | Fire in generator room |

**Celebration Cruises** (1 ship, 2 incidents)
Bahamas Celebration (n=2)

| 2/1/2012 | Maneuverability problems |
| 3/30/2012 | Maneuverability problems |

**Fred Olsen Cruises** (1 ship, 2 incidents)
Black Watch (n=2)

| 10/21/2009 | Severe list – navigational error while entering La Coruna Harbour (Spain) |
| 8/12/2010 | Collision with iceberg – damage superficial |

**Mediterranean Shipping Company (MSC)** (2 ships, 5 incidents)
Opera (n=3)

| 3/30/2011 | Collision with pier (twice), damage to several cabins; delayed 10 hours for repairs |
| 5/15/2011 | Failure of an electric panel causes power loss for 8.5 hours; towed to port and cruise canceled |
| 5/27/2011 | Detained by UK authorities for noncompliance with safety regulations |

Poesia (n=2)

| 1/7/2012 | Ran aground in Bahamas; waited for high tide to refloat |
| 1/10/2012 | Collision with pier while leaving Jamaican port |

**Saga Cruises** (1 ship, 3 incidents)
Saga Ruby (n=3)

| 10/12/2009 | Collision with pier, emergency repairs to bow; itinerary changes |
| 11/11/2012 | Engine problems; remainder of cruise canceled |
| 1/7/2013 | Mechanical problems with crankshaft; current world cruise delayed ten days |

**Silversea Cruises** (1 ship, 2 incidents)
Silver Shadow (n=2)

| 3/19/12 | Collision with container ship off Vietnam; major damage to container ship, minor damage to cruise ship |
| 9/9/2012 | Material failure |

**Thomson Cruises** (1 ship, 3 incidents)
<u>Thomson Dream</u> (n=3)
| | |
|---|---|
| 7/25/2010 | Plumbing/sewage problems |
| 1/17/2011 | Starboard engine fire |
| 5/20/2012 | Severe list following two maneuvers caused by "slip of the hand"; major damage |

**Travel Dynamics International** (1 ship, 3 incidents)
<u>Clelia II</u> (n=3)
| | |
|---|---|
| 12/26/2009 | Propeller damaged, loss of power; escorted to port, next cruise canceled |
| 9/1/2010 | Loss of electrical power (human error) |
| 12/9/2010 | Wave in storm breaks bridge window; damage to electronics, affecting engine performance |

**Voyages of Discovery/Coastal and Maritime Voyages (1 ship, 4 incidents)**
<u>Discovery</u> (n=4)
| | |
|---|---|
| 10/15/2009 | Engine problems; port missed |
| 12/05/2009 | Delayed return from drydock; itinerary changed |
| 3/4/2013 | Ship detained in UK for safety issues; cruise canceled |
| 5/7/2013 | Deep cleaning after illness outbreak delays departure; itinerary change |

63

**Appendix 3:   Summary of Persons Overboard, January 1995 – June 2013 (n=210)***

A. Gender
     Male           73.8%
     Female        26.2%

B. Age by Gender

|  | Total | | Male | | Female | |
|---|---|---|---|---|---|---|
| | Mean | Range | Mean | Range | Mean | Range |
| | 39.82 | 14 – 90 | 38.85 | 14 - 90 | 42.11 | 15 - 79 |

C.  Vessel
     Cruise        91.4%
     Ferry          8.6%

D. Passenger vs Crew
     Passenger     75%
     Crew          25%

E. Rescued        16.7%

F. Alcohol         6.2%

G. Suicide        11.0%

H Murder        3.3%

I. Fall           9.5%

J. Casino loss    2.4%

K. Fight         7.1%

* The data contained in this table is based on available information. Details were not consistently available for each incident. See www.cruisejunkie.com/Overboard.html for details.

**Appendix 4: Drug Busts, January 2009 – June 2013[1]**

A. Gender
        Male                    83.33%
        Female                  16.66%

B. Age by Gender

| | Total | | Male | | Female | |
|---|---|---|---|---|---|---|
| Mean | Range | | Mean | Range | Mean | Range |
| 38.5 | 19 – 74 | | 38.6 | 19 – 74 | 38.25 | 20 – 54 |

C. Drug Busts by Country (N=53)
Bermuda                    27
US                         8 (27 persons)
Belize:                    6
UK                         6
St. Kitts-Nevis            2
Jamaica                    1
Cayman Islands             1
Australia                  1
Spain                      1 (9 persons)

D. Drug Busts by US State/City
Florida                    3 (17 persons)
Baltimore                  2
Alaska                     1
US Virgin Islands          1
Puerto Rico                1

E. Ships with 2 or More Drug Busts
Norwegian Dawn             9
Explorer of the Seas       6
Black Watch                3
Enchantment of the Seas    3
Summit                     3
Allure of the Seas         2
Bahamas Celebration        2
Grandeur of the Seas       2
Grand Princess             2
Norwegian Gem              2
Poesia                     2

[1]Data based on media and other reports as recorded at Cruise Junkie dot Com

**APPENDIX 5:**  Klein, R.A. and J. Poulston. 2011. "Sex at Sea: Sexual Crimes Aboard Cruise Ships," *Journal of Tourism in Marine Environments*, 7:2, pp. 67 – 80.

*Tourism in Marine Environments*, Vol. 7, No. 2, pp. 67–80
Printed in the USA. All rights reserved.
Copyright © 2011 Cognizant Comm. Corp.

1544-273X/11 $60.00 + .00
DOI: 10.3727/154427311X13038402065820
www.cognizantcommunication.com

# SEX AT SEA: SEXUAL CRIMES ABOARD CRUISE SHIPS

ROSS A. KLEIN* and JILL POULSTON†

*School of Social Work, Memorial University of Newfoundland, St. John's, NL, Canada
†School of Hospitality and Tourism, AUT University, Auckland, New Zealand

Incidents of sexual assault and sexual victimization are significantly more common on cruise ships than on land. Analysis of data from three major cruise lines, comprising more than 50% of the North American-based cruise industry, reveals that perpetrators are most often male crewmembers, victims are most often female passengers (over 17.5% younger than age 18), and that the assaults occur almost anywhere, though most frequently in passenger cabins. This article examines factors that may be related to the incidence of sexual assaults on cruise ships and concludes with a discussion of the steps cruise lines can take to address the problem.

Key words: Cruise ship; Cruise industry; Sexual assault; Sexual harassment; Rape

## Introduction

In a survey reputedly conducted by the Royal Caribbean International (RCI) cruise line some years ago (exact details are elusive), 95% of respondents rated cruises as "extremely or very romantic." Nearly half said they had sex up to six times during a cruise compared to their usual once or twice a week at home, 80% said they felt more amorous at sea, and 58% said they had sex within 10 hours of embarking ("Sex Is Good at Sea," 2007). Unfortunately, these amorous feelings, supported by the images of romance and adventure portrayed by cruise lines, may be among the major causes of the unusually high incidence of sexual assaults and unwanted sexual contact on cruise ships—a problem that is considerably greater on cruise ships than on land (Klein, 2009). Data for the two largest cruise lines, RCI and Carnival

Cruise Lines (CCL), indicate the rate of sex-related incidents on cruise ships is almost 50% higher than the rate of sexual assault on land in Canada. This article reviews statistics about sexual assaults on cruise ships collected from the Federal Bureau of Investigation (FBI), RCI, and CCL, and analyses these in a search for the underlying reasons for the problem and to offer possible solutions.

## Background

### Cruise Ships

Cruise ships have become increasingly large over the past two decades, and now resemble small towns, except of course they have no elected governance. In 1985, CCL unveiled the 46,000-ton *Holiday*, proclaiming it the largest cruise ship ever built, carrying 1,450 passengers and 660

Address correspondence to Ross A. Klein, Professor of Social Work, School of Social Work, Memorial University of Newfoundland, St. John's NL A1C 5S7, Canada. Tel: 709-747-2177; Fax: 709-737-2408; E-mail: rklein@mun.ca

crewmembers (Smart Cruiser, 2010). Just 15 years later, RCI introduced the *Oasis of the Seas*, a 225,282-ton ship accommodating more than 6,000 passengers and more than 2,000 crew (Royal Caribbean, 2009). This ship has amphitheaters the size of football fields, parks, sandy beaches, ice-skating rinks, and all the usual entertainment and shopping facilities. At full capacity it will have the same population as Banff (Canada) during the off season, but unlike Banff, it is controlled by an appointed manager (i.e., the ship's captain) rather than by an elected council. The management of this artificial community is a shipping company registered in the Republic of Liberia (RCL Investor, 2010), that controls the daily lives of the hundreds of thousands of people who work and holiday on its cruise liners. The company has also paid out millions of dollars to settle claims of sexual assaults by crew on passengers (although this can be substantiated by one of the authors from extensive work with lawyers and victims, individual amounts and details cannot be published because of confidentiality clauses in the settlements).

### Cruising Holidays

Cruising is an increasingly popular style of vacation enjoyed by millions of people. The cruise industry is currently experiencing 3.4% annual passenger growth, with an estimated 13,445 million passengers in 2009 (Florida-Caribbean Cruise Association, 2010). A market report produced to assist shipping companies with their occupancy projections (Cruise Lines International Association, 2008) states that 94.8% of cruisers report satisfaction with their cruising experience. In 2007, global passengers reached 12.56 million people (Business Research & Economic Advisors, 2008), which means there were an estimated 653,120 dissatisfied passengers. Although the number of dissatisfied passengers is relatively small, apart from the obvious causes such as bad weather and seasickness, an unsettling question remains, of what went wrong.

Google searches reveal a plethora of sites devoted to cruising: sites detailing the sizes and shapes of the liners, the onboard pleasures, and an array of romantic and interesting destinations to visit. An interesting phenomenon quickly emerges, in that most sites are either strongly for or against cruising, and the criticisms are many. Entire sites are devoted to problems around cruising, such as rape (e.g., Cruiserape.com, 2011; International cruisevictims.org, 2011), environmental issues (e.g., Friends of the Earth, 2011; Klein, 2010), and holiday annoyances such as food poisoning, bedbug infestations, deaths, and abuse (Cruisebruise. com, 2011), to name a few.

This article focuses on one of many problems with the cruise industry: the frequency of rapes and sexual assaults on cruise ships. While cruise vacations are often sold as voyages of romance and adventure, a significant number of passengers have very different and very unpleasant experiences.

### Sexual Assault

Although at first glance the apparent risk of crime on a cruise ship is remarkably low, this is also remarkably deceiving (Panko, George, & Henthorne, 2009). In fact, the risk of sexual assault on a cruise ship is almost twice that of forcible rape in the US, and calculated as 48.065 per 100,000 (Klein, 2007). The debate over the calculations used to determine the rate of assaults is explained in the testimony provided to the Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety, and Security (see Klein, 2008a), and is not further explored here. However, it is worth noting the challenges of comparing cruise ship statistics on assault with those from land. The rate of sexual abuse in the 2007 testimony before Congress was compared to land-based rape data, as the US Criminal Code does not specify sexual assault as a specific category of data. Throughout this article, therefore, Canadian data are used for comparison as Canada has a clear definition of sexual assault in law (see Department of Justice, 2009) and there is a rate of sexual assault for the country and each of the provinces.

A meta-analysis based on 86,578 respondents in 55 samples showed that 24% of women overall reported having been sexually harassed at work (Illies, Hausman, Schwochau, & Stibal, 2003).

The lowest levels of harassment (16%) occurred in universities, and the highest levels (36%) in the military, which were attributed to the explicit power relationships in the armed services. Environmental factors and the demographic characteristics of a population are therefore shown to have a considerable effect on sexual behavior.

### Definitions

In its policy on harassment, the United Nations note that harassment includes incidents in which "improper and unwelcome conduct" occurs, "which might reasonably be expected or be perceived to cause offence or humiliation" (OSAGI, 2008). Sexual harassment is therefore construed as any "sexual advance, request for sexual favor, verbal or physical conduct or gesture of a sexual nature" that is not welcomed. In contrast, an assault is an actual and violent attack, defined in Canadian law as force applied intentionally to another person without their consent (Department of Justice, 2009), and in the US as an attack with intent to inflict bodily injury (U.S. Department of Justice, 2005). Assault implies physical force, whereas sexual harassment implies unwanted sexual advances that may not necessarily be physical, but may be repeated. Rape and sodomy are forced acts of sexual intercourse. In this article, all are considered as aggressive sexual behaviors.

### Possible Influences on Aggressive Sexual Behaviors

While cruise holidays may be perceived by families as safe forms of travel and adventure, they are perceived by some crew and passengers as opportunities to party, find love, or express themselves sexually. This is a dangerous combination that is not explicit in advertisements, nor even implied, and is very likely a major cause of the many assaults and rapes. Causes of sexual aggression by Royal Caribbean crew include the types of passengers in group bookings (swingers, bikers, etc.), the length of cruise (weekend cruises tend to attract those looking for a party), the onboard culture and management style set by management, and the cultural backgrounds of the crewmembers, which may differ from the types of behaviors ac-

cepted by passengers of Westernized cultures such as the US and Canada (Klein, 2008a).

The influence of uniforms and the manifestation of power relationships are also considered significant, as are the effects of the artificial lifestyle on board, where no one goes to the supermarket, drops their children off at school, or visits their mother on Sundays. An examination of these and other possible influences reveals a mix of ingredients that are destined to wreak havoc unless the component parts can be separated.

### *Characteristics of the Crew*

Remarkably little is known about the lives of cruise ship employees (Dennett, Cameron, Jenkins, & Bamford, 2010). In Europe, the cruise industry supported 226,000 jobs in 2007, an increase of 20% from the previous year (Passenger Shipping Association, 2008), but it is difficult to determine the profiles of cruise ship workers. The social networking site Facebook, shows people of all ages from around the world have worked for Carnival Cruise Lines and Royal Caribbean International and joined crewmember networks. The number of vacancies on cruise line job sites suggests companies are constantly looking for new recruits, and a lack of education and relevant experience do not present barriers to employment in junior positions. Although agents act as intermediaries, it is also possible to apply directly to some cruise lines through on-line recruitment pages. Life as a crewmember seems similar to that of a hotel worker, of long hours, and hard work.

> There are frequent rough seas, inconsiderate guests at times, very strict ship rules and regulations, sexual harassment incidents, long working hours, . . . inconsiderate bosses, crew food which may either be of poor quality or totally foreign to your taste. (Sison, 2009)

A story in the *New Miami Times* reveals the realities of crew life. The longer version of this article explains that the crew interviewed were working on cruise liners and sending money to their families.

> For the 98 hours (Jacques) clocks weekly, he earns $150. That translates to approximately

$1.50 an hour, about one-fourth the average wage of a burger flipper at a fast-food joint. François's schedule is similar, except his fifteen-hour shift begins at 7:00 a.m. and ends at 10:30 p.m., with a half hour off for lunch. François, who will complete his fifth year with Carnival in March, earns about $150 for his 105-hour week, or $1.45 an hour. That will amount to $6500 over the course of his ten-month contract. Like Jacques he communicates with his family by spending a small fortune calling from pay phones while in port. (Nielsen, 2000)

Crewmembers on ships operating out of the US must hold an American seafarer's visa, which is issued only after a State Department background check (Cruise Lines International Association, 2010), which would presumably detect arrest, court history, or criminal convictions within the last 7 years. However, it is not known if a conviction would prevent an applicant from obtaining a seafarer's visa, and media reports of recidivist sexual offenders on board cruise ships suggest it is not difficult to evade restrictions.

Cruise ship employees have no home or family life, and nowhere to go when off duty; in effect they may as well be on duty as long as they are at sea. The restlessness or "cabin-fever" caused by these living conditions, along with the ages, cultural backgrounds, and general characteristics of the crew may provide clues to the numbers of assaults. Eriksen (2006) comments that most crewmembers are men, and because of their differing backgrounds, some may be "culturally inclined toward aggressive sexual behavior or have a low regard for the status of women" (p. 49; see also Greenwood, 1999, cited in Klein, 2008a). Comments on cruise ship forums suggest that the darker racial features of some crewmembers are attractive to some women, encouraging them to form onboard relationships with crewmembers. Crewmembers hopeful of sexual liaisons on board are unlikely to be disappointed, and various media reports and websites (e.g., Cruisebruise.com, 2011; Cruiserape.com, 2011) indicate that some are prepared to take them forcibly. The problem is even more complex. According to Greenwood (1999, as cited in Klein, 2008a), some travel agents sell passengers the idea that crew are available for intimacy, even mentioning specific crew members by name.

## Customer Contact

Eriksen (2006) suggests that most crewmembers who commit sexual offenses against passengers work in front-of-house hospitality positions, where there is maximum passenger contact. On land, around 24% of British and New Zealand hospitality workers can expect to be sexually harassed, and customer contact is a significant predictor of sexual harassment (Hoel, 2002; Poulston, 2008b). Although the comparison with sexually aggressive behaviors on cruise liners suggests an inherent sexualization of the relationship between customers and service providers, an interesting role reversal occurs. On land, data show that harassment is primarily caused by customers (Poulston, 2008b) whereas problems with sexual behavior at sea are primarily caused by staff (Klein, 2009).

## Crew and Passenger Attitudes

Not just the passengers are on board to have a good time. As many crewmembers are also on working holidays, the atmosphere and general environment on a cruise ship provides further clues to the high incidence of assaults and rapes. The mood of passengers on vacation, the types of people they are, and the sudden change from normal life to life aboard a floating pleasure cocoon are all likely to affect their behavior, increasing their vulnerability.

The demographic characteristics of cruise passengers are changing. The average age of British cruise passengers fell to 53 years old in 2007 compared to 55 years a decade ago (Passenger Shipping Association, 2009), and more recent data show the median age of cruisers as 46 (Cruise Lines International Association, 2008). Children (under 18) are now a growing market, representing 25% of total cruisers (Cruise Lines International Association, 2008).

Cruise liners as depicted on the movie *Titanic* were once the domain of the bored and wealthy, whereas now they are accessible to anyone who can afford a short holiday, with weekend cruises often priced to compete with hotel stays. The changing characteristics of passengers means cruise lines now attract not just retirees, but families, young couples, single pleasure seekers, and

adventurers, which may represent an increased risk of crime on board, as involvement in criminal activities decreases with increased age (Brame & Piquero, 2003; Tittle, Ward, & Grasmick, 2003).

Hayner (1928) observed that otherwise normally upright citizens often take a "moral holiday" when staying in a hotel, perhaps influenced by an enhanced sense of anonymity while away from home. This effect is exacerbated on cruise ships, as most passengers are on holiday, whereas business hotel guests are at work during the day. The effect, naturally enough, will be a heightened sense of freedom, with the prospects of being observed by family, business associates, and friends substantially reduced.

In their pursuit of enjoyment, some passengers may break with their normal behavior codes in order to ensure a good time. Those responsible for children can leave them in supervised activity programs, but many young people wander around a ship on their own. There is an overarching assumption of safety. However, in contrast to home where one knows most of those in their immediate environment, on a cruise ship there are hundreds of crewmembers with access to passenger areas and cabins.

Some cruise staff may be attracted to the holiday atmosphere on board ships. One cruise line job website promises a "self-contained floating community that provides pleasure and services to up to 3000 passengers" (Cruise Ship Job, 2010b) with no accommodation or food costs, and the excitement of travel and being paid for living a life of luxury. This same site promotes life aboard as "an adventures job and a great way to save money and meet people from many different cultures" and notes that as staff turnover is high, plenty of jobs are available. On land, hospitality staff turnover is significantly associated with poor training and poor working conditions (Poulston, 2008a), so similar problems are likely to exist at sea. However, a more likely cause of turnover may be the "working holiday" nature of cruise ship jobs. These are jobs that only a few want permanently, because they limit the ability to have a normal family and social life. Many websites promote life on board as full of adventure and romance, which is somewhat beyond what one might generally expect from a normal day's work. The overall pic-

ture to emerge is of both crew and passengers attracted to an atmosphere of fun and pleasure.

## The Sexualization of Romance

A further ingredient to enter the developing mix is the sexualization of romance. Cruises are often touted as romantic getaways, no doubt creating the expectation that not just the entertainment and scenery will be good: it will also be romantic. However, the lines between sex and romance are difficult to determine. "Romance" is defined as the "sense of wonder or mystery surrounding the mutual attraction in a love affair" (Shorter Oxford English Dictionary, 2003, p. 2605), and "romantic," as having an "idealized, fantastic, and sentimental view of life" (p. 2606). Both definitions have resonances of sexual fantasy, which may be an implicit add-on to the romantic holidays touted by cruise liner companies and travel agents.

In a discussion about love and sex on cruise ships, Chin (2008) cites an informal poll posted on the Cruise Critic forum in which members were asked to respond about sexual encounters (described as "flings") at sea. Of the 108 participants, 48% described encounters with crew, and 64% of all respondents said their relationships did not continue after the cruise.

Chin (2008, p. 99) notes that posters to the forum cited locations for sexual encounters as crew quarters, passenger rooms, elevators, hot tubs, closets, dining room, pool, and discos after hours. One poster advised "if you go to cruise . . . do it . . . screw it . . . as much as you can and leave after a day . . . a week . . . that easy." Chin also notes the popular genre of cruise advertisements with photographs of couples hugging each other as they gaze out to sea, suggesting that cruise ships are an ideal playground for "emotional and sexual intimacy among strangers" (p. 99). This overt sexualization is reinforced with advertising campaigns, such as that used by P&O Australia as recently as 2003. This campaign used a postcard that displayed "a prostrate row of four tanned women, like so many sausages on a spit, with the line: 'Seamen (sic) wanted' . . . along with a photograph of the *Pacific Sky*, P&O's advertisement featured the slogan: 'More girls. More sun. More fun. There's nothing else a guy needs to know'"

(Devine, 2006, p. 15). It would be difficult to be more explicit.

## Uniforms, Power, and Harassment

Like hotels, hospitals, and prisons, cruise lines use uniforms to identify staff and reinforce their image. The word "uniform" means unity, standardized, or part of a group; a person in a uniform therefore creates the effect on others of believing that the uniformed person is part of a group, and will therefore exhibit similar behaviors to others in the group, and have similar levels of authority. While cruise ship and hotel uniforms enable easy differentiations to be made between staff and customers, the colors and styles may also influence customers' perceptions of staff. Hotel staff on land who need to appear authoritative (such as duty managers and receptionists) often wear quasi-management blazers or jackets, and women are generally expected to look business-like and efficient if they work with bookings or money, and "cute" if they serve food or liquor. Photographs of cruise ship hotel staff show they wear similar uniforms to staff on land, but with more trim and shiny buttons, perhaps to mimic Navy and military uniforms. On some ships, non-hotel crewmembers are also uniformed in quasi-Navy uniforms replete with badges and epaulettes.

While research in this area is limited, color and style of uniforms appear to be significant influences on perceptions. Bickman (1974) found that a police-styled uniform produces obedient behaviors in pedestrians, and in a study of 737 citizens, Johnson (2005) found that black connotes unfriendly, aggressive, and corrupt behaviors, whereas light blue and navy connote warmth, honesty, and generally nice behaviors. A more recent study of 200 students (Nickels, 2008) found that black uniforms were perceived more positively than white ones, which the author considered to be in conflict with Johnson's findings. However, Nickels noted that factors such as posture, race, and the characteristics of respondents may have skewed the data, and rating a uniform "positively" may just mean that respondents favored black uniforms, which may be an aesthetic rather than emotional reaction to the uniform.

Overall however, it seems likely that the white navy-style uniforms of crewmembers may impart a sense of security, trust, and safety to passengers, a distinct advantage to crewmembers seeking favors or perhaps obedience from passengers. While this is useful in an emergency, sexual predators can misuse the power implicit in their uniform.

Crewmembers also enjoy power accrued through their familiarity with their environment, having access to parts of the ship not normally accessible to passengers, and understanding the emergency procedures. Warhurst and Nickson (2007) describe service workers in luxury hotels and restaurants as being more comfortable in these environments than the customers they stoop to serve. For staff in potentially daunting environments, it is comparatively easy to manipulate guests, as they have the advantage of knowledge power and are in control of the guest experience. Similarly, it is relatively easy for crewmembers on board a ship to manipulate their passengers.

Harassment is more common where there are power inequalities (European Commission, 1998; Illies et al., 2003). Uggen and Blackstone (2004) explored the relationship between harassment and power, largely using MacKinnon's (1979) theory of sexual harassment, but also Connell's (1987) theory of gender relations. They concluded that sexual harassment is an expression of "power and masculinity" (p. 88), noting that men who were harassed at work generally had less powerful roles than others. An earlier study examining sexual harassment in organizations (De Coster, Estes, & Mueller, 1999) found that guardianship (i.e., a supervisory relationship) was a strong predictor of sexual harassment, but that vulnerability to harassment could be reduced by training the supervisors. Other predictors included male-dominated environments, larger work locations, and working in the public eye. Powerful women were also found to be targets of harassment, which the authors suggested might be caused by attempts to reduce the power of women who encroach on traditional male-dominated work roles. Sexual harassment, almost by definition, is an expression of a power. If there is no perceived expression of power, potentially harassing activities lack the ability to control the victim and, therefore, have little effect.

*Alcohol*

Around half of all sexual assaults are associated with alcohol consumption (e.g., Abbey, Zawacki, Buck, Clinton, & McAuslan, 2001; Finn, 2010) of either the perpetrator or victim. Profit on alcohol sales is excellent. In a restaurant, a customer will pay around double the bottle store price for wine, and even more in a bar, yet the cost of labor is relatively low. Although most cruise ships prohibit the consumption of alcohol purchased elsewhere (Cruise Mates, 2010), alcohol is also a major factor in sexual crimes committed on cruise ships (Hernandez, 2001).

*Summary of Possible Causes*

The artificial community and holiday atmosphere on board a cruise liner create an environment in which pleasure-seeking thrives, and in which most crew and passengers get what they were looking for in their cruise experience. For some, however, alcohol and the sexualization of romance may shift their experience from a kind of acquiescent hedonism to a hunger for physical satisfaction and adventure that must somehow be satisfied. When this is added to the effect of the power base held by crewmembers, it is hardly surprising that so much sexual gratification is taken by force.

Research Method

The authors draw on two sets of statistical data to examine the incidence and dynamics of sexual assaults on cruise ships. The first set of data was compiled from disclosures by RCI in the discovery phase of lawsuits filed against the carrier for sexual assault (see Klein, 2008a). These data cover two cruise lines, RCI and Celebrity Cruises, and include incident reports. For RCI, the data cover 1998 through to 2005. During this period, RCI received 451 complaints of sexual assault and sexual harassment involving physical contact. The yearly average was 56 with the highest incidence rate per year being 2004 ($n = 113$), followed by 2003 ($n = 80$), and 2002 ($n = 76$). Data for Celebrity Cruises (which has nine ships, compared to RCI's 18) cover 1998 through 2002 with an average of 16 incidents per annum. Celebrity Cruises' bleakest years were 2001 ($n = 27$) and 2002 ($n = 19$). Where the source is unclear, data from this set are referenced as "Cruise Ship Safety."

The second set of data was extracted from a compilation of crimes reported by cruise ships to the US Federal Bureau of Investigation (FBI) from October 1, 2007 through September 30, 2008, and secured through a Freedom of Information request by Kendall Carver, president of the International Cruise Victims' Association. This dataset is referenced as "FBI report" where the source is unclear.

Data on the relationship between the victims and perpetrators (Table 1), work roles of the perpetrators (Table 2), location of incidents (Table 3), and victimization of minors and the role of alcohol were extracted from these data sets (Table 4), to reveal the nature and severity of crimes on board cruise ships, as well as to examine the influence of potential factors identified in the literature search. The reports to the FBI include statements by investigators, victims, perpetrators, and witnesses, if any. A selection of victims' statements is presented to illustrate the nature of the assaults.

Results

*Profile of Cruise Lines*

Of particular interest are the two largest cruise lines: CCL and RCI. During the 1-year period up to September 2008, CCL reported 92 sex-related incidents: 48 of sexual contact, 40 of sexual assault, and three of sexual harassment (FBI report). Over 22 ships, this represents an average of four incidents per ship, although the actual range was from a nil on *Carnival Miracle* to 11 on *Carnival Victory*. By comparison, RCI reported 36 sex-related incidents, representing an average of 1.8 incidents per ship (half the average number recorded in 2003–2005) with no incidents on six of its 22 ships, and a high of five on *Freedom of the Seas* (Cruise Ship Safety).

The rate of sexual assault on RCI ships is a considerable improvement over the period 2003–2005, down from 111.97 to 45 per 100,000 (see Klein, 2008b). For CCL in 2007–2008, the rate for all sex-related incidents was 115 per 100,000 (50 per 100,000 for sexual contact, 60 per 100,000

for sexual assault, and five per 100,000 for sexual harassment). The overall rate for CCL is not significantly different than that of RCI for 2003–2005. Both rates compare poorly against the land rate of sexual assault (including sexual contact and assault) in Canada of 72 per 100,000 population in 2005 (StatsCan, 2006) and 68 per 100,000 in 2007 (StatsCan, 2008). There are no comparable statistics for the US or for Celebrity Cruises.

*The Perpetrators*

Consistent with findings in sexual harassment studies (e.g., Illies et al., 2003), perpetrators of sex-related incidents on cruise ships in these data sets were almost exclusively male. Data for Celebrity Cruises and RCI contained only one identifiable incident in which the perpetrator was female, and reports to the FBI indicated only one case in which a female initiated unwanted sexual contact. As presented in Table 1, crewmembers were perpetrators in 85.6% of the incidents on RCI between 1998 and 2005, and 10% of the incidents on Celebrity Cruises between 1998 and 2002. However, FBI data for 2007–2008 reveal that assaults perpetrated by crew decreased to 49.1%, indicating increasing problems among passengers. Passenger initiated assaults (most often against another passenger) more than doubled from 22.2% in the 2003–2005 period to nearly 51% between 2007 and 2008. While it is possible that cruise lines may have improved training and supervision of crewmembers, it is also possible that data are skewed by nondisclosure of incidents noted in other reports (e.g., Ehline, 2007; Panko et al., 2009). Although only incidents involving US citizens are required to be reported to the FBI, the data set does include a significant number of incidents involving non-US citizens.

Although data are not available from all cruise lines (i.e., incident reports were available only from RCI and Celebrity Cruises), it is interesting to note the work role of perpetrators. As seen in Table 2, service workers accounted for about two thirds of sex-related incidents, including room stewards, waiters, and bar workers. Officers ranked fourth worst in both RCI and Celebrity Cruises data, accounting for 8.1% of incidents on RCI and 18.2% of incidents on Celebrity.

*The Victims*

Victims were overwhelming but not exclusively female; males were victims in about 13% of cases, most involving unwanted same-sex contact. Most alarming was the proportion of incidents in which the victim was a minor (i.e., younger than age 18). The age of victims is discernible in less than half of the reported incidents; nonetheless, 11.4% of all victims on Celebrity Cruises were minors, 17.5% of all victims on RCI were minors, and 17.7% of incidents reported to the FBI in 2007–2008 dataset were minors. The proportion of victims who are minors could be twice as high, and the nature of the incidents is alarming, as the following extracts show.

> Minor female, 14, was reported missing by her father at approximately 4:00 AM. Upon returning to her cabin she advised her parents that she had been with the 2nd officer; they had kissed and participated in inappropriate touching on an open deck area. Her friend, also 14, claims she also met the same 2nd officer during the cruise, and that she had also kissed and inappropriately tou-

Table 1
Sex-Related Incidents by Perpetrator and Victim

| Source (n) | Period | Crew on Crew | Crew on Passenger | Passenger on Crew | Passenger on Passenger | Total |
|---|---|---|---|---|---|---|
| Celebrity (79) | 1998–2002 | 37.3% | 62.7% | 0 | 0 | 100% |
| RCI (451) | 1998–2005 | 8.4% | 77.2% | 1.4% | 13.0% | 100% |
| RCI (249)[a] | 2003–2005 | 10.7% | 67.1% | 0 | 22.2% | 100% |
| FBI (154) | 2007–2008 | 22.5% | 26.6% | 7.3% | 43.5% | 99.90% |

Note: Totals do not add to 100 due to rounding. Sources: Cruise Ship Safety and FBI report.
[a]2003–2005 data correspond to testimony given in the U.S. House of Representatives (Klein, 2007) and U.S. Senate (Klein 2008a).

Table 2
Work Role of Perpetrator

| Work Role | RCI, 1998–2005 ($n = 136$)[a] | Celebrity, 1998–2002 ($n = 33$)[a] |
|---|---|---|
| Room steward[b] | 34.8% | 18.2% |
| Waiter[b] | 25.0% | 21.2% |
| Bar worker[b] | 13.2% | 24.2% |
| Officer | 8.1% | 18.2% |
| Musician/entertainer | 5.1% | 6.1% |
| Cleaner | 2.9% | 3.0% |
| Youth staff | 2.9% | — |
| Security officer | 2.2% | 3.0% |
| Casino worker[b] | 2.2% | — |
| Galley worker | 1.5% | — |
| Other | 2.9% | 6.1% |
| | 100.8% | 100.0% |

Note: Totals do not add to 100 due to rounding. Source: Cruise Ship Safety.
[a]As the identity of the perpetrator is not known in all cases, the count is less than that of the total dataset.
[b]Roles with particularly high customer contact.

ched while on the bridge couch behind some curtains. (Source: FBI Report, Risk Management Department Incident Report)

While in the bathroom [my minor daughter] hears a knock on the door and assumes it is a family member coming back so she opens the door partially and sees it is the room steward. He forces his way into the cabin and holds on to her and asks her to kiss him. She responds 'NO' and tells him her parents are coming and he better get out of there now! He continues to try to kiss her using his tongue and begins to open her blouse. . . . (Source: FBI Report, Father's letter to cruise line about attempted rape)

A minor female passenger was out on the open decks on Deck 8 where she met one of our cabin attendants. They were having an innocent conversation when they both went inside. . . . The crewmember followed the girl down the corridor where he led her into a crew stairs area away from the passenger areas. When they were in the crew area he had her up against the wall with his arms on either side of the wall to hold her there. He proceeded to kiss her and pull down her tank top to kiss her right breast. Another crewmember was coming up the crew stairs . . . [The girl] was able to get away and run to her cabin. (Source: FBI Report, Security Officer Incident Report)

Not only minors are victimized. Data indicate the age of victims ranges from 6 months to 80

years. This account comes from a 28-year-old female teacher:

I was walking down the sixth floor hallway at about 8:00 PM, in a hurry as I wanted to make an appointment in the salon, which closed at 8:00 PM. A crewmember was standing in the hallway and greeted me by saying hello, as he did all week. He then told me to come here, he had to tell me something. He went down a side corridor and I followed. . . . He then [assault description]. I could taste alcohol in his mouth. As I tried to get away he grabbed my hand. . . . I woke up early the next morning to avoid him and showered at the spa. When I came back to my cabin at 10:45 AM he was in the hall and told me he was waiting for me all morning. When I opened my door he followed me in. . . . (Source: FBI Report)

And the account of a 37-year-old woman traveling with her husband:

I went down the long corridor passing the library and was looking for my cabin. Two employees were at the end of the hallway. I asked where my cabin was located; one man said, "I will walk you there." I said, "thank you" and proceeded with him. I handed him my room key, he opened the door, and said "let me help you." He came in my room. I sat at the edge of my bed; he then sat on the bed. I told him to leave. He then said, "let me help you change into your nightgown"—it was on the couch and he grabbed it. I said, "no thanks, please leave" [assault description]. I started yelling at him and pushing him away from me. I told him to get out of my room—I was very scared. . . . (Source: FBI Report)

*The Locations*

As presented in Table 3, more than one third of sex-related incidents occurred in passenger cabins, but the reality is that they can occur almost anywhere, as the following extracts from reports to the FBI show.

On the very first day of the cruise, shortly after boarding the ship, [my fourteen year old male client] was victimized by an unidentified employee in the sauna. The employee sexually assaulted, molested, accosted, and abused him.

And the following account contained in a memo from the Hotel Manager to the Captain:

Table 3
Location of Incident (Where Known)

| Location of Incident | RCI, 1998–2005 (n = 316) | Celebrity, 1998–2002 (n = 37) |
|---|---|---|
| Passenger cabin | 36.4% | 40.5% |
| Crew cabin/crew area | 7.3% | 27.0% |
| Bar | 7.3% | 5.4% |
| Dining room | 6.6% | 13.5% |
| Spa | 5.7% | 2.7% |
| Corridor | 5.7% | 2.7% |
| Deck | 5.4% | 2.7% |
| Public area | 5.4% | — |
| Disco | 5.1% | — |
| Public bathroom | 4.4% | 2.7% |
| Ashore | 4.1% | 2.7% |
| Youth program | 3.2% | — |
| Elevator | 1.9% | — |
| Pool | 1.6% | — |
| Total | 100.1% | 100.1% |

Note: Totals do not add to a 100 due to rounding. Source: Cruise Ship Safety.

This female guest had booked an appointment for a foot, ankle, and shoulder massage. While she was having the treatment by the spa therapist she claims that the therapist intentionally touched her on the vagina area. . . .

Even public bathrooms are unsafe:

Around 12:00–1:30 AM I was approached by an employee in the restroom next to the bar . . . he offered me oral sex. . . . I pushed him away and left the restroom and sat down at the bar. . . . [When I left the bar], I arrived at my floor and was walking down the hallway; then the same guy came out of an employee door and tried to pull me in by my right arm saying, "come, come" and still offering me oral sex. He tried pulling me into another room but I got away. (Source: FBI Report, 23 year old female passenger)

A crewmember asked a 14-year-old female passenger to go to the ladies room to see if anyone was there. Once inside, she told him no one was there, and he came in, locked the door, and began to kiss and fondle her. (Source: FBI Report, Parent's call to corporate office)

It is easy to assume a passenger shares responsibility for an assault given the frequency of incidents occurring in cabins. However, crewmembers often gain access without permission, as the following testimonies show.

About 3:00 to 3:30 PM I went to my cabin to have a shower. I had taken off my swimming suit and was next to the door to the bathroom. Without knocking a . . . [crewmember] entered the room. He said, "Do you want me to fuck you." . . . (Source: FBI Report, 44 year old female)

At about 6:00 PM, after her husband and son went for dinner, this female passenger remained behind in the cabin, was undressed and was going to take a shower. At that time she thought she heard her cabin steward in the passageway; she wanted some ice so she opened the cabin door slightly, she could see her cabin steward in the passageway, so she attracted his attention by going, "psst, psst." The steward then asked if her husband had gone, she replied yes, and with that he entered the cabin . . . [rape description]. As soon as it was over he left. (Source: FBI Report, Memo from Security Officer to Captain about a rape)

My cabin steward, on the 5th night, opened the door to my room (without knocking) at around 12:30 AM. I sat from the light, and he looked at me and just left. . . . The next night he saw me entering my room at 1:30 AM and followed me part way in and said, "So, are you going to let me sleep with you tonight?" I thought he was joking and I said, "No, I am married." He said, "But you are alone on this ship." I then said, "Do you know you could be fired for talking to me like this?" After that comment he left. (Source: FBI Report, Letter from female passenger to cruise line)

*The Influential Factors*

Table 4 presents results on two issues discussed above: the sexual victimization of minors and the role of alcohol in crime. While minors are the victims in 18.2% of all sex-related incidents, there is variation by the category of crime and by cruise line. Minors are the victims in the majority of cases of sexual harassment, 18% of cases involving sexual contact, and 13.7% of cases involving sexual assault. More interesting, however, is the variation between the cruise lines. Although CCL has a higher rate of sex-related crimes than RCI, the table reveals that victimization of minors is proportionately a bigger problem on RCI ships. More than one third of sexual assaults on that

Table 4
Incident Analysis Showing Involvement of Minors and Alcohol

| | Minors | | | Alcohol | | |
|---|---|---|---|---|---|---|
| Cruise Line | Sexual Contact $N$ (%) | Sexual Assault[a] $N$ (%) | Sexual Harassment $N$ (%) | Assault With Serious Bodily Injury $N$ (%) | Sexual Contact $N$ (%) | Simple Assault $N$ (%) |
| Carnival | 6 (12.5%) | 3 (7.5%) | 2 (40%) | 5 (100%) | 47 (97.9%) | 6 (66.7%) |
| Celebrity | | | | 1 (100%) | | 1 (20.0%) |
| Costa | | | 1 (100%) | | | |
| Crystal | 1 (100%) | | | | | |
| Disney | | | 1 (100%) | | | |
| NCL | 1 (100%) | 1 (50%) | | | | 1 (100%) |
| Princess | 2 (100%) | | | | | 1 (100%) |
| RCI | 4 (21.1%) | 6 (35.3%) | | 4 (50.0%) | 7 (36.8%) | 30 (31.3%) |
| Windstar | | | | | | 1 (100%) |
| Total | 14 (18.0%) | 10 (13.7%) | 4 (57.1%) | 10 (62.5%) | 54 (69.2%) | 40 (34.8%) |

Percentage reflects the proportion of all crimes of that type for that cruise line. Source: FBI report.
[a]Includes rape and attempted rape.

cruise line victimize a minor. This proportion that is almost three times the average for the industry and almost five times the proportion on CCL ships.

There are similar differences with regard to alcohol involvement. Intoxication is known to be present in more than two thirds of cases involving sexual contact, almost two thirds of the cases involving assault with serious bodily injury, and more than one third of incidents involving simple assault. There are again differences by cruise line. As seen, alcohol is present in a considerably larger proportion of incidents on CCL ships than on RCI. Alcohol is present twice as often for simple assault and assault with serious bodily injury, and almost three times more frequently for sexual contact. It is impossible to know whether this accurately reflects what happens on board, or whether it is an artifact of intoxication being more likely to be reported by CCL than RCI.

## Discussion

While the demographic characteristics of perpetrators were not apparent in these data sets, several other influences identified as potential problems in the literature review were upheld. Customer contact, identified by Hoel (2002), Eriksen (2006), and Poulston (2008b) as a predictor of

sexual harassment, was also a major predictor of harassment and assault in this study (Table 2). The role of uniforms (see Bickman, 1974; Johnson, 2005) and power (see Illies et al., 2003; MacKinnon, 1979; Uggen & Blackstone, 2004; Warhurst & Nickson, 2007) were not specifically tested in this study, but as crewmembers were largely responsible for harassment and assaults (Table 1), these are considered as potential factors, along with influence of the holiday atmosphere for crewmembers, evidenced in various publicly available blogs, forums, and advertisements (see Cruise Ship Job, 2010a). Alcohol was also shown to be a major factor (Table 4), as suggested by studies on the relationship between alcohol and sexual assaults (Abbey et al., 2001; Hernandez, 2001). The most chilling discovery, however, was that the most dangerous place to be on a cruise ship is in one's cabin (Table 3), and the most likely person to assault a passenger there is a uniformed crewmember (Table 2), in whom the passenger has placed a degree of trust (see above, victims' evidence).

There is little question that sexual assaults and sexual harassment are a problem on cruise ships. Factors such as the uniforms worn by officers and crewmembers, issues of power and control, and the sexualization of romance associated with a cruise certainly play a role, but they do not fully

explain the victimization of minors, nor the wide variations between cruise lines and between ships belonging to the same cruise line.

One possibility is that passengers come on board a cruise ship believing industry claims that they are safe. Indeed, the industry consistently stated during hearings in the US Congress between 2005 and 2008 that a cruise ship is the safest mode of commercial transportation. Passengers relax their usual defenses and allow children to roam freely, falsely assuming that no harm will occur. This makes them more vulnerable to abuse, because they are not on guard against an unpleasant incident or event. For many, it is inconceivable to think a crewmember will use a passkey to enter their room uninvited, or that they will be accosted in the hallway leading to their room or in a public bathroom.

As discussed, RCI had a rate of sex-related incidents in 2003–2005 equal to that of CCL in 2007–2008. There is no way of knowing whether CCL, like RCI, actually reduced their incident numbers during those couple of years, because data are unavailable for earlier periods. However we can report that RCI came under considerable pressure after its record was brought into the limelight by high-profile incidents and congressional hearings that focused more attention on RCI than on CCL or other cruise lines. It was at the height of this pressure that the corporation hired Gary Bald—a high-ranking official with the FBI—to serve as its Vice President for Global Security. Even though the company (like the industry generally) had developed a zero tolerance policy for crime (including sexual assaults) since 1999, and regular training to address the problem, the rate of sexual assaults still increased. Whether the company increased its training efforts under Mr. Bald, or reduced its tolerance for abuses, the result was a reduction in the number of sex-related incidents. The rate of occurrence is still problematic, but has been reduced by about half, while CCL's rate in 2007–2008 is as high as RCI's was in 2003–2005.

## Conclusion and Recommendations

There are ways to directly address the problem. Better training and supervision of staff (including managers and officers) is one strategy, although most perpetrators already know such behavior is not permitted and that it may lead to immediate dismissal. The worst that can happen is that they will lose their job and be sent home. In view of this, cruise lines need to adhere to the zero tolerance policy developed in 1999 (see Cruise Industry Facts, 2010) and rather than just dismissing employees accused of sexual misconduct, also ensure they are prosecuted. They must take victim accusations seriously, collect needed evidence, and cooperate with law enforcement agencies. However, these seemingly simple and logical recommendations are in contrast with what is often done, and with what seems fair. For example, one of the authors was an expert witness for a case about an 8-year-old girl who alleged she was molested by a cleaner. When the incident was reported to security, and in the deposition hearing before the trial, the child was accused of lying and of fabricating the whole story. Criminal prosecution was not pursued, although a six-figure out-of-court settlement resolved the civil suit.

Focusing on staff training and supervision alone is not enough, given that passengers also perpetrate sexual assaults. There is a need for greater presence of security (including increased real-time video surveillance) and for honest advice to prospective passengers about the risks of sea travel. Information could also be included in cabin guides about the need to take proper precautions for ensuring personal safety, for proper supervision of minors, and instructing what to do should a passenger be sexually harassed or assaulted. Cruise lines need not exaggerate the scale of the problem, but it is unrealistic to pretend there is no problem and continue marketing cruising as "the safest" mode of transportation, as some media reports suggest that they are not (e.g., Silverstein, 2006). Certainly CCL's choice of ship names (e.g., *Fantasy*, *Dream*, *Elation*, *Conquest*, *Freedom*, etc.) may be considered more suggestive of sexual expression than of safety.

Cruise lines are recommended to adopt policies of responsible alcohol service given that the FBI data indicate more than one third of all incidents involve a party that is intoxicated. This is a difficult step, given that the sale of alcohol is one of the largest contributors to onboard revenue, and many bar servers' and waiters' gratuities are based on their volume of sales, but it is an effective means to curb problems with unwanted sexual be-

haviors. Responsible alcohol service will also reduce other onboard crime such as altercations, theft, and domestic violence.

While the elimination of sex-related incidents on board cruise ships is unlikely to be achieved, it is a worthwhile goal to strive for. Passengers go on a cruise ship for a relaxing and enjoyable vacation, often as a family or with family members, and do not deserve or expect to be victimized. It is in the interest of cruise lines to take the problem of aggressive sexual behaviors seriously and take every possible measure to eradicate the problem, including a structured approach to implementing a zero tolerance program.

### Biographical Notes

Ross A. Klein is a Professor of Social Work at Memorial University of Newfoundland. He is an internationally recognized authority on the cruise ship industry, having published four books, six reports for nongovernmental organizations, and more than a dozen articles and book chapters. He is regularly called as an expert witness in lawsuits against the cruise industry and is frequently interviewed by media for stories about the cruise industry. Ross is online at www.cruisejunkie.com

Jill Poulston is an Associate Director of the New Zealand Tourism Research Institute, and Head of the Hospitality Department at AUT University's School of Hospitality and Tourism. Prior to joining AUT University, Jill worked in hotel management for over 15 years, and from this, developed an interest in ethical issues in hospitality. Although Jill publishes on hospitality workplace problems generally, she has a particular interest in sexual harassment and sexual behaviors at work.

*Coordinating Editor: Michael Lück*

### References

Abbey, A., Zawacki, T., Buck, P. O., Clinton, A. M., & McAuslan, P. (2001). Alcohol and sexual assault. *Alcohol Research and Health, 25*(1), 43–51.

Bickman, L. (1974). The social power of a uniform. *Journal of Applied Social Psychology, 4*(1), 47–61.

Brame, R., & Piquero, A. (2003). Selective attrition and the age-crime relationship. *Journal of Quantitative Criminology, 19*(2), 102–127.

Business Research & Economic Advisors. (2008). *The contribution of the North American cruise industry to the U.S. economy in 2007*. Retrieved July 2, 2010, from http://www.cruising.org/Press/research/2007.CLIA.EconomicSummary.pdf

Chin, C. B. N. (2008). *Cruising in the global economy: Profit, pleasure, and work at sea*. Hampshire, England: Ashgate.

Connell, R. W. (1987). *Gender and power: Society, the person, and sexual politics*. Stanford, CA: Stanford University Press.

Cruisebruise.com. (2011). *The Cruise Bruise cruise ship bruising report*. Retrieved March 10, 2011, from http://www.cruisebruise.com/index.html

Cruise Industry Facts. (2010). *Security*. Retrieved July 2, 2010, from http://www.cruiseindustryfacts.com/safety-and-security/security/

Cruise Lines International Association. (2008). *Cruise market profile study*. Fort Lauderdale, FL: Author.

Cruise Lines International Association. (2010). *Technical and regulatory: Security*. Retrieved July 2, 2010, from http://www.cruising.org/industry/security.cfm

Cruise Mates. (2010). *Alcohol policies by cruise line*. Retrieved July 2, 2010, from http://www.cruisemates.com/articles/feature/alcoholpolicies-090707.cfm#axzz0swnuLHpu

Cruiserape.com. (2011). *Cruise ship rape and sexual assault support center*. Retrieved March 10, 2011, from http://www.cruiserape.com/facts.php

Cruise Ship Job. (2010a). *Cruise ship employment guide*. Retrieved from http://www.cruiselinejob.com/

Cruise Ship Job. (2010b). *Cruise ship employment guide*. Retrieved 10 March 2011, from http://www.cruiselinejob.com/

De Coster, S., Estes, S. B., & Mueller, C. W. (1999). Routine activities and sexual harassment in the workplace. *Work and Occupations, 26*(1), 21–49.

Dennett, A., Cameron, D., Jenkins, A. K., & Bamford, C. (2010, May 5–7). *The social identity of waiters onboard UK cruise ships: 'Quasi-professionals' forming occupational communities*. Paper presented at the meeting of the CHME 19th Annual Research Conference, Horsley Towers, Surrey, England.

Department of Justice. (2009). Assault Sections, Criminal Code of Canada, Rule 265, 265 C.F.R. ¿ 1(a).

Devine, M. (2006, June 18). *Ship of fools all at sea after throwing decency overboard*. Retrieved July 2, 2010, from http://www.smh.com.au/news/miranda-devine/ship-of-fools-all-at-sea-after-throwing-decency-overboard/2006/06/17/1149964785495.html#

Ehline, M. (2007, November 8). *Carnival cruise ship rape attorneys discussion*. Retrieved February 2, 2009, from http://cruiseshiplawsuits.blogspot.com/2007/11/carnival-cruise-ship-rape-attorneys.html

Eriksen, M. (2006). Love boats on troubled waters. *Trial, 42*(3), 48–57.

European Commission. (1998). *Sexual harassment in the workplace in the European Union*. Brussells: European Commission.

Finn, L. (2010). Alcohol a factor in half of all sexual assaults. *Irish Medical Times, 44*(18), 10.

Florida-Caribbean Cruise Association. (2010). *Cruise industry overview*. Retrieved March 10, 2011, from www.f-cca.com/.../2010-overview-book_Cruise-Industry-Overview-and-Statistics.pdf

Friends of the Earth. (2011). *Cruise ships and pollution.*

Retrieved March 10, 2011, from http://action.foe.org/content.jsp?content_KEY=3018&t=2007_Ships.dwt

Hayner, N. (1928). Hotel life and personality. *American Journal of Sociology, 33*(5), 784–795.

Hernandez, S. (2001). *Congressional testimony*. Retrieved July 2, 2010, from http://www.fbi.gov/congress/congress07/hernandez032707.htm

Hoel, H. (2002). *Bullying at work in Great Britain*. Doctoral dissertation, University of Manchester Institute of Science and Technology, Manchester.

Illies, R., Hausman, N., Schwochau, S., & Stibal, J. (2003). Reported incidence rates of work-related sexual harassment in the United States: Using meta-analysis to explain reported data disparities. *Personnel Psychology, 56*(3), 607–631.

Internationalcruisevictims.org. (2011). *International cruise victims*. Retrieved March 10, 2011, from http://www.internationalcruisevictims.org/LatestMemberStories/Jamie.html

Johnson, R. R. (2005). Police uniform color and citizen impression formation. *Journal of Police and Criminal Psychology, 20*(2), 58–66.

Klein, R. A. (2007). *Crimes against Americans on cruise ships*. Subcommittee on Coast Guard and Maritime Transportation Hosue Committee on Transportation and Infrastructure.

Klein, R. A. (2008a, June 19). *Cruise ship safety: Examining potential steps for keeping Americans safe at sea* [Testimony]. Retrieved July 2, 2010, from http://www.cruisejunkie.com/

Klein, R. A. (2008b). *Paradise lost at sea: Rethinking cruise vacations*. Halifax, Nova Scotia: Fernwood.

Klein, R. A. (2009). *Cruising without a bruising: Cruise tourism in the maritimes*. Retrieved July 2, 2010, from http://www.policyalternatives.ca./publications/reports/cruising-without-bruising

Klein, R. A. (2010). *Cruisejunkie dot com: Environmental issues*. Retrieved March 10,l 2011, from http://www.cruisejunkie.com/index.html#Environmental_Issues

MacKinnon, C. (1979). *Sexual harassment of working women*. New Haven, CT: Yale University Press.

Nickels, E. (2008). Good guys wear black: Uniform color and citizen impressions of police. *Policing, 31*(1), 77–92.

Nielsen, K. (2000, February 3). *The perfect scam*. Retrieved July 2, 2010, from http://www.miaminewtimes.com/2000-02-03/news/the-perfect-scam/

OSAGI. (2008). *Harassment policy*. Retrieved July 2, 2010, from http://www.un.org/womenwatch/osagi/fpsexualharassment.htm

Panko, T. R., George, B. P., & Henthorne, T. L. (2009). Cruise crimes: Economic-legal issues and current debates. *Economic Interfaces, 11*(26), 585–596.

Passenger Shipping Association. (2008). *Annual cruise review*. Retrieved July 5, 2010, from http://www.the-psa.co.uk

Passenger Shipping Association. (2009). *UK cruise industry bullish for 2009 and beyond*. Retrieved from http://www.shipsandcruises.com/passenger_ships.htm

Poulston, J. (2008a). Hospitality workplace problems and poor training: A close relationship. *International Journal of Contemporary Hospitality Management, 20*(4), 412–427.

Poulston, J. (2008b). Metamorphosis in hospitality: A tradition of sexual harassment. *International Journal of Hospitality Management, 27*(2), 232–240.

RCL Investor. (2010). *Investor relations*. Retrieved July 5, 2010, from http://www.rclinvestor.com/phoenix.zhtml?c=103045&p=irol-faq#1345

Royal Caribbean. (2009). *Oasis of the Seas: Fast facts*. Retrieved January 11, 2010, from http://www.oasisoftheseas.com/presskit/Oasis_of_the_Seas.pdf

Sex is good at sea. (2007, May 12). Retrieved July 2, 2010, from http://www.canada.com/travel/good/804912/story.html

Shorter Oxford English Dictionary (5th ed.). (2003). New York: Oxford University Press.

Silverstein, E. (2006). *Are you safe on a cruise ship?* Retrieved March 10, 2011, from http://www.usatoday.com/travel/deals/inside/2006-09-06-inside-the-deals_x.htm

Sison, M. A. (2009). *Mark's cruise ship jobs experience*. Retrieved July 2, 2010, from http://www.cruiselinesjobs.com/eng/cruise-ship-job-experience/

Smart Cruiser. (2010). *Travel: Cruise*. Retrieved July 5, 2010, from http://www.smartcruiser.com/travel/cruise/ship.rvlx?ShipID=16

StatsCan. (2006). *Crime statistics in Canada, 2005*. Retrieved July 15, 2010, from http://www.statcan.gc.ca/cgi-bin/af-fdr.cgi?l=eng&loc=http://www.statcan.gc.ca/pub/85-002-x/85-002-x2006004-eng.pdf

StatsCan. (2008). *Selected violations, by most serious offences, Canada, 2007 and 2008*. Retrieved July 15, 2010, from http://www.statcan.gc.ca/pub/85-002-x/2009003/article/10902/tbl/t2-eng.htm

Tittle, C., Ward, D., & Grasmick, H. (2003). Gender, age, and crime/deviance: a challenge to self-control theory. *Journal of Research in Crime and Delinquency, 40*(4), 426–453.

U.S. Department of Justice. (2005). *Crime in the United States*. Retrieved July 2, 2010, from http://www.fbi.gov/ucr/05cius/offenses/violent_crime/aggravated_assault.html

Uggen, C., & Blackstone, A. (2004). Sexual harassment as a gendered expression of power. *American Sociological Review, 69*(1), 64–92.

Warhurst, C., & Nickson, D. (2007). A new labour aristocracy? Aesthetic labour and routine interactive service. *Work, Employment & Society, 21*(4), 785–798.

# Exhibit "R"

## FEE SCHEDULE

Ross A. Klein, PhD
6 Cormack Street
St. John's, NL A1E 4C9
CANADA

**Basic Fee** - $300 per hour. Includes investigation, research of professional material, counseling, trial and deposition preparation, and oral and written reports. This fee is portal-to-portal and includes all processing times and delays at airports. Travel outside Canada will be billed at one half the basic fee, portal-to-portal, to a maximum of $1200 per day.

**Appearances** - $300 per hour (including stand-by) with a four-hour minimum. Estimated fee for professional services in preparation for testimony, testimony time and expenses will be paid in advance at the Consultant's discretion.

**Deposition** - $300 per hour with a five-hour minimum, plus any appropriate travel fee and expenses, will be paid before the day of the deposition if requested by the Consultant. Should a scheduled deposition need to be cancelled by the party taking the deposition, the five-hour minimum will be paid to the Consultant unless the cancellation is at least two days prior to the date of the deposition.

**Expenses** - Actual expenses reasonably and necessarily incurred such as travel, subsistence, lodging, etc., are additional to the consulting fee and will be billed to the client at cost. Major expenses such as air travel, lodging, car rental, etc. will be payable in advance at the Consultant's discretion. All air travel will be full fare economy or discounted business class.

**Terms**
· Advance engagement retainer of $3600 ($300 x 12 hours).
· All bills are to be paid within 30 days of the date of the bill.
· The retaining law firm will be responsible for all charges for services from the Consultant except the taking of the Consultant's deposition when paid by the opposing party.

# Exhibit "S"

**RYAN C. W. HALL, M.D.**
**2500 W. Lake Mary Boulevard; Ste 219**
**Lake Mary, FL  32746**
**(407) 322-8199**
**Fax: (407) 322-8169**

| | | | |
|---|---|---|---|
| **NAME:** | Karl Broberg | **PHONE:** | 817-903-9322 |
| **ADDRESS:** | 2109 Scenic Bay Drive<br>Arlington, TX  76013 | **DOB:** | 12/04/70 |
| **CASE #:** | 1:17-cv-21537-FAM | | |

## INDEPENDENT MEDICAL EXAMINATION

**DATE OF EVALUATION:** September 4, 2017          **LENGTH OF EVALUATION:**  3 ¾ hours

**DATE OF REPORT:** October 4, 2017

**REQUESTED BY:** Attorney Robert Gardana

**PURPOSE OF THE EXAMINATION:**

To determine the evaluee's mental condition, diagnosis, prognosis, and disability status as related to incidents involving his wife's death of May 13, 2016.

**EXAMINATION:**

The examination consisted of a question-and-answer psychiatric evaluation with special interest in obtaining the history and performing a Mental Status Examination with regard to the evaluee's thinking, reasoning, behavior, mood, logic, intellectual functioning, intelligence, and judgment.

The evaluee was seen at our office at 2500 West Lake Mary Boulevard; Suite 219, Lake Mary, Florida 32746, for an Independent Medical Evaluation, for 3 ¾ hours from 9:00 a.m. to 12:45 p.m.

My opinion is based on examination findings, psychometric test results, and review of records received and may be subject to change pending receipt of any additional records and/or additional information.

The following screens/tests/scales were administered:

        Mini Mental State Examination (MMSE)

        Zung Self-Rating Anxiety Scale

Name:   Karl Broberg

Zung Self-Rating Depression Scale

**SOURCES OF INFORMATION:**

Complaint
Medical records of Cathal Grant, MD

**STATEMENT OF NONCONFIDENTIALITY:**

The evaluee was informed at the beginning of the examination that this was an Independent Medical Examination requested by Attorney Robert Gardana, that nothing he said would be held in confidence, and that we were not undertaking any treatment commitment to the evaluee. He was told that we would report the facts as he presented them, review supporting documentation, and make an objective evaluation of his psychiatric/medical condition, which could be presented before a court of law. He was advised that breaks could be taken as needed.

**RECORDS REVIEWED:**

Cathal Grant, MD.

11/09/16. Symptom Checklist. How often do you make careless mistakes when you have to work on a boring or difficulty project? Often. How often do you have difficulty keeping your attention when you are doing boring or repetitive work? Often. How often do you have difficulty concentrating on what people say to you, even when they are speaking to you directly? Often. How often do you have trouble wrapping up the final details of a project, once the challenging parts have been done? Very often. How often do you have difficulty getting things in order when you have to do a task that requires organization? Often. When you have a task that requires a lot of thought, how often do you avoid or delay getting started? Very often. How often do you misplace or have difficulty finding things at home or at work? Often. How often are you distracted by activity or noise around you? Often. How often do you have problems remembering appointments or obligations? Very often. How often do you fidget or squirm with your hands or feet when you have to sit down for a long time? Often. How often do you leave your seat in meetings or other situations in which you are expected to remain seated? Often. How often do you feel restless or fidgety? Often. How often do you have difficulty unwinding and relaxing when you have time to yourself? Very often. How often do you feel overly active and compelled to do things, like you were driven by a motor? Very often. How often do you find yourself talking too much when you are in social situations? Rarely. When you're in a conversation, how often do you find yourself finishing the sentences of the people you

Name:   Karl Broberg

are talking to before they can finish them themselves? Sometimes. How often do you have difficulty waiting your turn in situations when turn taking is required? Never. How often do you interrupt others when they are busy? Sometimes. Part A – score 30.  Part B – score 22.


11/09/16. Brief Patient Health Questionnaire. Over the last 2 weeks. . .  He noted "nearly every day" to trouble concentrating on things, such as reading the newspaper or watching television; and moving or speaking so slowly that other people could have noticed. Or the opposite – being so fidgety or restless that you have been moving around a lot more than usual. He noted "several days" to feeling down, depressed or hopeless; trouble falling or staying asleep, or sleeping too much; feeling tired or having little energy. He noted "not at all" to little interest or pleasure in doing things; poor appetite or overeating; feeling bad about yourself, or that you are a failure, or have let yourself or your family down; and thoughts that you would be better off dead, or hurting yourself in some way.  If you checked off any problems on this questionnaire so far, how difficult have these problems made it for you to do your work, take care of things at home, or get along with other people? Very difficult.  In the last 4 weeks. . .  He noted "bothered a lot" by the stress of taking care of children, parents, or other family members; "bothered a little" by worrying about your health; stress at work outside of the home or at school; and something bad that happened recently; and "not bothered" by your weight or how you look; little or no sexual desire or pleasure during sex; difficulties with husband/wife, partner/lover, or boyfriend/girlfriend; financial problems or worries; having no one to turn to when you have a problem; and thinking or dreaming about something terrible that happened to you in the past – like your house being destroyed, a severe accident, being hit or assaulted, or being forced to commit a sexual act.  What is the most stressful thing in your life right now? Inability to stay on task. Are you taking any medication for anxiety, depression, or stress? No.


11/09/16. Height: 6' 0". Weight: 196.5. BP 109/80, P 76. "Inability to stay on task", unable to remember tasks, "mood swings" and irritability. Recent stressors: "Lost wife" – 6 months ago, widowed, sudden, fell off cruise ship. Past psych history: Denied. Previous psych meds: 10 years ago – Adderall – Quit b/c "I'm anti-med." Possibly 20 mg. Past medical history: Denied.  Present psych meds: 1 ½ years ago. Quetiapine fumarate 15 [sic] mg. Dr. Jesus Ramirez. Other meds: Viagra, atorvastatin. Drug/alcohol history: Denied, but reported drinking a 24 pk week beer. Hobbies/interests: Limited. MSE: Animation: Fidgety. Guilt: Wife's death. _____ per patient. Speech: Heightened. Thought content:  Grief/staying on task. Mood: Up and down. Appetite: Up and down – situational. Sleep: Up and down – situational,

3

Name:   Karl Broberg

works w/ meds helps. Diagnosis: ADHD. Axis IV: Widower. Axis V: 60/90. Restart Adderall 20 mg. Seroquel 25 mg qhs. Viagra 100 (x6/mo).

12/07/16. Symptom Checklist. Part A – score 20. Part B – score 12.

12/07/16. Focus and concentration have improved. No increase in irritability. Most improved on completing tasks at hand. 4 kids. Recently settled custody dispute over deceased wife's child (he has full custody now). Depressed mood - 7/10. Denies appetite disturbance. Sleeps well with Seroquel. Poor concentration is improving. Trazodone did not help. Business partner is dying of cancer. Wife died summer 2016. Consider 1:1 therapy, patient declined.

01/04/17. Reports Adderall continues to be helpful. Denies mood lability or anxiety. Went to Great Wolf Lodge with the kids for the holiday ("It was terrible"). Presents as irritable at times but denies an increase in agitation. Work continues to be busy, had to work through the holiday. Depressed mood – 7/10. Denies sleep disturbance. Poor concentration is improved. Denies agitation/irritability. Denies generalized anxiety. Denies panic attacks. Substance abuse – ETOH weekly. Denies SI/HI. Had viral GI illness recently. Axis IV: Widowed, custody dispute, work stress. Plan: Increase physical activity (plans to begin jogging)

02/01/17. Adderall continues to work well. "Night and day." Work remains busy and "stressful." Kids are doing well, all have good grades. Sleeping well with Seroquel. Substance abuse: Alcohol several times/week. Plan: Consider decrease in alcohol.

05/01/17. Mood has remained stable. Focus/concentration is good. Kids are doing well. Wt 190 lbs.

08/07/17. Still has temporary custody of deceased wife's child, will have jury trial coming up. Focus/concentration has been good. Busy at work (business partner passed away). Decreased alcohol use lately. Depressed mood- 7-8/10. Generalized anxiety - ++ (due to work). Denies panic attacks. Substance abuse: ETOH decreased (1-2x/week). Axis I: ADHD combined. Axis IV: Grief, parenting.

4

Name:   Karl Broberg

<u>United States District Court, Southern District of Florida.</u>

Complaint, 04/25/17.  As a direct of [sic] Carnivals acts and omissions Carnival [sic], Samantha Joyce Broberg's body was never recovered. . . In the morning hours of May 13, 2016, Mrs. Broberg's traveling companion contacted Plaintiff to advise him that she had not returned to the cabin the prior evening. Immediately, the Plaintiff began calling Carnival's Guest Care Hotline hourly to ascertain the plight of his wife in a desperate attempt to find out more information about his wife's whereabouts on the Carnival Liberty. Despite his calls and concerns for his wife, Carnival did not return Mr. Broberg's calls until over 15 hours after her fall overboard and instead Mr. Broberg learned of his wife's death by numerous media and news stations calling and contacting him directly advising him that his wife had fallen overboard and that she was not rescued. Instead of contacting Plaintiff to inform him of his wife's fall overboard, Defendant Carnival acted with reckless indifference by communicating first with the media concerning Mrs. Broberg [sic] disappearance and fall overboard, without prior notification to Plaintiff that she had fallen overboard, resulting in extreme emotional distress to the patient.

Carnival acted recklessly and with callous indifference under the circumstances, particularly by not contacting the plaintiff for 15 hours, and never notified Karl M. Broberg, as her next of kin, that she had fallen overboard, despite Plaintiff's repeated and insistent calls to Carnival. Carnival's conduct was extreme and outrageous by first contacting and releasing her identity and information concerning her fall overboard to the news media without first contacting the Plaintiff, her husband.

Carnival's conduct was so extreme and outrageous and as a direct result, the Plaintiff began receiving disturbing telephone phone calls from numerous news media stations concerning his wife [sic] fall overboard and informing him that she was not recovered. Carnival's communication with the media first, while ignoring the Plaintiff's calls concerning his wife, was a failure on the part of Carnival Defendant that goes beyond the bounds of decency.

**<u>INTERVIEW</u>**

**RELEVANT BACKGROUND INFORMATION:**

Mr. Broberg reports he was born in Belvidere, Illinois. He had no known problems or complications with his birth. He believed he met his normal developmental milestones. He had no significant childhood illnesses. He was not removed from his parents' home (foster care, runaway, other types of behavior).

5

Name:   Karl Broberg

**FAMILY HISTORY:**

Mr. Broberg reports both of his parents are still alive. His father is 70 years old and currently retired. His father's past occupations included serving in the Marine Corp and working manual labor. His father has no known specific health problems and no known psychiatric history. Mr. Broberg's mother is 66 years old and is also currently retired. She primarily worked in retail and had no known specific health issue or psychiatric issues. Mr. Broberg has one younger brother, who works as a police officer in Springfield, Missouri, and is reported to be in good health with no known psychiatric issues. There was no history of psychiatric problems in the immediate or extended family.

**CHILDHOOD HISTORY:**

Mr. Broberg described his childhood as "alright." He engaged in normal childhood activities, such as collecting baseball cards. He dated as a teenager. He notes no issues with physical or sexual abuse as a child growing up. He attended a Lutheran school. He reports that he is not a particularly spiritual person. After his wife's death he has had a lot more questions about spirituality and religion. However, he notes that he still has his children attending Pantigo Christian Academy.

**EDUCATIONAL HISTORY:**

Mr. Broberg notes that he was a fair student, who made mostly B's. He was in some honors classes. He left school in his senior year. He did not obtain a GED. The reason for leaving school was due to a romantic relationship. He has not attended college or trade school. He reports no major disciplinary problems as a child, such as suspensions or expulsions. He does not identify receiving any major awards in school. While asking about educational history, I did perceive that he was having some emotional change. I asked what may have brought that about. He stated he was just thinking about his wife and the reason he was here for the evaluation and that the current questions did not seem to have much to do with his current emotional health (*mentioned in report at this time to provide context to mental status and how and when certain features were observed. Mr. Broberg was given the opportunity to ask questions about the interview process and was informed that the purpose of some of these questions was to obtain background information, context, and screen for potential past symptoms of a mental illness. He was generally seen as cooperative and willing to engage in the process, but there were times when it appeared*

Name:   Karl Broberg

*that his thoughts may be jumping ahead or related to other aspects, not directly on the question being asked.*)

**EMPLOYMENT HISTORY:**

In general, Mr. Broberg stated that he has "done it all." For example, he notes that he worked retail for a period of time and worked at a factory job for a period of time.  While working in the factory, there was an accident with one of the presses, where he had his ring finger on his left hand partially amputated. He notes there was a Workers' Compensation claim filed for which he believes he received roughly $3,000. He managed a Quick Stop gas station and noted that he was fired from that job for "engaging in actions outside of procedure." When asked what that meant, he reports that the station was having a problem with people driving off without paying for the gas and that he tried to stop an individual from doing that. When he confronted the person, an altercation occurred where he got hit.  He was fired because the gas station's policy was not to confront shoplifters (*paraphrasing but general theme of the story*).

After leaving Quick Stop, Mr. Broberg started a small advertising business. In hindsight, he says being fired from Quick Stop was one of the best things that ever happened to him in terms of professional growth.  If he had not been fired, he would still be "working for the man" to this day. He notes that he has engaged in a lot of entrepreneurial interests since, such as becoming involved in horse training. He reports he runs more horses a year than anyone other trainer. He indicated that many of the races that he enters are not necessarily larger races, such as the Triple Crown, but that he and his business enter more horses in regional races and often has had more wins than any other business/farm/trainer in a year. (*Statements were made when asking about his occupation and level of success/failures and were not seen as him being boastful or trying to put forth a level of grandeur.*) He notes he has always liked horses and that the track was an activity that he used to do with his father.  Mr. Broberg saw horse racing as an intellectual form of gambling because you take data/information and apply it. He notes since the passing of his wife he has not engaged in horse racing in terms of recreational betting as he used to in the past. Upon asking the question, it appears to be one of the many activities that he used to enjoy doing that he does not do since his wife's death (*clarification - still works as trainer or in the horse industry but does not engage in it as a recreational hobby or during time off*).

Name:   Karl Broberg

Mr. Broberg also notes that he has some rental properties. One of his business partners who used to primarily manage the properties passed away from cancer in the last six months. Mr. Broberg has had to try to be more active in managing that side of his business interests.

**MILITARY HISTORY:**

Mr. Broberg reports no active duty service. He did indicated that his father was in the Marine Corp and that he was raised with a lot of the notions of the Marines such as semper fi, be self-reliant, and get over illness. For that reason, Mr. Broberg notes that in general he does not like to take medications. Even when doctors have encouraged him to take medicines, he has been reluctant to do so and has only started medicines when he feels that symptoms were impacting his ability to function or could affect others (*e.g. if he was not able to work others would be impacted*). In addition to his upbringing and the notion of toughing it out, he also reports that he has seen a lot of people become "addicted" or overly dependent on taking medicine. This is an additional reason why he does not want or like to be prescribed medications. (*Aspects of what is discussed here do not directly pertain to issues of military service, but discussion occurred based on being asked about if he served. Included here to show how information would come up at different parts of evaluation and how at times Mr. Broberg's answers on a surface level may appear tangential, but were connected for him.*)

**RELATIONSHIP HISTORY:**

Mr. Broberg identifies himself as heterosexual. He notes he started dating when he was 16. He has probably had six significant relationships over the course of his life. He has been married four times. He married his first wife at around age 18 to 19. He and his first wife were on again/off again for about 8-10 years. He has one daughter with his first wife, who is currently 27 years old. He notes the reason for divorce from the first wife was that the two of them were incompatible with each other. He also stated that her family was from Oklahoma and that they had moved to Texas for a work opportunity, which provided additional strain on the relationship.

Mr. Broberg was married to his second wife for three years. They had no children. He notes that they had worked together, but he felt that she was somewhat lazy and "a mess".

8

Name:   Karl Broberg

Mr. Broberg's third wife, Heather, had two children that he had adopted. In addition, the couple had a daughter of their own. Mr. Broberg and Heather worked together in the advertising business and training horses. He notes that the relationship ended because he was spending 80 hours a week, if not more, at work and she felt abandoned. He notes currently having a civil relationship with Heather.

Mr. Broberg's fourth wife was Samantha, who he reports died after falling overboard on a cruise ship. He gives the date of the event as May 13, 2016. He notes that he had known Samantha through work prior to dating. They dated for about six months and lived together for two years prior to getting married. They had been married for about two years at the time of her death. He notes that he and Samantha used to joke that they were planning to take over the world together. The long-term goals were to make sure the kids got through school (*children from his past relationships and from her past relationships*), and then hopefully travel.

Mr. Broberg notes in general that he had a good to very good relationship with Samantha and her two daughters. The relationship with the oldest stepdaughter, although not poor, was not necessarily as close as the relationship he had with his wife and her youngest daughter, however, since Samantha's passing the relationship with the eldest daughter has deteriorated. Initially, the eldest daughter, who is a teenager, was living with him, but when she started acting out she went to live with her biological father and then went to live with her grandparents. Samantha's youngest daughter is still currently living with Mr. Broberg. Mr. Broberg is in the midst of a custody fight with the biological father of the youngest stepdaughter. He notes that the biological father has a history of previous arrests and Mr. Broberg does not think that the biological father would care for the stepdaughter as much as he would. Mr. Broberg has been in his youngest stepdaughter's life since she was roughly two to three years old.

Mr. Broberg notes that his youngest stepdaughter, although in general doing well, still has periods where she will regress (*e.g. periods of enuresis*) since her mother's death. She has had some therapy through school. The oldest daughter has also undergone therapy.

Mr. Broberg notes that one of the things that Samantha contributed to the relationship was stability for the children and that in large part due to her help he was able to get custody of his daughters from his third

9

Name:   Karl Broberg

marriage. He was always very appreciative and respectful of that. Mr. Broberg notes that his wife was wonderful with the children, even though he reports she had a bit of a rough upbringing herself.

When asked to describe the relationship, Mr. Broberg stated that he and his wife enjoyed spending time together, shared interests, and had good physical intimacy in the relationship. He was trying not to repeat mistakes with Samantha that he had made with Heather. Although there were some ups and downs, as occur in many relationships, he did think in general that it was a good marriage and Samantha accepted him for who he was.

Although in general Mr. Broberg reports a good marriage, he does note that his wife had a bit of a "checkered past" and had somewhat of an "addictive" personality. About a year prior to her passing, she had started to drink more. He notes that he had encouraged her to stop drinking (e.g. he had been "fussing at her"). He was under the impression that her drinking was improving (e.g. decrease in frequency and volume). He expressed guilt over not having done more to try to address potential alcohol problems while she was still alive.

Since his wife's passing, Mr. Broberg started to realize exactly how much Samantha did for him, the family, and work. He notes that he did not take her for granted, but he just did not realize how many little things she was responsible for and accomplished.  Her loss profoundly impacted aspects of the horse training business for about six to eight months and it has affected his ability to travel. He also had to get a nanny to look after the children.

Mr. Broberg notes that he has a bit of a strained relationship with his in-laws. There have been some disagreements over how to raise the children and philosophies regarding parenting.  In addition, both stepdaughters were with Samantha's parents when they found out about Samantha's death. Mr. Broberg wanted to be the one to reveal the information to the youngest daughter, but that information was told to her by the grandparents prior to him getting there.  He did have the opportunity to tell his own children, who had been with Heather, on his own terms.

10

Name:   Karl Broberg

Mr. Broberg notes he is currently dating a friend of Samantha's.  This relationship has caused some additional stress in that he feels others (e.g. in-laws) are judging him for dating after his wife's death, especially someone she knew.

## CURRENT LIVING SITUATION:

Mr. Broberg notes that the house is stable. However, he is in the process of looking for additional support for the children (*had to let a nanny go due to being unreliable*). He reports no periods of homelessness.

## LEGAL HISTORY:

Mr. Broberg reports no arrests. He had one Workers' Comp claim related to the amputation of his finger. He is currently in a custody dispute over his youngest stepdaughter with the child's biological father, who had not previously been significantly involved in the child's life per Mr. Broberg.

## VIOLENCE HISTORY:

Mr. Broberg reports no significant violent episodes.  He did fight some with his brother when he was younger.  He discussed being in a fight while working at Quick Stop, where he got punched. He reports he did not touch the other individual.  He indicates that he has had increased irritability since the passing of his wife and discussed two incidents where he felt he lost his temper in an uncharacteristic manner and was overly emotional.  However, he did not get violent towards others. One of the incidents was at a horse track after one of his horses had been disqualified. He got angry, upset, and threw things and he was fined by the track stewards (*horse racing judges*). Mr. Broberg notes that although the horse was disqualified he thought the large trigger to this event was that he had received a phone call from one of his wife's friends, who wanted to talk or ask questions about her passing. He also notes that given the large number of horses he enters into races it is not unheard of to have a horse disqualified and he had not had a reaction like that in the past. The other incident occurred when he went to a bank and was trying to cash a check.  He had difficulty and again became angry.  He discussed since his wife's passing that he feels he is more irritable, does not have as much frustration tolerance, and does not tolerate people as well in general.

Name:   Karl Broberg

**SUBSTANCE USE HISTORY:**

Mr. Broberg reports currently drinking six beers a day, which is more than what he drank before his wife's passing. His usual beer of choice is Goose Island IPA. He also notes that he has been smoking cigars daily, which is more than he used to smoke before his wife's passing. He reports no use of illicit substances such as marijuana, cocaine, prescription pills in a nonprescribed manner, heroin, LSD, PCP, methamphetamine, ecstasy, DXM, or inhalants.

**PAST MEDICAL HISTORY:**

Primary Care Doctor – Mr. Broberg identifies Dr. Jose Rodriguez as his primary care doctor. He notes since his wife's passing he has also started to see a Dr. Grant.  Mr. Broberg notes that Dr. Grant had discussed taking antidepressants with him. Mr. Broberg stated that he felt that he "could deal with his demons," so he did not want to take medications.  Also, as noted earlier, in general Mr. Broberg has a reluctance to take medications, however his concentration and focus at work were so poor (could not function at work) that he agreed to start Adderall 20 mg po BID in order to improve focus. He notes the Adderall has been somewhat helpful, but is not a cure-all.  He also indicates that he takes Seroquel 25 mg for sleep. He had been started on the Seroquel a year prior to his wife's death. He notes that even with the medicine his sleep is currently poor. He is also taking a statin for cholesterol.  Mr. Broberg notes that he's had problems with erectile dysfunction and had a trial of Viagra, which was helpful. Mr. Broberg thinks the cause of the dysfunction is related to his emotional distress since his wife's passing. He notes that historically he has always been a very sexual person and that he and his wife used to engage in intercourse almost on a nightly basis.

Past Surgery – Hemorrhoid surgery.

Allergies - No known drug allergies.

Transfusions – None.

Seizures – None.

Loss of Consciousness – None.

Name:   Karl Broberg

Accidents – None.

Caffeine Consumption – Six Coke Zeros daily.

Current Medications - Adderall 20 mg BID, Seroquel 25 mg qd, and atorvastan 25 mg qd.

**REVIEW OF SYSTEMS:**

General – Periods where he will get shaky, as if low blood sugar.

HEENT – He notes when he gets angry or upset he will see dots in his visual field.

Gastrointestinal – Diarrhea.

**PAST PSYCHIATRIC HISTORY:**

Mr. Broberg reports no significant prior psychiatric history. He had not seen any counselors, psychiatrists, or therapists prior to his wife's passing. He does note roughly a year's period of time prior to her passing when he was on 25 mg of Seroquel for sleep, which was initially written by his primary care doctor. In general, he has seen himself as a highly functioning individual, who does well in the work environment.

Mr. Broberg does not identify any historical bipolar symptoms, such as periods of decreased sleep with increased energy, grandiosity, hyperreligiosity, hypersexuality, or flight of ideas. He did not identify any psychotic symptomatology, such as delusions or hallucinations.  He does note that he does like a clean house and environment. However, it was unclear if he had any true historic obsessive compulsive disorder symptoms versus being someone who just liked a clean and tidy environment. Mr. Broberg does not report having any panic attacks. He does note in general that he seems to be more worried about things in general since his wife's passing.

**LOSS OF WIFE AND IMPACT:**

Mr. Broberg notes that he found out that his wife was missing when one of her friends called from the cruise ship.  He was out of state at a horse race at the time.  He reports his initial thought was that alcohol may be involved and was concerned that she ended up at the wrong cabin or fell and injured herself somewhere on the ship. He did not initially suspect that she may have fallen off the ship. He notes that he

13

Name:   Karl Broberg

had tried to call the cruise ship company to get information.  He perceives he did not receive much information except that the ship was being searched (*paraphrased*).  He learned from social media that the search on the boat had been stopped.  News organizations started calling him regarding his wife's death prior to him finding out from the cruise company that they believed she was dead or lost at sea.  He found the media calls distressing and basically told people he had no comment at that time.  He notes that he felt very dazed at the time.

Mr. Broberg reports that since his wife's death he has socially withdrawn from others outside of the family.  He has not engaged with friends and has had difficulty at work, both in terms of managing the business and interacting with partners.  He feels that he's had a depression and that his mood state is more than just normal grieving.  He notes that he had lost a business partner roughly six months ago and that his reaction to that was very different than the loss of his wife.  He indicated that he was good friends with the business partner so it was more than just the loss of an acquaintance.  He feels the loss of Samantha has changed his whole world view, which in part is why he feels his reaction to her loss is more than just grieving.

Mr. Broberg notes that he has experienced a lot of anger, disbelief, and that he feels that he is just "fucking sad".  He notes that he does not play the role of victim well and does not want to admit how much emotional distress he is having over the loss of his wife, however, "a huge piece of me died that day."  He notes becoming very cynical about the world and having much more difficulty focusing.

Mr. Broberg notes currently having poor sleep.  Initially after Samantha's passing he had difficulty falling asleep even with the Seroquel.  He is now able to fall asleep (*usually after taking Seroquel and drinking*), however he usually remains asleep for about two hours.  After he wakes up, he often has trouble falling back asleep, again due to thinking too much and having rapid thoughts.  He may get another hour or two of sleep later in the night, but has to get up at around 5 to 6 am due to working the track, as well as raising the family.

Mr. Broberg notes a significant decrease in interests.  He used to like to go to the track and take evening walks, which are both activities he is not doing as frequently.  He also used to socialize with friends.  Mr. Broberg notes he and his wife historically had multiple family friends, but now he tries to avoid them

14

Name:   Karl Broberg

since he does not want to have to discuss or think about his wife. In general, he is not engaging in activities where he would be around other people. He also notes not engaging in solitary activities he used to enjoy, such as taking walks in the evening.  He feels his self-esteem is fine, although he does note that he feels guilty.  He wishes there was more he could have done to address Samantha's alcohol issues.  He cannot help but to think if he had done more that maybe she would still be alive.  He notes that his energy has been poor. He is still very active in terms of having multiple projects, but historically he has engaged in this level of activity without feeling fatigued.   Now he feels it is much more of a struggle and sometimes he just does not want to get out of bed and face the world.

His concentration has been very poor. He notes that the Adderall has been helpful, but that he still gets very distracted and loses focuses.  He is still able to read trade magazines, but does not feel that he is retaining as much information from reading them as he used to. He does not think he would be able to watch a two-hour movie as well as he had in the past.  His appetite has been poor. He thinks he's had a roughly 24-pound weight loss.  The weight loss occurred even prior to starting the Adderall. He has since put two pounds back on, but he just doesn't feel a desire to eat.  He reports that people have commented that he just gets his calories from drinking beer.   At some level, he sees the beer as a form of self-medication. He knows that it is not necessarily good for his health, but he also does not necessarily see it as a destructive behavior at this time since he is still meeting obligations and it may be helping him to go to sleep (*of note, he made comment that after discussing how much he is drinking and why he was beginning to realize that it may be more of an issue than he had previously recognized*). He also notes that he has been smoking more. He used to smoke a cigar or two a month or every other month and now he is smoking a cigar daily.

Mr. Broberg notes that his thoughts are a lot more rapid since his wife's passing. He has no suicidal thoughts or ideation and has no passive death wish. He states that if anything happened to him "the kids would be fucked." (*At times, Mr. Broberg did use profanity during the evaluation. This was not seen as a hostile or disrespectful act on his part, but just a way he used to indicate a level of concern or distress.*)

Mr. Broberg notes that he was distraught about learning about his wife being missing and then subsequent death.  The continuous news coverage was also was distressing.  He specifically mentioned that at some point Nancy Grace got involved and started putting out theories such as foul play or there

Name:   Karl Broberg

was blood on the deck. He also notes that people on Facebook made negative comments about the situation. Mr. Broberg reports that he became cynical about people and that his world view has changed. He is a lot more negativistic now. He notes that he gets intrusive thoughts regarding his wife, such as remembering either the night before she left on the cruise or the aftermath of finding out. When this occurs he will often get goosebumps. He notes that he's had nightmares. The dreams will often contain many different themes such as dreams about the wife committing suicide, dreams related to her death, dreams that her body had been found, or dreams that the youngest daughter will not want to stay with him. He also reports feeling helpless that he couldn't do anything to address the situation. In general, he tries to fix problems, but was not able to in this situation. When he has intrusive recollections, he remembers the helpless feelings he had when he found out.

As well as avoiding people who may discuss his wife, Mr. Broberg is also avoiding locations that remind him of his wife, such as restaurants she liked or places that were more her place than his. He reports having low mood around places that remind him of her and gave an example that he went to Disney World recently with the children, but all he kept thinking about was past visits to Disney World when he was there with his wife as well. Mr. Broberg notes in general that he feels he does better when he is out of the house because a lot of aspects of the house remind him of her. However, he is working at home more than he did prior to her death because he does not want to go into the office and have to engage with people. He notes that one of the jokes at the office now is that he loses things and that if there is important paperwork they only give him duplicate copies because he is often misplacing the originals.

As discussed above, Mr. Broberg has had an increase in irritability, as noted from the two examples in the violence history. He does not think he is engaging in any reckless or self-destructive behaviors. He does not note any hypervigilance and indicates he has never been that way. He does not that often he does not even "lock his doors." However, he does believe that he is much easier to startle and that he is "the jumpiest bastard on the face of the earth". Others have even commented that he is now a very jumpy individual and it is a change for him. Again, he reports poor concentration with sleep difficulty.

When asked about attention deficit symptoms, historically he did not identify significant problems as a child (*Records reviewed indicated past treatment with Adderall roughly 10 years ago. Records were received after interview so not able to clarify if had past history on Adderall, if so when started, who*

16

Name:   Karl Broberg

*started, length of time on, and what the symptoms were at the time)*.  However, since his wife's passing he often fails to give close attention to details or makes careless mistakes at work.  He often has difficulty sustaining attention in tasks or play activities and indicated that that particular symptom "fits [him] like a glove [currently]."  He is often distracted and does not appear to be listening, even when being directly spoken to.  He notes that he has not been following through on workplace tasks or instructions.  He often has difficulty organizing tasks and activities.  He often avoids or is reluctant to engage in tasks that require sustained effort and, if possible, he will try to find someone else to do those tasks, such as reviewing lengthy paperwork or completing forms.  He often loses things, which is how the context of receiving duplicates at work came up.  He is often easily distracted by external stimuli and is often forgetful in daily activities.

In terms of potential hyperactive symptoms, he was noted to be fidgeting during the evaluation and notes that he often does tap things with his hands or feet.  He also indicated that he started pacing much more often.  During the evaluation, he needed to take a phone call.  He asked if he could go out to the lobby area of the building so he could pace while speaking on the phone.  He indicates that he often leaves his seat in situations when remaining still is expected and that he often has a feeling of restlessness.  He does believe he can engage in activities quietly.  He does often feel that he is on the go or has restless energy.  He notes that he tries not to talk or engage people, but historically once he starts talking he will often talk excessively.  He thinks he probably does blurt out answers to questions.  He does not think he has any difficulty waiting in line and doesn't think that he intrudes on others.

**SUMMARY OF A TYPICAL DAY:**

Mr. Broberg notes that he usually gets up at around 6:30 am, especially during school days to help the children get ready.  He notes that the 9- and 12-year-old children like to cook, so he does not do much of the cooking.  When they had a nanny, she would help.  He often does things around the business.  He does not like to maintain schedules.  He often has to put out fires in his work projects, which requires him to maintain a degree of flexibility.  He tends to work more at home now because he does not want to go into the office and engage with others.  He notes that he may take the kids out to dinner, but again often the 9- or 12-year-old will cook at home.

Name:   Karl Broberg

Activities of daily living: Mr. Broberg likes to have a clean house. Historically, either the nanny or the maid have been involved with the cleaning. He hates to go shopping and that has always been the case for him. He tends to buy too much when he goes. He does not currently use public transportation, but thinks he would be able to if he needed to. He notes he is trying to learn how to use Uber. He has done it when he has been with someone, but has not used it when he was alone. In general, he feels okay going out of the home and actually feels more comfortable when he is out of the house socially than when he is at home. He notes that travel has been hard with the kids, but it used to be a big part of his life. He has not been able to travel since his wife passed away. He notes recently he has become somewhat sloppy about paying his personal bills and again notes that this goes along the lines of his poor focus and concentration. He does try to maintain the house, however he notes he pays others to do certain tasks such as yard services.

Mr. Bromberg notes that he has not necessarily been good about caring for himself since his wife's passing. He has missed some doctors' appointments. He does keep up with his grooming and is able to use a telephone directory or Google, as well as go to places such as the post office. He notes that his sexual functioning has been poor and relates this to thinking too much. He is not engaging in social activities and if possible he tries to avoid/get out of activities he should go to. He is not engaging in any recreational activities just for himself (*e.g. did discuss participating in activities for the children such as a trip to Disney*). He notes that he is able to maintain contact with his brother and that he "tolerates" his parents (*believe statement may have been a mild attempt at humor*). He notes that given their age they are often complaining of physical ailments. He does not see his friends as much. He notes he was never very close to his neighbors, but he is now intentionally avoiding making eye contact with them because he does not want to talk with them and does not want to engage them.

Mr. Broberg notes that he is easily agitated by the general public or people he has to interact with, such as grocery store clerks or servers. He does not tolerate "stupidity" as well. He doesn't have a landlord, but he does serve as a landlord for others and it is a new role he is learning to adjust to. He notes that in order to engage in business or deal with the public many times he has to fake it or to put up a façade. He reports no significant problems working with others, but does indicate that he tries to decrease interactions when possible.

Name:   Karl Broberg

In terms of task completion, Mr. Broberg feels that his attention to detail has been horrible, that his concentration is very poor, and that his persistence depends on what he is doing. If it is something that he needs to do or that he historically has had an interest in, then he does tend to do better. In general, his pacing/putting forth consistent effort is poor. In general, he does well with stressful situations and is able to make decisions. His attendance is generally good, but that he often tries to leave early or get out of things. He generally does not like schedules since multiple times he has to deal with crises. Historically, he relied on his memory more to help with scheduling and keeping up with tasks. He is trying to use more technology now, but notes that has not been going well. He does not believe that his task completion has been as good. He has not been doing well with handling criticism, which historically he was better at. He has not engaged in any road rage issues, but again noted one or two incidents where he got angry and upset more than he usually would (at the track, also at a bank). He also notes that at times he would like to get angrier or engage with people in a hostile manner, but realizes that people are counting on him and that it would be a negative outcome.

**FORENSIC QUESTIONNAIRE:**

Mr. Broberg is right-handed. He can read a newspaper. Current employment is End Zone Athletics Inc, where he serves as the president. He has completed up to the 11th grade. He drove himself to the appointment. He lives with his children at the present time. He usually wakes up at about 6 am, usually goes to bed at around midnight. He or the nanny fix meals. He uses both a checkbook and online bill pay. He is responsible for his own bills. His nanny or housekeeper help with cleaning. He does not attend a place of worship. When asked what hobbies he has, he left it blank. In interview, he noted that that was a difficult question for him and one of those things that upset up because he realized now that he does not have any hobbies, whereas he used to enjoy doing things such as going to the horse races.

Mr. Broberg notes he primarily reads trade journals and news. For TV shows that he watches, he notes he seldom watches anything other than the news. When asked what activities he does with his children, he notes "I cover all aspects of care and entertainment." His last overnight trip was a work trip. A lawn keeper mows his yard. Activities he does around the house is office work. He does not rent movies. He goes out to a theater about three times a year. He sleeps away from home very seldom currently.

Name:   Karl Broberg

Mr. Broberg has attended three ball games over the last year (*did not clarify if professional or related to children's sport activities*). He does not hunt or fish. He eats out roughly eight times a month. He notes that family or friends seldom come to visit. He roughly does 20 personal calls a week on his phone, constantly makes calls for work. He does not grow any plants. He is able to dress himself and can bathe. He cannot have sex.   He does not maintain a social media page such as Facebook. He rarely emails anyone.

Mr. Broberg reports he had no serious childhood illnesses. There were no indications of attention deficit disorder as a child.  Serious issues he has been treated for in the past are sexual problems, sleep problems, depression, nerves, alcoholism, attention deficit disorder, and eating disorders. He has had no motor vehicle accidents. He has not been knocked out or unconscious. He does note that his left ring finger had been amputated. He had surgery in 2008 at Arlington Medical Center for hemorrhoids.   Current medications are Adderall 20 mg BID, Seroquel 25 mg qd, and atorvastan 25 mg qd.  He keeps track of his own medications.  He notes that he smokes a cigar or two a day, has been doing so for about the last year and two months. He drinks beer, roughly six a day. He does not indicate any use of illicit drugs. He notes he drinks about six Coke Zeros a day.  He reports no past psychiatric admissions. He has never been discharged from a hospital AMA.  He notes that he has been prescribed Seroquel. The first time he started taking nerve medication or antidepressants was in 2016. No history of ECT.  No suicide attempts and no overdoses.

At the present time, the following symptoms apply to him: nightmares, tense, don't like vacations or weekends, depressed, no appetite, insomnia, forgetful, respected, too ambitious, bad temper, need help, self-confident, restless, headaches, angry.

Family history is positive for cancer, high blood pressure, alcohol/drug problems. He notes grandparents on both sides had cancer, and father had high blood pressure and alcohol/drug problems. His father's age is 77. His mother is 66.  He was born in in Belvidere, Illinois.  While growing up, his family had enough money.  He was raised by both parents. His home was described as happy, not abusive, and was not threatening. He completed up to the 11th grade in school. The reason for stopping school was work. He was a B student. He was in no special education classes.

Name:   Karl Broberg

He has three natural children and one stepchild. He describes his relationship with his children as close and he is satisfied with the relationship. He notes no legal history. He notes not being involved in civil lawsuits as either a plaintiff or a defendant. He notes he was asked to resign or was fired from a job and reason given was failure to follow company protocol. He notes the starting date of his company as being 2004.

Review of symptoms: Loss in weight, fatigue, change in sleeping pattern, headaches prompted by loss of spouse, depression, nervousness, loss of memory, irritability, trouble thinking – all of these thought are associated with the loss of my spouse, can't stay asleep, nightmares.

## PSYCHOMETRIC INFORMATION:

Psychometric information constitutes but one facet of a comprehensive psychiatric evaluation. Psychometrics can provide useful data and offer potential diagnostic possibilities, but psychometric information should not be viewed in isolation. There needs to be clinical correlation to see what is applicable and what is not.

### *Mini Mental State Examination:*

Mr. Broberg obtained a 30/30. He initially had some difficulty with the serial 7's and gave responses of 93, 86, 81, 74, 67, and 60; realized that he made an error; and on the second attempt gave responses of 93, 86, 79, 72, and 65.

Scale: 27 - 30 indicates no severity/disability in intellectual performance.

      21 - 26 indicates a mild degree of severity/disability in intellectual performance.

      11 - 20 indicates a moderate degree of severity/disability in intellectual performance.

      0 - 10 indicates a severe degree of severity/disability in intellectual performance.

### *Zung Anxiety Scale:*

A Zung Anxiety Scale had a raw score of 49 and a scaled score of 61, indicating the presence of marked anxiety.

21

Name:   Karl Broberg

*Zung Depression Scale:*

A Zung Depression Scale had a raw score of 54 and a scaled score of 68, placing him in the ranges of hospitalized depressed, outpatient depressed, anxiety reactions, personality disorders, or transient situational adjustment reactions.

*Rey 15-item Memory Test:*

Mr. Broberg scored 15/15.

*Clock Drawing:*

Mr. Broberg was able to draw the circle. He had numbers relatively reasonably spaced. He did have both hands of the clock about the same size and stated he couldn't remember which hand was supposed to be shorter.

**MENTAL STATUS EXAMINATION:**

Mr. Broberg was appropriately dressed. There were no tattoos. He maintained fair eye contact. He spoke with a regular rate, rhythm, volume and tone.  He notes that he had to check his phone on occasion to address issues that had been texted to him related to his business. He was appropriate with this and apologized for interruptions.  His mood seemed low. There were times when he appeared to be on the verge of tears, often related to talking about his wife Samantha or his children.  He did appropriately respond to humor at times.   No indication of psychotic symptomatology, such as delusions or hallucinations. No suicidal or homicidal ideation, plan or intent.  Insight appears fair. Judgment based on questions, such as why is food refrigerated (to keep it from spoiling) and why are deaf individuals not allowed to drive schoolbuses (safety of the children), appears intact. Memory appeared grossly intact. He was awake, alert, and oriented x 3.  He did have shaking of his foot. No other abnormal movements.

Mr. Broberg was able to generate a list of five cities and gave Dallas, Fort Worth, Austin, Grand Prairie, and Houston. He could engage in verbal math tasks, such as making change if you purchase something with a dollar. He could engage in similarities and stated that an apple and an orange are both on a tree, a boat and a bicycle are both modes of transportation, and a mouse and a tree are both God's creatures. He could engage in proverbs, such as people who live in glass houses shouldn't throw stones (don't lash out at others for falling apart because you may also fall apart), don't cry over spilled milk (not that big of a

Name:   Karl Broberg

deal in the grand scheme of things), and better to have a red face than a black heart (better to have emotions than no emotions).

Mr. Broberg could identify a current event, such as Hurricane Harvey in Houston. He was able to repeat five numbers forward and backward. He could identify the current President as Trump and named the presidents going backward to Carter.

**DIAGNOSTIC IMPRESSION:**

At this time, I would diagnosis Mr. Broberg with Major Depressive Disorder, although I can see how the diagnosis of Post-Traumatic Stress Disorder (PTSD)[1] and potential Attention Deficit Disorder (ADD)

---

1 . Diagnostic Criteria 309.81 (F43.10)  Posttraumatic Stress Disorder

    A.   Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways: 1. Directly experiencing the traumatic event(s).2 Witnessing, in person, the event(s) as it occurred to others. 3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental. 4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse).

    B.   Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred: 1.Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s). 2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.)4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s). 5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

    C.   Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following: 1.Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

    D.   Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs). 2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others. 4.Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame). 5. Markedly diminished interest or participation in significant activities. 6.Feelings of detachment or estrangement from others. 7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

    E.   Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects. 2. Reckless or self-destructive behavior. 3.Hypervigilance. 4.Exaggerated startle response. 5.Problems with concentration. 6.Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

    F.   Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.

    G.   The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Name:   Karl Broberg

could also be considered. Both of these conditions have symptoms which overlap with depression.[2] Given the full context of Mr. Broberg's presentation at this time, I believe Major Depressive Disorder best explains the constellation of symptoms he presents with. Mr. Broberg has several symptoms of major depression, such as sleep difficulties, diminished interest, guilt, diminished energy, concentration changes, weight loss, and psychomotor changes. Some symptoms, such as intrusive thoughts about his wife, irritability, or guilt for not doing more, could be considered either a PTSD symptom (intrusive recollections, hypervigilance, survivor's guilt) or a potential depressive symptom (e.g. ruminative thoughts, irritable depression-related guilt). Although possible for both conditions to exist at the same time, I would want more independent verification of some of the PTSD symptoms (e.g. confirmation of hyperstartle) before diagnosing both at the same time.


Per the DSM 5, the essential feature of a major depressive episode is a period of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities. The individual must also experience at least four additional symptoms drawn from a list that includes changes in appetite or weight, sleep, and psychomotor activity; decreased energy; feelings of worthlessness or guilt; difficulty thinking, concentrating, or making decisions; or recurrent thoughts of death or suicidal ideation or suicide plans or attempts. To count toward a major depressive episode, a symptom must either be newly present or must have clearly worsened compared with the person's pre-episode status. The episode must be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. For some individuals with milder episodes, functioning may appear to be normal but requires markedly increased effort.

The mood in a major depressive episode is often described by the person as depressed, sad, hopeless, discouraged, or "down in the dumps". Many individuals report or exhibit increased irritability (e.g., persistent anger, a tendency to respond to events with angry outbursts or blaming others, an exaggerated sense of frustration over minor matters). Loss of interest or pleasure is nearly always present, at least to

---

H.   The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

2 . Per DSM 5 Major depression may or may not be preceded by a traumatic event and should be diagnosed if other PTSD symptoms are absent. Specifically, major depressive disorder does not include any PTSD Criterion B or C symptoms. Nor does it include a number of symptoms from PTSD Criterion D or E. . . . Individuals with PTSD are 80% more likely than those without PTSD to have symptoms that meet diagnostic criteria for at least one other mental disorder (e.g., depressive, bipolar, anxiety, or substance use disorders) . . . Distractibility and low frustration tolerance can occur in both attention-deficit/ hyperactivity disorder and a major depressive episode; if the criteria are met for both, attention-deficit/hyperactivity disorder may be diagnosed in addition to the mood disorder.

24

Name:   Karl Broberg

some degree. Individuals may report feeling less interested in hobbies, "not caring anymore," or not feeling any enjoyment in activities that were previously considered pleasurable. Family members often notice social withdrawal or neglect of pleasurable avocations (e.g., a formerly avid golfer no longer plays). In some individuals, there is a significant reduction from previous levels of sexual interest or desire. Appetite change may involve either a reduction or increase. Some depressed individuals report that they have to force themselves to eat. When appetite changes are severe (in either direction), there may be a significant loss or gain in weight.

Sleep disturbance may take the form of either difficulty sleeping or sleeping excessively. When insomnia is present, it typically takes the form of middle insomnia (i.e., waking up during the night and then having difficulty returning to sleep) or terminal insomnia (i.e., waking too early and being unable to return to sleep). Initial insomnia (i.e., difficulty falling asleep) may also occur. Psychomotor changes include agitation (e.g., the inability to sit still, pacing, hand-wringing; or pulling or rubbing of the skin, clothing, or other objects) or retardation (e.g., slowed speech, thinking, and body movements; increased pauses before answering; speech that is decreased in volume, inflection, amount, or variety of content, or muteness). The psychomotor agitation or retardation must be severe enough to be observable by others and not represent merely subjective feelings. Decreased energy, tiredness, and fatigue are common. A person may report sustained fatigue without physical exertion. Even the smallest tasks seem to require substantial effort. The efficiency with which tasks are accomplished may be reduced.

The sense of worthlessness or guilt associated with a major depressive episode may include unrealistic negative evaluations of one's worth or guilty preoccupations or ruminations over minor past failings. Such individuals often misinterpret neutral or trivial day-to-day events as evidence of personal defects and have an exaggerated sense of responsibility for untoward events. Many individuals report impaired ability to think, concentrate, or make even minor decisions. They may appear easily distracted or complain of memory difficulties. Those engaged in cognitively demanding pursuits are often unable to function. Stressful life events are well recognized as precipitants of major depressive episodes.

Again, per the DSM 5, many of the functional consequences of major depressive disorder derive from individual symptoms. Impairment can be very mild, such that many of those who interact with the affected individual are unaware of depressive symptoms. Impairment may, however, range to complete incapacity such that the depressed individual is unable to attend to basic self-care needs or is mute or

Name:   Karl Broberg

catatonic. Among individuals seen in general medical settings, those with major depressive disorder have more pain and physical illness and greater decreases in physical, social, and role functioning.

In addition, there is concern regarding Mr. Broberg's report of increased alcohol consumption, but based on history provided it does not seem to reach the level of an additional substance issue. However, this opinion may change with receipt of additional information or if his symptoms or alcohol intake continues to increase with time.

## MULTIAXIAL EVALUATION REPORT

*(Current DSM 5 no longer uses the Axis system, but it is included in this report at this time since other diagnostic and category systems, such as AMA disability guidelines six edition, still use aspects of the axis system).*

AXIS I:          *Clinical Disorders:* Major Depressive Disorder, moderate; Rule out PTSD; by history Attention Deficit Disorder.

AXIS II:         *Personality Disorders:* Deferred

AXIS III:        *General Medical Conditions:* Elevated cholesterol, finger amputation

AXIS IV:         *Psychosocial and Environmental Problems*

 X       Problems with primary support group: Loss of wife, strained relationship with former in-laws, diminished relationship with eldest stepdaughter, potential loss of youngest stepdaughter

 X       Problems related to the social environment: Diminished interactions in social situations with potential loss of some friendships

 X       Educational problems: Did not complete high school

 X       Occupational problems: Reported decreased occupational functioning

 X       Housing problems: Maintaining support for family

 ___     Economic problems:

 ___     Problems with access to health care services:

26

Name:   Karl Broberg

   X          Problems related to interaction with the legal system/crime: Potential custody issues

   X          Other psychosocial and environmental problems: Stress of media attention related to wife's death

*AXIS V:  Global Assessment of Functioning Scale*       *Score:50*
*Serious symptoms or any serious impairment in social, occupational, or school functioning*

**OPINION:**

I believe these opinions to be correct within reasonable medical certainty.  Mr. Broberg is suffering from a depression and potentially additional psychiatric conditions related to the loss of his wife (e.g. PTSD). The manner in which he learned of the loss seems to have exacerbated his suffering and potentially caused what could have been a normal grief process to turn into a major depression and possibly PTSD. During the interview, he described having an increased level of anxiety, sense of helplessness, and a feelings of being overwhelmed, which he relates to his interactions with Carnival's support network and lack of information.

In addition, Mr. Broberg reports being contacted by the media regarding his wife's disappearance/death before he was ever personally notified by the Carnival company.  As noted in the medical and general professional literature regarding death notification, appropriate and timely dissemination of information regarding someone's death to the family is important to minimize emotional harm and damage[3].  Proper

---

3 . <u>Sobczak K</u>.The procedure for death notification--"In Person, In Time…".<u>Anaesthesiol Intensive Ther.</u> 2013 Oct-Dec;45(4):241-3. "The professional manner of death notification may effectively reduce the level of stress and other negative emotions in both parties involved. Special information procedures defining cardinal rules of professional death notification have been devised to help physicians in this process. One of them, created in the United States in the 1990s, is the communication protocol - "In Person, In Time" - Recommended Procedures for Death Notification", . . .  The proper way of informing of a patient death can effectively reduce the level of stress and intensity of shock during the first moments after bad news has been broken. For the majority of people, such moments are extremely traumatic and are likely to be remembered for the rest of their lives. Therefore, the form of notification is essential for close relatives, who affected by their loss react emotionally.

"in Person, In Time"Recommended Procedures for Death Notification 1992 obtained at http://www.nationalcops.org/assets/in_person.pdf . . . The purpose of this booklet is to help those who must notify survivors of the death of a family member due to homicide, an automobile crash, a heart attack, drowning, or other sudden and unexpected events . . . learning of the death of a loved one often is the most traumatic event in a person's life. The moment of notification is one that most people remember very vividly for the rest of their life -- sometimes with pain and anger. Some survivors hear the news first through the media or a reporter calling, and then have flash-backs to that moment for years. . . **The principles described here are simple: Notification should be done in**

Name:   Karl Broberg

notification helps to ensure that information is delivered in an appropriate manner, that support personnel are available to answer questions, and to reduce the risk of traumatization or re-traumatization. When the media is given information prior to the family and it is the media who contacts the family, their goal is to obtain information, not to provide it in the way least likely to harm the individual. Per the version of events relayed by Mr. Broberg, in the early stages of learning of his wife's disappearance/death and in the complaint reviewed (e.g. He was the one to contact Carnival first, communication was by phone with no mention of in-person support persons, media aware of details before him), it appears that Carnival Cruise

---

person, in time, in pairs whenever possible, in plain language, and with compassion. . . Always make death notification in person -- not by telephone. . . Arrange notification in person even if the survivor lives far away. . . Provide notification as soon as possible . . . Too many survivors are devastated by learning of the death of a loved one from the media. . . . Even if there is no physical shock response, death notification must be considered a crisis for the survivors. They will have a need to express feelings; a need for calm and reassuring authority; a need for help in determining what happens next; and a need to begin restoring control by making some choices. . . These needs can be met through the humane, patient, and non-judgmental approach of notifiers. . . Many survivors, regardless of background, find themselves numb and unable to take the next step. This is where the support person helps the most. Survivors need support persons to help them through the initial crisis. Before you leave a survivor, make sure such ongoing support is available.

Workgroup Notification of an Employee or Family Member Death. http://employees.tamu.edu/media/126551/755workgroupdeathnotice.pdf 12/10/2013 Texas A&M University has a strong commitment to students, faculty, and staff, and recognizes that the death of a member of the Aggie family or extended family is filled with feelings of grief and loss. . . The guidelines that follow have been developed to assist departmental managers and supervisors in notifying the workgroup or others about the death of an employee or death of an employee's family member. . . Before communicating with the workgroup, assure that the family of the deceased or injured has been notified. Although there may be questions following an on-campus death or serious injury, it is critical that no information be delivered prior to notification of family members. . . Speak with the family soon thereafter to discuss what information they would like disclosed (details regarding the incident, notification about the funeral or memorial service, etc.). Respect the family's wishes to the best of your ability. . . Best Practices in Notification Procedures: • Take a personal approach to the notification by asking the manager or supervisor, who has had a working relationship with the deceased, to be a speaker. • Utilize a team approach with at least two managers making the notification. This will help reduce the professional and personal pressure that might be felt by the notifiers. • Prior to notification confirm as many facts of the incident as possible. • Receive authorization to release factual, confirmed information and clarify specific information that is permissible to release. There may be confidential or investigative information disclosed to you but not to be released to the workgroup. • Notify face-to-face, particularly within the workgroup. Telephone calls or emails may be permissible with other people or groups who may not have as personal of a relationship with the deceased. • Keep the group small to enhance communication; a large group may be seen as impersonal.

"We Regret to Inform You..." http://www.deathnotification.psu.edu/ This material has been developed between the Federal Bureau of Investigation and Penn State through a cooperative agreement. . . Death notifications can significantly impact a loved one's grieving process, either positively or negatively. The cornerstone of the recovery process rests on this initial interaction. Most families can recall a majority of the details of the death notification. They may not remember every word, but the essence of the words and the manner in which they were delivered stay with them forever. Every interaction with the decedent's loved ones can either enhance rapport or degrade it. . . At no time should you make a death notification telephonically unless absolutely necessary. Written justification should be documented if a telephonic notification is made

Name:   Karl Broberg

Line did not attempt to follow family notification guidelines widely used by multiple professionals and agencies (e.g. military, doctors, police, schools, employers).  As mentioned above, this lack of perceived or delayed organized response to a potential death more likely than not contributed to Mr. Broberg's emotional harm.


Respectfully submitted,

Ryan C. W. Hall, MD

RCWH/mjc

# Exhibit "T"

**CURRICULUM VITAE**

Ryan C. W. Hall, M.D., DFAPA

Updated 06/14/17

## TABLE OF CONTENTS

PRESENT POSITION                                                        2

EDUCATION                                                              2

MEDICAL LICENSE                                                        3

CERTIFICATION                                                          3

ADDITIONAL TRAINING                                                    3

SOCIETY MEMBERSHIPS, PAST AND PRESENT
        4

INVITATIONAL OFFICES AND ORGANIZATIONS                                 4

EDITORIAL POSITIONS                                                    5

COMMITTEES                                                             5

HONORS                                                                 7

PROFESSIONAL ACTIVITIES                                                8

REVIEWER                                                               9

BOOK REVIEWS                                                           9

PUBLICATIONS                                                          10

NEWSLETTERS                                                           16

ABSTRACTS                                                            17

PRESENTATIONS AT NATIONAL AND INTERNATIONAL MEETINGS
AND INVITATIONAL ACADEMIC LECTURES                                    18

VIRTUAL LECTURES                                                      25

MEDIA                                                                31

**NAME:**                           Ryan Chaloner Winton Hall, M.D.

**DATE OF BIRTH:**        May 10, 1976

**PLACE OF BIRTH:**      Titusville, Florida

**MARITAL STATUS:**     Married

**PRESENT POSITION:**

| | |
|---|---|
| Present | 07/2008 –              Psychiatrist<br>Richard C. W. Hall, MD, PA<br>2500 West Lake Mary Blvd; Ste 219<br>Lake Mary, FL  32746<br>Ph: 407-322-8199 |
| 03/03/2009 –<br>06/30/2019 | Assistant Professor of Psychiatry<br>University of Central Florida College of Medicine<br>Department of Medical Education |
| 10/17/2009 –<br>07/31/2016 | Affiliate Assistant Professor<br>University of South Florida<br>Department of Psychiatry |
| 08/01/2016-<br>07/31/2019 | Affiliate Associate Professor<br>University of South Florida<br>Department of Psychiatry and Behavioral Neurosciences |
| 2010 – 2017 | Adjunct Faculty Member – Law & Psychiatry<br>Barry University Dwayne O. Andreas School of Law, Orlando |

**EDUCATION:**

| | |
|---|---|
| 1995 - 1999 | Johns Hopkins University<br>Baltimore, Maryland<br>Double Major - Biology and Psychology<br>**B.A. Degree,** graduated Phi Beta Kappa with honors |
| 1999 - 2003 | Georgetown University School of Medicine<br>Washington, DC<br>**M.D. Degree** |

3

2003 -2004      Internal Medicine Internship
Sinai Hospital of Baltimore/Johns Hopkins
Baltimore, Maryland

2004 -2007      Psychiatric Residency
Johns Hopkins Hospital
Department of Psychiatry and Behavioral Sciences
Baltimore, Maryland

2007 – 2008      Fellow in Forensic Psychiatry
Case Western Reserve University
Cleveland, Ohio

**MEDICAL LICENSE:**

2004      Maryland – D62746 - Inactive
2007      Ohio – 89483 - Inactive
2007      Florida – ME99792

**CERTIFICATION:**

2008      Diplomate, American Board of Psychiatry and Neurology, #58286
2009      with added qualifications for Forensic Psychiatry

2009-2018      Certified Forensic Physician
American College of Forensic Examiners Institute

2011-2014      Diplomate, American Board of Forensic Medicine, #111779
American College of Forensic Examiners Institute

2015- 2018      Fellow, American College of Forensic Examiners Institute,
#111779

07/19/2015 –
07/19/2017      Diplomate, National Board of Physicians and Surgeons
for Psychiatry and Forensic Psychiatry

**ADDITIONAL TRAINING:**

2006      Forensic Psychiatry Review Course
American Academy of Psychiatry and the Law, Chicago, IL

2007      Forensic Psychiatry Review Course
American Academy of Psychiatry and the Law, Miami Beach, FL

2008      Florida Forensic Examiner Training
University of South Florida College of Behavioral and Community
Sciences, Ft. Lauderdale, FL

4

2012      MMPI-2-RF: Basic Overview, with Yossef S. Ben-Porath, 1-hr Webinar via Readytalk.com. (Overview, scales, documentation and standard procedures for administration and scoring)  Psych Corp (Pearson): February 15, 2012

2012      MMPI-2-RF: Forensic Practice Briefing, with Yossef S. Ben-Porath, 1-hr Webinar via Readytalk.com. (Overview, Using the MMPI-2-RF in Forensic Assessments, Admissibility, and Discussion) PsychCorp (Pearson): March 20, 2012

2013      Use of the MMPI-2-RF in Police & Public Safety Assessments, with Yossef S. Ben-Porath. 1-hr Webinar via Readytalk.com.  (Overview, Assessing Public Safety Candidates, and Fitness for Duty Evaluations) PsychCorp (Pearson): April 9, 2013

2014      Evaluation of Malingered Psychosis: Testing and Testifying.  C Scott and B McDermott.  American Academy of Psychiatry and the Law, October 24, 2014

2015      Psychological Testing for Psychiatrists. C Dike and M Baranoski. American Academy of Psychiatry and the Law, October 22, 2015

2015      Psychological Testing of Claimed Amnesia: A Guide to Remember. C Scott and B McDermott, American Academy of Psychiatry and the Law, October 24, 2015

2016      MMPI-2-RF: Use in Trauma and Stressor-Related Disorders with Paul Arbisi, PhD, ABAP, ABPP. 1-hr Webinar via Readytalk.com.  PsychCorp (Pearson): February 25, 2016

## SOCIETY MEMBERSHIPS, PAST AND PRESENT:

Member, Academy of Psychosomatic Medicine
Distinguished Fellow, American Psychiatric Association
Member, Maryland Psychiatric Society
Member, American Academy of Psychiatry and the Law
Member, American Medical Association
Member, Ohio Psychiatric Association
Member, Florida Psychiatric Society
Fellow, Southern Psychiatric Association
Member, The American College of Psychiatrists
Member, Florida Medical Association
Member, Seminole County Medical Society

5

Member, American College of Forensic Examiners Institute

## INVITATIONAL OFFICES AND ORGANIZATIONS:

| | |
|---|---|
| 2009 – 2012 | Secretary/Treasurer, Southern Psychiatric Association |
| 2012 – 2014 | Councilor, Florida Psychiatric Society |
| 2012 – 2013 | Vice President, Southern Psychiatric Association |
| 2013 – 2014 | President-elect, Southern Psychiatric Association |
| 2012 – 2015 | Councilor, American Academy of Psychiatry and the Law |
| 2013 - 2014 | Physician Leadership Academy, Florida Medical Association |
| 2013 - 2014 | Member, Specialty Society Section (SSS) Governing Council, Florida Medical Association |
| 7/2014-8/2017 | Council on Legislation, Florida Medical Association |
| 2014 – 2015 | President, Southern Psychiatric Association |
| 2015 - 2016 | Secretary, Florida Psychiatric Society |
| 2016 – 2017 | Treasurer, Florida Psychiatric Society |
| 2017 – 2018 | Treasurer, Seminole County Medical Society |
| 2017 - 2018 | Vice President, Florida Psychiatric Society |

## EDITORIAL POSITIONS:

| | |
|---|---|
| | Editorial Board, **Clinical Geriatrics,** (ended 06/2014) |
| 2016 | Associate Editor, **American Academy of Psychiatry and the Law Newsletter** |

## COMMITTEES:

| | |
|---|---|
| 2005 - 2007 | Public Relations Committee, Maryland Psychiatric Society |
| 2005 - 2007 | Legislative Committee, Maryland Psychiatric Society |

6

| | |
|---|---|
| 2005 - 2007 | Disaster Committee, Maryland Psychiatric Society |
| 2005 - 2007 | Resident and Fellows Committee, Maryland Psychiatry Society |
| 2007 - 2009 | Corresponding Committee on Graduate Education, American Psychiatric Association |
| 2008 - 2009 | Member, New Member Task Force, Southern Psychiatric Association |
| 2007 – 2018 | Psychopharmacology Committee, American Academy of Psychiatry and the Law |
| 2007 - 2018 | Research Committee, American Academy of Psychiatry and the Law |
| 2009 – 2010 | Chairman, Early Career Psychiatry Committee, Southern Psychiatric Association |
| 2009 – 2010 | Chairman, New Member Task Force, Southern Psychiatric Association |
| 2009 – 2010 | Member, Constitution and Bylaws Committee, Southern Psychiatric Association |
| 2010 | YPS Reference Committee, AMA House of Delegates-YPS, Annual Meeting, Chicago, IL, June |
| 2010 - 2011 | Various YPS Handbook Review Committees (e.g, Constitution & Bylaws, Committee E) AMA Meetings, San Diego, CA; Chicago, IL |
| 2009 - 2017 | CME Committee, Florida Psychiatric Society |
| 2009 – 2017 | Forensic Psychiatry Committee, Florida Psychiatric Society |
| 2009 – 2012 | Academic Affairs Committee, Florida Psychiatric Society |
| 2010 – 2017 | Ethics Committee, Florida Psychiatric Society |
| 2010 – 2011 | Member, New Member Task Force, Southern Psychiatric Association |
| 2010 – 2011 | Member, Nominating Committee, Seminole County Medical Society |

7

| | |
|---|---|
| 2011 | Chairman, AMA-YPS Handbook Review Committee, AMA Interim Meeting, New Orleans, LA, November |
| 2012 – 2018 | Member, Rappeport Fellowship Committee, American Academy of Psychiatry and the Law |
| 2012 | YPS Reference Committee on Amendments to Constitution and Bylaws, AMA House of Delegates-YPS, Annual Meeting, Chicago, IL, June, and Interim Meeting, Honolulu, HI, November |
| 2012 – 2017 | Member, Legislative Issues Committee, Florida Psychiatric Society |
| 2013 – 2016 | Member, Committee on Finance, The American College of Psychiatrists |
| 2013 | Chairman, AMA-YPS HOD Handbook Review Committee for the Reference Committee on Amendments to Constitution and Bylaws, AMA Interim Meeting, National Harbor, MD, November |
| 2014- 2015 | Member, Nominating Committee, American Academy of Psychiatry and the Law |
| 2014 | Member, AMA-YPS HOD Handbook Review Committee, AMA-YPS Annual Meeting, Chicago |
| 2014 | Member, AMA-YPS HOD Reference Committee on Amendments to Constitution and Bylaws, AMA Interim Meeting, Dallas |
| 2014 | Chairman, AMA-YPS HOD Handbook Review Committee for the Reference Committee B (Legislative Advocacy), AMA Interim Meeting, Dallas |
| 2014 - 2018 | Member, Geriatric Psychiatry Committee, American Academy of Psychiatry and the Law |
| 2016 | Member, Institute Research Committee, American Academy of Psychiatry and the Law |
| 2016 – 2017 | Chair, Long Range Planning Committee, Southern Psychiatric Association |
| 2016 – 2017 | Chair, Nominating Committee, Southern Psychiatric |

8

|               | Association |
|---------------|-------------|
| 2017 – 2018   | Executive Committee, Seminole County Medical Society |

**HONORS:**

| | |
|---|---|
| 1999 | Phi Beta Kappa, Johns Hopkins University |
| 2004 | "Superior" performance rating, 1st-year residency, by Sinai Hospital Department of Medicine's Clinical Competency and Evaluation Committee |
| 2005 | Dorfman Award, presented by The Academy of Psychosomatic Medicine for best review article of the year for **Definition, Diagnosis, and Forensic Implications of Postconcussional Syndrome.** Psychosomatics, 46(3):195-202, May-June 2005. |
| 2007 - 2008 Law | Rappeport Fellowship, American Academy of Psychiatry and the |
| 2009 – 2018 | Selected by peers to be included in *Best Doctors in America* |
| 2010 | Day TR, Hall RCW:  **Déjà vu: From Comic Books to Video Games: Legislative Reliance on "Soft Science" to Protect Against Uncertain Societal Harm Linked to Violence v. the First Amendment.** Oregon Law Review, 89(2):415-452, 2010. Selected as one of the best law review articles published in the field of entertainment, publishing, and the arts in 2010 by Thomson Reuters (West) |
| 2010 – 2016 | The Best Doctors in Orlando – *Orlando* magazine |
| 2014 | Appointed, Fellow, American Psychiatric Association |
| 2014 | Certificate of Appreciation for recognition of service for interviewing applicants, University of Central Florida College of Medicine |
| 2015 | Selected as Practitioner of the Year for Florida Psychiatric Society |
| 2016 | Appointed, Distinguished Fellow, American Psychiatric Association |

**PROFESSIONAL ACTIVITIES:**

9

| | | |
|---|---|---|
| 2008 | *HB873/SB501*<br>*Persons with a*<br>House Judiciary<br>District 19 Montgomery | Written testimony on **Elder Abuse** in support of bills *Criminal Law – Crimes Against the Elderly or Disability – Penalties,* presented to Maryland Committee for Delegate Benjamin Kramer, County, Maryland. Hearing March 4. |
| 2009 | | Central Florida Psychiatric Society representative to Florida Psychiatric Society's Council Meeting, January 10. |
| 2009 | | Testified before the Florida Senate Banking and Insurance Committee (SB 354) on **Mental Health Parity.** March 17. |
| 2009 | | Florida Psychiatric Society delegate to Florida Medical Association's annual meeting |
| 2010 | | American Academy of Psychiatry and the Law's Young Physician Delegate to the American Medical Association's House of Delegates meetings<br>                    - Young Physicians Section Reference Committee member |
| 2010 | | Area V Assembly Representative to the American Psychiatric Association's Assembly |
| 2010 - 2017 | | Florida Psychiatric Society delegate to the Florida Medical Association's annual meeting |
| 2011 | | Area V Council Representative |
| 2011 | | American Academy of Psychiatry and the Law's Young Physician Delegate to the American Medical Association's House of Delegates meetings |
| 2011 | | Area V Assembly Representative to the American Psychiatric Association's Assembly |
| 2012-2015 | | American Academy of Psychiatry and the Law's Young Physician Delegate to the American Medical Association's House of Delegates meetings |
| 2013- 2017 | | Interviewer of prospective medical school candidates University of Central Florida College of Medicine |
| 2017 | | Specialty Advisor for forensic and general psychiatry |

10

University of Central Florida College of Medicine

**REVIEWER:**

-AIMS Neuroscience
-American Journal of Disaster Medicine
-Archives of Internal Medicine
-Clinical Geriatrics
-Disaster Medicine and Public Health Preparedness
-European Psychiatry
-Journal of Adolescent Health
-Journal of Clinical Psychopharmacology
-Journal of Immigrant and Minority Health
-Journal of Neuropsychiatry and Clinical Neuroscience
-Mayo Clinic Proceedings
-Nature Clinical Practice Neurology
-Neurology India
-Oxford University Press (advisor on a book proposal)
-Psychosomatics
-Social Science & Medicine
-The American Journal on Addictions
-The Forensic Examiner
-Violence and Victims
-World Journal of Surgical Oncology

**BOOK REVIEWS:**

1. Clark MR and Treisman GJ: **Pain and Depression: An Interdisciplinary, Patient-Centered Approach.** Psychosomatics, July-August 2006, 47(4)365-366.

2. Faculty Reviewer for **First Aid for the USMLE Step 1, 2011 Edition**, psychiatry chapter.

3. Faculty Reviewer for **First Aid for the USMLE Step 1, 2012 Edition**, psychiatry chapter.

4. Faculty Reviewer for **First Aid for the USMLE Step 1, 2013 Edition**, psychiatry chapter.

5. Faculty Reviewer for **First Aid for the USMLE Step 1, 2014 Edition**, behavioral science and psychiatry chapters.

6. Faculty Reviewer for **First Aid for the USMLE Step 1, 2015 Edition**, behavioral science and psychiatry chapters.

7. Faculty Advisor for **First Aid for the USMLE Step 1, 2016 Edition**

8. Faculty Advisor for **First Aid for the USMLE Step 1, 2017 Edition**

**PUBLICATIONS:**

1. Hall RCW, Dunlap PK, **Hall RCW**, Pacheco CA, Blakey RE, Abraham J: **Thyroid disease and abnormal thyroid function tests in patients with eating disorders and depression.** The Journal of the Florida Medical Association, Inc. 82(3)187-192, 1995.

2. Hall RCW, **Hall RCW: Anxiety and Endocrine Disease.** In Popkin, MK, Seminars in Clinical Neuropsychiatry 4(2)72-83, 1998.

3. Hall RCW, Platt DE, **Hall RCW: Suicide Risk Assessment: A Review of Risk Factors for Suicide in 100 Patients Who Made Severe Suicide Attempts.** Psychosomatics 40:(1)18-27, 1999.

4. Hall RCW, **Hall RCW: Long-term Psychological and Neurological Complications of Lindane Poisoning.** Psychosomatics 40(6)513-517, 1999.

5. Hall RCW, **Hall RCW: False Allegations: The Role of the Forensic Psychiatrist.** Journal of Psychiatric Practice 7(5)343-346, September 2001.

6. Hall RCW, **Hall RCW: Principles of Physician Recruiting.** In *Handbook of Mental Health Administration and Management;* Reid WH and Silver S (ed.): Brunner-Routledge, New York, NY; Chapter 34:440-448, 2003.

7. **Hall RCW**, Hall RCW, Chapman M: **Identifying Geriatric Patients at Risk for Suicide and Depression.** Clinical Geriatrics 11(10)36-44, October 2003.

8. Hall RCW, **Hall RCW: Establishing Liaison Before Disaster Strikes.** http://www.psych.org/disasterpsych/pdfs/apadisasterhandbk.pdf; Chapter 2:12-19. 2004.

9. Hall RCW, **Hall RCW**, Chapman MJ: **Emotional and Psychiatric Effects of Weapons of Mass Destruction in First Responders.** In: *Bioterrorism: Psychological and Public Health Interventions;* Ursano RJ, Norwood AE & Fullerton CS (eds). Cambridge University Press:Cambridge; Chapter 14:250-273; 2004.

10. **Hall RCW**, Appleby B, Hall RCW: **Atypical Neuroleptic Malignant Syndrome Presenting as Fever of Unknown Origin in the Elderly.** Southern Medical Journal 1(98) 114-117, January 2005.

11. Hall RCW, **Hall RCW**, Chapman MJ: **Exploitation of the Elderly: Undue Influence as a Form of Elder Abuse.** Clinical Geriatrics 13(2)28-36, February 2005.

12

12. **Hall RCW**, Hall RCW, Chapman MJ: **Definition, Diagnosis, and Forensic Implications of Postconcussional Syndrome.** Psychosomatics, 46(3)195-202, May-June 2005.

13. **Hall RCW**, Hall RCW: **Abuse of Supraphysiologic Doses of Anabolic Steroids.** Southern Medical Journal, 98(5)550-555, May 2005.

14. **Hall RCW**, Hall RCW, Chapman MJ: **Psychiatric Complications of Anabolic Steroid Abuse.** Psychosomatics, 46(4)285-290, July-August 2005.

15. **Hall RCW**, Hall RCW, Chapman MJ: **Medical and Psychiatric Casualties caused by Conventional and Radiological (Dirty) Bombs.** General Hospital Psychiatry, 28(3):242-248, May-June 2006.

16. **Hall RCW**, Hall RCW, Chapman MJ: **Postconcussional Syndrome: A Work in Progress (Response to Dr. Smith).** Letter to the Editor. Psychosomatics, 47(3):272, May-June 2006.

17. **Hall RCW**, Hall RCW, Chapman MJ: **Neuroleptic Malignant Syndrome in the Elderly: Diagnostic Criteria, Incidence, Risk Factors, Pathophysiology, and Treatment.** (CME article) Clinical Geriatrics, 14(5):39-46, 2006.

18. **Hall RCW**, Hall RCW, Chapman MJ: **Effects of Terrorist Attacks on the Elderly, Part I: Medical and Psychiatric Complications of Bombings and Biological, Chemical, and Nuclear Attacks.** Clinical Geriatrics, 14(8):26-35, 2006.

19. **Hall RCW**, Hall RCW, Chapman MJ: **Effects of Terrorist Attacks on the Elderly, Part 2: Posttraumatic Stress, Acute Stress, and Affective Disorders.** Clinical Geriatrics, 14(9):17-24, 2006.

20. **Hall RCW**, Hall RCW: **Malingering of PTSD: forensic and diagnostic considerations, characteristics of malingerers and clinical presentations.** General Hospital Psychiatry, 28(6):525-535, 2006.

21. **Hall RCW**, Hall RCW: **A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues.** Mayo Clinic Proceedings, 82(4):457-471, 2007.

22. **Hall RCW**, Hall RCW: **Detection of Malingered PTSD: An Overview of Clinical, Psychometric, and Physiological Assessment: Where Do We Stand?** Journal of Forensic Sciences, 52(3):717-725, 2007.

23. **Hall RCW**, Macvaugh GS III, Merideth P, Montgomery J: **Commentary: Delving Further Into Liability for Psychotherapy Supervision.** The Journal of the American Academy of Psychiatry and the Law, 35(2):196-9, 2007.

13

24. Hall RCW, **Hall RCW**, Chapman MJ: **Psychiatric Effects of Terrorism: Medical and Societal Implications of Recent Attacks.** In: *Focus on Terrorism, Vol. 9;* Linden EV (ed), Nova Science:New York; Chapter 11, Publication date: 3rd Quarter, 2007.

25. **Hall RCW**, Hall RCW: **The 1995 Kikwit Ebola outbreak – Model of virus properties on system capacity and function: A lesson for future viral epidemics.** American Journal of Disaster Medicine, 2(5):270-276, 2007

26. **Hall RCW**, Hall RCW, Chapman MJ: **Central Serotonin Syndrome: Part I—Causative Agents, Presentation, and Differential Diagnosis.** Clinical Geriatrics, 15(12):18-25, 2007.

27. **Hall RCW**, Hall RCW, Chapman MJ: **Central Serotonin Syndrome: Part II – Pathophysiology, Drug Interactions, and Treatment.** Clinical Geriatrics, 16(1):24-28, 2008

28. **Hall RCW**, Resnick PJ: **Psychotherapy Malpractice: New Pitfalls.** Journal of Psychiatric Practice, 14(2):119-121, 2008

29. **Hall RCW**, Hall RCW, Chapman MJ: **Violence in Older Persons: Part I – Occurrence in Forensic/Criminal Situations, Partner Relationships, and Sexual Offenses.** Clinical Geriatrics, 16(5):27-32, 2008

30. **Hall RCW**, Hall RCW, Chapman MJ: **Violence in Older Persons: Part II – Occurrence in Hospitals and Pharmacological/Behavioral Treatment of Agitation, Aggression and Violence.** Clinical Geriatrics, 16(6):28-32, 2008.

31. **Hall RCW**, Hall RCW, Chapman MJ. **The 1995 Kikwit Ebola outbreak: lessons hospitals and physicians can apply to future viral epidemics.** Gen Hosp Psychiatry. 2008 Sep-Oct;30(5):446-52. Epub 2008 Jul 23

32. **Hall RCW**, Friedman SH: **Drug Diversion Program Rights.** Legal Digest. The Journal of the American Academy of Psychiatry and the Law, 36(4):579-580, 2008

33. **Hall RCW**, Hall RCW, Chapman MJ: **Nursing Home Violence: Occurrence, Risks, and Interventions.** Annals of Long-Term Care, 17(1):25-31, 2009

34. Paul RK, Lockey C, **Hall RCW**, Bursztajn H: **Practice Management: Managing Risks When Practicing in Three-Party Care Settings.** Psychiatrictimes.com, 26(2), Feb. 3, 2009.

35. **Hall RCW,** Hall RCW, Chapman MJ: Letter to the Editor response re: **Nursing Home Violence: Occurrence, Risks, and Interventions)** Annals of Long-Term Care, 17(1):25-31, 2009), Annals of Long-Term Care, 17(4):17-21, 2009.

36. **Hall RCW**, Hall RCW, Myers W, Chapman M: **Testamentary Capacity: History, Physicians' Role, Requirements, and Why Wills are Challenged.** Clinical Geriatrics,

14

17(6):18-24, 2009.

37. **Hall RCW**, Hall RCW, Chapman M: **Anticholinergic Syndrome: Presentations, Etiological Agents, Differential Diagnosis, and Treatment.** Clinical Geriatrics, 17(11):22-28, 2009.

38. **Hall RCW: Somatoform Disorders.** In *First Aid for the Neurology Boards: An Insider's Guide.* Rafii MS; Cochrane TI; and Le T (eds), McGraw-Hill Medical:New York, Chapter 17, Pps 451-460, 2010.

39. **Hall RCW: Somatoform Disorders.** In *First Aid for the Psychiatry Boards: An Insider's Guide.* Azzam A, Yanofski J, Kaftarian E, Le T (eds), McGraw-Hill Medical:New York, Chapter 10, Pps 122-135, 2010.

40. Day TR, **Hall RCW:  Déjà vu: From Comic Books to Video Games: Legislative Reliance on "Soft Science" to Protect Against Uncertain Societal Harm Linked to Violence v. the First Amendment.** Oregon Law Review, 89(2):415-452, 2010.

41. Appleby BS, Appleby KK, **Hall RCW**, Wallin MT: **D178N, 129Val and N171S, 129Val Genotype in a Family with Creutzfeldt-Jakob Disease.** Dement Geriatr Cogn Disord, 30:424-431, 2010.

42. **Hall RCW**, Day T, Hall RCW: **A Plea for Caution: Violent Video Games, the Supreme Court, and the Role of Science.** Mayo Clin Proc, 86(4):315-321, 2011.

43. Paul RK, Lockey C, **Hall RCW**, Bursztajn HJ: **Managing Risks When Practicing in Three-Party Care Settings.** Psychiatric Times, 28(4):18-22, 2011.

44. Gould NF, McKibben JB, **Hall R**, Corry NH, Amoyal NA, Mason ST, McCann UD, Fauerbach JA. **Peritraumatic Heart Rate and Posttraumatic Stress Disorder in Patients with Severe Burns.** Psychiatrist.com, Oct 19, 2010 [Epub ahead of print] and J Clin Psychiatry, 72(4):539-547, 2011.

45. **Hall RCW**, Day T, Hall RCW: Reply to **A Plea for Concern Regarding Violent Video Games.** Letter to the Editor, Mayo Clin Proc, 86(8):821-823, 2011.

46. **Hall RCW**, Hall RCW: **Plaintiffs Who Malinger: Impact of Litigation on Fake Testimony.** In *New Perspectives on Faking in Personality Assessment.* Ziegler M, MacCann C, Roberts R (eds), Oxford:New York, Chapter 16, Pps 255-281, 2012.

47. Nucifora FC, **Hall RCW**, Everly G:  **Reexamining the Role of the Traumatic Stressor and the Trajectory of Posttraumatic Distress in the Wake of Disaster.** Editorial, Disaster Medicine and Public Health Preparedness, 5:suppl 2:S172-175, 2011

48. **Hall RCW**, Hall RCW: **Compensation Neurosis: A Too Quickly Forgotten Concept?** J Amer Acad Psychiatry Law, 40(3):390-398, 2012.

15

49. **Hall RCW: Civil War.** In *Encyclopedia of Immigrant Health*, Loue S and Sajotovic M (eds.) Springer, Pps 445-447, 2012.

50. **Hall RCW: Radicalization.** In *Encyclopedia of Immigrant Health*, Loue S and Sajotovic M (eds.) Springer, Pps 1264-1266, 2012.

51. **Hall RCW: Terrorism.** In *Encyclopedia of Immigrant Health*, Loue S and Sajotovic M (eds.) Springer, Pps 1413-1416, 2012.

52. Myers WC, **Hall RCW,** Tolou-Shams M: **Prevalence and Assessment of Malingering in Homicide Defendants Using the Mini-Mental State Examination and the Rey 15-Item Memory Test.** Homicide Studies, 17(3):314-328, August 2012.

53. Hatters Friedman S, **Hall RCW: Antidepressant Use During Pregnancy: How to Avoid Clinical and Legal Pitfalls.** Current Psychiatry, 12(2):10-16, 2013

54. **Hall RCW,** Hall RCW: **Biological and Pharmacological Treatment of Post-traumatic Stress Disorder in Older Adults.** Clinical Geriatrics, 21(8), 2013. Published online August 22, 2013 at www.clinicalgeriatrics.com.

55. **Hall RCW,** Hall RCW: **Psychotherapeutic Interventions for Post-traumatic Stress Disorder.** Clinical Geriatrics, 21(9), 2013. Published online September 24, 2013 at www.clinicalgeriatrics.com.

56. **Hall RCW,** Hatters Friedman S: **Guns, Schools, and Mental Illness: Potential Concerns for Physicians and Mental Health Professionals.** Mayo Clinic Proceedings, 88(11):1272-1283, November 2013

57. Hatters Friedman S, **Hall RCW,** Sorrentino R: **Commentary: Women, Violence and Insanity.** J Am Acad Psychiatry Law, 41(4):523-528, 2013

58. Hatters Friedman S, **Hall RCW: Teaching Psychopathology in a Galaxy Far, Far Away: The Light Side of the Force.** Academic Psychiatry. 2015 Dec;39(6):719-25. Epub 2015 May 2.

59. **Hall RCW,** Hatters Friedman S: **Psychopathology in a Galaxy Far, Far Away: The Use of Star Wars' Dark Side in Teaching.** Academic Psychiatry. 2015 Dec;39(6):726-32. Epub 2015 May 6.

60. **Hall RCW: Somatic Symptom and Related Disorders (formerly Somatoform Disorders).** In *First Aid for the Neurology Boards. Second Edition.* Rafii MS; Cochrane TI; and Le T (eds), McGraw-Hill Medical:New York, Chapter 17, Pps 439-447, 2015.

61. **Hall RCW: Mental Status Examination.** In *Wiley Encyclopedia of Forensic Science.* Jamieson A and Moenssens AA (eds), John Wiley: Chichester. DOI: 10.1002/9780470061589.fsa287.pub2. (online), June 2015. http://onlinelibrary.wiley.com/doi/10.1002/9780470061589.fsa287.pub2/full

62. **Hall RCW**, Soliman S: **Elderly and Pharmacological Treatment of PTSD.** In: *Comprehensive Guide to Post-Traumatic Stress Disorder*. Martin C, Preedy V, Patel V (eds), Springer International: Switzerland, ISBN: 978-3-319-08613-2 (Online), March 2015.

63. Day TR, **Hall RCW**: **PTSD and Tort Law.** *Comprehensive Guide to Post-Traumatic Stress Disorder*. Martin C, Preedy V, Patel V (eds), Springer International: Switzerland, ISBN: 978-3-319-08613-2 (Online), March 2015.

64. Hatters Friedman S, Collier S, **Hall RCW**: **PTSD Behind Bars: Incarcerated Women and PTSD.** *Comprehensive Guide to Post-Traumatic Stress Disorder*. Martin C, Preedy V, Patel V (eds), Springer International: Switzerland, ISBN: 978-3-319-08613-2 (Online), March 2015.

65. Hatters Friedman S, **Hall RCW**: **Using Star Wars' Supporting Characters to Teach about Psychopathology.** Australasian Psychiatry, Epub June 23, 2015; print Aug 2015; 23(4):432-4.

66. Soliman S, **Hall RCW**: **Forensic Issues in Medical Evaluation: Competency and End of Life Issues.** In Balon R, Wise TN (eds): Clinical Challenges in the Biopsychosocial Interface. Update on Psychosomatics for the 21st Century. Adv Psychosom Med. Basel, Karger, 2015, vol 34, pp 36-48.

67. **Hall RCW**, Hatters Friedman S, Jain A: **Pregnant Women and the Use of Corrections Restraints and Substance Use Commitment.** J Am Acad Psychiatry Law, 43(3):359-68, 2015.

68. Shand J, **Hall RCW**: **Consent in Psychiatric Emergencies: What Clinicians Need to Know.** Psychiatric Times, 32(11):17-20, 2015.

69. Myers W, **Hall RCW**, Marshall R, Tolou-Shams M, Wooten K: **Frequency and Detection of Malingering in Homicide Defendants Undergoing Criminal Responsibility Evaluations Using the Schedule for Nonadaptive and Adaptive Personality: A Feasibility Study.** SAGE Open, April-June 2016, vol 6:1-8. http://sgo.sagepub.com/content/spsgo/6/2/2158244016638131.full.pdf

70. **Hall RCW**, Myers WC: **Challenges and Limitations to Treat ADHD in Incarcerated Populations.** Commentary. J Am Acad Psychiatry Law, 44(2):164-170, 2016

71. Sorrentino R, Hatters Friedman S, **Hall RCW**: **Gender Consideration in Violence.** In. Knoll JL (ed): Violence. Psychiatric Clinics of North America. Elsevier, NY; 39(4):701-10, 2016.

72. Hatters-Friedman S, **Hall RCW**: *Star Wars: The Force Awakens* **Forensic Teaching About Patricide.** J Am Acad Psychiatry Law, 45(1):128-130, 2017

17

73. **Hall RCW**, Hall RCW: **Torture and Psychiatric Abuse: Definition, Ethics, and Assessment.** In: Rosner R, Scott C (eds): Principles and Practice of Forensic Psychiatry, 3rd Edition. CRC Press. Taylor & Francis Group:Boca Raton, FL; 2017, Cpt 82, pp 845-854.

74. Lee J, **Hall RCW: The Death Penalty and Mental Illness: An Evolving Standard?** Psychiatric Times. 36(6):16C-16E, 2017

**\* Boldface indicates Ryan C. W. Hall, MD**

## NEWSLETTERS:

1. Hall RCW, **Hall RCW:  Fee-Splitting: Ethical Implications and Principles for Practice Management.** Florida Psychiatric Society's Transference, (2)14, 1999.

2. Phillips RTM, Wall B, Frisher K, **Hall RCW**, Zonana H: **American Medical Association 2010 Interim Meeting Highlights.** American Academy of Psychiatry and the Law Newsletter, 36(1):27-29, 2011.

3. Friedman S, Yang S, **Hall RCW: Why Research Matters in Expert Testimony.** American Academy of Psychiatry and the Law Newsletter, 36(2):1-21, 2011.

4. **Hall RCW**, Davidson C, Levine H: **Serotonin Syndrome in Children: A Potentially Toxic Clinical and Legal Entity.** American Academy of Psychiatry and the Law Newsletter, 36(2):18-26, 2011.

5. Phillips RTM, Wall B, Frisher K, **Hall RCW**, Zonana H: **American Medical Association 2011 Annual Meeting Highlights.** American Academy of Psychiatry and the Law Newsletter, 37(1):25, 2012.

6. Hatters Friedman S, **Hall RCW: Treatment of Mental Illness in Pregnancy and Malpractice Concerns.** American Academy of Psychiatry and the Law Newsletter, 37(2):21-22, 2012

7. Hatters Friedman S, **Hall RCW**, Kenedi C, Knoll IV J: "**Your Drugs Made Me Do It."** American Academy of Psychiatry and the Law Newsletter, 39(3): 24-29, 2014

8. **Hall RCW**, Hatters Friedman S, Jain A, Sorrentino R: **Guns and Mental Illness.** American Academy of Psychiatry and the Law Newsletter, 39(3): 26-29, 2014

9. Wall B, **Hall RCW**, Piel J: American Medical Association 2014 Interim Meeting **Highlights.** American Academy of Psychiatry and the Law Newsletter, 39(1):18, 2015

10. Hatters Friedman S, **Hall RCW**, Glezer A, Jain A, Wisner K: **Ethical and Legal Issues in Treatment of Mental Illness in Pregnancy.** American Academy of Psychiatry and

18

the Law Newsletter, 39(1):23, 28, 2015

11. Wall B, **Hall RCW**, Piel J: **American Medical Association 2015 Annual Meeting Highlights.** American Academy of Psychiatry and the Law Newsletter, 40(3):1, 2, 27, 2015

12. **Hall RCW: Where is Board Certification going?** Southlands, Newsletter of the Southern Psychiatric Association, Volume 2(1), Dec 2015

13. **Hall RCW: AAPL at the APA Awards.** American Academy of Psychiatry and the Law Newsletter, 41(3):1-2, 2016

14. Cheng J, **Hall RCW: What Toxicology Screens May Miss: Dextromethorphan.** American Academy of Psychiatry and the Law Newsletter, 41(3):23, 28, 2016

15. Cheng J, **Hall RCW: A Primer on Kratom.** American Academy of Psychiatry and the Law Newsletter, 42(2):24, 32, 2017

\* **Boldface indicates Ryan C. W. Hall, MD**

**ABSTRACTS/POSTERS:**

1. Hall RCW, Hazard SC, **Hall RCW**, Pacheco CA, Blakey RE, Abraham J: **Thyroid Disease in Eating Disordered and Depressed Patients.**

   -146th Annual Meeting, American Psychiatric Association, May 25, 1993, San Francisco, CA, P.1.57 (Poster Session).

2. Hall RCW, Platt DE, **Hall RCW: Suicide Risk Assessment: A Review of Risk Factors for Suicide in 100 Patients Who Made Severe Suicide Attempts: Evaluation of Suicide Risk in a Time of Managed Care.**

   - Psychiatric Practice and Managed Care, American Psychiatric Association, Vol. 5, No. 5, P 12, Sept-Oct 1999.

3. **Hall RCW**, Gould N, McCann U, McKibben J: **The Role of Morphine in the Development of Acute Stress Disorder and Posttraumatic Stress Disorder in Patients with Severe Burn Injury.**

   - 41st Annual Meeting, American Burn Association. San Antonio, TX, Mar 25, 2009.

4. Gould N, McCann U, McKibben J, **Hall RCW: Peri-traumatic Heart Rate as a Predictor of Acute Stress Disorder and Post-traumatic Stress Disorder in Patients with Burn Injury.**

19

- 41st Annual Meeting, American Burn Association. San Antonio, TX, Mar 25, 2009.

5. Marriner B, Tseng T, Rich W, **Hall RCW: Investigating the Factors Influencing the Prescription of Antidepressants with No FDA-Approved Indication in the United States Between 2006 – 2009.**

- Annual Meeting, American College of Clinical Pharmacy, Hollywood, FL, Oct 22, 2012.

6. Marriner B, Rich W, Matthews A, **Hall RCW**, Tseng T: **Provider Characteristics Influencing the Prescription of Antidepressants without a Psychiatric Diagnosis in the United States, 2006-2009.**

- 140th Annual Meeting & Expo, American Public Health Association, San Francisco, CA, Oct 29, 2012.

7. Padalia K, **Hall RCW: Change in Use of Suicidality Assessment Tools Since the 2004 FDA Suicidality Black Box Warning on Antidepressants in Children and Adolescents.**
-FIRE Module, University of Central Florida College of Medicine, Feb 23, 2017

**\* Boldface indicates Ryan C. W. Hall, MD**

## PRESENTATIONS AT NATIONAL AND INTERNATIONAL MEETINGS AND INVITATIONAL ACADEMIC LECTURES:

1. Hall RCW, Hazard SC, Dunlap PK, **Hall RCW**, Pacheco CA, Blakey RE, Abraham J: **Thyroid disease and abnormal function tests in patients with eating disorders and depression.** Poster Session - American Psychiatric Association Annual Meeting, San Francisco, CA, May 25, 1993

2. Hall RCW, **Hall RCW: Management of Hostage Situations.** Psychiatric Responses to Trauma, U.S. State Department Conference on International Terrorism, hosted by Uniformed Services University of Health Sciences, Washington, D.C., April 28, 1999

3. Hall RCW, **Hall RCW: Terrorism: Its Aftermath and Long-term Effects on Survivors - A Consultation-Liaison Perspective -- Part I.** Psychiatric Responses to Trauma, U.S. State Department Conference on International Terrorism, hosted by Uniformed Services University of Health Sciences, Washington, D.C., April 28, 1999

4. Hall RCW, **Hall RCW: Terrorism: Its Aftermath and Long-term Effects on Survivors - A Consultation-Liaison Perspective - Part II.** Psychiatric Responses to Trauma, U.S. State Department Conference on International Terrorism, hosted by Uniformed Services University of Health Sciences, Washington, D.C., April 28, 1999

20

5. Hall RCW, **Hall RCW**, Platt DE: **Impact of Managed Care on Suicide Risk Assessment.** American Academy of Psychiatry and the Law, 1999 Annual Meeting, Baltimore, MD, October 15, 1999

6. Hall RCW, **Hall RCW: Ethical Issues in Managed Care.** American Psychiatric Association, 1999 Ethics Workshop, Washington, DC, November 3, 1999

7. Hall RCW, **Hall RCW: Terrorism, Bioterrorism and Disaster - Aftermath and Long-term Effects on Survivors.** Cycle of Violence: Assessment and Management of Aggression - A Mardi Gras Symposium, Tulane University, New Orleans, LA, February 26, 2000

8. Hall RCW, **Hall RCW: Bioterrorism - Dealing with Medical and Psychiatric Consequences of Victims and Responders.** Cycle of Violence: Assessment and Management of Aggression - A Mardi Gras Symposium, Tulane University, New Orleans, LA, February 26, 2000

9. Hall RCW, **Hall RCW: Psychiatric Consequences of Terrorism, Bioterrorism and Disaster.** Rocky Mountain Emotional Trauma Symposium, Pathways Treatment Center, Kalispell, MT, June 29, 2000

10. Hall RCW, **Hall RCW: Suicide in an Era of HMO's and Managed Care.** Rocky Mountain Emotional Trauma Symposium, Pathways Treatment Center, Kalispell, MT, June 30, 2000

11. Hall RCW, **Hall RCW: Psychological Response to Disasters and Terrorism.** International Society of Political Psychology, 23rd Annual Scientific Meeting, Seattle, WA, July 4, 2000

12. Hall RCW, **Hall RCW: Biological Warfare - Attack Scenarios, Response to Terrorist Attacks, and Sources of Conflict.** American Academy of Psychiatry and the Law, Pre-AAPL meeting, Ireland, September 16-26, 2000

13. Hall RCW, **Hall RCW**, Chapman M: **Workplace Violence.** American Academy of Psychiatry and the Law, Pre-AAPL meeting, Ireland, September 16-26, 2000

14. Hall RCW, **Hall RCW: Biological Warfare: Attack Scenarios and Public Health Issues.** Grand Rounds, Hennepin County Medical Center, Minneapolis, MN, December 8, 2000

15. Hall RCW, **Hall RCW: Bioterrorism: A Short History of Biowarfare & Analysis of the Threat.** Grand Rounds, Mayo Clinic, Jacksonville, FL, August 15, 2001

16. Hall RCW, **Hall RCW: Situational Suicide.** Halifax Medical Center, Daytona Beach, FL, September 13, 2001

21

17. Hall RCW, **Hall RCW: Domestic Violence: The Physician's Role.** Halifax Medical Center, Daytona Beach, FL, September 14, 2001

18. Hall RCW, **Hall RCW: Terrorism, Bioterrorism and Assault with Anthrax as a Biological Weapon.**

    -Florida Psychiatric Society, Fall Meeting, Coconut Grove, FL, November 4, 2001
    -Grand Rounds, Louisiana State University Health Sciences Center, Shreveport, LA, January 30, 2002

19. Hall RCW, **Hall RCW: Smallpox.** Grand Rounds, Louisiana State University Health Sciences Center, Shreveport, LA, January 30, 2002

20. Hall RCW, **Hall RCW: Psychopharmacology - Forensic Risk and Clinical Practice: Things the clinician must know.** Apopka Community Health Center, Apopka, FL, March 13, 2002

21. Hall RCW, **Hall RCW: Overview of Terrorism and Bioterrorism.** Orlando Police Academy, Orlando Police Department, Orlando, FL, August 2, 2002

22. Hall RCW, **Hall RCW: Workplace Violence, School Shootings and Occupations at Risk: Analysis of current data and psychological profiles.** Orlando Police Academy, Orlando Police Department, Orlando, FL, August 2, 2002

23. Hall RCW, **Hall RCW: Smallpox as a Biological Weapon.** Orlando Police Academy, Orlando Police Department, Orlando, FL, August 2, 2002

24. Hall RCW, **Hall RCW: Smallpox as an Agent for Biological Warfare.** Southern Psychiatric Association Annual Meeting, Loews Ventana Canyon Resort, Tucson, AZ, October 3, 2002

25. Hall RCW, **Hall RCW: Domestic Violence: The Physician's Role.** Mandatory Madness, Halifax Medical Center, Daytona USA, Daytona Beach, FL, December 14, 2002

26. Hall RCW, **Hall RCW,** Chapman MJ: **Workplace Violence, School Shootings and Occupations at Risk: Analysis of current data and psychological profiles.** Orlando Police Department, Orlando, FL, February 11, 2003

27. Hall RCW, **Hall RCW: Medical and Psychological Sequelae of Bombings: Implications for First Responders and Critical Government Staff.** Orlando Police Department, Orlando, FL, February 11, 2003

28. Hall RCW, **Hall RCW: Domestic Violence: The Physician's Role.** Florida Psychiatric Society Spring Meeting, Orlando, FL, April 5, 2003

29. Hall RCW, **Hall RCW: Terrorist Bombings: Medical and Psychiatric Impact.**

22

Southern Psychiatric Association's Annual Meeting, Nashville, TN, October 11, 2003

30. Hall RCW, **Hall RCW: Terrorism, Bombings, and Psychiatric Casualties.**
    University of Florida, Department of Psychiatry, Visiting Professor Program,
    November 7, 2003

31. Hall RCW, **Hall RCW: Domestic Violence: The Physician's Role.** Tampa Bay
    Psychiatric Society, Tampa, FL, sponsored by Pfizer, January 29, 2004

32. Hall RCW, **Hall RCW: Smallpox as an Agent for Biological Warfare.** Orlando
    Police Academy, Orlando Police Department, Orlando, FL, August 13, 2004

33. Hall RCW, **Hall RCW: Medical and Psychiatric Casualties of Terrorist Bombings.**
    Orlando Police Academy, Orlando Police Department, Orlando, FL, August 13, 2004

34. Hall RCW, **Hall RCW: Medical and Psychological Consequences of Bombings.**
    Grand Rounds, Tulane University, Department of Psychiatry, New Orleans, LA,
    January 28, 2005

35. Hall RCW, **Hall RCW: Psychological Sequelae of Weapons of Mass Destruction
    on First Responders.** South Central Center for Public Health
    Preparedness/Alabama Department of Public Health, Montgomery, AL, Satellite
    Conference, May 6, 2005

36. Hall RCW, **Hall RCW: Medical and Psychological Aspects of Terrorist
    Bombings.** Grand Rounds, Sinai Hospital, Department of Medicine, Baltimore, MD,
    June 2, 2005

37. Hall RCW, **Hall RCW: Managed Care Disrupting the Physician-Patient
    Relationship: The New Realities. (Abbreviated version)** Forensic Psychiatry
    Fellows and Residents, University of Florida, Gainesville, FL, January 24, 2006

38. Hall RCW, **Hall RCW**, Chapman MJ: **Managed Care Disrupting the Physician-
    Patient Relationship: The New Realities.** Presidential Address. Southern
    Psychiatric Association, Baltimore, MD, September 30, 2006.

39. Hall RCW, **Hall RCW: When the System is Overwhelmed: Protecting the
    Provider during Biodisaster.** Satellite Conference, University of Alabama
    Birmingham South Central Center for Public Health Preparedness/Alabama
    Department of Public Health/Tulane University School of Public Health, Montgomery,
    AL, February 27, 2007.

40. **Hall RCW: Testamentary Capacity from Isaac Ray to Anna Nicole Smith.** Grand
    Rounds, Case Western Reserve School of Medicine, Cleveland, OH, March 28, 2008

41. Hall RCW, **Hall RCW**, Rundell JR, Winstead DK: **Psychiatrists' Role in Disaster
    Management: Lessons Learned.** Course 14, American Psychiatric Association,

23

Annual Meeting, Washington, DC, May 3, 2008.

42. **Hall RCW: Violence in the Elderly: Forensic and Treatment Concerns.** Forensic Forum, Florida Psychiatric Society, ChampionsGate, FL, September 20, 2008.

43. **Hall RCW: Testamentary Capacity: From Isaac Ray to Anna Nicole Smith.** Southern Psychiatric Association, September 25, 2008.

44. **Hall RCW: Testamentary Capacity: From Isaac Ray to Anna Nicole Smith.** Forensic Psychiatry Program, University of South Florida, Tampa, FL, January 29, 2009.

45. **Hall RCW, Hall RCW: Domestic Violence as Portrayed in Film – A Realistic Appraisal?** Florida Psychiatric Society, St. Petersburg Beach, FL, March 20, 2009.

46. **Hall RCW,** Silberman E, Preven D, Weissman S (chairperson): **Indications for the Use of Combined Talking Therapy and Pharmacotherapy and How to Teach in Residency.** Corresponding Committee on Graduate Education, CW16, American Psychiatric Association, San Francisco, CA, May 19, 2009.

47. **Hall RCW,** Hall RCW: **Serotonin Syndrome.** Southern Psychiatric Association, Destin, FL, September 24, 2009

48. **Hall RCW: Testamentary Capacity: From Isaac Ray to Anna Nicole Smith.** Florida Psychiatric Society, Orlando, FL, October 11, 2009.

49. **Hall RCW, Hall RCW: Avoiding Psychiatric Malpractice in a Litigious Environment.** Florida Psychiatric Society, Orlando, FL, October 11, 2009.

50. **Hall RCW,** Appleby B: **Research on Young-Onset Dementia and Forensic Implications.** Workshop, American Academy of Psychiatry and the Law, Baltimore, MD, October 29, 2009

51. Hall RCW, **Hall RCW: Terrorist Bombings: Medical and Psychiatric Impact.** Alabama Psychiatric Society meeting, Montgomery, AL, April 24, 2010.

52. Hall RCW, Hall RCW: **Serotonin Syndrome.** Alabama Psychiatric Society meeting, Montgomery, AL, April 24, 2010.

53. Hall RCW, **Hall RCW: Geneva Conventions and Foreign Intelligence Surveillance Act,** Florida Psychiatric Society's Forensic Psychiatry Committee meeting, Tampa, FL, April, 30, 2010

54. Hall RCW, **Hall RCW: Epidemics – Bureaucracy – and Why Governments Fail in Times of Crisis,** Southern Psychiatric Association, Asheville, NC, September 30, 2010

24

55. Levine H, Bradford, J, **Hall RCW**, Kaye N, Levin A: **Do Practice Guidelines Belong In Court? Where Do They Belong?** American Academy of Psychiatry and the Law, Annual Meeting, Tucson, AZ, October 21, 2010

56. Dinwiddie SH, **Hall RCW**, Harlow M, Friedman S, Yang S: **Why Research Matters: Applying Science to Cases.** American Academy of Psychiatry and the Law, Annual Meeting, Tucson, AZ, October 21, 2010

57. Hall RCW, **Hall RCW: Terrorist Bombings: Medical and Psychiatric Impact- Implications for Law Enforcement.** Orange County Sheriff's Office senior leadership team, Orlando, FL, November 4, 2010

58. **Hall RCW**, Hall RCW: **Head Trauma: Psychiatric Sequelae and Malingering.** Bell & Roper, PA, Law Seminar, Orlando, FL, November 5, 2010

59. **Hall RCW: Pedophiles: Definition, Characteristics, Patterns, and Technology.** Internet Crimes Against Children Task Force Conference (Investigation unit), Orlando, FL, December 2, 2010

60. **Hall RCW: Pedophiles: Definition, Recidivism, Technology, and Treatment Options.** Internet Crimes Against Children Task Force Conference (Prosecution unit), Orlando, FL, December 2, 2010

61. **Hall RCW:  Serotonin Syndrome: Diagnosis, Treatments and Societal Impact.** Grand Rounds, University of South Florida Department of Psychiatry, Tampa, FL, December 16, 2010

62. **Hall RCW: The Psychology of Aging.** Newcomers Group.  Lake Mary, FL, January 20, 2011

63. **Hall RCW**, Hall RCW: **The Culture of Domestic Violence?** Florida Psychiatric Society, Spring Meeting, Sarasota, FL, April 8, 2011

64. Pasternack S, Schmidt C, Barnett D, **Hall RCW: Guns and Medical Practice: Why does a physician need to inquire?** Panel, Florida Psychiatric Society, Spring Meeting, Sarasota, FL, April 9, 2011

65. **Hall RCW: Compensation Neurosis.** Hot Topics in Forensic Psychiatry. Tulane University, New Orleans, LA, April 17, 2011

66. **Hall RCW:  Offender Behavior.** National District Attorneys Association, National Center for Prosecution of Child Abuse, Unsafe Havens I: Investigation and Prosecution of Technology-Facilitated Child Sexual Exploitation, Portland, OR, June 23, 2011

25

67. **Hall RCW**, Hall RCW: **The Evaluation and Future of Posttraumatic Stress Disorder.** Southern Psychiatric Association Annual Meeting, Annapolis, MD, September 17, 2011

68. **Hall RCW**, Hall RCW: **Assessment of Violence Potential: Are there any neural factors?** Florida Psychiatric Society, Orlando, FL, September 24, 2011

69. Levine H, **Hall RCW**, Kaye N: **Black Box or Pandora's Box – How Black Boxes Affect our Field.** American Academy of Psychiatry and the Law, Annual Meeting, Boston, MA, October 27, 2011

70. Myers W, **Hall RCW**, Tolou-Shams M: **Malingering in Homicide Defendants: Use of the MMSE and FIT**. American Academy of Psychiatry and the Law, Annual Meeting, Boston, MA, October 27, 2011

71. **Hall RCW**: **Compensation Neurosis.** Florida Psychiatric Society, Orlando, FL, April 14, 2012

72. Hall RCW, **Hall RCW**: **Hostage Crises: A Psychiatric and Geopolitical Analysis.** Southern Psychiatric Association, White Sulphur Springs, WV, October 5, 2012

73. Kaufman A, Mossman D, **Hall RCW**, Trestman R: **Beyond a Reasonable Doubt: Evidence-Based Expert Opinions.** American Academy of Psychiatry and the Law, Annual Meeting, Montreal, Quebec, Canada, October 25, 2012

74. Kaye N, Hatters Friedman S, **Hall RCW**, Janvier A: **Legal, Ethical, and Risk Implications of Psychotropic Treatment in the Pregnancy/Perinatal Period.** American Academy of Psychiatry and the Law, Annual Meeting, Montreal, Quebec, Canada, October 26, 2012

75. **Hall RCW**, Day T: **Landmark Cases and Supreme Court's Decision on Healthcare**. American Academy of Psychiatry and the Law, Annual Meeting, Montreal, Quebec, Canada, October 26, 2012

76. **Hall RCW**, Day T: **Violent Video Games and the Battle of the Social Science Experts.** American Academy of Psychiatry and the Law, Annual Meeting, Montreal, Quebec, Canada, October 26, 2012

77. Hall RCW, **Hall RCW: Chechen Terrorists: Quick Overview**. Meridian Club, Maitland, FL, May 8, 2013

78. Sorrentino R, Hatters-Friedman S, Jain A, **Hall RCW**: **The Mentally Ill and Guns: A Perfect Target?** American Psychiatric Association, Annual Meeting, Workshop 134, San Francisco, CA, May 22, 2013

79. **Hall RCW: Offender Characteristics**. Safety Net: Multidisciplinary Investigation and Prosecution of Technology-Facilitated Crimes Against Children. National Center for

26

Prosecution of Child Abuse, National District Attorneys Association, Alexandria, VA, June 5, 2013

80. **Hall RCW: Sanity.** Defender Summer School, sponsored by Robert Wesley, Public Defender, 9th Judicial Circuit, Orlando, FL, August 6, 2013

81. **Hall RCW: Violent Video Games: Brown vs. Entertainment Merchants Association: A Precursor to the Current Debate.** Southern Psychiatric Association, Destin, FL, August 19, 2013

82. Myers W, **Hall RCW**, Scott C: **10 Reasons Why Psychiatrists Should Do Their Own Psychometric Testing.** American Academy of Psychiatry and the Law, San Diego, CA, October 24, 2013

83. Kaufman A, Candilis P, **Hall RCW**, Kolla N, Mossman D: **What Should Forensic Fellows Learn About Research?** American Academy of Psychiatry and the Law, San Diego, CA, October 26, 2013

84. Hatters Friedman S, **Hall RCW**, Kenedi C, Knoll J: **Not Guilty by Reason of Medication: Your Drugs Made Me Do It.** American Academy of Psychiatry and the Law, San Diego, CA, October 27, 2013

85. **Hall RCW: What Psychiatrists Need to be Careful of with the Gun Violence Debate.** Florida Psychiatric Society, March 29, 2014

86. **Hall RCW: Video Game Violence and the Supreme Court.** Forensic Psychiatry Conference, Tulane University, New Orleans, LA, April 12, 2014

87. Jain A (chair), **Hall RCW**, Hatters-Friedman S, Sorrentino R: **Mental Illness, Guns, and Public Policy** in Symposium 7: Taking Aim at a Loaded Issue: Guns, Mental Illness, and Risk Assessment. American Psychiatric Association, New York, NY, May 3, 2014

88. **Hall RCW: Death Penalty Ramifications of Hall v. Florida.** Southern Psychiatric Association, New Orleans, LA, September 12, 2014

89. Hatters Friedman S, Wisner K, Jain A, Glezer A, **Hall RCW: Ethics and Forensics in the Treatment of Pregnant Women.** Workshop, American Academy of Psychiatry and the Law, Chicago, IL, October 26, 2014

90. **Hall RCW: Competency.** University of Central Florida's Learning Institute for Elders (LIFE) program, Orlando, FL, January 13, 2015

91. **Hall RCW: Death Penalty: Hall v. Florida.** Florida Psychiatric Society's Forensic Luncheon, Orlando, FL, April 18, 2015

92. **Hall RCW: What Psychiatrists need to know about Ebola**. Alabama Psychiatric Physicians Association, Montgomery, AL, April 24, 2015

93. **Hall RCW:  Presidential Address:  What We as Psychiatrists Need to be Careful of with the Gun Violence Debate: An Update**. Southern Psychiatric Association, Chattanooga, TN, October 3, 2015

94. **Hall RCW**, Cooke B, Johnston L, Strauss A: **Forensics in Florida: Hot Topics for the Sunshine State**. Panel. American Academy of Psychiatry and the Law, Ft. Lauderdale, FL, October 23, 2015

95. **Hall RCW**, Piel J, Wall B: **AMA Resolutions which Focused on Corrections.** Panel. American Academy of Psychiatry and the Law, Ft. Lauderdale, FL, October 24, 2015

96. **Hall RCW**, Hatters Friedman S: **Using Star Wars to Teach Psychopathology**. American Psychiatric Association, Atlanta, GA, May 16, 2016

97. Jain A, **Hall RCW**, Hatters Friedman S, Sorrentino: **Sex Ed: A Psychiatric Primer on Managing Patients' Sexual Behaviors.** American Psychiatric Association, Atlanta, GA, May 17, 2016

98. **Hall RCW. When the Toxicology Screen is Not Enough.** Panel. American Academy of Psychiatry and the Law, Portland, OR, October 30, 2016

99. **Hall RCW. Physician Wellness**. Seminole County Medical Society, Longwood, FL, October 15, 2016

100. **Hall RCW. Florida Political & Legislative Update.** Seminole County Medical Society, Altamonte Springs, FL, February 21, 2017

101. **Hall RCW. Competency.** Barry Law School's Health Law Society, Orlando, FL, March 30, 2017

102. **Hall RCW. Divorce and Domestic Violence**. Florida Psychiatric Society, Orlando, FL, March 31, 2017

103. **Hall RCW. Posttraumatic Stress Disorder: Diagnosis and Application in Criminal Court.** 2017 Federal Criminal Practice Seminar, Orlando, FL, April 6, 2017

104. **Hall RCW** (chair), Hatters Friedman S (co-chair), Wagoner R, Sorrentino R, Jain A, Cooke B. **Boundary Violations in Correctional Settings.** American Psychiatric Association's Annual Meeting, San Diego, CA, May 22, 2017

105. **Hall RCW.  Video Game Violence.** Gang Intervention and Prevention Summit. Florida Gang Investigators Association, Daytona Beach, FL, June 12, 2017

28

\* Boldface indicates Ryan C. W. Hall, MD

**VIRTUAL LECTURES:**
**USMLERX.COM First Aid Step 1 Express Video Review Courses, May 2012**

1. **Types of studies**
2. **Clinical trial**
3. **Meta-analysis**
4. **Evaluation of diagnostic tests**
5. **Prevalence vs. incidence**
6. **Odds ratio vs. relative risk**
7. **Precision vs. accuracy**
8. **Bias**
9. **Statistical distribution**
10. **Statistical hypotheses**
11. **Error types**
12. **Power (1 − β)**
13. **Standard deviation vs. standard error**
14. **Confidence interval**
15. **t-test vs. ANOVA vs. χ2**
16. **Correlation coefficient (r)**
17. **Disease prevention**
18. **Reportable diseases**
19. Leading causes of death in the United States by age
20. **Health care payment**
21. **Core ethical principles**

29

22. Informed consent

23. Exceptions to informed consent

24. Consent for minors

25. Decision-making capacity

26. Written advance directive

27. Confidentiality

28. Exceptions to confidentiality

29. Malpractice

30. Good Samaritan law

31. Ethical situations

32. Apgar score

33. Low birth weight

34. Early developmental milestones

35. Piaget's stages of cognitive development

36. Tanner stages of sexual development

37. Changes in the elderly

38. Grief

39. Kübler-Ross grief stages

40. Stress effects

41. Sexual dysfunction

42. Body-mass index (BMI)

43. Sleep stages

44. REM sleep

45. Narcolepsy

46. Circadian rhythm

47. Intelligence quotient

48. Simple learning

49. Classical conditioning

50. Operant conditioning

51. Reinforcement schedules

52. Transference and countertransference

53. Freud's structural theory of the mind

54. Oedipus complex

55. Social learning

56. Erikson's Stages of Psychosocial development

57. Ego defenses

58. Infant deprivation effects

59. Child abuse

60. Child neglect

61. Anaclitic depression (hospitalism)

62. Regression in children

63. Childhood and early-onset disorders

64. Pervasive developmental disorders

65. Neurotransmitter changes with disease

66. Orientation

67. Amnesia types

68. Delirium

69. Dementia

70. Hallucination vs. illusion vs. delusion vs. loose association

71. Hallucination types

72. Schizophrenia

73. Delusional disorder

74. Dissociative disorders

75. Manic episode

76. Hypomanic episode

77. Bipolar disorder

78. Major depressive episode

79. Sleep patterns of depressed patients

80. Atypical depression

81. Electroconvulsive therapy (ECT)

82. Risk factors for suicide completion

83. Panic disorder

84. Specific phobia

85. Obsessive-compulsive disorder (OCD)

86. Post-traumatic stress disorder

87. Generalized anxiety disorder

88. Malingering

89. Factitious disorder

90. Somatoform disorders

91. Personality

92. Cluster A personality disorders

93. Cluster B personality disorders

94. **Cluster C personality disorders**

95. **Keeping "schizo" straight**

96. **Eating disorders**

97. **Gender identity disorder**

98. **Substance dependence**

99. **Substance abuse**

100. **Substance withdrawal**

101. **Signs and symptoms of substance abuse**

102. **Heroin addiction**

103. **Alcoholism**

104. **Delirium tremens (DTs)**


**MEDIA:**

1. *Time* Magazine, **Definition, Diagnosis, and Forensic Implications of Postconcussional Syndrome,** May 16, 2005

2. Reach MD XM Radio, **Pedophilia (Types and Classifications, Profile of Victims of Pedophilia, Treatment for Pedophiles and their Victims, and Pedophilia Research),** May 14, 2007

3. *MD Consult*. Doug Kaufman. Joint telephone interview with Richard C. W. Hall, MD, **Pedophilia.** May 2, 2007

4. The Korean Broadcasting System, KBS Special, **Pedophilia.** March 11, 2008.

5. Tony Pipitone, WKMG-TV Channel 6, **Mothers Who Kill Their Children.** October 28, 2008.

6. J. L. Webb. Orlando Medical News. **Cyberchondriacs.** November 13, 2008.

7. Fox 35 News, Orlando. **Forensic Implications of Casey Anthony case.** December 11, 2008.

8. Fox 35 News, Orlando. **The Casey Anthony Case: DNA Evidence.** December 12,

2008.

9.   Jessica Sanchez, WKMG-TV Channel 6. **The Casey Anthony Case: Baker Act and Stressors.** January 23, 2009.

10.  Nam Nae Won and Jihyun Song. Korea Educational Broadcasting System. **Pedophilia.** March 30, 2009.

11.  Keith Landry, Fox 35 News, Orlando.   **Effects of Stress and Financial Strain.** June 15, 2009.

12.  Heidi Hatch, Fox 35 News, Orlando. **Effects of Stress on Families.** June 16, 2009.

13.  Zac Anderson, Sarasota Herald-Tribune. **Child pornography.** January 8, 2010.

14.  Florida Psychiatric Society. Brief Conversations with Experts, Public Service Announcement. **Legal Competency.** January 23, 2010.

15.  Canadian Broadcasting Corporation, CBC Radio, *Up To Speed*, with host Margaux Watt, **Pedophilia.** April 5, 2010.

16.  Chilean newspaper, Third Voice, phone interview. **Pedophiles.** April 13, 2010.

17.  Roberto Schiattino, Caras Magazine, Santiago, Chile: **Pedophilia**, April 19, 2010

18.  Cris Barrish, Delaware News Journal, **Pedophiles**, June 5, 2010

19.  Steve Blow, The Dallas Morning News. **Pedophiles.** September 2, 2010

20.  Karen Lusky, MSN, RN, EliHealthcare.com. **Serotonin Syndrome vs. Anticholinergic Syndrome.** September 7, 2010

21.

http://www.katenagroup.org/expertsspeak/RYAN_HALL_MD_DOMESTIC_VIOLENC
E_SEPT2011.mp3

22.  Donna Leinwand Leger, USA Today.  **Misconceptions make sex abuse offenders difficult to detect.** November 16, 2011

23.

http://www.katenagroup.org/expertsspeak/RYAN_HALL_MD_CHILD_SEX_ABUSE_
NOVEMBER2011.mp3

24.  Renee Stoll. WFTV Channel 9 News. **Psychosis/Affect in Potential Violent Crimes.** March 30, 2012

34

25. The Discovery Channel. **Wills: Etta James**. April 26, 2012

26. Marisol Bello, USA Today.  **Sandusky child sex abuse case offers important lessons**.  June 23, 2012

27. Channel 13, Orlando.  **Stop the Bullying.** Town hall symposium. September 18, 2012

28. Brandon Keim, NOVA. **Videogames and Violence.** January 9, 2013

29. Jo Ciavaglia, Bucks County Courier Times (PA). **Anabolic Steroids Withdrawal.** January 18, 2013

30.

   http://www.katenagroup.org/expertsspeak/RYAN_HALL_MD_VIDEO_GAME_VIOLENCE_JAN2013.mp3

31. Gwen Knapp, www.sportsonearth.com. General comments on **Anabolic Steroids** for "Did Oscar Pistorius Have 'Roid Rage?"  February 21, 2013

32. Maia Szalavitz, TIME.com. **Video games and behavior**.  July 2, 2013

33. Erin Brodwin, *Scientific American*. **Guns, Schools, and Mental Illness.** October 25, 2013

34. Andrew Pollock, *New York Times*.  **Ebola (as a bioweapon)**. August 15, 2014

35. Abigail Ohlheiser, *Washington Post*. **Ebola**. October 2, 2014

36. Kelley Beaucar Vlahos, Foxnews.com. **Ebola (as a bioterrorist threat).** October 3, 2014

37. Rich Zeoli, Talk Radio 1210 WPHT, Philadelphia. **Ebola as bioterrorist threat**. October 3, 2014

38. Naseem Miller, *Internal Medicine News.* **Ebola**.  October 3, 2014

39. Amy Ohoheiser. *The Washington Post*. **It's highly unlikely you'll become infected with Ebola, So what are you afraid of?** October 5, 2014

40. Laura Evans, WTTG-FOX5 Washington, DC.  **Ebola**.  via Skype. October 8, 2014

41. Sue Ambrose, Dallas Morning News. **Ebola**. October 14, 2014

35

42. Mackenzie Carpenter, *Pittsburgh Post-Gazette.* **Ebola (Public discussions of).** October 15, 2014

43. Andy Newman, *New York Times.* **Pedophilia**. May 6, 2015

44. Wes Judd, *Pacific Standard*. **Teaching Psychopathology in a Galaxy Far, Far Away: The Light Side of the Force**, May 27, 2015

45. Tori Walker, *The Ledger.* **Local movie theaters respond to recent attacks with more security.** August 18, 2015

46. Michael Greshko, *National Geographic*. **The Real Science Inspired By Star Wars.** http://news.nationalgeographic.com/2015/12/151209-star-wars-science-movie-film/ December 9, 2015

47. Adam Hochron, *MD Magazine*. **Using Star Wars to Teach Psychopathology 3**. May 16, 2016

# Exhibit "U"

Ryan C. W. Hall, MD
2500 W. Lake Mary Blvd; Ste 219
Lake Mary, FL  32746

Case Log – Extended  (LISTS CASES DEPOSED IN OR TESTIFIED IN COURT ON)

| DATE | CLIENT/CASE | ATTORNEY/OTHER | TYPE OF SERVICE | COURT |
|---|---|---|---|---|
| 1/16/07 | Matthew Werfel | Janice Filipski, LAA; NBH, Northfield; PO Box 305; Northfield, Ohio 44067; Phone (330) 467 -7131 ext  1108; FAX (330) 468 – 6995; FILIPSKJ@mhmail.mh.state.oh.us | IME, report, testimony | The Honorable Paul H. Mitrovich Lake County Court of Common Pleas 47 N. Park Place P.O. Box 490 Painesville, OH  44077-0490 |
| 09/07/07 | William Levar Martin | Janice Filipski, LAA; NBH, Northfield; PO Box 305; Northfield, Ohio 44067; Phone (330) 467 -7131 ext  1108; FAX (330) 468 – 6995; FILIPSKJ@mhmail.mh.state.oh.us | IME, report, testimony | The Honorable James L. Miraldi Lorain County Common Pleas Court 225 Court Street Elyria, Ohio 44035 |
| 11/28/07 | Norman Roelle | Janice Filipski, LAA; NBH, Northfield; PO Box 305; Northfield, Ohio 44067; Phone (330) 467 -7131 ext  1108; FAX (330) 468 – 6995; FILIPSKJ@mhmail.mh.state.oh.us | IME, report, testimony | The Honorable Paul H. Mitrovich Lake County Court of Common Pleas 47 N. Park Place P.O. Box 490 Painesville, OH  44077-0490 |
| 2008 | Estate of Nicholas Renna  v. Danbury Hospital, Danbury Office of Physicians Services, and Donna Pellerin | Koskoff, Koskoff & Bieder, PC Atty: Joel Lichtenstein PO Box 1661 Bridgeport, CT  06601 Ph: (203) 336-4421 Fx: (203) 36-3244 **Attorney for Plaintiff** | Record review, deposition |  |

2

| 2009 | Dennis Makowitz v. <u>Peninsular Paper Co</u>. and Michael Salvato | Trichler Law Center, PA<br>Atty:  Ernie Trichler, II<br>1110 N. Florida Ave; 2nd Fl<br>Tampa, FL  33602<br>Ph: 813-273-9166<br>Fx: 813-273-6826<br>**_Attorney for Defendant_** | Record review, IME, deposition, settled out of court | |
| 2009 | Patricia and Steven Krause v. Wal-Mart Stores, Inc, Wal-Mart Stores East, Inc, and <u>National Security and Intelligence Agency, LLC</u> | George Hartz Lundeen<br>Atty: William O. Kratochvil, Esq.<br>13751 Metropolis Ave.<br>Fort Myers, FL  33912<br>Ph: 239-337-7787<br>Fx: 239-337-4303<br>**_Attorney for Defendant_** | Record review, IME, deposition | Circuit Court of 20th Judicial Circuit, General Jurisdiction Division<br>Case #06-CA-002057 |
| 2009 | State v. <u>Jason Rodriguez</u> | Robert Wesley, Esq.<br>Law Offices of of Robert Wesley, Public Defender<br>9th Judicial Circuit of FL<br>435 N. Orange Ave; Ste 400<br>Orlando, FL  32801<br>Ph: 407-836-4800<br>**_Defendant_** | Record review, competency evaluation (2009 and 2011), competency hearing testimony (2009 and 2012), sanity evaluation (2013), deposition (2013), trial testimony | Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.<br><br>Case #09-CF-016358-A-OR |
| 2009 | <u>State of Florida</u> v. Channing Madison | Pamela Davis,  Esq.<br>Office of the State Attorney<br>415 N. Orange Ave; #400<br>Orlando, FL  32801<br>Ph: 407-836-2405<br>**_Prosecution_** | Record review, competency eval, Report, deposition | Judge Roger McDonald<br>Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.<br><br>Case #48-2007-CF-10730-O<br>      48-2007-CF-10942-O |
| 2010 | <u>State of Florida</u> v. Tony Cordera | Les Hess, Esq.<br>Office of the State Attorney<br>415 N. Orange Ave; #400<br>Orlando, FL  32801<br>Ph: 407-836-2421<br>**_Prosecution_** | Record review, competency evaluation, report, deposition, court testimony | Judge Alicia Latimore<br>Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.<br><br>Case #48-2005-CF-13696-O |

| 2010 | Tina Calta v. Hearthstone at Carrollwood | Bassett Law Offices, PA<br>ATTN: R. Evan Bassett, Esq.<br>PO Box 12829<br>St. Petersburg, FL  33733<br>Ph: 727-323-8300<br>Fx: 727-323-8338<br>***Attorney for Plaintiff*** | Record review, deposition, testify at hearing by phone | Case No: 07-003102, Div F |
|---|---|---|---|---|
| 2010 | State of Florida v. Estaban Gonzalez | Anthony Falcone, ASA<br>Office of the State Attorney<br>13th Judicial Circuit<br>800 E. Kennedy Blvd; 5th Fl.<br>Tampa, FL  33602-4148<br>***Prosecution*** | Record review, competency evaluation, deposition, court testimony | 13th Judicial Circuit<br>Case #2006-CF-015558 |
| 2011 | Estate of Elsa Marie Borden v. John McCormick and Charles Wohlust | Shendell & Pollock<br>Atty: Nicole Maglio, Esq.<br>621 NW 53rd St; #310<br>Boca Raton, FL  33487<br>Ph: 561-241-2323<br>Fx: 561-241-2330<br>***Attorney for Plaintiff*** | Record review, deposition | Seminole County, Case #:07-CA-899-09-W |
| 2011 | State v. Toriano Griffin | Pam Smith, Asst St Atty<br>Will Jay, Asst St Atty<br>Office of the State Attorney<br>PO Box 1673<br>Orlando, FL  32802<br>Ph: 407-836-2410<br>***Prosecution*** | Record review, competency eval x 2, court testimony | Judge F. Rand Wallis<br>Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.<br><br>Case #2004-CF-12422-O |
| 2011 | State v. Justin Abercrombie | John J. Scotese, Asst  Pub Defender<br>Public Defender's Office<br>2071 Ringling Boulevard | Record review, deposition, hearing testimony | 12th Judicial Circuit<br>Case # 2010-CF-4103 |

4

| | | Criminal Justice Center, 5th Fl. Sarasota, FL 34237 Ph: 941-861-5500 **Defendant** | | |
|---|---|---|---|---|
| 2011 | State v. Frank Kash | Jennifer Kipke, ASA Office of the State Attorney 110 NW 1st Ave, Ste 5000 Ocala, FL 34475 Ph: 352-671-5828 **prosecution** | Record review, evaluation, deposition, court testimony | Circuit Court of 5th Judicial Circuit, Marion County, FL Case No: 2003-MH-000151 |
| 2011 | Matthan Prophete v. L&B Transfer, Inc; Timothy Haynes, Annabel Haynes, and Allen Finley | Wayne Argo, Esq. Law Office of Wayne Argo, PA 942 SE 17th St. Ocala, FL 34471 Ph: 352-732-8895 Fx: 352-622-4564 **Attorney for Defendant** | Record review, IME, deposition, video trial testimony | Circuit Court of 8th Judicial Circuit, Alachua County, FL Case No: 2008-CA-4189 |
| 2011 | Janet Bray Blanchard v. Brevard County Board of County Commissioners | Cindy Townsend, Esq. Bell & Roper, PA 2707 E. Jefferson St. Orlando, FL 32803 Ph: 407-897-5150 Fx: 407-897-3332 **Attorney for Defendant** | Record review, IME, deposition | Circuit Court of 18th Judicial Circuit, Brevard County, FL Case No: 0-CA-039051 |
| 2011 | Joey and Sharon Herren v. Gregory Bianco-Sucher; Non-Stop Fitness, Inc; Curtis Huffman and  Liken Enterprises Co, dba Active Nutrition Corporation | Dwight Feemster, Esq. Duffy & Feemster, LLC 236 E. Oglethorpe Ave. Savanna, GA 31401 Ph: 912-236-6311 Fx: 912-236-7641 **Attorney for Plaintiff** | Record review, deposition | State Court for the County of Chatham, State of Georgia Case No: STCV1001677 |

5

| 2012 | Betty Medina (children - Ivan and Maty Medina) v. Liberty Transport, LLC; Land Air Express; Refugio Medina | Carlos Becerra, Esq. Alcock & Associates, PC One Renaissance Square Two N. Central Ave, 26th Fl Phoenix, AZ  85004 Ph: 602-494-5000 Fx: 602-494-5205 **Attorney for Plaintiff** | IME (Betty, Ivan and Maty Medina), video testimony | Superior Court of Maricopa County, AZ

Case No: CV2010-020998 |
|---|---|---|---|---|
| 2012 | State v. Vernon Stevens | Dan Feinberg, State Attorney Jennifer Gutmore, ASA PO Box 399 Ft. Myers, FL  33902

Fx:  239-485-1155 **Attorney for prosecution** | Record review, deposition on qEEG (Frye), testimony at Frye hearing | Circuit Court of 20th Judicial Circuit, Hendry County, FL

Case #: 07-000668CF B

Judge Greider |
| 2013 | Shon and Laura Cameron on behalf of minor child, v. Camden Military Academy, Eric Boland, CH Armstrong, Vertis Wilder, Demise Miles, and John Richard | James Scott, Esq Young, Clement, Rivers, LLP 25 Calhoun St; Ste 400 Charleston, SC  29402 Ph:  843-577-4000 Fx: **Attorney for Defense** | Record review, deposition, trial testimony | US District Court, District of South Carolina Columbia Division

Case No: 3:12-CV-00846-JFA |
| 2013 | Eleanor Jenkins (Estate of Dolores White) v. Augustus Ruser, Jr, Post No. 273 The American Legion, Inc. | Christopher Donegan, Esq. Cole, Scott & Kissane 4301 W. Boy Scout Blvd; Ste 400 Tampa, FL  33607 Ph: 813-289-9300 Fx: 813-286-2900 **Attorney for Defendant** | Record review, IMEs, deposition | Circuit Court, 6th Judicial Circuit, Pinellas County, FL

Case #: 2011-011564-CICI(11) |
| 2013 | Steven Baker v Old Dominion Freight Line | James Garner, Esq. Quintairos, Prieto, Wood & Boyer PA 4905 W. Laurel St; Ste 200 Tampa, FL  33607 | Record review, IME, deposition | State of FL Division of Administrative Hearings Office of the Judges of Compensation Claims |

6

| | | Ph: 813-286-8818<br>Fx: 813-286-9998<br>***Attorney for Defendant*** | | Gainesville Division<br>OJCC No: 12-024542MRH |
|---|---|---|---|---|
| 2013 | <u>US</u>. v. R. Carson, USN | Lt J. L Marsh<br>Mayport Naval Station<br>Jacksonville, FL<br>Ph: 904-270-5445<br>***Attorney for prosecution*** | Record review, court testimony | |
| 2013 | <u>State</u> v. Elmer Banner | William Jay, ASA<br>Office of State Attorney<br>PO Box 1673<br>Orlando, FL 32802<br>***Attorney for prosecution*** | Record review, sanity evaluation, deposition, trial testimony | 9th Judicial Circuit,  Orange County, FL<br><br>Case #: 482012-CF-002280000-AOX |
| 2014 | State v. <u>Lawrence Gudmestad</u> | John Torraco, Esq.<br>PO Box 777<br>Sarasota, FL 34230<br>***Attorney for Defendant*** | Comp eval, record review, deposition | 12th Judicial Circuit, Sarasota County, FL<br><br>Case #: 2013 CF 000949 NC |
| 2014 | State v. <u>Samuel Ortiz-Rivera</u> | Andrew Clark, Asst Pub Defender<br>Law Office of Robert Wesley<br>435 N. Orange Ave; Ste 400<br>Orlando, FL  32801<br>Ph:  407-836-4800<br>***Attorney for defendant*** | Record review, competency eval, testimony | 9th Judicial Circuit, Orange County, FL<br><br>Case #:13-CF-016329-A-OR; Div 20 |
| 2015 | Francis Farmer and Timothy Kelly v. <u>Security & General Insurance Company Limited</u> | Sharanna Bodie, Esq.<br>Gail Lockhart Charles & Co.<br>No 4 Pineapple Grove<br>Old Fort Bay, Western Road<br>PO Box SP-60063<br>Nassau, Bahamas<br>***Attorney for defense*** | Record review, IMEs, trial testimony | Supreme Court of Commonwealth of the Bahamas<br><br>CLE/gen/01798 |

| 2015 | Robert Cregan v. <u>Kmart</u> <u>Corporation</u> | Sarah Egan, Esq<br>Cole, Scott & Kissane<br>PO Box 569015<br>Miami, FL  33256<br>Ph: 305-350-5396<br>Fx: 305-373-2294<br>***Attorney for defense*** | Record review, IME, deposition | Circuit Court of 5th Judicial Court, Marion County, FL<br><br>Case #: 42-2012-CA-001221 |
| --- | --- | --- | --- | --- |
| 2015 | State v. <u>Teyi Lawson</u> | Law Office of the Public Defender<br>Cynthia Hunold, APD<br>PO Box 386<br>Green Cove Springs, FL  32043<br>Ph:  904-269-6318<br>Fx:  904-269-6386<br>***Attorney for defendant*** | Review of records, sanity/ competency evaluation, deposition | Circuit Court of 4th Judicial Circuit, Clay County, FL<br><br>Case: 2012-CF-002255-AXXX-MA |
| 2015 | State v. <u>Anthony</u> <u>Wayne Welch</u> | Michael Pirolo, Chief Assistant Public Defender<br>Office of Public Defender<br>2725 Judge Fran Jamieson Way; Bldg E<br>Viera, FL  32940<br>Ph: 321-617-7373<br>***Attorney for defendant*** | Record review, evaluation, deposition | Circuit Court of 18th Judicial Circuit, Brevard County, FL<br><br>Case #: 2000-CF-44691-A |
| 2016 | <u>State</u> v. Michael Scott Shemansky | Aramis Ayala, ASA<br>Office of the State Attorney<br>415 N. Orange Ave; #300<br>Orlando, FL  32802<br>Ph: 407-836-2189<br>***Attorney for Prosecution*** | Review of records, sanity evaluation, deposition, trial testimony | Circuit Court of 9th Judicial Circuit, Orange County, FL<br><br>Case #: 48-2015-CF-005208-O<br>Div: 11 |
| 2016 | State of NH v. <u>Dr.</u> <u>Foad Afshar</u> | Tony Soltani, Esq.<br>The Munilaw Group<br>PO Box 300 | Record review, deposition, trial testimony | Supreme Court<br><br>State of New Hampshire |

| | | | | |
|---|---|---|---|---|
| | | Epsom, NH  03234<br>Ph: 603-736-3320<br>Fx: 603-736-3321<br>***Attorney for defendant*** | | |
| 2016 | State v. <u>Thomas Hahn</u> | Jane Park, Esq<br>Law Offices of Stepniak & Park<br>150 S. Palmetto Ave; Ste 100<br>Daytona Beach, FL  32114<br>***Attorney for defendant*** | Review of records, sanity evaluation, deposition | Circuit Court of 7th Judicial Circuit, Volusia County, FL<br><br>Case #: 2012-307028 CFDB |
| 2016 | Sheldon/Mary Ann Esnard v. <u>Seminole Lakes Homeowner's Association, Inc</u> | Ian Koven, Esq.<br>Cole, Scott, Kissane<br>1645 Palm Beach Lakes Blvd, 2nd Fl<br>West Palm Beach, FL  33401<br>Ph: 561-383-9200<br>Fx: 561-683-8977<br>***Attorney for defendant*** | Record review, evaluation, deposition, trial testimony | Circuit Court of 15th Judicial Circuit, Palm Beach County, FL<br><br>Case #: 502014-CA-005525XXXXMB AO |
| 2016 | <u>Vincent Williams, Sr</u>  v. Miriam Lucia Gomez and Country Lane Condominium No. 2 Association, Inc. | Matias Dorta<br>334 Minorca Ave<br>Coral Gables, FL  33134<br>Ph: 305-441-2299<br>Fx: 305-441-8849<br>***Attorney for plaintiff*** | Record review, evaluation, deposition | |
| 2016 | Karen Gray (Estate of Robert Gray) v. Vigarny Arguello, MD; Ted Brady, DO; Marlon Labi, MD; Arcor, Inc, dba Broward Family Care Center; Drs. Labi and Brady PA, dba Broward Institute for Respiratory Diseases; <u>Northwest Medical</u> | Kenneth Miller, Esq.<br>Halizcer Pettis & Schwamm<br>One Financial Plaza<br>7th Floor<br>Ft. Lauderdale, FL  33394<br>Ph: 954-523-9922<br>Fx: 954-522-2512<br>***Attorney for defendant*** | Record review, deposition | Circuit Court of 17th Judicial Circuit, Broward County, FL<br><br>Case: CACE 11-010583 |

9

| | | | | |
|---|---|---|---|---|
| | Center, Inc, dba <u>Northwest Medical Center;</u> and Hospital Corporation of America, Inc. | | | |
| 2016 | <u>Seana Barnett</u> v. Seminole County Sheriff's Office | Kendra Presswood, Esq. Shankman Leone, PA 707 N. Franklin St; Fl 5 Tampa, FL  33602 Ph: 813-223-1099 ***Attorney for plaintiff*** | Record review, evaluation, deposition | |
| 2016 | State v. <u>Lisa Troemner</u> | Donald Day LLC 3375 E. Tamiami Trail; Ste 200 Naples, FL  34112 Ph: 239-529-6053 Fx: 239-529-6293 ***Attorney for defendant*** | Record review, evaluation, deposition | Circuit Court of 20th Judicial Court, Collier County Case: 11-2014-CF-002322 |
| 2016 | <u>U.S.</u> v. Kathleen Cutuli | Matthew Langley, Asst US Attorney Southern District of Florida 99 NE 4th St Miami, FL  33132 Ph: 305-961-9123 ***Attorney for prosecution*** | Record review, IME, hearing testimony | US Federal Court, Southern District of Florida Case: 16-20233-Cr-Altonaga |
| 2016 | Jason Darnell v. Alejandro Rivera, <u>Alphonso Williams,</u> John Does 1-5, David Ogden, and Town of Windermere | Jeffrey Weiss, Esq . Garganese, Weiss & D'Agresta, PA 111 N. Orange Ave; Ste 2000 Orlando, FL  32801 Ph: 407-425-9566 Fx: 407-425-9596 ***Attorney for defendant*** | Record review, evaluation, deposition | US District Court, Middle District, Orlando Division Civil Case: 6:15-cv-999-Orl-37TBS |

| 2016 | State v. Quinten Jackson | Will Jay, ASA<br>Office of the State Attorney<br>415 N. Orange Ave; #300<br>Orlando, FL  32802<br>***Attorney for prosecution*** | Review of records, sanity evaluation, deposition | 9th Judicial Circuit, Orange County, FL<br><br>Case: 48-2011-CF-005125-O |
|---|---|---|---|---|
| 2016 | Judi Wademan v. United States of America | Kalynn Hughes<br>US Department of Justice<br>Civil Division, Torts Branch<br>1425 New York Ave, NW<br>Washington, DC 20005<br>Ph: 202-616-4060<br>***Attorney for defendant*** | Record review, IME, deposition | US District Court<br>Southern District of Florida<br><br>Case: 4:16-CV-10002-KING |
| 2016 | Brenda Street v. Wells Fargo Bank, NA as Trustee of the Beverly Ann Morgan Revocable Living Trust dated July 24, 2012 | Sarah Pape, Esq..<br>Zimmerman, Kiser, Sutcliffe<br>315 E. Robinson St; Ste 600<br>Orlando, FL  32801<br>Ph: 407-425-7010<br>Fx: 407-425-2747<br>***Attorney for defendant*** | Record review, deposition | Circuit Court of 5th Judicial Circuit, Marion County, FL<br><br>Case #: 2015-CA-595 |
| 2016 | State v. Amber Maltese | Mark Lanning, APD<br>Office of Public Defender<br>2725 Judge Fran Jamieson Way Bldg E<br>Viera, FL  32940<br>Ph: 321-617-7373<br>***Attorney for defendant*** | Record review, interviews (2), deposition | Circuit Court of 18th Judicial Court, Brevard County<br><br>Case: 05-2015-CF-025866-AXXX-XX |
| 2016 | William and Christina Calhoon v. United Bowling Congress, Ebonite International Inc, Las Vegas Convention and Visitors Authority, et al. | Max Corrick, Esq.<br>Olson, Cannon, Gormley, Angulo & Storberski<br>9950 W. Cheyenne Ave<br>Las Vegas, NV 89129<br>Ph: 702-384-4012<br>Fx: 702-383-0701 | Record review, evaluation, trial testimony | District Court, Clark County, NV<br><br>District Case No: A-11-635644-C; Dept No. XXXI |

11

| | | *Attorney for Defendant* | | |
|------|------------------------|------------------------------------------------------------------------------------------------------------------------|----------------------------------------------------|----------------------------------------------------------------------------------------|
| 2017 | US. v. <u>Brandon Russell</u> | Ian Goldstein, Esq<br>Goldstein Jette<br>500 S. Australian Ave; Ste 720<br>West Palm Beach, FL 33401<br><br>*Attorney for defendant* | Record review, evaluation, sentencing hearing testimony | US District Court<br>Middle District, Tampa, FL<br><br>Case #: 8:17-cr-287-T-24JSS |

# Exhibit "V"

## FEES AND CHARGES
### *Please read this document carefully before contracting for services.*

The following are fees and charges for forensic medical services and related activities by Ryan C. W. Hall, M.D. It should be noted that *all fees are assumed to be guaranteed by the retaining individual, company, agency or jurisdiction, at the rates listed below, unless otherwise agreed to in writing by Dr. Hall.* I am not expected to bill any patient, family member, insurance company, or litigant unless specifically arranged in advance, in writing. All consultation and financial agreements are with the contracting consultee, agency or jurisdiction alone. Contracts must be signed by an authorized representative of the contracting firm. **Payments must be made by the contracting firm, not by the litigant or family member.** Consultations will be considered without regard to whether they are related to defense or plaintiff in civil cases, or defense or prosecution in criminal cases.

Except as listed below this paragraph, **all work is charged by the hour, at $400 per hour,** plus expenses. This includes, but is not limited to, record review, interview, conference, telephone conversation, report preparation, travel time ("door-to-door"), and time spent waiting. Consultations will not be accepted on a contingency basis.

**IMEs and deposition testimony *outside my office* are charged at $500 per hour,** with a minimum of four hours if in the Central Florida area, eight hours if more than 100 miles from my office. Time will be measured from my leaving my home or office until return to my home or office.

**Videotaped IMEs and deposition testimony *in my office* are charged at $500 per hour.**

**Depositions** scheduled at the request of opposing counsel are expected to be prepaid by opposing counsel. However, in the event that payment is not received, charges for the deposition will be expected to be paid by contracted counsel.

***Court testimony* is charged at $500 per hour,** with a minimum of eight hours per day. Time will be measured from my leaving my home or office until return to my home or office. If non-billable time is inserted, I will, at my option, simply subtract the non-billable time from the total or make a reasonable estimate of the time for which the consultee is legitimately responsible. Expenses are in addition to the hourly or *per diem* charges.

**Out-of-state licensure.** If services require deposition or court testimony outside the state of Florida, the contracted attorney will verify licensing requirements with that state's medical licensure board.

**A retainer of $2000 ($5,000 for criminal cases) is usual, which is nonrefundable.** No obligation or agreement for services exists until either a retainer is accepted or such an agreement is established in writing. The retainer is applied against the incurred bill, at rates specified, until exhausted. Additional charges are billed to you.

Accounts are billed every thirty days, net due upon receipt of statement. Overdue accounts beyond 60 days will be subject to a 1.5% finance charge per month. **Account balances must be paid in full prior to submission of report or scheduling of deposition or trial testimony.** Depositions and/or court testimony costs are to be prepaid. Collection charges and legal fees incurred in collecting a past due account will become the responsibility of that account.

**All expenses are additional.** Air travel will be by business class. Automobile rental will be billed at "mid-sized" rates, and private automobile travel at $.35 per mile. Accommodations will be in business-class hotels or motels. Food will be billed up to $50.00 per day. **Alcoholic beverages and entertainment will not be billed.** Special secretarial, abstracting, computer time, etc., charges are billed in addition to the hourly fee. The consultee will be notified if such charges are expected to exceed $400.

**Canceled (less than 48 hours' notice) or unkept appointments are charged at the regular rate,** unless the time is filled with gainful activity. Time will not be charged to more than one account. If a deposition or trial testimony is canceled two weeks or more prior to the reserved time, the prepayment for the unused time will be refunded. **"Emergency" work or consultations with less that seven days' notice** are accepted subject to a surcharge of half the usual rate.

# Exhibit "W"

**Bernard F. Pettingill, Jr., Ph.D.**
Consulting Economist

93 Sandbourne Lane
PGA National
Palm Beach Gardens, Florida 33418

E-mail: biffpett@comcast.net
Website: www.bpettingill.com
T. 561.622.0330
F. 561.624.2854



| Present Value Analysis |
| --- |

In the Matter of:
Samantha Broberg

| Prepared By: |
| --- |

Bernard F. Pettingill, Jr. Ph.D.
Consulting Economist
12/18/2017

| Prepared For: |
| --- |

Robert L. Gardana, Esq.
Attorney at Law
Robert L. Gardana, P.A.
12350 SW 132 Court, Ste. #204
Miami, FL 33186

Bernard F. Pettingill, Jr., Ph.D. ©

## Table of Contents

### Sections

Section I: Introduction

Section II: Background & Documents Reviewed

Section III: Basic Assumptions

Section IV: Loss of Support

Section V: Loss of Household Services

Section VI: Discount Rate/ Present Value

Section VII: Quantitative Economic Loss Summary

Section VIII: Summary & Conclusion

Section IX: Certification

References

Appendices

Exhibits

## Section I: Introduction

### Present Value Analysis
### Re: Samantha Broberg

1.1 This report is intended for use by counsel in the aforementioned matter. Any transmission, copy, or utilization of this report is prohibited without the written consent of Bernard F. Pettingill, Jr., Ph.D.

I, Bernard F. Pettingill, Jr., Ph.D., am a consulting economist. I was retained by Robert L. Gardana, Esq. to determine the present value of future Loss of Support and Household Services for Samantha Broberg.

My firm will be compensated for this report and all consulting on the case at $375 per hour. Payment for my services is not contingent upon my findings or the results of this matter.

I was asked to analyze certain documents, perform calculations, and undertake appropriate research, as I deemed necessary to form opinions in connection with this matter. The work I performed and the opinions I have generated are based on my training and experience as a forensic economist.

I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, based on the nature and content of the documentation, data, proof and other evidence or testimony that either party or its experts may present, or based on additional discovery or other information provided to me in this matter. I reserve the right to supplement and revise this report upon presentation of, but not limited to, additional, relevant depositions, expert witness reports, exhibits and information.

A list of the documents that I have reviewed in forming my opinions is attached to this report or included by reference in the report.

## Section I: Introduction

1.2 Samantha Broberg, White Female, was born on 10/01/1982. Samantha Broberg's date of death was on 05/13/2016, at the age of 33.62 years.

1.3 This matter is a wrongful death case.

1.4 At the time of the incident, Samantha Broberg worked for TBD Training Facilities, LLC.

1.5 This report calculates the loss of support and other pecuniary damages.

1.6 For purposes of this analysis, non-pecuniary damages such as mental pain and anguish, loss of enjoyment of life, disability and inconvenience, are not computed in the tables below.  Also, there are no collateral source payments credited in the analysis contained within this economic damages report.

## Section II: Background and Documents Reviewed

**2.1 Plaintiff's counsel has provided the following information:**

1. Plaintiff's Name: Samantha Broberg
2. Gender: Female
3. Race: White
4. Date of Birth: 10/01/1982
5. Date of Death: 05/13/2016
6. Date of Trial: 05/29/18 (Estimated)

**2.2 Documents provided and reviewed:**

1. 2012 - 2016 Form W-2's
2. 2013 - 2015 Tax Returns
3. Complaint by Plaintiffs, Karl Broberg, as Administrator of the Estate of Samantha Broberg
4. Samantha Broberg's paystubs
5. Defendant's answer and affirmative defenses
6. Deposition of Karl Broberg, dated 11/15/2017
7. Bank of America records
8. Past medical expenses provided by plaintiff's attorney

## Section III: Basic Assumptions

| 3.1 | **Life Expectancy:** | | Decendent | Spouse |
|---|---|---|---|---|
| | Plaintiff's age at Date of Death: | | 33.62 | 45.44 |
| | Plaintiff expected to live future years: | | Normal | |
| | | | 49.30 | 34.30 |

(Source: Arias, Elizabeth. National Vital Statistics Reports, Vol. 66, No. 3, April 11, 2017)

| | | | Decendent | Spouse |
|---|---|---|---|---|
| | Total Life Expectancy Projection (in Years): | | 82.92 | 79.74 |
| | Expected Date of Death: | | 9/1/2065 | 9/1/2050 |

**3.2 Retirement:**

| | | |
|---|---|---|
| Retirement Age: | | 67 |
| Date of retirement: | | 10/1/2049 |

| 3.3 | **Dependents** | **D.O.B** | 4 |
|---|---|---|---|
| | Aalyah | 6/3/2000 | |
| | Savannah | 3/18/2005 | |
| | Ryleigh | 3/22/2008 | |
| | Kalee | 7/25/2008 | |

## Section IV: Loss of Support

**4.1 The past and future loss of support:**          $   52,000   (USD)

    Source:     1. 2015 Form W-2

**4.2 Income Growth Rate:**          2.59%

    Source: CPI 30 year growth, bureau of labor statistics

**4.3 Future Income Discount Rate:**          2.74%

    Source:     1. US Treasury Yield - 30 Year          Tax Adj          1.65%

**4.4 Consumption**          9.60% -14.70%

    **Household Income**          $200,000+

**4.5 Tax Rate**          39.60%

    Source:     1. 2015 Tax Return

**4.6 Net Accumulations**          $          -

## Section V: Loss of Household Services

**5.1  The past and future loss of services capacity:**                  $     19,219   (USD)

    Source:    1. Average of Florida minimum wage, $8.10/hr.,  and home care attendant at $15/hr

               2. 32 hours per week for 52 weeks per year

**5.2  Growth Rate:**                  2.59%

    Source: 30 Year CPI Historical Growth

**5.3  Future loss of services discount rate:**                  2.74%

    Source:    1. US Treasury Yield - 30 Year

**5.4  Spouse's Life Expectancy**                  9/1/2050

    Spouse's D.O.B.                  12/4/1970

    Age at Decedent's Death                  45.44

    Remaining Years (White, male)                  34.30

## Section VI: Discount Rate and Present Value

**6.1: Discount Rate**

The discount rate used to reduce future loss of support to present value was: 2.74%

The discount rate used to reduce future loss of services to present value was: 2.74%

These discount factors were based on the following criteria:

1. Liquidity, the ready convertibility into cash without penalty;

2. Credit risk or risk of default;

3. Market risk, including variability of interest rates and security prices;

4. Safety of the principal; and

5. Appropriate terms to maturity. (see Exhibit 1)

**6.2: Present Value**

The present value is the amount of money needed to invest today, earning a compound interest rate, to equal the value of each annual income salary or medical expense when each is expected to occur in the future.

## Section VIII: Quantitative Economic Loss Summary

### Retirement at age 67

**Period I: Past Loss (From Incident to Trial Date)**

| | | |
|---|---|---|
| I.1.a  Past Burial Expenses | $ | 15,000 |
| I.1.b  Past Loss of Support | $ | 60,170 |
| I.1.c  Past Loss of Services | $ | 41,285 |
| **Total Past Loss** | **$** | **116,454** |

**Period II: Future Loss**

| | | |
|---|---|---|
| II. 2.a  Present Value of Future Loss of Support | $ | 1,050,626 |
| II. 2.b  Present Value of Future Loss of Services | $ | 654,000 |
| **Total Future Loss** | **$** | **1,704,626** |

| | | |
|---|---|---|
| **Total Past and Future Loss** | **$** | **1,821,080** |

## Section VIII: Summary and Conclusion

8.1 In my opinion, the present value of the funds needed at the date of this analysis in order to compensate for the economic loss for Samantha Broberg, is as follows:

**Total Economic Loss - Retirement at age 67**

| | | |
|---|---|---:|
| Past Burial Expenses | $ | 15,000 |
| Total Loss of Support | $ | 1,110,795 |
| Total Loss of Household Services | $ | 695,285 |
| **Total Economic Loss** | **$** | **1,821,080** |

| Economic Loss by Dependents | Spouse/ Karl | Aaliyah | Savannah | Ryleigh | Kalee |
|---|---:|---:|---:|---:|---:|
| **Past Burial** | 15,000 | - | - | - | - |
| **Loss of Support** | 882,234 | 12,117 | 49,078 | 80,946 | 86,421 |
| **Loss of Household Services** | 542,956 | 8,314 | 33,075 | 53,714 | 57,226 |
| **Total** | **$ 1,440,190** | **$ 20,431** | **$ 82,153** | **$ 134,659** | **$ 143,647** |

8.2 If this sum of money is invested in a serial portfolio of short, intermediate and long-term bonds, and withdrawn on a regular basis, it would provide for the loss in this case. At the end of the terms of economic loss, the fund would be depleted to zero.

8.3 Kindly keep me informed of progress towards trial.

Section IX: Certification

### 9.1: Certification and Reservation of Rights

Finally, I certify that the enclosed present value analysis was prepared by Bernard F. Pettingill, Jr. Ph.D. This researcher has no present or future interest in this case. Furthermore, I certify that neither my employment to produce this analysis nor any compensation for this work are contingent on the outcome of this case.

This report is based upon available information and data.

I reserve the right to change, amend, or modify this report upon receiving any new or updated information.

I certify that, according to my knowledge as an economist, all statements in this report are true and correct, subject to the underlying assumptions.

Reviewed by:        Bernard F. Pettingill, Jr., Ph.D.

                    Consulting Economist

                    12/18/2017

## References

Board of Governors of the Federal Reserve System. Economic Research & Data. Statistical Releases and Historical data. Http://www.federalreserve.gov/releases/h15/current/default.htm

CPI Detailed Report, U.S. Department of Labor, Bureau of Labor Statistics, monthly issues. www.bls.gov/cpi/

Council of Economic Advisors, Economic Report of the President, Washington, D.C. 2016. http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=ERP.

Employment and Earnings, U.S. Department of Labor, Bureau of Labor Statistics, monthly issues. www.bls.gov/ces

Employment, Hours and Earnings, from the Current Employment Statistics Survey, United States (National). Http://www.bls.gov/data

Employment Cost Index Published by Bureau of Labor Statistics, http://www.bls.gov/eci

Kurt V. Krueger and Frank Slesnick (2014) Total Worklife Expectancy. Journal of Forensic Economics: April 2014, Vol. 25, No. 1, pp. 51-70.

Kurt V. Krueger (2014) Personal Consumption by Family Type & Household Income. Journal of Forensic Economics: December 2014, Vol. 25, No. 2, pp. 203-220.

"Measuring Price Change for Medical Care in the CPI", http://www.bls.gov/cpi/cpifact4.htm.

National Center for Health Statistics, United States Life Tables. Arias E, Heron M, Xu JQ. United States life tables, 2013. National Vital Statistics Report; Vol. 66 No. 3. Hyattsville, Maryland: National Center for Health Statistics, 2017.

Pettingill, B.F., Ph.D., Westerlund, N., DPT & Maynor, J., Research Associate, Analysis and Forecast of Nursing Care Costs, Available at: http://www.reuters.com/article/2008/04/11/idUS216550+11-Apr-2008+BW20080411. Accessed from Reuters.com on April 11, 2008.

Ruble, Michel R., Robert Patton, & David M. Nelson. Patton-Nelson Person Consumption Tables 2005 - 2006 Journal of Forensic Economics April 2009, Vol. 20, No. 3, pp.217-225

Social Security Retirement Age, http://www.socialsecurity.gov/

U.S. Department of Labor, Handbook of Labor Statistics, Bureau of Labor Statistics, https://www.bls.gov/ooh/

U.S. Department of the Treasury Bond Yields, http://www.treasury.gov/

Wall Street Journal, (selected issues). http://online.wsj.com/

## Appendix I.1: Loss of Support Summary

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Birth | 10/1/1982 | | | Date of Retirement at age 67 | | 9/2/2052 | Benefits (%) | | 6.20% | |
| Date Loss Started | 5/13/2016 | | | | | | Consumption | | 9.6% | |
| Date of Trial | 5/29/2018 | | | | | | Tax Rate | | 39.6% | |
| Discount Rate | 2.74% | | | | | | | | | |

| Claim | Time Period | Retirement Age | Date From | To | Years | Annual Salary | Base Year | Growth Rate | Discount Rate | FV | PV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Loss of Support | Before Trial | 67 | 5/13/2016 | 5/29/2018 | 2.05 | $ 52,000 | 1/1/2015 | 2.57% | 0.00% | $ 60,170 | $ 60,170 |
| Loss of Support | After Trial | 67 | 5/30/2018 | 10/1/2049 | 31.34 | $ 52,000 | 1/1/2015 | 2.57% | 1.65% | $ 1,385,234 | $ 1,050,626 |

## Appendix I.1: Loss of Services Summary

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Birth | 10/1/1982 | | | | | | | | | | |
| Date Loss Started | 5/13/2016 | | | Services Growth Rate | | 2.59% | | | | | |
| Date of Trial | 5/29/2018 | | | Services Discount Rate | | 0.03% | | | | | |
| Date Services End | 9/1/2050 | | | | | | | | | | |

| Claim | Time Period | Title | Date From | To | Years | Annual Value | Base Year | Growth Rate | Discount Rate | FV | PV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Loss of Services | Before Trial | Services | 5/13/2016 | 5/29/2018 | 2.05 | $ 19,219 | 1/1/2015 | 2.59% | 0.00% | $ 41,285 | $ 41,285 |
| Loss of Services | After Trial | Services | 5/30/2018 | 9/1/2050 | 32.26 | $ 19,219 | 1/1/2015 | 2.59% | 2.74% | $ 1,037,724 | $ 654,000 |

## Appendix I.2: Loss of Support by Dependents

| | | | | | | |
|---|---|---|---|---|---|---|
| Date Loss Started | 5/13/2016 | | Income Growth Rate | 2.57% | | |
| Date of Trial | 5/29/2018 | | Income Discount Rate | 0.00% | | |

| | | |
|---|---|---|
| Tax Rate | 39.60% | |
| Net Accumulations | $ - | |

Time Period: Before Trial 67

| | | | | | Aalyah | Savannah | Ryleigh | Kalee | Karl |
|---|---|---|---|---|---|---|---|---|---|
| Period | From | To | Days/ Year | PV | 6/3/2018 | 3/18/2023 | 3/22/2026 | 7/25/2026 | 9/1/2050 |
| 1 | 5/13/2016 | 12/31/2016 | 233 | $ 18,347 | $ 3,669 | $ 3,669 | $ 3,669 | $ 3,669 | $ 3,669 |
| 2 | 1/1/2017 | 12/31/2017 | 365 | $ 29,480 | $ 5,896 | $ 5,896 | $ 5,896 | $ 5,896 | $ 5,896 |
| 3 | 1/1/2018 | 5/29/2018 | 149 | $ 12,343 | $ 2,469 | $ 2,469 | $ 2,469 | $ 2,469 | $ 2,469 |
| **Total** | | | | $ **60,170** | $ **12,034** | $ **12,034** | $ **12,034** | $ **12,034** | $ **12,034** |

## Appendix I.2: Loss of Support by Period

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date Loss Started | 5/13/2016 | | Income Growth Rate | | | 2.57% | | |
| Date of Trial | 5/29/2018 | | Income Discount Rate | | | 0.00% | | |

Claim: Loss of Support

Time Period: Before Trial 67

| Period | From | To | Days/ Year | Wages | FV | Taxes | OASDI | SS Benefits | Net Accumulations | Consumption | Total FV | PV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/13/2016 | 12/31/2016 | 233 | $ 33,195 | $ 34,048 | $ (13,483) | $ (2,605) | $ 2,111 | $ - | $ (1,724) | $ 18,347 | $ 18,347 |
| 2 | 1/1/2017 | 12/31/2017 | 365 | $ 52,000 | $ 54,707 | $ (21,664) | $ (4,185) | $ 3,392 | $ - | $ (2,770) | $ 29,480 | $ 29,480 |
| 3 | 1/1/2018 | 5/29/2018 | 149 | $ 21,227 | $ 22,906 | $ (9,071) | $ (1,752) | $ 1,420 | $ - | $ (1,160) | $ 12,343 | $ 12,343 |
| **Total** | | | | | | | | | | | $ **60,170** | $ **60,170** |

## Appendix I.2: Loss of Support by Dependents

| Date Loss Started | 5/13/2016 | Income Growth Rate | 2.57% |
|---|---|---|---|
| Date of Trial | 5/29/2018 | Income Discount Rate | 1.65% |
| Date of Retirement at age 67 | 10/1/2049 | | |
| Tax Rate | 39.60% | Consumption | 9.60% |
| Net Accumulations | $ - | | |

Time Period: After Trial 67

| Period | From | To | Days/ Year | PV | Aalyah 6/3/2018 | Savannah 3/18/2023 | Ryleigh 3/22/2026 | Kalee 7/25/2026 | Karl 9/1/2050 |
|---|---|---|---|---|---|---|---|---|---|
| 3 | 5/30/2018 | 6/3/2018 | 5 | $ 414 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 |
| 3 | 6/4/2018 | 12/31/2018 | 211 | $ 17,480 | | $ 4,370 | $ 4,370 | $ 4,370 | $ 4,370 |
| 4 | 1/1/2019 | 12/31/2019 | 365 | $ 30,509 | | $ 7,627 | $ 7,627 | $ 7,627 | $ 7,627 |
| 5 | 1/1/2020 | 12/31/2020 | 366 | $ 30,784 | | $ 7,696 | $ 7,696 | $ 7,696 | $ 7,696 |
| 6 | 1/1/2021 | 12/31/2021 | 365 | $ 31,061 | | $ 7,765 | $ 7,765 | $ 7,765 | $ 7,765 |
| 7 | 1/1/2022 | 12/31/2022 | 365 | $ 31,341 | | $ 7,835 | $ 7,835 | $ 7,835 | $ 7,835 |
| 8 | 1/1/2023 | 3/18/2023 | 77 | $ 6,671 | | $ 1,668 | $ 1,668 | $ 1,668 | $ 1,668 |
| 8 | 3/19/2023 | 12/31/2023 | 288 | $ 24,781 | | | $ 8,260.22 | $ 8,260 | $ 8,260 |
| 9 | 1/1/2024 | 12/31/2024 | 366 | $ 31,689 | | | $ 10,563 | $ 10,563 | $ 10,563 |
| 10 | 1/1/2025 | 12/31/2025 | 365 | $ 31,974 | | | $ 10,658 | $ 10,658 | $ 10,658 |
| 11 | 1/1/2026 | 3/22/2026 | 81 | $ 7,159 | | | $ 2,386 | $ 2,386 | $ 2,386 |
| 11 | 3/23/2026 | 7/25/2026 | 125 | $ 10,951 | | | | $ 5,475 | $ 5,475 |
| 11 | 7/26/2026 | 12/31/2026 | 159 | $ 13,444 | | | | | $ 13,444 |
| 12 | 1/1/2027 | 12/31/2027 | 365 | $ 31,140 | | | | | $ 31,140 |
| 13 | 1/1/2028 | 12/31/2028 | 366 | $ 31,421 | | | | | $ 31,421 |
| 14 | 1/1/2029 | 12/31/2029 | 365 | $ 31,704 | | | | | $ 31,704 |
| 15 | 1/1/2030 | 12/31/2030 | 365 | $ 31,989 | | | | | $ 31,989 |
| 16 | 1/1/2031 | 12/31/2031 | 365 | $ 32,277 | | | | | $ 32,277 |
| 17 | 1/1/2032 | 12/31/2032 | 366 | $ 32,567 | | | | | $ 32,567 |
| 18 | 1/1/2033 | 12/31/2033 | 365 | $ 32,861 | | | | | $ 32,861 |
| 19 | 1/1/2034 | 12/31/2034 | 365 | $ 33,156 | | | | | $ 33,156 |
| 20 | 1/1/2035 | 12/31/2035 | 365 | $ 33,455 | | | | | $ 33,455 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 1/1/2036 | 12/31/2036 | 366 | $ | 33,756 | | | | | | | $ | 33,756 |
| 22 | 1/1/2037 | 12/31/2037 | 365 | $ | 34,060 | | | | | | | $ | 34,060 |
| 23 | 1/1/2038 | 12/31/2038 | 365 | $ | 34,366 | | | | | | | $ | 34,366 |
| 24 | 1/1/2039 | 12/31/2039 | 365 | $ | 34,676 | | | | | | | $ | 34,676 |
| 25 | 1/1/2040 | 12/31/2040 | 366 | $ | 34,988 | | | | | | | $ | 34,988 |
| 26 | 1/1/2041 | 12/31/2041 | 365 | $ | 35,303 | | | | | | | $ | 35,303 |
| 27 | 1/1/2042 | 12/31/2042 | 365 | $ | 35,621 | | | | | | | $ | 35,621 |
| 28 | 1/1/2043 | 12/31/2043 | 365 | $ | 35,941 | | | | | | | $ | 35,941 |
| 29 | 1/1/2044 | 12/31/2044 | 366 | $ | 36,265 | | | | | | | $ | 36,265 |
| 30 | 1/1/2045 | 12/31/2045 | 365 | $ | 36,591 | | | | | | | $ | 36,591 |
| 31 | 1/1/2046 | 12/31/2046 | 365 | $ | 36,921 | | | | | | | $ | 36,921 |
| 32 | 1/1/2047 | 12/31/2047 | 365 | $ | 37,253 | | | | | | | $ | 37,253 |
| 33 | 1/1/2048 | 12/31/2048 | 366 | $ | 37,588 | | | | | | | $ | 37,588 |
| 34 | 1/1/2049 | 10/1/2049 | 274 | $ | 28,471 | | | | | | | $ | 28,471 |
| Total | | | | $ | 1,050,626 | $ | 83 | $ | 37,044 | $ | 68,912 | $ | 74,387 | $ | 870,200 |

## Appendix I.2: Loss of Support by Period

| Date Loss Started | 5/13/2016 | Income Growth Rate | 2.57% |
|---|---|---|---|
| Date of Trial | 5/29/2018 | Income Discount Rate | 1.65% |
| Date of Retirement at age 67 | 10/1/2049 | | |

Claim: Loss of Support
Time Period: After Trial 67

| Period | From | To | Days/ Year | Wages | | FV | | Taxes | | OASDI | | SS Benefits | | Net Accumulations | | Consumption | | Total FV | | PV | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 5/30/2018 | 6/3/2018 | 5 | $ | 712 | $ | 769 | $ | (304) | $ | (59) | $ | 48 | $ | - | $ | (39) | $ | 414 | $ | 414 |
| 3 | 6/4/2018 | 12/31/2018 | 211 | $ | 30,060 | $ | 32,438 | $ | (12,845) | $ | (2,482) | $ | 2,011 | $ | - | $ | (1,643) | $ | 17,480 | $ | 17,480 |
| 4 | 1/1/2019 | 12/31/2019 | 365 | $ | 52,000 | $ | 57,555 | $ | (22,792) | $ | (4,403) | $ | 3,568 | $ | - | $ | (2,915) | $ | 31,014 | $ | 30,509 |
| 5 | 1/1/2020 | 12/31/2020 | 366 | $ | 52,000 | $ | 59,034 | $ | (23,378) | $ | (4,516) | $ | 3,660 | $ | - | $ | (2,990) | $ | 31,811 | $ | 30,784 |
| 6 | 1/1/2021 | 12/31/2021 | 365 | $ | 52,000 | $ | 60,552 | $ | (23,978) | $ | (4,632) | $ | 3,754 | $ | - | $ | (3,066) | $ | 32,629 | $ | 31,061 |
| 7 | 1/1/2022 | 12/31/2022 | 365 | $ | 52,000 | $ | 62,108 | $ | (24,595) | $ | (4,751) | $ | 3,851 | $ | - | $ | (3,145) | $ | 33,467 | $ | 31,341 |
| 8 | 1/1/2023 | 3/18/2023 | 77 | $ | 10,970 | $ | 13,439 | $ | (5,322) | $ | (1,028) | $ | 833 | $ | - | $ | (681) | $ | 7,242 | $ | 6,671 |
| 8 | 3/19/2023 | 12/31/2023 | 288 | $ | 41,030 | $ | 50,265 | $ | (19,905) | $ | (3,845) | $ | 3,116 | $ | - | $ | (2,731) | $ | 26,900 | $ | 24,781 |
| 9 | 1/1/2024 | 12/31/2024 | 366 | $ | 52,000 | $ | 65,341 | $ | (25,875) | $ | (4,999) | $ | 4,051 | $ | - | $ | (3,550) | $ | 34,968 | $ | 31,689 |
| 10 | 1/1/2025 | 12/31/2025 | 365 | $ | 52,000 | $ | 67,020 | $ | (26,540) | $ | (5,127) | $ | 4,155 | $ | - | $ | (3,641) | $ | 35,867 | $ | 31,974 |
| 11 | 1/1/2026 | 3/22/2026 | 81 | $ | 11,540 | $ | 15,255 | $ | (6,041) | $ | (1,167) | $ | 946 | $ | - | $ | (829) | $ | 8,164 | $ | 7,159 |
| 11 | 3/23/2026 | 7/25/2026 | 125 | $ | 17,808 | $ | 23,542 | $ | (9,323) | $ | (1,801) | $ | 1,460 | $ | - | $ | (1,391) | $ | 12,487 | $ | 10,951 |
| 11 | 7/26/2026 | 12/31/2026 | 159 | $ | 22,652 | $ | 29,945 | $ | (11,858) | $ | (2,291) | $ | 1,857 | $ | - | $ | (2,322) | $ | 15,331 | $ | 13,444 |
| 12 | 1/1/2027 | 12/31/2027 | 365 | $ | 52,000 | $ | 70,509 | $ | (27,922) | $ | (5,394) | $ | 4,372 | $ | - | $ | (5,467) | $ | 36,098 | $ | 31,140 |
| 13 | 1/1/2028 | 12/31/2028 | 366 | $ | 52,000 | $ | 72,322 | $ | (28,639) | $ | (5,533) | $ | 4,484 | $ | - | $ | (5,608) | $ | 37,026 | $ | 31,421 |
| 14 | 1/1/2029 | 12/31/2029 | 365 | $ | 52,000 | $ | 74,180 | $ | (29,375) | $ | (5,675) | $ | 4,599 | $ | - | $ | (5,752) | $ | 37,977 | $ | 31,704 |
| 15 | 1/1/2030 | 12/31/2030 | 365 | $ | 52,000 | $ | 76,087 | $ | (30,130) | $ | (5,821) | $ | 4,717 | $ | - | $ | (5,900) | $ | 38,953 | $ | 31,989 |
| 16 | 1/1/2031 | 12/31/2031 | 365 | $ | 52,000 | $ | 78,042 | $ | (30,905) | $ | (5,970) | $ | 4,839 | $ | - | $ | (6,052) | $ | 39,954 | $ | 32,277 |
| 17 | 1/1/2032 | 12/31/2032 | 366 | $ | 52,000 | $ | 80,048 | $ | (31,699) | $ | (6,124) | $ | 4,963 | $ | - | $ | (6,207) | $ | 40,981 | $ | 32,567 |
| 18 | 1/1/2033 | 12/31/2033 | 365 | $ | 52,000 | $ | 82,105 | $ | (32,514) | $ | (6,281) | $ | 5,091 | $ | - | $ | (6,367) | $ | 42,034 | $ | 32,861 |
| 19 | 1/1/2034 | 12/31/2034 | 365 | $ | 52,000 | $ | 84,215 | $ | (33,349) | $ | (6,442) | $ | 5,221 | $ | - | $ | (6,530) | $ | 43,115 | $ | 33,156 |
| 20 | 1/1/2035 | 12/31/2035 | 365 | $ | 52,000 | $ | 86,379 | $ | (34,206) | $ | (6,608) | $ | 5,356 | $ | - | $ | (6,698) | $ | 44,223 | $ | 33,455 |
| 21 | 1/1/2036 | 12/31/2036 | 366 | $ | 52,000 | $ | 88,599 | $ | (35,085) | $ | (6,778) | $ | 5,493 | $ | - | $ | (6,870) | $ | 45,359 | $ | 33,756 |
| 22 | 1/1/2037 | 12/31/2037 | 365 | $ | 52,000 | $ | 90,876 | $ | (35,987) | $ | (6,952) | $ | 5,634 | $ | - | $ | (7,047) | $ | 46,525 | $ | 34,060 |
| 23 | 1/1/2038 | 12/31/2038 | 365 | $ | 52,000 | $ | 93,212 | $ | (36,912) | $ | (7,131) | $ | 5,779 | $ | - | $ | (7,228) | $ | 47,721 | $ | 34,366 |
| 24 | 1/1/2039 | 12/31/2039 | 365 | $ | 52,000 | $ | 95,607 | $ | (37,861) | $ | (7,314) | $ | 5,928 | $ | - | $ | (7,414) | $ | 48,947 | $ | 34,676 |
| 25 | 1/1/2040 | 12/31/2040 | 366 | $ | 52,000 | $ | 98,065 | $ | (38,834) | $ | (7,502) | $ | 6,080 | $ | - | $ | (7,604) | $ | 50,205 | $ | 34,988 |
| 26 | 1/1/2041 | 12/31/2041 | 365 | $ | 52,000 | $ | 100,585 | $ | (39,832) | $ | (7,695) | $ | 6,236 | $ | - | $ | (7,800) | $ | 51,495 | $ | 35,303 |
| 27 | 1/1/2042 | 12/31/2042 | 365 | $ | 52,000 | $ | 103,170 | $ | (40,855) | $ | (7,892) | $ | 6,397 | $ | - | $ | (8,000) | $ | 52,819 | $ | 35,621 |
| 28 | 1/1/2043 | 12/31/2043 | 365 | $ | 52,000 | $ | 105,821 | $ | (41,905) | $ | (8,095) | $ | 6,561 | $ | - | $ | (8,206) | $ | 54,176 | $ | 35,941 |
| 29 | 1/1/2044 | 12/31/2044 | 366 | $ | 52,000 | $ | 108,541 | $ | (42,982) | $ | (8,303) | $ | 6,730 | $ | - | $ | (8,417) | $ | 55,568 | $ | 36,265 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 1/1/2045 | 12/31/2045 | 365 | $ | 52,000 | $ | 111,330 | $ | (44,087) | $ | (8,517) | $ | 6,902 | $ | - | $ | (8,633) | $ | 56,996 | $ | 36,591 |
| 31 | 1/1/2046 | 12/31/2046 | 365 | $ | 52,000 | $ | 114,192 | $ | (45,220) | $ | (8,736) | $ | 7,080 | $ | - | $ | (8,855) | $ | 58,461 | $ | 36,921 |
| 32 | 1/1/2047 | 12/31/2047 | 365 | $ | 52,000 | $ | 117,126 | $ | (46,382) | $ | (8,960) | $ | 7,262 | $ | - | $ | (9,082) | $ | 59,964 | $ | 37,253 |
| 33 | 1/1/2048 | 12/31/2048 | 366 | $ | 52,000 | $ | 120,137 | $ | (47,574) | $ | (9,190) | $ | 7,448 | $ | - | $ | (9,316) | $ | 61,505 | $ | 37,588 |
| 34 | 1/1/2049 | 10/1/2049 | 274 | $ | 39,036 | $ | 92,502 | $ | (36,631) | $ | (7,076) | $ | 5,735 | $ | - | $ | (7,173) | $ | 47,357 | $ | 28,471 |
| | Total | | | | | | | | | | | | | | | | $ | 1,385,234 | $ | 1,050,626 |

## Appendix I.2: Loss of Services by Dependents

| | | | | | | |
|---|---|---|---|---|---|---|
| Date Loss Started | 5/13/2016 | | Services Growth Rate | 2.59% | | |
| Date of Trial | 5/29/2018 | | Services Discount Rate | 0.00% | | |
| Date Services End | 9/1/2050 | | | | | |

Claim: Loss of Services

Time Period: Before Trial Services

| | | | | | Aalyah | Savannah | Ryleigh | Kalee | Karl |
|---|---|---|---|---|---|---|---|---|---|
| Period | From | To | Days/ Year | PV | 6/3/2018 | 3/18/2023 | 3/22/2026 | 7/25/2026 | 9/1/2050 |
| 1 | 5/13/2016 | 12/31/2016 | 233 | $ 12,586 | $ 2,517 | $ 2,517 | $ 2,517 | $ 2,517 | $ 2,517 |
| 2 | 1/1/2017 | 12/31/2017 | 365 | $ 20,227 | $ 4,045 | $ 4,045 | $ 4,045 | $ 4,045 | $ 4,045 |
| 3 | 1/1/2018 | 5/29/2018 | 149 | $ 8,471 | $ 1,694 | $ 1,694 | $ 1,694 | $ 1,694 | $ 1,694 |
| **Total** | | | | $ **41,285** | $ **8,257** | $ **8,257** | $ **8,257** | $ **8,257** | $ **8,257** |

## Appendix I.2: Loss of Services by Period

| | | | | | | |
|---|---|---|---|---|---|---|
| Date Loss Started | 5/13/2016 | | | Services Growth Rate | 2.59% | |
| Date of Trial | 5/29/2018 | | | Services Discount Rate | 0.00% | |
| Date Services End | 9/1/2050 | | | | | |

Claim: Loss of Services

Time Period: Before Trial Services

| Period | From | To | Days/ Year | Wages | FV | PV |
|---|---|---|---|---|---|---|
| 1 | 5/13/2016 | 12/31/2016 | 233 | $ 12,269 | $ 12,586 | $ 12,586 |
| 2 | 1/1/2017 | 12/31/2017 | 365 | $ 19,219 | $ 20,227 | $ 20,227 |
| 3 | 1/1/2018 | 5/29/2018 | 149 | $ 7,846 | $ 8,471 | $ 8,471 |
| **Total** | | | | | $ **41,285** | $ **41,285** |

## Appendix I.2: Loss of Services by Dependents

| Date Loss Started | 5/13/2016 | Services Growth Rate | 2.59% |
|---|---|---|---|
| Date of Trial | 5/29/2018 | Services Discount Rate | 2.74% |
| Date Services End | 9/1/2050 | | |

Claim: Loss of Services

Time Period: After Trial Services

| Period | From | To | Days/ Year | PV | Aalyah 6/3/2018 | Savannah 3/18/2023 | Ryleigh 3/22/2026 | Kalee 7/25/2026 | Karl 9/1/2050 |
|---|---|---|---|---|---|---|---|---|---|
| 3 | 5/30/2018 | 6/3/2018 | 5 | $ 284 | $ 57 | $ 57 | $ 57 | $ 57 | $ 57 |
| 3 | 6/4/2018 | 12/31/2018 | 211 | $ 11,996 | | $ 2,999 | $ 2,999 | $ 2,999 | $ 2,999 |
| 4 | 1/1/2019 | 12/31/2019 | 365 | $ 20,721 | | $ 5,180 | $ 5,180 | $ 5,180 | $ 5,180 |
| 5 | 1/1/2020 | 12/31/2020 | 366 | $ 20,691 | | $ 5,173 | $ 5,173 | $ 5,173 | $ 5,173 |
| 6 | 1/1/2021 | 12/31/2021 | 365 | $ 20,661 | | $ 5,165 | $ 5,165 | $ 5,165 | $ 5,165 |
| 7 | 1/1/2022 | 12/31/2022 | 365 | $ 20,630 | | $ 5,158 | $ 5,158 | $ 5,158 | $ 5,158 |
| 8 | 1/1/2023 | 3/18/2023 | 77 | $ 4,346 | | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 |
| 8 | 3/19/2023 | 12/31/2023 | 288 | $ 16,254 | | | $ 5,418.16 | $ 5,418 | $ 5,418 |
| 9 | 1/1/2024 | 12/31/2024 | 366 | $ 20,570 | | | $ 6,857 | $ 6,857 | $ 6,857 |
| 10 | 1/1/2025 | 12/31/2025 | 365 | $ 20,540 | | | $ 6,847 | $ 6,847 | $ 6,847 |
| 11 | 1/1/2026 | 3/22/2026 | 81 | $ 4,552 | | | $ 1,517 | $ 1,517 | $ 1,517 |
| 11 | 3/23/2026 | 7/25/2026 | 125 | $ 7,024 | | | | $ 3,512 | $ 3,512 |
| 11 | 7/26/2026 | 12/31/2026 | 159 | $ 8,935 | | | | | $ 8,935 |
| 12 | 1/1/2027 | 12/31/2027 | 365 | $ 20,480 | | | | | $ 20,480 |
| 13 | 1/1/2028 | 12/31/2028 | 366 | $ 20,450 | | | | | $ 20,450 |
| 14 | 1/1/2029 | 12/31/2029 | 365 | $ 20,420 | | | | | $ 20,420 |
| 15 | 1/1/2030 | 12/31/2030 | 365 | $ 20,391 | | | | | $ 20,391 |
| 16 | 1/1/2031 | 12/31/2031 | 365 | $ 20,361 | | | | | $ 20,361 |
| 17 | 1/1/2032 | 12/31/2032 | 366 | $ 20,331 | | | | | $ 20,331 |
| 18 | 1/1/2033 | 12/31/2033 | 365 | $ 20,301 | | | | | $ 20,301 |
| 19 | 1/1/2034 | 12/31/2034 | 365 | $ 20,272 | | | | | $ 20,272 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | 1/1/2035 | 12/31/2035 | 365 | $ | 20,242 | | | | | | | $ | 20,242 |
| 21 | 1/1/2036 | 12/31/2036 | 366 | $ | 20,213 | | | | | | | $ | 20,213 |
| 22 | 1/1/2037 | 12/31/2037 | 365 | $ | 20,183 | | | | | | | $ | 20,183 |
| 23 | 1/1/2038 | 12/31/2038 | 365 | $ | 20,154 | | | | | | | $ | 20,154 |
| 24 | 1/1/2039 | 12/31/2039 | 365 | $ | 20,124 | | | | | | | $ | 20,124 |
| 25 | 1/1/2040 | 12/31/2040 | 366 | $ | 20,095 | | | | | | | $ | 20,095 |
| 26 | 1/1/2041 | 12/31/2041 | 365 | $ | 20,066 | | | | | | | $ | 20,066 |
| 27 | 1/1/2042 | 12/31/2042 | 365 | $ | 20,036 | | | | | | | $ | 20,036 |
| 28 | 1/1/2043 | 12/31/2043 | 365 | $ | 20,007 | | | | | | | $ | 20,007 |
| 29 | 1/1/2044 | 12/31/2044 | 366 | $ | 19,978 | | | | | | | $ | 19,978 |
| 30 | 1/1/2045 | 12/31/2045 | 365 | $ | 19,949 | | | | | | | $ | 19,949 |
| 31 | 1/1/2046 | 12/31/2046 | 365 | $ | 19,920 | | | | | | | $ | 19,920 |
| 32 | 1/1/2047 | 12/31/2047 | 365 | $ | 19,890 | | | | | | | $ | 19,890 |
| 33 | 1/1/2048 | 12/31/2048 | 366 | $ | 19,861 | | | | | | | $ | 19,861 |
| 34 | 1/1/2049 | 12/31/2049 | 365 | $ | 19,832 | | | | | | | $ | 19,832 |
| 35 | 1/1/2050 | 9/1/2050 | 244 | $ | 13,238 | | | | | | | $ | 13,238 |
| Total | | | | $ | 654,000 | $ | 57 | $ | 24,818 | $ | 45,457 | $ | 48,969 | $ | 534,699 |

## Appendix I.2: Loss of Services by Period

| Date Loss Started | 5/13/2016 | Services Growth Rate | 2.59% |
|---|---|---|---|
| Date of Trial | 5/29/2018 | Services Discount Rate | 2.74% |
| Date Services End | 9/1/2050 | | |

Claim: Loss of Services

Time Period: After Trial Services

| Period | From | To | Days/ Year | Wages | FV | PV |
|---|---|---|---|---|---|---|
| 3 | 5/30/2018 | 6/3/2018 | 5 | $ 263 | $ 284 | $ 284 |
| 3 | 6/4/2018 | 12/31/2018 | 211 | $ 11,110 | $ 11,996 | $ 11,996 |
| 4 | 1/1/2019 | 12/31/2019 | 365 | $ 19,219 | $ 21,289 | $ 20,721 |
| 5 | 1/1/2020 | 12/31/2020 | 366 | $ 19,219 | $ 21,840 | $ 20,691 |
| 6 | 1/1/2021 | 12/31/2021 | 365 | $ 19,219 | $ 22,406 | $ 20,661 |
| 7 | 1/1/2022 | 12/31/2022 | 365 | $ 19,219 | $ 22,986 | $ 20,630 |
| 8 | 1/1/2023 | 3/18/2023 | 77 | $ 4,054 | $ 4,975 | $ 4,346 |
| 8 | 3/19/2023 | 12/31/2023 | 288 | $ 15,165 | $ 18,607 | $ 16,254 |
| 9 | 1/1/2024 | 12/31/2024 | 366 | $ 19,219 | $ 24,192 | $ 20,570 |
| 10 | 1/1/2025 | 12/31/2025 | 365 | $ 19,219 | $ 24,819 | $ 20,540 |
| 11 | 1/1/2026 | 3/22/2026 | 81 | $ 4,265 | $ 5,650 | $ 4,552 |
| 11 | 3/23/2026 | 7/25/2026 | 125 | $ 6,582 | $ 8,720 | $ 7,024 |
| 11 | 7/26/2026 | 12/31/2026 | 159 | $ 8,372 | $ 11,091 | $ 8,935 |
| 12 | 1/1/2027 | 12/31/2027 | 365 | $ 19,219 | $ 26,121 | $ 20,480 |
| 13 | 1/1/2028 | 12/31/2028 | 366 | $ 19,219 | $ 26,798 | $ 20,450 |
| 14 | 1/1/2029 | 12/31/2029 | 365 | $ 19,219 | $ 27,492 | $ 20,420 |
| 15 | 1/1/2030 | 12/31/2030 | 365 | $ 19,219 | $ 28,204 | $ 20,391 |
| 16 | 1/1/2031 | 12/31/2031 | 365 | $ 19,219 | $ 28,934 | $ 20,361 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17 | 1/1/2032 | 12/31/2032 | 366 | $ | 19,219 | $ | 29,684 | $ 20,331 |
| 18 | 1/1/2033 | 12/31/2033 | 365 | $ | 19,219 | $ | 30,452 | $ 20,301 |
| 19 | 1/1/2034 | 12/31/2034 | 365 | $ | 19,219 | $ | 31,241 | $ 20,272 |
| 20 | 1/1/2035 | 12/31/2035 | 365 | $ | 19,219 | $ | 32,050 | $ 20,242 |
| 21 | 1/1/2036 | 12/31/2036 | 366 | $ | 19,219 | $ | 32,880 | $ 20,213 |
| 22 | 1/1/2037 | 12/31/2037 | 365 | $ | 19,219 | $ | 33,732 | $ 20,183 |
| 23 | 1/1/2038 | 12/31/2038 | 365 | $ | 19,219 | $ | 34,606 | $ 20,154 |
| 24 | 1/1/2039 | 12/31/2039 | 365 | $ | 19,219 | $ | 35,502 | $ 20,124 |
| 25 | 1/1/2040 | 12/31/2040 | 366 | $ | 19,219 | $ | 36,421 | $ 20,095 |
| 26 | 1/1/2041 | 12/31/2041 | 365 | $ | 19,219 | $ | 37,365 | $ 20,066 |
| 27 | 1/1/2042 | 12/31/2042 | 365 | $ | 19,219 | $ | 38,332 | $ 20,036 |
| 28 | 1/1/2043 | 12/31/2043 | 365 | $ | 19,219 | $ | 39,325 | $ 20,007 |
| 29 | 1/1/2044 | 12/31/2044 | 366 | $ | 19,219 | $ | 40,344 | $ 19,978 |
| 30 | 1/1/2045 | 12/31/2045 | 365 | $ | 19,219 | $ | 41,389 | $ 19,949 |
| 31 | 1/1/2046 | 12/31/2046 | 365 | $ | 19,219 | $ | 42,461 | $ 19,920 |
| 32 | 1/1/2047 | 12/31/2047 | 365 | $ | 19,219 | $ | 43,560 | $ 19,890 |
| 33 | 1/1/2048 | 12/31/2048 | 366 | $ | 19,219 | $ | 44,689 | $ 19,861 |
| 34 | 1/1/2049 | 12/31/2049 | 365 | $ | 19,219 | $ | 45,846 | $ 19,832 |
| 35 | 1/1/2050 | 9/1/2050 | 244 | $ | 12,848 | $ | 31,442 | $ 13,238 |
| Total | | | | | | $ | 1,037,724 | $ 654,000 |

U.S. DEPARTMENT OF THE TREASURY

# Resource Center

### Daily Treasury Yield Curve Rates

Get updates to this content.

`XML`   These data are also available in XML format by clicking on the XML icon.

`XSD`   The schema for the XML is available in XSD format by clicking on the XSD icon.

If you are having trouble viewing the above XML in your browser, click here.

To access interest rate data in the legacy XML format and the corresponding XSD schema, click here.

**Select type of Interest Rate Data**
[ Daily Treasury Yield Curve Rates ▾ ]  [Go]

**Select Time Period**
[ Current Month ▾ ]  [Go]

| Date | 1 Mo | 3 Mo | 6 Mo | 1 Yr | 2 Yr | 3 Yr | 5 Yr | 7 Yr | 10 Yr | 20 Yr | 30 Yr |
|------|------|------|------|------|------|------|------|------|-------|-------|-------|
| 12/01/17 | 1.14 | 1.27 | 1.45 | 1.62 | 1.78 | 1.90 | 2.13 | 2.28 | 2.37 | 2.58 | 2.76 |
| 12/04/17 | 1.16 | 1.29 | 1.45 | 1.66 | 1.80 | 1.93 | 2.15 | 2.29 | 2.37 | 2.58 | 2.77 |
| 12/05/17 | 1.21 | 1.30 | 1.48 | 1.64 | 1.83 | 1.94 | 2.15 | 2.28 | 2.36 | 2.55 | 2.73 |
| 12/06/17 | 1.18 | 1.30 | 1.48 | 1.68 | 1.78 | 1.92 | 2.11 | 2.25 | 2.33 | 2.53 | 2.71 |
| 12/07/17 | 1.16 | 1.29 | 1.47 | 1.67 | 1.80 | 1.92 | 2.14 | 2.29 | 2.37 | 2.58 | 2.76 |
| 12/08/17 | 1.14 | 1.28 | 1.45 | 1.65 | 1.80 | 1.92 | 2.14 | 2.29 | 2.38 | 2.59 | 2.77 |
| 12/11/17 | 1.18 | 1.33 | 1.47 | 1.69 | 1.82 | 1.95 | 2.16 | 2.30 | 2.39 | 2.59 | 2.77 |
| 12/12/17 | 1.26 | 1.34 | 1.49 | 1.70 | 1.83 | 1.95 | 2.18 | 2.32 | 2.40 | 2.60 | 2.79 |
| 12/13/17 | 1.22 | 1.30 | 1.47 | 1.68 | 1.79 | 1.90 | 2.12 | 2.26 | 2.36 | 2.56 | 2.74 |

* 30-year Treasury constant maturity series was discontinued on February 18, 2002 and reintroduced on February 9, 2006. From February 18, 2002 to February 8, 2006, published alternatives to a 30-year rate. See Long-Term Average Rate for more information.

Treasury discontinued the 20-year constant maturity series at the end of calendar year 1986 and reinstated that series on October 1, 1993. As a result, there are no 20-ye available for the time period January 1, 1987 through September 30, 1993.

Treasury Yield Curve Rates. These rates are commonly referred to as "Constant Maturity Treasury" rates, or CMTs. Yields are interpolated by the Treasury from the daily This curve, which relates the yield on a security to its time to maturity is based on the closing market bid yields on actively traded Treasury securities in the over-the-coun These market yields are calculated from composites of quotations obtained by the Federal Reserve Bank of New York. The yield values are read from the yield curve at fi currently 1, 3 and 6 months and 1, 2, 3, 5, 7, 10, 20, and 30 years. This method provides a yield for a 10 year maturity, for example, even if no outstanding security has e remaining to maturity.

Treasury Yield Curve Methodology. The Treasury yield curve is estimated daily using a cubic spline model. Inputs to the model are primarily bid-side yields for on-the-run securities. See our Treasury Yield Curve Methodology page for details.

Negative Yields and Nominal Constant Maturity Treasury Series Rates (CMTs). Current financial market conditions, in conjunction with extraordinary low levels of interes resulted in negative yields for some Treasury securities trading in the secondary market. Negative yields for Treasury securities most often reflect highly technical factors markets related to the cash and repurchase agreement markets, and are at times unrelated to the time value of money.

As such, Treasury will restrict the use of negative input yields for securities used in deriving interest rates for the Treasury nominal Constant Maturity Treasury series (CM input points with negative yields will be reset to zero percent prior to use as inputs in the CMT derivation. This decision is consistent with Treasury not accepting negative Treasury nominal security auctions.

In addition, given that CMTs are used in many statutorily and regulatory determined loan and credit programs as well as for setting interest rates on non-marketable gove securities, establishing a floor of zero more accurately reflects borrowing costs related to various programs.

For more information regarding these statistics contact the Office of Debt Management by email at debt.management@do.treas.gov.

Exhibit I - US Yield                    Broberg 27 of 31

National Vital Statistics Reports, Vol. 66, No. 3, April 11, 2017    19

**Table 6. Life table for white females: United States, 2013**

Spreadsheet version available from: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/NVSR/66_03/Table06.xlsx.

| Age (years) | Probability of dying between ages $x$ and $x+1$ $q_x$ | Number surviving to age $x$ $l_x$ | Number dying between ages $x$ and $x+1$ $d_x$ | Person-years lived between ages $x$ and $x+1$ $L_x$ | Total number of person-years lived above age $x$ $T_x$ | Expectation of life at age $x$ $e_x$ |
|---|---|---|---|---|---|---|
| 0–1 | 0.004515 | 100,000 | 451 | 99,599 | 8,136,222 | 81.4 |
| 1–2 | 0.000344 | 99,549 | 34 | 99,531 | 8,036,623 | 80.7 |
| 2–3 | 0.000197 | 99,514 | 20 | 99,504 | 7,937,092 | 79.8 |
| 3–4 | 0.000148 | 99,495 | 15 | 99,487 | 7,837,587 | 78.8 |
| 4–5 | 0.000116 | 99,480 | 12 | 99,474 | 7,738,100 | 77.8 |
| 5–6 | 0.000110 | 99,468 | 11 | 99,463 | 7,638,626 | 76.8 |
| 6–7 | 0.000097 | 99,457 | 10 | 99,453 | 7,539,163 | 75.8 |
| 7–8 | 0.000090 | 99,448 | 9 | 99,443 | 7,439,711 | 74.8 |
| 8–9 | 0.000086 | 99,439 | 9 | 99,435 | 7,340,267 | 73.8 |
| 9–10 | 0.000085 | 99,430 | 8 | 99,426 | 7,240,833 | 72.8 |
| 10–11 | 0.000088 | 99,422 | 9 | 99,418 | 7,141,407 | 71.8 |
| 11–12 | 0.000097 | 99,413 | 10 | 99,408 | 7,041,989 | 70.8 |
| 12–13 | 0.000112 | 99,404 | 11 | 99,398 | 6,942,581 | 69.8 |
| 13–14 | 0.000135 | 99,392 | 13 | 99,386 | 6,843,183 | 68.9 |
| 14–15 | 0.000164 | 99,379 | 16 | 99,371 | 6,743,797 | 67.9 |
| 15–16 | 0.000195 | 99,363 | 19 | 99,353 | 6,644,426 | 66.9 |
| 16–17 | 0.000229 | 99,343 | 23 | 99,332 | 6,545,074 | 65.9 |
| 17–18 | 0.000264 | 99,321 | 26 | 99,307 | 6,445,742 | 64.9 |
| 18–19 | 0.000302 | 99,294 | 30 | 99,279 | 6,346,434 | 63.9 |
| 19–20 | 0.000339 | 99,264 | 34 | 99,247 | 6,247,155 | 62.9 |
| 20–21 | 0.000378 | 99,231 | 37 | 99,212 | 6,147,907 | 62.0 |
| 21–22 | 0.000415 | 99,193 | 41 | 99,173 | 6,048,696 | 61.0 |
| 22–23 | 0.000445 | 99,152 | 44 | 99,130 | 5,949,523 | 60.0 |
| 23–24 | 0.000468 | 99,108 | 46 | 99,085 | 5,850,393 | 59.0 |
| 24–25 | 0.000487 | 99,062 | 48 | 99,037 | 5,751,308 | 58.1 |
| 25–26 | 0.000505 | 99,013 | 50 | 98,988 | 5,652,271 | 57.1 |
| 26–27 | 0.000527 | 98,963 | 52 | 98,937 | 5,553,282 | 56.1 |
| 27–28 | 0.000552 | 98,911 | 55 | 98,884 | 5,454,345 | 55.1 |
| 28–29 | 0.000582 | 98,857 | 58 | 98,828 | 5,355,461 | 54.2 |
| 29–30 | 0.000616 | 98,799 | 61 | 98,769 | 5,256,634 | 53.2 |
| 30–31 | 0.000654 | 98,738 | 65 | 98,706 | 5,157,865 | 52.2 |
| 31–32 | 0.000694 | 98,674 | 69 | 98,639 | 5,059,159 | 51.3 |
| 32–33 | 0.000734 | 98,605 | 72 | 98,569 | 4,960,520 | 50.3 |
| 33–34 | 0.000775 | 98,533 | 76 | 98,494 | 4,861,951 | 49.3 |
| 34–35 | 0.000820 | 98,456 | 81 | 98,416 | 4,763,457 | 48.4 |
| 35–36 | 0.000875 | 98,376 | 86 | 98,332 | 4,665,041 | 47.4 |
| 36–37 | 0.000941 | 98,289 | 93 | 98,243 | 4,566,708 | 46.5 |
| 37–38 | 0.001015 | 98,197 | 100 | 98,147 | 4,468,465 | 45.5 |
| 38–39 | 0.001092 | 98,097 | 107 | 98,044 | 4,370,318 | 44.6 |
| 39–40 | 0.001172 | 97,990 | 115 | 97,933 | 4,272,274 | 43.6 |
| 40–41 | 0.001260 | 97,875 | 123 | 97,814 | 4,174,342 | 42.6 |
| 41–42 | 0.001359 | 97,752 | 133 | 97,685 | 4,076,528 | 41.7 |
| 42–43 | 0.001473 | 97,619 | 144 | 97,547 | 3,978,843 | 40.8 |
| 43–44 | 0.001608 | 97,475 | 157 | 97,397 | 3,881,295 | 39.8 |
| 44–45 | 0.001766 | 97,318 | 172 | 97,233 | 3,783,899 | 38.9 |
| 45–46 | 0.001935 | 97,147 | 188 | 97,053 | 3,686,666 | 37.9 |
| 46–47 | 0.002120 | 96,959 | 206 | 96,856 | 3,589,613 | 37.0 |
| 47–48 | 0.002335 | 96,753 | 226 | 96,640 | 3,492,758 | 36.1 |
| 48–49 | 0.002579 | 96,527 | 249 | 96,403 | 3,396,118 | 35.2 |
| 49–50 | 0.002836 | 96,278 | 273 | 96,142 | 3,299,715 | 34.3 |
| 50–51 | 0.003097 | 96,005 | 297 | 95,856 | 3,203,573 | 33.4 |
| 51–52 | 0.003357 | 95,708 | 321 | 95,547 | 3,107,717 | 32.5 |
| 52–53 | 0.003619 | 95,387 | 345 | 95,214 | 3,012,170 | 31.6 |
| 53–54 | 0.003890 | 95,041 | 370 | 94,856 | 2,916,956 | 30.7 |
| 54–55 | 0.004178 | 94,672 | 396 | 94,474 | 2,822,099 | 29.8 |
| 55–56 | 0.004492 | 94,276 | 423 | 94,064 | 2,727,625 | 28.9 |
| 56–57 | 0.004826 | 93,853 | 453 | 93,626 | 2,633,561 | 28.1 |
| 57–58 | 0.005172 | 93,400 | 483 | 93,158 | 2,539,935 | 27.2 |
| 58–59 | 0.005529 | 92,917 | 514 | 92,660 | 2,446,777 | 26.3 |
| 59–60 | 0.005909 | 92,403 | 546 | 92,130 | 2,354,117 | 25.5 |
| 60–61 | 0.006318 | 91,857 | 580 | 91,567 | 2,261,987 | 24.6 |

See footnote at end of table.

Exhibit II - Life Expectancy                 Broberg 28 of 31

**Table 5. Life table for white males: United States, 2013**

Spreadsheet version available from: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/NVSR/66_03/Table05.xlsx.

| Age (years) | Probability of dying between ages $x$ and $x + 1$ | Number surviving to age $x$ | Number dying between ages $x$ and $x + 1$ | Person-years lived between ages $x$ and $x + 1$ | Total number of person-years lived above age $x$ | Expectation of life at age $x$ |
|---|---|---|---|---|---|---|
| | $q_x$ | $l_x$ | $d_x$ | $L_x$ | $T_x$ | $e_x$ |
| 0–1 | 0.005585 | 100,000 | 559 | 99,509 | 7,671,407 | 76.7 |
| 1–2 | 0.000409 | 99,441 | 41 | 99,421 | 7,571,898 | 76.1 |
| 2–3 | 0.000271 | 99,401 | 27 | 99,387 | 7,472,477 | 75.2 |
| 3–4 | 0.000200 | 99,374 | 20 | 99,364 | 7,373,090 | 74.2 |
| 4–5 | 0.000169 | 99,354 | 17 | 99,346 | 7,273,726 | 73.2 |
| 5–6 | 0.000153 | 99,337 | 15 | 99,330 | 7,174,380 | 72.2 |
| 6–7 | 0.000135 | 99,322 | 13 | 99,315 | 7,075,050 | 71.2 |
| 7–8 | 0.000120 | 99,309 | 12 | 99,303 | 6,975,735 | 70.2 |
| 8–9 | 0.000106 | 99,297 | 11 | 99,291 | 6,876,433 | 69.3 |
| 9–10 | 0.000094 | 99,286 | 9 | 99,281 | 6,777,141 | 68.3 |
| 10–11 | 0.000089 | 99,277 | 9 | 99,272 | 6,677,860 | 67.3 |
| 11–12 | 0.000098 | 99,268 | 10 | 99,263 | 6,578,587 | 66.3 |
| 12–13 | 0.000130 | 99,258 | 13 | 99,252 | 6,479,324 | 65.3 |
| 13–14 | 0.000189 | 99,245 | 19 | 99,236 | 6,380,072 | 64.3 |
| 14–15 | 0.000271 | 99,227 | 27 | 99,213 | 6,280,836 | 63.3 |
| 15–16 | 0.000357 | 99,200 | 35 | 99,182 | 6,181,623 | 62.3 |
| 16–17 | 0.000447 | 99,164 | 44 | 99,142 | 6,082,441 | 61.3 |
| 17–18 | 0.000556 | 99,120 | 55 | 99,092 | 5,983,299 | 60.4 |
| 18–19 | 0.000685 | 99,065 | 68 | 99,031 | 5,884,207 | 59.4 |
| 19–20 | 0.000822 | 98,997 | 81 | 98,956 | 5,785,176 | 58.4 |
| 20–21 | 0.000963 | 98,916 | 95 | 98,868 | 5,686,220 | 57.5 |
| 21–22 | 0.001090 | 98,820 | 108 | 98,766 | 5,587,352 | 56.5 |
| 22–23 | 0.001183 | 98,713 | 117 | 98,654 | 5,488,586 | 55.6 |
| 23–24 | 0.001234 | 98,596 | 122 | 98,535 | 5,389,931 | 54.7 |
| 24–25 | 0.001255 | 98,474 | 124 | 98,412 | 5,291,396 | 53.7 |
| 25–26 | 0.001266 | 98,351 | 125 | 98,288 | 5,192,984 | 52.8 |
| 26–27 | 0.001283 | 98,226 | 126 | 98,163 | 5,094,696 | 51.9 |
| 27–28 | 0.001304 | 98,100 | 128 | 98,036 | 4,996,533 | 50.9 |
| 28–29 | 0.001335 | 97,972 | 131 | 97,907 | 4,898,496 | 50.0 |
| 29–30 | 0.001373 | 97,841 | 134 | 97,774 | 4,800,590 | 49.1 |
| 30–31 | 0.001416 | 97,707 | 138 | 97,638 | 4,702,816 | 48.1 |
| 31–32 | 0.001456 | 97,569 | 142 | 97,498 | 4,605,178 | 47.2 |
| 32–33 | 0.001490 | 97,427 | 145 | 97,354 | 4,507,680 | 46.3 |
| 33–34 | 0.001517 | 97,281 | 148 | 97,208 | 4,410,326 | 45.3 |
| 34–35 | 0.001544 | 97,134 | 150 | 97,059 | 4,313,118 | 44.4 |
| 35–36 | 0.001581 | 96,984 | 153 | 96,907 | 4,216,059 | 43.5 |
| 36–37 | 0.001636 | 96,831 | 158 | 96,751 | 4,119,152 | 42.5 |
| 37–38 | 0.001711 | 96,672 | 165 | 96,589 | 4,022,401 | 41.6 |
| 38–39 | 0.001806 | 96,507 | 174 | 96,420 | 3,925,811 | 40.7 |
| 39–40 | 0.001918 | 96,332 | 185 | 96,240 | 3,829,392 | 39.8 |
| 40–41 | 0.002048 | 96,148 | 197 | 96,049 | 3,733,151 | 38.8 |
| 41–42 | 0.002197 | 95,951 | 211 | 95,845 | 3,637,102 | 37.9 |
| 42–43 | 0.002369 | 95,740 | 227 | 95,627 | 3,541,257 | 37.0 |
| 43–44 | 0.002569 | 95,513 | 245 | 95,391 | 3,445,630 | 36.1 |
| 44–45 | 0.002804 | 95,268 | 267 | 95,134 | 3,350,240 | 35.2 |
| 45–46 | 0.003059 | 95,001 | 291 | 94,855 | 3,255,105 | 34.3 |
| 46–47 | 0.003347 | 94,710 | 317 | 94,552 | 3,160,250 | 33.4 |
| 47–48 | 0.003696 | 94,393 | 349 | 94,219 | 3,065,698 | 32.5 |
| 48–49 | 0.004107 | 94,044 | 386 | 93,851 | 2,971,480 | 31.6 |
| 49–50 | 0.004555 | 93,658 | 427 | 93,445 | 2,877,629 | 30.7 |
| 50–51 | 0.005008 | 93,231 | 467 | 92,998 | 2,784,184 | 29.9 |
| 51–52 | 0.005460 | 92,765 | 507 | 92,511 | 2,691,186 | 29.0 |
| 52–53 | 0.005933 | 92,258 | 547 | 91,984 | 2,598,675 | 28.2 |
| 53–54 | 0.006441 | 91,711 | 591 | 91,415 | 2,506,690 | 27.3 |
| 54–55 | 0.006989 | 91,120 | 637 | 90,801 | 2,415,275 | 26.5 |
| 55–56 | 0.007578 | 90,483 | 686 | 90,140 | 2,324,474 | 25.7 |
| 56–57 | 0.008190 | 89,797 | 735 | 89,430 | 2,234,334 | 24.9 |
| 57–58 | 0.008816 | 89,062 | 785 | 88,669 | 2,144,904 | 24.1 |
| 58–59 | 0.009449 | 88,277 | 834 | 87,860 | 2,056,235 | 23.3 |
| 59–60 | 0.010102 | 87,443 | 883 | 87,001 | 1,968,375 | 22.5 |
| 60–61 | 0.010805 | 86,559 | 935 | 86,092 | 1,881,374 | 21.7 |

See footnote at end of table.

Exhibit II - Life Expectancy              Broberg 29 of 31



MINIMUM WAGE
PER HOUR
1938 - 2017 (79 Years)

Source: Economic Report of the President

Exhibit III - Minimum Wage                    Broberg 30 of 31



INFLATION C.P.I.
1948-2016 (68 Years)

ANNUAL OVERALL
GROWTH RATE

1965-2015 = 4.1%
1975-2015 = 3.8%
1985-2015 = 2.7%

1982-1984 = 100

Exhibit IV - CPI Inflation                    Broberg 31 of 31

# Exhibit "X"

# BERNARD F. PETTINGILL JR., PH.D.
## CONSULTING ECONOMIST

#93 Sandbourne Lane ● PGA National ● Palm Beach Gardens, FL 33418
(561) 622-0330 ● (561) 346-7828 ● Fax (561) 624-2854
E-mail:  biffpett@comcast.net
Website:  www.bpettingill.com

**Education:**

Graduate Manchester University, Manchester, England, January 1977, Ph.D. – Economics, Department of Economics and Social Administration.   Dissertation: "Cost-Benefit Analysis of the Treatment of Arthritis – A Comparison of Five Hospitals."

Graduate Tulane University, New Orleans, Louisiana, June 1973, MPH-Master Public Health, Department of Health Economics and Medical Care Administration

Graduate Loyola University, New Orleans, Louisiana, June 1971 and June 1969; MBA – Economics, BBA – Business Administration

**Organizations:**

Member, City of Palm Beach Gardens Budget Committee, 2007-Present.
Member, AAEFE, 1989 – Present.
Member, American Economic Association, 1983 – Present.
Member, National Association of Forensic Economists, 1989 – Present.
Member, National Association of Business Economists, 1990 – Present. (Health Roundtable).
Member, Health Economics Study Group, Great Britain, 1973 – Present.
Member, Gideons International, 1978 – Present (Past President).
Member, Rotary International, 1983 – Present.
Member, Emergency Medical Service, Inc., New Orleans, Louisiana, 1977 – 1979.
Referee Journal of Forensic Economic – (2 Years).
Licensed, State of Florida and State of Louisiana, Health and Life Insurance. No.43972-6317 (FL), Series 6 (N.A.S.D.).

**Experience:**

| | |
|---|---|
| 1996 to Present | Forensic Economist / Medical & Professional Practice Financial Analysis. |
| 1988 to 1996 | Professor of Economics, Florida Institute of Technology, Graduate Business School, Treasury Coast Graduate Center, Stuart, Florida. Taught Advanced Macroeconomics, Managerial Economics, Health Care Economics, Microeconomics and Macroeconomics at the graduate level. (Retired) |

| | |
|---|---|
| 1987-1988 | Professor of Economics, Rinker School of Business, PALM BEACH ATLANTIC COLLEGE. Taught Microeconomics, Macroeconomics, Free Enterprise System and International Economics. |
| 1980-1987 | Associate Professor, College of Business Administration, UNIVERSITY OF SOUTHWESTERN LOUISIANA, Lafayette, Louisiana.  Taught undergraduate and graduate courses in Economics, Finance and Management. |
| 1978-1980 | Assistant Professor and Administrative Assistant, Department of Medicine, LSU MEDICAL CENTER, New Orleans, Louisiana.  Principal duties at Medical School included lectures in Medical Economics, grant writing, and computer-assisted data analysis. |
| 1977-1978 | Assistant Professor, Department of Economics and Management, UNIVERSITY OF NEW ORLEANS, New Orleans, Louisiana.  Taught undergraduate and graduate level courses in Economics and Health Care. |
| 1975-1977 | Research Associate in Department of Economics and Social Administration, UNIVERSITY OF MANCHESTER, Manchester, England. Dual appointment: Lecturer in Economics and Course Coordinator of the Administrative Development Course for Hospital Administrators. |
| 1974-1975 | Research Fellow at the Centre for Studies in Economics and Social Policy, London, England. Primary task was a case study of Wigan Community Health Council. Research published in a sequel to the book, Politics of Consumer Representation, by R. Klein and J. Lewis, Centre for Studies in Social Policy, London, England. |

**Publications:**

Pettingill, B. "Wigan Community Health Council." in Community Health Councils: Four Case Studies: ed. Janet Lewis (Centre for Studies in Social Policy, Publ.) 1976 pp. 87-98.

Pettingill, B. "Cost Effectiveness of Chiropractic Treatment in Louisiana − A Feasibility Study." Louisiana Journal of Chiropractics September-October, 1977 pp. 9-10.

Pettingill, B. "Review of a History of Economic Thought." by William J. Barber. Review of Business and Economic Research XIII, Fall 1977 pp. 111-112.

Pettingill, B. "A Feasibility Study of the Cost-Effectiveness Analysis of Rheumatoid Arthritis in Great Britain." Ph.D., Thesis, Manchester Business School Publication January 1977 p. 275.

Pettingill, B F. "Cost-Effectiveness Analysis in the Hospital." Dimensions in Health Service-Canada, January 1978 pp. 19-20.

Pettingill, B. and Langdon, C. "View on Youth Employment: A Survey of Businessmen and Vocational Counselors in the Greater New Orleans Area." Business Review Louisiana Tech Publishers, March 1979 pp. 23-28.

Villere, M. and Pettingill, B. "Transactional Analysis: An Effective Management Tool for Medical Record Supervisors." Medical Record News, Journal of the American Medical Record Association December 1979 pp. 96-100.

Pettingill, B. "Physicians' Estimates of Disability vs. Patients' Reports of Pain." Psychosomatics December 1979, Vol.20, No 12, pp. 827-830.

Pettingill, B. and Langdon, C. "The Problem of Teenage Workers as Viewed by the New Orleans Businessmen." Louisiana Business Survey Fall 1979 pp. 6-8.

Langdon, C., Pettingill, B. F., Bhatia, S. "Vocational-Technical Education in Region I of Louisiana." Research Study Number 44, Division of Business and Economic Research University of New Orleans, May 1982 p. 124.

Payne, Stephen L. and Pettingill, B. F., "How Much Theft Can You Tolerate?" Security Management August 1982 pp. 100-102.

Langdon, Charles, Pettingill, B.F., and Bhatia, S. "Vo-Tech in Metro New Orleans: The Student and the Schools." Louisiana Business Survey Summer 1982 pp. 9-11.

Pettingill, B. F. Bhatia, S., and Langdon, C. "The Counselor-Firstline Manager in the Vocational Technical Educational System." Vocational Guidance Quarterly (December, 1985 pp. 14-17).

Payne, S. and Pettingill, B. F. "Theft Perceptions." The Personnel Administrator October 1983 pp. 102-111.

Pettingill, B F. and Payne, S. "Shrinkage-Another Area of Supply Cost." Hospital Topics May-June 1984 pp. 12-15.

Pettingill, B. F., et al. "A Hospital Linen Cost Control System." Southern Hospitals May-June 1984 pp.62-64.

Pettingill, B. F. and Stafford, John, MD. "The Insurance Carriers Can Contribute to the Reduction of Health Care Costs." City Business January 1984 pp.4-5.

Pettingill, B. F. and Soignier, Wayne, M.D. "The Consumer at the Hand of Cost Containment, Quality Medical Care vs. Cost-Consciousness." Medical Economics (submitted May 1988).

Pettingill, B. F. and Watson, Marie. "One System of Health Care Delivery Hospital Administrators Cannot Afford to Overlook." Hospital Topics September 1984 pp. 111-114.

Pettingill, B F. and Westell, Hariette. "Management of Diagnostic Related Groups." Hospital Topics Vol. 62, No. 4, August 1984 pp. 68-70.

Pettingill, B. F. "Competition for the Consumer." Citybusiness July 1984 pp.14-16.

Pettingill, B. F. "Award Winning Tax Angle." Tax Angle Vol. X, No. 4, April 1984 pp. 28-29.

Pettingill, B. F. and Payne, S. "Coping with Organizational Politics." Supervisory Management April 1986 pp.28-32.

Pettingill, B. F. and Payne, S. "Obstacles to Improving Student Creativity in Management for Business." Journal of Education for Business March 1986 Vol. 61, No. 6 pp. 271-275.

Pettingill, B. F. and Payne, S. "Management and Values Education." Published in SMA Proceedings November 1985 pp. 349-352.

Pettingill, B. F. and Perrin, Warren A. "Estimating Future Medical Maintenance Expenses." Louisiana Bar Journal October 1986 pp. 149-152.

Pettingill, B. F. and Payne, S. "Management and Value Education." Organizational Behavior Teaching Review Vol. XI, No. 1 1986-87 pp. 18-27.

Pettingill, B. F. and Payne, S. "Faculty Perceptions of "Student Values." Southern Management Association Dennis F. Ray (ed.) pp. 437-440.

Pettingill, B. F. and Griest, D. "Hospital Downsizing." Journal of Hospitals forthcoming October 1988 pp. 91-95.

Pettingill, B. F. "How an Economist Sets a Value on Human Life." Editorial Palm Beach Post [West Palm Beach, FL] May 1989.

Pettingill, B. F. and Eriksen Michael "Case Management: Evaluating a Firm's Caseload Using a Cost-Benefit Approach." The Trial Lawyer Vol. 22, No. 5 September-October 1999.

Pettingill, B.F., "Providing Economic Consulting Services to Health Professionals,"
    Business Economics: The Journal of the National Association for Business Economics,
    Volume XXXIX, Number 3, July 2004.

Pettingill, B.F., Ph.D. & Westerlund, N., PT, DPT, MPT.  "Strangers in a Strange
    Land - Medical Mishaps Due to National and Global Nursing / Health Professional
    Shortages", Journal of Social Work in Public Health, Volume 23, No. 1, 2007

Pettingill, B.F., Ph.D. & Westerlund, N., PT, DPT, MPT, Instant Gratification vs. Future Economic
    Stability - Promoting Financial Literacy Through Cyberspace.  Available at http://www.
    forbes.com/businesswire/feeds/businesswire/2007/09/14/businesswire20070914005648r1
    .html.  Accessed from Forbes.com on September 14, 2007.

Pettingill, B.F., Ph.D. & Westerlund, N., PT, DPT, MPT, Financial Writers: Buy the Dow in 2008.
    Available at http://newsblaze.com/story/20070608200234tsop.nb/newsblaze/TOPSTORY/
    Top-Stories.html.  Accessed from News Blaze on October 30, 2007.

Pettingill, B.F., Ph.D. & Escoffery, Mark, CPA, Real Estate Tax Benefit Bonanza.  Available at
    http://www.marketwatch.com/news/story/real-estate-tax-benefit-bonanza/story
    .aspx?guid= {7FF123A4-6F10-4C9F-B26C-A27BAF608A89}.  Accessed from MarketWatch
    on September 1, 2007.

Pettingill, B.F., Ph.D. & Escoffery, Mark, CPA, Real Tax Benefit of Boat Donations.  Available at
    www.smartmoney.com/news/pr/index.cfm?story=PR-20070924-000725-0802.   Accessed
    from Smart Money on September 24, 2007.

Pettingill, B.F., Ph.D. & Westerlund, N., PT, DPT. Preparing For a Successful Medical Practice,
    Florida Medical Business, March 2008, Volume # 5, www.FMBnews.com.

Pettingill, B.F., Ph.D., Westerlund, N., DPT & Manor, J., Research Associate, Analysis and
    Forecast of Nursing Care Costs, Available at http://www.forbes.com/businesswire
    /feeds/businesswire/2008/04/11/businesswire20080411005794r1.html.   Accessed from
    Forbes.com on April 14, 2008.

Pettingill, B.F., Ph.D., Westerlund, N., DPT, Cost Benefit Analysis of Life - Universal Life
    Assessment Plan (ULAP100), Available at http://www.forbes.com/businesswire/feeds/
    businesswire/2008/11/26/businesswire117125483.html.   Accessed from Forbes.com on
    December 1, 2008.

Pettingill, B.F., Ph.D., Westerlund, N., DPT, Commentators / Informational Disseminators: Creditability, Credentials & Choice, Available at http://www.smartbrief.com/news/ustelecom/industryBW-detail.jsp?id=6F5C2041-BC2E-42F3-A023-66AFBE18FBE6. Accessed from The Wall Street Journal (Smart Brief) on April 1, 2009.

Pettingill, B.F., Ph.D., Westerlund, N., DPT., Commentary on Calendar Shifts, Retail Sales, Forecasting GDP and Reliable Sales Estimates, Available at http://eresearch.fidelity.com/eresearch/markets_sectors/analysis/story.jhtml?storyid=201004121705BIZWIRE_USPR_____BW7109&provider=BIZWIRE_&product=USPR____&category=sectorNews&gic=25.  Accessed from Fidelity on April 19, 2010.

Pettingill, B.F., Ph.D., Westerlund, N., DPT., Physician Performance Planning for a Profitable Patient Practice - H.R. 3200, Available at http://us.reuters.com/article/companyNewsAndPR/idUS193931+17-Sep-2010+BW20100917.  Accessed from Reuters on September 17, 2010.

Pettingill, B.F., Ph.D., Westerlund, N., DPT., Commentary: "Housing Depression 2.0" and Its Impact on Americas' Great Recession, Available at http://www.reuters.com/article/2011/11/16/idUS252722+16-Nov-2011+BW20111116.  Accessed from Reuters on December 1, 2011.

Bernard Pettingill, Ph.D., Nils Westerlund, DPT., Commentary: Historical COLA (CPI) Calculations vs. Current Government, Insurance and Societal Health and Wellness Recommendations, Available at http://markets.financialcontent.com/synacor/news/read?GUID=20298446. Accessed from Synacor on January 4, 2012. Available at http://insurancenewsnet.com/article.aspx?id=321712&type=newswires.  Accessed from Insurance News Net on January 6, 2012.

Pettingill, B.F., Ph.D., MPH. Bartimus, James, J.D. & Tewes, F.R., BA, "The Secret To Big Pharma's Success" - Why Do Big Pharma's Profits Resemble a Typical Oligopoly?, The Trial Lawyer, Volume III, No. I, Winter/Spring 2013.

rev 7/2013

# Exhibit "Y"

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Acker, Kelly and Raymond Iglesias v. G.F.B. Enterprises, LLC | Miami, Dade County, FL | 02-4582-CA-41 | | X |
| Adams v. City of Sunrise Fire Rescue | Broward County, FL | 99-0113 | X | |
| Adkins, Everett and Adkins, Irene v. Jean G. Numa and Overland Services, Inc. | St. Lucie County, FL | 03-CA-000485 (AN) | X | |
| Agnoli, Antoine v. Amex Assurance Company | Palm Beach County, FL | CA 02-8053 AH | | X |
| Aksoy, Levent individually and Maurice Stewart v. Maroone Chevrolet, LLC | Southern District of Florida | 01-7371-CIV-Hurley/Lynch | X | |
| Alabre, Damas and Alabre, Jessie v. Marco Chew and American Airlines, Inc. | Miami-Dade County, FL | 02-25364 CA 11 | X | |
| Albright, III, Charles et al v. The City of New Orleans, et al | New Orleans, LA | 96-0679 CLW 97-2523 "J" (5) | X | X |
| Alexander, Ronald v. Janice L. Cohen | Broward County, FL | 98-003860-09 | X | |
| Algarin, Alvin and Maria Diaz v. John Moran | Broward County, FL | 01-005575 (04) | | X |
| Ampel, Stuart v. James R. Barron, M.D. | Palm Beach County, FL | CA 01-13431 AN | X | |
| Arias, Michael and Cristina Arias v. The Sports Authority, Inc., et al | Miami-Dade County, FL | 00-33023 CA 25 | X | |
| Armakan, Bahram v. Jim McLean | Dade County, FL | 98-30109-CA-08 | X | |
| Atwill, Marion Korth v. Aircraft Maintenance Specialist Inc. | Palm Beach County, FL | 98-001566 | X | |
| Bache, Deanna G. and James Bache v. Maria E. Tarafa and Bellsouth Telecommunications, Inc. | Palm Beach County, FL | CL 00-3848 AG | X | |
| Bankens, Cassandra v. Hartford Fire Insurance Company | Lake Charles, LA | CV-00-1239 | X | |
| Barfield, M.D., Richard D. v. Columbia/HCA Healthcare Corp. | Palm Beach County, FL | CL-99-6508 AH | X | |
| Barry, Rachel v. Miami Dade County | Miami, FL | 00 4739 | | X |
| Bartolini, John v. Royal Palm Polo Sports Club, Inc. | Palm Beach County, FL | 98-006313-AF | X | |
| Bazinet, Lynn v. John D. Rumbough | Palm Beach County, FL | CL 99-7508 AE | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Becker, Joanna v. Janice Rapfogel | Broward County, FL | CA CE 99-0376 07 | X | |
| Bell, Susan B. as personal representative of the estate of Lyle J. Bell v. Michael Schauber, M.D., et al | Polk County, FL | 53-2001 CA 004680-0000-00 | X | |
| Bellot, Brandon v. DP Amoco Corporation and Diamond Offshore Drilling, Inc. | Houston Division, TX | G-01-212 | X | |
| Bennett, Nancy v. Alec C. Fulford | Polk County, FL | G 99-1789 Section 4 | X | |
| Benton, Nancy, et al v. Ford Motor Company, et al | Dayton, OH | C-3-02-61 | X | |
| Bernard, Norman v. General Security Property and Casualty Company | Lafayette, LA | 85521 17th Jurisdiction | | X |
| Best, Cindy v. Michael Cushman, et al. | Palm Beach County, FL | CL 98-007980 AO | X | |
| Birkelbach, Craig and Robin Birkelbach v. George Camacho, M.D., et al | Duval County, FL | 01-07781-CA | X | |
| Blanchette, Priscilla as Personal Representative of the Estate of Jack Blanchette v. Solavner and Betty Kessler-Avner | Palm Beach County, FL | CA 02-11443-AO | X | |
| Bobo, Rebecca as mother and next friend of Brian Christopher Bobo v. Steven Spanioli and Albert Spanioli | Indian River County, FL | 99-0035 CA-10 | X | |
| Bogalusa Chemical Release v. Robert Pittman | Hinds County, MS | 25196493 | | X |
| Bogan, David and Barbara Bogan v. Parrish Allen Harris | St. Lucie County, FL | 02-CA-000281 (AN) | X | |
| Bogan, Floyd and Alise Bogan v. Commerce Commercial Joint Venture | Broward County, FL | 01-4889 (08) | X | |
| Bonuchi, Kathy and Gail Renshaw Perkins v. Sea Tech Construction, Inc., et al | Broward County, FL | 02-012638 (18) | X | |
| Bowman, Felicia v. Darby Goodwin, Enterprise Leasing Company | St. Lucie County, FL | 03-CA-000535 (AN) | X | |
| Bowman, Terry L. and Bowman, Thomas J. v. Jose Rivera and State Farm Mutual Automobile Insurance Company | Broward County, FL | 03-05709 (07) | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Brackett, Neil K. v. Palm Beach Auto Imports, Inc. | Palm Beach County, FL | CA-01-08191-AI | X | |
| Bradshaw, Colleen and Michael v. TR Industries, Inc., et al. | Palm Beach County, FL | CL 99-3403 AO | | X |
| Brand, Jennifer v. Amelia O'Malley | Palm Beach County, FL | CL-01-4954 AN | X | |
| Brant, James W.  v. Dollar Rent-a-Car Systems, Inc. | Broward County, FL | 99-005811 (13) | X | X |
| Bray, Brandon T., as Personal Representative of the Estate of Amy O. Bray v. Barbara L. Cruikshank, M.D. | Duvall County, FL | 01-6103-CA | X | |
| Breen, Cyril and Breen, Marcia v. Enterprise Leasing Company of Orlando | Brevard County, FL | 05-2003-CA-039595 | X | |
| Bronner, Jeanmarie and Neal, v. Beall's Outlet Stores, Inc. | St John's County, FL | CA 98-2065 | X | |
| Brooks, Ralph v. Dollar Rent-a-Car Systems, Inc. | Broward County, FL | 00-007025 18 CA CE | X | |
| Broughton, James and Ruth Broughton v. Lloyd Zucker, M.D. | Palm Beach County, FL | 98-007382 AO | X | |
| Brown, Colleen Cameron v. South Broward Hospital District | Broward County, FL | 99-003543 CA CE 02 | X | |
| Brown-Ervolino, Rita v. Jungle Queen, Inc. | Broward County, FL | 01-001731 (13) | | X |
| Brown, Pamela K.  v. Douglas W. David | Broward County, FL | 98-15018-05 | X | |
| Brown, Olive Mae, as personal representative of the estate of Vincent Brown v. St. Mary's Hospital, Inc., et al | Palm Beach County, FL | CA 02 005348 AO | X | |
| Brown, Richard v. Kozlows, Inc. | Palm Beach County, FL | CL-01-1642-AO | | X |
| Buckstein, Christopher v. United Services Automobile Association | Palm Beach County, FL | CA-01-7274-AH | | X |
| Bueno, Ismal v. Budget Rent-a-Car Systems, Inc. | Miami, FL | 99-1802 | X | |
| Bulla, Virginia v. Nationwide Property and Casualty Insurance Company | Palm Beach County, FL | CA 02-03733 AI | | X |
| Bunch, Charles and Jane Bunch v. Jorge Parrado, et al | Palm Beach County, FL | 01-15755 (09) | X | |
| Burke, Darryl v. FS Dairy Plant, Inc. | Dade County, FL | 99-8302 CA 10 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Bush, James H., et al v. Protestant Memorial Medical Center, Inc., et al | St. Clair County, IL | 01-L-665 | X | |
| Butler, Pierce and Stephanie Butler, individually and as natural guardians of next friends of Hughes Butler v. Sandhills Pediatric & Adolescent Clinic, P.A., et al | Charleston, CS | 01-CP-40-3719 | X | X |
| Cannatella, Ronald and Louise Cannatella v. West Boca Medical Center | Palm Beach County, FL | CA 01-10211 AI | X | |
| Capelli, Ann Marie as personal representative of Estate of Milos Coric v. Thomas John Barry | Palm Beach County, FL | CL-01-03289 AB | X | X |
| Cardenas, Monica as mother and natural guardian of Carlos W. Cardenas v. Belkys Bravo, M.D., et al | Dade County, FL | 01-30268 CA 21 | X | X |
| Carroll, Charles Patrick v. Lester E. Cox Medical Centers | Greene County, MO | 101 CC 3168 | X | |
| Carroll, Rebecca, as Personal Representative of the Estate of Ronald J. Carroll, et al v. North Florida Regional Medical Center, Inc. | Pinellas County, FL | 00-5427-CI-7 | X | |
| Carson, Roy v. Prudential Property and Casualty Insurance Company | Palm Beach County, FL | CL 99-6246 AN | X | X |
| Carter, Robert Wayne and Rita S. Carter v. Imperial-Savannah, LP, et al | Hendry County, FL | 2001-CA 644 | X | |
| Estate of Matthew Cassan v. Thomas Albert Dunford, et al. | Palm Beach County, FL | CL 99-2336 AO | X | X |
| Chaplic, Carey B.  v. Budget Rent-a-Car Systems, Inc. | Palm Beach County, FL | 98-002089 AJ | X | |
| Chaves, Maria and Jorge P. Chaves v. Leonard V. Perna and Asphalt Consultants, Inc. | Broward County, FL | 01-0080-31 (11) | X | |
| Chivari, Linda v. Okeechobee International d/b/a Angus Restaurant | Okeechobee County, FL | 2000-CA-114 | | X |
| Cho, Diane E. and Leonard Cho v. Douglas G. Johnson, OB d/b/a Eye Institute of West Florida | Pinellas County, FL | 01-9585-CI 021 | X | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Ciporkin, Lorry and Peter Ciporkin v. Nationwide Mutual Insurance Company, et al | Broward County, FL | 01-015104 (08) | X | |
| Cohen, Stanford v. Bernard Cohen | Broward County, FL | 00-0016784 (11) | | X |
| Comfort, M.D., Earl V.  v. R. Robert Eastridge, M.D. | Palm Beach County, FL | CL-99-2205-AD | X | |
| Cooper, Margaret v. Columbia/JFK Medical Center Limited Parnership, et al | Palm Beach County, FL | CL 00-5951 AA | X | |
| Costadura, Jr., Jose v. Enterprise Leasing Company, et al | Broward County, FL | 02007654 18 | X | |
| Coughanour, Frank W. v. Rapids Water Park, Inc. | Palm Beach County, FL | CA-02-1467 AH | X | |
| Covert, M.D., Michael James v. South Florida Stadium Corp. | Dade County, FL | 98-07049 CA 04 | X | |
| Crout, John v. Nova Southeatern University, Inc. | Broward County, FL | 99-20398 (25) | X | |
| Crowley, Neris as Personal Representative of the Estate of Walter William Crowley v. George D. Luna, D.O. | Broward County, FL | 01-22634 02 | X | |
| Cruz, Marlene v. Simon DeBartolo Group, L.P. d/b/a Palm Beach Mall, Inc. | Palm Beach County, FL | 98-010211 AE | X | |
| Culleton, Alaina M. v. Bridgestone/Firestone, Inc. | Duvall County, FL | 2000-04634-CA | | X |
| Curran, Belinda v. William Watford and Bobby Pendergrass | St. Lucie County, FL | 03-CA-000361 (AN) | X | |
| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
| Custer, Harry and Georgetta Custer v. Duffy's Draft House, Inc. | Palm Beach County, FL | CL 00-7715 AG | X | |
| Daigle, Susan v. Walter Basen | Broward County, FL | 01008186008 | X | |
| Dangerfield, Kathaleen, et al v. Overland Park Regional Medical Center, Inc. | Johnson County, KA | 02CV00206 | X | |
| Decaria, Frank v. Ryder Truck Rental, et al. | Sarasota County, FL | 98-6226 CA 01 | X | |
| Deopersaud, Sisnarine v. Edward Don & Company | Fort Lauderdale, FL | 00-7751-CIV-Ferguson | X | |
| Destefano, Douglas S. v. Charles Bruce Jones, as personal representative of the Estate of Hermine D. Till | Palm Beach County, FL | CL-01382 AD | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| DeThomas, Louis | Palm Beach County, FL | PI9900388 | | X |
| DiBartolo, Frank A. and DiBartolo, Antoinette v. C & C Concrete Pumping, Inc. | Palm Beach County, FL | CA 02-02962 AH Consolidated with CA 02-02964 AH | X | |
| Djuric, Miodrag v. Florida Carrier, Inc. and Albo Gonzalez | Palm Beach County, FL | CL-0101719 AO | | X |
| Dobbins, Jr., Charles F. and Charles F. Dobbins, Sr. v. Poma Corporation | Palm Beach County, FL | CL 00-12751 AG | X | |
| Donckers v. Zindrick | Cook County, IL | 00 L 4149 | | X |
| Dorfman, Philip M. v. Bethesda Memorial Hospital, Inc. | Palm Beach County, FL | CL-00-9001 AN | X | |
| Duplechin, Debra v. Redman Homes, Inc. | Lake Charles, LA | CV 98-0457 L-0 | | X |
| Durango, Luis (Estate of) Yemi Durango as Personal Representative v. Edward C. Mease, M.D. | Broward County, FL | 01-013531 (14) | X | |
| Earle, Deborah v. William R. Pearson | Autauga County, AL | CV 01-171-B | X | |
| Eberhardt, Sieni, as personal representative of the estate of Donald Albert Eberhardt, Jr. v. Raul Sosa, et al | Palm Beach County, FL | CA 01-12479 AB | X | |
| Edwards v. Eaton Construction Co., et al. | Orange County, FL | C186-12346 | | |
| Emerson, John B. and Mildred Emerson v. Florida Health Care Plan, Inc., et al | Flagler County, FL | 99-384 CA | X | |
| Emerson, Richard v. State Farm Mutual Automobile Insurance Company | Highlands County, FL | GC 98-283 | X | |
| EMT Medical Services, Inc. v. Visa Health Plan, Inc. | Palm Beach County, FL | 01-22489 CA CE 18 | X | |
| Endacott, Robert v. International Hospitality, Inc. | Miami-Dade County, FL | 01-05921 CA 20 | X | |
| Epstein, Mitchell J. and Karen Epstein, et al v. Toys-R-Us Delaware, Inc., et al | Miami, FL | 02-60057-CIV-GRAHAM/Turnoff | X | |
| Eskridge, Ulysses v. Minto Developments, Inc. | Broward County, FL | 00-5289 (18) | X | |
| Esperante-Celidor, Marie as Personal Representative of the Estate of Elina Celidor v. Dixie Right and Luis Fernando Cosme | Palm Beach County, FL | CA 02-3845 AO | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Esposito, Daniel v. Weeks Marine, Inc. | Dade County, FL | 98-14874-CA 02 | X | |
| Esposito, Jean and Andrew Esposito v. HCA Health Services of Florida, Inc. | St. Lucie County, FL | 99-CA-001535 | X | |
| Fein, Lisa M. v. Glenn D. Meyers, M.D. | Broward County, FL | 00-008296 CA CE 08 | X | |
| Fennell, Lillian C., individually and as Personal Representative of the Estate of Ronald Dean Fennell, Jr., v. Intracoastal Health Systems, Inc. | Palm Beach County, FL | 02-10801 AA | X | |
| Fisher, Jacqueline v. Neil Boland, M.D. | Martin County, FL | 99-451 CA | X | |
| Fischer, John v. Irwin Gluck | St. Lucie County, FL | 01 CA 006374 | X | |
| Fox, Gary v. Weezer Electric Company, Inc. | Broward County, FL | 99-16874 CA CE 21 | X | |
| Francis, Marla v. Norwegian Cruiseline, Ltd. | Miami-Dade County, FL | 02-17999 CA 22 | X | |
| Franklin, Diamond v. Health Midwest Develpoment Group, et al. | Jackson County, MO | 98-CV-18511 | X | |
| Frazier, Michelle F. v. Wesch, Stacey | Broward County, FL | CACE 02-03007 (03) | X | |
| Frietas, Laura v. General Claim, Inc. | Palm Beach County, FL | CL-00-1078-AH | X | |
| Gallart, Jr., Wilfred v. Stryker Electrical Contracting, Inc. | Palm Beach County, FL | 01-9291-AH | X | |
| Gans, Richard and Gans, Joanne v. Baptist Hospital of Miami, Inc. | Miami-Dade County, FL | 00-9992-CA 13 | X | |
| Garcia, Norma v. Kelly – Springfield Tire Company | Tampa, FL | 99-1611-CIV-T-17B | X | |
| Garcia, Wifredo v. Dept. of Corrections, State of FL | | | X | |
| Garjian, Pamela v. Alamo Rent-a-Car, Inc. | Miami-Dade County, FL | 99-14208 CA (06) 98-375 CA 04 | X | |
| Gerish, Olive T. v. Donald A. Davis | Palm Beach County, FL | CA-021779 AI | X | |
| Gilmore, Thomas, a minor by and through his natural parents, Andrew M. Gilmore and Lisa D. Gilmore v. Catherine M. Salazar, M.D. | Fulton County, GA | 99-VS 0151757 | X | |
| Goble, Albert and Jean Goble v. Mark E. Frohman | Hillsborough County, FL | 00-4075 | X | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Goldberg, Debra, et al. v. State Farm Mutual Automobile Insurance Co. | Palm Beach County, FL | CL 98-1878 AN | X | |
| Golden, Ed v. City of Miami | Dade County, FL | 99-14530 CA (27) | X | |
| Golden, Phyllis v. Phudendra K. Gupta, M.D. | Hillsborough County, FL | 98-8281 | X | |
| Gomez, Dulce Gonzalez v. Jeffrey Scott Marshall | Dade County, FL | 01-1403 CA 22 | X | |
| Gonzales, Margie v. Stephen W. Yates | Broward County, FL | 98-200010 (04) | X | |
| Gonzalez, Adolfo v. Ventaer Morejon, an individual, and Fedex Ground Package System, Inc. | Dade County, FL | 01-07187 CA 32 | X | |
| Gonzalez, Ivan and Gonzalez, Myrna v. Brown Blowmolding Service, Inc. | Dade County, FL | 01-01332-CA 25 | X | |
| Gonzalez, Judith M. v. Lifemark Hospital of Florida, Inc. | Miami-Dade County, FL | 02-11454 CA 02 | X | |
| Goodman, Joseph v. The Pep Boys Manny and Moe and Jack, Inc. | Broward County, FL | 98-03081 CA CE 12 | X | |
| Graham, James Reid v. Private Care, Inc. | Palm Beach County, FL | CL-006710 AE | X | |
| Grasso, Pamela v. Juanita S. Carmichael | Palm Beach County, FL | CL 99-183 AI | X | |
| Graves-Brooks, Grenita, individually and as the personal representative of the Estate of Ashante Brooks, deceased, et al v. Wuesthoff Memorial Hospital, Inc., et al | Palm Beach County, FL | 02-4267MA | X | |
| Greco, Vincent v. Alltstate Insurance Company | | CL-01-2223-AF | | X |
| Greer, Kejuana, et al v. Barnes-Jewish Hospital and Washington University | St. Louis, MO | 992-07830 | X | |
| Gregory, Thomas v. Arizona Pipeline Company, City of Newport Beach | Woodland Hills, CA | 02 CC 0295 | | X |
| Gressman, Carl H. v. Capak, Inc. | St. Lucie County, FL | 00-CA-001384 (PL) | X | |
| Grunow, Pamela as p.r., Estate of Grunow, Barry v. Valor Corporation of Florida | Palm Beach County, FL | 00-9657-AB | X | X |
| Guarino, William v. Winn-Dixie Stores, Inc. | Palm Beach County, FL | CL 99-2465 AD | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Guillory, Greg individually and as administrator of the estate of his minor daughter, Aniqua Guillory v. Travelers Insurance Company, et al | Calcasieu Parish, LA | 2001-2446-B | X | X |
| Guitierrez, Victor v. Jeffrey S. Schottland, M.D. | Palm Beach County, FL | CL-00-4925 AF | | X |
| Hagin, Doris v. Paulo Roberto Nacarato | Palm Beach County, FL | CL 00-8223 AA | X | |
| Hannin, Theresa, et al. v. Jeffery Fowler, et al. | Palm Beach County, FL | CL 99-6466 AG | X | |
| Harris, Phyllis and Harris, Edward v. Gary Gale and Nancy Gale | Palm Beach County, FL | CL-99-2677 AH | X | |
| Harris, Renee v. Evans Delmas | Palm Beach County, FL | CL 006912 AH | | X |
| Harris, Trevalis and Harris, Lydia v. Enterprise Leasing Company | Palm Beach County, FL | CL 02-4250 AO | | X |
| Hayden, Leigh S. v. Brian Beaver, M.D. | Palm Beach County, FL | CL 00-9274 AI | X | |
| Hedrick, Dianne and Hedrick, Gary v. Paul R. Lieberman, M.D. | Palm Beach County, FL | CL 012867 AH | X | |
| Heller, Todd H. v. Miller, Michael Kirby, et al | Palm Beach County, FL | CA 02-01911 AG | X | |
| Helm, Margaret B.  v. Martin County | Martin County, FL | 99-790 ZA | X | |
| Henderson, William G. and Henderson, Barbara v. Richard M. Luceri, M.D. | Broward County, FL | 02-021486 (12) | X | |
| Heran, Ginger v. Gary H. Cross | Palm Beach County, FL | CL-007159 AF | | X |
| Hestekin, Ricky and Sharon T. Hestikin v. Jax Port Express, Inc. | Duval County, FL | 01-05278 CA | X | |
| Hettinger, III, Edward P. v. American Hospitality Management Company of Minnesota | Palm Beach County, FL | CL 0010434 AG | | X |
| Hock, Rand v. TLC, The Laser Center, Inc. | Palm Beach County, FL | CL 00-12280 AO | X | |
| Hoecherl, Robert and Hoecherl, Raymond v. Jason H. Frost, D.O. | Broward County, FL | 99 020766 18 | X | |
| Hoggro, Sergio D.  v. Rinker Materials Corporation | Broward County, FL | 99-01873 | X | |
| Holloway, Pauline v. Shands Jacksonville Medical Center, Inc. | Duval County, FL | 00-04355CA CV-C | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Houghtaling, Denise v. Publix Supermarkets, Inc. | Broward County, FL | 98-16435 CA CE (14) | X | |
| Howell, Max E.  v. Walgreen Company | Palm Beach County, FL | CL 99-1227 AB | X | |
| Hudson, Cindy v. Reigel | Suwannee County, FL | 98-174-CA | X | |
| Hughes, Marjorie W., as Personal Representative of the Estate of Oramel J. Hughes v. Philip Levitt, M.D. | Palm Beach County, FL | 99-8072 AA | X | |
| Human, Tracey Anthony v. City of Cocoa Florida | Orlando, FL | 99-311-CIV-ORL-18A | X | |
| Hunt, Terrance, a minor by and through Corene Wright, et al v. Bernice Volz | Broward County, FL | 0120095 CACE 18 | X | |
| Imperatore, Sandra and Imperatore, George v. Royal and Sun Alliance Personal Insurance Company | Palm Beach County, FL | CA 01-9003 (AG) | X | X |
| Inman, Loral v. Michael Paul, M.D. | St. Lucie County, FL | 00-CA-000871 (MP) | X | |
| Irvins, James v. Adam J. Greenberg | Martin County, FL | 98-943 CA | | X |
| Jack, Jeannette Sisk v. Fitzandies D. Forbes | Hendry County, FL | 2000-CA-321 | X | |
| Jackson, Gloria as personal representative of the Estate of Ronald Jackson v. Triple M Roofing Corporation | Broward County, FL | 01-12341-CACE-13 | X | |
| Jackson, Hattie et al v. The Connecticut Indemnity Company, et al | Parish of Richland, LA | 36,132 C | X | |
| Jacobs, Linda and Jay Jacobs v. Niki Kurnitsky | Palm Beach County, FL | CA-01-10634-AG | X | X |
| James, Cassilda and Herbert Gorochovsky v. Thomas J. Frasor, Jr., et al | Broward County, FL | 00000279 (05) | X | X |
| Jameson, David Michael v. Beverly Stacy | Polk County, FL | G 98-3310 | X | |
| Janik, Teresa v. William Dorfman | Palm Beach County, FL | CL-00-1990-AO | | X |
| Japp, Diane v. Froedtert Memorial Lutheran Hospital, Inc., et al | Milwaukee, WI | 00-CV-008345 | X | |
| Jean, Marie Alberte, et al. v. Hoyt C. Murphy, Inc. Realtors, et al. | St Lucie County, FL | 99-213 CA 11 | | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Jean, Samantha, a minor by and through Willermise Wroy Jean v. Intracoastal Health Systems, Inc. | Palm Beach County, FL | CA 02-8570 AE | X | |
| Jefferson, Mickey as Personal Representative of the Estate of Bernetta Jefferson v. Carol A. Murphy, M.D. | Miami-Dade County, FL | 98-1404-CA-01 (20) | X | |
| Joffe, Alexis C. v. North Florida Regional Medical Center | Alachua County, FL | 01-00-CA-3275 | X | |
| Johnson, Audley v. Michael S. Latterman, D.O., et al. | Miami-Dade County, FL | 16780 CA 10 | X | |
| Johnson, Claudia v. Alamo Rent-a-Car, LLC | Palm Beach County, FL | CL-99-6397 AB | | X |
| Jolivette, Rodger v. Walgreen Co., et al. | Harris County, TX | 1999-22890 | X | |
| Johnson, George R. as guardian for Estate of Jennifer K. Johnson v. Louis A. Weiss Memorial Hospital, et al | Chicago, IL | 36891 | X | |
| Johnson, Karen M. individually and as personal representative of the estate of Donald P. Johnson v. William G. Stanton, M.D., et al | Palm Beach County, FL | CL 00-7558 AG | | X |
| Johnson, Robert Paul and Johnson, Sylvia Selena v. Koehring Cranes, Inc. | Jacksonville District, FL | 3:00-CV-959-J-20 MCR | X | |
| Jones, Dr. Colleen v. District Hospital Partners, LP | District of Columbia | 00 CA 007052 | X | |
| Jones, Daniel v. John A. Ruth | Palm Beach County, FL | CL-98-003149 | X | |
| Jones, Edward C. and Debra Jones v. Double D Properties, Inc., et al | Palm Beach County, FL | CL-00-9354 AI | | X |
| Jones, Josiah Nathaniel Douglas v. Howard Steven Schwartz | Brevard County, FL | 98-04783-CA-T | X | |
| Jones, Michelle v. Miami Lincoln Mercury, Inc., et al. | Miami-Dade County, FL | 99-24470 CA 32 | X | |
| Jones, Odella, v. Cyril Christian, M.D., et al. | Broward County, FL | 98-05754 (18) | X | |
| Jones, Robert Dane v. Hess Oil Virgin Islands Corp. and United Dominion Construction, Inc. | St. Croix, U.S.V.I. | 686/1993 | | X |
| Joseph, Esther Charles and Richardson Joseph v. Mid-South Painting, Inc. | Broward County, FL | 01-07646 CA CE 18 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Justice, Ronald and Patricia Justice v. Philip Klein | Palm Beach County, FL | CL-01-01580 AG | X | |
| Kaley, Douglas as Personal Representative of the Estate of Jacqueline Kaley v. University Hospital, Ltd. d/b/a University Hospital and Medical Center | Broward County, FL | 02-20173 (07) | X | |
| Kazanjian, II, John S. v. Donald Masters | Palm Beach County, FL | CL 00-11861 AG | | X |
| Kay, Carole and Stanley Kay v. Kathleen Ann Livanec | Palm Beach County, FL | CL 00-00421 AD | X | X |
| Keating, Daniel v. Pioneer Engineering Corporation, et al | Hillsborough County, FL | 00 02994 | X | |
| Keeler, Ronald v. Correctional Physician Services, Inc. | Martin County, FL | 00-603 CA | X | |
| Kelly, Baverlee v. Bellsouth Telecommunicatios, Inc., et al. | Palm Beach County, FL | CL 99-00381 AH | X | |
| Keyes, Raymond and Wanda Keyes v. Smith and Company, Inc. | Broward County, FL | 00-10212 (18) | X | |
| Kibodeaux, Barbara Linda v. The Estate of Douglas Breaux, et al | Calcasieu Parish Courthouse, LA | 2001-1866-G | | X |
| King, Regina and William Tucker, M.D. v. Jupiter Medical Center, Inc. | Palm Beach County, FL | CL 00-8746 AJ | X | |
| Knight, Gale v. Mary L. Sparkes, M.D. | Chatham County, GA | I 98-1357-F | X | |
| Koenig, David v. Mary Taylor | Palm Beach County, FL | CL-01-7355 AG | X | |
| Koritzky, Leah v. Life Health Benefits Agency, Inc. | Palm Beach County, FL | CA 01-09856 AE | X | |
| Kosky, Donald v. Elliott A. Stein, M.D. | Dade County, FL | 99-10643 CA 25 | X | |
| Krowka, Linda and Mark Krowka v. George Lozano and Florida Intranet Group, Inc. | Broward County, FL | 00-010048 (18) CA CE | X | |
| Jennings, Suzanne v. Parkland Health Center | St. Louis, MO | 012-887 | | X |
| L'Esperance, Francoise & Florent v. State Farm Automobile Insurance Co., et al. | Palm Beach County, FL | 9302419CA00101-05 | | |
| LaClaustra, Maribell v. Virgil Pfaff and Richard John Pfaff | Palm Beach County, FL | 02-00145 AJ | X | |
| Lander, Rodrick v. Mitsubishi Motor Manufacturing of America, Inc. | New Orleans, LA | C 98-375 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Lanfier, Thomas and Julie B. Lanfier v. Long's Air Conditioning, Inc. | Highlands County, FL | GC 01-196 | X | X |
| Lang, Denise v. Dana Olson | Palm Beach County, FL | CA 01-118445 AA | | X |
| Larsen, Wilheim v. Curtis Lee George, Jr., et al | Palm Beach County, FL | CL-99-2516 AB | | X |
| Lauer, Dawn v. St John's Medical Center | St Louis County, MO | 98CC-4361 | X | |
| Lavrack, Kevin and Laura Lavrack v. Pedro E. Lopez, et al | Lee County, FL | 01-3910 CA-JSC | | X |
| Lawson, Kevin, individually and on behalf of Dillon Lawson and Kelli Lawson v. Mitsubishi Motor Sales of America, Inc. | Parish of Calcasieu, LA | 99-3876 | X | |
| Leavesley, James v. R & J Crane Service, Inc. | St. Lucie County, FL | 99-107 CA 10 | X | |
| Lee, Doric Asquit v. Cresswell A. Scott | Broward County, FL | 99-018112 | X | |
| Leefatt, Headley v. Stephen Lee Turner | Broward County, FL | 0000887314 | X | |
| Leffler, Carole A. and Paul Leffler v. Ronald Stengel | Palm Beach County, FL | CL 00-1819 AF | X | |
| Leon, Rory v. Florida Power and Light Company | Miami, Dade County, FL | 99-13108-CA 06 | X | |
| Lewis, John v. State Farm Mutual Automobile Insurance | Palm Beach County, FL | CL 99-04074 AF | X | |
| Liebman, Michael and Karen Liebman v. Scott J. Seidner, M.D. | Palm Beach County, FL | 01-04111 AB | X | X |
| Lieberman, Hyman and Anna Marie Lieberman v. BFI Waste Systems of North America, Inc. | Dade County, FL | 00-28613 CA 24 | X | |
| Little, Latasha v. Potamkin Toyota, Inc. | Dade County, FL | 98-18535 CA 22 | X | |
| Little, Randy v. CSR America, Inc. | Collier County, FL | 99-3744 CA | | X |
| Llorens, Jorge M. v. Robert Comperatore, M.D., et al. | Miami-Dade County, FL | 98-16105 CA 25 | X | |
| Lomeli, Maura and Jose Lomeli v. Kenneth B. Seifert, M.D., et al | Collier County, FL | 02-1216 CA | X | |
| Loomis, Timothy G. v. Thomas A. Molina | Palm Beach County, FL | CL-011214 AI | X | |
| Lorello, Robert L. v. Paul C. Schmitt | Palm Beach County, FL | CL-99-0132 AH | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Louis, Mirackson and Louis, Marie v. Pradhavathi K. Vilaram, M.D. and Garden Family Practice, P.A. | Palm Beach County, FL | CA 02-03170 AJ | X | |
| Louissaint, Andree Marquis v. Enterprise Leasing Comp. et al. | | | | |
| Lucas, Dawn as Personal Representative of the Estate of Robert Lucas v. Punta Gorda HMA | Charlotte County, FL | 03-3672 CA | X | |
| Luchinger, Laurie v. Automobile Club Insurance Company | Palm Beach County, FL | 98-009738 AF | X | |
| Lynch, James J., et al v. Alan B. Kravitz, M.D., et al | Montgomery County, MD | 238846-V | X | |
| Macfarland, Donna v. William Jacobs, et al | St. Lucie County, FL | 01-CA-000921 (AN) | X | |
| Machanic, Olga R. v. North Dade Medical Foundation, Inc. | Dade County, FL | 98-375 CA 04 | X | |
| MacNeil, Mary E. and MacNeil, John L. v. State Farm Mutual Automobile Insurance Co. | Duval County, FL | 01-02568-CA | X | |
| Magson, Jennifer v. Comprehensive Leg Treatment, Inc. | Palm Beach County, FL | 01-02703 AF | X | |
| Maksad, Ali v. Stewart M. Kaskel, M.D. | Palm Beach County, FL | 98-02300 AD | X | |
| Manzo, Louis and Melinda Joann Manzo v. Robert John Mendenhall | Broward County, FL | 01-13026 (21) | X | |
| Martinez, Jr., Angel and Laurie Hope Martinez v. Roger James Huzgins, M.D. | Atlanta, GA | 100-CV-3326 | | X |
| Martinez, Raquel v. Daisy Rivero, et al. | Dade County, FL | 99-274470-CA-01 | | X |
| Massey, John C. and Massey, Christine v. Joseph C. Hildner, M.D. | Marion County, FL | 02-1966-CA-G | X | |
| Mathis, Karla v. Four Florida Shopping Center Properties, Ltd. | Palm Beach County, FL | 98-2853 AJ | X | |
| Mayreis, Begonia as Personal Representative of the Estate of Michael R. Mayreis v. Holy Cross Hospital, Inc. | Broward County, FL | 01-013633 (07) | X | |
| McCloud, Arthur Lee v. My Doctor, P.A. | Palm Beach County, FL | CL-00-4218 AF | | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| McCurdy, Howard v. Holy Cross Hospital, Inc. | Broward County, FL | 97-07936 (5) | X | |
| McGlon, David C. v. Martin Memorial Health Systems, Inc. | St. Lucie County, FL | 01-CA 000787 (ON) | X | |
| McGrew, Bessie v. Enterprise Leasing Company | Palm Beach County, FL | CL-99-5475 AD | X | |
| McIntosh, Beverly and Sammy R. McIntosh v. John D. Okun, M.D. | Hillsborough County, FL | 01-003570 | X | X |
| McKeithan, Davion a minor, by and through his parents and natural guardians, Nelson McKeithan and Delores McKeithan v. HCA Health Services of Florida, Inc. | St. Lucie County, FL | 01-CA-001091 (ON) | X | X |
| McNeil, Arthur and Evelyn McNeil v. The Hertz Corporation, et al | Broward County, FL | 01-7889 (25) | | X |
| McVay, Jr., Donald Glynn v. BL Smith General Contractors, Inc. | Polk County, FL | 2001-2158 | X | |
| Mechanic, Olgar v. North Dade Medical Foundation, Inc. | Dade County, Florida | CL 00-7676 AE | X | X |
| Meeks, Linda as personal representative of Estate of Herbert J. Meeks v. Florida Power and Light Company | St. Johns County, FL | CA 98-2122 Div 55 | X | |
| Mejia, Osvaldo v. Manheim Auctions, et al ~ Consolidated with Carloe Johnson v. Manheim Auctions, et al ~ Consolidated with Delmy Antonia Caballero v. Daniel Wayne Webb, et al | Miami-Dade County, FL | 01-25176 CA 24 01-30477 CA 21 01-18808 CA 21 | X | |
| Melsom, Robert, as personal representative of the estate of Barbara Melsom v. Karen Bay Reed, M.D., et al | Lee County, FL | 02-2924-CA LG | X | |
| Metzler, Jeanne v. DSI Transport, Inc. | Hillsborough County, FL | 96-08336 Div. I | X | |
| Meyerin, Jessika as parent and natural guardian of minor, Joshua Curcio v. John Landry, et al | St. Lucie County, FL | 01-CA-000403 (ON) | X | |
| Miller, Clint v. Sonat Exploration Co., et al. | Harris County, TX | | | X |
| Miller, Leroy v. Landstar Inway, Inc. | Duval County, FL | 99-06599-CA CV-A | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Miller, Merle v. Mary Sandra Gore | Broward County, IL | 02-000903 CACE 11 | X | |
| Miller, Samuel E. v. Carrie M. Teach | Brevard County, FL | 05-2002-CA-008566 | X | |
| Minnear, Norval v. Hector Inglesia | Palm Beach County, FL | CL-00-00132 AN | X | |
| Mitchell v. Drs. Bonnell and Medina | Palm Beach County, FL | 941-0043061 | X | |
| Molina, David v. American Architectural Waterproofing and Consulting, Inc. | Dade County, FL | 98-29694 CA 22 | X | |
| Montenegro, Mercedes v. U.S. Environmental Group, Inc. | Palm Beach County, FL | CL-0102599 AH | X | X |
| Morales, Roberto v. State Automobile Mutual Insurance Company | Palm Beach County, FL | CA 02-03004 | X | |
| Moreland, Charles v. Timothy Arquiette | Duval County, FL | 02-04483 CA | X | |
| Mooney, Kay v. John Mastalaski, M.D., et al | St. Lucie County, FL | 01- DA 000923 (MT) | X | |
| Morales, Carmen L. and Angel Morales v. Cooper Tire & Rubber Company, et al | Jacksonville, FL | 3:01-CV-01018-J-21-HTS | X | |
| Morgan, James and Linda Morgan v. Buena Vista Palace Corporation | Orange County, FL | CI 0-00-3934 | X | |
| Morone, Frank v. Anastasi Masonry Corp. | Palm Beach County, FL | CL 99-00042 AD | | X |
| Mosley, Jennifer v. Kristen Beeler, et al | Marion County, FL | 49D06-9802-CT-0232 | X | |
| Murillo, Michael and Sherise Murillo v. Avis Rent-a-Car Systems, Inc. | Dade County, FL | 00-18837-01 | X | |
| Musco, Vincent and Lisa Musco v. Liberty Mutual Fire Insurance Company | Palm Beach County, Florida | 99-14208 CA (06) | X | |
| Naini, Dr. Majid M. v. State of FL, et al. | Palm Beach County, FL | 98-5256 AH | X | |
| Natiello, Thomas v. Fred Chikovsky, et al. | Miami-Dade County, FL | 99-3724 CC 25 (02) | | X |
| Nation, Clinton v. Coral Bay Sales, Inc., et al | Broward County, FL | 99-3038 (08) | X | |
| Naylor, Jinelle v. Andrew Zorbis, M.D. | Brevard County, FL | 99-25401-CAM and 05-1999-CA-025401 | X | X |
| Neal, James v. Columbia/HCA Healthcare Corp., et al. | Broward County, FL | 99-018142 04 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Nehiley, Celia, as Personal Representative of the Estate of Leslie Nehiley v. Tenet St. Mary's, Inc. | Palm Beach County, FL | CA 02-13677 AJ | X | |
| Nehme, Naji v. Smith Kline Beecham Clinical Laboratories, Inc. | Orange County, FL | CI 099-7465 | X | |
| Nelson, David Scott v. Catherine Fleming Gullo and Stephen N. Gullo | Palm Beach County, FL | 03-00225 AG | X | |
| Nelson, Nancy v. U-Haul International, Inc. | Osceola County, FL | CI-010N93 | X | |
| Nepa, Gabriella and Carman Nepa v. Toys R Us-Delaware, Inc. | Palm Beach County, FL | CL-00-003123-AE | X | X |
| Nieves, Santos and Emily Nieves v. Hillsborough County Aviation Authority | Hillsborough County, FL | 2001-CA-712 | X | |
| Norder, Mark J. as personal representative of Donna Jo Norder v. United States of America, et al | Tampa, FL | 8:01-CV-851-T-24TGW | X | |
| Nodurft, Collee v. Servico Centre Associates, Ltd. | Palm Beach County, FL | CL-00232 AF | | X |
| Nowland, Jay R. v. R.E. Purcell Construction Company, Inc. | Hillsborough County, FL | 99-3362 Div. H | X | X |
| Nulty, Claudia v. American Home Products Corp. | Charlotte County, FL | 98-1140-CA | X | |
| O'Bryant, Xavier v. Norman S. Meldrum | Palm Beach County, FL | 98-005011 AE | X | |
| O'Connor, Andrea Monique and James K. O'Connor v. Barbara O'Brien | Palm Beach County, FL | CL-00-9959 AE | X | |
| O'Hara, Fran v. SCI Funeral Services of Florida, Inc. | Palm Beach County, FL | 32 160 00538 02 | X | |
| Olsen, Debra v. Columbia/HCA Healthcare Corp. | St. Lucie County, FL | 99-503-CA-01 | X | |
| O'Rawe, Cathleen v. Palm Beach Gardens Community Hospital, Inc. | Palm Beach County, FL | CL-00-2520 AE | X | |
| Orazi, Jan and Stephen Orazi, as natural guardians of James Orazi v. Martin Memorial Medical Center, Inc. | Martin County, FL | 00-902 CA | X | |
| Os, Haluk M. and Os, Ruzvan v. Cynthia Marie Wong and Gabriel Wong | Palm Beach County, FL | CA 01-12846 AN | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| O'Shea, Michelle v. SMC Hospital, Ltd. | Broward County, FL | 02-00097-4 (02) | X | |
| Ortega, Enrique v. Island Shipping Lines, Inc., et al | Dade County, FL | 99-15123-CA10 | X | |
| Ott, Jessica A. v. Maria Cieslak and Allstate Indemnity Company | Palm Beach County, FL | CA-01-6801-AI | X | |
| Owens, Robert v. South Florida Orthopedics, Inc., et al | Dade County, FL | 98-01329 CA 22 | X | |
| Padorr, Ruth v. Gradys Baxter Davis | Dade County, FL | 99-10489-CA (22) | X | X |
| Page, Anthony and Page, Donna v. FMC Corporation, Union Electric Company | St. Louis, MO | 022-00889 | X | |
| Palmer, Patricia Ann v. Erica Lynn Adache | Broward County, FL | 98-013879-08 | X | |
| Parker, Richard, a minor, by and through William T. Parker, Sr. v. Westbrooke Companies, Inc. | Broward County, FL | 0000876221 | X | |
| Parks, Chong v. Alamo Rent-a-Car, Inc. | Monroe County, FL | 98-20180 CA 10 | X | |
| Parlato, Jr., Lewis v. Shindaiwa, Inc. | Palm Beach County, FL | 02-80361-CIV-Hurley/Lynch | X | |
| Parra, Jose Antonio and Zenaida Parra v. Health Care and Retirement Corporation of America d/b/a Heartland Healthcare Center, Miami Lakes | Dade County, FL | 01-23492 CA 03 | X | |
| Parson, Doris v. Dennys, Inc. | Broward County, FL | 98-17173 (02) | | X |
| Pauley, Jimmy and Pauley, Linda v. Longwood Medical Center, Inc. | St. Lucie County, FL | 02-CA-001422 (MP) | X | |
| Pedron, Miguel, a minor, by and through his natural parents, Odalys Estupinan and Miguel Angel Padron v. Ramon Hechavarria, M.D. | Miami-Dade County, FL | 98-20407 (CA) 31 | X | |
| Pegram-Mills, Stephen and Susan Pegram-Mills v. Jupiter Medical Center, Inc., et al | Palm Beach County, FL | CA 01 09119 AB | X | |
| Pena, Edwardo v. State Automobile Mutual Insurance Company | Palm Beach County, FL | CL-01-009237 AE | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|-------|--------------|----------|------------|-----------------|
| Pepper, James F. and James L. Pepper v. Picerne Development Corporation of Florida | Palm Beach County, FL | CL-008009 AG | X | |
| Perez, Audencio v. Juan C. Morquez, et al | Palm Beach County, FL | CL 00-5055 AB | X | |
| Perez, Francisco v. Alamo Rent-a-Car, Inc. | Dade County, FL | 99-09251 CA (21) | X | |
| Peters, Randall D. v. General Motors Corporation | Jackson County, MO | 01-CV-205917 | X | X |
| Petranic, Michael v. White Consolidated Industry, Inc. | New Orleans, Louisiana | 054-0682 | | X |
| Pierce, Robert v. Almir Lopes | Broward County, FL | 98-011925-04 | X | |
| Podd, Stephen A. v. Nationwide Mutual Fire Insurance Company | Palm Beach County, FL | CL-01-0422 AG | X | |
| Pope, Betty J. v. Anthony DeMarco and Cross County Sandblasting | Broward County, FL | CA CE 01 14028 25 | X | |
| Pope, Stephen v. Federal Express Corporation | Palm Beach County, FL | CL 00-2416 AH | X | |
| Porter, Elena W. v. Joseph B. Greenspan | Palm Beach County, FL | CL-00-9041 AG | | X |
| Porter, Suzanne v. Cohen, Jayson, Foster, and Sheehan, P.A. | Hillsborough County, FL | 98-4813 Div. F | X | |
| Powell, Herman v. Custom Builders, Inc. | Broward County, FL | 99-015352 CA CE (07) | X | |
| Prather, David B. and Jodi D. Prather v. Susan Balfanz and Morton Roofing, Inc. | Brevard County, FL | 99-36652-CA-R/H Consolidated with 05-2000-CA 016451 | X | X |
| Prendergast, Monica v. Bayview Animal Clinic | Broward County, FL | 99-012977-07 | X | |
| Prichard. et al. v. Lewis | Broward County, FL | 9-020940  (01) | | |
| Ramos, Dawn v. Arrigo Enterprises, Inc. | Palm Beach County, FL | CL 98 6308 AO | | X |
| Ramos, Edith, individually and as personal representative of the Estate of Manuel Ramos v. Reliance Insurance Company, et al | Hillsborough County, FL | 99-002326 | X | X |
| Rapp, Shanna v. The Mark Apartment, Inc. | Brevard County, FL | 99-39433, CA-H | X | |
| Ray, Deborah v. Sears Logistic Services, Inc. | Palm Beach County, FL | CL 01-7857 AD | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Reese, Estate of Taquita, et al v. Tenet Health Systems Di-TPS, Inc. | St. Louis, MO | 012-08256 | X | |
| Register, JoAnn v. Cayman Manufacturing, Inc. | Palm Beach County, FL | CL-99-12369 AJ | X | |
| Reizburg, Annette v. Daniel Mandel | Palm Beach County, FL | CL-98-8466-AB | X | |
| Remite, James J.  v. Larry S. Buhrman | Palm Beach County, FL | 98-002034 AB | X | |
| Rennie, Lawrence M. and Deborah Rennie v. The Heil Company | Palm Beach County, FL | 99-3004 AA | X | |
| Restauri, Betty Jane v. State Farm Mutual Insurance Company | Broward County, FL | 99-005522 (09) | X | |
| Rich, David v. Better Roads, Inc. | Collier County, FL | 99-3932 CA | X | |
| Richey, Otis v. Georgia Pacific Corporation | Jacksonville, FL | 300-CV-93-J-20 A | X | |
| Ritch, William v. Safeway Steel Products, Inc. | Palm Beach County, FL | CL 99-3777 AB | X | |
| Riveroll, Jr., Alfonso and Alfonso Riveroll, Sr. v. Winterthur International Ltd., et al | Miami-Dade County, FL | 99-05842 CA 32 | X | |
| Rivers, Leslie, et al v. Willie Hill, et al | Sabine Parish, LA | 49-690 | X | |
| Rivers, Jr., Emory v. John J. Nevins | Hardee County, FL | CA 98-349 | X | |
| Roberts, Tammy, as personal representative of the estate of Christina Hernandez v. Bombardier Motor Corporation of America, et al | Palm Beach County, FL | CL 00-9617 AH | X | |
| Robinson, Jr., Carl, and Cynthia Robinson v. The Neiman Marcus Group, Inc. | Broward County, Florida | 98-1309-CA 17 | | X |
| Rodriguez, Jose v. Albert Towing, et al. | Palm Beach County, FL | CL 99-4583 AE | | |
| Rodriguez-Caicedo, Rosa M. v. Budget Rent-a-Car Systems, Inc. | Dade County, FL | 00-04366 CA 21 | X | |
| Rosenberg, Mildred v. | Palm Beach County, FL | CL 99-2222 AN | X | |
| Ross, Angela v. Steven Allen | Marion County, IN | 49D04-0005-CT000660 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|-------|--------------|----------|------------|------------------|
| Rothman, Michael v. Ylorcier Davilma, et al. | Broward County, FL | 98-015646 (18) | X | |
| Rowland, Julie and Steven Rowland v. Nellie S. Payne | Palm Beach County, FL | CA 01-13004 AG | | X |
| Ruiz, Santos Manual v. Anita L. Zambardi | Palm Bach County, FL | CL 99-9562 AH | | X |
| Ryan, Scott, et al v. Louisiana Farm Group Bureau Casualty Insurance Company, et al | Lafayette Parish, LA | J20005027 | X | |
| Saavedra, Blanca, as personal representative of the Estate of Juan Saavedra v. Public Health Trust of Miami-Dade County, Florida, et al | Miami-Dade County, FL | 01-28660 CA 09 | X | |
| Sallette, Kevin and Sallette, Teresa v. Tadd D. Hoskins and Frances Jesselli | St. Lucie County, FL | 01-CA-0000948 AN | X | |
| Salmon, Jr., Fred D.  v. Rollins Leasing Corp. | Palm Beach County, FL | CL 99-7822 AB | X | |
| Sanchez, Rogelio v. Corporate Express of Florida, Inc. | Broward County, FL | 00021504 | X | |
| Sandoval, Anabel and Jose Sandoval v. Olga Maddy, et al | Dade County, FL | 01-304 22 CA (09) | X | |
| Sands, Basil and Pamela Sands v. Amos W. Stoll, M.D. | Broward County, FL | 99-07752 (25) | X | |
| Santana, Felipe v. Blue Ribbon Meat, Inc. | United States Southern District of Florida | 02-21089-CIV-King/O'Sullivan | X | |
| Saulk, Jacqueline v. City of Opa Locka | Dade County, FL | 01-05033 CA 13 | X | |
| Sauter, Laurette v. K-Mart Corp., et al. | Palm Beach County, FL | CL 98-008025 AI 95-011113 (12) | X | |
| Savoy, Patricia as guardian of Joan Savoy, et al v. William H. Heitman, M.D., et al | Palm Beach County, FL | CA 01 8379 AN | | X |
| Schessler, Stephen Warren v. Clarence Peter Scott | Collier County, FL | 02-1220-CA | X | |
| Schmaltz, James v. TDP Inc. | Palm Beach County, FL | 98-3132 AF | | X |
| Schoolsky, Samuel S., et al v. John M. Harrison | Parish of Calcasieu, LA | 2000-3604 | | X |
| Schwartz, Jeff v. All Sands Trucking, Inc. | Palm Beach County, FL | CA-03-0986 AA | X | |
| Scott, Brian K. and Scott, Deborah C. v. Karl T. Browning and Jeffrey Bryant Bullard | Polk County, FL | 02-CA 002967 | X | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|-------|-------------|----------|------------|-----------------|
| Seehoff, Sr., Jeffrey A. v. South County Mental Health and Womesh C. Sahadeo, M.D. | State of Florida, Division of Administrative Hearings | 02-1394 MA | X | |
| Serrano, Donna v. Dollar Rent-a-Car Systems, et al | Dade County, FL | 02-15052 CA 10 | X | |
| Shane, Stephen and Misty Shane v. Liberty Mutual Insurance Company | Palm Beach County, FL | CA-01-10297 AH | X | |
| Shefter, Lawrence v. Jupiter Medical Center, Inc. | Palm Beach County, FL | 99-0193 AG | X | |
| Shipp, Dawn and Bryan Shipp v. Maria Balen | Palm Beach County, FL | CA 01-7464-AN | X | X |
| Sholtz, Louis and Patricia v. Dynaelectric Company | Dade County, FL | 98-07788 CA 6 95-080 | X | X |
| Showers, Adaijah v. Southern Baptist Hospital of Florida, Inc., et al. | Duval County, FL | 99-05714 CA | X | |
| Shurte, Laura v. Big "D" Paving Company, Inc. | Palm Beach County, FL | 98-5778 AN | X | |
| Sic, Myra v. John Terry | Palm Beach County, FL | CL 00-00191 AN | X | |
| Siedentopf, Regina v. Progressive American Insurance Comp., et al. | Broward County, FL | 98-03610 (04) | X | |
| Silva, Carlos A. and Elizabeth Silva v. Cousins Club Corp. | Palm Beach County, FL | 98-001615 AI | X | X |
| Simmonds, Diane v. Sunshine Supermarket, Inc. | St. Croix, Virgin Islands | 703-1998 | X | |
| Simmons, Glenn v. Wiktor Neidzeidzki | Miami/Dade County, FL Palm Beach County, FL | 98-28817 CA (08) 01-307 | X | X |
| Singleton, Larry E. and Willie Singleton v. Enterprise Rent-a-Car Company | Palm Beach County, FL | CL 98-4715 AO | X | |
| Skolnik, Sandra and Ira Skolnik v. Varbaro J. Orta | Palm Beach County, FL | CL 99-12339 AO | X | |
| Slate, Eugene v. National Fire Insurance Company of Pittsburgh, PA, et al. | 33rd Judicial District Court, LA | | | X |
| Smith, Myrna, individually and as the Personal Representative of the Estate of Victor Ramos v. Captain Manny Fernandez, et al | United States District Courts, Southern District of Florida | 02-21951-CIV-Gold/Simoahon | X | |
| Smith, Terry v. Stephen B. Barry | St. Lucie County, FL | 01-CA-000415 (AN) | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Spencer, Larry and Spencer, Jean v. Barnabas C. Horvath, M.D. | Broward County, FL | 02-021722 (08) | X | |
| Spooner, Joan | Palm Beach County, FL | 16309-0001/LAM | | X |
| Spuck, Nancy A. v. Atlantic Palm Beach Ambulance | Palm Beach County, FL | CA-0105875 AI | X | |
| Steinberg, Cheryl v. Liberty Mutual Fire Insurance Company | Brevard County, FL | 98-8348 CA D | X | |
| Steinberg, Marc S. v. Liberty Mutual Fire Insurance Company | Brevard County, FL | 05-1999-CA 99-9614-CAV, consolidated with 05-1999-CA 046857 | X | X |
| Stephens, Beatrice, as Personal Guardian and Next of Kin of Otis Roosevelt Stephens v. Auto-Owners Insurance Company | Broward County, FL | CA CE 02-10549 (21) | | X |
| Stewart, Karin A. and Douglas Stewart v. Federal Express Corporation | Palm Beach County, FL | CL-00-11437 AJ | X | |
| Streigold, Mindy v. Nationwide Mutual Fire Insurance Company | Palm Beach County, FL | CL 00-8088 | X | |
| Stuhlert, Wolfgang A. v. Monsanto Company | Southern District of Florida | 01-1611-CIV-Ungargo-Venages | X | |
| Suker, David E. v. Colby Arthur Swanson | Palm Beach County, FL | CA 018094 AB | X | |
| Suntheimer, George and Delores Suntheimer v. The North Broward Hospital District, et al | Broward County, FL | 01-017879 (09) | X | |
| Tate, Sr., Anderson Lee v. Dorothy Magwood | St. Lucie County, Florida | CL 98-008025 AI | X | |
| Taylor, Christine v. John Patrick Young, Airport Rent-a-Car, Inc. | Broward County, FL | 00-04665 (4) | X | |
| Taylor, James v. Troy Thibodeaux, et al – Consolidated with Mancle R. Taylor v. Troy Thibodeaux, et al | Calcasieu Parish, LA | 2000-005027 Consolidated with 2000-005741 | | X |
| Teter, Christopher and Michelle Teter v. Duane A. Burge | Marion, IN | 49D06-0011-CT-001665 | | X |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Thacker, Jerry as guardian and natural parent of Gerica Thacker v. Harbin Clinic, P.A. d/b/a Harbin Clinic at Cartersville, et al | Fulton County, GA | 01-BS-021357F | X | |
| Thomas, Homer v. Subway Restaurants, Inc. and Richard Mark, Inc. | Broward County, FL | 98-009722 (18) Consolidated with 99-009659 (18) and 00-3284 (18) | X | X |
| Thomas, Lula Mae v. GGSK One, Inc. | Palm Beach County, FL | CL 99-11307 AB | X | |
| Thomas, Margaret v. WSUA Broadcasting Corporation | Broward County, FL | 99-21364-02 | X | |
| Thompkins, Peggy, individually and as mother and next friend of Christopher Thompkins v. Southeastern Silo Company, Inc. | Broward County, FL | 01-014262 (11) | X | |
| Thompson, Richard and Betty Jean v. Haynes Scaffolding & Supply, Inc. | Palm Beach County, FL | CL-00217 AB | | X |
| Teeters, Jason Robert v. Nationwide Mutual Fire Insurance Company | Palm Beach County, FL | TL 01-4219 AI | X | |
| Thompson, Richard and Betty Jean v. Haynes Scaffolding and Supply, Inc. | Palm Beach County, FL | CL-00-217-AB | X | |
| Tipton, Georgia and William Tipton v. Bob Rajcoomar, M.D. | Palm Beach County, FL | CL-00-8491 AB | X | |
| Tognacci, Barry and Carol Tognacci v. Atlas Environmental, Inc. | Palm Beach County, FL | CL-00-6680 AN | X | |
| Torrence, James v. Palm Beach County Health Care District | Palm Beach County, FL | CL-001619-AG | X | |
| Touchton, Gail v. Bridgestone/Firestone, Inc. | Duvall County, FL | 2000-04735-CA | X | X |
| Tropeano, Michelle v. Aaron and Douglas Pool Service, Inc. | Palm Beach County, FL | CL 00-5750 AF | X | |
| Tropepe, Rocco v. Peter Dancio | Palm Beach County, FL | CL-99-2711 AG | X | X |
| Underwood, David v. St. Cloud Hospital | Orange County, FL | CIO 98-10570 Div. 40 | X | X |
| Ure, Wanda Lynn v. BFI Waste Systems of North America, Inc. | Palm Beach County, FL | CL 98-006484 AI | X | |
| Usry, Kevin v. Alama Rent-a-Car, Inc. | Palm Beach County, FL | 98-101448 AH | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Valdivia, Arlee v. London Trust | Palm Beach County, FL | CL 99-10567 AO | X | |
| Varney, Bonnie S. v. Esprit Systems, Inc. | U. S. District Court Orlando, FL | 99-1066 Civ ORL 18C | X | |
| Varney, Deborah and Varney, Michael v. The Home Depot U.S.A., Inc. | Palm Beach County, FL | CA 02-010478 AF | X | |
| Veino, Tammy v. Central Florida Regional Hospital d/b/a Columbia Hospital, et al | Seminole County, FL | 00-CA-1280-09-P | X | |
| Vigdor, Lillian as personal representative of Estate of Phillip Vigdor v. Browning-Ferris Industries of Florida, Inc. | Palm Beach County, FL | CA 01-07681 AB | X | |
| Villanueva, Anna, as Personal Representative of the Estate of Raymundo Villanueva v. Jeffrey Fox, D.O., et al | Miami-Dade County, FL | 99-10671 CA 05 | X | |
| Villegas, Jose Fernando and Villegas, Magda v. The Hertz Corporation | Dade County, FL | 02-17664 CA 08 | X | |
| Waichulis, William L. and Sandra J. Waichulis v. Holiday Isle Resort and Marina, Inc. | Monroe County, FL | CAP-99-523 | X | |
| Wagstaff, Jr., James E. v. Nationwide Mutual Insurance Company | Palm Beach County, FL | CA 02011025 AE | X | |
| Walker, Clyde W.  v. Sandra Christofferson | Brevard County, FL | 98-10520-CA-F | X | |
| Walker, II, John Parry as personal representative of Estate of Beatrice Tirillo Walker v. James W. Smith, Jr., D.O., et al | Palm Beach County, FL | CL 0022-19 AD | X | |
| Watkins, Scott and Kathy Watkins v. U.S. Leader Construction Corp. | Seminole County, FL | 01-CA-1446-11-L | X | X |
| Watras, Victoria and Donnally, David K. v. Virginius A. Marks a/k/a V.A. Marks, M.D. | Palm Beach County, FL | 01-05300 AA | X | |
| Webb, Angela v. Brandon Kittendorf, et al. | Broward County, FL | 99-11516 CACE 05 | X | X |
| Webb, Lisa v. Baptist Hospital of Miami, Inc. | Dade County, FL | 98-05578 CA 32 | X | |
| Weber, Judith v. Lakewood Foods, Inc. | Broward County, FL | 00008497 14 | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|-------|--------------|----------|------------|-----------------|
| Weisberg, Sandra and Glenn Campbell v. Donald W. Onufer, M.D. | Indian River County, FL | 20-010256 CA 01 | X | |
| Weller, Addie E. as personal representative of estate of Danny Weller v. Michael Tasha | Palm Beach County, FL | CL-01-2007 AN | X | |
| Wellner, Floyd L. v. East Pasco Medical Center, Inc. | Pasco County, FL | 2000-4048 CA B | X | |
| Werntz, M.D., Joanne R. v. Royal MacKabees Life Insurance Companies | Orange County, FL | CI-099-6207 | X | |
| Whelan, John v. Hedrick Brothers Construction Company, Inc. | Palm Beach County, FL | CA 01-11799 AB | X | |
| White, Jennifer v. Suarez, Stevan E. and the School Board of Okeechobee County, FL | Okeechobee County, FL | 2000-CA 241 | X | |
| Whitman, Sandra v. American Home Products Corp. | Broward County, FL | 98-19277 (03) | X | |
| Wilder, Melissa v. Lawnwood Medical Center, Inc. | St. Lucie County, FL | 00-CA-000898 (MP) | X | X |
| Wilkinson, Helene v. University Medical Center, Inc. | Duvall County, FL | 98-06425-CA Div. CV-E | X | |
| Wilkinson v. University Medical Center | Palm Beach County, FL | 086034 | X | |
| Williams, Anthony v. Ace Security, Inc. and Todd David Chuha | Palm Beach County, FL | 99-6817 AF | | X |
| Williams, Charles R. and Dorothy L. Williams v. Tenet Healthsystem Hospitals, Inc., et al | Broward County, FL | 00018198 (13) | X | |
| Williams, Helenie v. Treasure Bay V.I. Corp. | St. Croix, Virgin Islands | 213-2002 | | X |
| Williams, Homer v. Paul Sobczak, et al. | U. S. District Court, Lake Charles, LA | CV 99-0372 | X | |
| Williams, Mercedes, Brenda Cook, and Bobby Cook v. James Dwyer | Broward County, FL | 01-006766 DA CE 13 | X | |
| Williams, Roger and Denise Williams v. Outdoor Maintenance Company and Antonio Dwayne Rogers | Indian River County, FL | 20010461–CA 10 | X | |
| Williams, Ronnie v. Octavio Prieto, M.D., et al. | Broward County, FL | 98-14858 (07) | X | |

| STYLE | JURISDICTION | CASE NO. | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|---|---|
| Williams, Jr., Roy D. v. Allied Health Care Products, Inc. | Broward County, FL | 99-0011250 CA DE 14 | X | |
| Wilson, Veronica Denise v. JRA Painting and Waterproofing Corp. | Broward County, FL | 01-01823508 | X | |
| Wladyka, Cory v. Galen Care, Inc. | Hillsborough County, Fl | 01-001456 | X | |
| Wolfe, Erin Michelle v. Erie Insurance Exchange, et al | Palm Beach County, FL | CA 02-4476 AE | X | |
| Womack, Joe as the guardian ad litem of Georgette Gomes v. HCA Health Services of Oklahoma, et al | Oklahoma City, OK | CJ-2001-6675 | | X |
| Wood v. International Lifestyles, Inc. | Fort Lauderdale, FL | 23600.0001 | X | |
| Wood, Susan v. Patricia Myers and Safeco Insurance Company of Illinois | Palm Beach County, FL | CL 98-006578 AB | X | |
| Woodsmith, Inc. v. Flexible Materials, Inc. | Broward County, FL | 98-001643 CA CE (02) | X | |
| Woodus, Sr., Robert v. Valuejet Airlines, Inc. | Dade County, Florida | 99-12264 AG 97-6068 CA 10 | X | X |
| Wright, Vicki R. v. Enterprise Leasing | Palm Beach County, FL | CL-00-5981 AO | X | X |
| Wuensch, Douglas v. Carnival Corporation | Dade County, FL | 98-2364 CA 05 | X | |
| Yablin, Arlene and David Yablin v. MDN Wharfside, Ltd. | Palm Beach County, FL | CA 01-7462 AB | X | |
| Young, Peter M. and Sandra Young v. James Michael Shamblin | Marshall, TX | 2-01CV171-DF | X | |
| Zamora, Saul and Lesbia Gonzalez Zalez v. Kelly's Foods, Inc. | Martin County, FL | 01-511-CA | X | |

# Exhibit "Z"

# BERNARD F. PETTINGILL JR., PH.D.
### CONSULTING ECONOMIST

#93 Sandbourne Lane ● PGA National ● Palm Beach Gardens, FL 33418
(561) 622-0330 ● (561) 346-7828 ● Fax (561) 624-2854
E-mail: biffpett@comcast.net
Website: www.bpettingill.com

## RETAINER AND FEE AGREEMENT

This agreement is entered into on (date):     August 30, 2017

By and between (attorney):     Robert L. Gardana

of (the firm):     Robert L . Gardana, PA     (Hereinafter, "Client")

and the firm of Bernard F. Pettingill, Jr. Ph.D, who (Hereinafter, "Expert Witness")
will serve as the consulting testifying expert. It is our policy that we are retained
solely by the attorney and their firm.

A.    **Purpose of Engagement**

I.    The Client has hired the Expert Witness to provide advice, reports and possibly
testimony as necessary in the matter of (case name):
Case 1:17-cv-21537-FAM Broberg v. Carnival Corporation    (Hereinafter, "Matter")

II.   The Expert Witness will provide review, advice, conferences, reports and
testimony (as needed) up to and including the trial in this matter.

III.  The Client agrees to pay the Expert Witness for his services and the services of all
associates under his direction, and to pay for all authorized expenses incurred. As
noted below, fees due to the Expert Witness shall be paid by the Client before a
signed copy of the Expert Report is provided and prior to any scheduled testimony.
The Client agrees to cooperate fully with the Expert Witness and to provide all
information which may aid the Expert Witness in advising and/or testifying in this
matter.

IV.   The Client or the Expert Witness may terminate this retainer agreement at any time via
written notice to the other party. Any unpaid monies owed to Bernard F. Pettingill, Jr.,
Ph.D. will be due immediately. The Client agrees to waive any claims for damages
against Bernard F. Pettingill, Jr., Ph.D., if we disengage from the Matter for any reason
including, but not limited to, any request to compromise our ethical standards, any
misrepresentation or failure to disclose material facts, or any failure on the Client's part
to pay the invoices in a timely manner.

1

**B.**     <u>Expert Witness Fees and Travel Fees & Expenses</u>

     I.    The Client and Expert Witness agree that the following method is to be used for determining the proper amount of Expert Witness Fees. The fees quoted below on this matter will be good for one year from the date that this agreement is signed by the Client.

     II.    It is our firm policy that the Expert Witness is not retained and will not begin work on this Matter until a copy of this Agreement signed by the Client, along with a non-refundable retainer fee of payment to Bernard F. Pettingill, Jr., Ph.D. in the amount of $1,500 USD (the retainer) are both received. The Client agrees that time expended by the Expert Witness and the professional services of associates under his direction and control in the Matter is the primary basis for determining the total fees to be paid to the Expert Witness. Expert Witness fees are charged at the rate of $375.00 per hour for preparation, consulting, drafting an expert report, preparation for testimony, and testimonial work. For trial testimony, depositions, or mediation/ arbitration hearings, the Expert Witness fees are charged at $1,500.00 for a maximum of four hours and at $3,000 for a maximum of eight hours. Travel is billed hourly, portal to portal. Payment for testimony, deposition, or mediation/ arbitration hearing is requested at the time of scheduling and must be received no later than 2 weeks before the scheduled testimony, deposition, or mediation/ arbitration hearing. Additional travel expenses will be charged as incurred. If travel is necessary, please contact our office directly to make travel arrangements. There is a $500 minimum cancelation fee if the testimony, deposition, or mediation/ arbitration hearing is cancelled 48 hours or less before the scheduled testimony date.

**C.**     <u>Out of Pocket Expenses</u>

     I.    The Client acknowledges that the Expert Witness may incur various expenses in the course and scope of providing services to the Client and agrees to reimburse the Expert Witness for all reasonable out-of-pocket expenses. Out of pocket expenses include, but are not limited to, travel and lodging expenses, photocopying, postage, books, journals, computer research, or additional research data.

**D.**     <u>Billing, Payment of Fees, and Report Updates</u>

     I.    The Client agrees that all invoices are immediately due and payable. The Client and Expert Witness agree that the billing and payment of Fees, Charges, and Expenses to the Client in this Matter shall be as follows: All fees, charges, and expenses shall be due within 30 days of billing. The final amount of fees, charges, and expenses will first be billed against the retainer. Any outstanding fees, charges, and expenses are to be paid prior to any testimony. There is a 1.5% monthly charge on any outstanding balance due after 60 days. The expert reserves the right to stop all work on the case, if the account is not kept current. Furthermore, all attorney's fees and costs incurred by Bernard F. Pettingill, Jr., Ph.D. necessitated by failure to pay fees and costs will be the responsibility of the Client.

     II.    Under no circumstances is our firm name or the name of any of our testifying

2

expert associates to be used or listed for any litigation purposes without prior notification and written approval by Bernard F. Pettingill, Jr., Ph.D.

III.  We base our analyses on available data, research and professional expertise, experience & judgment. Since economic, market, and business cycle conditions change, data can prove incomplete or outdated. The Client agrees that we reserve the right to update our reports when needed as appropriate to the variables. The updates to our report will be billed at our hourly rate of $375.00 per hour.

IV.  This contract limits our liability under all circumstances to the total amount of professional fees in any engagement.

V.  The attorney agrees to notify the Expert Witness in advance of a Frye/ Daubert Hearing to exclude expert report or testimony, to discuss the issues with Bernard F. Pettingill, Jr., Ph.D., and to have the Expert Witness appear at the hearing if possible. The Expert Witness retains the right to defend all work in any Frye/ Daubert Hearing or similar motions to exclude the economic report and/ or testimony relating to this matter, and to bill the Client for the Expert's time at $375.00 per hour.

VI.  Bernard F. Pettingill, Jr., Ph.D. is under no obligation to store or retain documents related to this case once their involvement in concluded. Please notify us when the case is closed or otherwise settled and we will send our case file to you for a fee of $25 if requested or destroy the file. There will be a minimal storage fee for documents beginning one year after the date of settlement. Otherwise, all documents will be shredded.

VII.  This is the entire Agreement between the Client and the Expert Witness regarding this matter and the fees, charges, and expenses to be paid. This Agreement shall not be modified except by written consent signed by both the Client and the Expert Witness. This Agreement shall be binding upon the Client and the Expert Witness and their respective heirs, executors, legal representatives, and successors.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date and year written above.

Bernard Pettingill, Jr.
_____

**EXPERT WITNESS – Bernard F. Pettingill, Jr., Ph.D.**

_____

**CLIENT** - Robert L. Gardana

- **Please return the signed retainer agreement via email to** biffpett@comcast.net or by mail.
- **Please pay the retainer fee via our website** www.bpettingill.com or by check.

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
BERNARD   PETTINGILL

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

- [✓] Individual/sole proprietor or single-member LLC
- [ ] C Corporation
- [ ] S Corporation
- [ ] Partnership
- [ ] Trust/estate
- [ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

  Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
- [ ] Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)
93 SANDBOURNE LANE

**6** City, state, and ZIP code
PALM BEACH GARDENS, FL. 33418

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I**   **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| 4 | 3 | 9 | – | 7 | 2 | – | | | |

or

Employer identification number

| | – | | | | | | |

---

**Part II**   **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶ *Bernard Pettingill*   Date ▶

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X                     Form **W-9** (Rev. 12-2014)